# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**ROLANDO PENATE,**

      Plaintiff

    **v.**

**ANNE KACZMAREK, KRIS FOSTER, RANDALL RAVITZ, JOSEPH BALLOU, ROBERT IRWIN, RANDY THOMAS, SONJA FARAK, SHARON SALEM, JAMES HANCHETT, JULIE NASSIF, LINDA HAN, ESTATE OF KEVIN BURNHAM, STEVEN KENT, JOHN WADLEGGER, GREGG BIGDA, EDWARD KALISH, and CITY OF SPRINGFIELD**

      Defendants

**CIVIL ACTION NO.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

This is a case about government corruption. It features constitutional violations perpetrated by officials at the Department of Public Health, Massachusetts State Police, Attorney General's Office, and Springfield Police Department. Revelations regarding this misconduct ultimately resulted in the dismissal of Rolando Penate's criminal conviction for Distribution of a Class A Substance but not before he spent five years, seven months, and twelve days in confinement. Mr. Penate now brings this complaint seeking compensation for the harms he suffered as a result of multiple, overlapping conspiracies to suppress highly exculpatory evidence.

## PARTIES

1.   Plaintiff ROLANDO PENATE of Springfield is a natural person and was a resident of the State of Massachusetts and the United States of America at all times referred to in this complaint.

2.   Defendant ANNE KACZMAREK is a natural person and resident of the Commonwealth of Massachusetts.  From 2005 until July 2014, she was employed as an Assistant Attorney General (AAG) by the Attorney General's Office (AGO).  KACZMAREK is being sued in her individual capacity.

3.   Defendant KRIS FOSTER is a natural person and resident of the Commonwealth of Massachusetts.  From July 2013 until February 2015, she was employed as an AAG by the AGO.  FOSTER is being sued in her individual capacity.

4.   Defendant RANDALL RAVITZ is a natural person and resident of the Commonwealth of Massachusetts.  He is, and was at all times relevant herein, employed as an AAG by the AGO.  RAVITZ is being sued in his individual capacity.

5.   Defendant JOSEPH BALLOU is a natural person and resident of the Commonwealth of Massachusetts.  He is, and was at all times relevant herein, employed as a Massachusetts State Police (MSP) Sergeant and assigned to the AGO.  BALLOU is being sued in his individual capacity.

6.   Defendant ROBERT IRWIN is a natural person and resident of the Commonwealth of Massachusetts.  He is, and was at all times relevant herein, employed as a MSP Lieutenant and/or Captain and assigned to the AGO.  IRWIN is being sued in his individual capacity.

7.    Defendant RANDY THOMAS is a natural person and resident of the Commonwealth of Massachusetts.  He is, and was at all times relevant herein, employed as a MSP Trooper and assigned to the AGO.  THOMAS is being sued in his individual capacity.

8.    Defendant SONJA FARAK is a natural person and resident of the Commonwealth of Massachusetts.  From July 2003 until April 2013, she was employed as a chemist by the Massachusetts Department of Public Health (DPH) and MSP.  FARAK is being sued in her individual capacity.

9.    Defendant SHARON SALEM is a natural person and resident of the Commonwealth of Massachusetts.  She was, at all times relevant herein, employed as a chemist by the DPH and MSP.  SALEM is being sued in her individual capacity.

10.   Defendant JAMES HANCHETT is a natural person and resident of the Commonwealth of Massachusetts.  He was, at all times relevant herein, employed as a chemist by the DPH and MSP.  HANCHETT is being sued in his individual capacity.

11.   Defendant JULIE NASSIF is a natural person and resident of the State of New Hampshire.  From 2006 until 2012, she was employed as DPH's Director of the Division of Analytical Chemistry.  NASSIF is being sued in her individual capacity.

12.   Defendant LINDA HAN is a natural person and resident of the Commonwealth of Massachusetts.  From 2009 until 2012, she was employed as the Director of DPH's Bureau of Laboratory Sciences.  HAN is being sued in her individual capacity.

13.   KEVIN BURNHAM was a natural person and resident of the Commonwealth of Massachusetts.  From 1971 to July 2014, he was employed by the City of Springfield as an officer in the Springfield Police Department (SPD).  BURNHAM died on June 5,

2017.  Defendant ESTATE OF KEVIN BURHAM is being sued for actions taken by BURNHAM in his official and individual capacity.

14.  Defendant STEVEN KENT is a natural person and resident of the Commonwealth of Massachusetts.  He is, and was at all times relevant herein, employed by the City of Springfield as an officer in the Springfield Police Department (SPD).  KENT is being sued in his official and individual capacity.

15.  Defendant JOHN WADLEGGER is a natural person and resident of the Commonwealth of Massachusetts.  He is, and was at all times relevant herein, employed by the City of Springfield as an officer in the SPD.  WADLEGGER is being sued in his official and individual capacity.

16.  Defendant GREGG BIGDA is a natural person and resident of the Commonwealth of Massachusetts.  He is, and was at all times relevant herein, employed by the City of Springfield as an officer in the SPD.  BIGDA is being sued in his official and individual capacity.

17.  Defendant EDWARD KALISH is a natural person and resident of the Commonwealth of Massachusetts.  He is, and was at all times relevant herein, employed by the City of Springfield as an officer in the SPD.  KALISH is being sued in his official and individual capacity.

18.  Defendant CITY OF SPRINGFIELD is a municipal corporation located within Hampden County, the Commonwealth of Massachusetts and the United States of America with principal offices at 36 Court Street, Springfield, Massachusetts.

19.  At all times referred to in this complaint, the individual DEFENDANTS were acting under color of state law.

JURISDICTION

20.     Plaintiff's action for violation of rights guaranteed by the Fifth and Fourteenth

        Amendments to the United States Constitution is brought pursuant to the provisions of 42

        U.S.C. § 1983.

21.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 (federal question) and 1343

        (civil rights).

VENUE

22.     This action is properly brought in the Western Division of the United States District

        Court for the District of Massachusetts under 28 U.S.C. §§ 1391(b)(1) and (2) because

        the events at issue in the case arose and transpired in the Western Division of the District

        of Massachusetts.

FACTUAL ALLEGATIONS

A.      *Drug Labs Situated Within DPH*

23.     In the 1960s, DPH began operating the Amherst Drug Lab in the Morrill Science

        Building on the campus of the University of Massachusetts.

24.     The Amherst lab served as satellite facility for the main DPH drug lab located at the

        William A. Hinton State Laboratory Institute in Jamaica Plain (Hinton Drug Lab).

25.     DPH treated its two drug labs differently from its other laboratories, and many drug lab

        employees felt neglected by DPH management.

26.     While situated under DPH, the Amherst and Hinton Drug Labs remained underfunded,

        understaffed and unable to adequately fulfill their mission of delivering free-of-charge

        forensic analysis of samples submitted by law enforcement agencies.

27. To determine whether a given sample contained a controlled substance, analysts at both labs were required to perform a series of preliminary tests to establish a presumptive identification, then prepare a small portion of the unknown substance for secondary or confirmatory testing.

28. The second phase of testing typically utilized a Gas Chromatographer/Mass Spectrometer (GC/MS) – a sophisticated instrument with high discriminatory power.

29. Analysts were supposed to use this device to compare the retention times and spectra for unknown substances with the retention times and spectra for known standards.

30. Each month, supervisors at the two drug labs produced spreadsheets tracking the number of samples each analyst purported to test.

31. These numbers played an important role in measuring a chemist's productivity.

32. Personnel at both drug labs felt constant pressure from law enforcement clients to decrease the turnaround-time for drug certifications.

33. With budget restrictions generating significant back-logs, supervisors at the two labs welcomed any chemist's drive to test samples.

B.   *The Deplorable Condition of the Amherst Drug Lab*

34. In 2002, a team from the National Forensic Science Technology Center (NFSTC) visited the Amherst Drug Lab to evaluate the lab's policies and procedures.

35. NFSTC expressed concern over the lab's lack of formal quality systems consistent with standards set by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board (ASCLD/LAB) or recommendations from the Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG).

36. NFSTC urged the Amherst lab to develop quality assurance safeguards, such as written protocols for the analysis of substances, peer reviews of reports, and a proficiency testing program.

37. NFSTC warned that although the absence of such protocols had not produced "a knowledgeable effect on the outcome of chemical analysis as of yet, in the future reducing quality might jeopardize correct, error-free results."

38. DPH officials made no effort to adopt any NFSTC recommendations.

39. In 2006, DPH created the Division of Analytical Chemistry and made NASSIF its first Director.

40. NASSIF had previously been in charge of the Childhood Lead Screening Lab, the Chemical Terrorism Response Lab, and the Environmental Chemistry Lab.

41. The new position added the Hinton and Amherst Drug Labs to the list of labs she was responsible for supervising.

42. NASSIF had no academic or work experience in forensic chemistry and exhibited little interest in learning about how the drug labs functioned.

43. Once she took on this new responsibility, NASSIF developed a reputation for cancelling the few meetings she scheduled with drug lab supervisors.

44. Perceived by Hinton chemists as disinterested and unresponsive, NASSIF conducted herself in a way that suggested that the Hinton Drug Lab was not a priority for her.

45. Amherst chemists were in no position to form perceptions of NASSIF; she almost never went to the Amherst Drug Lab, and Amherst analysts were rarely summonsed to Boston to meet with her.

46.    Prior to NASSIF's arrival, supervisors at both drug labs regularly evaluated their subordinates under the Human Resources Division Employee Performance Review System (EPRS).

47.    These evaluations were required in all state agencies and as part of the chemists' collective bargaining agreement and assisted supervisors in making decisions regarding: salary and step increases, employee development needs, promotions, transfers, discipline and other personnel matters.

48.    Once NASSIF became Director, the practice of completing EPRS evaluations ceased.

49.    In the realm of laboratories, Quality Control (QC) is a reactive process designed to uncover instances where quality is lacking; Quality Assurance (QA) refers to a set of proactive policies aimed at preventing problems before they emerge.

50.    Until 2007, each DPH lab NASSIF supervised was required to participate in a group responsible for overseeing its QC and QA protocols.

51.    One function of this QC/QA Group was to ensure that all the DPH laboratories complied with their respective accrediting bodies' requirements and the recommendations from periodic audit findings.

52.    Because DPH drug labs were not accredited and did not undergo routine audits, the QC/QA Group had difficulty structuring a suitable quality control plan.

53.    All the Group could do was ask drug lab supervisors to produce their quality control records on a monthly basis.

54.    Following its review of these documents, the QC/QA Group would discuss defects and propose changes.

55.    No representative from the Amherst Drug Lab was required to attend these meetings.

56. At some point in 2007, budget restraints forced the dissolution of the QC/QA Group, and NASSIF assumed responsibility for QC and QA at the two drug labs.

57. Performing this task was not a priority for her.

58. HAN became the Director of the Bureau of Laboratory Sciences (BLS) in 2009.

59. As Director, HAN oversaw the eighteen distinct laboratories making up the BLS, including the two drug labs.

60. Like NASSIF, HAN had little relevant background to qualify her to oversee a forensic drug lab.

61. HAN's interactions with Hinton Drug Lab employees were typically limited to occasions when she gave tours of their lab to state officials.

62. HAN rarely, if ever, went to Amherst.

63. One thing NASSIF and HAN did monitor closely was the Amherst Drug Lab's budget; they pushed back against the acquisition of essential supplies like paper, chemicals, and consumables – including gloves, beakers, glassware, and the plastic bags chemists used to package samples.

64. NASSIF and HAN also denied requests for new equipment and the replacement of older instruments, cancelled subscriptions to resource periodicals, deprived analysts of opportunities for continuing education, and ensured the Amherst Drug Lab remained in a deplorable condition.

C.    *The Beginning of FARAK's Criminal Activity*

65. HANCHETT started working at the Amherst Drug Lab in 1977.

66. When he became the lab Supervisor in 2008, HANCHETT took a *laissez faire* approach to lab management.

67.   HANCHETT felt his subordinates did not really need a lot of oversight.

68.   In his view, they were trusted employees, and he harbored no doubts they were doing

their jobs properly.

69.   HANCHETT did not: (i) "retest" samples to ensure the accuracy of analysts' results; (ii)

observe analysts during the testing process; (iii) conduct evidence audits; (iv) review

analysts' notebooks; or (v) initiate any day-to-day dialogue about lab procedures.

70.   As FARAK herself would later acknowledge, there was "basically . . . no oversight in the

Amherst lab."

71.   Nor were there appropriate safeguards to protect the integrity of evidence.

72.   Each of HANCHETT's subordinates had unrestricted access to the entire the lab, even by

themselves over the weekend.

73.   Amherst analysts also had access to the lab's primary standards.

74.   These substances were kept under lock and key in Hinton, but as many as fifty such

standards were stored in an Amherst refrigerator that could not be locked.

75.   The biggest item in this unsecured refrigerator was a brown, opaque bottle of

methamphetamine oil.

76.   Methamphetamine is an extremely addictive stimulant that affects the central nervous

system by releasing dopamine rapidly in reward regions of the brain thereby producing

the euphoric rush or flash that many users experience.

77.   According to the National Institute on Drug Abuse,

> People who use methamphetamine long-term may experience anxiety,
> confusion, insomnia, and mood disturbances and display violent behavior.
> They may also show symptoms of psychosis, such as paranoia, visual and
> auditory hallucinations, and delusions (for example, the sensation of insects
> crawling under the skin) . . . Long-term methamphetamine use has many
> negative consequences for physical health, including . . . skin sores . . . [,]

10

[which] are the result of picking and scratching the skin to get rid of insects imagined to be crawling under it.

78. In studies of chronic methamphetamine users, severe structural and functional changes have been found in areas of the brain associated with emotion and memory.

79. These changes are the cause of psychotic symptoms, which can sometimes last for a decade after a person has quit abusing the drug.

80. As for its impact on cognitive performance, studies show that methamphetamine users lack the ability to focus on the task at hand and to ignore information that is irrelevant to it.

81. Deficits have also been detected in the capacity of users to combine information in new ways and make inferences from new combinations of information.

82. In 2004, FARAK began stealing and using the lab's supply of methamphetamine oil.

83. On a near daily basis, she would open the bottle of methamphetamine, use a pipette to transfer a milliliter of liquid into a small vial, then seal the bottle back up and return it to the refrigerator.

84. Once FARAK completed this process, she would keep the vial in her pocket, desk drawer or lab bench drawer until the time came to ingest the drug with a soda or during a bathroom break.

85. Shortly after HANCHETT became the lab supervisor, FARAK overheard him complaining about an audit he had to conduct.

86. FARAK knew this task would cause HANCHETT to encounter the methamphetamine oil and discover the level had gone down dramatically because of what she had consumed.

87. In her haste, FARAK added water to the bottle.

88. As it turned out, the methamphetamine oil and water did not mix very well.

89. Faced with this clear evidence of tampering, HANCHETT surmised that the drug was just degrading.

90. Ever conscious of his budget, HANCHETT siphoned off the oil and put it in a very tiny vial for future casework.

91. As a result of this close call, FARAK stopped using methamphetamine and started stealing and abusing other lab standards – including amphetamine, phentermine, ketamine, cocaine, ecstasy, marijuana, and LSD.

92. FARAK also soon began tampering with police submissions that tested positive for the presence of her drugs of choice.

D.    *Amherst's Inflated Output*

93. In the fall of 2009, DPH began receiving funds, as an MSP sub-recipient, from the National Institute of Justice's Paul Coverdell National Forensic Science Improvement Grant (Coverdell grant).

94. DPH came to depend upon this money.

95. In fact, when the MSP notified NASSIF in April 2011, that it planned to eliminate the Coverdell grant allocation, she responded that DPH could not absorb the loss of the Coverdell grant without a significant impact on the delivery of drug-testing services.

96. NASSIF's superiors eventually persuaded the MSP to continue the grant allocation to DPH and reduce it by 18%.

97. On or about May 2, 2011, NASSIF sent an email to all DPH Drug Lab employees.

98. Her stated purpose was to schedule monthly drug lab meetings in preparation for accreditation.

99. The correspondence contained this note to HANCHETT: "Jim – you are always invited, please come when it works for your schedule. I know it's not feasible to clear out the entire Amherst lab so I will plan on an Amherst meeting quarterly."

100. As it turned out, NASSIF took no significant steps toward initiating the process for accreditation at Hinton and soon began formulating other plans for Amherst.

101. Each month, HANCHETT would drive to the parent laboratory to provide NASSIF with monthly reports featuring accounts of how many samples Amherst had analyzed.

102. In an effort to help reduce Hinton's backlog, HANCHETT would bring 200-300 samples back to the Amherst lab, which he and his staff would analyze usually on overtime.

103. Amherst numbers tended to decrease towards the end of each fiscal year due to the exhaustion of funds that could be allocated for overtime.

104. At the start of fiscal year 2012, NASSIF cherry-picked Amherst testing figures for the previous quarter and placed them in a chart she passed up the DPH chain of command.

105. NASSIF used these numbers to make the case for eliminating the Amherst Drug Lab.

106. HANCHETT responded by noting the three analysts at his lab reported testing 6,156 samples in FY2011, an average of 2,052 samples/analyst.

107. During this same fiscal year, sixteen Hinton Drug Lab analysts reported testing 17,683 samples, an average of 1,105 samples/analyst.

108. NASSIF and HAN knew, or should have known, the volume of samples Amherst analysts reportedly tested was excessive and reflected serious departures from forensically acceptable practices.

109. On October 5, 2011, state legislators approved a supplemental budget with the bare minimum of funds needed to keep the Amherst Drug Lab open.

E.    *The SPD Investigation and Submission of Substances to the Amherst Drug Lab*

110. On October 21, 2011, SPD undercover officer Edwin Hernandez (Hernandez) went to 57 Johnson Street for the purpose of purchasing heroin.

111. On that date, he purportedly gave Plaintiff $20 in exchange for two glassine packets containing a brownish substance Hernandez believed to be heroin.

112. That night when he returned to the Springfield police station, Hernandez placed the glassine packets he acquired in a manila envelope and deposited it through a slot in the door on the evidence room.

113. BURNHAM, acting in his capacity as SPD Narcotics Evidence Officer, took custody of the packets the next morning.

114. On October 25, 2011, BURNHAM transported the fruits of two dozen separate drug investigations to the Amherst Drug Lab for chemical analysis.

115. Among the items BURNHAM brought with him were the two glassine packets Hernandez allegedly purchased from Plaintiff on October 21, 2011.

116. On November 9, 2011, Hernandez returned to 57 Johnson Street and allegedly made a second purchase of a substance purported to be heroin.

117. Two days later, on November 11, 2011, WADLEGGER applied for and obtained a warrant to search 57 Johnson Street.

118. On November 15, 2011, Plaintiff allegedly made a third sale to Hernandez of a substance purported to be heroin.

119. Later that day, officers executed the search warrant.

120. During the course of this search, officers purportedly found packets of heroin and cocaine, as well as an inoperable firearm and ammunition.

14

121. Plaintiff was present at 57 Johnson Street during this search and was one of the five individuals arrested.

122. Plaintiff did not physically possess any contraband.

123. In a police report he completed later that night, WADLEGGER claimed Plaintiff had cash in the amount of $386 at the time of his arrest.

124. According to arrest reports, officers seized an additional $1,958 in cash from two other female suspects.

125. On November 16, 2011, Plaintiff was arraigned in Springfield District Court and pled not guilty.

126. Unable to post the $50,000 bail, Plaintiff was transported from court to the Hampden County Correctional Center in Ludlow.

127. That same day, BURNHAM returned to the Amherst Drug Lab with the substances Plaintiff allegedly sold to Hernandez on November 9, 2011, and November 15, 2011, as well as the substances officers seized during the execution of the warrant.

128. DPH protocols required evidence custodians like BURNHAM to heat seal packets of suspected narcotics prior to submitting them.

129. BURNHAM did not adhere to this policy.

130. It was his practice to bring unsealed packets to the Amherst Drug Lab and use the lab's heat sealer in the process of transferring custody of suspected narcotics to lab staff.

131. FARAK would later testify it was her practice to partially disable the lab's heat sealer in anticipation of BURNHAM's visits.

132. FARAK undertook this activity in furtherance of her longstanding scheme to steal and use narcotics at the Amherst Drug Lab.

133.  SALEM knew, or should have known, BURNHAM's transportation of unsealed
      substances increased the likelihood of cross-contamination.

134.  SALEM also knew, or should have known, BURNHAM's practice of sealing samples on-
      site resulted in samples with insufficient seal strength to prevent tampering.

F.    *FARAK's Drug Abuse During the Testing Process*

135.  HANCHETT and SALEM assigned FARAK to test all the samples Plaintiff was charged
      with distributing and possessing with the intent to distribute.

136.  The batches containing these samples also happened to contain white chunks believed by
      the SPD to be crack cocaine.

137.  FARAK did not receive these assignments by chance.

138.  By the end of 2011, FARAK was smoking crack at the lab 10-12 times a day.

139.  Feeding her addiction caused FARAK to become very in tune with pieces of evidence
      that were in the pipeline.

140.  If an upcoming batch did not appear to contain crack, FARAK would delay returning a
      batch of samples she had tested in order to avoid such an assignment.

141.  SALEM, the evidence officer in charge of making the vast majority of assignments, knew
      or should have known FARAK was manipulating the system in order get pieces of
      evidence she wanted to analyze.

142.  FARAK purportedly tested the samples giving rise to Plaintiff's charges on three
      different dates: December 22, 2011, January 6, 2012, and January 9, 2012.

143.  Each test she performed in Plaintiff's case purportedly came back positive for the
      presence of a controlled substance.

144. At the same time FARAK was entrusted with samples in Plaintiff's case, she was receiving treatment for her drug addiction from clinicians at ServiceNet, Inc. (ServiceNet).

145. During the seven-day period from Tuesday, December 20 to Monday, December 26, 2011, FARAK completed a ServiceNet Diary Card.

146. On Thursday, December 22, 2011 – the same day she reported testing a sample in Plaintiff's case – FARAK memorialized her use of narcotics at the Amherst Drug Lab by making the following entry on her Diary Card: "tried to resist using @ work but ended up failing."

147. At some point after December 26, 2011, FARAK placed the completed Diary Card in the trunk of her automobile.

148. On Monday, January 9, 2012 – another day she reported testing samples in Plaintiff's case – FARAK spent the morning smoking crack in various bathrooms inside the Morrill Science Building.

149. At some point before lunch, she discovered a police submission of tablets suspected of containing LSD.

150. Once FARAK confirmed the presence of this drug, she pilfered some of the LSD and ingested it.

151. This caused FARAK to spend the remainder of her work day hallucinating.

G.  *Plaintiff's Indictment and Arraignment*

152. On January 11, 2012, Burnham retrieved a batch of samples from the Amherst Drug Lab.

153. This batch purportedly included the same substances Plaintiff was charged with distributing or possessing which FARAK handled while under the influence of powerful psychotropic drugs.

154. One of SALEM's duties as evidence officer was to ensure that all samples leaving the lab were contained in heat-sealed plastic bags to eliminate the possibility of cross-contamination.

155. Upon information and belief, not all of the samples BURNHAM retrieved from the Amherst Drug Lab were in this condition.

156. Upon information and belief, not all of the samples BURNHAM retrieved matched the descriptions of the evidence as documented on the SPD evidence tags.

157. In addition, one of the samples Plaintiff was charged with distributing contained an empty packet with the word, "MOONWALK," on it.

158. Upon information and belief, this packet was not included with the samples BURNHAM submitted on October 25 or November 16, 2011.

159. Upon information and belief, FARAK mishandled samples in her custody while under the influence of illegal narcotics and returned items to BURNHAM Plaintiff was not charged with distributing or possessing.

160. On February 1, 2012, the Hampden County District Attorney's office presented its case against Plaintiff to a Grand Jury.

161. During this proceeding, a prosecutor introduced as exhibits copies of drug certificates FARAK signed on days when she abused narcotics at the Amherst Drug Lab.

162. Unaware of FARAK's malfeasance, grand jurors returned an indictment against Plaintiff charging him with: possessing Class A and Class B substances with the intent to

distribute as a second offender (Counts 1 and 3); three counts of distributing a Class A

substance as a second offender (Counts 5, 7, and 9); five school zone violations (Counts

2, 4, 6, 8, and 10); possessing a firearm without a valid FID card (Count 11); possessing

ammunition without a valid FID card (Count 12); and possessing a firearm during the

commission of a felony (Count 13).

163.   Plaintiff pled not guilty to these charges at his Superior Court arraignment on February

10, 2012.

164.   After bail was once again set in the amount of $50,000, Plaintiff returned to the Hampden

County Correctional Center.

H.       *The End of HAN and NASSIF's DPH Employment*

165.   The MSP assumed control over operations at the Amherst Drug Lab from DPH on July 1,

2012.

166.   On August 8, 2012, Plaintiff, through counsel, filed a motion to compel the production of

evidence in the possession of the Amherst Drug Lab.

167.   This motion was allowed, in part, following a hearing on August 30, 2012.

168.   That same day, Governor Deval Patrick ordered the closure of the Hinton Drug Lab

based on the misconduct of former chemist Annie Dookhan (Dookhan).

169.   Once it became clear Dookhan's misdeeds would not have been possible but for the

deliberate indifference of DPH supervisors, personnel changes were instituted.

170.   HAN resigned on September 11, 2012, and NASSIF was fired the next day.

I.       *Withholding Evidence of Criminal Activity and Misrepresenting Lab Practices*

171.   Shortly after Dookhan's misconduct came to light, HANCHETT did an inventory of lab

standards and discovered many were missing or much lower than they should have been.

172. These standards were gone because FARAK had consumed them.

173. HANCHETT immediately spoke with SALEM and raised the possibility of wrongdoing.

174. As the holder of a federal license, HANCHETT had an obligation to make a report of any missing narcotics at his lab.

175. HANCHETT made no such report.

176. During a "Quality Assurance Audit" on October 10, 2012, MSP auditors discovered a number of serious discrepancies between the procedures employed at the Amherst Drug Lab and those utilized at accredited laboratories.

177. On November 18, 2012, FARAK responded to Plaintiff's motion to compel by furnishing a "Chemist Discovery Packet."

178. FARAK conceded the Amherst Drug Lab was "not accredited at this time" but falsely claimed: "All of our testing procedures performed are the same as in any accredited Drug Analysis Laboratory."

179. This statement was consistent with a policy endorsed by HANCHETT and SALEM of withholding exculpatory evidence concerning deficiencies at the Amherst Drug Lab.

180. By the end of 2012, FARAK had begun stealing large quantities of powder cocaine from police submissions and using lab equipment to manufacture crack.

181. This process involved dissolving the powder cocaine in water, adding baking soda, heating it up, and letting it precipitate out.

182. FARAK would then form the crack, filter it through a funnel, and let it dry for her use.

183. All of this took place at the Amherst Drug Lab.

184. During the first week of 2013, FARAK made a batch of crack at the lab and was drying it in a drawer.

185. In the midst of rushing to get back home, FARAK collected all the crack but left a beaker that had some liquid and some white residue on the edge in the drawer.

186. HANCHETT found the beaker and confronted FARAK.

187. When FARAK feigned ignorance, HANCHETT decided another coworker must have brought her daughter to the lab and did a science experiment involving the beaker.

J.    *The Beginning of the FARAK Criminal Investigation*

188. On Friday morning, January 18, 2013, SALEM advised HANCHETT that two cocaine samples assigned to FARAK were not in the main evidence room where they were supposed to be.

189. During a subsequent search for the samples, they discovered a manila envelope containing the packaging for the two missing samples, which had been cut open.

190. This time, HANCHETT contacted the MSP.

191. MSP Investigators found two additional case envelopes in a temporary storage locker used by FARAK.

192. Meanwhile, FARAK spent that morning at the Hampden County Hall of Justice waiting to be called as a witness.

193. During the midday recess, FARAK went to her car in the parking garage where she ate lunch and smoked crack.

194. FARAK then returned to the courthouse and was just about to take the witness stand when MSP investigators asked to speak with her.

195. During this interview, FARAK denied any wrongdoing.

196. At its conclusion, investigators impounded her vehicle and towed it back to the MSP barracks in Northampton.

197. That evening, BALLOU and THOMAS began drafting an application for a warrant to search FARAK's car.

198. In the early morning hours of January 19, 2013, a clerk issued the warrant.

K.     *The Search of FARAK's Car and Discovery of the ServiceNet Diary Card*

199. BALLOU, THOMAS, and IRWIN began searching the car at 3:23 am.

200. During this search, IRWIN communicated with John Verner, the Chief of the AGO's Criminal Bureau.

201. BALLOU, THOMAS, and IRWIN seized approximately 300 pages of paper, including the aforementioned ServiceNet Diary Card, memorializing FARAK's use of narcotics at the Amherst Drug Lab on December 22, 2011.

202. BALLOU took these papers and other evidence to the AGO's Springfield office.

203. Days later, during a more thorough review of FARAK's papers, BALLOU discovered the aforementioned ServiceNet Diary Card, along with dozens of other documents related to FARAK's treatment for a drug addiction.

204. BALLOU brought this documentation to the attention of Verner, IRWIN, THOMAS, and KACZMAREK, the AAG in the AGO's Enterprise and Major Crimes Unit assigned to prosecute FARAK.

L.     *The Mischaracterization of Mental Health Worksheets as "Assorted Lab Paperwork"*

205. During an email exchange on the morning of January 23, 2013, Verner suggested BALLOU disclose the seizure of these "personal papers" from FARAK's car in an affidavit BALLOU was drafting in support of an application for a warrant to search a tote bag found at FARAK's work station.

206. BALLOU did not incorporate Verner's suggestion; the affidavit he eventually submitted made no mention of the ServiceNet Diary Card or other mental health worksheets.

207. This was not an oversight but reflected a collective decision on the part of KACZMAREK, IRWIN, BALLOU, and THOMAS to deny the existence of this highly probative evidence.

208. On the afternoon of January 23, 2013, THOMAS filed a return for the warrant to search FARAK's vehicle.

209. THOMAS swore the inventory he provided was "a true and detailed account of all the property taken by me on this search warrant."

210. In this return, THOMAS deliberately misrepresented the ServiceNet Diary Card and other mental health worksheets as "assorted lab paperwork."

211. THOMAS made the same misrepresentation in a police report he submitted the next day.

M.  *Artificially Limiting the Scope of the FARAK Investigation*

212. FARAK was arraigned in Belchertown District Court on January 22, 2013.

213. The following day, BALLOU sent an email to KACZMAREK, IRWIN, and Verner about a report BALLOU received from a Hampden County ADA regarding a case where FARAK appeared to tamper with oxycodone pills seized by BIGDA and submitted by BURNHAM.

214. When BALLOU met with this ADA on January 24, 2013, she told him about a colleague who had a FARAK cocaine case that was light by four grams.

215. After speaking to this second ADA, BALLOU sent an email informing KACZMAREK that FARAK had performed the analysis in 2005.

216. In response, KACZMAREK wrote: "Please don't let this get more complicated than we thought.  If she were suffering from back injury- maybe she took some oxys?"

217. KACZMAREK would later characterize this email as a "plea to God" to spare her team from "an avalanche of work."

218. Prior to receiving KACZMAREK's plea, BALLOU had been told to "document everything."

219. After receiving KACZMAREK's plea, BALLOU did not write a police report documenting any concern about a 2005 cocaine case being light by 4 grams.

N.    *Emailing FARAK's Mental Health Worksheets*

220. On February 14, 2013, BALLOU cc'ed Verner and IRWIN on an email he sent KACZMAREK with the subject heading, "FARAK admissions"; the text read:

> Anne,
>
> Here are those forms with the admissions of drug use I was talking about. There are also news articles with handwritten comments about other officials being caught with drugs. All of these were found in her car inside of the lab manila envelopes.
>
> Joe

221. Among the "forms" BALLOU attached were two "Emotion Regulation Worksheets," a list of "pros" and "cons" of "resisting" or engaging in "target behavior," and the aforementioned ServiceNet Diary Card.

222. KACZMAREK never reviewed the originals of these documents or any of the other evidence IRWIN, BALLOU, and THOMAS seized from FARAK's car.

223. After being told not to let the FARAK investigation get more complicated, BALLOU kept a second undated ServiceNet Diary Card from KACZMAREK indicating FARAK's near-complete consumption of the lab's supply of phentermine.

24

224. Specifically, this undated Diary Card stated: "Shame at work. Going to use phentermine, but when I went to take it, I saw how little (v. little) there is left = ended up not using."

O.   *Advocating Against a Broader Investigation at the Amherst Drug Lab*

225. Ten days after FARAK's arrest, Chief Legal Counsel for the MSP sent KACZMAREK, Verner, and others an email asking if recipients had any concerns about releasing the results of the October 10, 2012 audit of the Amherst Drug Lab in response to a public records request from the *Boston Herald*.

226. KACZMAREK told Verner she was "ok" disclosing the audit but confessed it was "a little embarrassing how little quality control they had."

227. Weeks later, an article appeared in the *Daily Hampshire Gazette*, which contained the following quote from an ADA in the Office of the Northwestern District Attorney: "We are . . . awaiting word on whether Amherst will be the subject of an investigation by the inspector general."

228. KACZMAREK forwarded the article to Audrey Mark (Mark), an attorney with the Office of the Inspector General (OIG).

229. By this point, the OIG had embedded itself at the Hinton Drug Lab for purposes of conducting an independent, comprehensive review of the Jamaica Plain (JP) facility.

230. KACZMAREK's email to Mark contained this message: "Audrey-  when they ask you to [do] this audit- say no.  (actually its very different than JP.  A professional lab)."

231. Neither the OIG nor any other Commonwealth entity attempted to perform a comprehensive review of the Amherst Drug Lab until the summer of 2015.

P.       *The Non-Disclosure of FARAK's Mental Health Worksheets to District Attorneys*

232.   On or about March 27, 2013, Verner sent an identical letter to each of the

Commonwealth's eleven District Attorneys; it began this way:

> This Office is investigating Sonja Farak, a chemist who conducted analysis
> of suspected narcotic samples out of the Amherst Drug Laboratory . . . .
> During our investigation, this Office has produced or otherwise come into
> possession of information, documents and reports. Pursuant to this Office's
> obligation to provide potentially exculpatory information to the District
> Attorneys as well as information necessary to your Offices' determination
> about how to proceed with cases in which related narcotics evidence was
> tested at the Amherst Laboratory, please find the below listed materials . . .

233.   None of the "forms" with "FARAK admissions" or mental health worksheets were

included in the materials Verner provided to the District Attorneys.

234.   On the same day Verner sent discovery packets to the District Attorneys, KACZMAREK

completed a "Prosecution Memo" and submitted it to Verner and two other supervisors

within the AGO.

235.   The memo contained multiple references to the mental health worksheets seized from

FARAK's car and noted they had "not been submitted to the grand jury out of an

abundance of caution," even though "[c]ase law" suggested "the paperwork [was] not

privileged."

236.   When Verner reviewed the memo, he knew the mental health worksheets were not a part

of the materials he had just distributed to the District Attorneys; he therefore hand-wrote

a note to KACZMAREK on the prosecution memo reminding her this evidence had

"NOT" been "turned over to DAs offices yet."

237.   Verner entrusted KACZMAREK with considerable discretion in how to handle the

FARAK case.

238. KACZMAREK decided the mental health worksheets should not be turned over to the District Attorneys or any defendants seeking relief based on FARAK's misconduct.

239. When she disclosed the mental health worksheets to FARAK's attorney, KACZMAREK said her office considered the documents to be "privileged" and promised they would not be furnished to any so-called "Farak defendants," like Plaintiff.

Q.    *Plaintiff's Motion to Dismiss*

240. On May 14, 2013, Plaintiff moved to compel the production of discovery of items relating to FARAK's arrest and prosecution.

241. The discovery was not forthcoming.

242. On July 15, 2013, Plaintiff filed a motion to dismiss the drug charges against him based on FARAK's egregious misconduct and the government's noncompliance with its obligation to turn over exculpatory evidence.

243. Hampden County Superior Court Judge Mary-Lou Rup issued an order on July 23, 2013, stating that:

> an evidentiary hearing must be conducted on the following issues: (i) if Ms. FARAK and/or the Amherst drug lab engaged in egregious misconduct in the handling, storage, and analysis of suspected narcotics during the time period between November 2011 and January 2012, when the Amherst drug lab had custody and control of the alleged substances related to the defendant's case; (2) if such misconduct has substantially prejudiced the defendant or irreparably harmed his right to a fair trial; or (3) if such egregious misconduct was deliberate and intentional, warranting a prophylactic sanction of dismissal.

244. Judge Rup's order reminded the Hampden District Attorney's office of its "obligation to seek [evidence] from government agencies (including the Office of the Attorney General) and to produce exculpatory evidence that may be favorable to [Plaintiff's] case, and not simply turn a blind eye to what is not in its immediate control."

245. At this point, neither Plaintiff, the District Attorneys, nor Judge Rup knew the AGO possessed the mental health worksheets.

246. Upon information and belief, ADA Eduardo Velazquez (Velazquez), the Hampden County prosecutor assigned to Plaintiff's case, sought exculpatory evidence from the AGO and was told all relevant evidence had already been turned over.

R.   *Plaintiff's Subpoenas to KACZMAREK and BALLOU*

247. Two days later, Hampden County Superior Court Judge C. Jeffrey Kinder issued an order consolidating fourteen unrelated post-conviction cases for an evidentiary hearing on September 9, 2013, focused on the timing and scope of FARAK's misconduct.

248. On August 22, 2013, Plaintiff served KACZMAREK and BALLOU with subpoenas to testify at the evidentiary hearing Judge Rup had ordered.

249. These subpoenas directed KACZMAREK and BALLOU to bring "Copies of any and all inter and intraoffice correspondence pertaining to the scope of evidence tampering and/or deficiencies at the Amherst Drug Laboratory from January 18, 2013 to the present."

250. The email BALLOU sent to KACZMAREK on February 14, 2013, regarding "FARAK admissions" was among the undisclosed documents BALLOU and KACZMAREK possessed that would have been responsive to the subpoena.

S.   *The AGO's Response to a Second BALLOU Subpoena*

251. Whenever an AAG or state trooper assigned to the AGO received a subpoena, an attorney in the Appeals Division would be assigned to the case.

252. In 2013, RAVITZ was the Chief of the Appeals Division and Suzanne Reardon (Reardon) served as his Deputy.

253. On or about August 23, 2013, RAVITZ tasked FOSTER with handling the AGO's response to Plaintiff's subpoenas.

254. FOSTER had only been working at the AGO for approximately six weeks; before becoming an AAG, she had no exposure to subpoenas and had never filed a motion to quash.

255. The fundamental first step in preparing a motion to quash, after reading the subpoena, is to examine the materials sought.

256. FOSTER should have collected the files from BALLOU and KACZMAREK, reviewed their contents, and asked BALLOU and KACZMAREK to find responsive documents in their emails.

257. Alternatively, FOSTER could have asked the AGO's Information Technology (IT) department to check electronically stored information (ESI) in BALLOU and KACZMAREK's email accounts to see what evidence responsive to the subpoenas existed.

258. Had FOSTER reviewed either of their files or the physical evidence or had she arranged for IT to check BALLOU's and KACZMAREK's ESI, FOSTER would have seen the mental health worksheets.

259. At 10:38 a.m. on August 26, 2013, RAVITZ sent FOSTER copies of memos he had filed in prior cases seeking to quash subpoenas.

260. RAVITZ's purpose in providing these briefs was to give FOSTER a "template" she could use in drafting her own pleadings.

261. Plaintiff's evidentiary hearing was originally scheduled to take place on August 27, 2013.

262. It was postponed at the request of FOSTER; the parties later agreed that the evidence adduced at the post-conviction proceeding before Judge Kinder could be used to adjudicate Plaintiff's pre-trial motion to dismiss.

263. On August 30, 2013, BALLOU received a subpoena *duces tecum* for the September 9 post-conviction hearing "command[ing] the production of all documents and photographs pertaining to the investigation of Sonja Farak and the Amherst Drug Lab."

264. The ServiceNet Diary Card BALLOU attached to the email he sent to KACZMAREK on February 14, 2013, regarding "FARAK admissions" was among the undisclosed documents BALLOU possessed that would have been responsive to this subpoena.

265. Responding to this post-conviction subpoena became another one of FOSTER's assignments.

266. On the morning of September 3, 2013, KACZMAREK sent the following email to RAVITZ, Verner, and Reardon:

> I [am] told that the judge wants to come to the bottom of the issues mentioned below making it unlikely he will allow a motion to quash. As long as the judge has set up the scope of the motion & I am confident that Ballou will be pretty unhelpful in what the judge is trying to do- do we just let Ballou go?

267. Verner arranged for a meeting that afternoon; among those required to attend were FOSTER, RAVITZ, and IRWIN.

268. In advance of that meeting, RAVITZ sent an email offering some "food for thought."

269. "One thing we can talk about," RAVTIZ wrote, "is that sometimes even if we can't . . . get the subpoena quashed entirely, we can get its scope limited so as to preclude certain types of questions."

270. The morning after this first meeting, RAVITZ returned to the subject of the BALLOU subpoena in an email he sent to FOSTER, KACZMAREK, Verner, Reardon, and Dean Mazzone (Mazzone), the Supervisor of the Enterprise and Major Crimes Unit.

271. In pertinent part, RAVTIZ's email stated:

> My take on the "Order Regarding Drug Lab Evidentiary Hearing" that was circulated is that there's still a rationale for moving to quash, or limit, the scope of the subpoena . . . . A defense attorney could still try to elicit information of the type that we think shouldn't be revealed under the guise of fleshing out information concerning "the timing and scope of Ms. Farak's alleged criminal conduct" and the other categories.  Thoughts?

272. This led to a second FARAK subpoena meeting.

273. During these meetings, KACZMAREK revealed that she and BALLOU possessed undisclosed copies of FARAK'S mental health worksheets.

274. KACZMAREK falsely claimed these documents were irrelevant to "Farak defendants" like Plaintiff and should not be produced given the fact that several contained information concerning FARAK's health/medical/psychological treatment.

275. On September 6, 2013, FOSTER filed a motion to quash the post-conviction subpoena to BALLOU.

276. In the alternative, FOSTER's pleadings sought a protective order to restrict the scope of the subpoena by not requiring the AGO to produce seven types of information, including "emails responsive to the subpoena, but not already contained in the case file specifically listed therein" and "information concerning the health or medical or psychological treatment of individuals."

277. This wording and these grounds were not inadvertent but deliberately intended to relieve the AGO from having to produce the mental health worksheets.

T.  *Plaintiff's Motion for Third Party Records*

278. On the same day FOSTER filed her motion to quash, Plaintiff filed a motion to compel the production of documentation in the possession of third parties, including DPH and the AGO.

279. Among other things, Plaintiff's motion sought "any and all evidence suggesting that a third party may have been aware of Farak's evidence tampering at the Amherst Drug Laboratory prior to Farak's arrest."

280. The undisclosed ServiceNet Diary Cards suggested ServiceNet clinicians may have been aware of FARAK evidence tampering prior to her arrest and therefore would have been responsive to this request.

281. Plaintiff also sought the production of documents he identified in the subpoenas he served on KACZMAREK and BALLOU, i.e., correspondence pertaining to the scope of evidence tampering and/or deficiencies at the Amherst Drug Lab.

282. The email BALLOU sent to KACZMAREK on February 14, 2013, regarding "FARAK admissions" constituted correspondence that would have been responsive to this request.

283. In addition, Plaintiff sought the production of FARAK's personnel file, including copies of performance evaluations.

284. An affidavit submitted in support of this motion contained the following two paragraphs:

> 29.  Given the misconduct that occurred on Mr. Hanchett's watch, I believe that he has an obvious incentive to minimize the time period during which it occurred.

> 30.  If the contents of Farak's personnel file paint a different picture as to Farak's performance (or no picture at all), I believe it will undermine the credibility of Mr. Hanchett and cast doubt on claims by the Commonwealth that there was no impropriety at the laboratory back in 2011 when the substance allegedly seized from Mr. Penate were submitted for analysis.

32

285. A review of FARAK's personnel file would have revealed no performance evaluations completed by HANCHETT during the four and a half years he served as Supervisor of the Amherst Drug Lab.

U.    *The Evidentiary Hearing*

286. Prior to the post-conviction hearing on September 9, 2013, IRWIN and FOSTER instructed BALLOU not to divulge the existence of the mental health worksheets.

287. At the outset of this hearing, Judge Kinder denied the motion to quash the BALLOU subpoena insofar as it related to BALLOU's testimony.

288. With respect to her request for a protective order, FOSTER confessed that she had not reviewed any documents in BALLOU's possession and BALLOU had not brought his file to the hearing.

289. Rather than delay the hearing, Judge Kinder admonished FOSTER, then instructed her to review BALLOU's file and submit copies of any undisclosed documents for an *in camera* review.

290. The contents of the "assorted lab paperwork" came up at the end of BALLOU's testimony.

291. After agreeing that "reports regarding what was in the car" only provided a "summary" of what was seized, BALLOU was asked to acknowledge that he did not write "paragraph after paragraph about what assorted lab paperwork was found."

292. Instead of answering the question, BALLOU claimed Crime Scene Services "took pretty detailed photos."

293. In response to a later question inquiring whether he "'photograph[ed] every piece of evidence that was seized from the automobile," BALLOU implied that this is exactly what Crime Scene Services did: "As I said, I didn't photograph anything. But yeah, crime scene services photographed the evidence as we seized it, yes."

294. BALLOU knew none of the photographs taken by Crime Scene Services depicted any of the mental health worksheets he attached to the email he sent on February 14, 2013.

V.    *Responding to the Order for an In Camera Review*

295. The morning after the hearing, FOSTER returned to the office and told Reardon she got yelled at by Judge Kinder.

296. FOSTER also sent an email to Verner, KACZMAREK, Mazzone, RAVITZ, and Reardon informing them of Judge Kinder's order with respect to the *in camera* review.

297. In this email, FOSTER advised the group that "Judge Kinder did not allow any of questioning [of BALLOU] anywhere near anything privileged."

298. Verner responded by posing one question to KACZMAREK and another to FOSTER.

299. "Anne," Verner wrote, "can you get a sense from Joe what is in his file? Emails etc? Kris, did the judge say his 'file' or did he indicate Joe had to search his emails etc?"

300. KACZMAREK answered:

> Joe has all his reports and all reports generated in the case. All photos and videos taken in the case. His search warrants and returns. Copies of the paperwork seized from her car regarding new[s] articles and her mental health worksheets.

301. FOSTER said while it was unclear what Judge Kinder was "looking for . . . [,] Sergeant Ballou did testify that he thinks everything in his file has already been turned over."

302. Later that morning, KACZMAREK compared BALLOU's file to a "trial binder," and told Verner she had "asked Ballou to come to Boston sometime this week so we/I can look at his file."

303. When BALLOU arrived in Boston with his file, KACZMAREK noticed that he never printed out hard copies of any of the mental health worksheets he scanned and sent to her as attachments to an email.

304. KACZMAREK decided to embrace an unduly restrictive interpretation of the term "file" and advised FOSTER there was no need to produce any additional documents for Judge Kinder's *in camera* review.

305. On September 16, 2013, FOSTER sent Judge Kinder the following letter:

> Dear Judge Kinder:
>
> On September 9, 2013, pursuant to a subpoena issued by defense counsel, you ordered the Attorney General's Office to produce all documents in Sergeant Joseph Ballou's possession that the Attorney General's Office believes to be privileged by September 18, 2013, to be reviewed by your Honor in camera. After reviewing Sergeant Ballou's file, every document in his possession has already been disclosed. This includes grand jury minutes and exhibits, and police reports. Therefore, there is nothing for the Attorney General's Office to produce for your review on September 18, 2013.
>
> Please do not hesitate to contact me should your require anything further.
>
> Sincerely,
>
> Kris C. Foster
> Assistant Attorney General
> (617) 963-2833

306. In addition to being factually false, FOSTER's letter was purposely vague.

307. FOSTER intentionally left out the subject in the sentence discussing the review of BALLOU's file.

308. FOSTER crafted this grammatically incorrect sentence to create the appearance she complied with a court order to personally review the file without actually lying that she had done so.

W.    *Plaintiff's Efforts to Inspect the Evidence and Obtain Third Party Records*

309. On the same day FOSTER sent this letter, Plaintiff's counsel sent an email to FOSTER requesting permission to inspect the evidence seized from FARAK's car.

310. FOSTER forwarded the email to KACZMAREK.

311. In response, KACZMAREK wrote: "No. Why is this relevant to this case. I really don't like him."

312. FOSTER subsequently sent Plaintiff's counsel an email conveying the AGO's position that the evidence seized from FARAK's car was irrelevant to any case but FARAK's.

313. On October 1, 2013, Plaintiff filed a motion to inspect the physical evidence in the FARAK case.

314. That same day, FOSTER filed oppositions on behalf of the AGO and DPH to Plaintiff's motion for third party records.

315. RAVITZ approved these pleadings before FOSTER filed them.

316. In response to Plaintiff's request for evidence suggesting third-party knowledge of FARAK's tampering, FOSTER stated: "The AGO has turned over all grand jury minutes, exhibits, and police reports in its possession to the District Attorney's office. Based on these records, to which the defendant has access, there is no reason to believe that a third party had knowledge of Farak's alleged malfeasance prior to her arrest."

317. This representation did not squarely or honestly address the request for documents suggesting third party knowledge.

318. FOSTER used this language in an effort to avoid acknowledging the existence of the undisclosed mental health worksheets.

319. In the opposition she filed on behalf of DPH, Foster mocked the notion that FARAK's personnel file "*may* uncover inadequate supervision."

320. Foster also argued that the possibility of "James Hanchett perjuring himself" was "not enough to show the relevance of the personnel file."

321. On October 2, 2013, the parties appeared before Judge Kinder for hearing on Plaintiff's discovery motions.

322. When Judge Kinder asked whether she had reviewed FARAK's personnel file, FOSTER admitted she had not.

323. Judge Kinder nevertheless denied the motion.

324. Days later, when HANCHETT falsely testified that he completed EPRS evaluations for FARAK three times a year, Plaintiff was unable to impeach him.

325. With respect to the motion to inspect physical evidence, FOSTER characterized the undisclosed items in FARAK's car as "irrelevant," even though she had never seen any of this evidence.

326. Judge Kinder ultimately denied this motion based, in large part, on BALLOU's misrepresentation that "the physical evidence ha[d] been described in detail for [Plaintiff] and photographs of that evidence have been provided."

327. The discovery request that garnered the most attention at the October 2 hearing concerned the AGO's intra-office correspondence.

328. When FOSTER took the position that "almost all of that is going to be work-product preparation," Judge Kinder stated: "Well, let me ask the same question that I asked with

respect to Mr. Ballou's file, are you saying that because you've actually looked at it or are you just guessing?"

329. FOSTER said her office had "not compiled every email that mentions the word 'Farak' in it."

330. After agreeing that "an email exchange" suggesting "this conduct has been ongoing for some time" would be exculpatory, FOSTER framed Plaintiff's request as "fishing expedition" based on the unwarranted presumption the AGO was "hiding some type of exculpatory evidence."

331. This inspired the following exchange:

> THE COURT: My question is: Has anybody looked?
>
> MS. FOSTER: Not that I know of. As I said, no one has compiled all of these correspondence because there could be letters, emails, voice mails.
>
> THE COURT: So you agree that that kind of information would be exculpatory if it existed, but you don't believe anybody has even looked to determine whether it exists?
>
> MS. FOSTER: I know the lead investigators and the lead prosecutor, they would naturally be the people who wrote the most correspondence on this and they have said that nothing in it is outside, really, what has already been disclosed other than work product.
>
> THE COURT: Let me just say in the future, it would be helpful for me, in attempting to resolve these matters and deciding them, if you actually looked at the information you were talking about other than making bold pronouncements about them being privileged or the content of them.

332. The hearing concluded with FOSTER's representation that she had talked to KACZMAREK and BALLOU and both assured her "there's no smoking gun."

333. As noted above, BALLOU sent a ServiceNet Diary Card to KACZMAREK via email that memorialized misconduct in the lab over a year before FARAK's arrest.

334. This document also would have provided Plaintiff with a good faith basis to seek the production of third-party records in the possession of ServiceNet that demonstrated daily misconduct by FARAK for close to a decade.

335. In the context of this litigation, BALLOU's email was a smoking gun.

336. Judge Kinder allowed the portion of Plaintiff's motion that would have compelled this document's production.

337. FOSTER filed a twenty-seven page motion for clarification that asked Judge Kinder to reconsider his initial ruling.

338. RAVITZ edited this pleading and proposed the inclusion of a footnote stating: "It is appropriate for this Court to accept the AGO's representation as to the existence of work product within its materials."

339. RAVITZ knew or should have known that FOSTER had not reviewed any AGO materials to determine whether there was a good faith basis to make representations as to the existence of work product.

340. The pleading FOSTER filed persuaded Judge Kinder to issue an order on October 23, 2013, relieving the AGO of the obligation to produce any of its internal correspondence.

X.   *The Denial of Plaintiff's Motion to Dismiss and Allowance of Motions Precluding the Introduction of Farak's Misconduct at Plaintiff's Trial*

341. On November 4, 2013, Judge Kinder denied Plaintiff's motion to dismiss.

342. Based on the incomplete body of evidence before him, Judge Kinder found that FARAK's "misconduct, while deplorable, postdate[d] the testing in [Plaintiff's] case."

343. On November 22, 2013, the Commonwealth dismissed the five counts against Plaintiff alleging school zone violations (Counts 2, 4, 6, 8, and 10).

344. On that same date, ADA Velazquez filed a motion *in limine* to preclude Plaintiff from arguing FARAK was engaged in misconduct at the Amherst Drug Lab during the period of time when the substances in question were present there.

345. On November 25, 2013, Foster filed motions to quash Plaintiff's subpoenas to KACZMAREK and BALLOU.

346. RAVITZ approved these pleadings before FOSTER filed them.

347. In a memorandum of law in support of the KACZMAREK motion, FOSTER wrote:

> The testimony the defendant apparently seeks from AAG Anne Kaczmarek either could be obtained from other sources or is irrelevant. The drugs in the defendant's case were seized in October and November of 2011. It appears that the defendant is going to argue that Farak may have tampered with the drugs in his case, by attempting to elicit from AAG Kaczmarek that the allegations against Farak date back much further than the roughly four months before Farak's arrest that the AGO alleges. This is merely a fishing expedition. There is nothing to indicate that the allegations against Farak date back to the time she tested the drugs in the defendant's case. Therefore, her testimony would be irrelevant and unhelpful to the Court.

348. As previously noted, KACZMAREK possessed a ServiceNet Diary Card revealing evidence tampering and drug abuse by FARAK at the Amherst Drug Lab on December 22, 2011 – the exact same date FARAK reported testing a sample in Plaintiff's case.

349. At the conclusion of this memorandum, FOSTER once again asked the Court to relieve the AGO of the obligation to produce "Information concerning the health or medical or psychological treatment of individuals" and "Emails responsive to the subpoena, but not already contained in the case files specifically listed therein."

350. Again, this wording and these grounds were not inadvertent but deliberately intended to relieve the AGO from having to produce FARAK's mental health worksheets.

351. On December 4, 2013, the Honorable Tina Page allowed ADA Velazquez's motion *in limine* and FOSTER's motions to quash.

Y.     *The Withholding of Exculpatory Evidence Regarding Burnham's Criminal Activity*

352.   Plaintiff's trial began on December 9, 2013.

353.   The integrity and professionalism of the police investigation were hotly contested issues.

354.   BURNHAM, WADLEGGER, KENT, BIGDA, and KALISH all testified.

355.   During their cross-examinations, they were confronted with discrepancies in WADLEGGER's police report, search warrant return, and evidence tags regarding the amounts of money and suspected narcotics seized by the police.

356.   As night shift narcotics detectives, it was the practice of WADLEGGER, KENT, BIGDA, and KALISH to have at least two officers count money anytime there was a seizure of cash in excess of $100 or $200.

357.   Once they all arrived at the same figure, the last person to count would seal the money in an envelope, record the sum on the envelope and separate evidence tag, then put the envelope and evidence tag through a slot in the door to BURNHAM's office.

358.   Upon information and belief, before taking the stand, WADLEGGER, KENT, BIGDA, and KALISH had all been told by BURNHAM, on numerous occasions, that their counts were off.

359.   Upon information and belief, each and every time officers received this kind of feedback, BURNHAM would claim the amount of money WADLEGGER, KENT, BIGDA, and/or KALISH recorded was less than the amount they submitted.

360.   Upon information and belief, WADLEGGER, KENT, BIGDA, and KALISH all rightly suspected BURNHAM was stealing cash that had been entrusted to him for safekeeping.

361. Upon information and belief, WADLEGGER, KENT, BIGDA, and KALISH reported their suspicions to superiors in the SPD, including superior officers entrusted with the power to make and enforce Department policies

362. But neither WADLEGGER, KENT, BIGDA nor KALISH ever reported BURNHAM's thefts to ADA Velazquez or anyone else at the Hampden County District Attorney's Office.

363. At all pertinent times, the CITY OF SPRINGFIELD and its policy makers knew of their legal duty to supervise and monitor the seizure and safekeeping of property seized by Narcotics Detectives.

364. At all pertinent times, the Defendant CITY OF SPRINGFIELD and its policymakers failed to monitor, supervise, control, and discipline BURNHAM for his dereliction of this duty with such recklessness and gross negligence as to manifest deliberate indifference to the right of persons, including Plaintiff.

365. Prior to Plaintiff's trial in December, 2013, the CITY OF SPRINGFIELD and its policymakers were aware of complaints and claims by Narcotics Detectives alleging thefts on the part of Burnham, but on information and belief such allegations did not result in substantive investigation into such incidents or discipline of BURNHAM.

366. Information regarding BURNHAM's criminal activity was highly exculpatory to Plaintiff.

367. BURNHAM testified on December 10, 2013.

368. By this point, he had stolen over $200,000 in cash submitted by Narcotics Detectives in at least 113 separate investigations and misappropriated funds in countless others.

369. Evidence of BURNHAM's criminal activity called into question the integrity of a key link in an already compromised chain of custody and could have been used to impeach BURNHAM during his cross-examination.

370. The suppression of this exculpatory evidence by WADLEGGER, KENT, BIGDA, KALISH, and the CITY OF SPRINGFIELD delayed the discovery of misconduct by BURNHAM in Plaintiff's case.

371. During Plaintiff's trial, the prosecution produced 66 bills that were supposedly seized at 57 Johnson Street on November 15, 2011.

372. One of the twenty-dollar bills introduced into evidence had the following serial number: JF76580211B.

373. Years later, an investigation into BURNHAM's wrongdoing revealed this bill was not placed into circulation until December 24, 2012, i.e., more than thirteen months after it was allegedly seized.

374. In fact, 10 of the 66 bills entered into evidence at Plaintiff's trial were not placed into circulation until after the date they were alleged seized.

Z.   *Plaintiff's Conviction and State Prison Sentence*

375. On December 11, 2013, the trial judge allowed Plaintiff's motion for a required finding of not guilty for the charges of possessing a firearm without a valid FID card (Count 11); possessing ammunition without a valid FID card (Count 12); and possessing a firearm during the commission of a felony (Count 13).

376. On December 13, 2013, the jury acquitted Plaintiff of all remaining offenses with the exception of a single count of Distributing a Class A Substance on November 15, 2011 (Count 9).

377. On December 16, 2016, Plaintiff received a sentence of five to seven years to state prison.

378. Later that day, BALLOU sent an email to FOSTER, KACZMAREK, Verner, and Mazzone informing them of Plaintiff's sentence.

379. Mazzone proclaimed this was a "Nice" outcome.

380. Plaintiff was depressed while in prison. He missed his family and family gatherings – particularly birthday parties for the youngest members.

AA.   *Revelations Regarding the Mental Health Worksheets, Burnham's Criminal Activity and Plaintiff's Post-Conviction Relief*

381. FARAK pled guilty to charges against her on January 6, 2014.

382. On July 30, 2014, undersigned counsel obtained an order to inspect the "assorted lab paperwork" in an unrelated Hampshire County case.

383. On October 30, 2014, an inspection of the evidence revealed the existence of FARAK's mental health records.

384. On November 1, 2014, undersigned counsel sent an eleven-page letter to the AGO regarding the existence of this previously undisclosed evidence.

385. On November 13, 2014, Verner sent copies of all the documents seized from FARAK's car to each of the District Attorneys pursuant to the AGO's obligation to provide exculpatory information.

386. On May 21, 2015, Plaintiff filed a motion for a new trial.

387. His case was once again consolidated with the post-conviction cases of nine other "Farak defendants."

388. On December 30, 2015, BURNHAM was indicted on seven counts of larceny.

389. On February 16, 2016, the Marcum Advisory Group completed a "privileged and confidential" report entitled, "City of Springfield, Massachusetts Narcotics Evidence Examination."

390. Among other things, the Marcum Group found:

> (i) In some instances, the description of narcotics evidence as documented on the laboratory receipt did not match the actual narcotics that [they] observed in the envelopes or boxes . . . .

> (ii) The majority of envelopes or boxes did not include a laboratory receipt of narcotics evidence, therefore, [they] could not verify that the quantities and types of narcotics received by the laboratory matched the actual narcotics contained in the envelopes and boxes.

> (iii) In some instances, narcotics evidence was not contained in a heat sealed plastic package after being returned from the laboratory.

> (iv) In some instances, the description of narcotics evidence as documented on the arrest report did not match the actual narcotics evidence contained in the envelopes or boxes.

391. Plaintiff and the other post-conviction defendants subsequently sought discovery of prosecutorial misconduct in the possession of the AGO.

392. The AGO opposed the production of such discovery.

393. On April 29, 2016, the AGO filed a pleading that contained this passage:

> The defendants' proposed claim of prosecutorial misconduct based on actions by the Attorney General's Office fails for the very simple fact that the AGO is not the prosecutor of any of these cases. Certainly, the AGO prosecuted Sonja Farak; but this is not Farak's case. Instead, in these cases the AGO was a non-party from which the defendants previously sought expansive post-conviction discovery. In that capacity, the AGO was well supported by case law in presenting arguments opposing the proposed discovery requests, just as any other non-party might do.

394. The parties appeared before the Honorable Richard J. Carey in December 2016 for a six-day evidentiary hearing.

395. In a 127-page decision issued on June 26, 2017, Judge Carey dismissed Plaintiff's conviction with prejudice.

396. Among other things, Judge Carey found "Kaczmarek's and Foster's deliberate withholding of exculpatory evidence was particularly egregious in the Penate case" and "qualifies as a fraud upon the court."

397. On June 27, 2017, Plaintiff was released from custody.

## COUNT I
## VIOLATION OF 42 U.S.C. § 1983
(FARAK)

398. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 397 as if fully set forth herein.

399. With a deliberate indifference to Plaintiff's constitutional rights, Defendant FARAK mishandled the evidentiary samples Plaintiff was charged with distributing and possessing.

400. With a deliberate indifference to Plaintiff's constitutional rights, Defendant FARAK stole and consumed mild-altering narcotics immediately before, during, or in lieu of performing tests on said samples, including the sample Plaintiff was convicted of distributing.

401. Defendant FARAK knew or should have known she was in no condition to perform the essential tasks of her job while in custody of these samples.

402. Defendant FARAK knew or should have known information concerning her drug-induced impairment while handling the samples in question constituted exculpatory evidence Plaintiff had a constitutional right to receive.

403. Defendant FARAK nevertheless intentionally withheld this exculpatory information from Plaintiff because she did not want to face any consequences for her criminal activity.

404. Defendant FARAK knew or should have known the testing procedures performed at the Amherst Drug Lab were not remotely similar to those found at any accredited Drug Analysis Laboratory.

405. Defendant FARAK also knew or should have known deficiencies in Amherst protocols constituted exculpatory evidence Plaintiff had a constitutional right to receive.

406. Defendant FARAK nevertheless intentionally withheld this exculpatory information from Plaintiff and affirmatively misrepresented the quality of forensic work performed in Amherst.

407. The foregoing actions by Defendant FARAK violated Plaintiff's due process rights under the Fourteenth Amendment.

408. As a direct and proximate cause of the aforesaid actions and conduct by Defendant FARAK, Plaintiff suffered great pain of mind and body and was otherwise damaged.

## COUNT II
### VIOLATION OF 42 U.S.C. § 1983
(HAN, NASSIF, HANCHETT, and SALEM)

409. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 397 as if fully set forth herein.

410. Defendants HAN, NASSIF, HANCHETT, and SALEM were responsible for providing adequate training, supervision, and discipline to chemists at the Amherst Drug Lab during the time staff at that lab had custody of the samples Plaintiff was charged with distributing and possessing.

411. Defendants HAN, NASSIF, HANCHETT, and SALEM provided inadequate training, ineffective supervision, and no discipline to Amherst Drug Lab chemists.

412. Defendants FARAK committed serious acts of misconduct, and felt emboldened to do so, based on this lack of proper training, inattentive supervision, and absence of discipline.

413. This absence training, supervision, and discipline constituted gross negligence on the part of HAN, NASSIF, HANCHETT, and SALEM.

414. Defendants HAN, NASSIF, HANCHETT, and SALEM were deliberately indifferent to Plaintiff's constitutional rights by providing insufficient training, failing to properly supervise chemists, failing to investigate, let alone discipline, breaches or acts of misconduct, failing to implement policies to ensure quality of work product and compliance with chain of custody measures, and failing to safeguard the evidence submitted to the lab for chemical analysis.

415. By having these affirmative policies in place, Defendants HAN, NASSIF, HANCHETT, and SALEM demonstrated callous indifference to the civil rights of Plaintiff.

416. By not properly training, supervising, or disciplining Defendant FARAK, Defendants HAN, NASSIF, HANCHETT, and SALEM violated Plaintiff's due process rights under the Fourteenth Amendment.

417. As a direct and proximate cause of the aforesaid actions and conduct by Defendant FARAK, Plaintiff suffered great pain of mind and body and was otherwise damaged.

### COUNT III
### VIOLATION OF 42 U.S.C. § 1983
(IRWIN, BALLOU and THOMAS)

418. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 397 as if fully set forth herein.

419. Prior to Plaintiff's conviction in 2013, and continuing thereafter, Defendants IRWIN, BALLOU, and THOMAS, acting individually and in concert and conspiracy with each other, covered up and lied to Hampden County ADAs about the existence of the aforementioned mental health worksheets.

420. Defendants IRWIN, BALLOU, and THOMAS knew these mental health worksheets constituted exculpatory evidence in the cases of defendants, like Plaintiff, who were charged with distributing or possessing controlled substances that were purportedly analyzed by Defendant FARAK.

421. Defendants IRWIN, BALLOU, and THOMAS knew they had duties, under the United States Constitution, to disclose *Brady* material to Hampden County ADAs in general and the Hampden County ADA prosecuting Plaintiff in particular.

422. Defendants IRWIN, BALLOU, and THOMAS knew they had duties, under the United States Constitution, to make truthful statements to the Hampden County ADA prosecuting Plaintiff and not cause or continue Plaintiff's unconstitutional conviction and resultant injuries by lying about such evidence.

423. Notwithstanding their awareness of their duties, Defendants IRWIN, BALLOU, and THOMAS, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed *Brady* material, lied about, and otherwise failed to disclose *Brady* material to the Hampden County ADA prosecuting Plaintiff.

424. Prior to, during, and following Plaintiff's trial, Defendants IRWIN, BALLOU, and THOMAS also intentionally, recklessly, and/or with deliberate indifference to their legal obligations failed to disclose *Brady* material to attorneys at the MSP and AGO.

425. Defendants IRWIN, BALLOU, and THOMAS did so with the knowledge that their conduct would result in the jury being provided a false or misleading picture of Defendant FARAK's criminal activity and the professionalism of the investigation and would thereby substantially increase the likelihood of a conviction, in violation of Plaintiff's civil rights.

426. The aforesaid conduct operated to deprive Plaintiff of his rights under the Constitution and the Laws of the United States to timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States,* 405 U.S. 150 (1972), and their progeny, and to not be convicted or punished based upon the government's knowing use of false or misleading testimony or argument, all in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

427. As a direct and proximate cause of the aforesaid actions and conduct by Defendants IRWIN, BALLOU, and THOMAS, Plaintiff suffered great pain of mind and body and was otherwise damaged.

### COUNT IV
### VIOLATION OF 42 U.S.C. § 1983
(KACZMAREK, FOSTER, and RAVITZ)

428. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 397 as if fully set forth herein.

429. Prior to Plaintiff's conviction in 2013, and continuing thereafter, Defendants KACZMAREK, FOSTER, and RAVITZ, acting individually and in concert and conspiracy with each other, covered up and lied to Hampden County ADAs, Plaintiff's

counsel, and the Hampden County Superior Court about the existence of the
aforementioned mental health worksheets.

430. Defendants KACZMAREK, FOSTER, and RAVITZ knew these mental health
worksheets constituted exculpatory evidence in the cases of defendants, like Plaintiff,
who were charged with distributing or possessing controlled substances that were
purportedly analyzed by Defendant FARAK.

431. Defendants KACZMAREK, FOSTER, and RAVITZ knew they had duties, under the
United States Constitution, to disclose *Brady* material to Hampden County ADAs in
general and the Hampden County ADA prosecuting Plaintiff in particular.

432. Defendants KACZMAREK, FOSTER, and RAVITZ knew they had duties, under the
United States Constitution, to make truthful statements to the Hampden County ADA
prosecuting Plaintiff and not cause or continue Plaintiff's unconstitutional conviction and
resultant injuries by lying about such evidence.

433. Notwithstanding their awareness of their duties, Defendants KACZMAREK, FOSTER,
and RAVITZ, prior to, during, and following Plaintiff's trial, intentionally, recklessly,
and/or with deliberate indifference to their legal obligations, concealed *Brady* material,
lied about, and otherwise failed to disclose *Brady* material to the Hampden County ADA
prosecuting Plaintiff.

434. Prior to, during, and following Plaintiff's trial, Defendants KACZMAREK, FOSTER,
and RAVITZ also intentionally, recklessly, and/or with deliberate indifference to their
legal obligations, concealed *Brady* material, lied about, and otherwise failed to disclose
Brady material to Plaintiff's counsel and the Hampden County Superior Court.

435. Defendants KACZMAREK, FOSTER, and RAVITZ did so with the knowledge that their conduct would result in the jury being provided a false or misleading picture of Defendant FARAK's criminal activity and the professionalism of the investigation and would thereby substantially increase the likelihood of a conviction, in violation of Plaintiff's civil rights.

436. The aforesaid conduct by Defendants KACZMAREK, FOSTER, and RAVITZ occurred at times when they were not acting functionally as prosecutors but as third party evidence custodians simultaneously acting in conjunction with and on behalf of the prosecuting agency.

437. The aforesaid conduct operated to deprive Plaintiff of his rights under the Constitution and the Laws of the United States to timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States,* 405 U.S. 150 (1972), and their progeny, and to not be convicted or punished based upon the government's knowing use of false or misleading testimony or argument, all in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

438. As a direct and proximate cause of the aforesaid actions and conduct by Defendants KACZMAREK, FOSTER, and RAVITZ, Plaintiff suffered great pain of mind and body and was otherwise damaged.

**COUNT V**
**VIOLATION OF 42 U.S.C. § 1983**
(ESTATE OF BURNHAM)

439. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 397 as if fully set forth herein.

440. With a deliberate indifference to Plaintiff's constitutional rights, BURNHAM mishandled the evidentiary samples Plaintiff was charged with distributing and possessing by failing to seal said samples to eliminate the possibility of cross-contamination and decrease the likelihood of tampering.

441. With a deliberate indifference to Plaintiff's constitutional rights, BURNHAM also stole, misappropriated, and/or manufactured cash seized at 57 Johnson Street on the day of Plaintiff's arrest.

442. BURNHAM knew or should have known information concerning his mishandling of said samples and misuse of said cash constituted exculpatory evidence Plaintiff had a constitutional right to receive.

443. BURNHAM nevertheless intentionally withheld this exculpatory information from Plaintiff because he did not want to face any consequences for his criminal activity.

444. The foregoing actions by BURNHAM violated Plaintiff's due process rights under the Fourteenth Amendment.

445. As a direct and proximate cause of the aforesaid actions and conduct by BURNHAM, Plaintiff suffered great pain of mind and body and was otherwise damaged.

**COUNT VI**
**VIOLATION OF 42 U.S.C. § 1983**
(KENT, WADLEGGER, BIGDA, and KALISH)

446. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 397 as if fully set forth herein.

447. Prior to Plaintiff's conviction in 2013, and continuing thereafter, Defendants KENT, WADLEGGER, BIGDA, and KALISH covered up and lied to Hampden County ADAs about the substantial evidence of BURNHAM's criminal activity.

448. Defendants KENT, WADLEGGER, BIGDA, and KALISH knew information concerning BURNHAM's criminal activity constituted exculpatory evidence in the cases of defendants, like Plaintiff, where cash was "short" and/or BURNHAM was entrusted with the custody of suspected narcotics.

449. Defendants KENT, WADLEGGER, BIGDA, and KALISH knew they had duties, under the United States Constitution, to disclose *Brady* material to Hampden County ADAs in general and ADA Velazquez in particular.

450. Defendants KENT, WADLEGGER, BIGDA, and KALISH knew they had duties, under the United States Constitution, to make truthful statements to ADA Velazquez and not cause or continue Plaintiff's unconstitutional conviction and resultant injuries by covering up the existence of such evidence.

451. Notwithstanding their awareness of their duties, Defendants KENT, WADLEGGER, BIGDA, and KALISH, prior to, during, and following Plaintiff's trial, intentionally, recklessly, and/or with deliberate indifference to their legal obligations, concealed *Brady* material, lied about, and otherwise failed to disclose *Brady* material to ADA Velazquez.

452. Defendants KENT, WADLEGGER, BIGDA, and KALISH did so with the knowledge that their conduct would result in the jury being provided a false or misleading picture of BURNHAM's reliability and veracity as a witness and the professionalism of the investigation and would thereby substantially increase the likelihood of a conviction, in violation of Plaintiff's civil rights.

453. The aforesaid conduct operated to deprive Plaintiff of his rights under the Constitution and the Laws of the United States to timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United*

*States,* 405 U.S. 150 (1972), and their progeny, and to not be convicted or punished based upon the government's knowing use of false or misleading testimony or argument, all in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

454. As a direct and proximate cause of the aforesaid actions and conduct by Defendants KENT, WADLEGGER, BIGDA, and KALISH, Plaintiff suffered great pain of mind and body and was otherwise damaged.

**COUNT VII**
**VIOLATION OF 42 U.S.C. § 1983**
(CITY OF SPRINGFIELD)

455. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 397 as if fully set forth herein.

456. Defendant CITY OF SPRINGFIELD was responsible for providing adequate supervision and discipline of Defendant BURNHAM in the performance of his duties as a police officer tasked with safeguarding cash and alleged contraband seized by other Narcotics Detectives.

457. Instead, Defendant CITY OF SPRINGFIELD allowed an unwritten policy or custom to develop in the SPD of permitting Defendant BURNHAM to steal and misappropriate cash seized by Narcotics Detectives and mishandle and contaminate substances alleged to contain illicit drugs.

458. The SPD had a policy or custom of failing to investigate allegations of misconduct made against BURNHAM by other police officers and of failing to discipline Defendant BURNHAM for these violations.  This policy or custom led Defendant BURNHAM to

believe he could steal, misappropriate, and manufacture evidence with impunity because he would not be investigated or disciplined for his misconduct.

459. The SPD had another policy or custom of failing to supervise Defendant BURNHAM's handling of substances in the performance of his duties as a Narcotics Detective.  This policy or custom led Defendant BURNHAM to believe he could ignore safeguards designed to prevent the contamination and tampering of evidence with impunity because he would not be investigated or disciplined for his misconduct.

460. These policies and customs of Defendant CITY OF SPRINGFIELD were the moving force behind Defendant BURNHAM's violations of Plaintiff's constitutional rights

461. As a direct and proximate cause of the aforesaid actions and conduct by Defendant CITY OF SPRINGFIELD, Plaintiff suffered great pain of mind and body and was otherwise damaged.

## COUNT VIII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (INDIVIDUAL DEFENDANTS)

462. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 397 as if fully set forth herein.

463. The aforesaid conduct by the INDIVIDUAL DEFENDANTS was extreme and outrageous and likely to result in severe emotional distress to Plaintiff, which Plaintiff did in fact suffer.

464. As a direct and proximate cause of the aforesaid actions and conduct by the INDIVIDUAL DEFENDANTS, Plaintiff suffered great pain of mind and body and was otherwise damaged.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against Defendants jointly and severally on all counts of this complaint and:

a) Award compensatory damages;
b) Award punitive damages;
c) Award interest and costs of this action to Plaintiff;
d) Award attorneys' fees to Plaintiff; and
e) Award such other relief which this Court deems just and proper.

*       *       *       *       *       *       *

PLAINTIFF DEMANDS A JURY TRIAL

Respectfully Submitted,
THE PLAINTIFF,

By ___/s/ Luke Ryan
LUKE RYAN, BBO#664999
SASSON, TURNBULL, RYAN & HOOSE
100 Main Street, Third Floor
Northampton, MA  01060
(413) 586-4800
lryan@strhlaw.com