UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROLANDO PENATE,<br>          Plaintiff<br><br>v.<br><br>ANNE KACZMAREK, ET AL.,<br>          Defendants | NO.  17-CV-30119-KAR |

**MEMORANDUM IN SUPPORT OF DEFENDANT KRIS FOSTER'S MOTION TO DISMISS**

The defendant, Kris Foster, moves to dismiss the claim against her asserted by the plaintiff, Rolando Penate, pursuant to Fed. R. Civ. P. 12(b)(6).  Although Foster disputes the allegations contained in the Complaint, she acknowledges that under Rule 12(b)(6), the well-pleaded factual allegations set forth in the Complaint must be accepted as true for purposes of this motion. Even assuming the well-pleaded allegations of the Complaint are true (which they are not), the claim against Foster must be dismissed.

As explained in greater detail below, controlling Supreme Court and First Circuit authority, including Imbler v. Pachtman, 424 U.S. 409 (1976) and Reid v. New Hampshire, 56 F.3d 332 (1st Cir. 1995), mandates dismissal of the claim against Foster on the ground of absolute immunity.  Pursuant to this controlling authority, Foster is entitled to absolute immunity because the claim arises from her advocacy on behalf of the Commonwealth during ongoing criminal proceedings.  Indeed, the First Circuit in Reid expressly held that the failure to disclose exculpatory evidence --- the precise allegation made here --- falls squarely within the grant of absolute immunity. Reid, 56 F.3d at 336-37.

Moreover, the claim against Foster must be dismissed for the additional reason that the Complaint never alleges that Foster, a lawyer "inexperienced" with subpoenas and motions to quash, ever reviewed the evidence at issue or appreciated that it was exculpatory. Whether or not Foster should have reviewed that evidence and should have understood its exculpatory import, these missteps would amount at most to negligence, falling far short of the intentional or reckless disregard of plaintiff's constitutional rights needed to state a claim under 42 U.S.C. § 1983.

## ALLEGATIONS OF THE COMPLAINT

### A.  General Allegations Concerning Sonia Farak and the Drug Lab

The claims asserted against Foster in this case arise from discovery motions and requests filed by the plaintiff, a former criminal defendant, who was seeking to challenge his criminal charges and subsequent conviction due to the misconduct of the state laboratory chemist who had tested the substances sold by the plaintiff in the course of three undercover drug purchases. (Complaint, ¶¶ 110-18, 142-43, 166, 240, 278).[1] That chemist, Sonia Farak, ultimately pled guilty to evidence tampering and drug charges arising from her theft and consumption of controlled substances from the drug lab. (¶¶ 82-92, 381).

### B.  The Exculpatory Evidence

In January 2013, law enforcement seized approximately 300 pages of paper from Farak's vehicle. (¶¶ 198, 201). The documents included mental health worksheets, which evidently memorialized Farak's use of controlled substances at the drug lab --- including on December 22, 2011, one of the days on which Farak reported testing a sample in the plaintiff's criminal case. (¶¶ 146, 201, 203, 205). In the inventory prepared by law enforcement, the mental health worksheets were listed as "assorted lab paperwork." (¶¶ 208-210).

---

[1] All paragraph references are to the Complaint.

### C. Foster's Alleged Role

On August 22, 2013, the plaintiff served subpoenas on the lead Farak prosecutor, Assistant Attorney General Anne Kaczmarek, and Sgt. Joseph Ballou of the Massachusetts State Police (assigned to the Massachusetts Attorney General's Office ("the AGO"), directing them to produce evidence relating to Farak's misconduct, including inter- and intra-office correspondence concerning the scope of evidence tampering or deficiencies at the Amherst Drug Laboratory. (¶ 249).

The following day, the Chief of the AGO's Criminal Appeals Division, Randall Ravitz, assigned Foster to handle the AGO's response to the subpoenas. (¶ 253). At that time, Foster had been with the AGO for only six weeks, and she had no experience responding to subpoenas or filing motions to quash. (¶ 254). Ravitz provided Foster with sample briefs he had filed in prior cases seeking to quash subpoenas. (¶¶ 259, 260).

An evidentiary hearing on various motions by defendants seeking discovery concerning Farak's misconduct was scheduled for September 9, 2013. (¶ 286). Ballou was served with a new subpoena *duces tecum* for the September 9 hearing that called for the "production of all documents and photographs pertaining to the investigation of Sonja Farak and the Amherst Drug Lab." (¶ 263). Foster was assigned to respond to this new subpoena. (¶ 265).

The Complaint alleges that at some point during two AGO meetings to discuss the subpoena, Kaczmarek informed her colleagues that she and Ballou possessed undisclosed copies of Farak's mental health worksheets. (¶ 273). Kaczmarek claimed these documents were irrelevant to "Farak defendants" like the plaintiff and should not be produced given the fact that several contained information concerning Farak's mental health treatment. (¶ 274).

On September 6, 2013, Foster filed a motion to quash the Ballou subpoena. (¶ 275). In the alternative, the motion sought a protective order to restrict the scope of the subpoena by not requiring the AGO to produce seven types of information, including "emails responsive to the subpoena, but not already contained in the case file specifically listed therein" and "information concerning the health or medical or psychological treatment of individuals." (¶ 276). The plaintiff also sought copies of Farak's personnel file, including copies of her performance evaluations. (¶ 283).

The Complaint alleges that prior to the hearing on September 9, 2013, Irwin and Foster instructed Ballou not to divulge the existence of the mental health worksheets. (¶ 286). At the hearing, Judge Kinder denied the motion to quash the Ballou subpoena insofar as it called for Ballou's testimony. (¶ 287). With respect to Foster's request for a protective order, Foster acknowledged that she had not reviewed any documents in Ballou's possession and that Ballou had not brought his file to the hearing. (¶ 288). Rather than delay the hearing, Judge Kinder told her to review Ballou's file and submit copies of any undisclosed documents for an *in camera* review. (¶ 289).

In e-mails exchanged after the hearing, Foster informed her superiors at the AGO that that while it was unclear what Judge Kinder was "looking for . . . [,] Sergeant Ballou did testify that he thinks everything in his file has already been turned over." (¶ 301). According to the Complaint, Kaczmarek decided to embrace an unduly restrictive interpretation of the term "file" and advised Foster there was no need to produce any additional documents for Judge Kinder's *in camera* review. (¶ 304). On September 16, 2016, Foster sent a letter to Judge Kinder stating "After reviewing Sergeant Ballou's file, every document in his possession has been disclosed. This includes grand jury minutes and exhibits, and police reports." (¶ 305).

The plaintiff later filed a motion to inspect the physical evidence in the Farak case, as well as motions for third-party discovery from the AGO and Department of Public Health. (¶ 309). Foster filed oppositions on behalf of the AGO and DPH to the plaintiff's motion for third party records. (¶ 314). Ravitz approved these pleadings before Foster filed them. (¶ 315). In response to the plaintiff's request for evidence suggesting third-party knowledge of Farak's tampering, Foster stated: "The AGO has turned over all grand jury minutes, exhibits, and police reports in its possession to the District Attorney's office. Based on these records, to which the defendant has access, there is no reason to believe that a third party had knowledge of Farak's alleged malfeasance prior to her arrest." (¶ 316).

On October 2, 2013, the parties appeared before Judge Kinder for a hearing on the plaintiff's discovery motions, which focused on the plaintiff's efforts to obtain a physical inspection of the evidence seized from Farak's vehicle, intra-office communications, and Farak's personnel file. (¶ 312). With respect to the motion to inspect physical evidence, Foster characterized the undisclosed items in Farak's car as "irrelevant," although she had not reviewed the evidence. (¶ 325). Judge Kinder ultimately denied this motion based, apparently based in part on testimony by Ballou that "the physical evidence ha[d] been described in detail for [Plaintiff] and photographs of that evidence have been provided." (¶ 326). As for the request for the personnel file, Judge Kinder asked Foster whether she had reviewed Farak's personnel file, to which she had responded that she had not. Judge Kinder declined to order the production of the personnel file. (¶¶ 322-23).

Finally, with respect to the AGO's intra-office correspondence, Foster took the position that "almost all of that is going to be work-product preparation," though she acknowledged that the AGO had not compiled all of the possible correspondence. (¶ 328). Foster also told Judge

5

Kinder that she had talked to Kaczmarek and Ballou and both assured her "there's no smoking gun." (¶ 332).

On November 4, 2013, Judge Kinder denied a motion to dismiss filed by the plaintiff, concluding that Farak's "misconduct, while deplorable, postdate[d] the testing in [the plaintiff's] case." (¶¶ 341-342).

On November 25, 2013, Foster filed motions to quash the plaintiff's subpoenas to Kaczmarek and Ballou. (¶ 345). Ravitz approved these pleadings before Foster filed them. (¶¶ 346). Judge Page granted the motions to quash on December 4, 2013. (¶ 351).

On December 11, 2013, the trial judge allowed the plaintiff's motion for a required finding of not guilty on various firearms-related charges. (¶ 376). On December 13, 2013, the jury acquitted the plaintiff of all remaining offenses with the exception of a single count of Distributing a Class A Substance on November 15, 2011. (¶ 376).

On January 6, 2014, Farak pled guilty to evidence tampering and drug-related charges. (¶ 381). On July 30, 2014, the plaintiff's defense attorney obtained an order to inspect the "assorted lab paperwork" in an unrelated Hampshire County case. (¶ 382). The inspection uncovered the Farak mental health worksheets. (¶ 383). On May 21, 2015, Plaintiff filed a motion for a new trial. (¶ 387). Judge Carey dismissed the plaintiff's prosecution on June 26, 2017. (¶ 395).

## ARGUMENT

### I. THE DEFENDANT HAS ABSOLUTE IMMUNITY BECAUSE SHE WAS ACTING AS AN ADVOCATE FOR AN AGENCY OF THE COMMONWEALTH

Two propositions regarding absolute immunity are beyond dispute. First, a lawyer acting as a prosecutor is absolutely immune from suit under 42 U.S.C. §1983 when she acts as an advocate for the government in activities that are "intimately associated with the judicial phase

of the criminal process." Imbler v. Pachtman, 424 U.S. 409, 430-31 (1976).  Second, this absolute immunity extends to a lawyer who is accused of surpressing exculpatory evidence and lying to the court about the existence of that evidence. Reid v. New Hampshire, 56 F.3d 332, 336-37 (1st Cir. 1995). See Campbell v. Maine, 787 F.2d 776, 778 (1st Cir. 1986). Goodwin v. Jones, 2016 WL 3581998, *2 (D. Mass. June 27, 2016); Aldrich v. Cambridge, 2012 WL 6622495, *8 (D. Mass. Dec. 18, 2012); Almeida v. Fall River, 2012 WL 3548063, *7 (D. Mass. Aug. 13, 2012); Cignetti v. Healey, 89 F. Supp. 2d 106, 117 (D. Mass. 2000).

     The First Circuit's holding in Reid is fully consistent with the position taken by the Court of Appeals of every Circuit. See, e.g. Warney v. Monroe County, 587 F. 3d 113, 124-26 (2d Cir. 2009); Yarris v. Delaware County, 465 F. 3d 129, 137 (3d Cir. 2006); Carter v. Burch, 34 F.3d 257, 262-63 (4th Cir. 1994); Cousin v. Small, 325 F.3d 627, 635 (5th Cir. 2003); Koubriti v. Convertino, 593 F.3d 459, 470 (6th Cir. 2010); Houston v. Partee, 978 F.2d 362, 365-66 (7th Cir. 1992); Reasonover v. St. Louis County, 447 F.3d 569, 579-80 (8th Cir. 2006); Broam v. Brogan, 320 F.3d 1023, 1030 (9th Cir. 2003); Esquibal v. Brian Williamson, 421 Fed. Appx. 813, 815-16 (10th Cir. 2010); Bonilla v. United States, 652 Fed. Appx. 885, 892 (11th Cir. 2016); Moore v. Valder, 66 F.3d 189, 194 (D.C. Cir. 1995). One could add to this list literally hundreds of District Court decisions reaching the same result.

     The plaintiff would apparently acknowledge these bedrock principles, but tries to plead around them. In Paragraph 436, he alleges:

> The aforesaid conduct by defendants KACZMAREK, FOSTER, and RAVITZ occurred at times when they were not acting functionally as prosecutors but as third-party evidence custodians acting in conjunction with and on behalf of the prosecuting agency.

As an initial matter, this allegation is conclusory and is not a well-pleaded fact. But more fundamentally, it misapprehends the scope of absolute immunity and the test to be applied in

7

determining whether a government lawyer is entitled to immunity. Absolute immunity is not limited to prosecutors. The focus in determining whether a lawyer is entitled to absolute immunity is not on the lawyer's title or status, but on "the functional nature of the activities" that are being challenged. Imbler, 424 U.S. at 430; see also Knowlton v. Shaw, 704 F.3d 1, 5-6 (1st Cir. 2013).

Foster was acting at all times as an advocate for an agency of the Commonwealth in handling the AGO's response to discovery requests, which the Complaint makes absolutely clear. According to the plaintiff, Foster filed two motions to quash subpoenas (¶¶275, 345); filed an opposition to a motion to inspect evidence (¶314); filed a motion to reconsider the court's ruling on the motion to inspect evidence (¶337); attended two court hearings on the various motions as attorney for the AGO at which she presented the AGO's position on the motions (¶¶ 288, 322); and wrote a letter to a judge on behalf of the AGO in response to an order at one of the hearings (¶305). Her advocacy "persuaded Judge Kinder to issue an order on October 23, 2013, relieving the AGO of the obligation to produce any of its internal correspondence" (¶340), and persuaded Judge Page to quash the subpoena requesting the mental health worksheets (¶351). These are the kinds of things a lawyer acting as an advocate does. Because Foster was acting as an advocate in "the judicial phase of the criminal process," she is absolutely immune from suit.

In determining whether to grant absolute immunity to a government lawyer, a court considers three factors:

> (1) Whether a historical or common law basis exists for immunity from suit arising out of the performance of the function, (2) whether performance of the function poses obvious risks of harassing or vexatious litigation against the official, and (3) whether there exist alternatives to damage suits against the official as a means of redressing wrongful conduct. Hootstein v. Collins, 928 F. Supp. 2d

>   326, 336 (D. Mass. 2013), citing Mitchell v. Forsyth, 472 U.S. 511,
>   521-23 (1985).

In this case, each of these factors militates in favor of absolute immunity.

### A.     There Is A Historical Basis For Absolute Immunity In This Context

Judicial and quasi-judicial immunity have deep roots in common law.  See Imbler, 424 U.S. at 423 n. 20.  That immunity applies to suits under §1983.  In Imbler v. Pachtman, the Supreme Court held that prosecutors were entitled to absolute immunity.  Since Imbler, absolute immunity has been extended to government lawyers in a wide variety of contexts.  In Butz v. Economou, 438 U.S. 478 (1978), the Court extended absolute immunity to lawyers representing the government in administrative proceedings.  In Moniz v . Hall, 2011 WL 487833 *8 (D. Mass. Feb. 7, 2011) and Dinsdale v. Commonwealth, 424 Mass. 176, 180-182, 675 N.E. 2d 374, 377-78 (1997), absolute immunity was conferred on government lawyers involved in civil litigation on behalf of the Commonwealth.  It has even been extended to government lawyers who decline to bring civil litigation.  See Mangiafico v. Blumenthal, 471 F.3d 391, 397 (2d Cir. 2006).

The critical factor in deciding whether absolute immunity is appropriate is not whether the lawyer was acting as a prosecutor or whether the proceeding was criminal or civil.  Rather, the critical factor is what the lawyer was doing in the proceeding.  Where the government lawyer was acting as an advocate in a judicial proceeding, she is entitled to absolute immunity.  Absolute immunity is unavailable to a government lawyer only where she was acting "in the role of an administrator or investigative officer rather than that of advocate."  In those cases, she is entitled to qualified immunity.  Imbler, 424 U.S. at 430-31.  The Supreme Judicial Court has described the dichotomy this way:

>   As with government prosecutors, the cloak of absolute immunity
>   extends only to the attorney's performance of standard advocacy
>   functions for the Commonwealth.  Where the challenged activity is
>   beyond the realm of litigation and involves assistant attorneys general

>in roles other than that of advocates, the activity is protected only by qualified immunity. Dinsdale, 424 Mass. at 181, 675 N.E. 2d at 378.

See also Kalina v. Fletcher, 522 U.S. 118, 127 (1997) (government lawyer entitled to absolute immunity "when performing the traditional functions of an advocate.").

Everything the plaintiff alleges Foster did or failed to do falls within the traditional functions of an advocate. She responded to subpoenas, she filed motions resisting the subpoenas, and she appeared and argued in court on behalf of the Commonwealth. These are not "administrative" or "investigative" functions. They are standard advocacy functions under any definition of that term.

Foster is entitled to absolute immunity for her conduct as a government advocate, and the claims against her must be dismissed, notwithstanding the plaintiff's characterization of her actions as involving an intentional failure to disclose exculpatory evidence and her status as a mere "custodian." First, there is no "bad faith" exception to absolute immunity. Campbell, 787 F.2d at 778, citing Imbler, 424 U.S. at 430-31 (no bad faith exception for withholding exculpatory evidence). If a government lawyer is acting as an advocate on behalf of the Commonwealth, as the Complaint alleges Foster was, she is entitled to absolute immunity regardless of how the plaintiff chooses to characterize the lawyer's intent. See Suboh v. Revere, 141 F. Supp. 2d 124, 137 (D. Mass. 2001) ("When a [lawyer] is enshrouded in absolute immunity, the protection is not eroded no matter how erroneous the act may have been, how injurious its consequences, or how malicious the motive.").

Second, Foster's entitlement to absolute immunity for representing the Commonwealth in Court cannot be defeated by the verbal trick of calling her a "third-party evidence custodian." (¶436). This phrase was obviously designed to convey the impression that Foster was a passive receptacle for evidence, rather than an advocate in a criminal case. The phrase, whatever the

plaintiff intended it to mean, is utterly inconsistent with the actions the Complaint alleges Foster undertook. The allegations of the Complaint show that Foster, in responding to the subpoenas, had to decide which documents were responsive, what privileges applied, what disclosure obligations existed and how they could properly be met, and then presenting and defending those positions in court in a criminal prosecution. These allegations describe the discretionary actions of a lawyer acting as an advocate, not those of a "custodian." The plaintiff's semantic maneuver does not deprive Foster of absolute immunity because her entitlement is not determined by labels but by an analysis of "the functional nature of the activities" that are being challenged. Imbler, 424 U.S. at 430.

### B. Public Policy Factors Warrant Absolute Immunity

There is a very real concern that government attorneys can be subjected to vexatious litigation arising out of their role in judicial proceedings. "The judicial process is an arena of open conflict, and in virtually every case there is, if not always a winner, at least one loser. It is inevitable that many of those who lose will pin the blame on judges, prosecutors, or witnesses and will bring suit against them in an effort to relitigate the underlying conflict." Mitchell v. Forsyth, 472 U.S. 511, 521-22 (1985). The danger of vexatious litigation, and the corresponding need for absolute immunity, is most acute where the lawyer's conduct is "closely related to the judicial process," and involves the lawyer's "role in judicial proceedings." Burns v. Reed, 500 U.S. 478, 494 (1991). See Dinsdale, 424 Mass. at 181, 675 N.E.2d at 377 ("conducting civil litigation on behalf of the government poses obvious risks of entanglement of such attorneys in vexatious and burdensome litigation by disgruntled litigants.").

Note that the public policy concern of avoiding vexatious litigation does not depend on whether a particular case in which a lawyer is acting as an advocate for the Commonwealth will or will not result in vexatious litigation. See Id. at 181 n. 9, 675 N.E.2d at 377 n. 9 ("To the

11

extent that the defendants suggest Dinsdale is a 'disgruntled litigant,' we think that on these facts he is understandably and justifiably so."). Rather, the policy is based on concerns arising out of the role the lawyer was playing in the proceeding. The plaintiff's allegations against Foster easily satisfy these concerns. They raise much more than "a generalized concern with interference with an official's duties . . . ." Rather, the plaintiff expressly alleges actions Foster took that "closely related to the judicial process," and the gist of the Complaint concerns Foster's "role in judicial proceedings." Burns, 500 U.S. at 494.

### C. There Exist Alternatives to Damage Suits To Redress Wrongful Conduct

There are at least three avenues available to redress and deter wrongful conduct by government lawyers in criminal cases. First, there are remedies available in an underlying criminal case. These include such things as sanctions or contempt against the lawyer. Dinsdale, 424 Mass. at 181, 675 N.E.2d at 377; Moniz, 2011 WL 487833 *9 n. 7. They also include the standard post-conviction remedies available to the criminal defendant. Second, there are bar disciplinary proceedings to deter and punish conduct proscribed by the Rules of Professional Conduct. Id. Third, plaintiffs who believe they were wrongfully convicted may file a claim for compensation under the Massachusetts erroneous conviction statute, G.L. c. 258D.

Taken together, these remedies provide ample opportunity for redress. But even if they didn't, and there were no avenue for redress, this is a risk that must be accepted. As Judge Learned Hand observed:

> As is so often the case, the answer must be found in a balance between the evils, inevitable in either alternative. In this instance, it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949).

**II.  THE PLAINTIFF HAS FAILED TO STATE A CLAIM AGAINST FOSTER UNDER § 1983 BECAUSE THE WELL-PLEADED FACTS DO NO ESTABLISH AN INTENTIONAL OR RECKLESS DEPRIVATION OF PLAINTIFF'S RIGHTS**

The absolute immunity doctrine mandates dismissal of the claim against Foster for the reasons outlined above.  The claim is also subject to dismissal for the separate and independent reason that the well-pleaded factual allegations of the Complaint fail to show that Foster intentionally or recklessly deprived the plaintiff of his constitutional rights.

It is settled law that merely negligent conduct is not actionable under § 1983.  Germany v. Vance, 868 F.2d 9, 17-18, 21 (1st Cir. 1989).  Instead, what is required is either an intentional interference with the plaintiff's constitutional rights or "reckless or callous indifference when it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights."  Id. at 17-18.  Such reckless or callous indifference may fall short of intentional or willful conduct yet still exemplify "the arbitrary exercise of the powers of government" animating the protections of the Due Process Clause.  Id. at 18.  (quotation omitted).  "Negligence, in contrast – no matter how 'gross' it may be – exemplifies lack of care, rather than abuse of power."  Id.  The failure to disclose exculpatory information will rise to the level of reckless indifference only where "the information is of such obvious import that withholding it would appear very likely to lead to a miscarriage of justice."  Id. at 19.

In Germany, for example, which involved a juvenile offender committed to the care of the Massachusetts Department of Youth Services ("DYS"), DYS employees were told by the juvenile's parents that they had fabricated the charge that had led their child being placed in DYS custody.  Id. at 11.  This information was not shared with the juvenile or the state court that had adjudged her a delinquent child.  Id.  Although the First Circuit agreed with the District Court that the failure to disclose important exculpatory evidence could constitute a violation of the

plaintiff's right of access to the courts, it ruled that summary judgment in the plaintiff's favor was not warranted because the record did not clearly establish that the defendants appreciated the significance of the parents' statement, which would be required to ground a claim that they were recklessly indifferent to the juvenile's rights. Id. at 16, 18-19.

Here, the crux of the plaintiff's claim against Foster is that she failed to disclose Farak's mental health worksheets, which contained exculpatory evidence. The Complaint does not contain any well-pleaded factual allegations, however, that Foster knew what was contained in the mental health worksheets or appreciated their possible exculpatory significance. Quite the opposite: the Complaint alleges that Foster, who was new to the Office of the Attorney General and inexperienced in responding to subpoenas (¶ 254), never reviewed the mental health worksheets (¶¶ 258, 274, 288), and was told by the lead Farak prosecutor, Anne Kaczmarek, that the mental health documents were irrelevant and that there was no need to produce any documents not already furnished to the Farak defendants -- apparently based, at least in part, on Kaczmarek's interpretation of what constituted "the file" -- (¶¶ 274, 304), and that there was no exculpatory "smoking gun." (¶ 332).

Moreover, the Complaint also alleges that Ballou testified, or at least implied, that all the evidence seized from Farak's vehicle had been photographed and that Foster understood Ballou to have testified that everything in his file had been turned over. (¶¶ 292-293, 301). The Complaint further suggests that Foster's objections to the production of certain categories of evidence on behalf of the Commonwealth were prompted by, or at least consistent with, the guidance of her superiors. (¶¶ 260, 269, 271, 315, 338).

Whether or not the allegations of the Complaint support the conclusion that Foster *should have* reviewed the file and thus failed to exercise due care, there are no well-pleaded factual

allegations plausibly suggesting that Foster appreciated the potential exculpatory impact of the mental health worksheets.  She did not know what they contained or reflected.  Also, the allegations of the Complaint suggest that Foster believed that everything discoverable had already been turned over and that the Commonwealth had colorable objections to the production of certain categories of evidence.  Even if those beliefs were incorrect, or even based on a failure to exercise due care, such alleged negligence cannot ground a claim for damages under § 1983.

>  Defendant,
>  KRIS FOSTER.
>  By her attorneys,
>
>  */s/Allen N. David*
>  Allen N. David, BBO #115000
>  George A. Berman, BBO #4701
>  Timothy M. Pomarole, BBO #660827
>  Peabody & Arnold LLP
>  Federal Reserve Plaza
>  600 Atlantic Avenue
>  Boston, MA 02210
>  (617) 951-2100
>  adavid@peabodyarnold.com
>  gberman@peabodyarnold.com
>  tpomarole@peabodyarnold.com

DATE:  December 26, 2017

## CERTIFICATE OF SERVICE

I, Timothy M. Pomarole, hereby certify that I have this 26th day of December  2017, served a copy of the foregoing document, by causing a copy thereof, to be sent electronically, through the ECF system, to the registered participants in this case, as identified on the Notice of Electronic Filing (NEF).

>  */s/Timothy M. Pomarole*
>  Timothy M. Pomarole

1329094
16360-202353