## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
|  |  |  |
|---|---|---|
| **ROLANDO PENATE,** | \* | |
| Plaintiff | \* | |
| | \* | |
| **v.** | \* | |
| | \* | **CIVIL ACTION NO. 17-30119-KAR** |
| **ANNE KACZMAREK, KRIS FOSTER,** | \* | |
| **RANDALL RAVITZ, JOSEPH BALLOU,** | \* | |
| **ROBERT IRWIN, RANDY THOMAS,** | \* | |
| **SONJA FARAK, SHARON SALEM,** | \* | |
| **JAMES HANCHETT, JULIE NASSIF,** | \* | |
| **LINDA HAN, STEVEN KENT, JOHN** | \* | |
| **WADLEGGER, GREGG BIGDA,** | \* | |
| **EDWARD KALISH, and** | \* | |
| **CITY OF SPRINGFIELD** | \* | |
| | \* | |
| Defendants | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF'S OPPOSITION TO DEFENDANT KRIS FOSTER'S MOTION TO DISMISS

### *Introduction*

On June 26, 2017, Superior Court Judge Richard Carey found that former Assistant Attorney General (AAG) Kris Foster (Foster) perpetrated a fraud upon the court by deliberately withholding exculpatory evidence in a criminal case brought against Plaintiff Rolando Penate (Plaintiff) by the Office of the Hampden County District Attorney.   Notwithstanding this determination, which resulted in the termination of Plaintiff's prosecution, Foster now protests that: (a) she is entitled to absolute immunity because she acted "as an advocate for an agency of

the Commonwealth"; and (b) her "missteps . . . amount at most to negligence."[1]  Neither contention

warrants the dismissal she seeks.

Absolute immunity is a doctrine that protects officials who initiate and pursue prosecutions

or perform other judicial or quasi-judicial functions.  It cannot be invoked by non-party advocates,

like Foster, who disregard their *Brady* obligations.  With respect to her so-called missteps, Foster

plainly did not perpetrate a fraud on the court by accident.  Judge Carey's findings and Plaintiff's

well-pled facts easily establish her reckless indifference to Mr. Penate's constitutional rights.  For

these reasons and those set forth below, Foster's motion should be denied.

### *Factual Background*

What follows is a concise summary of the Complaint's most pertinent facts, as they pertain

to Foster, supplemented with facts set forth in "documents the authenticity of which are not

disputed by the parties; . . . official public records; . . . documents central to plaintiff's claim[s];

[and] documents sufficiently referred to in the complaint."  *Freeman v. Town of Hudson*, 714 F.

3d 29, 36 (1st Cir. 2013) (citation omitted).

A.    *The Hampden County Case Against Rolando Penate*

On November 16, 2011, Plaintiff was charged with a number of drug-related offenses in

Springfield District Court.  (Compl. ¶ 125.)  The substances giving rise to these charges were

delivered to the Amherst Drug Lab and assigned to Sonja Farak (Farak) for testing.  (*Id.* ¶¶ 110-

15, 127, 143.)  Each test Farak performed in Plaintiff's case purportedly came back positive for

the presence of a controlled substance.  (*Id.* ¶ 143.)  The analysis of these substances took place

on three different dates: December 22, 2011, January 6, 2012, and January 9, 2012.  (*Id.* ¶ 142.)

On the first of these dates, Farak memorialized her use of narcotics at the Amherst Drug Lab by

---

[1] (Dkt. No. 54, Mem. in Supp. of Def. Kris Foster's Mot. to Dismiss 8, 2.)

making the following entry on a ServiceNet Diary Card: "tried to resist using @ work but ended up failing." (*Id.* ¶¶ 144-46.) At some point after December 26, 2011, Farak placed the completed Diary Card in the trunk of her automobile. (*Id.* ¶ 147.)

On February 1, 2012, the Hampden County District Attorney's office presented its case against Plaintiff to a Grand Jury. (*Id.* ¶ 160.) During this proceeding, an Assistant District Attorney (ADA) introduced, as an exhibit, a copy of the drug certificate Farak signed on December 22, 2011, i.e., the same date she "tried to resist using @ work but ended up failing." (*Id.* ¶ 161.)

B.    *The Beginning of the Farak Criminal Investigation*

The charges against Plaintiff were pending on January 19, 2013, investigators assigned to the Attorney General's Office (AGO) obtained a warrant to search Farak's car and seized approximately 300 pages of paper, including the aforementioned ServiceNet Diary Card. (*Id.* ¶ 201.) On February 14, 2013, Sergeant Joseph Ballou (Ballou) attached copies of several "mental health worksheets," including the ServiceNet Diary Card, to an email he sent Anne Kaczmarek (Kaczmarek), the Assistant Attorney General (AAG) assigned to prosecute Farak. (*Id.* ¶ 220.)

C.    *Plaintiff's Motion to Dismiss*

On or about March 27, 2013, John Verner (Verner), the Head of the AGO's Criminal Bureau, sent an identical letter to each of the Commonwealth's eleven District Attorneys; it began this way:

> This Office is investigating Sonja Farak, a chemist who conducted analysis of suspected narcotic samples out of the Amherst Drug Laboratory . . . . During our investigation, this Office has produced or otherwise come into possession of information, documents and reports. Pursuant to this Office's obligation to provide potentially exculpatory information to the District Attorneys as well as information necessary to your Offices' determination about how to proceed with cases in which related narcotics evidence was tested at the Amherst Laboratory, please find the below listed materials . . . .

(*Id.* ¶ 232.) None of the mental health worksheets in possession of the AGO were included in the materials provided to the District Attorneys. (*Id.* ¶ 233.)

On July 15, 2013, Plaintiff filed a motion to dismiss. (*Id.* ¶ 242.) Hampden County Superior Court Judge Mary-Lou Rup issued an order on July 23, 2013, stating that:

> an evidentiary hearing must be conducted on the following issues: (i) if Ms. Farak and/or the Amherst drug lab engaged in egregious misconduct in the handling, storage, and analysis of suspected narcotics during the time period between November 2011 and January 2012, when the Amherst drug lab had custody and control of the alleged substances related to the defendant's case; (2) if such misconduct has substantially prejudiced the defendant or irreparably harmed his right to a fair trial; or (3) if such egregious misconduct was deliberate and intentional, warranting a prophylactic sanction of dismissal.

(*Id.* ¶ 243.)

Judge Rup's order reminded ADA Eduardo Velazquez (Velazquez) of his "obligation to seek [evidence] from government agencies (including the Office of the Attorney General) and to produce exculpatory evidence that may be favorable to [Plaintiff's] case, and not simply turn a blind eye to what is not in its immediate control." (*Id.* ¶ 244.) At this point, neither Plaintiff, Velazquez, nor Judge Rup knew the AGO possessed the mental health worksheets. (*Id.* ¶ 245.) Velazquez sought exculpatory evidence from the AGO and was told all relevant evidence had already been turned over. (*Id.* ¶ 246.)

Plaintiff's evidentiary hearing was originally scheduled to take place on August 27, 2013. (*Id.* ¶ 261.) It was postponed at the request of the AGO; the parties later agreed that the evidence adduced at a post-conviction proceeding before Superior Court Judge Kinder could be used to adjudicate Plaintiff's pre-trial motion to dismiss. (*Id.* ¶ 262.)

D.   *Foster's Involvement in the Penate Prosecution*

Ballou and Kaczmarek received subpoenas commanding their testimony and the production of certain documents. (*Id.* ¶ 249.) The AGO received one motion to inspect evidence

4

seized from Farak's car and a second motion compelling the production of "any and all evidence suggesting that a third party may have been aware of Farak's evidence tampering at the Amherst Drug Laboratory prior to Farak's arrest." (*Id.* ¶ 279.) This second motion also requested certain documentation in the possession of the Department of Public Health (DPH), including Farak's personnel file and copies of any performance evaluations. (*Id.* ¶ 283.) All four non-parties entrusted Foster with their response.

### 1.    Foster's Advocacy on Behalf of Ballou

Foster moved to quash the Ballou subpoenas. (*Id.* ¶ 275.) In the alternative, she sought relief from the obligation to produce "emails responsive to the subpoena[s], but not already contained in the case file specifically listed therein" and "information concerning the health or medical or psychological treatment of individuals." (*Id.* ¶ 276.) The impetus of the protective order request was a desire to prevent the production of the undisclosed mental health worksheets. (*Id.* ¶ 277.) Prior to a hearing on September 9, 2013, Foster instructed Ballou "not to divulge the existence" of this evidence. (*Id.* ¶ 286.) At the outset of that hearing, Judge Kinder denied the motion to quash and instructed Foster to review Ballou's file and submit copies of any undisclosed documents for an *in camera* review. (*Id.* ¶¶ 287-89.) Foster defied this court order by not reviewing Ballou's file, then sent Judge Kinder a personal letter falsely claiming "every document in [Ballou's] possession has already been disclosed." (*Id.* ¶¶ 305-08.)

### 2.    Foster's Advocacy on Behalf of Kaczmarek

Foster depicted Kaczmarek as an "irrelevant" witness by falsely claiming no evidence suggested "the allegations against Farak date[d] back to the time she tested the drugs in [Plaintiff's] case." (*Id.* ¶ 347.) As previously noted, Kaczmarek actually possessed a document demonstrating

evidence tampering and drug abuse by Farak on the exact same date she reported testing a sample in Plaintiff's case. Foster succeeding in quashing Kaczmarek's subpoena. (*Id.* ¶ 351.)

3.   Foster's Advocacy on Behalf of the AGO

Foster did not squarely or honestly address Plaintiff's request for evidence suggesting third-party knowledge of Farak's tampering. (*Id.* ¶ 317.) Instead, she filed a pleading stating: "The AGO has turned over all grand jury minutes, exhibits, and police reports in its possession to the District Attorney's office. Based on these records, to which the defendant has access, there is no reason to believe that a third party had knowledge of Farak's alleged malfeasance prior to her arrest." (*Id.* ¶ 316.) Foster used this language in an effort to avoid acknowledging the existence of the undisclosed mental health worksheets. (*Id.* ¶ 318.)

Judge Kinder denied Plaintiff's motion to inspect physical evidence due, in part, to Foster's claim the undisclosed items in Farak's car were "irrelevant," even though she had never seen any of this evidence.   (*Id.* ¶¶ 325-26.)   Foster opposed Plaintiff's request for intra-office correspondence concerning the scope of Farak's evidence tampering by designating it "work product." (*Id.* ¶ 318.) Once it became clear Foster had not reviewed this evidence, Judge Kinder ordered its production. (*Id.* ¶ 318.) He later reconsidered this ruling when Foster submitted a post-hearing pleading falsely suggesting she had reviewed the materials and now had a good faith basis for lodging a "work product" objection. (*Id.* ¶ 318.)

4.   Foster's Advocacy on Behalf of DPH

Foster did not review Farak's personnel file. (*Id.* ¶ 322.) Had she done so, she would have revealed no performance evaluations completed by James Hanchett (Hanchett) during the four and a half years he supervised the Amherst Drug Lab. (*Id.* ¶ 285.) In the opposition Foster filed on behalf of DPH, she mocked the notion that Farak's personnel file "*may* uncover inadequate

supervision." (*Id.* ¶ 319.)  Foster also argued that the possibility of "Hanchett perjuring himself" was "not enough to show the relevance of the personnel file." (*Id.* ¶ 320.)  On October 2, 2013, Judge Kinder denied Plaintiff's requests for DPH materials. (*Id.* ¶ 323.)  Days later, when Hanchett falsely testified that he completed evaluations for Farak three times a year, Plaintiff was unable to impeach him. (*Id.* ¶ 324.)

K.    *Plaintiff's Conviction and Post-Conviction Relief*

Judge Kinder found Farak's misconduct post-dated her handling of the substances in Plaintiff's case and therefore denied his motion to dismiss. (*Id.* ¶ 342.)  In December, 2013, Plaintiff was convicted of one count of Distributing a Class A Substance and received a five to seven year state prison sentence. (*Id.* ¶ 376-77.)  In the fall of 2014, an inspection of the evidence seized from Farak's car revealed the presence of the mental health worksheets. (*Id.* ¶ 383.)  On May 21, 2015, Plaintiff filed a motion for a new trial. (*Id.* ¶ 386.)  His case was once again consolidated with the post-conviction cases of nine other "Farak defendants." (*Id.* ¶ 387.)

Plaintiff and the other post-conviction defendants subsequently sought discovery of prosecutorial misconduct in the possession of the AGO. (*Id.* ¶ 391.)  The AGO opposed the production of such discovery.  On April 29, 2016, the AGO filed a pleading that contained this passage:

> The defendants' proposed claim of prosecutorial misconduct based on actions by the Attorney General's Office fails for the very simple fact that the AGO is not the prosecutor of any of these cases. Certainly, the AGO prosecuted Sonja Farak; but this is not Farak's case. Instead, in these cases the AGO was a non-party from which the defendants previously sought expansive post-conviction discovery. In that capacity, the AGO was well supported by case law in presenting arguments opposing the proposed discovery requests, just as any other non-party might do.

(*Id.* ¶ 393.)

On January 10, 2017, Plaintiff's motion for a trial was allowed with the assent of the Hampden County District Attorney's Office.[2] In a 127-page decision issued on June 26, 2017, the Judge Carey dismissed Plaintiff's conviction with prejudice. (*Id.* ¶ 395.) Among other things, Judge Carey found "Kaczmarek's and Foster's deliberate withholding of exculpatory evidence was particularly egregious in the Penate case" and "qualifies as a fraud upon the court." (*Id.* ¶ 396.)

***Pertinent Legal Principles***

"Section 1983 on its face admits of no defense of official immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993). The Supreme Court has "nevertheless ascertained and announced what it deemed to be the appropriate type of immunity from § 1983 liability in a variety of contexts." *Butz v. Economou*, 438 US 478, 503 (1978) (citations omitted). "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed*, 500 U.S. 478, 486-87 (1991).

Absolute immunity "is reserved for the 'special functions' of certain officials that resemble functions that would have been immune at common law when § 1983 was enacted." *Guzman-Rivera v. Rivera-Cruz*, 55 F.3d 26, 29 (1st Cir. 1995) (citations omitted); *see also Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985) (recognizing the "rare and exceptional character" of "absolute immunity"); *Goldstein v. Galvin*, 719 F.3d 16, 24 (1st Cir. 2013) (holding that absolute immunity only "applies to a narrow swath of public officials"). A defendant "seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Guzman-Rivera*, 55 F.3d at 30 (quoting *Burns*, 500 U.S. at 486).[3] This "functional approach" focuses on

---

[2] (Ex. 1, Criminal Case Summary, <u>Commonwealth v. Rolando Penate</u>, 1279CR00083.)

[3] "In determining immunity," a court must "accept the allegations of [a] complaint as true." *Kalina v. Fletcher*, 522 U.S. 118, 122 (1997) (citing *Buckley*, 509 U.S. at 261). Although "absolute immunity, unlike qualified immunity, only rarely turns on questions of fact," the First Circuit recently dismissed an appeal of an order denying absolute immunity for this reason. *Filler v. Kellett*, 859 F.3d 148 (1st Cir. 2017).

"the nature of the function performed, not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269 (citations omitted).

The Supreme Court first recognized a prosecutor's right to absolute immunity in *Imbler v. Pachtman*, 424 U.S. 409 (1976). In that case, a deputy district attorney allegedly used perjured testimony to convict an innocent man. Because this trial prosecutor "acted within the scope of his duties *in initiating and pursuing a criminal prosecution*," the Court found he was not amenable to suit. *Id.* at 410 (emphasis added). Since then, the Court has held absolute immunity extends to prosecutors who: requested an arrest warrant under false pretenses, *Burns*, 500 U.S. at 492; filed untruthful pleadings, *Kalina*, 522 U.S. at 128-29; and ignored subordinates' non-compliance with the dictates of *Giglio*, *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009) (citing *Giglio v. United States*, 405 U.S. 150 (1972)). In addition to immunizing reprehensible acts, what these cases have in common is underlying conduct related to criminal proceedings initiated by the prosecutors seeking immunity. When prosecutors have pursued immunity for misconduct perpetrated in parallel proceedings, their efforts have been unsuccessful.

For example, in *Lampton v. Diaz*, 639 F.3d 223 (5th Cir. 2011), an Assistant U.S. Attorney (AUSA) prosecuted a Mississippi Supreme Court Justice for fraud, bribery, and tax evasion. *Id.* at 225. Following the judge's acquittal, the AUSA filed a complaint with the state commission on judicial performance and included copies of the judge's tax returns. *Id.* This disclosure prompted the judge to sue the AUSA who, in turn, moved to dismiss on the ground of absolute immunity. *Id.* The district court denied the motion. *Id.*

On appeal, the AUSA took the position that because he was "acting before a state ethics commission," he "should enjoy the same immunity" as its members. *Id.* at 227. The Fifth Circuit

9

disagreed. It noted that the AUSA was neither on the Commission nor "a state ethics attorney authorized to prosecute cases before it." *Id.* Rather, "*Vis-à-vis* the Commission, his status was merely that of a complaining witness." *Id.*[4]

More recently, in *Filler v. Kellett*, 859 F.3d 148 (1st Cir. 2017), a plaintiff involved in a custody dispute was convicted of five counts of gross sexual assault and two counts of simple assault but received a new trial due to the trial judge's finding of prosecutorial misconduct. *Id.* at 150-51. After a second trial resulted in acquittals on all but one charge of simple assault, the prosecutor became the first member of Maine's prosecutorial bar to be sanctioned "based on the prosecutor's representation of the State." *Id.* at 151. The plaintiff then sued the prosecutor for suppressing exculpatory evidence, tampering with evidence, and advising or directing law enforcement officers not comply with subpoenas that the plaintiff's attorney had submitted. *Id.*

When the prosecutor asserted the defense of absolute immunity, the district court denied relief and the First Circuit dismissed the appeal. *Id.* at 150. With respect to the subpoenas issue, the complaint alleged one of them thwarted by the defendant was issued in a civil custody proceeding. *Id.* at 154. The court strongly implied the prosecutor would not enjoy absolute immunity for misconduct perpetrated in this venue. *Id.* Dismissal of the appeal therefore became necessary to "await the development of facts during discovery." *Id.*[5]

*Argument*

---

[4] But for his work as prosecutor, the AUSA also claimed, he would not have possessed the returns. *Id.* This prompted the court to point out that a "prosecutor does not have *carte blanche* to do as he pleases with the information he can access." *Id.*

[5] *See also Mikko v. City of Atlanta*, 857 F.3d 1136, 1143 (11th Cir. 2017) (finding "no support for prosecutorial immunity based on actions taken by prosecutors to prevent a witness from testifying in a case handled by a different prosecutor, from a different office, in a different jurisdiction"); *Spurlock v. Thompson*, 330 F. 3d 791, 799 (6th Cir. 2003) ("Functionally, a prosecutor who injects himself into a post-trial investigation into the possibility of misconduct during the trial is not acting as an advocate.").

A.    *Foster Failure's to Disclose Exculpatory Evidence to Plaintiff's Prosecutor Is Not Covered By the Doctrine of Absolute Immunity.*

Foster devotes much of her brief to recounting the various things she did as "an advocate for an agency of the Commonwealth." One thing she plainly did not do was fulfill her "obligation to provide potentially exculpatory information" to the agency of the Commonwealth prosecuting Plaintiff. (Compl. ¶ 232.)

The AGO acknowledged this obligation on March 27, 2013, but nevertheless failed to provide the District Attorneys with copies of the mental health worksheets. After Judge Rup reminded ADA Velazquez of his own "obligation to seek [evidence] from government agencies (including the Office of the Attorney General)," he fulfilled his obligation and Foster failed to fulfill hers. (*Id.* ¶¶ 244, 246.) Instead of disclosing the existence of the mental health worksheets, Foster conveyed the same untruthful messages to Velazquez she communicated to Plaintiff's counsel and the Superior Court. Judge Carey later found this dereliction of Foster's duty was not only a proximate cause of Plaintiff's conviction; it was so egregious it required dismissing the remaining charge against him with prejudice.

In *Drumgold v. Callahan*, 707 F. 3d 28 (1st Cir. 2013), the First Circuit made it clear that while "the responsibility for obtaining and disclosing . . . evidence remains the duty of the prosecutor, . . . law enforcement officers have a correlative duty to turn over to the prosecutor any material evidence that is favorable to a defendant." *Id.* at 38 (quotation marks and citations omitted). Foster failed to perform this "standard police function," and thereby exposed herself to civil liability. *Brady v. Dill*, 187 F.3d 104, 114 (1999) (citations omitted).

In doing so, she was hardly alone. The complaint alleges that two other AAGs and three MSP troopers assigned to the AGO also knew the mental health worksheets had been mischaracterized as "assorted lab paperwork" and kept from District Attorneys. Granting Foster

and her fellow AAGs absolute immunity for their suppression of this evidence while denying the same protection to the troopers who engaged in the same misconduct would be "incongruous." *Burns*, 500 U.S. at 491. As the Supreme Court has held, "it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Buckley*, 509 U.S. at 273 (quotation marks and citation omitted).

B.    *Foster's Non-Party Advocacy Is Not Entitled to Absolute Immunity*

A prosecutor is the "principal player in carrying out a prosecution." *Albright v. Oliver*, 510 U.S. 266, 279 n.5 (1994) (Ginsburg, J., concurring). His or her "daily function . . . is to bring criminal charges," *Rehberg v. Paulk*, 132 S.Ct. 1497, 1504 (2012), for purposes of "seeking a conviction," *Buck v. Davis*, 137 S.Ct. 759, 777 (2017). "[P]rosecutors, when they rise in court, represent the people." *Kaley v. United States*, 134 S.Ct. 1090, 1114 (2014) (Roberts, C.J., dissenting). It is undisputed that neither Foster nor any of the parties she represented brought criminal charges against Plaintiff or sought his conviction. Those tasks were performed by the Office of the Hampden County District Attorney. *Vis-à-vis* Plaintiff's prosecution, Foster's status was merely that of counsel for witnesses and/or non-party evidence custodians. This characterization is not, as Foster contends, a "verbal trick" or "semantic maneuver" pled to avoid the implications of "bedrock principles." By its own admission, the AGO was a "non-party" in Plaintiff's criminal case. (Compl. ¶ 393.)[6]

This distinction made all the difference in *Barrett v. United States*, 798 F.2d 565, 571 (2d Cir. 1986). In that case, a man named Blauer died in a New York state hospital after receiving an injection of a "compound furnished by the United States Army Chemical Corps as part of an

---

[6] As for DPH, this agency has no authority to initiate and pursue criminal prosecutions. Thus, when she suppressed exculpatory evidence in DPH's possession, Foster was not acting "reasonably within the functions of a prosecutor," *Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012), but "totally outside *any* prosecutorial authority," *Rose v. Bartle*, 871 F. 2d 331, 346 (3rd Cir. 1989) (emphasis in original).

experimental program." 798 F.2d at 567. When the administratix of Blauer's estate brought suit, an Assistant Attorney General of the State of New York named Marcus was "assigned to defend the case." *Id.* at 568. The plaintiff later alleged that Marcus conspired with four federal attorneys to conceal the Army's role in causing Blauer's death. *Id.* at 568-70. All five attorneys invoked the doctrine of absolute immunity in motions to dismiss or for summary judgment. *Id.* at 570. Because Marcus' alleged misdeeds were "undertaken on behalf of the State of New York during the course of and in connection with ongoing litigation," both the district judge and Second Circuit found he was entitled to absolute immunity. *Id.* The federal attorneys were not. Unlike their alleged co-conspirator, they "did not act as counsel for any of the parties in litigation relating to the death of Blauer." *Id.* at 573.

In this case, ADA Velazquez is not alleged to have intentionally suppressed exculpatory evidence. But that is not the reason he cannot be sued.[7] Velazquez enjoys absolutely immunity because he represented a party to the controversy. Because her clients performed a "non-adversarial function" – "acting merely as . . . custodian[s] of evidence,"[8] – all Foster can ask for is qualified immunity.[9]

This becomes even more clear when one considers Judge Pratt's recent rejection of an absolute immunity assertion in *Marten v. Swain*, 242 F. Supp. 3d 744 (S.D. Ind. 2017). Swain was

---

[7] If Foster had disclosed the mental health worksheets and contents of Farak's DPH personnel file to Velazquez, his failure to furnish this exculpatory evidence to Plaintiff could not serve as the basis of her liability under *Brady*, even if the two of them conspired to suppress this evidence. *See Porter v. White*, 483 F.3d 1294, 1310 (11th Cir.2007). This defense was not available to the federal attorneys in *Barrett* because the suppression of evidence favorable to the plaintiff took place in a civil suit; accordingly, the dictates of *Brady* did not apply.

[8] *Yarris v. Delaware County*, 465 F.3d 129, 138 (3d Cir. 2006) (citation omitted); *see also McSurely v. McCalellan*, 697 F.2d 309, 320 (D.C. Cir. 1982) ("[A]llegations regarding the safekeeping of . . . seized materials . . . describe activities outside the scope of a prosecutor's absolute immunity from suit").

[9] The reason she has not done so is perhaps obvious; Foster had a clearly established "duty to turn over to the prosecutor any material evidence that [was] favorable to [Plaintiff]." *Drumgold*, 707 F.3d at 38.

"chief counsel for the tax litigation division of the Indiana Attorney General's Office." *Id.* at 749. It became his responsibility to coordinate and conduct the tax investigation of the plaintiffs, a husband and wife, and their jewelry business. *Id.* at 751. The Hamilton County Prosecutor's Office eventually brought charges against the Martens due, in part, to materials Swain provided. *Id.* at 751. "Joshua Kocher (Kocher), an attorney with the Hamilton County Prosecutor's Office, prosecuted the criminal case against the Martens." *Id.* Swain maintained custody of the evidence. *Id.* "When the Martens requested discovery in the criminal case, Kocher forwarded the requests to Swain to obtain the responsive material." *Id.* (citations omitted).

As "discovery disputes arose," the plaintiffs "sought court intervention" and obtained an order compelling their "unfettered access to the Department of Revenue's records related to the Martens." *Id.* In spite of this order, Swain "instructed" an auditor to withhold a "civil audit assessment" the plaintiffs' attorneys had specifically asked to inspect. *Id.*

Unlike the case at bar, Swain's misdeeds came to light prior to trial and resulted in the dismissal of the criminal charges. *Id.* at 752-53. When the plaintiffs sued Swain, a district judge found their Section 1983 claim was untimely. *Id.* at 753. On appeal, Swain asked the court to "affirm the dismissal . . . because his position as prosecutor furnishe[d] absolute immunity." *Id.* at 754 (citation omitted). The Seventh Circuit reversed the untimeliness determination and declined Swain's immunity request noting its reluctance to engage the required "functional analysis at the pleading stage, particularly where the district court has yet to pass on the issue." *Id.* (citation omitted).

After the remand, Swain sought summary judgment. Citing his status "as a state prosecutor," he once again laid claim to "absolute prosecutorial immunity." *Id.* at 755. Swain stressed that he "perform[ed] functions traditionally viewed as prosecutorial" while representing

14

the state in civil proceedings against the plaintiffs. *Id.* at 755-56. "In this role," it was undisputed that "he utilized his legal and tax expertise to decide whether the Martens' conduct was lawful and to decide whether to prepare and file documents to enforce the administrative subpoena, seek search warrants, and prepare probable cause affidavits." *Id.* at 756.

Notwithstanding these activities, the court found the "proper focus" was not Swain's "prosecutorial role in the civil enforcement action" but "his function in the Martens' criminal cases." *Id.* at 756. Ultimately, Judge Pratt concluded "Swain acted not as a prosecutor but as an investigator and witness in the Martens' criminal cases, and thus, he [was] not entitled to absolute immunity." *Id.* at 757.

Most of the decisions Foster cites, like *Imbler*, feature the absolute immunity claims of trial prosecutors in criminal cases, *see, e.g., Reid v. New Hampshire*, 56 F.3d 332 (1st Cir. 1995); *Goodwin v. Jones*, 2016 WL 3581998 (D. Mass. June 27, 2016); *Aldrich v. Cambridge*, 2012 WL 6622495 (D. Mass. Dec. 18, 2012); *Almeida v. Fall River Police Station*, No. 12-11476-PBS (D. Mass. Aug. 13, 2012), or "agency officials performing . . . functions analogous to those of a prosecutor," like "initiat[ing] administrative proceedings, *Butz v. Economou*, 438 U.S. 478, 515 (1978); *see also Moniz v. Hall*, 2011 WL 487833 (D. Mass. Feb. 7, 2011).[10] Others involve grants of absolute immunity for post-trial work like "defending a conviction from collateral attack,"

---

[10] It should be noted that not all of these claims were entirely successful. *See, e.g., Kalina v. Fletcher*, 522 U.S. 118, 120, 131 (1997) (no absolute immunity "for making false statements of fact in an affidavit supporting an application for an arrest warrant"); *Burns v. Reed*, 500 U.S. 478, 495 (1991) (no absolute immunity "for giving advice to the police"); *Houston v. Partee*, 978 F.2d 362, 367 (7th Cir. 1992) ("When the defendant prosecutors discovered the evidence exculpating [the plaintiffs], they were not functioning as prosecutors," but in the same position as the defendant police officers: "state law enforcement officials who, during a large scale investigation . . . discovered – and then suppressed – evidence which could have exculpated [the plaintiffs]."); *Suboh v. Revere*, 141 F. Supp. 2d 124, 137-38 (D. Mass. 2001) (refusing to extend absolute immunity to ADA whose "alleged conduct was akin to making a custody determination"); *Hootstein v. Collins*, 928 F. Supp. 2d 326, 337 (D. Mass. 2013) (refusing to extend absolute immunity to "attorneys who are negotiating agreements with private parties on behalf of government agencies").

*Warney*, 587 F. 3d at 122; *see also Aldrich*, 2012 WL 6622495, *8, or pursuing the "potential

postjudgment remedies" of a "client agency," *Dinsdale v. Commonwealth*, 424 Mass. 176, 182

(1997). What binds the recipients of absolute immunity in these cases – and separates them from

Foster – is their advocacy on behalf of parties to controversies. It is practically impossible to

perform prosecutorial functions in the service of a non-party; the status of Foster's clients thus

deprives her of the immunity she seeks.

1.     There Is No Historical Basis For Absolute Immunity In This Context.

The onus is on Foster to demonstrate her conduct would have been "accorded immunity

from tort actions at common law when the Civil Rights Act was enacted in 1871." *Tower v.

Glover*, 467 U.S. 914, 920 (1984). Unless she can establish a clear-cut "application of the

principle," she "simply loses." *Buckley*, 509 U.S. at 281 (Scalia, J., concurring).

Foster makes no serious effort to satisfy this heavy burden. Instead, she merely states:

"Judicial and quasi-judicial immunity have deep roots in common law. See Imbler, 424 U.S. at

423 n. 20." (Mem. in Supp. of Def. Kris Foster's Mot. to Dismiss at 9.) That *Imbler* footnote, in

pertinent part, reads:

> The immunity of a judge for acts within his jurisdiction has roots extending to the
> earliest days of the common law . . . . The immunity of grand jurors, an almost
> equally venerable common-law tenet, . . . also has been adopted in this country . . .
> . Courts that have extended the same immunity to the prosecutor have sometimes
> remarked on the fact that all three officials —judge, grand juror, and prosecutor—
> exercise a discretionary judgment on the basis of evidence presented to them . . . .
> It is the functional comparability of their judgments to those of the judge that has
> resulted in both grand jurors and prosecutors being referred to as "quasi-judicial"
> officers, and their immunities being termed "quasi-judicial" as well.

424 U.S. at 423 n.20.

In her capacity as counsel to the recipient of a subpoena *duces tecum*, Foster deliberately

communicated misinformation to a Superior Court Judge by means of a personal letter. This act

is not functionally comparable to those of a judge or grand juror. *See Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435-36 (1993) (describing "resolving disputes between parties, or . . . authoritatively adjudicating private rights" as the "'touchstone' for the doctrine's applicability") (citation omitted). Nor does it bear any resemblance to the functions at issue in *Imbler*: "initiating a prosecution and . . . presenting the State's case." 424 U.S. at 431.

2.    Public Policy Factors Do Not Warrant Absolute Immunity.

The Supreme Court has recognized that absolute immunity is "strong medicine, justified only when the danger of [officials' being] deflect[ed from the effective performance of their duties] is very great." *Forrester v. White*, 484 U.S. 219, 230 (1988) (alterations in original) (citation and internal quotation marks omitted). Such a danger often arises when the performance of an official's duties inspires a "strong incentive" in an adversary "to counter-attack." *Butz*, 438 U.S. at 515 (citation omitted). This incentive is perhaps strongest in those "whom [the prosecutor] accuses and fails to convict." *Imbler*, 424 U.S. at 423 (citation omitted).

The recipients of subpoenas and third-party discovery requests in criminal cases are not the defendants' accusers. Any "resentment at being prosecuted" is unlikely to be directed at them; almost always, such animus is reserved for those advocates who "bring" the prosecutions and "conduct[] them in court." *Id.* at 424-25. Consequently, affording non-parties only a qualified immunity does not "subject those who try to do their duty to the constant dread of retaliation." *Id.* at 427 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)). Nor does it "impose a particularly onerous burden on governmental officials." *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 358 (2d. Cir. 2004). All it means is that, when contemplating the suppression of highly exculpatory evidence in the cases of third party criminal defendants, AAGs may "have to

pause to consider whether a proposed course of action can be squared with the Constitution and laws of the United States." *Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985).

      3.    <u>Alternatives to Damage Suits To Redress Wrongful Conduct Are Woefully Inadequate.</u>

Because the government "alone can know what is undisclosed," *Kyles v. Whitley*, 514 US 419, 437 (1995), its "failure to turn over exculpatory information in its possession is unlikely to be discovered and thus largely unreviewable," *United States v. Alvarez*, 86 F.3d 901, 905 (9th Cir. 1996). When such misconduct does come to light, those responsible are rarely held accountable. Criminal charges against government attorneys "for conduct occurring in the course of a prosecution is all but unheard of,"[11] and the dearth of "professional discipline is particularly glaring in cases involving intentional *Brady* violations."[12] According to one recent report,

> Public records of decisions released by the [Massachusetts] Board of Bar Overseers name only two prosecutors since 1980 who were disciplined for improper trial behavior. An additional nine prosecutors received admonishments from the board for trial conduct without their names being released, the records show. The board has disciplined more than 1,400 attorneys overall since 2005.[13]

The reluctance to name names is not confined to disciplinary boards. "[M]any judges" who lambaste the government for suppressing exculpatory evidence still "go to great lengths to redact the names of misbehaving prosecutors from trial transcripts quoted in judicial opinions."[14]

---

[11] Malia N. Brink, *A Pendulum Swung Too Far: Why the Supreme Court Must Place Limits on Prosecutorial Immunity*, 4 CHAR. L. REV. 1, 27 (2009).

[12] Bennett L. Gershman, *Bad Faith Exception to Prosecutorial Immunity for Brady Violations*, pg. AMICUS (Aug. 10, 2010), http://digitalcommons.pace.edu/lawfaculty/635/ (last visited Jan. 7, 2018).

[13] Shawn Musgrave, *Scant discipline follows prosecutors' impropriety in Massachusetts*, NECIR (Mar. 6, 2017), https://www.necir.org/2017/03/06/scant-discipline-follows-prosecutors-impropriety-massachusetts/ (last visited Jan. 7, 2018.)

[14] Adam M. Gershowitz, *Prosecutorial Shaming: Naming Attorneys to Reduce Prosecutorial Misconduct*, 42 U.C. DAVIS L. REV. 1059, 1062 (2009).

Viewed against this backdrop, the need for suits like the present one become all the more apparent. The alternatives Foster cites are not new. While their creation was no doubt well-intentioned, they have done little to "redress and deter wrongful conduct by government lawyers in criminal cases."

C.    *Plaintiff's Well-Pled Facts Establish Foster's Reckless, If Not Intentional, Violation of His Rights.*

Foster ends her brief by pointing to the purported absence of well-pled facts suggesting she "knew what was contained in the mental health worksheets or appreciated their possible exculpatory significance." (Mem. in Supp. of Def. Kris Foster's Mot. to Dismiss at 14.) This is a makeweight argument unworthy of serious consideration. It depends upon drawing inferences about Foster's state of mind in her favor. *But see Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 514 (1st Cir. 2016) ("[A]ll reasonable inferences" must be drawn "in the pleader's favor."). More importantly, in the context of this case, Foster's claim that she never personally inspected the mental health worksheets is not a defense but an admission of liability. Plaintiff made repeated efforts to inspect the so-called "assorted lab paperwork" or compel its production. Foster responded by portraying this evidence as "irrelevant" or claiming everything had already been disclosed. To suggest, as Foster does, that she was led astray by Ballou's testimony requires one to overlook that he testified in accordance with her instructions. (*See* Compl. ¶ 286.)

Finally, Foster's reliance on *Germany v. Vance*, 868 F.2d 9 (1st Cir. 1989), is somewhat curious given the strikingly different facts and procedural posture of that case. *Germany* arrived at the First Circuit as an appeal of a summary judgment award *to the plaintiff.* Viewed in the light most favorable to the non-moving parties, the record did not compel a conclusion that the defendants "deprived plaintiff of her liberty through reckless or callous indifference." *Id.* at 18-19. According to Chief Judge Campbell, this result might have been different but for the fact that

19

the "defendants were not lawyers but caseworkers" and "defendants neither ignored nor attempted to cover up the [exculpatory evidence]." *Id.* at 19-20. Here, of course, we have a lawyer who ignored *and* attempted to cover up exculpatory evidence.

***Conclusion***

In effect, Foster's Motion to Dismiss asks this Court "to bless a breathtaking injustice." *Fields v. Wharrie*, 740 F.3d 1107, 1113 (2014). For the reasons set forth above, it should be denied.

Respectfully Submitted,
THE PLAINTIFF,

By ___/s/ Luke Ryan_____
LUKE RYAN, BBO#664999
SASSON, TURNBULL, RYAN & HOOSE
100 Main Street, Third Floor
Northampton, MA 01060
(413) 586-4800
lryan@strhlaw.com

## CERTIFICATE OF SERVICE

I, LUKE RYAN, hereby state that the foregoing was filed through the ECF system and electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 9, 2018. A paper copy of this pleading was also sent via first-class mail to Defendant Sonja Farak at P.O. Box 162, Hatfield, MA 01038.

/s/ Luke Ryan, Esq._____
BBO#664999
Sasson, Turnbull, Ryan & Hoose
100 Main Street, 3rd floor
Northampton, MA 01060
(413) 586-4800
lryan@strhlaw.com