# EXHIBIT 4

```
1                                          Pages:  1-152
                                           Exhibits:  8-26
2                                          ID:  E-H

3

4                    COMMONWEALTH OF MASSACHUSETTS
     HAMPDEN, SS                      SUPERIOR COURT DEPARTMENT
5                                     OF THE TRIAL COURT

6

7    * * * * * * * * * * * * * * * *
     COMMONWEALTH OF MASSACHUSETTS    *
8                                     *
     vs.                              *   Docket No. 12-83
9                                     *
     ROLANDO PENATE                   *
10   * * * * * * * * * * * * * * * *

11

12            JURY TRIAL:
              BEFORE THE HONORABLE TINA PAGE
13

14   APPEARANCES:

15   For the Commonwealth:
     Hampden County District Attorney's Office
16   50 State Street
     Springfield, MA  01103
17   By:  Eduardo Velasquez, Assistant District Attorney

18   For the Defendant:
     By:  Luke Ryan, Esq.
19

20

21                                    Springfield, Massachusetts
                                      December 11, 2013
22

23

24                    Elizabeth Marzano
                    Official Court Reporter
25
```

1                          I N D E X

2

3    WITNESS:              DIRECT      CROSS      REDIRECT   RECROSS

4    JOHN SCHRIJN
     (By Mr. Velazquez)    6                      26
5    (By Mr. Ryan)                     13

6    GREGG BIGDA
     (By Mr. Velazquez)    26
7    (By Mr. Ryan)                     35

8    MARTIN AMBROSE
     (By Mr. Velazquez)    42
9    (By Mr. Ryan)                     52

10   DEVON WILLIAMS
     (By Mr. Velazquez)    62
11   (By Mr. Ryan)                     67

12   EDWARD KALISH
     (By Mr. Velazquez)    70                      98
13   (By Mr. Ryan)                     84

14   EDWARD VANZANDT
     (By Mr. Velazquez)    99
15   (By Mr. Ryan)

16   WILLIAM LOPES
     (By Mr. Velazquez)    103
17   (By Mr. Ryan)                     106

18   MARK TEMPLEMAN
     (By Mr. Velazquez)    108
19   (By Mr. Ryan)                     113

20   REBECCA PONTES
     (By Mr. Ryan)         138
21   (By Mr. Velazquez)

22   JOHN KENT
     (By Mr. Ryan)         145
23   (By Mr. Velazquez)

24

25

1                           I N D E X   (Continued)

2

3      EXHIBITS:                                          PAGE:

4      8,              Bag of heroin
       9,              Bag of heroin
5      10,             Phone
       11,             Wallet
6      12,             $366
       13,             Photograph
7      14,             $266
       15,             Heroin
8      16,             Cocaine
       17,             One bag of cocaine
9      18,             Three bags of heroin
       19,             Two bags of cocaine
10     20,             Ten bags of heroin
       21,             Scale
11     22,             Items
       23,             Papers
12     24,             .38 Caliber handgun
       25,             Ammunition
13     26,             Ammunition

14

15

16     FOR IDENTIFICATION:                               PAGE:

17     E,              .38 Caliber handgun
       F,              Ammunition
18     G,              .22 Caliber test fire
       H,              .38 Caliber test fire
19

20

21

22

23

24

25

1    (Court called to order)
     (Defendant present)
2    (9:28 a.m.)

3

4         THE CLERK:  We're on the record in Commonwealth versus

5    Rolando Penate.  For the record, the interpreter is present.

6         THE COURT:  Good morning.

7         MR. RYAN:  Good morning, Your Honor.

8         THE COURT:  I understand our jurors are all here, so are

9    you ready to proceed?

10        MR. RYAN:  Just one minor matter, I hope a minor matter.

11   I'm not sure that the Court ever ruled on a motion to

12   sequester that I filed prior to trial.

13        THE COURT:  It was ruled on because it was allowed

14   without objection.

15        MR. RYAN:  Okay.

16        THE COURT:  What's the problem?

17        MR. RYAN:  I was just in here taking notes about 15

18   minutes ago and Detective Wadlegger, who testified yesterday

19   and is no longer, in my view, a witness in the case, came in

20   and spent a good period of time looking at that board.  I

21   have no idea why he would be looking at that board, but I

22   have concerns that there may be conversations taking place,

23   and I just want to make sure the sequestration order is

24   followed.

25        THE COURT:  Mr. Velazquez, do you need time to go to

1    talk to your witnesses?

2        MR. VELAZQUEZ:  No, Your Honor, because I spoke with

3    Mr. Ryan and I informed Detective Wadlegger about what was

4    observed and told him that he was not to discuss this with

5    any other witnesses.

6        THE COURT:  Okay.

7        MR. VELAZQUEZ:  He acknowledged that.

8        THE COURT:  Okay.  Fine.  Thank you very much.  Anything

9    else?

10       MR. RYAN:  No, Your Honor.

11       THE COURT:  Great.  You can have the jurors brought in,

12   please.

13   (Pause in proceedings)

14   (The jury enters the courtroom)

15       THE COURT:  Good morning, ladies and gentlemen.

16       THE JURY:  Good morning, Your Honor.

17       THE COURT:  Now, have any of you begun discussing this

18   case amongst each other or with anybody else outside of the

19   courtroom?  Seen, heard, or read anything about the case?

20   Taken any independent views or done any independent research

21   with respect to any of the issues that have come up during

22   the course of this trial?  Is there anything that needs to be

23   brought to my attention before we resume the case?

24       For the record, there are no affirmative responses to

25   any of the questions asked by the Court.

1          Mr. Velazquez, would you please call your next witness.

2          MR. VELAZQUEZ:  Your Honor, the Commonwealth calls John

3     Schrijn.

4                          JOHN SCHRIJN, sworn

5          THE WITNESS:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. VELAZQUEZ:  May I proceed, Your Honor?

8          THE COURT:  You may.

9          MR. VELAZQUEZ:  Thank you.

10                          DIRECT EXAMINATION

11    BY MR. VELAZQUEZ

12    Q.   Sir, would you please state your name for the jury and

13    spell your last name for the record?

14    A.   My name is John S. Schrijn, S-C-H-R-I-J-N.

15    Q.   And by whom are you employed?

16    A.   By the Massachusetts State Police.

17    Q.   In what capacity?

18    A.   I'm a trooper, currently assigned to the Firearms

19    Identification Section.

20    Q.   And how long have you been with the Firearms

21    Identification Section?

22    A.   More than 16 years.

23    Q.   And could you tell the jury what your background is in

24    firearms identification and what your educational background

25    is?

1    A.    I hold a bachelor of science degree in criminal justice.

2    As far as firearms identification work, I've attended and

3    completed armory schools for Smith & Wesson, Sturm Ruger,

4    Glock, Heckler and Koch, Remington, Beretta, Colt, and SIG

5    Sauer.

6         At these armory schools, they familiarize you with their

7    manufacturing processes and give you actual hands-on

8    experience in building the various models of their firearms.

9         I have ten years' experience in firearms training with

10   the United States Military.  My last position being a weapons

11   armorer.

12        I've completed specialized courses of firearms

13   identification given by the Federal Bureau of Investigation

14   as well as the Bureau of Alcohol, Tobacco, Firearms, and

15   Explosives.

16        I've completed courses of instruction on the

17   reconstruction of shooting incidents presented by the Henry

18   C. Lee Institute of Forensic Science.

19        I've lectured on ballistics and firearms identification

20   in area colleges as well as the State Police Academy.

21        And I was instructed and trained in the field of

22   firearms identification by well-qualified experts; namely,

23   retired Captain John Busa and retired Lieutenant Phillip

24   Langton.

25   Q.    And what are your duties generally at the ballistics lab

1  at present?

2  A.    We respond to crime scenes.  We gather and preserve

3  firearms and firearms-related evidence.  We conduct routine

4  test firing of suspect weapons.  We also do microscopic

5  comparisons of test specimens fired from suspect weapons to

6  recovered evidence.  We also attend autopsies observing

7  wounds and receiving evidence, projectiles from the Medical

8  Examiner's Office.

9  Q.    Are there different types of tests you conduct on

10  weapons per se?

11  A.    A large percentage of the work that we do is looking at

12  and examining firearms for the purposes of seeing if they're

13  operable, getting nomenclature that they're, again,

14  designating caliber, make, model, et cetera, and test firing

15  those weapons for the purposes of generating reports for the

16  courts.

17  Q.    And how do you test fire them?  Do you test fire them in

18  a laboratory and what ammunition, if any, do you use?

19  A.    Yes.  The weapons would be submitted to the Crime Lab.

20  I currently work out of the Springfield sub laboratory.

21  Either submitted ammunition with a case will be test fired in

22  a suspect weapon if it's the correct caliber and/or sections

23  inventory ammunition would be introduced into the weapon and

24  we'd fire that section ammunition.

25  Q.    And with respect to ammunition itself, if ammunition is

1   submitted to the lab for your testing, how do you go about

2   testing ammunition, for example, if you were to receive a box

3   of alleged live rounds?

4   A.   If the ammunition came in just as itself as one item, we

5   would use a sections inventory weapon with that caliber

6   designated, or chambered in that ammunition, and we would

7   simply fire a piece of that ammunition doing a destructive

8   test if there was enough ammunition for the purposes of that

9   destructive test.

10  Q.   So then you don't fire each and every one of those

11  bullets, if you will?

12  A.   No.

13  Q.   With respect to the case of Commonwealth versus Rolando

14  Penate, are you familiar with that case?

15  A.   Yes.

16  Q.   Did you receive any evidence in connection with that

17  case to do some tests on?

18  A.   I did.

19  Q.   What did you receive?

20  A.   I received a .38 Smith & Wesson caliber Harrington &

21  Richardson revolver, Serial Number E, as in echo, 06 -- I'm

22  sorry, there is a correction, 67067 as well as thirty-three

23  .22 long rifle caliber live cartridges.

24  Q.   I'm going to show you some items here.  I'm going to ask

25  you to take a look at them to yourself, and I'm going to ask

1  you some questions on these.

2  (Pause in proceedings)

3       THE WITNESS:  Safe and empty weapon, Your Honor.

4       THE COURT:  Thank you, Trooper.

5  BY MR. VELAZQUEZ

6  Q.   Beginning with the item that we just put down, do you

7  recognize that item?

8  A.   Yes, I do.

9  Q.   What do you recognize it to be?

10 A.   This is the .38 S&W Harrington & Richardson revolver

11 that I generated a report on.

12 Q.   And how do you know that?

13 A.   The serial number on the top of the top strap, again,

14 indicating the actual item that I received, serial number

15 was, again, E, echo, 67067.

16 Q.   And what, if any, tests did you perform relative to that

17 item?

18 A.   A prime case was introduced into the cylinder.  Initial

19 examination showed that, as submitted, this weapon had a

20 malfunction.  There is -- when this weapon was submitted to

21 me between December 8th and now, this weapon did, in fact,

22 hold in single action.  It will still function as it is here

23 today.

24      There is a pawl missing on the weapon.  The weapon is

25 initially designed to fire double action and single action.

1   But by manually rotating the cylinder and pulling the hammer

2   to the rear and releasing, the weapon would fire.

3        So other than those malfunctions, a piece of live

4   ammunition from our test section was used in the testing of

5   the weapon itself.

6   Q.   And did you measure the barrel length on that weapon?

7   A.   Yes, I did.

8   Q.   And what was it?

9   A.   Five inches and three-sixteenths, including the length

10  of the cylinder itself.

11  Q.   And to a degree of ballistic certainty, do you have an

12  opinion as to whether or not that's a working firearm?

13  A.   It is a firearm.

14  Q.   Did you do any tests on the items that are contained in

15  the bag -- the large plastic bag that you just looked in?

16  A.   Yes, I did.

17  Q.   And what tests did you do on that?

18  A.   One of the 33 live cartridges, .22LR caliber live

19  cartridges was fired by using a section ammunition -- I'm

20  sorry, a section inventory weapon.  That test being an

21  envelope that on the exterior I've marked with my case number

22  by writing "test .22 caliber."

23        And the second envelope having my case number test, the

24  prime case .38 S&W, which I fired out of the firearm.

25  Q.   Just so that it will be clear, the .38 test fire was

1    something that you got from your lab, not was submitted to

2    you by the Springfield Police; is that correct?

3    A.    That's correct.

4    Q.    And what results did you find relative to the

5    ammunition?

6    A.    There were no malfunctions in test firing.  It is

7    ammunition.

8          MR. VELAZQUEZ:  Your Honor, I would ask that these be

9    marked just for identification purposes.

10         THE COURT:  All right.

11         MR. RYAN:  No objection to that.

12         THE COURT:  All right.

13         THE CLERK:  Can you identify each?

14         MR. VELAZQUEZ:  The .38 caliber handgun, Your Honor, can

15   we mark that first?

16         THE CLERK:  That will be E for ID.

17         THE COURT:  Thank you.

18   (The clerk marks the .38 caliber handgun as E for

19   identification)

20         MR. VELAZQUEZ:  The large plastic bag, Your Honor,

21   containing what appears ammunition and some identifications

22   that also contained within them, which will be addressed

23   later on, I ask that be marked F.

24         THE COURT:  Okay.

25   (The clerk marks the ammunition as F for identification)

1        MR. VELAZQUEZ:  The .22 caliber test fire, can we mark

2   that as G, Your Honor?

3        THE COURT:  Yes.

4   (The clerk marks the .22 caliber test fire as G for

5   identification)

6        MR. VELAZQUEZ:  And the .38 caliber test fire, may we

7   mark that as H, please?

8        THE COURT:  Yes.

9   (The clerk marks the .38 caliber test fire as H for

10  identification)

11  BY MR. VELAZQUEZ

12  Q.   Trooper, the .22 caliber bullets that you tested, can

13  those be fired in the .38 caliber handgun?

14  A.   No.

15  Q.   Thank you.

16       MR. VELAZQUEZ:  I have no further questions.

17       THE COURT:  All right.  Mr. Ryan.

18       MR. RYAN:  Thank you.

19                      CROSS EXAMINATION

20  BY MR. RYAN

21  Q.   Good morning, Trooper.

22  A.   Good morning, Counsel.

23  Q.   Is it fair to say you've been handling firearms your

24  entire adult life?

25  A.   Yes.

1    Q.    And you're a lifelong member of the NRA?

2    A.    I am.

3    Q.    Became one in 1990?

4    A.    Yes.

5    Q.    And since you've become a ballistician -- maybe -- are

6    you a ballistician, is that how you pronounce it?

7    A.    Yes.

8    Q.    And in the course of your work as a ballistician, you've

9    toured many manufacturing firearm companies?

10   A.    I have.

11   Q.    I think you testified as to some of the names, but

12   places like Smith & Wesson?

13   A.    Yes.

14   Q.    Beretta?

15   A.    A number of facilities, yes.

16   Q.    Now, the revolver you tested in this case was

17   manufactured by a company called Harrington & Richardson?

18   A.    That's correct.

19   Q.    And just backing up, all of these places that you took

20   tours of, you were instructed on how to assemble and

21   disassemble and function these particular weapons that these

22   companies manufacture, right?

23   A.    Many of them.  Some of them are simply tours in which

24   you get an idea and explanations and so forth of machining

25   operations and so forth.

1   Q.   Well, you submitted your curriculum vitae in the course

2   of this case, correct?

3   A.   Yes, I believe so.

4   Q.   And if I told you that ten of the courses that you took

5   you listed as designed to instruct firearms examiners how to

6   assemble/disassemble and how to function their weapons

7   separately, does that sound about right?

8   A.   Yes.

9   Q.   Now, you did not at any point ever take a course on how

10  to do this at the Harrington & Richardson facility, did you?

11  A.   No, I did not.

12  Q.   And that's because Harrington & Richardson went out of

13  business before you became a ballistician, correct?

14  A.   I believe so.  I believe they were located in Worcester,

15  actually.

16  Q.   And that was a company that was founded in 1871?

17  A.   Yes, I believe so.

18  Q.   And they went out of business in 1986, correct?

19  A.   Sounds about right.

20  Q.   So you testified earlier that this pistol that was

21  before you was missing something called a pawl?

22  A.   It may actually be nomenclature-wise, it might be

23  something similar to that.  In essence, what it is, is a

24  mechanism that works off of a ratchet on the back of the

25  cylinder, and what it does is carries up or makes the

1   cylinder turn and rotate so that once the weapon is ready to
2   be fired, the live round is in the cylinder in alignment with
3   the barrel.
4   Q.   Well, when I use the word "pawl," that's a word that you
5   used in examining this pistol, correct?
6   A.   I did.
7   Q.   And you did a worksheet, a Firearms Identification
8   Section worksheet and you said at one point, "no pawl"; is
9   that correct?
10  A.   That's correct.
11  Q.   So it was missing a pawl?
12  A.   Yes.
13  Q.   And you couldn't go to the factory in Worcester to get a
14  new pawl because there was no factory in Worcester anymore,
15  correct?
16  A.   I would agree with that, yes.
17  Q.   And just so we're clear, this gun that you examined,
18  this wasn't one of the last ones off the line in 1986, was
19  it?
20  A.   I wouldn't have knowledge of that.
21  Q.   Well, how old --
22  A.   I wouldn't believe it to be the last one.  I could agree
23  with that.
24  Q.   Do you have any idea how old this gun is?
25  A.   I do not.

1   Q.   And so we've got a company that began manufacturing guns

2   in 1871, correct?

3   A.   I would agree with that.

4   Q.   We don't know when this particular gun was manufactured.

5   A.   It's not a weapon that was from the model from the 1800s

6   if that's what you're asking me.

7   Q.   Well, do you know how old it is?

8   A.   I don't have the exact information in front of me, but

9   if I was given time, I'm sure in the literature I could find

10  and narrow it down to the actual design and so forth.

11  Q.   Well, this was submitted to you back in December of

12  2011, correct?

13  A.   Yes.

14  Q.   How much more time would you need?

15  A.   I'm not sure.  But, again, the weapon was chambered with

16  .38 S&W which is a caliber of ammunition that's readily

17  available.  Seeing as, again, the ammunition is readily

18  available and it's in commerce now, the weapon fired so

19  therefore it's a firearm.

20  Q.   Now, you testified a moment ago about what a pawl does.

21  I'd like to talk about that a little bit.  A pawl is a part

22  in a pistol that turns the cylinder?

23  A.   Yes.

24  Q.   Maybe it would be helpful if we had this exhibit.  This

25  right here, (indicating) is that the cylinder?

1    A.    Yes, it is.

2    Q.    And a cylinder is a part of a revolver that rotates,

3    correct?

4    A.    Yes.

5    Q.    And it contains multiple cartridge chambers, right?

6    A.    Yes.

7    Q.    How many does that weapon carry?

8    A.    This design of the cylinder is intended to hold five

9    live cartridges.

10   Q.    And it's a five-shooter?

11   A.    Five live cartridges can be introduced into this

12   cylinder.

13   Q.    And you would agree, in order to fire properly, the

14   chamber has to line up with the barrel?

15   A.    Yes.

16   Q.    And would you agree that if a pistol like this were to

17   be fired at any point in time when the chamber is not lined

18   up with the barrel, it could be very dangerous, couldn't it?

19   A.    It could be.

20   Q.    What could happen is if a bullet went through and wasn't

21   aligned properly, it could, instead of going into the barrel,

22   it could hit the barrel, right?

23   A.    It's possible.

24   Q.    And if that were to happen, pieces of projectile could

25   go lots of different places, right?

1    A.    That's a possibility.

2    Q.    Now, there is a cylinder stop that's attached to the

3    trigger?

4    A.    Yes.

5    Q.    And did you disassemble this gun?

6    A.    I did not.

7    Q.    Well, there is something else wrong with it besides

8    missing a pawl, correct?

9    A.    Again, when this weapon was submitted to myself --

10         THE WITNESS:  Your Honor, if I may look at my work

11   sheet?

12         THE COURT:  (No audible response.)

13         THE WITNESS:  This weapon -- actually, when the hammer

14   was cocked to the rear, again, when this weapon was submitted

15   to myself -- I've lost control, obviously, since I generated

16   my report in December 8, 2011 until today -- this weapon

17   would, in fact, fire in single action mode.

18         I also, on my worksheet, I've noted the poundage or

19   trigger pull pressure that would be needed to exert on the

20   trigger to have the weapon fire.

21         So in between when I authored my report on December 8th

22   and today, this weapon is not in the same configuration as it

23   was submitted to myself.  This weapon, at that point in time,

24   this hammer would actually stay to the rear.

25         And, again, when the trigger was pulled, my first

1    measurement of trigger pull pressure was 2.28 pounds of

2    pressure.  My second test firing was 3.02 pounds of pressure.

3    And my third trigger pull pressure was 2.43 pounds of

4    pressure.

5         But even in this configuration, the weapon could

6    still -- again, that cylinder stop that you mentioned will

7    hold the cylinder in the correct position and the weapon can

8    be fired.

9    BY MR. RYAN

10   Q.   You'd agree that as the gun is in your hands today, that

11   trigger is not operable, correct?

12   A.   In this position, no.  By simply pulling the hammer to

13   the rear, there still remains spring pressure, and when you

14   release, the weapon will fire.

15   Q.   We're talking about the hammer.  The trigger does not

16   work, is my question.

17   A.   That's correct.

18   Q.   Ordinarily when you examine weapons at your facility,

19   how many weapons approximately have you test fired in the

20   course of your career as a ballistician?

21   A.   Thousands of weapons.

22   Q.   And in your resume you said in excess of 2000 different

23   weapons.  Does that sound about right?

24   A.   That's probably accurate, yes.

25   Q.   Ordinarily when you test fire, your ultimate

1    determination you have to make is one as to whether or not

2    something is a firearm.

3    A.    Yes.

4    Q.    And that's defined by Massachusetts law, correct?

5    A.    That's correct.

6    Q.    You're familiar with that definition?

7    A.    I don't know it verbatim but basically, yes.

8    Q.    Well, you've got to certify, at the end of the day, that

9    something is a firearm, correct?

10   A.    Yes.

11   Q.    So you need to be familiar with what the definition is.

12   A.    Yes.

13   Q.    But sitting here today, you don't know what the

14   definition of a firearm is under Massachusetts law?

15   A.    Basically it states that any weapon loaded or unloaded

16   having the capabilities of firing a shot or projectile having

17   a barrel length less than 16 inches would qualify it as a

18   firearm.

19   Q.    Now, you'd agree with me that one of the best ways to

20   tell whether or not something is capable of firing a shot is

21   to fire a shot through it, correct?

22   A.    Yes.

23   Q.    And you ended up testing this weapon, but you never

24   actually put a bullet that went through that chamber,

25   correct?

1   A.    I used a prime case.  Again, a definition stating that

2   the weapon has to have the ability to fire a live round or

3   piece of ammunition.  What is very common in our section is

4   to use a prime case.  A prime case was introduced into the

5   cylinder of this weapon and that prime case was fired.

6   Q.    Trooper John Schrijn, my question is, did you put a

7   bullet through that muzzle?

8   A.    No.

9   Q.    Okay.  And in order to test fire this, you first had to

10  identify that there was a problem with this weapon, correct?

11  A.    Yes.

12  Q.    You had to identify that it was missing a pawl.

13  A.    That's what I described it as.  Again, the manufacturer

14  may not actually describe it as a pawl.  In essence, it's

15  something that we use on a basis -- a daily basis in which,

16  again, it's a portion of the weapon designed to engage these

17  ratchets.  Some people call it a hand, some people call it a

18  pawl.  There are a number of different descriptors that are

19  used for it.

20  Q.    There was a problem with the firearm.

21  A.    Yes.  It did not fire in double action.

22  Q.    And you had to come up with a solution.

23  A.    The solution was simply to keep the cylinder in the

24  correct orientation.  Again, as I stated and testified, this

25  weapon, when I examined it, that hammer would stay to the

1    rear and the trigger was pulled in single action and the

2    weapon would fire.

3    Q.   Now, one of the things that you had to do, Trooper

4    Schrijn, is you had to manually align the cylinder, correct?

5    A.   Yes.

6    Q.   If that cylinder was misaligned in any way, then it

7    wouldn't fire properly, correct?

8    A.   There is a possibility that the cylinder would be

9    misaligned with the barrel.

10   Q.   And when you pull back the hammer, you would agree that

11   there is a potential for the cylinder to jiggle a little bit

12   after you've taken the time to manually align it.

13   A.   When I manually align it, it doesn't actually move.

14   It's not free-spinning, if you will.

15   Q.   We talked about what would happen if it was misaligned

16   and attempted to be fired, and we talked about the

17   projectiles that would result.  It could also blow the sides

18   of the cylinder off too, couldn't it?

19   A.   That's a possibility.  Depends upon the degree of

20   misalignment.

21   Q.   And so a person who was handling this gun would need to

22   be very careful if they were going to try to actually fire

23   it.

24   A.   They would have to pay attention to the alignment of the

25   cylinder, I would agree.

1    Q.    And if they didn't, they certainly wouldn't be pursuing

2    a career as a concert pianist.

3    A.    I'm not sure how to answer that.

4    Q.    Okay.  Now, you were aware of all of the dangers

5    associated with testing this weapon.

6    A.    Yes.

7    Q.    And you're aware of them because you've been involved

8    with guns your entire adult life.

9    A.    I would say that's accurate, yes.

10   Q.    Now, being aware of these dangers caused you to not

11   attempt to shoot a bullet through that muzzle.

12   A.    That's not correct.

13   Q.    Well, let me ask you this:  Did you remove gunpowder

14   from the unit of ammunition that you attempted to fire?

15   A.    The propellant was removed from the live cartridge, yes.

16   Q.    You knew something could very easily go wrong when you

17   were testing this weapon?

18   A.    There is a possibility that the alignment may be off,

19   but, again, as I stated, it's very common practice with a

20   large number of items that are submitted to our laboratory

21   for us to introduce prime cases into various weapons for the

22   purposes of test firing.

23   Q.    And the reason you introduced the prime case in this is

24   because you didn't want to risk injury.

25   A.    I would not agree to that.

1    Q.    Well, did you ignite the powder in this case?

2    A.    No.  The ammunition, again, as I stated, that was used

3    in this case came from our sections inventory.

4    Q.    And no portion of the prime chamber went through the

5    muzzle of that gun.

6    A.    The projectile, again, didn't pass through the barrel,

7    no.  The live pieces of ammunition from our section was

8    pulled, and simply the prime case was introduced into the

9    weapon and fired.

10   Q.    So this was like a cap gun, more or less.

11   A.    A primer was used, yes.

12   Q.    Okay.  Now, that weapon that's before you, that has a

13   gold cylinder on it?

14   A.    I believe it's painted gold in coloration, yes.

15   Q.    And that's, in your experience, that's not how it would

16   have looked originally, is it?

17   A.    No.

18   Q.    This was something that somebody just decided to spray

19   paint some gold on an old gun.

20   A.    It looks like the grips on the weapon as well as the

21   cylinder were taken off of the weapon and painted.

22   Q.    Decorated.

23   A.    Painted, yes.

24         MR. RYAN:  No further questions.

25         THE COURT:  Thank you.  Mr. Velazquez.

1

2                            REDIRECT EXAMINATION

3    BY MR. VELAZQUEZ

4    Q.    In light of the questions that you were asked by

5    Mr. Ryan, has your opinion changed as to whether or not this

6    is a working firearm?

7    A.    No.

8    Q.    Thank you.

9          MR. RYAN:  No further questions.

10         THE COURT:  Thank you very much, Trooper Schrijn.

11         THE WITNESS:  Thank you, Your Honor.

12         MR. VELAZQUEZ:  Commonwealth calls Gregg Bigda.

13                         GREGG BIGDA, sworn

14         MR. VELAZQUEZ:  If I may have a moment, Your Honor?

15         THE COURT:  Yes, you may, Mr. Velazquez.

16         THE WITNESS:  Good morning, Your Honor.

17         THE COURT:  Good morning.

18    (Pause in proceedings)

19                           DIRECT EXAMINATION

20    BY MR. VELAZQUEZ

21    Q.    Good morning, Detective.  Could you please state your

22    name and spell your last name for the record?

23    A.    Gregg Bigda, B-I-G-D-A.

24    Q.    And you're employed by the Springfield Police

25    Department?

1    A.    I am.

2    Q.    In what capacity?

3    A.    I'm a narcotics detective on the four to twelve shift.

4    Q.    How long have you been a narcotics detective?

5    A.    About ten years now.

6    Q.    And how long have you been a police officer?

7    A.    Over 20 years now.

8    Q.    And I'm going to direct your attention to

9    November 15th of 2011.  Were you working that day?

10   A.    I was.

11   Q.    And were you involved in an investigation around 57

12   Johnson Street?

13   A.    I was.

14   Q.    And how long had you been involved in that

15   investigation, if you recall?

16   A.    From the onset.  We had an undercover officer making

17   purchases from the residence.

18   Q.    And who was that undercover officer?

19   A.    Edwin Hernandez.

20   Q.    And what role did you play with respect to Mr. Hernandez

21   relative to any photographs?

22   A.    At some point during the investigation, Officer

23   Wadlegger provided me with some names.  I pulled the names up

24   on the computer and had Officer Hernandez look at them.

25   Q.    Okay.  I'm going to ask you to look at what's been

1   marked as Exhibit No. 2.  Do you recognize the person who is

2   depicted in that photograph?

3   A.   Just by the name that's on the ID, Shaina Robles.

4   Q.   Shaina Robles?

5   A.   Yes.

6   Q.   And at some point during your investigation, did you

7   show Officer Hernandez a photograph of Ms. Robles?

8   A.   I believe that's one of the names that Officer Wadlegger

9   gave me to pull up on the computer.

10  Q.   What was the reason for you showing him that photograph?

11  A.   They were names that Officer Wadlegger had come up with

12  in regards to the investigation.

13  Q.   In fact, you showed him a photograph of another woman as

14  well; is that correct?

15  A.   Yes, I believe so.

16  Q.   And who was that?

17  A.   I don't remember the name offhand.

18  Q.   Does Maria Colon sound right?

19  A.   That's correct, yes.

20  Q.   Was that for the same purpose?

21  A.   Yes.

22  Q.   Now, as far as your involvement when the search warrant

23  was executed, where did you go at that point?

24  A.   Upon execution of the search warrant, I entered through

25  the front door, ascended the stairs to the second floor.  We

1   were attacked by a pit bull.  At that point, I assisted

2   Officer Mitchell with the dog.  We were able to detain the

3   dog in a side bedroom, and then we secured the people in the

4   residence and began a search of the area.

5   Q.   Did you see where that pit bull came from?

6   A.   It met us at the top of the stairs.  After that, I'm not

7   sure where it came from.

8   Q.   On which level?

9   A.   Second floor.  As soon as we hit the landing at the top

10  of the stairs.

11  Q.   How many apartments on that second floor landing?

12  A.   I believe just one.

13  Q.   As part of the search team, did you recover any items

14  inside that apartment?

15  A.   Yes.  As soon as you get to the top of the stairs, there

16  was a room to the left.  It was kind of set up like a living

17  room area.  It had an area cordoned off for the dog, of what

18  appeared to be for the dog.  The dog was loose when we got

19  there.  And amongst the blankets that were on the floor, I

20  found a baggy which contained some heroin and some cocaine.

21  Q.   I'm going to show you a couple of items and ask you to

22  just look at them to yourself.  And I will tell you in

23  advance that the first item I'm going to show you has been

24  marked for identification as B1.

25  (Pause in proceedings)

1    Q.    Do you recognize that item?

2    A.    Yes.

3    Q.    What do you recognize it to be?

4    A.    This is the heroin that I recovered inside the dog area.

5    Q.    Inside the apartment inside the dog pen area?

6    A.    Yes.

7          MR. VELAZQUEZ:  Your Honor, I would offer this.

8          MR. RYAN:  No objection.

9          THE COURT:  All right.

10         THE CLERK:  That will be 8 now, Your Honor.

11         THE COURT:  Okay.  That will be marked as Exhibit No. 8.

12         MR. VELAZQUEZ:  Your Honor, may we approach at this

13   point?

14         THE COURT:  Sure.

15

16

17

18

19

20

21

22

23

24

25

1   (The following conference was held sidebar)

2       THE COURT:  Yes.

3       MR. VELAZQUEZ:  Your Honor, if you take a look at the

4   bag itself, there is some written items on the back there.

5       THE COURT:  Mm-hm.

6       MR. VELAZQUEZ:  And there is also drug certs that are

7   associated with that that have been marked.  And I know that

8   one of them is -- Mr. Hebert testified directly from the

9   cert.  And when he introduced that, however, there is a Sonja

10  Farak part of it.  So if we could only mark the bag itself as

11  the exhibit, unless there is objection to the cert that goes

12  with that.

13      MR. RYAN:  Well, the cert wouldn't be going in as an

14  exhibit anyways, right?

15      MR. VELAZQUEZ:  I'm asking that question.

16      MR. RYAN:  It's hearsay unless there is testimony about

17  it.

18      THE COURT:  Yeah, Mr. Hebert has testified as to his

19  opinion with respect to the contents, the substances, so I

20  don't think we need the certs.  We can have this still marked

21  for identification.  Why don't we keep it that way.

22      MR. VELAZQUEZ:  The only reason I'm saying that is

23  because the bags themselves do not say whether they're heroin

24  versus cocaine.  The jury has to --

25      THE COURT:  This says 13 bags of heroin.

1        MR. VELAZQUEZ:  Unless that's going in as is, and I

2    think there is going to be an objection to that.

3        MR. RYAN:  Mr. Hebert testified the number related to

4    that is heroin.  I don't think it's necessary to get it in

5    there, but I don't think that's an issue.  This is an issue

6    and that shouldn't come in, and I don't think there is going

7    to be an argument on the --

8        THE COURT:  On the substance.

9        MR. RYAN:  With respect to the chain that that's what he

10   says it is.  And then that made its way eventually to

11   Mr. Hebert that testified it's positive.

12       THE COURT:  This also says "drug-free school zone."

13       MR. RYAN:  That needs to come out.

14       THE COURT:  My concern is there is so many different

15   bags.  Normally, before Melendez-Diaz, the cert was attached

16   to the bags.  And my concern is the jurors may get confused

17   as to what is what.  So why don't we -- this needs to be

18   redacted somehow.

19       MR. VELAZQUEZ:  Right.

20       THE COURT:  We'll keep these marked for identification

21   and just introduce the bags.

22       MR. VELAZQUEZ:  Okay.  And the reason I asked that

23   question is precisely what you brought up, because once it

24   goes in without anything, they're just bags of powder.  There

25   is no knowing whether it's heroin, cocaine, and I doubt --

1          THE COURT:  This says "heroin" on it.  Do the other bags

2    say anything?

3          MR. VELAZQUEZ:  They do say the same, but I think there

4    is going to been an objection to that.

5          MR. RYAN:  I would just ask the Court to instruct that

6    they may say that, but that's --

7          THE COURT:  It's for them to find, and that's what the

8    instructions say.

9          MR. VELAZQUEZ:  Very well.

10         THE COURT:  All right.

11         THE CLERK:  The bag will be 8.

12   (The clerk marks the bag of heroin as Exhibit No. 8)

13         THE COURT:  Right, but the "drug-free school zone" has

14   to be redacted.

15         MR. VELAZQUEZ:  Thank you.

16   (Sidebar conference concluded)

17

18

19

20

21

22

23

24

25

1  BY MR. VELAZQUEZ

2  Q.   Detective, I'm going to show you a second bag, and I'm

3  going to ask you if you would look at it, and it's also been

4  marked for identification as B3.  Do you recognize that bag?

5  A.   Yes.

6  Q.   And what do you recognize that to be?

7  A.   This is the cocaine which I recovered out of the dog pen

8  area.

9  Q.   It's the same dog pen area that you found the heroin?

10  A.   Yes.

11       MR. VELAZQUEZ:  Your Honor, I would offer that.

12       MR. RYAN:  No objection.

13       THE COURT:  All right.  Thank you.  That will be marked

14  as Exhibit No. 9.

15       THE CLERK:  B3 will be No. 9.

16       THE COURT:  Thank you.

17  (The clerk marks the bag of heroin as Exhibit No. 9)

18  BY MR. VELAZQUEZ

19  Q.   Detective, what, if anything else, did you find in the

20  apartment that you submitted to the evidence officer?

21  A.   I believe that was it.

22       MR. VELAZQUEZ:  Thank you.  I have no further questions.

23       THE COURT:  Mr. Ryan.

24       MR. RYAN:  Thank you.

25       THE COURT:  Mm-hm.

1                             CROSS EXAMINATION

2    BY MR. RYAN

3    Q.    Good morning, Detective Bigda.

4    A.    Good morning.

5    Q.    You testified that you've been with the Narcotics Unit

6    for ten years now?

7    A.    In that vicinity, yes.

8    Q.    And you were working in this investigation with an

9    Officer Hernandez?

10   A.    Yes.

11   Q.    And this was, if not the first, one of the first

12   instances where Officer Hernandez had been utilized by your

13   squad, correct?

14   A.    I have no idea.

15   Q.    All right.  Now, you testified about showing some

16   pictures to Officer Hernandez at some point.  Do you recall

17   that?

18   A.    Yes.

19   Q.    And that was on November 9th?

20   A.    I have no idea what date it was.

21   Q.    If I told you it was on November 9th, does that sound

22   about right?

23   A.    It could have been.  It was in that vicinity, yes.

24   Q.    It wasn't the day that you executed the warrant, was it?

25   A.    No, it wasn't.

1  Q.   Sometime before then?

2  A.   Yes.

3  Q.   Now, when you were -- you received a request from

4  Detective Wadlegger to just pull some names, correct?

5  A.   Yes.

6  Q.   And you basically did what he asked you to do, right?

7  A.   Correct.

8  Q.   You put pictures in front of Officer Hernandez and asked

9  him if he could identify the individuals?

10  A.   All I did was pull up the photos.  Officer Wadlegger was

11  present when I did this.  Basically, all I did was manipulate

12  the keys on the computer to make the photos come up.

13  Q.   So these weren't physical pictures.  They were just on a

14  computer screen?

15  A.   Correct.

16  Q.   So was there any talk about perhaps doing a photo array

17  in the case?

18  A.   Not that I was involved in, no.

19  Q.   And you know what a photo array is, correct?

20  A.   I do.

21  Q.   And you administered photo arrays in the past?

22  A.   I have.

23  Q.   Now, you've had a chance to review Detective Wadlegger's

24  report in preparation for today's --

25  A.   The arrest report?

1    Q.    Yes.

2    A.    I did read it.

3    Q.    And you'd agree with me that he neglected in his arrest

4    report to note anything about you finding any cocaine in the

5    dog pen area, correct?

6    A.    Correct.

7    Q.    And the number of packets that you found, there was nine

8    packets?

9    A.    Yes.

10   Q.    And these were among some blankets on the floor?

11   A.    I believe that's what it was.  Something for the dog to

12   lay on, yes.

13   Q.    And so now, when you executed the warrant, you'd agree

14   there were a number of people that were present at the time?

15   A.    Yes.

16   Q.    And I understand your initial focus was perhaps the dog,

17   correct?

18   A.    Yes.

19   Q.    But there were a number of arrests that were made of

20   individuals who were present at the time, correct?

21   A.    Yes.

22   Q.    And did you come into contact with any of these

23   individuals?

24   A.    I was assisting Officer Mitchell.  He was wrestling with

25   somebody at the time the dog attacked him.  But at that

1    point, I continued on into the house and didn't actually

2    encounter anybody.

3    Q.   So from there, your focus became a search for contraband

4    as opposed to taking people into custody?

5    A.   At that point, everybody was pretty much taken into

6    custody.  The door that we locked the dog in didn't have a

7    latch so the dog was pounding on the door attempting to get

8    out.  I continued to focus more or less on the door and the

9    dog while attempting to help Officer Mitchell take a subject

10   into custody.

11   Q.   After the execution of the warrant, did you have any

12   exposure to any of the other things that were found at that

13   location?

14   A.   Yes, I'm sure I was involved in the different aspects of

15   it.

16   Q.   And so you became aware that personal papers for various

17   individuals were located?

18   A.   Yes.

19   Q.   So William Cruz, he was a person who was arrested

20   during -- following the execution of the search warrant,

21   correct?

22   A.   I'm not sure.

23   Q.   Let me ask you this:  After this search warrant was

24   executed, did you show any other photographs of any of the

25   people who were arrested to Officer Hernandez?

1   A.    I did not, no.

2   Q.    Were you aware of whether anybody else in your

3   department administered a presentation of a photograph to

4   him?

5   A.    I'm not aware if he was or not.

6   Q.    Did you show Officer Hernandez pictures of any

7   individuals whose personal effects were found there but they

8   themselves were not found there at the time of the raid?

9   A.    I did not show him any photos at all.

10  Q.    Are you aware if anybody else --

11  A.    I'm not aware of that.

12        MR. RYAN:  Can we be seen at sidebar?

13        THE COURT:  Sure.

14

15

16

17

18

19

20

21

22

23

24

25

1    (The following conference was held sidebar)

2        MR. RYAN:  One, I would like to make a short offer of

3    proof as to this witness.  I believe in terms of

4    demonstrating that Ms. Farak tampered with the drugs in my

5    client's case, he was a witness who would be able to testify

6    about another incident where he submitted Oxycodone pills.

7    And we talked about this in a motion in limine, so I just

8    reserve my rights with respect to that.

9        The second thing that I would like to do with this

10   witness is demonstrate that other individuals whose personal

11   effects were found at the location are individuals who had

12   histories of committing drug crimes and that would go to a

13   Bowden defense.  And the person I would specifically say

14   would be Jose Ramos, there is going to be testimony that some

15   identification of Mr. Ramos was found at the address.  This

16   person was subsequently arrested for controlled substances

17   offenses, so I think that it's relevant evidence that I

18   should be able to show that they made no efforts to determine

19   whether or not there was another perpetrator of the offenses

20   besides my client.

21       MR. VELAZQUEZ:  Your Honor, I mean, the evidence is that

22   the person who is the defendant in this case was the one that

23   made the sales.  Everybody else was arrested except for the

24   infant that was brought to the DCF.

25       THE COURT:  If your client was only charged with

1  possession with the intent to distribute the drugs that were

2  found in the house, I would probably give you some leeway

3  with respect to the party whose papers were found in the

4  house but was not there at the time of the arrest, rather the

5  raid.

6      But given the fact that the case really hinges on what

7  occurred between -- allegedly occurred between your client

8  and Detective Hernandez, I'm not going to permit you to go

9  into that line of questioning with Detective Bigda.

10     MR. RYAN:  Okay.

11  (Sidebar conference concluded)

1      MR. RYAN:  No further questions for this witness.

2      THE COURT:  All right.  Do you have any other questions

3  for this witness?

4      MR. VELAZQUEZ:  No, Your Honor.

5      THE COURT:  Thank you, sir.  You are excused.

6      THE WITNESS:  Thank you, Your Honor.

7      MR. VELAZQUEZ:  Commonwealth calls Sergeant Ambrose.

8                    MARTIN AMBROSE, Sworn

9                    DIRECT EXAMINATION

10 BY MR. VELAZQUEZ

11 Q.   Sir, would you please state your name and spell your

12 last name for the record?

13 A.   Yes.  My name is Sergeant Martin Ambrose.  The spelling

14 is A-M-B-R-O-S-E.

15 Q.   And you're employed by the Springfield Police?

16 A.   Yes, I am.

17 Q.   In what capacity?

18 A.   I'm a sergeant in the Narcotics Bureau from the 4:00

19 p.m. to midnight shift.

20 Q.   How long have you been assigned to that bureau?

21 A.   Approximately six years.

22 Q.   And how long have you been a police officer?

23 A.   Twenty-five years.

24 Q.   Sergeant, were you involved in the investigation

25 surrounding 57 Johnson Street in the City of Springfield in

1   the late October -- September, October, November of 2011?

2   A.   Yes, I was.

3   Q.   And what was your role relative to that investigation?

4   A.   I oversaw the investigation that was led by Officer

5   Wadlegger.

6   Q.   And was Sergeant Kent also part of that investigation?

7   A.   Absolutely, yes.

8   Q.   And would you say that you, the two sergeants, were the

9   lead or the ranking officers in that investigation?

10   A.   Yes.

11   Q.   And as to any of the controlled buys that occurred,

12   what, if anything, did you do during those buys?

13   A.   Sergeant Kent led those buys.  There was three, I

14   believe.

15   Q.   Were you involved in any way in the search warrant

16   execution?

17   A.   Yes, I was.

18   Q.   And what was your role in that execution?

19   A.   That day there, we executed the search warrant, and I

20   was part of the search team looking for evidence.

21   Q.   Did you find it?

22   A.   Yes, I did.

23   Q.   What did you find?

24   A.   I found a cell phone off of Mr. Penate.  It turned out

25   to be the same cell --

1        MR. RYAN:   Objection.   Move to strike.   Can we be seen

2   at sidebar?

1    (The following conference was held sidebar)

2         THE COURT:  Okay.

3         MR. RYAN:  Your Honor, this witness is going to want to

4    testify that the cell phone he found is the one that was used

5    in the investigation.  There was no testimony from Officer

6    Hernandez as to what telephone number was used, and this

7    witness just testified he wasn't involved in this case at

8    all, so he has no firsthand knowledge.

9         THE COURT:  He can -- go ahead.

10        MR. VELAZQUEZ:  I'm not sure what he's going to say but

11   if you wish, I can ask him to just limit his testimony to

12   what he actually found.

13        THE COURT:  Yes.

14        MR. RYAN:  He found a cell phone.

15        THE COURT:  Yes.  And he started to say something.

16        MR. RYAN:  Yes.

17        THE COURT:  But he wasn't able to complete his sentence.

18   So just limit the testimony as to what he found on the date

19   of the raid.

20        MR. RYAN:  Thank you.

21   (Sidebar conference concluded)

22

23

24

25

1          MR. VELAZQUEZ:  May I proceed?

2          THE COURT:  Yes.

3     BY MR. VELAZQUEZ

4     Q.   Sergeant, I'm going to ask you to look at an item and

5     tell me if you recognize it.  Just look at it to yourself.

6     A.   Yes, I recognize this.

7     Q.   And what do you recognize that to be?

8     A.   The cell phone that I recovered from Mr. Penate.

9     Q.   And where did you recover it on his person?

10    A.   It was in his pants pocket.

11    Q.   And did you recover anything else from Mr. Penate?

12    A.   Yes, I did.  There was some cash that was located on

13    him.  It was $386.

14    Q.   And that cash, what, if anything, did you do with that

15    cash?

16    A.   We -- I went through the cash to see if there was any

17    buy money.  I checked the serial numbers and I found a $20

18    bill in there that matched up with the buy money that we had

19    used on a previous purchase.

20    Q.   I'm going to show you a photograph of an item and ask

21    you if you recognize the signature on that item and what's

22    depicted there?

23    A.   Yes.  That's the $20 bill.

24         MR. RYAN:  I'm going to object and ask to be seen at

25    sidebar.

1    (The following conference was held sidebar)

2        MR. RYAN:  This cannot come into evidence.  This is not

3    the best evidence of that $20 bill, and this is the end

4    amount.  This is hearsay.  This is like introducing a police

5    report.  So I need to make sure that my objection is this is

6    not evidence that can or should come in this case.

7        THE COURT:  Okay.  I'm sorry.  This is a copy of the $20

8    bill that he found on your client?

9        MR. RYAN:  That's what he says, yes.  He can say that,

10   but he can't put this into evidence as an exhibit.

11       THE COURT:  Okay.

12       MR. VELAZQUEZ:  He's going to -- he began to say that

13   the serial number on that bill that was used in a previous

14   buy was somehow -- they kept track of it and this is a copy

15   of that bill.

16       THE COURT:  But who -- wasn't it Kent that gave Officer

17   Hernandez the buy money?

18       MR. VELAZQUEZ:  Right.

19       THE COURT:  Nothing was elicited from Sergeant Kent with

20   respect to the serial number on the bill that he gave them

21   so --

22       MR. VELAZQUEZ:  That's fair.

23       THE COURT:  So he can testify that he found a $20 bill

24   on the defendant.  Well, are you going to be able to elicit

25   that he knew what the serial number was?

1        MR. VELAZQUEZ:  I will do that.

2        THE COURT:  Okay.

3        MR. RYAN:  Do we have the $20 bill?

4        MR. VELAZQUEZ:  We have a copy of it.

5        MR. RYAN:  So we don't have the buy money?

6        MR. VELAZQUEZ:  We don't have the exact actual $20 bill.

7        THE COURT:  What happened -- never mind.

8        MR. VELAZQUEZ:  Thank you.

9   (Sidebar conference concluded)

1          MR. VELAZQUEZ:  Your Honor, before I forget, I'd like to

2    offer the phone.

3          MR. RYAN:  No objection.

4          THE COURT:  All right.  That's No. 10.

5          THE CLERK:  No. 10, Your Honor.

6    (The clerk marks the phone as Exhibit No. 10)

7    BY MR. VELAZQUEZ

8    Q.   Sergeant, with respect to the currency that you found on

9    Mr. Penate, you said -- did you count that amount?

10   A.   Yes, I did.

11   Q.   And what was the total amount of that?

12   A.   $386.

13   Q.   And you said you recognized one of the bills?

14   A.   Yes.

15   Q.   And how did you recognize that bill?

16   A.   I recognized it by comparing the serial number that was

17   on the bill.

18   Q.   And what result was -- what did you decide after you

19   compared the serial number?

20   A.   It matched with the buy money that we had used for the

21   buy.

22   Q.   Where was that money found on Mr. Penate?

23   A.   In his pants pocket.

24   Q.   Was there anything else that you took from Mr. Penate?

25   A.   No.

```
 1   Q.   I want to show you an item and ask you if you recognize
 2   this item?
 3   A.   Yes, I do.
 4   Q.   And what do you recognize that to be?
 5   A.   That's his wallet.
 6   Q.   And did you actually locate that?
 7   A.   Yes, I did.
 8   Q.   Now, did you write a report in this case?
 9   A.   No, I didn't.
10   Q.   So, is it fair to say you're testifying from memory?
11   A.   That's correct.
12   Q.   But you do recall finding a wallet on him?
13   A.   I do now, yes.  Sorry.
14        MR. VELAZQUEZ:  And, Your Honor, I would offer this
15   wallet subject to any redactions.
16        MR. RYAN:  No objection.
17        THE COURT:  So do you want to mark it for
18   identification?
19        MR. VELAZQUEZ:  No, we can redact it before it goes to
20   the jury.
21        THE COURT:  Okay.  No. 11.
22   (The clerk marks the wallet as Exhibit No. 11)
23   BY MR. VELAZQUEZ
24   Q.   Do you have any independent memory of anything else that
25   you may have found on the individual that you searched?
```

1    A.    No, sir.

2    Q.    I'm going to show you an envelope and ask you to look at

3    it, to yourself.

4    A.    Okay.

5    Q.    What do you recognize that envelope to be?

6    A.    This appears to be the money that I recovered from

7    Mr. Penate.

8    Q.    The $20 that you have just testified to as buy money, is

9    that also contained in that envelope?

10   A.    No.

11   Q.    Why not?

12   A.    When we locate our money that we use in a controlled

13   buy, after we compare it, locate it, we put it right back

14   into our drug buy fund.

15   Q.    And that's essentially 386 minus 20?

16   A.    That's correct.

17   Q.    Thank you.

18         MR. VELAZQUEZ:  I would offer this.

19         MR. RYAN:  No objection.

20         THE COURT:  All right.  So it's $366.

21         MR. VELAZQUEZ:  That's correct, Your Honor.

22         THE CLERK:  No. 12.

23         THE COURT:  12, thank you.

24   (The clerk marks the $366 as Exhibit No. 12)

25

1    BY MR. VELAZQUEZ

2    Q.   Sergeant, was there anything else that you found that

3    you can recall from your memory?

4    A.   Not that I remember, no.

5    Q.   Thank you.

6         MR. VELAZQUEZ:  I have no further questions.

7         THE COURT:  All right.

8         MR. RYAN:  If I can just have a minute to see the most

9    recently admitted exhibit?

10        THE COURT:  Sure, No. 12.

11   (Pause in proceedings)

12                        CROSS EXAMINATION

13   BY MR. RYAN

14   Q.   Good morning, Sergeant.

15   A.   Good morning.

16   Q.   You testified that you and Detective Kent were in charge

17   of this investigation?

18   A.   Yes.

19   Q.   And you also testified you didn't write a police report

20   in this case.

21   A.   No, I didn't.

22   Q.   And you're aware that there was only one police report

23   written in this case, right?

24   A.   As far as an arrest report, sir?

25   Q.   Yes.

1    A.    Yes.

2    Q.    And that was by Detective Wadlegger?

3    A.    Yes.

4    Q.    Now, a moment ago you testified about some buy money

5    that you said you recovered.  Do you recall that?

6    A.    Yes, I do.

7    Q.    Now, you did not furnish this buy money to Edwin

8    Hernandez, did you?

9    A.    No, I didn't.

10   Q.    That was Sergeant Kent that did that.

11   A.    Correct.

12   Q.    And so that was not a currency that before entering into

13   the hands of Edwin Hernandez that you had any occasion to

14   examine.

15   A.    Right.

16   Q.    You didn't look at the serial number.

17   A.    I didn't, no.

18   Q.    After you recovered this currency on my client, you

19   testified that you made some sort of comparison?

20   A.    That's correct.

21   Q.    But you weren't comparing it to anything that you

22   personally observed.

23   A.    There was a photocopy in the office of the buy money.

24   Q.    Well, don't you ordinarily put these -- isn't there some

25   auditing that's related to this kind of evidence?

1    A.    Regarding what, sir?  I'm not familiar.

2    Q.    Well, you have a certain fund that you can use to make

3    controlled purchases, right?

4    A.    Right.

5    Q.    And there is paperwork that needs to be filled out about

6    this money.

7    A.    I keep a log myself, yes.

8    Q.    And that's what officers do, they keep a log of the buy

9    money that gets utilized.

10   A.    Yes.

11   Q.    And there is no buy money log related to this money in

12   this case, is there?

13   A.    I don't have one, no.

14   Q.    Now, you would agree that the police report written by

15   Officer Wadlegger indicates that some other sums of money

16   were seized, correct?

17   A.    Yes.

18   Q.    And Ms. Colon, Maria Colon, is that a name that's

19   familiar with you?

20   A.    Yes.

21   Q.    She was an individual who was arrested, correct?

22   A.    Yes, she was.

23   Q.    And Ms. Colon was searched upon her arrest, correct?

24   A.    Correct.

25   Q.    And Ms. Colon was found to be in possession of some

1   money, right?

2   A.   Yes.

3   Q.   Do you know how much money Ms. Colon had on her?

4   A.   I believe she had $226.

5   Q.   Is that what Detective Wadlegger's report says?

6   A.   No.

7   Q.   What does his report say?

8   A.   I believe it says 26.

9   Q.   So he was off by $200?

10  A.   Yes.

11  Q.   Now, you would agree that this is the evidence tag that

12  goes along with this envelope that's been marked Exhibit 12

13  now?

14  A.   The evidence tag references two envelopes, correct, and

15  envelope No. 1 and envelope No. 2, right.

16  Q.   And it gives a total of money, correct?  If I can point

17  your attention over there (indicating).

18  A.   Yeah, total of 592.

19       MR. VELAZQUEZ:  Your Honor, I would object.  This is not

20  something that this officer wrote out and --

21       THE COURT:  You'll have the opportunity to --

22       MR. VELAZQUEZ:  -- it's hearsay.

23       MR. RYAN:  This is a --

24       THE COURT:  Let me see counsel at sidebar, please.

25

1    (The following conference was held sidebar)

2          THE COURT:  Is this the evidence tag he filled out?

3          MR. RYAN:  It's filled out by Edward Kalish, but there

4    is no indication there of how much is in each individual

5    envelope.

6          THE COURT:  Okay.  Is Officer Kalish here?

7          MR. VELAZQUEZ:  Yes, he is.

8          MR. RYAN:  I'll save it for Officer Kalish.

9          THE COURT:  Thank you.

10   (Sidebar conference concluded)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. RYAN

2    Q.    Now, I just want to get back to your role as one of the

3    two sergeants in charge of this investigation.  Prior to

4    executing the search warrant, you met with members of the

5    raid team, correct?

6    A.    Yes.

7    Q.    And up until that point in time, some members of the

8    raid team had nothing to do with this investigation, correct?

9    A.    I believe so, that's correct.

10   Q.    They're individuals that are part of a different unit

11   altogether to execute a search warrant, correct?

12   A.    Yes.

13   Q.    So part of your job in preparing for that was to provide

14   them with information.

15   A.    Yes.

16   Q.    And one of the things you went over with them was the

17   search warrant, what were you permitted to search for,

18   correct?

19   A.    Yes.

20   Q.    And the search warrant listed various individuals that

21   were the targets of the search warrant, correct?

22   A.    Correct.

23   Q.    Now, prior to executing the search warrant, you're aware

24   that Officer Hernandez had made his final controlled

25   purchase, correct?

1   A.    Yes.

2   Q.    And that happened just before the execution of the

3   search warrant, right?

4   A.    Right.

5   Q.    And part of his purpose there was to gather

6   intelligence, right?

7   A.    Correct.

8   Q.    And your job was to pass along whatever intelligence you

9   had to raid team members.

10  A.    Yes.

11  Q.    Now, when Officer Hernandez came out of that last

12  controlled buy, he didn't provide any sort of detailed

13  description as to what my client was wearing, did he?

14  A.    I don't recall at this time.

15  Q.    Well, you weren't able to communicate to the raid team

16  members that my client was wearing a yellow shirt, were you?

17  A.    I don't recall.

18  Q.    And he was wearing a yellow shirt, wasn't he?

19  A.    He could have been.  I have no idea.

20  Q.    Does this refresh your recollection as to whether he was

21  wearing a yellow shirt?

22  A.    Yes.

23  Q.    And was he wearing a yellow shirt?

24  A.    He must have been.

25  (Defense attorney shows photo to Assistant District Attorney)

1        MR. VELAZQUEZ:  I'm going to object, Your Honor.

2        MR. RYAN:  May we see you at sidebar?

3        THE COURT:  Yes.

1    (The following conference was held sidebar)

2         MR. RYAN:  It's his objection.

3         MR. VELAZQUEZ:  He has no memory of this, so I don't

4    know if he's going to ram this down this witness's throat.

5         MR. RYAN:  The witness just said his memory was

6    refreshed.  I'm just asking if this is what his --

7         THE COURT:  The purpose of this is where we're going.

8         MR. RYAN:  Judge, this is a picture of my client on the

9    day of his arrest.  The witness just testified --

10        THE COURT:  I know but I just want to know where are we

11   going.  Simple question.

12        MR. RYAN:  We have -- Officer Hernandez is the key

13   witness in this case.  He has provided no physical

14   description of any kind as to my client, so all he's doing

15   is -- my theory of the defense is all he's doing is showing

16   him, and this is the witness, so if you have somebody wearing

17   a bright yellow shirt who has just sold to you, you would

18   think you would tell people:  Be on the lookout for the

19   bright yellow shirt.

20        THE COURT:  Okay.

21   (Sidebar conference concluded)

22

23

24

25

```
 1   BY MR. RYAN

 2   Q.    Sergeant Ambrose, is this a fair and accurate

 3   representation of what my client looked like on the day the

 4   search warrant was executed?

 5   A.    Yes.

 6         MR. RYAN:  I'd ask that this be marked as the next

 7   exhibit.

 8         THE CLERK:  No. 13.

 9         THE COURT:  Do you have an objection?

10         MR. VELAZQUEZ:  No objection, Your Honor.

11         THE COURT:  Okay.

12   (The clerk marks the photograph as Exhibit No. 13)

13         MR. RYAN:  I don't have any further questions for this

14   witness.

15         MR. VELAZQUEZ:  I don't have anything further.

16         THE COURT:  Thank you very much, sir.

17         THE WITNESS:  Thank you, Your Honor.

18         THE COURT:  You may step down and be excused.

19         MR. VELAZQUEZ:  Your Honor, the Commonwealth calls

20   Sergeant Devon Williams.

21                     DEVON WILLIAMS, sworn

22         THE WITNESS:  Good morning, Your Honor.

23         THE COURT:  Good morning.

24

25
```

1                        DIRECT EXAMINATION

2    BY MR. VELAZQUEZ

3    Q.    Sergeant, would you please state your first name and

4    spell your last name for the record?

5    A.    Good morning.  My name is Devon Williams,

6    W-I-L-L-I-A-M-S.

7    Q.    And by whom are you employed, sir?

8    A.    Since November of 1988, I've been employed as a

9    Springfield Police Officer.

10   Q.    In what capacity are you currently employed there?

11   A.    I'm currently assigned to the BDGE Unit.

12   Q.    And what are your duties in that unit?

13   A.    It's similar to community policing, high-profile

14   patrols, and dealing with businesses and the residents in the

15   area of Mason Square.

16   Q.    And on occasion, do you assist other units in either

17   arrests or search warrants?

18   A.    Yes.

19   Q.    And I'm going to direct your attention to the evening

20   hours of November 15th of 2011.  Were you working then?

21   A.    Yes.

22   Q.    And at some point did your duties take you to 57 Johnson

23   Street in the City of Springfield?

24   A.    Yes.

25   Q.    And what was the purpose of your going there?

A.    The purpose was to assist the Narcotics Bureau with a
drug raid.

Q.    And were you accompanied by any other officers when you
first got there?

A.    Yes.

Q.    And who was that -- were you assigned with another
officer?

A.    I was assigned a certain area when we were going to
execute a search warrant.  I'm not sure which officer went
with me initially down the driveway, but I believe it was
Officer Roberson.

Q.    And when you got there, what, if anything, did you see
that drew your attention?

A.    Well, there was people yelling and we exited our search
vehicles, the vehicles that we arrived in, and I went down
the driveway area.  I heard yelling and screaming coming from
the upstairs apartment.

Q.    And where did you go and where did you stay while you
were at that address?

A.    I went to the rear of the house down the driveway
towards the rear to cover the door and the windows.

Q.    And at some point, who, if anybody, did you encounter in
that area?

A.    Initially no one, but as I stayed outside, a person
arrived, a Maria Colon.  That's who I encountered.

1    Q.    Could you describe her for the jury?

2    A.    A Hispanic female.

3    Q.    Roughly how old?

4    A.    About 40, I think.

5    Q.    Okay.  And when you encountered her, what, if anything,

6    did you do relative to her at that time?

7    A.    I secured her.  I knew she was a target of the

8    investigation.  I secured her and I searched her, the inner

9    part of the car that she arrived in which was a minivan, and

10   the purse that she had.

11   Q.    And when you searched the purse, what, if anything, did

12   you find in that purse?

13   A.    I found currency and a package of heroin and a package

14   of cocaine.

15   Q.    When you say "currency," do you remember how much

16   currency there was in that purse?

17   A.    I believe it was $226.

18   Q.    I'm going to show you an item and ask if you recognize

19   it, and you can open it and look inside if you wish?

20   A.    (Witness complies.)

21   Q.    What do you recognize that to be?

22   A.    That's currency.

23   Q.    And is it the same currency that you found on the person

24   of Maria Colon at that time?

25   A.    I'd have to count it but yes, it appears to be that.

1            MR. VELAZQUEZ:  I'd like to offer that, Your Honor.

2            MR. RYAN:  No objection.

3            THE COURT:  Okay.  That can be marked as No. 13.

4            THE CLERK:  The dollar amount of that?

5            MR. VELAZQUEZ:  $226.

6            THE CLERK:  It will be 14.

7            THE COURT:  Thank you.

8    (The clerk marks the $226 as Exhibit No. 14)

9    BY MR. VELAZQUEZ

10   Q.   Sergeant, in addition to the currency, did you find

11   anything else in that purse?

12   A.   Yes.  A package of heroin and a package of cocaine.

13   Q.   I'll show you two items and I'll ask you to look at them

14   and tell me if you recognize what's in those items?

15   A.   Yes.

16   Q.   And what do you recognize the first item on your right

17   to be?

18   A.   This is a package of heroin.

19   Q.   And that item has been previously marked as an exhibit

20   for identification purposes as Item B9.

21   A.   Yes.

22            MR. VELAZQUEZ:  Your Honor, I would offer this.

23            MR. RYAN:  No objection.

24            THE COURT:  Okay.  B9 is now No. 15.

25            THE CLERK:  B9 is now 15, heroin.

1       THE COURT:   Thank you.

2   (The clerk marks the heroin as Exhibit No. 15)

3   BY MR. VELAZQUEZ

4   Q.   And with respect to the second item that you recognize,

5   what do you recognize that to be?

6   A.   Cocaine, white powdery substance.

7   Q.   And that's something you found inside the purse of Maria

8   Colon?

9   A.   Yes.

10  Q.   Thank you.   That item was marked previously as B5 for

11  identification purposes.

12       MR. VELAZQUEZ:   Your Honor, I would offer this at this

13  point.

14       MR. RYAN:   No objection.

15       THE COURT:   All right.   No. 16.

16       THE CLERK:   No. 16.

17  (The clerk marks the cocaine as Exhibit No. 16)

18  BY MR. VELAZQUEZ

19  Q.   Sergeant, did you conduct an arrest at that time --

20  A.   Yes.

21  Q.   -- of Ms. Colon?

22  A.   Yes.

23  Q.   And at some point did you go inside the house at 57

24  Johnson Street?

25  A.   I believe I went up the stairs, but I don't believe I

1    went inside the apartment.

2    Q.    So is it fair to say that's the extent of your

3    investigation in this case?

4    A.    Yes.

5    Q.    Thank you.

6          MR. VELAZQUEZ:  I have no further questions.

7          THE COURT:  All right.

8                          CROSS EXAMINATION

9    BY MR. RYAN

10   Q.    Good morning.

11   A.    Good morning, sir.

12   Q.    Just a couple quick questions for you, Sergeant.  You

13   didn't write a police report in this case.

14   A.    No, I did not.

15   Q.    And in preparation for today's testimony, did you have a

16   chance to review Detective Wadlegger's report?

17   A.    Yes.

18   Q.    And you'd agree with me that Detective Wadlegger's

19   report is inaccurate in terms of the amount of money that he

20   said you recovered from Ms. Colon, correct?

21   A.    There was a typo in the report, yes.

22   Q.    Well, it's missing a couple hundred dollars, correct?

23   A.    Again, it must be a typo, sir.  But the money is -- go

24   ahead.  I'm sorry.

25   Q.    It's just not accurate, correct?  It says $26, right?

1  A.    Yes.

2  Q.    And it should have been $226.

3  A.    Yes.

4  Q.    Okay.

5        MR. RYAN:  No further questions.

6        THE COURT:  Do you have any redirect?

7        MR. VELAZQUEZ:  No, Your Honor.

8        THE COURT:  Thank you very much, Sergeant.  You may step

9  down and be excused.

10        THE WITNESS:  Thank you, Your Honor.

11        MR. VELAZQUEZ:  Your Honor, the Commonwealth calls

12  Detective Kalish, please.

13        THE COURT:  I think we're going to take our midmorning

14  break now.

15  (The jury leaves the courtroom)

16  (Court recessed at 10:49 a.m.)

17  (Court reconvened at 11:19 a.m.)

18        THE COURT:  Mr. Ryan, you wanted to address the Court?

19        MR. RYAN:  He did.

20        THE COURT:  Oh, Mr. Velazquez.

21        MR. VELAZQUEZ:  Yes, Your Honor.  The witness list did

22  not include Detective Carla Daniele, D-A-N-I-E-L-E, and she's

23  here and ready to testify, and I've spoken with Mr. Ryan

24  about that.

25        And rather than call her and risk a juror saying:  I

1    know her, she's my neighbor, or something to that effect,

2    because of the nature of her testimony, and that is that she

3    found drugs on two different women, and as the female

4    officer, she was the one that searched their bra area, we can

5    stipulate to that.  And I have isolated the four exhibits

6    that I would offer, and I believe that's a stipulation that

7    counsel is willing to make.

8        THE COURT:  Okay.  And they were found on Ms. Colon and

9    who?

10       MR. VELAZQUEZ:  Ms. Colon and Ms. Basset, the woman who

11   was encountered in the stairs.

12       THE COURT:  Do you intend to prepare a stipulation or

13   how do you want to handle it?  Did you want me to advise the

14   jury of that now or do you want to wait?

15       MR. RYAN:  I guess my preference in the case would be to

16   just permit it to come in as hearsay, unobjected to hearsay,

17   as opposed to a stipulation.

18       THE COURT:  Through a witness?

19       MR. RYAN:  Through a different witness.

20       THE COURT:  Fine.

21       MR. VELAZQUEZ:  Okay.  I can ask Officer Kalish.

22       THE COURT:  All right.  As long as the record is clear

23   that the defendant will not be objecting to the proposed

24   hearsay testimony that will be offered by Detective Kalish

25   with respect to the drugs found on the two women,

```
 1   specifically Ms. Basset and Ms. Colon, found by Carla
 2   Daniele, Officer Carla Daniele.
 3        MR. RYAN:  That's correct.
 4        THE COURT:  Anything else?
 5        MR. VELAZQUEZ:  No.
 6        THE COURT:  Okay.  So we're ready --
 7        MR. VELAZQUEZ:  If I can just advise Detective Kalish?
 8        THE COURT:  Yes.
 9        MR. VELAZQUEZ:  He's right outside.
10   (Pause in proceedings)
11        MR. VELAZQUEZ:  We're all set, Your Honor.
12        THE COURT:  Great.  Can you have the jurors come in,
13   please.  Thank you.
14   (The jury enters the courtroom)
15        THE COURT:  Please call your next witness, Mr.
16   Velazquez.
17        MR. VELAZQUEZ:  Your Honor, the Commonwealth calls
18   Detective Edward Kalish.
19                    EDWARD KALISH, sworn
20                    DIRECT EXAMINATION
21   BY MR. VELAZQUEZ
22   Q.   Detective, would you please state your name and spell
23   your last name for the record.
24   A.   Edward Kalish, K-A-L-I-S-H.
25   Q.   And are you employed by the Springfield Police?
```

1    A.    I am.

2    Q.    How long have you been employed by them?

3    A.    Just over 16 years.

4    Q.    What position do you currently hold?

5    A.    I'm in the four to twelve Narcotics Division.

6    Q.    How long have you been in the Narcotics Division?

7    A.    Just over four years.

8    Q.    And I'm going to direct your attention to the evening

9    hours of November 15, 2011 and ask you, did you go to 57

10   Johnson Street at some point?

11   A.    I did.

12   Q.    And what was your role at that address at that point?

13   A.    I was the evidence officer.

14   Q.    And could you tell the jury what your duties are as an

15   evidence officer?

16   A.    Once the address is secure, we will find a table or

17   counter or someplace that I'll set up an evidence collection

18   bag, is what we call it.

19        Once there, I will either respond to locations in the

20   address, another officer will notify me:  I've recovered

21   something here or found something there, and/or the officer

22   will come to me with the item and say:  I found this, here is

23   where I found it.

24        I'll place that into a bag, jot down their name and the

25   recovery quickly, and place that into a larger bag or box.

1    And that's later transported to the police station, and then

2    I go through it again and neatly write out the bags and go

3    through all the evidence.

4    Q.    And is that what happened on November 15, 2011?

5    A.    Yes.

6    Q.    And with respect to any activity happening outside of

7    this house with, say, Sergeant Williams, would he also have

8    provided you with evidence that he may have encountered on

9    someone outside the house?

10   A.    As long as -- yes, as long as it's involved with this

11   investigation and/or arrest, all evidence should come in to

12   me, again, with the location it was found and the officer

13   that found it.

14        For whatever reason, an officer may be dealing with

15   multiple people, if I were to recover an item, I may hand it

16   to another officer who would then bring it to me and say:

17   Officer Kalish recovered it, here is where it was recovered.

18   So it's not always the recovering officer that will bring it

19   but most of the time that's what it is.

20        The officer that recovered it will bring me the items,

21   give me the location they found it, the person they found it

22   on, the motor vehicle they found it on, and things of that

23   nature.

24   Q.    Is there a particular protocol for searching women as

25   opposed to men in your department?

1    A.    Yes.

2    Q.    And with respect to women, how does a physical search

3    proceed?

4    A.    We will call for a female officer and that female

5    officer will conduct a search of any female arrestee or

6    detainee.

7    Q.    I will show you some items that have been marked as

8    beginning with B4 for identification purposes and ask you if

9    you can look at this and tell me if you recognize that item?

10   A.    I do.

11   Q.    And what do you recognize that to be?

12   A.    Glassine baggy of cocaine.

13   Q.    And where did that come from?

14   A.    The bra of Mrs. Colon.

15   Q.    Thank you.  And that was brought to you by another

16   officer?

17   A.    It was.

18         MR. VELAZQUEZ:  Your Honor, I would offer this exhibit

19   that's been marked as B4 for identification and ask that it

20   be entered.

21         MR. RYAN:  No objection.

22         THE COURT:  The next number?

23         THE CLERK:  17, Your Honor.

24         THE COURT:  Thank you.  It will be so marked.

25   (The clerk marks the one bag of cocaine as Exhibit No. 17)

1    BY MR. VELAZQUEZ

2    Q.   I'm going to show you another item that's been marked

3    for identification as B8, and I'll ask you to look at it

4    yourself.

5    A.   (Witness complies.)

6    Q.   Do you recognize that item?

7    A.   I do.

8    Q.   And what do you recognize that to be?

9    A.   Three bags of heroin.

10   Q.   And where did that come from?

11   A.   Also from Ms. Colon's bra.

12   Q.   Thank you.

13        MR. VELAZQUEZ:   I would offer this.   It's been marked

14   previously as B8 for identification.

15        MR. RYAN:   No objection.

16        THE COURT:   No. 18.

17        THE CLERK:   No. 18.

18   (The clerk marks the three bags of heroin as Exhibit No. 18)

19   BY MR. VELAZQUEZ

20   Q.   And, sir, I'm going to show you an item that's been

21   marked B2 for identification, and ask you to look at that, to

22   yourself.

23   A.   (Witness complies.)

24   Q.   Do you recognize that item?

25   A.   I do.

1   Q.   What do you recognize it to be?

2   A.   Two bags of cocaine.

3   Q.   And where did that come from?

4   A.   The purse of Ms. Basset.

5   Q.   Basset?

6   A.   Basset.

7   Q.   Thank you.

8        MR. VELAZQUEZ:  I would offer this, Your Honor, item

9   marked as B2 for identification.

10       MR. RYAN:  No objection.

11       THE COURT:  No. 20 {sic}.

12       THE CLERK:  No. 20 {sic}.

13  (The clerk marks the two bags of cocaine as Exhibit

14  No. 20 {sic})

15  BY MR. VELAZQUEZ

16  Q.   And with respect to what's been marked as B6, would you

17  take a look at this one.

18  A.   (Witness complies.)

19  Q.   Do you recognize that item?

20  A.   I do.

21  Q.   What do you recognize that to be?

22  A.   Ten bags of heroin.

23  Q.   And where was that found?

24  A.   Also in the purse of Ms. Basset.

25       MR. VELAZQUEZ:  I would offer this item, Your Honor.

1   It's been previously marked as B6 for identification.

2          MR. RYAN:  No objection.

3          THE COURT:  All right.  That will be marked as Exhibit

4   No. 20.

5          THE CLERK:  21, Your Honor.

6          THE COURT:  20.

7   (The clerk marks the ten bags of heroin as Exhibit No. 20)

8   BY MR. VELAZQUEZ

9   Q.    I'm going to ask you to first look at an item I'm

10  handing you and ask if you recognize that item?

11  A.    I do.

12  Q.    What do you recognize that to be?

13  A.    A digital scale.

14  Q.    And do you know who found that item?

15  A.    I did.

16  Q.    And where did you find that item?

17  A.    On top of a tall dresser in the front bedroom at this

18  address.

19  Q.    The 56 Johnson Street address?

20  A.    Correct.

21  Q.    And do you have any training and experience in drugs?

22  A.    I do.

23  Q.    And do you -- have you been involved in any kind of drug

24  arrests --

25         MR. RYAN:  I'm going to object.

1        THE COURT:  Overruled.

2    BY MR. VELAZQUEZ

3    Q.    -- previously?

4    A.    Yes.

5    Q.    How many?

6    A.    Thousands.

7    Q.    And have you seen an item such as this during your drug

8    arrests?

9    A.    Yes.

10   Q.    And is there a use for an item such as this?

11   A.    Yes.

12   Q.    What is that?

13   A.    To weigh out different forms of narcotics to be sold to

14   verify the amount that they're selling and the amount they're

15   selling it for.

16   Q.    It's a digital scale?

17   A.    Correct.

18        MR. VELAZQUEZ:  Your Honor, I would offer that item

19   separately.

20        MR. RYAN:  No objection.

21        THE COURT:  Okay.  No. 21.

22        THE CLERK:  If we can backtrack for clarification on 19

23   and 20, please.

24        THE COURT:  19, Class B found in Ms. Basset's --

25        THE CLERK:  Is that B6?

1           THE COURT:  B2.

2           THE CLERK:  B2 is now 19?

3           THE COURT:  Yes.  B6 is now 20.  And that's the Class A,

4     the alleged Class A substance that was found in Ms. Basset's

5     purse.  No. 21 is the scale.

6           THE CLERK:  Thank you.

7     (The clerk marks the two bags of cocaine as Exhibit No. 19)

8     (The clerk marks the ten bags of heroin as Exhibit No. 20)

9     (The clerk marks the scale as Exhibit No. 21)

10    BY MR. VELAZQUEZ

11    Q.   Detective, I'm going to show you this large bag and ask

12    you to look at the contents of that bag and tell me if you

13    recognize those items.

14          MR. RYAN:  Your Honor, may I be permitted to look along

15    with the detective to see what he's looking at?

16          THE COURT:  Yes.  Well, Mr. Velazquez will show it to

17    you --

18          MR. VELAZQUEZ:  I will show it to you.

19          THE COURT:  -- once he's done.

20    BY MR. VELAZQUEZ

21    Q.   Is it fair to say that there were more items in that bag

22    originally?

23    A.   Yes.

24    Q.   And what is that bag essentially about?  What is

25    contained in that bag generally speaking?

1    A.    Personal papers, ID, packaging material.

2    Q.    Okay.  And how did those items get into that bag?

3    A.    They would have been placed into this bag by the tagging

4    officer, whoever was filling out this particular tag.

5    Q.    And as evidence officer, is it fair to say you would

6    have given the tagging officer that evidence?

7    A.    Yes.

8    Q.    And everything is filtered through you as you earlier

9    testified; is that correct?

10   A.    Correct.

11   Q.    Now, what of those items did you personally locate, if

12   any?

13   A.    It would have been the IDs and the items that are no

14   longer in the bag.

15   Q.    And where did you find those items?

16   A.    They were throughout the apartment.

17   Q.    To be a little bit more specific, is there any one

18   particular room that you remember these items being in?

19   A.    No.  I was notified by the searching officers that were

20   searching the entire house that there were personal papers.

21   One officer will say:  I have some in here.  I have some in

22   there.  I have some over here.

23   Q.    And those are items that were all submitted into your

24   evidence bin; is that correct?

25   A.    Correct.

```
 1   (Assistant District Attorney shows the items to defense

 2   attorney)

 3         MR. VELAZQUEZ:  Your Honor, I would offer the items as

 4   agreed.

 5         MR. RYAN:  No objection.

 6         THE COURT:  Okay.

 7         THE CLERK:  22?

 8         THE COURT:  Yes.

 9   (The clerk marks the items as Exhibit No. 22)

10   BY MR. VELAZQUEZ

11   Q.   Detective, would you take a look in the bag that I just

12   placed on the counter?

13   A.   (Witness complies.)

14   Q.   Do you recognize those items, sir?

15   A.   I do.

16   Q.   What do you recognize them to be?

17   A.   Those are personal papers belonging to the occupants of

18   the house that were found in the address.

19   Q.   So let's qualify this now.  How do you know that these

20   people were occupants of this house?

21   A.   They were found in the house, and it's addressed to that

22   address and the individual's name is on it.

23         MR. VELAZQUEZ:  Are you going to object to this?

24         MR. RYAN:  If I can take a look at it?

25         MR. VELAZQUEZ:  Yes.
```

1   (Pause in proceedings)

2       MR. RYAN:  Can we be seen sidebar, Your Honor?

3       THE COURT:  Yes, you may.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (The following conference was held sidebar)

2         MR. RYAN:  I think the witness -- if this is -- if he

3    actually testified that he personally seized these items, for

4    the most part, I don't have any objection to them.  There is

5    one piece of paper in here that I'd have the Court take a

6    look at that I don't know where that came from, but that's my

7    only objection is just a scrap piece of paper.

8         MR. VELAZQUEZ:  I can ask him.

9         THE COURT:  Okay.

10        MR. RYAN:  Other than that, no.

11   (Sidebar conference concluded)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. VELAZQUEZ

2    Q.    Sir, I'm going -- I've isolated one small document.   Do

3    you recognize that document?

4    A.    I do.

5    Q.    And how do you recognize that document?

6    A.    This was on the mailbox of the address.

7    Q.    And did you personally see it on the mailbox?

8    A.    Yes.

9          MR. VELAZQUEZ:   I would offer these items, Your Honor.

10         MR. RYAN:   No objection.

11         THE COURT:   All right.   23.

12   (The clerk marks the papers as Exhibit No. 23)

13   BY MR. VELAZQUEZ

14   Q.    Is that the extent of the items that you handled as the

15   evidence officer in this case?

16   A.    No.

17   Q.    Let me qualify that question.   Without regard to the

18   items that were submitted by officers found in other rooms

19   that are here to testify.

20   A.    Are those the only items that I recovered personally?

21   Q.    Right.

22   A.    Yes.

23   Q.    Thank you.

24         MR. VELAZQUEZ:   No further questions.

25

```
 1                            CROSS EXAMINATION

 2    BY MR. RYAN

 3    Q.    Good morning, Detective.

 4    A.    Good morning.

 5    Q.    You testified you participated in the execution of this

 6    search warrant, correct?

 7    A.    Correct.

 8    Q.    And this was a warrant that gave you permission to

 9    search for all personal papers showing the true identity of

10    the occupants, correct?

11    A.    Correct.

12    Q.    And the personal papers that you looked for, that's

13    because they can establish a tenancy or control of the

14    premises, correct?

15    A.    Correct.

16    Q.    And things like letters can do this, correct?

17    A.    Correct.

18    Q.    Bills?

19    A.    Yes.

20    Q.    Leases?

21    A.    Yes.

22    Q.    Mortgages?

23    A.    Yes.

24    Q.    Bank statements?

25    A.    Yes.
```

1    Q.    Checkbooks?

2    A.    Yes.

3    Q.    Health records?

4    A.    Yes.

5    Q.    House keys?

6    A.    Yes.

7    Q.    Photographs?

8    A.    Yes.

9    Q.    Now, in this particular case, you did not write a

10   report, correct?

11   A.    I did not.

12   Q.    The only report that you're aware of with respect to the

13   execution of the search warrant was written by Detective

14   Wadlegger, right?

15   A.    Correct.

16   Q.    And you provided information to Detective Wadlegger

17   regarding the seizure of personal papers; is that correct?

18   A.    Correct.

19   Q.    You'd agree that Detective Wadlegger's report does not

20   say who seized particular personal papers?

21   A.    I don't recall if he put it in there or not, if it's

22   specific.

23   Q.    I'll draw your attention to that portion of Detective

24   Wadlegger's report.

25   (Pause in proceedings)

1   Q.   So having read that, you would agree that Detective

2   Wadlegger's report doesn't say who seized particular personal

3   papers, correct?

4   A.   Correct.

5   Q.   And it doesn't say where these particular personal

6   papers were seized.

7   A.   Correct.

8   Q.   And it doesn't say who seized the particular

9   identifications.

10  A.   Correct.

11  Q.   And it doesn't say where those particular

12  identifications were seized.

13  A.   Other than in the house, it's not specific.

14  Q.   Right.  Did you not tell Detective Wadlegger these

15  things or did he just not write them down?

16  A.   To the best of my recollection, when the report was

17  being authored, when Detective Wadlegger gets to that portion

18  of the report, he'll ask me where these items were recovered.

19  I believe I told him they were throughout the apartment.  I

20  don't believe I was specific in it.

21  Q.   Okay.  And you said that you keep notes at the scene as

22  the evidence officer.  I think you said that somebody will

23  say:  I found this, here is where I found it, and you jot

24  something down?

25  A.   I wouldn't call it a note.  I place it into a bag, a

1   larger -- depending on how big the item is, a Ziploc bag, and

2   on the bag it has a white section where you're able to write,

3   as the evidence bags that you saw, and I'll just quickly

4   write down the officer's name and the location of the

5   recovery.

6       That bag will then be rewritten in the proper manner

7   with the evidence, the date, the tag number, all the

8   correlating information we put on the bag after that.

9   Q.   And do you save the, sort of, rough draft that you use

10  that's then written correctly as you testified to?

11  A.   Yes.  This would be given -- for example, on the scale,

12  it would be given to the tagging officer.  He will be given a

13  new bag, the old bag, a tag.  He will then sit down at a

14  desk, take the item out of the old bag -- first, he'd rewrite

15  the new bag, take the item out of the old bag, the scribble

16  bag, put it into the new bag that's neatly written, and then

17  that will be eventually placed into evidence.

18  Q.   Do we have the scribble bags in this case?

19  A.   No, they're discarded after the new bag is written.

20  Q.   Okay.  Now, I think you testified that you don't know

21  where these identifications were found?

22  A.   I don't recall specifically.  Again, it was officers

23  telling me there is paperwork in here, there is paperwork in

24  there, and I just went around and gathered it.

25  Q.   In any event, I was hoping we could go through some of

1    the personal effects that were recovered, and perhaps it

2    would be useful if we had it in front of you.  Exhibit No.

3    23.  So I'd like to start with some personal effects of Maria

4    Colon's that were located.

5    A.    Okay.

6    Q.    If you want to just check to make sure I've got this

7    right as I -- you would agree there was an envelope addressed

8    to her from People's Bank?

9    A.    Yes.

10   Q.    There was a certified envelope addressed to her from

11   High School of Science and Technology?

12   A.    Yes.

13   Q.    There was an envelope addressed to Maria Colon from New

14   Beginnings Child Care Center?

15   A.    Yes.

16   Q.    There was certified mail as the apparent guardian of

17   Luis Vega Colon from the principal at the High School of

18   Science and Technology that would have been dated October 19,

19   2011?

20   A.    Yes.

21   Q.    There was a letter to Marie J. Colon Vasquez from the

22   Department of Transitional Assistance dated 11-10-11.

23   A.    Yes.

24   Q.    There was an envelope addressed to Maria Colon from the

25   High School of Science and Technology dated 9-16-11.

1    A.    Yes.

2    Q.    An envelope addressed to Maria Colon from the High

3    School of Science and Technology dated 9-15-11.

4    A.    I think you said there was three from the high school.

5    I think I only see two here.  I only have two from the high

6    school.

7    Q.    Was there a letter to Maria J. Colon Vasquez from the

8    Farmer's Counsel dated 11-3-11?

9    A.    I don't have the Farmer's -- I do have another something

10   from the high school.  It's not in an envelope.  It's just a

11   letter.

12   Q.    Okay.  And one of the identifications, was that from

13   Maria Colon?  And maybe I can give you that bag too.

14   A.    I did find the Farmer's.

15   Q.    Okay.

16   A.    Yes.

17   Q.    And just moving over to Luis Vega.  You would agree that

18   it would appear to be a Luis Vega that appears to be

19   Ms. Colon's son?

20   A.    Yes.

21   Q.    And he was one of the people arrested during the

22   execution of the search warrant on November 15, 2011,

23   correct?

24   A.    I believe so.

25   Q.    And some personal effects of his were discovered,

1  correct?

2  A.   Yes.

3  Q.   There was a Forest Park Middle School ID card for him?

4  A.   Correct.

5  Q.   And there was a Social Security card for him?

6  A.   Correct.

7  Q.   Now, there were also some other material identifications

8  of Luis Vega found, correct?  They wouldn't be in front of

9  you right now.

10  A.   Oh.

11  (Attorney hands witness bag)

12  BY MR. RYAN

13  Q.   What you have before you are some other identifications

14  for Luis Vega, correct?

15  A.   Correct.

16  Q.   And these were found by Sergeant Lopes along with some

17  ammunition, correct?

18  A.   Detective Lopes, yes.

19  Q.   And those were right next to some .22 caliber bullets?

20  A.   Yes.

21  Q.   And, in fact, they were so close they were put in that

22  same evidence bag there, correct?

23  A.   Correct.

24  Q.   Now, there was an individual named Carlos Vega who had

25  some personal effects that showed up at 57 Johnson Street

1    too, correct?

2    A.    Correct.

3    Q.    There was a certificate of registration for a 2000 Dodge

4    Caravan as well as a Mass ID card that you just pulled out,

5    correct?

6    A.    Correct.

7    Q.    William Cruz was another person who had an

8    identification at 57 Johnson Street?

9    A.    Yes.

10   Q.    And are you aware he was present at the time of the

11   search warrant execution?

12   A.    I don't have personal knowledge if he was there.   I

13   don't recall.

14   Q.    Okay.  And the search of the premises turned up a Mass

15   Identification card for him?

16   A.    Yes.

17   Q.    Jose Ramos is another individual who had personal papers

18   at 57 Johnson Street suggesting a connection to that address?

19   A.    I don't have any for Mr. Ramos in front of me.

20   Q.    You don't have a copy of a Social Security card for a

21   Jose Antonio Ramos received by the Department of Transition

22   Assistance?

23   A.    Oh, yes, I do.  Yes, I do.

24   Q.    As well as a copy of a photo identification card for

25   Jose Ramos received by the Department of Transition

1    Assistance?

2    A.    Yes.

3    Q.    And does that piece of paper have the name Joel on it?

4    A.    It does.

5    Q.    Does there appear to be five phone numbers on that piece

6    of paper?

7    A.    Yes.

8    Q.    Did you ever call any of those phone numbers?

9    A.    I did not, no.

10   Q.    Are you aware of anybody in your department who called

11   any of those five phone numbers?

12   A.    Not that I know of.

13   Q.    Now, Luis J. Colon was another individual with an

14   apparent connection to that address, correct?  I'll direct

15   your attention to an envelope from Hover Round, Luis J. Colon

16   with a first address of 192 White Street with a notification

17   from the Post Office of a new address as of 10-15-11 of 57

18   Johnson Street.  Did you find that?

19   A.    Yes.

20   Q.    Now, you were aware that when you went to execute this

21   search warrant that one of the targets was a young woman

22   named Shaina Lee Robles?

23   A.    I believe that was given to us in the briefing, yeah.

24   Q.    And in the search warrant that was went over during the

25   briefing, she was identified as one of the occupants of this

1    address, correct?

2    A.   I believe so, yes.

3    Q.   And officers didn't recover any personal effects of hers

4    at this location, did they?

5    A.   Not that I see in front of me, no.

6    Q.   Now, officers did recover a Western Mass electric bill

7    addressed to another person we haven't talked about, correct?

8    A.   I believe I saw an electrical bill in here somewhere,

9    yes.

10   Q.   And that would have been dated 10-11-11?

11   A.   Yes.

12   Q.   And it would have been addressed to a woman named Maria

13   Vega, correct?

14   A.   Correct.

15   Q.   Now, am I correct that during the execution of the

16   search warrant, officers did not recover any heat, water,

17   cable, phone, or electric bills addressed to a Rolando

18   Penate?

19   A.   Not that I see here, no.

20   Q.   No catalogs with his name on them?

21   A.   If there was one there, we wouldn't have taken it.  It's

22   too large to put in the evidence bag.  We look for smaller

23   pieces of mail.

24   Q.   So if there was a large piece of mail that had a

25   person's identifying information to that address, you would

1  leave it there because it would be too big to walk off with?

2  A.   No, I mean in the matter of if it's an encyclopedia that

3  has his name on the top of it, we would prefer to keep the

4  items smaller such as we have here.  I don't recall if there

5  was any or not.  I'm just saying that would be our procedure.

6  We try to not bulk up the evidence with large encyclopedias

7  or things of that nature.  If that was the only item in the

8  apartment, we would take it.

9  Q.   There were no health records for Rolando Penate?

10 A.   No.

11 Q.   No checkbooks?

12 A.   No.

13 Q.   No photographs of him on the mantle?

14 A.   Not that I recall.

15 Q.   Or anywhere else?

16 A.   I didn't recover any.

17 Q.   No bank statements?

18 A.   No.

19 Q.   No house keys on his person?

20 A.   I wasn't given any house keys.

21 Q.   In fact, there is not a single letter at that premises

22 addressed to a person by the name of Rolando Penate, is

23 there?

24 A.   There is this one here for Hancock Street.

25 Q.   And what is the name on that envelope?

1    A.    Rolando Penate Diaz.

2    Q.    Are you sure that that's the name on that envelope?

3    A.    Yes.

4    Q.    What's the first name on that envelope?

5    A.    Rolando.

6    Q.    The first name on this is Ronaldo, correct?

7    A.    Yes.

8    Q.    And you're aware that the defendant's name is Rolando,

9    correct?

10   A.    I believe so.

11   Q.    Okay.  And the last name, is it spelled with an I or an

12   E?

13   A.    It has both in it.

14   Q.    Well, the first -- how is the name on this spelled?

15   A.    P-I-N-A-T-E Diaz.

16   Q.    All one word?

17   A.    Yes.

18   Q.    Can you open up that envelope?

19   A.    (Witness complies.)

20   Q.    Is that more or less a form letter?

21   A.    It would appear so, yeah.

22   Q.    Is there anything on there that identities the recipient

23   by Social Security number, date of birth, anything of that

24   nature?

25   A.    No.

1   Q.   So it's your testimony that that little scrap of paper

2   that you talked about before was on the mailbox, correct?

3   A.   Correct.

4   Q.   And yet there is not a single letter that was found at

5   this location to my client.

6   A.   Other than the misprinted one we just discussed.

7   Q.   Well, you're assuming it's misprinted, aren't you,

8   Detective?

9   A.   I receive letters in that nature where my name is

10  misspelled all the time.  I believe it belongs to Mr. Penate.

11  Q.   But you have no knowledge as to whether that was

12  misprinted or not, do you?

13  A.   I did not send that letter, no.

14  Q.   One of the things that was taken was a surveillance

15  system, correct?

16  A.   Correct.

17  Q.   There were cameras that were discovered outside the

18  residence?

19  A.   Correct.

20  Q.   And there were monitors on the inside?

21  A.   Correct.

22  Q.   And a decision was made to take photos of the system,

23  correct?

24  A.   Correct.

25  Q.   Any idea what happened to those photographs?

1    A.    I do not.

2    Q.    So just so I'm clear, there was a camera present during

3    the execution of the search warrant?

4    A.    I believe there was three cameras total.

5    Q.    A camera that you used to take photos of the system?

6    A.    I'm sorry.  I don't recall if it was a camera or someone

7    took it on their cell phone and then was supposed to print it

8    out.  I don't know how the pictures were taken.

9    Q.    Because we all have at this stage of our existence on

10   the planet a cell phone in our pocket that has a camera on

11   it, right?

12   A.    Correct.

13   Q.    And this camera was used or a camera was used to take

14   pictures of a surveillance system.

15   A.    I didn't take a picture.  It says in the report that

16   photos were taken.

17   Q.    Detective Wadlegger's report, the one report in this

18   case, says photos were taken of the system.

19   A.    Correct.

20   Q.    But no other pictures were taken that day.

21   A.    I don't believe so.

22   Q.    And no pictures were taken of the mailbox at this

23   address that you say contained that scrap of paper?

24   A.    No.  We took the mailbox label.

25   Q.    Well, you didn't take a picture showing where that

1  alleged mailbox label was before you took it, did you?

2  A.   We didn't take a picture of any evidence that was

3  recovered.

4  Q.   Well, you took pictures of the surveillance system.  We

5  just talked about that.

6  A.   Right.  They don't like us to take the monitors or the

7  entire system.  The cameras are small, therefore they fit

8  into evidence.  If Officer Wadlegger says a photo was taken,

9  then a photo was taken.

10  Q.   But a photo wasn't taken of the mailbox.

11  A.   Correct.

12       MR. RYAN:  May I just have a moment?

13       THE COURT:  Sure.

14  (Pause in proceedings)

15       MR. RYAN:  No further questions for this witness.

16       THE COURT:  Do you have any redirect, sir?

17       MR. VELAZQUEZ:  Just a couple questions.

18                       REDIRECT EXAMINATION

19  BY MR. VELAZQUEZ:

20  Q.   The small item from the mailbox, how is Penate's name

21  spelled on that?

22  A.   R-O-L-A-N-D-O P-E-N-A-T-E.

23       MR. VELAZQUEZ:  I have no further questions.

24       THE COURT:  Do you?

25       MR. RYAN:  Nothing further.

1        THE COURT:  Thank you very much.

2        THE WITNESS:  Do you want me to put this stuff back?

3        THE COURT:  Mr. Velazquez will take care of it.

4        THE WITNESS:  Okay.

5        THE COURT:  Thank you.

6        MR. VELAZQUEZ:  Your Honor, the Commonwealth would like

7   to call Detective Edward VanZandt, please.

8                         EDWARD VANZANDT, sworn

9        THE WITNESS:  Good morning, Your Honor.

10       THE COURT:  Good morning.

11                          DIRECT EXAMINATION

12  BY MR. VELAZQUEZ

13  Q.    Detective, would you please state your name and spell

14  your last name for the record.

15  A.    Sure.  My name is Edward VanZandt.  My last name is

16  spelled V-A-N capital Z-A-N-D-T.

17  Q.    And by whom are you employed, sir?

18  A.    The City of Springfield as a police officer.

19  Q.    And how long have you been so employed?

20  A.    Approximately 17 -- a little over 17 years.

21  Q.    Are you assigned to a particular unit at the police

22  department?

23  A.    I'm assigned to the BDGE Unit in the Forest Park area.

24  Q.    And drawing your attention to November 15, 2011, were

25  you working that day?

1   A.    I was.

2   Q.    And at some point during your duty, were you called to

3   assist at 57 Johnson Street?

4   A.    I was.

5   Q.    And what was the purpose of your going to that address?

6   A.    My purpose was to assist the Narcotics Unit in executing

7   a warrant.

8   Q.    And while you were there, did you find anything that you

9   submitted as evidence during this case?

10   A.    Yes.

11   Q.    What did you find?

12   A.    I recovered a revolver, an H & R, I believe it was a .38

13   caliber revolver, and some ammunition, .22 ammo, I believe.

14   Q.    And where was that located?

15   A.    In the basement on top of a workbench.

16   Q.    Describe the basement for the jury, please.

17   A.    As I recall, the basement -- it was an open basement.  I

18   recall it being somewhat dimly lit, and I recall there being

19   a workbench in the basement.

20   Q.    And how did you access the basement from this apartment,

21   if you can tell us?

22   A.    You know what, I don't exactly recall.  I mean,

23   obviously I took stairs to get down into the basement.  Where

24   I accessed those stairs, I believe it was from the apartment

25   but I don't exactly recall.

1          MR. RYAN:   I'm going to move to strike if the witness

2     has no recollection.

3          THE COURT:   Overruled.

4     BY MR. VELAZQUEZ

5     Q.   I'm going to show you an item that's been marked for

6     identification as Exhibit E.   I'm going to ask you to look at

7     that, please.

8     A.   (Witness complies.)

9     Q.   Do you recognize that?

10    A.   I do.

11    Q.   What do you recognize it to be?

12    A.   I recognize this as the revolver that I recovered from

13    the basement at 57 Johnson Street.

14         MR. VELAZQUEZ:   Your Honor, I would offer this at this

15    point.

16         MR. RYAN:   No objection.

17         THE COURT:   All right.

18         THE CLERK:   24, Your Honor.

19         THE COURT:   Thank you.

20    (The clerk marks the .38 caliber handgun as Exhibit No. 24)

21    BY MR. VELAZQUEZ

22    Q.   I'm looking in a bag that's been submitted and marked as

23    F for identification.   I'm actually taking something out of

24    that bag and ask you to look at it and tell me if you

25    recognize the item that's in that bag?

1    A.    I do.   I recognize these as the ammunition that I

2    recovered in the basement of 57 Johnson Street.

3         MR. VELAZQUEZ:   Your Honor, although these were

4    originally contained in an item marked F for identification,

5    I would offer them separately at this point.

6         MR. RYAN:   No objection.

7         THE COURT:   Fine.   So F -- what was formerly F for ID is

8    No. 25.

9    (The clerk marks the ammunition as Exhibit No. 25)

10        MR. VELAZQUEZ:   There is another item that was left in

11   the F for ID bag.   That's my problem.

12        THE COURT:   Well, the ammunition is now 25, and you

13   still have F for ID.

14        MR. VELAZQUEZ:   There is still ammunition in here, but

15   it was found in a different location.

16        THE COURT:   That's fine.

17        MR. VELAZQUEZ:   Thank you.

18   BY MR. VELAZQUEZ

19   Q.    Detective, were you alone when you found this gun and

20   these bullets in the basement?

21   A.    No, there was another -- I believe there was another

22   officer too in the area of the basement.   I don't recall

23   exactly who that was.

24   Q.    Is it fair to say you were there to assist in the

25   execution of the warrant?

1    A.    It is fair to say.  I was assisting.

2    Q.    Did you write a report regarding your findings?

3    A.    I did not, no.

4          MR. VELAZQUEZ:  Thank you.  I have no further questions.

5          THE COURT:  Mr. Ryan.

6          MR. RYAN:  No questions for this witness.

7          THE COURT:  Thank you very much, Officer.  You may step

8    down and be excused.

9          THE WITNESS:  Thank you very much, Your Honor.

10         MR. VELAZQUEZ:  Your Honor, the Commonwealth calls

11   Officer William Lopes at this point.

12                     WILLIAM LOPES, sworn

13         THE WITNESS:  Good afternoon, Your Honor.

14         THE COURT:  Good afternoon.

15                     DIRECT EXAMINATION

16   BY MR. VELAZQUEZ

17   Q.    Detective, would you please state your name and spell

18   your last name for the record?

19   A.    William Lopes, L-O-P-E-S.

20   Q.    And are you employed by the Springfield Police

21   Department?

22   A.    Yes, I am.

23   Q.    And what unit are you assigned to?

24   A.    I'm assigned to the Narcotics Vice Control Unit 4:00

25   p.m. to midnight shift.

1    Q.    Were you working on November 15, 2011?

2    A.    Yes, I was.

3    Q.    And were you assigned to go to an address at 57 Johnson

4    Street at some point during the evening?

5    A.    Yes.

6    Q.    And when you were there, where did you go?

7    A.    I entered with the raid team through the front door, and

8    I encountered a female in the stairwell.  I secured that

9    female and then brought her upstairs.

10   Q.    And at some point, did you involve yourself in a search

11   for items of evidence?

12   A.    Yes, I did.

13   Q.    And where did that search take you?

14   A.    To the third floor bedroom.

15   Q.    All right.  Before we get to anything in there, how did

16   you get to that third floor bedroom?

17   A.    It was through the rear of the house, through the

18   kitchen, and then up some stairs.

19   Q.    And would you have been able to access that bedroom from

20   outside of the house without going into that apartment?

21   A.    I believe so.  I didn't walk down the rear stairs.

22   Q.    But you did access it from inside the apartment?

23   A.    Yes.

24   Q.    While you were there, what, if anything, did you find

25   that you submitted in evidence in this case?

1    A.    I recovered some .22 caliber ammunition.

2    Q.    And was there anything with the ammunition?

3    A.    Also from the bedroom some IDs.

4    Q.    In relation to the .22 caliber ammunition, where were

5    the IDs?

6    A.    From my memory, they were right in the same area.

7    Q.    And do you have any memory as to what area that was?

8    A.    I believe it was a dresser.

9    Q.    And I'm going to show you what's been previously marked

10   as F for identification purposes, and I'm going to ask you to

11   look inside the bag here to yourself and I'm going to ask you

12   some questions about that.

13   A.    (Witness complies.)

14   Q.    Do you recognize those items?

15   A.    Yes.   This would be the .22 caliber ammunition and two

16   IDs.

17   Q.    Now, the ammunition appears to be inside a bag.   Was

18   that how you first found it?

19   A.    Yes, it was.

20         MR. VELAZQUEZ:   Your Honor, I would offer this.   It's

21   been previously marked as F as well.

22         MR. RYAN:   No objection.

23         THE COURT:   Okay.   No. 26.

24         THE CLERK:   Do you want to keep them all in the original

25   bag?

1          MR. VELAZQUEZ:  Sure.

2          THE CLERK:  26.

3  (The clerk marks the ammunition as Exhibit No. 26)

4  BY MR. VELAZQUEZ

5  Q.   Detective, besides those two items, or the IDs and the

6  ammunition, what else did you find that you submitted as

7  evidence in this case?

8  A.   Nothing else.

9  Q.   Did you have occasion to interview or interrogate

10  anybody?

11  A.   No.

12  Q.   Thank you.

13          MR. VELAZQUEZ:  No further questions.

14          MR. RYAN:  Thank you.

15          THE COURT:  You're welcome.

16                          CROSS EXAMINATION

17  BY MR. RYAN

18  Q.   Good afternoon.

19  A.   Good afternoon.

20  Q.   I'm showing you what's been marked Exhibit 26.

21  A.   Yes.

22  Q.   Could you tell the jury whose identification -- what the

23  names on the identifications are that you found located right

24  next to those bullets?

25  A.   Yes.  The names on the IDs are Luis Vega Colon.

1    Q.    And was Mr. Colon -- strike that.

2          You can put those back in there.

3    A.    Okay.

4    Q.    Now, you went to this location as part of a raid team to

5    execute a search warrant?

6    A.    Correct.

7    Q.    This is a copy of the search warrant that you and the

8    fellow raid team members went to execute?

9    A.    Yes.

10   Q.    And it has a description of a location that you went to

11   execute, correct?

12   A.    Yes.

13   Q.    It talks about 57 Johnson Street being a two and a half

14   story, two-family home?

15   A.    Correct.

16   Q.    Describes the siding light blue and yellow in color?

17   A.    Yes.

18   Q.    And it's vinyl siding?

19   A.    Yes.

20   Q.    It says that the number 57 is clearly marked near the

21   front common entry door, correct?

22   A.    Correct.

23   Q.    It doesn't say anything about identity of anybody on any

24   mailbox, does it?

25   A.    Nothing about a mailbox.

1      MR. RYAN:  No further questions.

2      MR. VELAZQUEZ:  Nothing further, Your Honor.

3      THE COURT:  Thank you very much.  You may step down and

4  be excused.

5      THE WITNESS:  Thank you, Your Honor.

6      MR. VELAZQUEZ:  Your Honor, the Commonwealth calls Mark

7  Templeman, please.

8                     MARK TEMPLEMAN, sworn

9                     DIRECT EXAMINATION

10 BY MR. VELAZQUEZ

11 Q.   Sir, would you please state your name and spell your

12 last name for the record?

13 A.   Sure.  Mark Templeman, T-E-M-P-L-E-M-A-N.

14 Q.   And by whom are you employed, sir?

15 A.   The City of Springfield Police Department.

16 Q.   In what capacity?

17 A.   I'm a police officer.

18 Q.   Are you assigned to a particular unit?

19 A.   Yes.

20 Q.   Which unit?

21 A.   Currently it's the Squad C shift which is the 4:00 p.m.

22 to midnight shift, Narcotics Bureau.

23 Q.   And I'm going to direct your attention to November 15,

24 2011.  Were you working that day?

25 A.   Yes.

1  Q.    And did your duties take you, at some point, to 57

2  Johnson Street?

3  A.    Yes.

4  Q.    And when you first went to that address, were you part

5  of a team?

6  A.    Yes.

7  Q.    And what were your duties as far as that team?

8  A.    I was a surveillance officer before the execution of the

9  search warrant.

10  Q.    At some point, did you go from your surveillance

11  position to somewhere else?

12  A.    Yes.

13  Q.    Where was that?

14  A.    Inside the target address.

15  Q.    And where did you go once you got inside that address?

16  A.    To the target apartment.

17  Q.    And that would be what floor?

18  A.    Second floor, I believe.

19  Q.    When you went to the second floor, did you encounter any

20  individuals besides police officers?

21  A.    Yes.

22  Q.    Who did you see, if you recall?

23  A.    There was a Nicole Basset, white female.  There was

24  another female, I believe her name was Maria Colon, and

25  another male, Rolando Penate, and there may be another person

1   in there.

2   Q.   Now, when you saw Rolando Penate, where did you see him?

3   A.   He was seated on the couch in the living room.

4   Q.   And Maria Colon, where was she seated?

5   A.   Beside him on that couch.

6   Q.   Did you notice or observe them doing anything relative

7   to each other?

8   A.   They were just sitting there.  They were communicating.

9   Q.   And in what language were they communicating?

10  A.   In Spanish.

11  Q.   Do you have any background in the Spanish language?

12  A.   Yes.

13  Q.   Tell the jury, what is your background relative to the

14  Spanish language?

15  A.   I took four years of Spanish in high school.  In college

16  I CLEP'd and received credit for classes.  I just took a test

17  and received credit for those classes.  I've been assigned --

18  and then I've been assigned to the North End which is

19  predominantly Spanish and I've spoken a lot of Spanish.  My

20  wife is from Puerto Rico.  We communicate in Spanish in the

21  home, not all the time but we do.  And I've been to Puerto

22  Rico a bunch of times.

23  Q.   How far were you from Mr. Penate and Ms. Colon when they

24  were having this conversation?

25  A.   Right there in the room.  They were on the couch.  I

1    was -- there was a space, you know, the center of the living

2    room, and I was just standing within that space.

3    Q.    Were you able to determine what they were talking about?

4    A.    I really wasn't paying attention to their entire

5    conversation.  At some point I did make note of what Maria

6    had asked Rolando.

7    Q.    And what did she ask?

8    A.    She asked him, "Donde esta la pistola?" which in Spanish

9    means:  Where is the gun?

10   Q.    What was his response?

11   A.    He said, "In el basement."  Basement isn't the correct

12   word.  His use is basement, that's the word he used, but it's

13   not the Spanish word for basement but it is the word he used.

14   Q.    And the person who uttered those words, do you see him

15   in the courtroom?

16   A.    Yes, I do.

17   Q.    Where is he?

18   A.    Seated to the left of his attorney.  He has his face in

19   his hand.  He's wearing headsets around his head.

20        MR. VELAZQUEZ:  Would the record reflect he's pointed to

21   the defendant, Your Honor?

22        THE COURT:  Yes, it will.

23   BY MR. VELAZQUEZ

24   Q.    Detective, at that point in time when you heard this

25   conversation, were you aware that there was a gun in the

1   basement?

2   A.   Yes.

3   Q.   And do you know where that gun was physically located at

4   the point you heard this conversation?

5   A.   No.

6   Q.   And --

7   A.   I was aware there was a gun recovered.  I didn't know

8   exactly where it had been recovered from.  There was another

9   officer that had brought the gun to our evidence officer.

10  Q.   Do you know, where was the evidence officer located at

11  that point?

12  A.   I don't recall specifically, but the officer who found

13  it had walked through the living room with the gun.  So, I

14  mean, I saw it, they saw it, and then he turned it over to

15  the evidence officer.

16  Q.   And was there a question put to either of these two

17  individuals about that gun?

18  A.   No.  Nobody -- we didn't speak to them.  I didn't speak

19  to them.

20  Q.   Besides yourself, were you aware of any other

21  Spanish-speaking officers in the room at the time?

22  A.   No, there were not.

23  Q.   Thank you.

24       MR. VELAZQUEZ:  I have no further questions.

25       THE COURT:  Okay.

1                      CROSS EXAMINATION

2     BY MR. RYAN

3     Q.   Good afternoon, Detective.

4     A.   Good afternoon, sir.

5     Q.   Now, you talked about the role you played on

6     November 15, 2011 as part of this search warrant execution

7     team.  One of the responsibilities of at least one officer is

8     to write a police report, correct?

9     A.   Yes.

10    Q.   And in this case, that responsibility did not fall on

11    you.

12    A.   That's correct.

13    Q.   There is no rule that says an officer can't write his or

14    her own report, correct?

15    A.   That's correct.

16    Q.   But one officer has to write a report when an arrest is

17    made.

18    A.   That's correct.

19    Q.   And in this case, the only officer who wrote a report

20    was Detective Wadlegger, correct?

21    A.   Yes.

22    Q.   Now, you had a chance to review Detective Wadlegger's

23    report, correct?

24    A.   Yes.

25    (Cell phone rings)

1        MR. RYAN:  I should check mine.

2        THE COURT:  Everybody should check theirs, okay?

3    BY MR. RYAN

4    Q.   So you had a chance to review Detective Wadlegger's

5    report, correct?

6    A.   Yes.

7    Q.   And this particular vignette you've talked about is

8    featured in Detective Wadlegger's report, isn't it?

9    A.   Yes.

10   Q.   And you were able to provide that information to him

11   before he completed his report?

12   A.   Yes.

13   Q.   And you reviewed what he wrote?

14   A.   Yes.

15   Q.   And what he wrote is accurate, correct?

16   A.   Yes.

17   Q.   Directing your attention to this paragraph here

18   (indicating), is that the paragraph that treats the incident

19   you just testified to?

20   A.   Yes.

21   Q.   And the way that it's recorded in Detective Wadlegger's

22   report is it said:  While the raid team was conducting a

23   search of the address, Penate learned officers recovered a

24   pistol in the basement.

25   A.   Yes.

1    Q.    And upon hearing this, Ms. Colon stated to Penate:

2    Where was the pistol?

3    A.    Yes.

4    Q.    And Mr. Penate replied:   In the basement.

5    A.    Yes.

6    Q.    Which is what he just learned from the officers.

7    A.    He learned that a pistol was recovered.

8    Q.    Well, the report says he learned that officers recovered

9    a pistol in the basement.

10   A.    That's how the author of the report chose to write that,

11   but there was no indication that the gun was recovered in the

12   basement at that time.

13   Q.    Well, we, just two minutes ago, talked about how you had

14   a chance to review how the author of the report wrote the

15   report, correct?

16   A.    That's correct.

17   Q.    And you didn't tell him that's inaccurate, did you?

18   A.    No.

19   Q.    You just told us that this accurately captured what you

20   witnessed, correct?

21   A.    Yes.

22         MR. RYAN:  No further questions.

23         THE COURT:  Do you have anything else?

24         MR. VELAZQUEZ:  No, Your Honor.

25         THE COURT:  Okay.  Thank you very much.

1          THE WITNESS:  Thank you, Your Honor.

2          MR. VELAZQUEZ:  Your Honor, the Commonwealth rests.

3          THE COURT:  All right.

4          MR. RYAN:  Could we be seen at sidebar?

5          THE COURT:  Yes.

1  (The following conference was held sidebar)

2      MR. RYAN:  Your Honor, I have a 14-page memo in support

3  of my motion for required finding of not guilty.  It might be

4  better to do this argument outside the presence of the jury.

5      THE COURT:  Of course we will.  Do you intend to call

6  any witnesses?

7      MR. RYAN:  I do.

8      THE COURT:  Are they here for this afternoon?

9      MR. RYAN:  I'm not sure.  They're Commonwealth

10 witnesses.  One is Sergeant John Kent who is a booking

11 officer, and the chemist from the Amherst lab who I've

12 served, and I just haven't had any -- John Kent.

13     THE COURT:  John or Steve?

14     MR. RYAN:  John.

15     THE COURT:  I don't know him.

16     MR. RYAN:  We've spoken.  I told him that I would --

17 given where the evidence was going, he'd likely be an

18 afternoon witness.  He said he was going to check in at nine

19 o'clock.

20     THE COURT:  Any other witness?  Rebecca Pontes?

21     MR. RYAN:  Rebecca Pontes, Sharon Salem, and James

22 Hanchett.  I'm going to ask that all the names that they

23 heard at the beginning were just who -- I don't think I'll

24 likely call all of them, but I want to offer one or two of

25 them.  Usually they go and drink Mr. Velazquez's coffee, but

1    I don't know if they've been doing that or not.

2         THE COURT:  All right.  Are you ready to argue against

3    the defendant's motion?

4         MR. VELAZQUEZ:  Sure.

5         THE COURT:  What I think I will do is have the jurors

6    have an extra long lunch today.  How long do you think it

7    will take, about 15 minutes?

8         MR. RYAN:  For argument?

9         THE COURT:  Yes.

10        MR. RYAN:  Sure.

11        THE COURT:  Okay.

12   (Sidebar conference concluded)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Ladies and gentlemen, the Commonwealth has

2   rested its case.  What we're going to do today, I'm going

3   to -- we'll adjourn today for lunch, so you'll have a little

4   longer lunch hour than normal.

5          But please remember my instructions to you.  Do not

6   begin discussing the case amongst each other, with anybody

7   outside of the courtroom.  Don't use this long lunch hour as

8   an opportunity to take independent views of 57 Johnson

9   Street.

10         If you see anybody involved in the case, witnesses or

11  anybody else involved in the case outside the courtroom,

12  please do not approach them and ask them for anything, and

13  don't do any independent research during your lunch hour.

14         So, it's twenty-five after twelve.  If you can report

15  back at five minutes to two.  Thank you.

16  (The jury leaves the courtroom)

17         THE COURT:  We're going to take a short recess.  I'll be

18  back in ten minutes.

19  (Court recessed at 12:24 p.m.)

20  (Court reconvened at 12:45 p.m.)

21         THE COURT:  All right.  Mr. Ryan.

22         MR. RYAN:  Thank you, Your Honor.  Your Honor, this, in

23  my view, is not a difficult call with respect to the

24  firearm-related evidence, the gun and the ammunition.

25         This is a drug case and these are things that, as you

 1   heard during the course of this, these three controlled buys,

 2   there is no evidence offered that there was any suggestion

 3   that firearms had any role to play in any of these undercover

 4   sales.

 5       The locations that they were found in were not locations

 6   that the undercover officer went to.  Mr. Penate was not

 7   alleged to have postured that he had a firearm.  And I think

 8   you can infer, given just the nature of these items, that

 9   they just wouldn't have any connection anyways.

10       We've got a very old decrepit gun, and we'll talk about

11   that in a second, but in terms of just constructive

12   possession, the case law is clear.  You have to not only know

13   about these items but have the ability and intention to

14   control -- exercise dominion and control over them.

15       I cited in the most recent case of *Commonwealth versus*

16   *Ramirez*.  It's a 2013 Supreme Judicial Court case.  They

17   reversed a firearm conviction that had been affirmed by the

18   Appeals Court, and this was based on a finding that a

19   defendant knew about a firearm that his passenger in a motor

20   vehicle had.

21       And it was actually in the decision that the evidence at

22   trial was that the defendant may have himself handled it

23   earlier in the same day and yet Judge Cordy said that just

24   mere knowledge of it and an ability to reach inches away at

25   the time of the arrest and exercise control isn't enough to

1    establish a defendant's intention to do so.

2         So just with respect to what we're going to call a

3    firearm for the time being and the ammunition, I don't

4    think -- I think there was barely enough.  And Your Honor

5    actually heard the motion to dismiss, the McCarthy motion

6    here, and I think it was just enough to get over McCarthy but

7    they didn't come up with anything beyond what they needed to

8    to establish probable cause.  No reasonable jury viewing the

9    evidence in the light most favorable to the Commonwealth

10   could reach a determination that the elements of constructive

11   possession are met.

12        And I would throw in Detective Templeman's account, even

13   if you give the Commonwealth every inference possible, all

14   that shows is that Mr. Penate might have known that this

15   firearm two floors below was in the premises, but there is no

16   indication -- he wasn't fleeing, he wasn't running in that

17   direction, his papers weren't found down there, nothing ties

18   him to the firearm or the ammunition in the basement or the

19   ammunition in the third floor.

20        So I think that the Court ought to direct the verdicts

21   of not guilty for Counts 11, 12, and 13.

22        THE COURT:  Why don't we talk about the firearm offense,

23   the firearm itself, because that's what I think is pretty

24   crucial.

25        MR. RYAN:  Certainly.

1        THE COURT:   That's what I'd like to hear about and then

2   I'll hear from you with respect to that count.

3        MR. VELAZQUEZ:   Okay.

4        MR. RYAN:   Section C of my memo deals with the

5   operability of this weapon, and I think that it's very clear

6   that a firearm does not have to be the sort of thing that

7   anybody can just pick up and squeeze the trigger and make a

8   bullet go through.

9        However, while the courts are willing to let something

10  count as a firearm with some minor adaptation or repair that

11  can be made to get a bullet through the chamber, they're

12  willing to go in that direction, but there is no precedent

13  that I think would permit a finding of an operable firearm

14  where the evidence in this case is concerned.

15       You've got a gun that an extremely experienced witness,

16  first of all, couldn't identify its age.   They give a

17  ballpark nature it was so old.   It had been decorated with

18  gold paint on the handle and the cylinder, and the cylinder

19  did not line up.   The testimony was that he had to manually

20  do that.   In order to get a shot out of it, he would have to

21  hope that he aligned it correctly or it could literally

22  explode in his hand.

23       Now, I drew the Court's attention to not only the

24  Appeals Court case of *Commonwealth v. Rose* where they make

25  the distinction between saying it's one thing to shoot a

1    weapon, quite another to repair it.  Anyone knows how to turn

2    on a television set, few know how to fix one.

3        But also the Supreme Judicial Courts case in

4    *Commonwealth v. Sampson,* that was a case where the expert --

5    same situation, someone very experienced, handled firearms

6    all their life, they did not want to try to shoot this

7    firearm with gunpowder in it so they took the gunpowder out

8    because, in the words of the expert, he would have been a

9    little leery about doing so.  And Chief Justice Hennessey

10   said:  Look, you know, if you've got an expert here who isn't

11   confident enough to use this thing and let the gunpowder be

12   in it, then you can assume that anybody who would be

13   sophisticated enough to make the same adaptations and repair

14   as the expert would be similarly apprehensive about letting a

15   live round go through that device.

16       So in this case you have an expert who has qualified

17   this as a firearm, but I think the Court can find as a matter

18   of -- even viewing the evidence in the light most favorable,

19   you can't get to a jury on the issue of whether it's operable

20   when he didn't -- a bullet did not go through that muzzle,

21   and there is a good reason for it, because he was scared.

22       He didn't disagree with the characterization that he

23   treated this like a cap gun.  He had a primed cartridge.

24   Nothing went through that muzzle because, frankly, he was

25   scared to do it.  He didn't think that he could do it without

1   injuring himself.  So I don't think you've got a working

2   firearm here.

3        And I think another thing that's important to note is

4   there is no bullets for this firearm.  The suggestion that

5   this could somehow be used in the commission of a felony in

6   traditional means of doing so would be to actually brandish

7   it.

8        And this isn't a gun that could have been used for

9   defense purposes.  It was located way, way far away from

10  where any of the activity that's been alleged took place, so

11  I really don't see how this is a case where they can say that

12  they've got a working firearm or my client constructively

13  possessed it or the ammunition.

14       THE COURT:  Or that he possessed it during the

15  commission of a felony.

16       MR. RYAN:  Absolutely.

17       THE COURT:  Okay.

18       MR. RYAN:  And I would like to be heard on the other

19  counts as well but I'll wait.

20       THE COURT:  Thank you.  Mr. Velazquez.  For the record,

21  it is Count 11.

22       MR. VELAZQUEZ:  Your Honor, my memory of Trooper

23  Schrijn's testimony is that he essentially said this is

24  capable of firing a projectile.  He did not fire a

25  projectile.  He fired a -- whatever he called it, and I'm not

1   real familiar with all the terms.  But certainly it was his

2   opinion that this was a working firearm, and he did not back

3   off from that.

4       And he essentially talked about how that test that he

5   puts it through is a test he puts through a lot of weapons,

6   not necessarily just because he's leery about it but because

7   it's something that they do at the state police lab.

8       And I don't believe there is anything in the statute or

9   anything in the case law that says that you have to actually

10  put a live round in there in order for it to be capable of

11  discharging a projectile.  And that's where he testified to,

12  that this is a working firearm because it is capable of

13  firing a projectile.  The fact that it is not the best

14  firearm doesn't change the meaning of the fact that it's a

15  firearm nonetheless.

16      And with respect to -- he was asked about whether he was

17  leery and all of that, but I think he basically held firm

18  that this is not something he did because he was so afraid of

19  it discharging in a way that might hurt him, but certainly

20  this is something that he does in a number of cases in order

21  to determine if it's a working firearm.

22      And it's ultimately a jury question whether or not they

23  believe his testimony or they agree with his testimony.  But

24  certainly that's what we have as far as an expert.  And

25  that's his testimony:  That it met the requirements, in his

1   opinion, of what the statute requires for a working firearm.

2       THE COURT:  Thank you.  Trooper Schrijn, who does have

3   extensive experience with this stuff, did testify that the

4   weapon had a malfunction when he received it and that that

5   pawl piece was missing.  But what concerns me is when he

6   testified that he had to manually adjust the --

7       MR. RYAN:  Cylinder, I think, Your Honor.

8       THE COURT:  -- cylinder, thank you.  I'm looking through

9   my notes.  The cylinder.  The fact that the chamber has to

10  line up with the barrel and in this weapon it did not, and

11  that he had to manually adjust it.  And the fact that -- here

12  it is:  He had to manually align the cylinder because it

13  could blow both sides of the cylinder off if he had used

14  gunpowder, which in my mind is the reason why he didn't use

15  gunpowder.

16      MR. VELAZQUEZ:  Your Honor, if I may?

17      THE COURT:  Sure.

18      MR. VELAZQUEZ:  The case law that even counsel cites

19  talks about a gun ceases to be a firearm in the statute if

20  the required adjustment is so substantial that only a trained

21  expert could fire it.

22      THE COURT:  Right.

23      MR. VELAZQUEZ:  In this case he said that the cylinder

24  is not free-spooling.  He said the cylinder, once aligned, is

25  capable of firing a projectile.

1        THE COURT:  But he also said that the trigger does not

2   work.

3        MR. VELAZQUEZ:  He said that the trigger does not lock.

4   But if you bring it back and let it go, it will have enough

5   of a thrust to fire a projectile through that barrel.  That's

6   his testimony, Judge.

7        THE COURT:  My recollection is that he said that the

8   trigger does not work.  That's in my notes.

9        MR. VELAZQUEZ:  We may both be saying the same thing.

10  He said it's not a single action trigger in that you can

11  press the trigger itself and the hammer goes back and

12  forward.  He said you could pull it back and it will work as

13  a firearm.

14       And he also said, and he made a point of this, when he

15  saw it at the lab, the trigger did lock and it did fire.  But

16  during the interim period, something may have happened.  But

17  when he first tested it shortly after this case was first --

18  when the evidence was taken in, that's when he examined it,

19  or at least whatever date he may have said, but he said --

20       THE COURT:  December 11th, I think he said.

21       MR. VELAZQUEZ:  But since then there has been a change.

22  And this is not in evidence, but I can tell the Court that

23  that gun was handled by the defense expert during the interim

24  period.  But that's why he made the point to say that when I

25  examined it, it was in the condition most closely related to

1   how it was when it was taken into evidence by the police, and

2   that was December 8, 2011, and it did work at that point.

3        THE COURT:   Okay.   I'm going to be read *Rose* during my

4   lunch break and make a decision then.

5        Have you completed your argument with respect to the

6   possessory offenses -- no, with respect to the firearms, the

7   ammunition that was found in the basement and the ammunition

8   in the --

9        MR. RYAN:   The last thing I want to draw the Court's

10  attention to is that the identifications of Luis Vega found

11  so close to the ammunition, the .22, that they were put in

12  the same bag.

13       THE COURT:   That's found on the third floor.

14       MR. RYAN:   Found on the third floor but same caliber of

15  bullets found in the basement.   So I think if there is any

16  inference to be drawn, it would be that it's that

17  individual's ammunition.   So, again, I don't think there is

18  anything tying my client to that.

19       I would -- there are a couple arguments I've made just

20  for making a record.   I'm not going to tell the Court that I

21  think the failure to introduce a license, which I think is an

22  element of the offense but the SJC seems to think otherwise.

23  I think it's framed as an affirmative defense.   I think that

24  that goes against due process concerns but the SJC has ruled

25  otherwise.

1        I would just like to draw attention to the argument that

2   I make in Section F about *Commonwealth v Barbosa*, and this

3   argument would cover Counts 1, 2, and 12.  And it would

4   essentially be this:  Counts 1 and 3 are the possession with

5   intent counts.  And what happened is at the Grand Jury, the

6   Grand Jury heard evidence, basically the same evidence that

7   was heard here, that there was cocaine and heroin recovered

8   in a dog pen and off of various individuals in the residence.

9   And this -- what they did is they returned a single count

10  indictment for each of those substances even though they were

11  located at different times in different places.

12       Same thing for the ammunition.  It was located by one

13  officer in the third floor and another one in the basement.

14  They returned a single count of possession of ammunition

15  without an FID card.

16       The danger we have right now if this goes to the jury,

17  is the jury could say:  Well, I think he possessed the

18  ammunition in the basement, when the Grand Jury thought that

19  he possessed it in the attic.  And so what has happened is my

20  client has been convicted of a crime punishable by the state

21  prison without having a jury indict him on that.

22       And I would just draw the Court's attention to

23  *Commonwealth v. Barbosa*.  It's the first case where this

24  principle has been annunciated and there has been recent

25  decisions by the SJC where they have affirmed this principle,

1    *Commonwealth v. Smith* and *Commonwealth v. Munoz*.

2         *Smith* was a home invasion case where I think everybody

3    understood what home invasion was being charged, but it lined

4    up the same way, and when it got to the SJC, they had to

5    reverse the conviction for that count.  It was a homicide

6    case.

7         And *Munoz* was a Class D possession with intent case

8    where they found marijuana in two different locations; one by

9    the defendant's foot and another in a different part of the

10   house, and they came back with a single count of possession.

11   And the SJC said you can't say which one the charging body

12   picked and whether it lines up with what the petit jury found

13   the defendant guilty of.

14        So I think those counts have to go out as well.  And

15   with respect to all other -- I wouldn't waive my Rule 25 with

16   respect to the distributions, but I just -- those ones that

17   I've highlighted, I think, are the ones that the Court really

18   should give some strong consideration to allowing the motion.

19        THE COURT:  Okay.  So, Mr. Velazquez, first talk to me

20   about possession of a firearm during to the commission of a

21   felony because the cases cited by the defendant indicate a

22   lack of nexus.

23        MR. VELAZQUEZ:  Right.  Well, we have to first establish

24   that there is a felony that's being committed at the time,

25   and the felonies that the Commonwealth is offering are the

1   distributions as well as the possession of the controlled

2   substances with the intent to distribute.

3       So that if you possess a firearm, whether you intend to

4   use it as backup or to show some sort of strength, whatever

5   it is that you use it, the fact that you possess it, whether

6   it's actually or constructively, in this case, I think there

7   is enough to go to a jury.

8       THE COURT:  But I think the cases say that there has to

9   be some sort of a nexus between -- I don't think it's like a

10  strict liability issue where just because you possess it, you

11  can automatically be found guilty of that offense.  I thought

12  that there needed to be more of a connection between the

13  crime and -- the felony and the possession.

14      MR. VELAZQUEZ:  And I think most cases where you find

15  those two charges, a person may possess a gun and also be out

16  there dealing drugs or doing some other crime, and I believe

17  that's enough.

18      In this case, there is one household, and the suggestion

19  is that not only he had knowledge of it, he had the ability

20  to exercise control and dominion over that gun at the time

21  while he was committing these other crimes.

22      THE COURT:  Okay.  Now, do you want to argue with

23  respect to the possession of ammo and the firearm because

24  your theory is constructive possession?

25      MR. VELAZQUEZ:  My theory is both -- my theory is

1    twofold.  Since there are so many people involved in this

2    house, clearly with respect to the distribution charges,

3    there is two cases -- two of the counts I am proceeding on a

4    principal, and those are the two counts that there was

5    testimony that he actually distributed these drugs.

6         One of those counts involved the other two women who

7    were upstairs.  And it's the Commonwealth's position in that

8    count that it's a joint venture.

9         The drugs that are found throughout the house, in my

10   opinion, because they were not found on him, based on his

11   connection to that address, counsel may argue otherwise, but

12   I feel that there is a strong connection not only with

13   respect to his presence there over a period of time but also

14   his connection to drugs in general based on the distributions

15   and his involvement with the undercover officer.

16        THE COURT:  What about the drugs that were found on the

17   women, Ms. Colon and Ms. Basset?  They were introduced into

18   evidence.  Are you including those with respect to the count

19   alleging possession with intent to distribute?

20        MR. VELAZQUEZ:  I'm more concerned with the drugs that

21   were found in the dog pen.

22        THE COURT:  In the house, okay.

23        MR. VELAZQUEZ:  In the house.

24        THE COURT:  So the drugs that were found on the women.

25        MR. VELAZQUEZ:  Right.  That's a fair presentation of

1   the evidence, in my opinion.  Rather than fail to put in

2   evidence that the police found, because I know that the

3   defense would raise it and offer it themselves in order to

4   give the jury a fair picture of what happened at that house

5   on that day, I'm offering it and the jury can see for

6   themselves that there are people that may be connected to

7   this address or not connected to this address that have

8   various amounts of cash on them, various amounts of drugs,

9   and they can draw inferences, for example, that somebody who

10  was leaving the premises may have just purchased drugs in

11  that apartment.

12       So I don't expect that they're going to find that this

13  defendant possessed the drugs that were found inside somebody

14  else's purse or somewhere on their person because the

15  evidence would not support that.  But certainly as to the

16  intent to distribute, that is certainly evidence of that.

17       THE COURT:  All right.  So Mr. Ryan's *Barbosa* argument?

18       MR. VELAZQUEZ:  With respect to the evidence in the

19  attic versus the basement?

20       THE COURT:  No, the fact that the Grand Jurors heard

21  evidence that there were drugs found in the house, drugs

22  found on Ms. Colon, drugs found on Ms. Basset, and that they

23  could, this jury, could easily find him guilty of possessing

24  with the specific intent to distribute all of those drugs.

25       But I have to say my intent would be to instruct the

1   jurors that the defendant is not charged -- I don't see where

2   there is sufficient evidence to charge this defendant with

3   the drugs that were found on Ms. Basset or on Ms. Colon.

4       MR. VELAZQUEZ:  Right.

5       THE COURT:  The Commonwealth does have the right to

6   present circumstantial evidence of an intent to distribute

7   and I will -- I gather that's why that evidence was

8   introduced.  I just wanted to make sure that you did not

9   intend for me to instruct the jurors that those drugs found

10  on those two women would be part of the possessory offense.

11      MR. VELAZQUEZ:  Right.  I think we have to limit the

12  possession with intent to the drugs that are found in the

13  pen.

14      THE COURT:  In the dog pen, okay.

15      MR. VELAZQUEZ:  In the dog pen.

16      THE COURT:  All right.  Fine.

17      MR. RYAN:  I think that what the Commonwealth is

18  attempting to do here and what the Court seems inclined to do

19  is something that people tried to do in *Barbosa*.  And by the

20  time it got to this stage, the fatal flaw is the Grand Jury

21  has already heard all of this evidence and came back with one

22  count for each illicit substance.

23      So even if the Court were to say we're picking the dog

24  pen evidence, it's possible that the Grand Jury picked the

25  Basset and Colon evidence or Cruz evidence.

1       THE COURT:  Okay.  And I've read the Grand Jury minutes

2  a while ago, but that testimony was presented during the

3  presentment?  That those drugs were found on those women?

4       MR. VELAZQUEZ:  I believe so.  I haven't read them in a

5  while myself.

6       THE COURT:  All right.  Well, let's give the Grand

7  Jurors the benefit of the doubt, but I will instruct that.

8  That will be part of my instruction.

9       I'm going to go read a couple cases.  Any other argument

10 you want to present the Court?

11      MR. VELAZQUEZ:  No, Your Honor.

12      THE COURT:  Okay.

13      MR. RYAN:  No, Your Honor.  Thank you.

14      THE COURT:  You're more than welcome.  Thank you.

15      MR. RYAN:  Just in terms of schedule.  John Kent is here

16 and he's my first witness to call.  I'll try to track down

17 the chemist.  I don't think it's a long defendant's case we

18 would be putting on.

19      Would the Court be inclined to do arguments and charge

20 tomorrow morning?

21      THE COURT:  I would rather do it -- tomorrow morning is

22 fine.  We need to have a charge conference, but we can do

23 that at the end of the day.

24      MR. RYAN:  Thank you.

25      THE COURT:  Great.  I know the jurors are going to be

1    back at five to two but how about two o'clock.  You can let

2    them know that my hearing ran a little longer.

3    (Court adjourned at 1:10 p.m.)

4    (Court reconvened at 2:11 pm.)

5        THE COURT:  So, with respect to Count 11, that's the

6    firearm and the ammunition, I read some cases on constructive

7    possession and since the firearm or the -- and the ammunition

8    were not found on the defendant's person, the Commonwealth's

9    theory is that the defendant constructively possessed the

10   firearm.

11       So, while proof of possession may be established by

12   circumstantial evidence and inferences, presence alone cannot

13   show knowledge, power, or intention to exercise control over

14   the contraband, and I'm quoting from *Romero*, *Commonwealth*

15   *versus Romero*, 464 Mass at 653, but presence supplemented by

16   other incriminating evidence will serve to tip the scale in

17   favor of sufficiency.

18       Here the firearm was not found on the defendant's

19   person, so we need evidence that the defendant knew of the

20   location of the firearm and had the ability and the intent to

21   exercise dominion and control over the firearm and the

22   ammunition.

23       And I don't think there is sufficient evidence to

24   establish that he had the intent to exercise dominion and

25   control over the firearm.  You can't go forward with just the

 1    fact that the defendant knew or may have known about the
 2    location of the firearm.
 3        Here we have a firearm, A, that was found in the
 4    basement, and it hasn't even been established that the
 5    basement -- that the second floor apartment was the only
 6    apartment that had access to the basement.  That was not made
 7    clear to me.
 8        There were many adults found in this apartment, so it's
 9    not a situation where it's just the defendant and perhaps
10    maybe Ms. Maria Colon as the only two adults in the
11    apartment.  And there is absolutely no evidence that the
12    defendant intended to exercise dominion and control over the
13    firearm or the ammunition, whether it be the ammunition found
14    in the basement or that on the third floor.
15        So, for those reasons, I am going to allow the
16    defendant's motion with respect to Counts 11 and 12.  And it
17    would carry over then to 13, the last count.  So, that's my
18    ruling.
19        MR. RYAN:  The defense would be prepared to call Rebecca
20    Pontes.  And she has childcare issues, but she shouldn't be
21    on the stand that long.
22        THE COURT:  Okay.  Are we ready for the jurors?
23        MR. RYAN:  Yes.
24   (The jury enters the courtroom)
25        THE COURT:  Good afternoon, ladies and gentlemen.

1        THE JURY:  Good afternoon.

2        THE COURT:  Have any of you begun discussing the case

3   amongst each other or with anybody outside of the courtroom?

4   Seen, heard, or read anything about the case?  Done any

5   independent research or taken any independent views to

6   Johnson Street?  Is there anything that needs to be brought

7   to my attention before we resume the trial?

8        For the record, there is no affirmative responses to any

9   of the questions asked by the Court.

10       Ladies and gentlemen, the Commonwealth has rested its

11  case.  As I indicated to you earlier, the defendant is not

12  compelled, not required to call any witnesses.

13       But I will ask, Mr. Ryan, do you intend to call any

14  witnesses in this case?

15       MR. RYAN:  The defense does.  The defense at this point

16  would call Rebecca Pontes.

17                    REBECCA PONTES, sworn

18                    DIRECT EXAMINATION

19  BY MR. RYAN

20  Q.   Good afternoon, Ms. Pontes.

21  A.   Good afternoon.

22  Q.   Could you state your name and spell your last name for

23  the record?

24  A.   Rebecca Pontes, P-O-N-T-E-S.

25  Q.   And, Ms. Pontes, where are you employed?

1    A.    For the Mass State Police Crime Lab.

2    Q.    How long have you been with the Mass State Police Crime

3    Lab?

4    A.    Since July 2012.

5    Q.    And where are you currently stationed?

6    A.    In Springfield.

7    Q.    And were you previously stationed at a different

8    location before moving to the Springfield location?

9    A.    The Amherst lab, yes.

10    Q.    And when did you stop working in Amherst?

11    A.    January 2013.

12    Q.    Now, when did you begin your tenure -- are you a

13    chemist?

14    A.    Yes.

15    Q.    And when did you begin working as a chemist at the

16    Amherst laboratory?

17    A.    May 2004.

18    Q.    And in August of 2004, did somebody else join the staff

19    at that laboratory at Amherst?

20    A.    Yes.

21    Q.    Who was that?

22    A.    Sonja Farak.

23    Q.    And after Ms. Farak joined the staff in August of 2004,

24    besides the two of you, who else worked there?

25    A.    My supervisors Sharon Salem and Jim Hanchett.

1    Q.    And was Jim Hanchett the overall supervisor there?

2    A.    Yes.

3    Q.    And did Sharon Salem serve as the evidence officer?

4    A.    Yes.

5    Q.    Now, the work at the Amherst laboratory, was that

6    directed towards determining whether substances submitted

7    contained the presence or absence of controlled substances

8    under Mass law?

9         MR. VELAZQUEZ:  Objection as to form.

10        THE COURT:  Okay.  Could you rephrase your question,

11   please.

12        MR. RYAN:  Certainly.

13   BY MR. RYAN

14   Q.    What did you do at the Amherst lab?

15   A.    We determined whether evidence submitted by police

16   departments contained controlled substances.

17   Q.    Would you agree not every sample submitted to the

18   Amherst laboratory turned out to be a controlled substance?

19   A.    Yes.

20   Q.    Are you aware in 2012, 302 samples came back negative

21   for the presence of --

22        MR. VELAZQUEZ:  Objection.

23        THE COURT:  Are you aware of that?

24        THE WITNESS:  No.

25        THE COURT:  Okay.

1   BY MR. RYAN

2   Q.   Now, in Amherst, before you left there, you said that

3   Sharon Salem was the evidence officer, right?

4   A.   Correct.

5   Q.   And as the evidence officer, would she typically assign

6   samples for analysis to you and Ms. Farak?

7   A.   Yes.

8   Q.   Would it sometimes happen that Sharon Salem wouldn't be

9   there?

10   A.   Yes.

11   Q.   And did it sometimes happen that you would assign

12   samples to yourself?

13        MR. VELAZQUEZ:   Objection.

14        THE COURT:   Can I see counsel at sidebar, please.

15

16

17

18

19

20

21

22

23

24

25

1    (The following conference was held sidebar)

2         THE COURT:  What's your objection, Mr. Velazquez?

3         MR. VELAZQUEZ:  Your Honor, first of all, I'm not sure

4    where this is going, but certainly I think this has already

5    been ruled, and it looks like it's going in the direction of

6    an adverse ruling on the Court's part as well as --

7         THE COURT:  So tell me the purpose of you calling

8    Ms. Pontes to the stand.

9         MR. RYAN:  Ms. Pontes would testify that she's not going

10   to testify about --

11        THE COURT:  Tell me what she will testify to.

12        MR. RYAN:  She will testify that at the Amherst lab that

13   she and Sonja Farak assigned samples to themselves for

14   testing from time to time.  She will testify that she had

15   access to a main drug vault as did Sonja Farak with a regular

16   key that wouldn't show up on any computer, and would be --

17   they could go in there on the weekends and be in the drug

18   vault by themselves assigning samples to themselves.  She

19   would testify that they would frequently leave samples

20   unsealed in overnight evidence safes that were not secure.

21        And none of this is information that touches on the

22   circumstances of Ms. Farak's arrest, which I thought was the

23   nature of the Court's ruling.  My goal has been to show

24   tampering in this case, and this witness could show that

25   there was certainly tampering as part of the unsecured nature

1    of how the laboratory was run.

2         THE COURT:  Mr. Velazquez.

3         MR. VELAZQUEZ:  Your Honor, it, sort of, in a negative

4    way is asking her to testify about something that she may

5    have done or what Sonja Farak may have done or not done, and

6    it still, sort of, is treading on that area that has been

7    discussed.  And, first of all, we don't have a time frame and

8    I'm not sure where this is going.

9         THE COURT:  Yeah, I don't feel comfortable with your

10   eliciting this testimony.  I really don't.  And so if you

11   want to -- I am not going to permit you to question her about

12   the procedures at the Amherst lab.

13        The reason why I asked you to enter into the stipulation

14   was so that could have been addressed and we could have moved

15   on and discussed the testing that took place in Worcester.  I

16   think the stipulation covered any potential concerns you may

17   have with respect to the drugs that were allegedly found in

18   your client's apartment or sold -- allegedly sold by him to

19   Mr. Hernandez.

20        MR. RYAN:  Just so the record is clear --

21        THE COURT:  Yeah, make it clear.

22        MR. RYAN:  I was under the impression that the Court's

23   ruling and the stipulation concerned the evidence of Ms.

24   Farak's malfeasance with respect to other samples and at the

25   time of her arrest.  So I apologize to the Court.

1          This witness would testify to the practices at Amherst

2     that made tampering possible, and my argument would be that

3     it made it possible in this case.   But if the Court is saying

4     no, this will be a very short witness.   Thank you very much.

5     (Sidebar conference concluded)

```
 1  BY MR. RYAN
 2  Q.    Ms. Pontes, I have no more questions for you.
 3        MR. VELAZQUEZ:  Nothing, Your Honor.
 4        THE COURT:  Okay.  You may be excused.  Thank you.
 5  Would you please call your next witness.
 6        MR. RYAN:  The defendant would call Sergeant John Kent.
 7                       JOHN KENT, sworn
 8        THE WITNESS:  Good afternoon, Judge.
 9        THE COURT:  Good afternoon.
10                       DIRECT EXAMINATION
11  BY MR. RYAN
12  Q.    Good afternoon, Sergeant Kent.
13  A.    Good afternoon.
14  Q.    Can you state your name and spell your last name for the
15  record?
16  A.    John Kent, K-E-N-T.
17  Q.    And, Sergeant Kent, where are you employed?
18  A.    Springfield Police Department.
19  Q.    And how long have you been there?
20  A.    Since 1979.
21  Q.    And what's your current assignment?
22  A.    I am a sergeant.  Currently I'm assigned to the Internal
23  Investigation Unit.
24  Q.    Are you also doing work over at the academy?
25  A.    Yes.
```

1    Q.    And back on November 15, 2011, were you serving as a

2    booking officer?

3    A.    I may have been.

4    Q.    (Shows witness document.)

5    A.    Booking sergeant, that's me.

6    Q.    Does that refresh your recollection as to whether you

7    were working as a booking sergeant that day?

8    A.    Well, I was.

9    Q.    And as part of your booking sergeant responsibilities,

10   do you advise people of the charges against them?

11   A.    No, not necessarily.

12   Q.    Okay.

13   A.    If they ask, I do.

14   Q.    Is this a booking photograph?

15   A.    Yeah, it appears to be.

16   Q.    Is that a booking photograph that you took?

17   A.    No, I don't --

18   Q.    You supervise the taking of the photographs?

19   A.    Not directly but it's done under my watch.  Somebody

20   from the Detective Bureau comes downstairs and removes the

21   prisoner from the cell and takes him to the photo lab, and

22   I'm not directly supervising it but I am the supervisor of

23   the booking area.

24   Q.    Do you know is this a photograph that you were present

25   for when it was taken?

1    A.   No, I wouldn't have been, no.  The only time I would go

2    in that room is if there is a problem.  If there is a fight

3    or something breaks out, but I generally stay out in the

4    front at the booking desk.

5    Q.   Okay.  Thank you.

6         MR. RYAN:  I don't have any other questions of this

7    witness.

8         THE COURT:  Mr. Velazquez.

9         MR. VELAZQUEZ:  No, Your Honor.

10        THE COURT:  All right.  Thank you, Sergeant.

11        THE WITNESS:  You're welcome.

12        THE COURT:  Mr. Ryan.

13        MR. RYAN:  The defendant would rest.

14        THE COURT:  Do you have any rebuttal witnesses you

15   intend to call, Mr. Velazquez?

16        MR. VELAZQUEZ:  No, Your Honor.

17        THE COURT:  Okay.  I'd like to see counsel at sidebar.

18

19

20

21

22

23

24

25

1   (The following conference was held sidebar)

2       MR. RYAN:  Just for the record, I renew Rule 25

3   arguments.  I'd waive further argument.

4       MR. VELAZQUEZ:  I'd waive argument.

5       THE COURT:  The motions are denied.

6       MR. RYAN:  Thank you.

7       THE COURT:  So, what I'm inclined to do is dismiss the

8   jurors and we can take five and I'll come back and we can do

9   a charge conference.  Okay?

10      MR. RYAN:  Yes.  Thank you.

11  (Sidebar conference concluded)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  All right, ladies and gentlemen.  That

2     concludes the evidentiary portion of this trial.

3          So, what we're going to do is suspend for the day, and

4     tomorrow we will have what are called closing arguments and

5     the charge, my charge to you, charge to the jury.  And we

6     will begin at 9:15.  You don't have to bring your coffee

7     because since you'll be a deliberating jury, that's when we

8     can provide you with coffee or tea or whatever.

9          So, please remember my instructions to you.  Do not

10    begin discussing the case amongst each other or with anybody

11    else outside of the courtroom.  Ignore any media attention

12    that may be paid to the case.

13         If you hear something about it on the radio or on your

14    television, leave the room, and ignore any print news

15    articles that may be paid to the case.

16         Please do not do any independent research, look up any

17    statutes, talk to any friends who are involved in the

18    criminal justice system, or take any independent views of 57

19    Johnson Street.  And do not approach anybody involved in the

20    case should you see them outside of the courtroom.

21         So, I will see you tomorrow morning.  Enjoy the rest of

22    your afternoon.  Thank you very much.

23    (The jury leaves the courtroom)

24         THE COURT:  All right.  Are there any specific

25    instructions you would want the Court to instruct the jury

1   on?

2       MR. VELAZQUEZ:  No, Your Honor.  I think this is pretty

3   straightforward.

4       THE COURT:  Yeah.

5       MR. RYAN:  Your Honor, the only -- and I don't have

6   written ones for the Court right now.  I didn't anticipate

7   being in this position at this moment, but the only ones I

8   would ask the Court to give that are special instructions

9   would be the SJC study group instructions on identification.

10      Those recommendations, I think there are some -- ones

11  that are relevant to the facts of this case, particularly

12  around single photograph identifications, and I think there

13  is ones that would be easily plucked out of there that would

14  be appropriate given what the identification evidence is in

15  this case.

16      THE COURT:  Well, those are recommendations, they have

17  not yet been adopted.

18      MR. RYAN:  Not yet.

19      THE COURT:  There is so much discussion going on about

20  those proposed instructions that I am going to -- I am going

21  to stay away from them.  And I'm going to give the

22  identification instruction that's included in the Superior

23  Court charge book, okay?  And your objection is noted but

24  there is so many unanswered questions about those

25  recommendations.

1          MR. RYAN:  Understood.  I would ask the Court -- I think

2     one of the standard available instructions is around

3     photographs that are displayed to witnesses, that mug shot

4     instruction, so that there is not an assumption that because

5     the police have their photograph, that they've misbehaved in

6     the past.

7          THE COURT:  All right.  There is several reasons why the

8     police may have the defendant's photograph.

9          MR. RYAN:  Yes.

10         THE COURT:  All right.  I'll include that.  Do you want

11    an instruction that the defendant did not testify?

12         MR. RYAN:  I do, yes.

13         THE COURT:  Okay.

14         MR. RYAN:  And I think the standard one is appropriate.

15         THE COURT:  All right.

16         MR. RYAN:  But I don't think there are many other aside

17    from the -- and I think I will just bring in some written

18    ones so my rights are saved, but I understand the Court's

19    made a ruling on the identification instructions.

20         THE COURT:  All right.  I am going to instruct on the

21    three distinct dates of the alleged distribution, and that

22    the defendant will be charged with the drugs allegedly found

23    in the dog pen.

24         MR. RYAN:  Other than that, I think we'll have some work

25    to do redacting.

1          THE COURT:  Yes.

2          MR. RYAN:  And I don't anticipate having any problems.

3          THE COURT:  Thank you very much.

4          MR. VELAZQUEZ:  Thank you.

5          MR. RYAN:  Thank you.

6          THE COURT:  Mr. Ginley is going to start working on the

7    verdict slips.  Maybe you can look at them later.

8          MR. RYAN:  Okay.

9    (Court adjourned at 2:33 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25