# EXHIBIT 5

```
 1                                        Pages:  1-82
                                          Exhibits:  26A
 2                                        ID: J-L

 3

 4                   COMMONWEALTH OF MASSACHUSETTS
        HAMPDEN, SS                   SUPERIOR COURT DEPARTMENT
 5                                    OF THE TRIAL COURT

 6

 7      * * * * * * * * * * * * * * * *
        COMMONWEALTH OF MASSACHUSETTS    *
 8                                       *
        vs.                              *   Docket No. 12-83
 9                                       *
        ROLANDO PENATE                   *
10                                       *
        * * * * * * * * * * * * * * * *

11

12              JURY TRIAL:
                BEFORE THE HONORABLE TINA PAGE
13

14      APPEARANCES:

15      For the Commonwealth:
        Hampden County District Attorney's Office
16      50 State Street
        Springfield, MA  01103
17      By:  Eduardo Velasquez, Assistant District Attorney

18      For the Defendant:
        By:  Luke Ryan, Esq.
19

20

21                                      Springfield, Massachusetts
                                        December 12, 2013
22

23

24                      Elizabeth Marzano
                        Official Court Reporter
25
```

1                          I N D E X

2

3    EXHIBITS:                                       PAGE:

4    26A,           Luis Vega's IDs                    6

5

6

7    FOR IDENTIFICATION:                             PAGE:

8    J,             Jury communication                77
     K,             Jury communication                80
9    L,             Jury communication                80

10

11

12   CLOSING ARGUMENT:                               PAGE:
     for the Defendant                                8
13   for the Commonwealth                             28

14

15

16   JURY CHARGE                                      36

17

18

19

20

21

22

23

24

25

```
 1   (Court called to order)
     (Defendant present)
 2   (9:25 a.m.)

 3

 4        THE CLERK:  Your Honor, we're back record in

 5   Commonwealth versus Rolando Penate, Indictment 12-83, with

 6   Attorneys Velazquez and Ryan.  For the record, the

 7   interpreter is present.

 8        THE COURT:  Good morning.

 9        MR. RYAN:  Good morning.

10        MR. VELAZQUEZ:  Good morning.

11        THE COURT:  Mr. Velazquez, you wanted to address the

12   Court?

13        MR. VELAZQUEZ:  Your Honor, I did want to address the

14   Court, however, I spoke with one of the officers that I had a

15   question about and I had resolved it and I don't need to

16   address the Court at this point.  I'm sorry.

17        THE COURT:  That's okay.

18        MR. VELAZQUEZ:  It happened just before you came on the

19   bench.

20        THE COURT:  Not a problem.  Now, is there -- do you have

21   any instructions you want to submit?

22        MR. RYAN:  No, Your Honor.  I killed a lot of trees in

23   this case, but I didn't kill any for the purposes of the

24   proposed instructions.

25        THE COURT:  And I understand with respect to the verdict
```

1    slips, the dates will be on those verdict slips, correct?

2         MR. VELAZQUEZ:  Yes.

3         THE COURT:  Good.  Have you gone through the exhibits

4    yet?

5         MR. RYAN:  We have.  There is one issue that I don't

6    quite know how to address, but I don't think it will be too

7    big a problem.

8         The identifications of Luis Vega were found with the

9    bullets.  I know the bullets aren't going back given the

10   Court's ruling of the Rule 25 motion, but I think those

11   identifications are relevant, and I was hoping they could go

12   back as maybe as a separate exhibit.  I don't know.

13        THE COURT:  Do you have them?

14        THE CLERK:  I do, Your Honor.  For the record, that

15   would currently be Exhibit No. 26.

16        THE COURT:  Okay.  So, Mr. Velazquez?

17        MR. VELAZQUEZ:  Your Honor, I do know that Luis Vega

18   Colon was one of the people that was arrested on that day in

19   the apartment.  So the only thing of any evidentiary value in

20   that room, in that bedroom, is those two IDs that would come

21   in.  I'm not sure if there is any drugs associated there.

22   I've kind of lost track.

23        THE COURT:  No, this is Exhibit No. 26, these are the --

24   this is the ammunition that was found on the third floor

25   along with Mr. Vega's identification.

1        MR. VELAZQUEZ:  Right.

2        THE COURT:  And the identification and the bullets are

3    in the same small plastic bag which is contained in the

4    larger evidence bag.  Mr. Ryan wants the identification to go

5    in as an exhibit sans the ammunition.

6        MR. VELAZQUEZ:  Understood.

7        THE COURT:  So what we could do is keep the

8    identification documents in as Exhibit No. 26, take the

9    ammunition out, and mark it for identification and the number

10   would say "previously No. 26."

11       MR. VELAZQUEZ:  Right.  Just a question, Your Honor, I

12   don't know what it says at the top, if it identifies

13   ammunition or anything.

14       THE COURT:  Yup, it does.  "Bullets in basement."  This

15   says "bullets in basement with gun."  Bag No. 2.

16       MR. VELAZQUEZ:  There were originally two bags inside.

17       THE COURT:  Inside this one bag, okay.

18       MR. VELAZQUEZ:  May I suggest something?

19       THE COURT:  Sure.

20       MR. VELAZQUEZ:  Take the identification and mark them as

21   whatever that identification number is and add an A to it.

22       THE COURT:  Perfect.

23       MR. RYAN:  That's fine.

24       THE COURT:  So Luis Vega's identification will be marked

25   as Exhibit No. 26A.  Thank you, Mr. Velazquez.

1          MR. VELAZQUEZ:  You're welcome, Your Honor.

2          THE COURT:  This needs to go into a smaller envelope

3     because the small bag refers to the bullets also.

4          THE CLERK:  26A will be the IDs.

5     (The clerk remarks Luis Vega's IDs as Exhibit No. 26A)

6          THE COURT:  Anything else?

7          MR. RYAN:  Just a question in terms of how long we'll

8     have for our closings.  I don't think I'll need more than a

9     half an hour.

10          THE COURT:  That's what I was going to give you, 30

11     minutes apiece.  Is that okay for you, Mr. Velazquez?

12          MR. VELAZQUEZ:  That's fine.

13          THE COURT:  Are you going to be referring to any of the

14     exhibits in your closing?

15          MR. RYAN:  I am.

16          THE COURT:  Do you have them?

17          MR. RYAN:  Yes.

18          THE COURT:  All right.  So I think we are ready for the

19     jurors.

20     (The jury enters the courtroom)

21          THE COURT:  Good morning, ladies and gentlemen.

22          THE JURY:  Good morning.

23          THE COURT:  Now, have any of you begun discussing the

24     case amongst each other or with anybody outside of the

25     courtroom?  Seen, heard, or read anything about the case?

1    Taken any independent views or done any independent research

2    with respect to any of the issues that have developed during

3    this trial?  Is there anything that needs to be brought to my

4    attention before we resume the case?

5         For the record, there is no affirmative responses to any

6    of the questions asked by the Court.

7         Ladies and gentlemen, when we began this case there were

8    three indictments that referenced firearms or weapons

9    charges.  Those counts of the indictments will not be

10   considered by you during the course of your deliberations.

11   They are no longer a part of this case.  So they were Counts

12   11, 12, and 13.  They will not be considered by you during

13   the course of your deliberations.  Is that understood?  Thank

14   you.

15        We will now have closing arguments, and let me just

16   remind you that closing arguments are not evidence.  It's the

17   lawyers' opportunity to sum up all of the evidence that's

18   been presented thus far.  We reverse the order of closings,

19   and the defendant presents his closing argument first.

20   Mr. Ryan.

21        MR. RYAN:  Thank you, Your Honor.

22        THE COURT:  You're welcome.

23

24

25

1              CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

2          MR. RYAN:   Two days ago at the start of this trial I

3    drew attention to the flawed process that led to the

4    misidentification of Shaina Lee Robles as the perpetrator of

5    a criminal offense.   Make no mistake.   The process that led

6    to the identification of my client as the Hispanic male

7    dealing drugs out of 57 Johnson Street is far more troubling.

8          Edwin Hernandez was shown this picture of Shaina Lee

9    Robles.   He identified her as the young girl who took his

10   orders for drugs on November 9, 2011 despite the fact that

11   she was seven inches taller and some five years older than

12   the young girl he actually claims to have dealt with.   This

13   evidence casts considerable doubt on Edwin Hernandez's

14   reliability as an eyewitness.

15         The evidence concerning my client's identification

16   doesn't simply undermine Officer Hernandez's reliability, it

17   all but destroys his credibility along with the credibility

18   of John Wadlegger, the lead investigator in this case.

19         Edwin Hernandez testified that John Wadlegger showed him

20   this photograph before and after each and every undercover

21   buy he made.   John Wadlegger said the same thing before and

22   after each and every time.

23         Now, having heard all about the corners that John

24   Wadlegger cut during the course of this case, do you really

25   think he's the kind of officer who would have bothered to

1   show this same picture six times to a fellow officer?

2       The fact is, ladies and gentlemen, this picture was not

3   shown to Edwin Hernandez before or after any of the purchases

4   he made in the fall of 2011.  It wasn't shown on

5   October 21st, it wasn't shown on November 9th, and it was not

6   shown prior to my client's arrest on November 15th.  This

7   picture did not even exist until after my client's arrest.

8       How do we know this?  The bottom of this photograph

9   provides a birthday 2-2-58.  At the top there is an age, 58.

10  A man born on February 2, 1955 is 58 years old today.  Back

11  in the fall of 2011, this man was 56 years old.

12      You want more proof that this photograph was never shown

13  to Edwin Hernandez?  Take a look at Exhibit 13.  During his

14  time on the witness stand, Sergeant Ambrose testified that

15  this photograph was a fair and accurate representation of my

16  client on the one and only day that he encountered him,

17  November 15, 2011, during the execution of the search

18  warrant.

19      When you go back to the jury deliberation room, you're

20  going to have both of these pictures, and I'd encourage you

21  to place them side by side.  As you do, take note of the

22  shape of each shirt collar, in particular the crooked path it

23  takes in each picture under my client's chin.  If you go

24  through the trouble of comparing these photographs, I am

25  confident that you will find that Exhibit 1 is a black and

1   white copy of Exhibit 13.

2        What does this mean?  It means that the two most

3   important witnesses against my client offered false testimony

4   concerning the single most important issue in this case, the

5   identity of the Hispanic male who sold substances out of 57

6   Johnson Street.

7        This case is a whodunit, ladies and gentlemen, and Edwin

8   Hernandez is the only witness who said he saw my client do

9   anything.  Now, if he had been shown this photograph before

10  and after encountering the Hispanic male, that would have

11  been problematic.  A single picture popped up -- popped down

12  on his lap or pulled up on a computer screen by somebody like

13  Gregg Bigda, that's inherently suggestive.  And when you have

14  a witness as suggestible as William Hernandez, this process

15  is tantamount to putting words in his mouth.

16       But pretending to have engaged in an identification

17  process that did not happen, that's beyond disturbing, ladies

18  and gentlemen.  It's almost diabolical.  How could police

19  officers do this sort of thing?  Well, perhaps it's best to

20  consider what kind of police officers these are.

21       With a few exceptions like Sergeant Devon Williams, the

22  officers who testified in this case were members of a

23  Narcotics Unit.  They don't spend their days walking, in

24  uniforms, the beat getting to know the people in the

25  neighborhoods.  Narcotics officers dress in plain clothes.

1    They take on assumed identities.  Day in/day out, they live

2    lives of make-believe.

3        Telling lies is not something they simply do to make

4    busts.  It's something that they do in order to survive.

5    Nobody wants to believe a police officer sworn to uphold the

6    law would come into court and testify untruthfully.  But in

7    this case, that's exactly what happened.

8        Now, the beauty of trials stems from the opportunities

9    that they provide to evaluate not just what witnesses say but

10   how they say it.  Judge Page touched on this at the beginning

11   of this trial when she told you, cautioned you not to get too

12   caught up in note-taking.

13       If anybody were to ever read a transcript of this trial,

14   I doubt very much that they would comprehend what a truly

15   terrible witness Edwin Hernandez was.  Right from the get-go

16   he had to refer to his reports to provide basic information

17   about this case.  And even when he consulted these reports,

18   the accounts he offered were lacking in critical details.

19       What telephone number did he call to set up these deals?

20   What did the Hispanic male look like?  How old was this man?

21   How tall?  What was his build?  Color of his hair?  Did he

22   even have hair?  On November 15, 2011, was he wearing a

23   bright yellow shirt?

24       At times you got the sense that Edwin Hernandez was not

25   recalling personal experiences but was attempting to recite a

1 | script somebody else wrote for him.  One example of this took

2 | place when I asked him to confirm that it was dark at seven

3 | o'clock at night on November 9, 2011.

4 | This was not a trick question.  Everybody in this

5 | courtroom knows that by November, it's dark out at seven

6 | o'clock at night.  How long did it take Edwin Hernandez to

7 | answer that question?  When he finally acknowledged that it

8 | was dark out, did you get the sense that he was testifying

9 | from his memory or just trying not to sound stupid?

10 | The one moment when Edwin Hernandez gave the impression

11 | of a man telling the truth came when I asked him whether he

12 | used drugs or alcohol during the course of this

13 | investigation.  Recall, if you will, the way he scoffed at

14 | that notion and shook his head.

15 | These were questions I had to ask to discover the source

16 | of the many serious errors and mistakes he made.  He did not

17 | hesitate in answering these questions and his voice did not

18 | betray any uncertainty.

19 | Now, contrast these answers to the answer he gave to the

20 | very last question I asked.  That question asked him to admit

21 | the possibility that he had mistakenly pointed the finger at

22 | my client.  Edwin Hernandez knew the answer that his script

23 | required him to give, but he paused before giving it.  And

24 | when he said the words he knew he had to say, his voice was

25 | devoid of any confidence or conviction.

1     Deep down, Edwin Hernandez isn't sure that my client is

2 the Hispanic male that sold him Exhibits 3, 4, and 5.  He

3 knows that his errors led to the indictment of at least one

4 innocent person.  And by the end of his testimony, he

5 appeared to harbor serious and reasonable doubts that his

6 actions led to a second individual being wrongfully charged.

7     What about Detective Wadlegger?  One of the most

8 shocking moments in this trial came when I asked him about

9 the indictment of Shaina Lee Robles.  Detective Wadlegger was

10 the lead investigator in this case, and it was absolutely

11 news to him that Edwin Hernandez misidentified Shaina Lee

12 Robles as my client's accomplice.

13     What does this say about this investigation?  First, it

14 demonstrates an extreme level of carelessness.  Detective

15 Wadlegger applied for a warrant for Shaina Lee Robles's

16 arrest based on two claims made by a rookie undercover cop.

17 Edwin Hernandez said that the Hispanic male in the driveway

18 told him to go inside and seek out his daughter Maria.

19 Suffice it to say, ladies and gentlemen, Maria and Shaina are

20 completely different names.  And no evidence was offered

21 suggesting that my client had a daughter named Shaina.

22     The other thing Edwin Hernandez said is that when he

23 went inside, the young woman he thought was Maria said, "Mom,

24 hook him up" to Maria Colon.  The warrant report that

25 Detective Wadlegger generated said that Maria Colon was not

1   Shaina Lee Robles's mom.  Rosa Caramayo is the mother of

2   Shaina Lee Robles.  In spite of this, Detective Wadlegger

3   went ahead and dragged this poor innocent woman into the

4   criminal justice system.

5        Detective Wadlegger's ignorance of Shaina Lee Robles's

6   innocence, even as of Tuesday morning, revealed something

7   else.  It shows that in the world these officers live in,

8   this investigation wasn't a very big deal.  If it was a big

9   deal, ladies and gentlemen, you wouldn't see errors like this

10  (indicating).

11       During the trial, the prosecutor attempted to explain

12  these conflicting numbers by eliciting testimony that

13  Detective Wadlegger's report contained a typo, and that the

14  officers had to count the money they seized by hand and

15  didn't have access to one of those fancy money counters that

16  bank tellers have.

17       Now, Mr. Velazquez is a talented advocate, and I have a

18  world of respect for him.  In a case like this when he's

19  dealt lemons, he's very good at trying to make some lemonade.

20  But do these explanations make any sense?  And was any

21  explanation offered as to how Detective Wadlegger came up

22  with that number, $2,018, the figure that he provided the

23  Court in a, quote, true and detailed account he furnished?

24  How about an explanation for the mess he made in his police

25  report and search warrant regarding the number of bags of

1    narcotics found at the scene?

2         Want more evidence that in the eyes of the Narcotics

3    Unit this case wasn't worth any sort of detailed attention?

4    Think back to when Edward Kalish was on the stand.  This is

5    the man that served as the evidence officer.

6         We were going through things that they were seeking to

7    establish control and occupancy at the premises.  And at some

8    point I asked him whether a catalog addressed to an

9    individual at 57 Johnson Street might be evidence suggesting

10   a connection to that premises.  Detective Kalish balked.  He

11   balked at the idea that this would be something that any of

12   his officers would think to take.  Why?  Because catalogs are

13   too bulky to fit in the manila evidence bags.

14        So were catalogs found at the premises containing names

15   like Luis Vega Senior or William Cruz or Jose Ramos or Luis

16   G. Gordon?  We don't know.  Detective Kalish could not rule

17   this out.  All he knew is if there were catalogs, officers

18   would have altogether ignored them.  Is this a policy geared

19   towards removing reasonable doubt?

20        You might recall that during his time on the stand,

21   Detective Kalish acknowledged that officers had cell phones

22   and cell phones have cameras and they were present during the

23   execution of the warrant and photos were taken of the

24   surveillance system.  Photos, incidentally, that have appear

25   to have disappeared.

1          But do these J. Crew or Eddie Bauer catalogs require

2     some sort of backbreaking effort to seize or create some kind

3     of unimaginable storage problem?  Couldn't someone have taken

4     their phone out and taken a picture to document their

5     presence?

6          The absence of any pictures or video recordings is

7     really quite shocking if you step back and think about it.

8     Having listened to all of the witnesses, as the fact finders

9     in this case, how clear an image in your mind can you create

10    of what 57 Johnson Street looks like?  Do you have a firm

11    grasp of the layout?  Any sense of the lighting on that

12    second floor landing where so much critical action took

13    place?  Where exactly in the pile of blankets in the dog pen

14    was thirteen bags of suspected heroin and ten bags or nine

15    bags of cocaine were discovered?

16         And speaking of evidence, why on earth wasn't this

17    evidence sent out to some lab for fingerprints or DNA

18    testing?  The explanation that Detective Wadlegger offered

19    was pretty much the explanation a parent gives a child when

20    there is no good explanation to offer.  Why don't you test

21    for trace evidence on these baggies?  That's not something we

22    do, said Detective Wadlegger.  Why not?  Because we don't,

23    except in some cases but very rarely.

24         Now, at first blush, one has to admit that much of the

25    evidence against my client appears pretty damning.  Damming

 1   until you start to ask a couple of questions.  Buy money was

 2   found on his person, said Sergeant Ambrose.  Well, where is

 3   that buy money?  It's been recycled.  What was the serial

 4   number of that buy money?  We don't know.  What was the

 5   serial number of the buy money recorded in the logbook?  We

 6   don't know that either.  And if this buy money was supposedly

 7   found on my client, why is William Cruz listed as an owner of

 8   it on an official Springfield Police Department report?

 9        The defendant's name was on the mailbox, said Officer

10   Kalish.  Well, did you take any pictures of that scrap of

11   paper on the mailbox?  No.  Was this scrap of paper listing

12   my client's name included in a search warrant describing

13   exactly where the number 57 was located?

14        Did Edward Hernandez, the eyes and ears of the

15   investigation, ever see this scrap of paper during his trips

16   into or out of the residence?  How was it affixed to the

17   mailbox?  How come there is not any tape on the back of it or

18   any signs that tape was ever used?  How come it doesn't list

19   Luis Vega Junior, the occupant of the third floor bedroom, or

20   other individuals like Luis Colon who are getting their mail

21   there?

22        If the defendant's name was on the mailbox, how come

23   this one form letter to a Renaldo Penate Diaz is the only

24   letter that supposedly showed up during the search of the

25   residence?  Who found this letter, by the way?  Where was it

1    found?  Is there a date on it?  The list of things that could

2    have and should have been done in this case is staggering.

3        Officers observed a green Jeep Cherokee Grand in the

4    driveway.  Officer Hernandez identified the man who sold him

5    substances as the owner of this vehicle.  Did anybody get a

6    license plate to determine if Rolando Penate was the

7    registered owner?

8        A dog bit Officer Mitchell.  Critical evidence was

9    discovered in a dog pen.  Everyone agrees that the owner of

10   the dog would have been in a position to know about and

11   exercise dominion and control over contraband.  Did anybody

12   examine the dogs' tags to determine the owner?  When asked

13   this question, Detective Wadlegger claimed the dogs didn't

14   have any tags.  However when this same question was posed to

15   Officer Hernandez, he admitted that they did.

16       Officer Hernandez used a cell phone to contact a man who

17   sold him substances.  Presumably he dialed a number that he

18   or somebody else wrote down somewhere, and presumably the

19   work cell phone that Officer Hernandez used had a number.

20   Mr. Penate had a cell phone in his pants when he was

21   arrested.  Did you hear any testimony that the number for the

22   phone that Mr. Penate had on him was the same number as the

23   one Officer Hernandez called?  Were phone records introduced

24   showing that calls between Officer Hernandez's phone and this

25   phone on the dates that Officer Hernandez said contact

1    occurred?

2         Did anybody talk to the downstairs tenants or the owner

3    of the property to see if Mr. Penate was on the lease or

4    lived there?

5         Wouldn't it have been nice to hear at least from one

6    civilian prosecution witness in this case?  How hard would it

7    have been to produce this evidence?  Not very hard at all.

8    Why not produce such evidence?

9         Well, there are only two answers and neither reflecting

10   well on the officers involved in this case.  Either they were

11   too lazy to do their jobs or they knew that if they did their

12   jobs it would produce evidence that would be helpful to the

13   defense.

14        Now, when I sit down and Mr. Velazquez stands up, I

15   expect he will draw attention to an item that is currently in

16   Mr. Penate's wallet, an identification card belonging to

17   Maria Vega.  Nobody testified as to it being present in the

18   wallet when it was seized.  So I think you can and should be

19   somewhat skeptical as to how and when it ended up there.

20        At the end of the day, I would suggest that the

21   probative value of this evidence is extremely limited.

22   Nobody is suggesting that Rolando Penate is a complete and

23   total stranger to 57 Johnson Street or its occupants.  He was

24   there, after all, the day that officers executed the search

25   warrant.

1          The fact is, if you believe Officer Hernandez, the man

2     he met on the driveway on November 9, 2011 told him to go

3     inside and see his daughter Maria.  During his direct

4     examination, Officer Hernandez attempted to tow the party

5     line by pretending that this man said my wife Maria.  He did

6     this in an effort to support Detective Wadlegger's

7     unsubstantiated claim that my client was married to Maria

8     Colon even though Maria Colon's arrest report indicated that

9     she was single.  Once he was asked to consult his November 9

10    undercover buy report, Mr. Hernandez conceded that the man in

11    the driveway referred to a daughter named Maria, not a wife.

12         Later on in his testimony Officer Hernandez acknowledged

13    that my client is not Maria Vega's father.  He said that

14    Maria Vega's father is a man by the name of Luis Vega, the

15    man who happens to be the father of Luis Vega Junior, whose

16    identifications were found on the third floor, and Carlos

17    Vega, the young man that followed the police and had a

18    registration for a Dodge Caravan at the address.

19         These are cold hard facts, ladies and gentlemen.  And at

20    the end of the day, the prosecutor is going to ask you to

21    overlook these cold hard facts and engage in a game of

22    speculation.  Ultimately, I think we can all agree that if a

23    picture of Sasha Obama was found in his wallet, it would not

24    make Mr. Penate the president.

25         The critical question to ask is this:  Was Edwin

1   Hernandez ever shown a photograph of Luis Vega Senior?  Why

2   not?  Wouldn't it be nice to know that this was not the man

3   that Officer Hernandez dealt with?  What about William Cruz?

4   Why didn't anybody show his identification photo recovered at

5   the address to Officer Hernandez?

6       During the two occasions that Officer Hernandez

7   testified that he bought directly from this Hispanic man, he

8   said that the Hispanic man had drugs on his person.  In other

9   words, he didn't have to go to a dog pen or anywhere else to

10  procure the drugs that he sold.

11      When the police executed the warrant, it is an

12  undisputed fact that my client did not have any contraband on

13  him.  But William Cruz did.  Ten bags of heroin were found in

14  his pockets.  And as I said before, the police report

15  indicates that he was the owner of the buy money.

16      Now, throughout this closing I've been referring to the

17  substances seized as cocaine or heroin, and that happened

18  during the course of the trial as well.  I've done this

19  because it's a lot easier to say cocaine or heroin than it is

20  to say tan or white powders suspected of containing

21  controlled substances as defined in Chapter 94C of the

22  General Laws of Massachusetts.

23      But at the end of the day, the fact that officers think

24  they've seized cocaine or heroin really doesn't amount to a

25  whole lot.  These substances have to be sent out for forensic

1    analysis to see if the officers' suspicions are correct.

2        As William Hebert and Rebecca Pontes acknowledged,

3    sometimes the suspicions of law enforcement are unfounded or

4    at least can't be confirmed.  Testing sometimes reveals that

5    substances that may appear to be illicit narcotics are really

6    something else.

7        Now, of course Mr. Hebert testified that all the samples

8    he analyzed contained control substances.  The problem is

9    that William Hebert is not the first chemist to whom these

10   substances were entrusted.  When Kevin Burnham dropped off

11   these items at the lab in Amherst, they fell into the hands

12   of woman now under indictment for tampering with substances

13   alleged to be cocaine or heroin.  This undisputed stipulated

14   fact is a great big elephant in the room, and it's an

15   elephant that deserves some consideration in the jury

16   deliberation room.

17       Now, as I begin to conclude my remarks, it may occur to

18   you that there is something kind of odd about the fact that

19   I'm up here as the first attorney to speak to you.  Up until

20   this point in the trial, the prosecutor has always gone

21   first.  He got to make the first opening statement, create an

22   impression about this case in your minds.  He got to call the

23   first witnesses and be the first attorney to question them.

24       Now that we're at the end of the trial, I've been thrust

25   into the position of going first.  That means that whereas

1    Mr. Velazquez can comment on things that I've said, I'm not

2    going to be able to make any comments or offer any rebuttal

3    to any of his remarks no matter how much I might disagree

4    with them.

5        Now, in the course of your lives, I am sure that you

6    have all been in arguments and everybody knows that in an

7    argument, everybody wants to have the first word and

8    everybody wants to have the last word.  And those are things

9    that Mr. Velazquez gets to have in this argument that we've

10   been having.

11       Now, as much as I might not like this, it's the way our

12   system works, and I have to concede that it makes a certain

13   amount of sense.  The prosecutor gets the first word and the

14   last word because he has the burden of proof, as Judge Page

15   has told you throughout this trial.  Mr. Penate doesn't have

16   to prove anything.  He's presumed innocent and must be found

17   not guilty unless and until the prosecution proves him guilty

18   beyond a reasonable doubt.

19       Now, once Mr. Velazquez finishes his closing argument,

20   Judge Page is going to instruct you on the law.  Among other

21   things, she's going to tell you that our system does not

22   permit people to be found guilty of crimes simply because

23   they associate with people who commit them.

24       There is no question that Rolando Penate associated with

25   people who were engaged in criminal activity back on

1    November 15, 2011.  But there is no evidence that he did

2    anything more than associate with them.

3         At the end of the day, in order to convict my client,

4    you're going to have to do something that you promised not to

5    do during the jury selection process.  Back on Monday, the

6    judge asked all of you whether you could treat the testimony

7    of police officers the same way you would treat the testimony

8    of any other witnesses.  In order to become jurors in this

9    case, you had to promise that you would not credit the

10   testimony of police officers simply because they are police

11   officers.  The only request my client, Rolando Penate, has is

12   that you keep that promise.  If you do, I'm confident that

13   you will find him not guilty.  Thank you.

14        MR. VELAZQUEZ:  May we approach, Your Honor?

15        THE COURT:  Yes.

16

17

18

19

20

21

22

23

24

25

1    (The following conference was held sidebar)

2        MR. VELAZQUEZ:  Your Honor, I take issue as to

3    Mr. Ryan's comment about a wallet that was at the police

4    station where a photograph mysteriously showed up, and it

5    suggested that maybe the Commonwealth had something to do

6    with putting it in there.

7        And I will tell the Court that I know that Mr. Ryan has

8    been to the police station to view all of the physical

9    evidence.  He spent hours, I guess, and whether he missed

10   that photo or not is something I don't know, but certainly

11   it's something that we both saw yesterday when we were

12   looking through it or at least when I was looking through it

13   and I showed him.

14       THE COURT:  And the wallet is in evidence?

15       MR. VELAZQUEZ:  Yes.

16       THE COURT:  So as you were looking through the wallet,

17   was it the first time that you saw it?

18       MR. VELAZQUEZ:  First time I saw it.

19       MR. RYAN:  First time I saw it too was yesterday.

20       THE COURT:  All right.  Well, the thing is, even though

21   it's an exhibit, there was no -- and that's what he brought

22   out was there was no testimony with respect to the wallet.

23       You know, Mr. Velazquez, I am going to reiterate during

24   my charge that closings aren't evidence and they have to rely

25   on the exhibits and the testimony that was presented during

1    the course of this trial.  Is there anything else you would

2    want me to do --

3          MR. VELAZQUEZ:  Well --

4          THE COURT:  -- with respect to that issue?

5          MR. VELAZQUEZ:  With respect to that issue, no.  That

6    would suffice, Your Honor.

7          There was also a comment made in -- his comment made in

8    his closing about the police failing to look into the phone

9    to determine whether the phone number had been called.  Now,

10   there was a police officer who was ready to testify as to

11   what their findings were, however, it was objected to by the

12   defense and sustained by the Court.  So it's kind of

13   disingenuous, if you will, to now say they didn't do

14   something which they, in fact, did.

15         THE COURT:  Mm-hm.

16         MR. RYAN:  Your Honor, the reason it was objected to is

17   the officer was not going to be testifying to any firsthand

18   knowledge.  It was something he read in the undercover

19   report.

20         THE COURT:  That was my understanding that the basis of

21   the objection was hearsay.  The officer that actually

22   determined the phone number wasn't here to testify and

23   that --

24         MR. VELAZQUEZ:  But it suggests something that wasn't

25   done when counsel knows that, in fact, it was done and that

1    is dishonest, in my opinion.

2         THE COURT:  Well, your opinion is noted.  I'm not going

3    to make any comments with respect to that.  Was the officer

4    who actually looked into the phone available to testify?

5         MR. VELAZQUEZ:  I'm not sure.

6         THE COURT:  Okay.

7         MR. VELAZQUEZ:  But it doesn't change my objection to

8    his comments.

9         THE COURT:  All right.  Your objection is noted.

10        MR. VELAZQUEZ:  Thank you.

11   (Sidebar conference concluded)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. VELAZQUEZ:  May I proceed, Your Honor?

2          THE COURT:  Yes.

3          MR. VELAZQUEZ:  Thank you.

4            CLOSING ARGUMENT ON BEHALF OF THE COMMONWEALTH

5          MR. VELAZQUEZ:  Good morning.

6          THE JURY:  Good morning.

7          MR. VELAZQUEZ:  Members of the jury, I told you a couple

8     days ago, generally speaking, what I expected the evidence

9     was going to be in this case.  And I guess I could have

10    probably made it easier by just calling Officer Hernandez and

11    have him testify that on three occasions he bought heroin or

12    at least he bought two bags of white powder which he thought

13    to be heroin from the gentleman seated in the middle here,

14    Rolando Penate.  But that would not be a total picture for

15    you as jurors.  And it's only fair to Mr. Penate that you

16    knew everything about this case, the good, the bad, and the

17    ugly.

18         Edwin Hernandez was a rookie cop.  There is no changing

19    that.  Edwin Hernandez had gone through his first undercover

20    experience.  There is no changing that.  Did he appear

21    nervous on the stand.  You can all judge that from what you

22    see.

23         And I think that even the most experience police

24    officers, even lawyers get nervous whenever they address a

25    group of people.  But you couple that with the fact that

1    these incidents happened over two years ago and people are

2    asked to testify to their best memory.

3         And occasionally you saw Officer Hernandez ask if he

4    could be permitted to read his report so that he could

5    refresh his recollection, if you will.  And, of course, I

6    don't know how many times any of you have read something

7    under circumstances that might be considered duress, if you

8    will, read it fast, answer the question, people are waiting

9    to hear your response.

10        But if anything comes back to you after his testimony

11   about those three encounters at 57 Johnson Street, I ask you

12   to think about why he would say that he went to this address

13   and bought from that man seated in the chair right there on

14   three different occasions?  What's his motive?  What's his

15   motive to make that up?

16        The suggestion is that he was mistaken because he was

17   mistaken about the young woman that he bought from.  And you

18   will have both of these photographs with you in the

19   deliberation room.  You'll have an opportunity to look close

20   and see if there is any similarities, if on one chance

21   encounter you might make the same mistake that Officer

22   Hernandez made in terms of identifying this woman in Exhibit

23   2 as really the woman in Exhibit 6.

24        But he also told you that when he next saw her in person

25   in court some time later, he realized that he had made a

1    mistake and for that woman in Exhibit No. 2, Shaina Lee

2    Robles, it was a huge mistake and she had to endure whatever

3    she endured during the period of time before he realized it.

4         But what did he do?  He owned up to it and he said

5    that's not the woman that sold me those drugs when he saw her

6    in person, and that case went away.  So he was willing, at

7    that time, to say he made a mistake.  He had to admit it here

8    because it's a fact.  It's a fact that we can't change.  But

9    he stood firm on the fact that the person that sold him two

10   bags of heroin on each and every one of those days was

11   Rolando Penate.

12        Now, how do we know it's heroin?  Well, we're relying on

13   three things here.  One is the police officers' observations

14   of what, in their experience, looks like heroin.  That's not

15   enough.

16        We're relying on the chemist who told you under oath

17   that based on his tests of all of these items, that came back

18   to heroin or cocaine, notwithstanding the fact that they may

19   have been tested by somebody else.  But he made it a point to

20   tell you that he tested only the items that were not tested.

21   And that still to this day those items that were submitted by

22   the police on November 15th or on those two separate dates

23   that the undercover buys took place were heroin or cocaine.

24   That hasn't changed.

25        And there is a third reason that you should believe it

1    was heroin, because Edwin Hernandez called this man and asked

2    him if he could come over and buy some heroin, and this man

3    gave him heroin in return for money.  So he's also vouching

4    for this -- these items from the street.

5        So that in the very beginning, he was the one that

6    called it heroin, the police officer recognized it as heroin,

7    and the chemist confirmed it was heroin.  But ultimately it's

8    your job to determine if it's heroin or not.

9        This was introduced as Exhibit 11, and you'll have it in

10   the jury deliberation room.  Inside this wallet was found a

11   photograph, and you will have an opportunity to look at it

12   and you may not have heard testimony about this but it's in

13   evidence.  You take it with you.

14       This is a photograph with words on it S.A.F.E. High

15   School Berkshire Avenue Campus Maria Vega.  It may or may not

16   be the same person.  You are the ones that make this

17   determination.  But this was found in Rolando Penate's pocket

18   in his wallet.

19       There is no claim that that's not his wallet.  There is

20   only a claim that maybe this wasn't there, somehow it

21   miraculously appeared in his wallet.  And I think the

22   reference to the young Obama woman, I'm not even going to

23   touch on that.

24       The fact is, ladies and gentlemen of the jury, this is a

25   wallet that he carried with him on that day.  He was present

1    in the apartment on that day.  It's the Commonwealth's

2    position that he was present on October 21, 2011, on

3    November 9, 2011, and on November 15, 2011.  And on those

4    days, he sold heroin to an undercover police officer.  Either

5    he or somebody at his disposal:  Go see Maria upstairs, my

6    daughter, or whatever he said.

7         This is the Maria that we're talking about as his

8    daughter, and that Maria referred to her mother:  Ma, hook

9    him up.  And the woman seated eating, as Officer Hernandez

10   said, pulled two bags of heroin from her lap and gave them to

11   him in exchange for $20.

12        There was a lot of drugs in this case and a lot of drugs

13   that were found on various people throughout this apartment.

14   And as part of a presentation to you so that you can get a

15   true picture of everything that went on during this

16   investigation, you were told about the woman that came down

17   the stairs with heroin or items inside her bra with $1,700 in

18   cash.

19        And that, by the way, is not involved in this case

20   because it wasn't found on Mr. Penate.  Or the woman that has

21   been referred to as his wife, Maria Colon.  Those are the

22   only two items that were presented in this case.  The cash is

23   there, you have an opportunity to count it, and you take into

24   account all of what Detective Wadlegger and everybody else

25   said, Detective Kalish.

1       There are things that I may find important and you may

2   not, but the defense has suggested a number of things and one

3   of the things that counsel has talked about and made a real

4   big issue about is there is nothing to connect Rolando Penate

5   to this address.  And I say to you what more than his

6   presence?

7       The judge is not going to charge you and say Rolando

8   Penate must live at this address in order to be considered

9   guilty of selling drugs from this address.  That's not an

10  element.  He could have been a passerby, somebody who just

11  happened to be there on these three dates.

12      The issue here is not whether he lives there or whether

13  the correct spelling of a document that went to his address

14  and it's Penate Diaz versus Rolando Penate.  That's just

15  evidence that, sort of, adds to what other officers have

16  said.  But the important thing is that he was present and

17  that he's been identified as a person who sold it.

18      The drugs inside the pen and the fact that there is dogs

19  with or without collars in order to determine whose drugs

20  those are, what you have is an apartment full of drugs and

21  people with drugs on them.

22      And it's not our position that all of those bags that

23  have drugs in somebody's pocket, in somebody's bra, in

24  somebody's purse or some other woman's purse, we're not

25  asking you, from the Commonwealth's point of view, to

1    consider those drugs in terms of his possession with intent

2    to distribute.  Specifically what I'm asking you on the

3    Commonwealth's behalf is that on November 15, 2011 there was

4    drugs inside the house.

5        And by the way, these drugs that were found in the dog

6    pen were found there.  Nobody claimed ownership to them.

7        But we do have a police officer who had just finished

8    leaving there and telling you that Mr. Penate sold to him on

9    that day inside that apartment.  So what I'm asking you is to

10   consider those drugs as his intent to distribute.

11       And the rest of the information that you got in this

12   case I'm asking you to consider is part of the larger picture

13   that this was an operation for dealing drugs.  There was

14   people everywhere, there was surveillance cameras facing

15   outside of this house.  There were people in the neighborhood

16   yelling "guardia," yelling things to folks and you can only

17   assume to people in the house that the police are coming.

18       So if there are drugs in this pen, obviously it doesn't

19   belong to the dogs.  Somebody must have thrown them there

20   when they heard folks yelling "police."

21       We could stand here and I can talk about all of the

22   things that the police did not do in this case, and sometimes

23   I think that point is really well taken.  But have you ever

24   lost an item or misplaced an item and you look for it and you

25   find it someplace that you were at some point during the day?

1       Your job is done once you find whatever it was, your

2    glasses, your pen, your wallet.  You don't continue looking

3    for things or evidence to support why you left it there or

4    who may have had something to do with putting it there, but

5    certainly you found it and your search ends.

6       We have the person who sold on those three dates.  You

7    can mess around with the numbers on the board, mess around

8    with all of the things that the police didn't do or may have

9    done better.  The identification, I think, is certainly

10   important because we don't want to send an innocent away.

11   But you are the ones that, sort of, connect the dots here.

12   That is your job.

13      And you're the ones that have to assess the credibility

14   of all of those witnesses.  You may believe one and not

15   believe any of them, all the rest.  But certainly is there

16   enough here to satisfy your judgment that Rolando Penate sold

17   on those three occasions and possessed cocaine and heroin

18   with the intent to sell it on November 15th?  Thank you.

19      THE COURT:  Thank you, Mr. Velazquez.  We're going to

20   take a short recess and then when we come back, I will give

21   you the charge.

22   (The jury leaves the courtroom)

23   (Court recessed at 10:19 a.m.)

24   (Court reconvened at 10:42 a.m.)

25

```
 1                          JURY CHARGE

 2        THE COURT:  All right.  Ladies and gentlemen, you are

 3   about to begin your final duty which is to decide the fact

 4   issues in this case.  Before you do that, I'm going to

 5   instruct you on the law.

 6        It was obvious to me throughout this trial that you paid

 7   close, careful attention to the witnesses as they testified

 8   and to the lawyers as they questioned the witnesses.  I am

 9   now going to ask you to pay that same close, careful

10   attention to me as I instruct you on the law.

11        First let me just underscore the importance of this

12   case.  To the Commonwealth and to Mr. Penate, this is the

13   most important case in the United States today.  This is

14   their day in court, and that's how I want to begin my charge

15   to you, to emphasize how important this case is both to the

16   Commonwealth and to the defendant.

17        My function as the judge in this case has been to see

18   that this trial was conducted fairly, orderly, and

19   efficiently.  It was also my responsibility to rule on what

20   you may consider as evidence and to instruct you on the law

21   that applies to this case.

22        It is your duty as jurors to accept the law as I state

23   it to you.  You should consider all of my instructions as a

24   whole.  You may not ignore any instruction or pay special

25   attention to any one instruction.  You must follow the law
```

1    whether you agree with it or not.

2          I assure you that this is not my law that I made up

3    specifically for this case.  There are two higher courts here

4    in the Commonwealth, the Appeals Court and the Supreme

5    Judicial Court.  These courts guide every trial judge.  They

6    establish and interpret the law for trial judges to use when

7    I instruct juries.

8          I am going to read the charge to you.  I do that to make

9    sure that I'm accurate when I instruct you on the law.  You

10   should not be concerned about the wisdom of any rule of law

11   that I give you.  Whatever your private opinions are about

12   what the law is or ought to be, it is your duty to base your

13   verdict on the law as I define it to you.

14         If I take a bit more time discussing a particular

15   charge, please don't pay any attention to the length of my

16   instruction.  Some matters may take longer to explain but

17   that is not a guide to their relative importance and is not

18   an indication that I have any opinion on any issue in this

19   case.

20         It was the duty of both lawyers to object when the other

21   side offered evidence which that lawyer believed was not

22   admissible under our rules of evidence.  They also had an

23   obligation to ask to speak with me at the sidebar at the

24   judge's bench about questions of law which the law requires

25   me to rule on outside of your hearing.

1        Again, the purpose of such objections and rulings is not

2    to keep relevant information from you.   In fact, it's just

3    the opposite.   They are to make sure that what you hear is

4    relevant to this case and that the evidence is presented in a

5    way that gives you a fair opportunity to evaluate its worth.

6        You should not draw any inference, favorable or

7    unfavorable, to either attorney or his client for objecting

8    to proposed evidence or asking me to make such rulings.   That

9    is the function and the responsibility of the attorneys here.

10        Your function as the jury is to determine the facts of

11    this case.   You are the sole and exclusive judges of the

12    facts.   You alone determine what evidence to accept, how

13    important any evidence is that you do accept, and what

14    conclusions to draw from all of the evidence.

15        You must apply the law as I give it to you to the facts

16    as you determine them to be in order to decide whether the

17    Commonwealth has proved the elements of these charges beyond

18    a reasonable doubt.   You should determine the facts based

19    solely on a fair consideration of the evidence.

20        You are to be completely fair and impartial, and you are

21    not to be swayed by prejudice, by sympathy, by personal likes

22    or dislikes towards either side.   You are not to allow

23    yourselves to be influenced because the claims are popular or

24    unpopular with the public.

25        You are in search of a verdict.   The word "verdict"

1    stems from two Latin words "dictum veritas" meaning to speak

2    the truth.

3         You are not to decide this case based on what you may

4    have read or heard outside of the courtroom.  You are not to

5    engage in any guesswork about any unanswered questions that

6    remain on your mind or to speculate about what the real facts

7    might or might not have been.

8         You should not consider anything I have said or done

9    during the trial in ruling on motions or objections or in

10   comments to the attorneys or in setting forth the law in

11   these instructions as any indication of my opinion as to how

12   you should decide this case.

13        If you believe that I have expressed or hinted at any

14   opinion about the facts of this case, please disregard it.  I

15   have absolutely no opinion about the facts of this case or

16   what your verdict ought to be.  This is solely and

17   exclusively your duty and responsibility.  In short, you are

18   to confine your deliberations to the evidence and nothing but

19   the evidence.

20        Now, what is evidence?  We touched upon this at the

21   beginning of the case.  It consists of two things.  It is the

22   testimony of witnesses and the exhibits.  You are to decide

23   what the facts are solely from the evidence that's been

24   admitted in this case.  You are not to decide the facts based

25   on suspicion or conjecture.

1        Now, in this case, there are, I think, 25 exhibits and

2   you will have all of them in the jury room during your

3   deliberations.  You alone will decide the weight; that is,

4   the value that they deserve to receive in helping you to make

5   your ultimate judgment about whether the Commonwealth has met

6   its burden.

7        You are not required to believe something simply because

8   it is written on a piece of paper or appears in a photograph.

9   You are not, of course, required to disbelieve it because it

10  appears there.  Whether to believe what an exhibit purports

11  to show and how much weight to give that exhibit is entirely

12  for you to decide.

13       Of course the quality or strength of proof is not

14  determined by the sheer volume of evidence or the number of

15  witnesses or exhibits.  It is the weight of the evidence, its

16  strength intending to prove the issue at stake that is

17  important.  You might find that a smaller number of witnesses

18  who testified to a particular fact are more believable than a

19  larger number of witnesses who testified to the opposite.

20       Some things that occur during a trial are not evidence

21  and you may not consider them as evidence in deciding the

22  facts of this case.  A question put to a witness is never

23  evidence, only the answers are evidence.  Also, you may not

24  consider any answer that I struck from the record and told

25  you to disregard.  Do not consider such answers.

1    If I sustained an objection; that is, if I did not allow

2    the witness to answer, you are to disregard that question and

3    you must not wonder or guess about what the answer might have

4    been.  An unanswered question is not evidence.

5    You may not consider any item that was marked for

6    identification but never received into evidence as an

7    exhibit.

8    I know I've said this a number of times but I repeat

9    myself purposefully.  The opening statements and the closing

10   arguments of counsel, they're not evidence.  They are not a

11   substitute for evidence.  They are only intended to assist

12   you in understanding the evidence and the contentions of the

13   parties.

14   A lawyer's question itself, no matter how artfully or

15   cleverly phrased, is not evidence.  A question can only be

16   used to give meaning to a witness's answer.  If a question

17   included any suggestions or an insinuation, you are to ignore

18   them unless I permitted the witness to answer and the witness

19   confirmed those suggestions.

20   My instructions and anything I said in passing during

21   the trial are not evidence.  If your memory of the testimony

22   differs from that of the attorneys or mine, you are to follow

23   your own recollection.  All of this comes down to one simple

24   rule:  Testimony comes from witnesses and not from the

25   lawyers.

1          Now, in this case, I did permit you to take notes, and

2     you may refer to your notes during your deliberations.

3     However, your notes are not a substitute for your -- for the

4     actual -- your actual recollection of the testimony of the

5     witnesses.

6          And let me also caution you about something else.  We

7     cannot provide a transcript of the testimony of any of the

8     witnesses who testified during the course of this trial.  So

9     it is your recollection that you must rely on with respect to

10    determining the credibility or believability of the

11    witnesses.

12         Now, there are two types of evidence that you may use to

13    determine the facts of a case and they are direct evidence

14    and circumstantial evidence.  You have direct evidence when a

15    witness testifies about something they saw, heard, or somehow

16    sensed.  The only question you must resolve in your mind is

17    whether or not to believe that witness.

18         You have circumstantial evidence where no witness can

19    testify directly about the fact that is to be proved but you

20    are presented with evidence of other facts and then asked to

21    draw reasonable inferences from them about the fact that is

22    to be proved.

23         Let me give you an example.  Your spouse or your child

24    or your significant other may tell you one day that they see

25    the mailman at your mailbox.  That is direct evidence that

1   the mailman has been to your house.

2       On the other hand, they may tell you only that they see

3   mail in the mailbox.  That is circumstantial evidence that

4   the mailman has been there to your house.  Nobody has seen

5   him but you can reasonably infer that the mailman has been

6   there because there is mail in the mailbox.

7       Now, I use the phrase "reasonable inference," and I'm

8   now going to define that for you.  An inference is a

9   permissible deduction that you may make from evidence that

10  you have accepted as believable.  Inferences are things that

11  we do every day.  They are little steps in reasoning in which

12  you take some piece of known information, apply your life

13  experience to it, and then draw a conclusion.  You may draw

14  an inference, even if it is not necessary or inescapable, so

15  long as it is reasonable and warranted by the evidence.

16      I'm going to give you an example of an inference and use

17  the same mailman/mailbox analogy.  If you knew your mailbox

18  was empty when you left home this morning and find mail in it

19  when you go home tonight, you may reasonably and properly

20  infer that the mailman has delivered the mail.

21      Now, obviously you didn't see the mailman deliver the

22  mail because you've been sitting here in court with me, but

23  from the fact that you knew that your mailbox was empty when

24  you left home this morning and you go home tonight and it's

25  filled with catalogs and bills, you can reasonably and

1    properly infer that the mailman has been to your house in the

2    interim to deliver your mail.  That is all we mean by an

3    inference.

4        Now, during this case, the parties did enter into a

5    stipulation.  I read it to you earlier, and I'm going to

6    reread it to you now.  And this is to be taken by you as an

7    undisputed fact:

8        "Items alleged to be controlled substances in this case

9    were seized by the Springfield Police and originally sent to

10   a laboratory in Amherst for testing.  These items were sent

11   in October and November of 2011 and tested between December

12   of 2011 and January of 2012 by Sonja Farak, a chemist for the

13   Department of Public Health.

14       "In January of 2013, Ms. Farak was arrested and charged

15   with evidence tampering involving alleged heroin and cocaine.

16   As a result of her pending indictment, Ms. Farak is

17   unavailable to testify in this case and no testimony can or

18   will be offered concerning the results of any testing she may

19   have performed.  The Court has found that tampering by Ms.

20   Farak occurred as early as July of 2012."

21       So that is the stipulation that was entered into by the

22   parties at the beginning of this case.

23       As jurors, it will be your duty to decide any disputed

24   questions of fact.  You will have to determine which

25   witnesses to believe and how much weight to give their

1    testimony.  You should give the testimony of each witness

2    whatever degree of belief and importance that you judge it is

3    fairly entitled to receive.

4        You are the sole judges of the credibility of witnesses,

5    and if there are any conflicts in the testimony, it is your

6    function to resolve those conflicts and to determine where

7    the truth lies.

8        You may believe everything a witness says or only part

9    of it or none of it.  If do you do not believe a witness's

10   testimony that something happened, of course your disbelief

11   is not evidence that it did not happen.  When you disbelieve

12   a witness, it just means you have to look elsewhere for

13   credible evidence about that issue.

14       In deciding whether to believe a witness and how much

15   importance to give a witness's testimony, you must look at

16   all of the evidence, drawing on your own common sense and

17   life experience.  Often it may not be what a witness says but

18   how they say it that might give you a clue whether or not to

19   accept their version of an event as believable.

20       You may consider a witness's character, their appearance

21   and demeanor on the witness stand, their frankness or lack of

22   frankness in testifying, whether their testimony is

23   reasonable or unreasonable, probable or improbable.

24       You may take into account how good an opportunity the

25   witness had to observe the facts about which they testified,

1    the degree of intelligence they show, and whether their

2    memory seems accurate.  You may also consider their motive

3    for testifying, whether they display any bias in testifying

4    and whether or not they have an interest in the outcome of

5    the case.

6         Where there are inconsistencies or discrepancies in a

7    witness's testimony or between the testimony of different

8    witnesses, that may or may not cause you to discredit such

9    testimony.  Innocent mistakes of memory do happen.  Sometimes

10   people forget things or get confused or remember an event

11   differently.  In weighing such discrepancies, you should

12   consider do they involve important facts or only minor

13   details, and whether the discrepancies result from innocent

14   lapses of memory or intentional falsehoods.

15        Now, during this case, you may have noticed that the

16   defendant did not testify at this trial.  The defendant has

17   an absolute right not to testify since the entire burden of

18   proof in this case is on the Commonwealth to prove that the

19   defendant is guilty.  It is not up to this defendant,

20   Mr. Penate, to prove that he is innocent.

21        Under our system of law, a defendant has a perfect right

22   to say to the Commonwealth:  You have the burden of proving

23   your case against me beyond a reasonable doubt.  I do not

24   have to say a word.

25        The fact that the defendant did not testify has nothing

1    to do with the question of whether he is guilty or not

2    guilty.  You are not to draw any adverse inference against

3    the defendant because he did not testify.  You are not to

4    consider it in any way or even discuss it during your

5    deliberations.

6        You must determine whether the Commonwealth has proved

7    its case against the defendant based solely on the testimony

8    of the witnesses and the exhibits.

9        Now, you heard questions posed to a witness about

10   statements made on a prior occasion that are allegedly

11   inconsistent with that witness's in-court testimony.  There

12   is a limitation to that procedure.  Generally, statements

13   made outside of court aren't admissible.  We call those

14   hearsay.  They are not admissible to say what is said out of

15   court for a number of reasons.

16       However, there are a number of exceptions to that rule.

17   One of those is if a witness made a statement on a prior

18   occasion that is somehow inconsistent with his or her

19   in-court testimony, then the jury is permitted to hear the

20   statement for a limited purpose.  The purpose is to determine

21   whether or not that prior inconsistent statement makes the

22   in-court testimony somehow less believable.

23       Bear in mind that proof of what was said on the prior

24   occasion is not being offered to prove the substance of that

25   statement.  Instead, it's being offered solely to assist you

1    in weighing that particular witness's believability.

2         It's up to you to determine a couple of things.  First,

3    was there a statement made on a prior occasion that's

4    inconsistent?  And, second, if there was, does that make the

5    witness less believable to you?  That's for you to determine,

6    and that really speaks to the jury's function.

7         During the deliberation process, you're going to have to

8    take about the case, talk about the witnesses, and talk about

9    the testimony.  Every jury in one manner or another has to

10   weigh the credibility or the believability of witnesses.

11        Just because I'm a judge, I'm not better equipped in

12   that endeavor than any of you.  It is the very ability of a

13   jury to make these decisions that gives strength to our

14   system.  So you are to use your common sense in weighing the

15   believability of all of the witnesses who testify in this

16   case.

17        One of the most important issues in this case is the

18   identification of the defendant as the perpetrator of the

19   crime.  The Commonwealth has the burden of proving identity

20   beyond a reasonable doubt.  It is not essential that the

21   witness himself or herself be free from doubt as to the

22   correctness of his statement.

23        However, you, the jury, must be satisfied beyond a

24   reasonable doubt as to the accuracy of the identification of

25   the defendant before you convict him.  If you are not

1    convinced beyond a reasonable doubt that the defendant was

2    the person who committed these crimes, you must find the

3    defendant not guilty.

4         Identification testimony is an expression of belief or

5    impression by the witness.  Its value depends on the

6    opportunity the witness had to observe the offender at the

7    time of the events and to make a reliable identification

8    later.

9         In appraising the identification testimony of a witness,

10   there are several things you should consider.  The first is

11   whether you are convinced that the witness had the capacity

12   and an adequate opportunity to observe the offender.

13        Whether the witness had an adequate opportunity to

14   observe the offender at the time of the offense will be

15   affected by such matters as how long or short a time was

16   available, how far or close the witness was, how good were

17   lighting conditions, any circumstances that might focus or

18   distract the witness's attention such as the presence of a

19   gun, and whether the witness had occasion to know or see the

20   person in the past.

21        In general, a witness bases any identification he makes

22   on his or her perception through the use of his or her

23   senses.  Usually the witness identifies an offender by the

24   sense of sight.  However, this is not necessarily so, and he

25   or she may use other senses.

1          The second thing to consider is whether you are

2     satisfied that the identification made by the witness

3     subsequent to the offense was the product of his or her own

4     recollection.  You may take into account the circumstances

5     under which the identification was made.  If the

6     identification by the witness may have been influenced by the

7     circumstances under which the defendant was presented to the

8     witness for identification, you should scrutinize that

9     identification with great care.

10          You may also consider the length of time that lapsed

11     between the occurrence of the crime and the opportunity of

12     the witness to see and identify the defendant as the offender

13     as a factor bearing on the reliability of the identification.

14          You may also take into account that an identification

15     made by picking the defendant out of a group of similar

16     individuals is generally more reliable than one that results

17     from the presentation of the defendant alone to the witness.

18          You may take into account any occasion in which the

19     witness failed to make an identification of the defendant or

20     made an identification that was inconsistent with his

21     identification at trial.

22          Finally, you must consider the credibility of each

23     identification witness in the same way as any other witness.

24     Consider whether he or she is truthful and whether he had the

25     capacity and the opportunity to make a reliable observation

1   on the matter covered in his testimony.

2       I again emphasize that the burden of proof is on the

3   Commonwealth and that burden extends to every element of the

4   crime charged, and this specifically includes the burden of

5   proving beyond a reasonable doubt the identity of the

6   defendant as the perpetrator of the crime with which he

7   stands charged.

8       If you have a reasonable doubt as to the identification

9   of the defendant as the perpetrator, you must find the

10  defendant not guilty.

11      I am now going to turn to the legal principles that

12  apply in all criminal trials.  Those principles are the

13  presumption of innocence, the burden of proof, and the

14  standard of proof beyond a reasonable doubt.

15      In the beginning of this trial I told you that the

16  defendant was presumed innocent and cannot be convicted

17  unless the prosecution proves his guilt beyond a reasonable

18  doubt.  That means that no adverse inference can be drawn

19  against this defendant because he was arrested, indicted, and

20  is now on trial.

21      When a case is presented to the Grand Jury, there is a

22  copy of an indictment.  An indictment is returned from the

23  Grand Jury.  An indictment is a very formal looking document

24  and it's signed by the foreperson of the Grand Jury and an

25  Assistant District Attorney.

1          And we talked about this earlier about how the word

2     "indictment" is a more formal word that we use here in the

3     Superior Court but it's essentially the complaint.  Let me

4     remind you, an indictment does not prove a thing in this

5     case.  A Grand Jury is very different from a trial jury.  A

6     Grand Jury merely accuses a defendant and sets into motion

7     the process that culminates in a trial in front of a jury

8     such as you.  So do not draw any adverse inference against

9     the defendant because he was indicted.

10         I also told you at the beginning of the trial that the

11    burden of proof is on the prosecution to prove the

12    defendant's guilt beyond a reasonable doubt.  That burden

13    stays with the prosecution throughout the entire trial.  It

14    never shifts to the defendant.  No defendant has to prove his

15    or her innocence.  Rather, the burden of proof is on the

16    Commonwealth to prove the defendant's guilt beyond a

17    reasonable doubt.

18         Now, for years judges have struggled with the proper

19    definition of the term "beyond a reasonable doubt," and I

20    certainly don't have any greater insight into the proper

21    definition of that term.  So, my policy is this:  I will read

22    to you the definition of the term "beyond a reasonable

23    doubt," and it was developed in a case that was tried here in

24    the Commonwealth in 1850.

25         The name of the case is Commonwealth versus Webster.  So

 1   I'm going to read the definition of the term "beyond a

 2   reasonable doubt" that was developed in this case, but I'm

 3   going to read it in its modern syntax.

 4        "The burden is on the Commonwealth to prove beyond a

 5   reasonable doubt that the defendant is guilty of the charge

 6   made against him.  What is proof beyond a reasonable doubt?

 7   The term is often used and probably pretty well understood

 8   though it is not easily defined.  Proof beyond a reasonable

 9   doubt does not mean proof beyond all possible doubt because

10   everything in the lives of human beings is open to some

11   possible or imaginary doubt.

12        "A charge is proved beyond a reasonable doubt if after

13   you have compared and considered all of the evidence, you

14   have in your minds an abiding conviction to a moral certainty

15   that the charge is true.  I have told you that every person

16   is presumed to be innocent until he is proved guilty and that

17   the burden of proof is on the Commonwealth.

18        "If you evaluate all the evidence and you still have a

19   reasonable doubt remaining, the defendant is entitled to the

20   benefit of that doubt and must be acquitted.  It is not

21   enough for the Commonwealth to establish a probability, even

22   a strong probability that the defendant is more likely to be

23   guilty than not guilty.  That is not enough.

24        "Instead, the evidence must convince you of the

25   defendant's guilt to a reasonable and moral certainty, a

1    certainty that convinces your understanding and satisfies

2    your reason and judgment as jurors who are sworn to act

3    conscientiously on the evidence.  That is what we mean by

4    proof beyond a reasonable doubt."

5        Now, it doesn't mean that everything that's been

6    presented during this trial must be proved to that standard.

7    It is the elements of the crimes charged which I will now

8    define which must be proved to that standard.

9        In this case, the defendant is charged with two counts

10   of possession with the intent to distribute a controlled

11   substance.  Count 1 alleges that the defendant possessed a

12   Class B substance with the intent to distribute it, and Count

13   3 alleges that the defendant possessed a Class A substance

14   with the intent to distribute it.

15       These are the substances that were allegedly found in

16   the dog pen in the apartment.  The defendant is not charged

17   with possessing any other controlled substances with the

18   intent to distribute them.

19       Our state legislature has specifically defined

20   possession with intent to distribute in a statute, and it's

21   found in General Laws 94C, Section 32 through 32D.  The

22   pertinent parts of the statute read as follows:

23       Any person who knowingly or intentionally possesses with

24   intent to distribute a controlled substance shall be

25   punished.  In order to prove the defendant guilty of

1    possession with the intent to distribute a controlled

2    substance, the Commonwealth must prove four elements beyond a

3    reasonable doubt.

4         First, that the defendant possessed a certain substance.

5         The second element, that the substance was a controlled

6    substance; namely, with respect to Count 1, cocaine, and with

7    respect to Count 2, heroin.

8         The third element is that the defendant possessed that

9    controlled substance knowingly or intentionally.

10        And, fourth, that the defendant had the specific intent

11   to distribute the controlled substance.

12        The first element that the Commonwealth must prove

13   beyond a reasonable doubt is that the defendant possessed a

14   controlled substance.  The law recognizes two types of

15   possession; actual possession and constructive possession.

16        A person that has physical control over an object and

17   has the intent to exercise such control is in actual

18   possession of it.  A person who knowingly has direct physical

19   control over an object at a given time is then in actual

20   possession of it.

21        Actual possession implies control and power over the

22   thing or object.  For example, I've got this pencil in my

23   hand.  I know it's a pencil.  I can do anything I want with

24   it.  Clearly, I have actual control over this pencil.

25        Possession does not depend on the length of time one has

1   an object in his or her control.  Fleeting, momentary contact

2   with an object may constitute actual possession if at the

3   time of contact with the object a person has the control and

4   power to do with it what he or she wills.

5       Constructive possession is the other type of possession

6   recognized by the law.  A person who, although not in actual

7   possession, knowingly has both the power and the intention at

8   any given time to exercise dominion, power, or control over

9   an object either directly or through another person or

10  persons is in constructive possession of the object.

11      Thus, constructive possession means knowledge of the

12  location of an object combined with the ability and intention

13  to exercise dominion and control over it.  For example, I am

14  in constructive possession of my car keys which are in my

15  purse which is in my lobby.

16      To be in possession of an object, a person does not have

17  to own the object.  Mere presence in the vicinity of a

18  controlled substance or mere knowledge of its physical

19  location is not, however, the equivalent of possession.  As

20  I've said to you, the term constructive possession means that

21  a person has knowledge of the location of the object and the

22  ability and the intention to exercise control and power over

23  it.

24      Possession, whether actual or constructive, need not be

25  exclusive.  It may be joint or shared between or among more

 1    than one person.  Possession may be proved by circumstantial

 2    evidence and the reasonable inferences drawn from that

 3    evidence.  Whether such an inference is reasonable in this

 4    case depends on all the circumstances and is for you to

 5    determine.

 6         The second element the Commonwealth must prove beyond a

 7    reasonable doubt is that the substance that the defendant

 8    possessed was a controlled substance.  With respect to Count

 9    1, that would be cocaine.  With respect to Count 3, a Class A

10    substance heroin.

11         As a matter of law, cocaine is a controlled substance as

12    defined in Class B as defined in our General Laws.  As a

13    matter of law, heroin is a controlled substance as defined

14    in -- in Class A as defined in our General Laws.

15         The Commonwealth must therefore prove to you beyond a

16    reasonable doubt that the substance that the defendant

17    allegedly possessed was, in fact, cocaine with respect to

18    Count 1 and heroin with respect to Count 3.

19         The statute defining possession with intent of

20    controlled substance -- the statute defining possession with

21    intent to distribute a controlled substance does not require

22    that the substance be in pure form.  Any mixture that

23    includes a controlled substance will suffice.

24         In your evaluation of whether the substance the

25    defendant allegedly possessed was a controlled substance, you

may consider all the relevant evidence in the case, including any witness who may have testified either to support or deny the allegation that the substance in question was either cocaine with respect to Count 1 or heroin with respect to Count 3.  You may also consider the testimony of experienced police officers, qualified chemists, or other relevant evidence.

Bear in mind, the Commonwealth must prove beyond a reasonable doubt that the substance was, in fact, with respect to Count 1, cocaine, and with respect to Count 3, heroin.

The third element the Commonwealth must prove beyond a reasonable doubt is that the defendant possessed a controlled substance knowingly and intentionally.  As to the knowledge requirement, the Commonwealth must prove beyond a reasonable doubt that the defendant knew that the substance in his possession was a controlled substance.

However, the Commonwealth does not have to prove the defendant knew the exact nature of the substance.  It is sufficient if the Commonwealth proves beyond a reasonable doubt that the defendant was aware that he possessed some sort of a controlled substance.

The Commonwealth must also prove beyond a reasonable doubt that the defendant had consciously, voluntarily, and purposefully possessed the controlled substance.  A person's

1   knowledge, like his or her intent, is a matter of fact that

2   may or may not be susceptible to proof by direct evidence.

3        If it is not susceptible to proof by direct evidence,

4   then the Commonwealth may prove knowledge by circumstantial

5   evidence and the inferences reasonably drawn from that

6   evidence.

7        The fourth element the Commonwealth must prove beyond a

8   reasonable doubt is that the defendant had the specific

9   intent to distribute the controlled substance in his

10  possession.  In other words, that the defendant actually

11  intended to distribute the controlled substance.

12       Intent refers to a person's objective or purpose.

13  Specific intent, which is what is required in this case, is

14  the act of concentrating or focusing the mind for some

15  perceptible period.  It is a conscious act with the

16  determination of the mind to do an act.  It is contemplation

17  rather than reflex and it must precede that act.

18       The Commonwealth must prove specific intent on the part

19  of the defendant.  This requires you to make a decision about

20  the defendant's state of mind at the time of the crime.  In

21  this case, you may or may not infer the defendant's intent by

22  considering all the facts as well as evidence of the

23  defendant's conduct offered during the trial.

24       You should consider all of the evidence and any

25  reasonable inferences that you draw from the evidence in

1   determining whether the Commonwealth has proved beyond a
2   reasonable doubt, as it must, that the defendant acted with
3   the specific intent to distribute the cocaine and the heroin.
4       Again, in this case, the Commonwealth must prove that
5   the defendant had the specific intent to distribute the
6   controlled substance.  The word "distribute" includes all
7   forms of physical transfer.  It is unlawful for a person to
8   even make a gift of a controlled substance.
9       To distribute means what the word commonly or usually
10  means.  It means to hand over to another, to give away, or to
11  transfer possession from one person to another.  It is
12  irrelevant whether money, property, or some other sort of
13  compensation was involved.
14      The Commonwealth does not have to prove an actual sale
15  but it must prove that this defendant specifically had it in
16  his mind that he was going to distribute; that is, to
17  transfer possession of some portion of this controlled
18  substance to another person.  The Commonwealth need not prove
19  the defendant specifically intended to distribute all of it.
20      However, bear in mind, as to this element that the
21  Commonwealth must prove that the defendant did not possess
22  the controlled substance solely for his own use or
23  consumption but instead intended to distribute it to others.
24      Now, here again, a person's intent or state of mind is a
25  matter of fact.  Absent other direct evidence, the

1  Commonwealth may resort to proof by inference reasonably

2  drawn from all the facts and circumstances developed at

3  trial.  You must determine whether such an inference is

4  reasonable in this case.

5      An inference of an intent to distribute may be drawn

6  from evidence such as possession of a large quantity of

7  drugs, the amount of which would be inconsistent with

8  personal use, the exceptional purity of the drugs, the way in

9  which the drugs were packaged, the confiscation of large

10 amounts of unexplained money, the possession of drug

11 processing equipment such as cutting powder, calibrated

12 scales, testing kits, cigarette papers, and glassine

13 envelopes, or empty capsules to be filled with narcotic

14 powder, the possession of notations indicating the selling of

15 drugs, repeated travel to drug distribution centers, and

16 sophisticated sales arrangements and clandestine methods.  It

17 is for you to decide whether such an inference is reasonable

18 here.

19     So, if after considering all the evidence you determine

20 that the Commonwealth has proved beyond a reasonable doubt

21 each of the four elements that I have just defined; that is,

22 that the defendant knowingly or intentionally possessed a

23 controlled substance with the specific intent to distribute

24 it, then you should shall find the defendant guilty of

25 possession of a Class B substance, cocaine, with the intent

1    to distribute it, and that refers to Count 1.

2        If, however, after your consideration of all the

3    evidence you find the Commonwealth has not proved any of the

4    four elements of possession of a controlled substance with

5    the intent to distribute it beyond a reasonable doubt, then

6    you shall find the defendant not guilty of possession of a

7    Class B substance with the intent to distribute it.

8        With respect to Count 3, if after considering all the

9    evidence you determine that the Commonwealth has proved

10   beyond a reasonable doubt each of the four elements that I've

11   just defined; that is, that the defendant knowingly or

12   intentionally possessed a controlled substance with the

13   specific intent to distribute, then you shall find the

14   defendant guilty of possession of a Class A substance,

15   heroin, with the intent to distribute it.

16       If, however, after your consideration of all the

17   evidence you find the Commonwealth has not proved any one of

18   the four elements of possession of a controlled substance

19   with the intent to distribute it beyond a reasonable doubt,

20   then you shall find the defendant not guilty of possession of

21   a Class A substance with the intent to distribute it.

22       Now, in this case, the defendant is charged with

23   unlawful distribution of a controlled substance, a Class A

24   substance, heroin, on three separate occasions, on three

25   separate dates.  Those dates are October 21, November 9,

1    November 15, 2011.

2        Our state legislature has specifically defined

3    distribution of a controlled substance in a statute.  The

4    relevant portions of the statute read as follows:  Any person

5    who knowingly or intentionally distributes a controlled

6    substance in Class A of Section 31 shall be punished.

7        In order to prove the defendant guilty of distribution

8    of a controlled substance, the Commonwealth must prove three

9    elements beyond a reasonable doubt.

10       First, that the substance in question is a controlled

11   substance.

12       Second, that the defendant distributed some perceptible

13   amount of that substance to another person or persons.

14       And, third, that the defendant did so knowingly or

15   intentionally.

16       The first element the Commonwealth must prove beyond a

17   reasonable doubt is that the powder that the defendant

18   allegedly distributed was a controlled substance, in this

19   case, heroin, a Class A controlled substance.  As a matter of

20   law, heroin is a controlled substance in Class A as defined

21   in our General Laws.

22       Now, this first element is the same as the first element

23   in the first charge that I just read to you, but I'm going to

24   read it again.  I will read it again.

25       The Commonwealth must, therefore, prove to you beyond a

 1   reasonable doubt that the substance the defendant allegedly

 2   distributed was, in fact, heroin.  The statute defining

 3   distribution does not require that the substance be in pure

 4   form.  Any mixture will suffice.

 5       In your evaluation of whether the substance the

 6   defendant allegedly possessed was a controlled substance, you

 7   may consider all the relevant evidence in the case, including

 8   any witness who may have testified either to support or deny

 9   the allegation that the substance in question was heroin.

10       You may also consider the testimony of experienced

11   police officers, qualified chemists, and other relevant

12   evidence.  Bear in mind, the Commonwealth must prove beyond a

13   reasonable doubt that the substance was, in fact, heroin.

14       The second element the Commonwealth must prove beyond a

15   reasonable doubt is that the defendant distributed some

16   perceptible amount of that substance to another person or

17   persons.

18       The term "distribute" means to actually deliver a

19   controlled substance to another person other than by legally

20   administering or dispensing it.  Deliver, in turn, is a

21   transfer of a controlled substance from one person to

22   another.  Distribution includes all forms of physical

23   transfer.  For example, it is unlawful for a person even to

24   make a gift of a controlled substance.

25       To distribute means what the word commonly or usually

1   means; to hand over to another, to give away, or to transfer

2   ownership from one person to another.

3        The third element the Commonwealth must prove beyond a

4   reasonable doubt is that the defendant not only distributed a

5   Class A controlled substance, but that he did so knowingly or

6   intentionally.  Intent refers to a person's objective or

7   purpose.  You may find that the defendant acted knowingly or

8   intentionally if he did so consciously, voluntarily, and

9   purposefully.

10       A person's knowledge and his or her intent is a matter

11  of fact that may or may not be susceptible to proof by direct

12  evidence.  If it is not susceptible to proof by direct

13  evidence, then you may resort to proof by circumstantial

14  evidence and the inferences reasonably drawn from that

15  evidence.

16       If after considering all of the evidence you find that

17  the Commonwealth has proved beyond a reasonable doubt each of

18  the three elements I have just defined; that is, that the

19  substance at issue here is a controlled substance, that the

20  defendant distributed it, and that the defendant did so

21  knowingly or intentionally, then you shall find the defendant

22  guilty of distribution of a controlled substance.

23       If, however, after your consideration, you find that the

24  Commonwealth has not proved any one of the three elements of

25  distribution of a controlled substance that I just defined

1    beyond a reasonable doubt, then you shall find the defendant

2    not guilty of distribution of a controlled substance.

3        Now, with regards to Count 7, and Count 7 only, and that

4    is a charge -- a count alleging distribution of a Class A

5    substance on November 9th of 2011, the Commonwealth, with

6    respect to that count only, is proceeding on a theory of

7    joint venture.

8        The Commonwealth alleges that although the defendant did

9    not sell the Class A substance directly to Officer Hernandez,

10   he aided and abetted in the commission of this offense by

11   directing another person to sell to Officer Hernandez.

12       A defendant knowingly participates in the commission of

13   an offense if he intentionally participates in some

14   meaningful way in the commission of the offense with the

15   intent required to commit the offense.

16       Such participation may take any one of several forms.

17   It may take the form of personally committing the acts that

18   constitute the crimes or of aiding or assisting another in

19   those acts.  It may take the form of asking or encouraging

20   another person to commit the crime or helping to plan the

21   commission of the crime.

22       Alternatively, it may take the form of agreeing to stand

23   by, at, or near the scene of the crime to act as a lookout or

24   to provide aid or assistance in committing the crime or in

25   escaping if such help becomes necessary.

1    The agreement to help if needed does not need to be made

2    through a formal or explicit written or oral advanced plan or

3    agreement.  It is enough consciously to act together before

4    or during the crime with the intent of making the crime

5    succeed.

6    The Commonwealth must also prove beyond a reasonable

7    doubt that at the time the defendant knowingly participated

8    in the commission of the crime charged, and that would be the

9    November 7th -- November 9th, Count 7 crime, he had or shared

10   the intent required for that crime.

11   You are permitted but not required to infer the

12   defendant's mental state or intent from his knowledge of the

13   circumstances or any subsequent participation in the crime.

14   The inferences you draw must be reasonable and you may rely

15   on your experience and common sense in determining the

16   defendant's knowledge and intent.

17   Mere knowledge that a crime is to be committed is not

18   sufficient to convict the defendant.  The Commonwealth must

19   also prove more than mere association with the perpetrator of

20   the crime either before or after its commission.  He must

21   also prove more than a mere failure to take appropriate steps

22   to prevent the commission of the crime.

23   Mere presence at the scene of the crime is not enough to

24   find a defendant guilty.  Presence alone does not establish a

25   defendant's knowing participation in the crime, even if a

1    person knew about the intended crime in advance and took no

2    steps to prevent it.

3         To find the defendant guilty, there must be proof that

4    the defendant intentionally participated in some fashion in

5    committing that particular crime and had or shared the intent

6    required to commit the crime.  It is not enough to show that

7    the defendant was present when the crime was committed or

8    that he knew about it in advance.

9         So that's my instructions with respect to joint venture

10   which applies only to Count 7, and that would be the

11   November -- the allegations with respect to the November 9th

12   incident.

13        That, ladies and gentlemen, concludes my instructions to

14   you.

15        May I please see counsel at sidebar before we proceed.

16

17

18

19

20

21

22

23

24

25

1    (Sidebar conference concluded)

2        THE COURT:  Commonwealth satisfied?

3        MR. VELAZQUEZ:  Yes, Your Honor.

4        THE COURT:  Defense?

5        MR. RYAN:  Defendant would just object for the record to

6    the giving of the model instructions.  I don't wish to be

7    heard any further on that.

8        THE COURT:  On identification?

9        MR. RYAN:  Yes.

10       THE COURT:  The objection is noted.

11       MR. RYAN:  Thank you.

12   (Sidebar conference concluded)

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  Okay.  You know, we started out with 14

2   jurors, we're now down to 13, and I did tell you at the

3   beginning of the case that only 12 of you can deliberate.

4   So, I am going to ask Mr. -- first let me select the

5   foreperson.  That's pretty important.  Mr. Ginley.

6   (Discussion was held off the record between the Court and

7   clerk)

8        THE CLERK:  Shevon Rosa in seat No. 4, you've been

9   selected as a jury foreperson.

10       THE COURT:  Ms. Rosa, it doesn't mean you're going to

11  get paid any more than your fellow jurors, and your word

12  doesn't carry any greater weight than your fellow jurors.

13  I'll explain to you what your responsibilities are as soon as

14  the jury is reduced.

15       FOREPERSON:  Okay.

16       THE CLERK:  Juror in seat No. 9, Adam Gullucci, please

17  step down having been selected as an alternate.

18       THE COURT:  Okay.  So, Ms. Rosa, your responsibility is

19  to act like the chairperson of a board.  Everybody has an

20  equal say or equal voice in this process, and make sure that

21  everybody has an opportunity to be heard.

22       Your other responsibility is to sign and date the

23  verdict slip, and it's pretty self-explanatory.  Each count

24  of the indictment should be considered separately, must be

25  considered separately.  And we need a unanimous verdict with

1    respect to all counts of the indictment.

2        So with respect to Count 1, the defendant can either be

3    found not guilty or guilty.  You are to sign and date the

4    verdict slip in pen.  Use ink.

5        In the event that you have any questions, please write

6    them on a piece of paper, give them to the court officer, and

7    they will give them to me.  I will read it and share it with

8    counsel.  If it's appropriate for me to answer your question,

9    I will do so.  If it isn't, I will tell you that and I won't

10   answer the question.

11       You will be receiving the exhibits shortly and feel free

12   to go through the exhibits.

13   (Court officers sworn)

14       THE COURT:  Ladies and gentlemen, all we ask is that

15   your verdict be the result of integrity and principle.  Your

16   verdict should be the result of a careful consideration of

17   all of the evidence that's been admitted during the course of

18   this trial.  Everyone who comes to court stands equal before

19   the bar of justice.  So your verdict should be based on the

20   evidence that you heard during the course of this trial and

21   the law as I have defined it for you.

22       Ladies and gentlemen, you may begin your deliberations.

23   (The jury leaves the courtroom)

24       THE CLERK:  Counsel, step forward and review the verdict

25   slips and the exhibits for the record.

1   (Pause in proceedings)

2       MR. VELAZQUEZ:  For the record, the Commonwealth is

3   satisfied with the verdict slips.

4       MR. RYAN:  For the record, the defendant is satisfied

5   with the verdict slips.

6       THE COURT:  Thank you.  Now the exhibits.

7   (Pause in proceedings)

8       MR. VELAZQUEZ:  Your Honor, can we remove the evidence

9   tag from Exhibit No. 22?

10      THE COURT:  Sure.

11      MR. VELAZQUEZ:  It's just a handwritten evidence tag.

12      THE COURT:  It says "school zone."

13      MR. RYAN:  Right.  It's by agreement.

14      THE COURT:  Nothing else is on it?

15      MR. VELAZQUEZ:  We've already redacted what was on there

16  and that seems to be fine the way it is.

17      THE CLERK:  And 24, 25, and 26, Your Honor, had been

18  removed.  26A are the IDs.

19      THE COURT:  Okay.

20      MR. VELAZQUEZ:  Commonwealth is satisfied.

21      MR. RYAN:  The defendant is satisfied.

22      THE COURT:  Thank you.  Interesting case, gentlemen.

23      MR. RYAN:  Thank you, Your Honor.

24  (Court recessed at 11:40 a.m.)

25  (Court reconvened at 4:01 p.m.)

1       THE COURT:  I have received a note from the foreperson

2  and it reads, "We cannot come to a conclusion and come up

3  with a verdict."

4       So, my recollection, with the help of Mr. Ginley, is

5  that the jurors went out at about 11:30.

6       THE CLERK:  That's correct, Your Honor.  11:20 or so.

7       THE COURT:  I alerted you to the fact that I'm not

8  available tomorrow.  It's now four o'clock.  I will entertain

9  any suggestions from counsel.  Mr. Velazquez.

10       MR. VELAZQUEZ:  If you want to give them a charge at

11  this point, the Tuey-Rodriguez charge.

12       THE COURT:  Well, I think it's a little pre -- what do

13  you think, Mr. Ryan?

14       MR. RYAN:  It sounds a little premature to me.

15       THE COURT:  Technically I think I should tell them you

16  went out at 11:30, it is 4:00 and getting late, but please

17  attempt to resolve the matter, and then give them an

18  opportunity to resolve it and then Tuey them.  I think that's

19  procedurally how it should be done.

20       MR. VELAZQUEZ:  Sure.

21       THE COURT:  So, Mr. Ryan.

22       MR. RYAN:  I agree with the Court.  I don't know if you

23  want to talk about "what ifs," but I think that's the way to

24  proceed with the question.

25       THE COURT:  But the other thing is this:  I could tell

1   them that --

2        THE DEFENDANT:  Can I talk to my lawyer?

3        THE COURT:  Certainly.  You know what?  I'll go -- do

4   you want me to go outside?

5        MR. RYAN:  If that would be okay.  Thank you, Your

6   Honor.

7   (Court recessed at 4:03 p.m.)

8   (Court reconvened at 4:06 p.m.)

9        THE COURT:  Did you have enough time to talk to your

10  client?

11       MR. RYAN:  We did.  Thank you for giving us that

12  consideration.  We're ready to proceed.

13       THE DEFENDANT:  Thank you.

14       THE COURT:  You're welcome.  I don't remember where I

15  was, but I can tell them -- ask them to go back out or just

16  tell them they have to come back Monday.

17       MR. RYAN:  May I ask how late was the Court, if there

18  had been no question, how late is the Court inclined --

19       THE COURT:  I usually send in a note at 4 or 4:15.

20       MR. RYAN:  I guess my feeling is I would prefer to use

21  up whatever time is left today, if just coming into the court

22  causes them to have any movement, but I think it probably

23  would be helpful also to find out -- I don't think they were

24  anticipating coming back next week.  I don't know if we're

25  going to be in trouble with alternates and all that sort of

1    thing too.

2        MR. VELAZQUEZ:  Your Honor, after the trial began, I

3    learned something about one of the jurors that I was not

4    aware of, and I suspect that there may be some issues with

5    that particular juror.

6        I will tell the Court that Melvin Jones is somebody who

7    indicated to the Court that he had some prior involvement,

8    one traffic case or something like that, and I asked about

9    that.

10       But I've since learned that apparently his son was

11   arrested on more than one occasion by these same police

12   officers.  And there was no indication that he may harbor

13   some ill will towards them, and it was not something that was

14   ever explored --

15       THE COURT:  When did you find out all of this

16   information?

17       MR. VELAZQUEZ:  Well, I found out that this person's

18   name is Melvin Jones and so I looked it up after the trial.

19   After we impaneled.

20       THE COURT:  And what is it you want me to do about that?

21       MR. VELAZQUEZ:  Well, there is a serious question as to

22   whether or not this is a hung jury, that maybe he would be

23   one person who is holding up the process.

24       THE COURT:  Well, you know, Mr. Velazquez, A, that's

25   something you should have brought to the Court's attention as

1    soon as you found out about it, and it seems to me it's a

2    little late in the game for us to be concerned about that.

3    The witness -- the juror indicated that he did not give any

4    indication as to whether he knew any of the witnesses, the

5    police witnesses.

6         MR. VELAZQUEZ:  Yes.

7         THE COURT:  I don't know how long ago this arrest

8    occurred.  He may not even -- I don't know what kind of

9    relationship he has with his son and whether he was involved

10   in his criminal matters, whether he even came to court with

11   his son.

12        MR. VELAZQUEZ:  I just brought it to the Court's

13   attention.  I think that may be a live issue, but if it's not

14   something the Court is willing to address, I understand.

15        THE COURT:  So am I hearing that you want me to call

16   this juror and question him about whether he could be -- this

17   deliberating juror whether he can be a fair and impartial

18   juror?

19        MR. VELAZQUEZ:  Well, there is one alternate still left

20   at this point and it might be an option for the Court if that

21   is the case.  I don't know this to be true, but I think it's

22   my duty to inform the Court of what I have learned since this

23   trial started.

24        THE COURT:  I think it -- I agree with you.  I think it

25   was your duty to inform the Court about it before he became a

1   deliberating juror.

2        If we could have the jurors brought in, please.  I am

3   going to just chat with them, explain that it's late, and ask

4   if they would go back for another couple of minutes to resume

5   their deliberations.

6        This will be marked as J for ID.

7   (The clerk marks the jury communication as J for

8   identification)

9   (The jury enters the courtroom)

10       THE COURT:  Okay, Madam Foreperson and members of the

11  jury, I did receive your note and it reads, "We cannot come

12  to a conclusion and come up with a verdict."

13       I know it's probably been a relatively long day for you,

14  but what I'm going to do is ask you to all take a deep breath

15  and exhale.  Okay.  It's ten after four.  I am going to

16  implore you and ask you to go back to your deliberation room

17  and talk about this case.  And please talk about the case.

18  Do your best and listen to everybody's opinion with respect

19  to the case.  Okay?  All right.  If you want to stand up and

20  stretch, feel free to do so.

21       Please resume your -- do you want to stay in here for a

22  minute and just work out the kinks?

23  (Laughter)

24       FOREPERSON:  Do you want to come in there with us?

25  (Laughter)

1        THE COURT:  Let me just share this with you.  So,

2   normally you'd come back tomorrow.  I'm not available

3   tomorrow.  So if you think it's best, you may need to take

4   time away, time off.  You'd have to come back on Monday and

5   conclude your deliberations, which it's really up to you.

6        I am going to ask that you go back, just talk for a

7   couple of minutes.  We're here, and it's okay.  It's okay.

8   If we have to come back on Monday, it really is okay.

9        So, please, you may resume your deliberations, ladies

10  and gentlemen.  And I'll send in a note in a while or you can

11  just knock on the door and let Donald know whether or not

12  you've reached an agreement.  If not, that's fine.  We'll

13  just come back on Monday.  Thank you.

14       ALTERNATE JUROR:  Your Honor, may I have a word, please?

15       THE COURT:  No.  Just follow.  Thank you.

16  (The jury leaves the courtroom)

17       THE COURT:  I just didn't feel comfortable not telling

18  them about my day so I just blurted it out.  I'll wait -- I

19  think the alternate may want to have a few words with us.

20  (Pause in proceedings)

21       THE COURT:  Did the alternate need to see me?

22       COURT OFFICER:  I didn't even ask him.  Do you want me

23  to ask him?

24       THE COURT:  Please.

25  (Pause in proceedings)

1          COURT OFFICER:  Your Honor, the alternate.

2          ALTERNATE JUROR:  Thank you, Your Honor.

3          THE COURT:  You're welcome.  I just didn't want you to

4     blurt anything out --

5          ALTERNATE JUROR:  Oh, of course.

6          THE COURT:  -- in front of the deliberating jury.  Yes,

7     sir.  Your name again?

8          ALTERNATE JUROR:  I'm sorry.  My name is Adam Gullucci.

9     I'm just requesting if I could be excused for the day.  I

10    have a cell phone and I'm immediately available if you need

11    me.

12         THE COURT:  I so appreciate that.  I really do.  But I

13    must ask that you stay.  Okay?  I don't think it will be too

14    much longer.

15         ALTERNATE JUROR:  Okay.

16         THE COURT:  But you have to stay.

17         ALTERNATE JUROR:  Okay.  That's all.  Thank you for your

18    consideration.

19         THE COURT:  You're more than welcome, sir.

20    (Court recessed at 4:12 p.m.)

21    (Court reconvened at 4:37 p.m.)

22    (Defendant not present)

23         THE COURT:  Okay.  I know the defendant is not here.

24    The question from Madam Foreperson was they want a new

25    verdict slip on Count 1.  Do you have a problem with me

1    giving it to her?  It says the same thing.

2         Do you want your defendant present or will you waive his

3    presence just for this?

4         MR. RYAN:  I'll waive his presence just for this.

5         THE COURT:  And so, Mr. Norris, if you would kindly give

6    this to the jurors.  All right?

7         THE CLERK:  K for ID, Your Honor.

8         THE COURT:  Yes.

9    (The clerk marks the jury communication as K for

10   identification)

11   (Court recessed at 4:37 p.m.)

12   (Court reconvened at 5:05 p.m.)

13        THE COURT:  At five of five I sent the jurors a note and

14   I said, "If you wish, you may continue your deliberations

15   tomorrow."  And the response was, "Please, please allow us

16   ten more minutes.  We're almost there."

17        This will be marked as the next --

18        THE CLERK:  L or ID, Your Honor.

19   (The clerk marks the jury communication as L for

20   identification)

21        THE COURT:  I just hope they want to come back tomorrow.

22        MR. RYAN:  Tomorrow, tomorrow?

23        THE COURT:  Tomorrow, tomorrow.  I will be here

24   tomorrow.

25        MR. RYAN:  So will we.

1        THE COURT:  All right.

2   (Court recessed at 5:07 p.m.)

3   (Court reconvened at 5:28 p.m.)

4   (The jury enters the courtroom)

5        THE COURT:  All right, ladies and gentlemen.  It is now

6   5:30.  My understanding is you want to come back tomorrow; is

7   that correct?

8        A JUROR:  (Inaudible.)

9        THE COURT:  I'm sorry.  I didn't hear what you said, and

10  I don't know if I want to hear what you said.

11  (Laughter)

12       THE COURT:  I will give you the following instruction:

13  Please, you must not discuss the case with anybody outside of

14  the courtroom, all right?  We will begin tomorrow at 9:15 and

15  there will be coffee for you.  But if some of you get here

16  before others, don't begin deliberating until you all come

17  back into the courtroom as a group and I excuse you for

18  purposes of resuming your deliberations, all right?

19       Do not do any independent research with respect to any

20  of the issues that have developed during the course of this

21  trial.  Please ignore any media attention that has been paid

22  to the case.  And in the event you see anyone involved in the

23  case outside of the courtroom, please do not approach them.

24       Enjoy the evening, get some rest, and I'll see you

25  tomorrow morning.  Thank you very much.

1    (The jury leaves the courtroom)

2    (Court adjourned at 5:30 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25