# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

*****************************************

ROLANDO PENATE,

     Plaintiff

v.

ANNE KACZMAREK, KRIS FOSTER,
RANDALL RAVITZ, JOSEPH BALLOU,
ROBERT IRWIN, RANDY THOMAS,
SONJA FARAK, SHARON SALEM,
JAMES HANCHETT, JULIE NASSIF,
LINDA HAN, STEVEN KENT, JOHN
WADLEGGER, GREGG BIGDA,
EDWARD KALISH, and
CITY OF SPRINGFIELD

     Defendants

**CIVIL ACTION NO. 17-30119-KAR**

*****************************************

## PLAINTIFF'S OPPOSITION TO DEFENDANT ANNE KACZMAREK'S MOTION TO DISMISS

*Introduction*

Anne Kaczmarek (Kaczmarek) is the second former Assistant Attorney General (AAG) to

file a responsive pleading to the above-referenced complaint. The first was Kris Foster (Foster).

During the time they spent together in the Attorney General's Office (AGO), Kaczmarek and

Foster were assigned to separate divisions and had different responsibilities. But they shared one

important thing in common: neither of them (nor their office) represented the Commonwealth in

the criminal case against Plaintiff Rolando Penate (Plaintiff). That task was undertaken by the

Hampden County District Attorney's Office. During that prosecution, Kaczmarek and Foster

conspired with each other and others to keep highly exculpatory evidence from Plaintiff and the

Assistant District Attorney (ADA) who presented the state's case. Now that this misconduct has

1

come to light, Kaczmarek and Foster seek the 'strong medicine' of absolute immunity, *Forrester v. White*, 484 U.S. 219, 230 (1988) (citation omitted), the law reserves for "a narrow swath of public officials[.]" *Goldstein v. Galvin*, 719 F.3d 16, 24 (1st Cir. 2013).

Kaczmarek's convoluted immunity claim starts with her prosecution of Sonja Farak (Farak). Although Farak is the only party to this lawsuit she prosecuted, Kaczmarek suggests it would be a radical departure from Supreme Court precedent to "restrict or limit [her] discretionary, prosecutorial functions and responsibilities to the Farak prosecution alone." (Dkt. No. 87, Kaczmarek's Mem. of Law in Supp. of Mot. to Dismiss at 1.) In her view, the evaluation of potentially exculpatory evidence she conducted in her capacity as Farak's prosecutor was indistinguishable from the one she conducted "in the derivative Penate matter." (*Id.*) Because the doctrine of absolute immunity would bar Farak from bringing a *Brady* claim against her, Kaczmarek contends Plaintiff should be foreclosed from doing the same.

This reasoning suffers from at least three major flaws.

First, neither the Supreme Court nor First Circuit has ever suggested, let alone held, that an assignment to pursue criminal charges against one person comes with a license to engage in unconstitutional conduct during another agency's prosecution of a different defendant. In fact, the First Circuit has made it clear that "[t]he prosecutorial nature of an act does not spread backwards like an inkblot, immunizing everything it touches." *Guzman-Rivera v. Rivera-Cruz*, 55 F.3d 26, 29 (1st Cir. 1995). Adopting Kaczmarek's position on absolute immunity would contravene four decades of jurisprudence by transforming a careful functional analysis into an "overly simplistic" transactional test. *Imbler v. Pachtman*, 424 U.S. 409, 421 (1976) ("The liability of a state prosecutor under § 1983 must be determined" by "a considered inquiry into the immunity historically accorded . . . at common law and the interests behind it.").

2

Second, by stressing her participation in the "evaluative process of producing exculpatory materials,"[1] Kaczmarek improperly "[f]ocuse[s] on conduct and not function[.]" *Riley v. Colantuono*, No. 12-175 MML, 2013 WL 866734 *7 (D.N.H. Feb. 5, 2013). When she engaged in this conduct vis-à-vis Farak -- i.e., the one person she "was actively prosecuting"[2] – Kaczmarek performed the function of a prosecutor. When she engaged in this same conduct vis-à-vis Plaintiff, she did not. Kaczmarek seems to suggest that because certain prosecutors sometimes suppress exculpatory evidence, everyone who suppresses exculpatory evidence must be functioning as a prosecutor. This is plainly incorrect. Police officers and forensic lab personnel are perfectly capable of committing *Brady* violations; when they are accused of doing so, all they can ask for is qualified immunity. *See Drumgold v. Callahan*, 707 F.3d 28, 38 (1st Cir. 2013); *Jones v. Han*, 993 F. Supp. 2d 57 (D. Mass. 2014).

Finally, the purportedly "derivative Penate matter" commenced in Hampden County more than fourteen months before Kaczmarek appeared on behalf of the AGO at Farak's arraignment in the Eastern Hampshire District Court. Putting aside the chronology (and geography) of events, numerous courts have declined absolute immunity requests for actions taken by prosecutors in what might be fairly labeled derivative proceedings.[3]

---

[1] (Def.'s Mem. of Law in Supp. of Mot. to Dismiss at 1.)

[2] (*Id.*)

[3] *See, e.g., Filler v. Kellett*, 859 F.3d 148, 154 (1st Cir. 2017) (no absolute immunity for prosecutor's interference with subpoenas issued to police officers in "civil custody and divorce proceedings" taking place "at the same time as [the] criminal prosecution"); *Mikko v. City of Atlanta*, 857 F.3d 1136, 1143 (11th Cir. 2017) (finding "no support for prosecutorial immunity based on actions taken by prosecutors to prevent a witness from testifying in a case handled by a different prosecutor, from a different office, in a different jurisdiction."); *Lampton v. Diaz*, 639 F.3d 223, 228 (5th Cir. 2011) (refusing to extend "immunity to post-trial conduct relating to a new action before a new tribunal."); *Spurlock v. Thompson*, 330 F. 3d 791, 799 (6th Cir. 2003) ("Functionally, a prosecutor who injects himself into a post-trial investigation into the possibility of misconduct during the trial is not acting as an advocate."); *McSurely v. McClellan*, 697 F.2d 309, 319 (D.C. Cir. 1982) ("To immunize absolutely a prosecutor's actions unrelated or only tangentially related to the prosecution of a particular case would contravene the functional rationale which underpins

The well-pled facts in Plaintiff's complaint establish that in addition to prosecuting Farak, Kaczmarek acted as a custodian of – and gatekeeper to – compelling evidence of government misconduct in Plaintiff's case. The AGO acknowledged its obligation to furnish precisely this kind of information to the office of Plaintiff's prosecutor. Kaczmarek nevertheless conspired to keep hidden what she had a duty to disclose. Under these circumstances, the doctrine of absolute immunity has no role to play in resolving the claims set forth in the complaint. For these reasons and those set forth below, Kaczmarek's motion should be denied.

## *Factual Background*

What follows is a concise summary of the Complaint's most pertinent facts, as they pertain to Kaczmarek.

A.      *The Hampden County Case Against Rolando Penate*

On November 16, 2011, Plaintiff was charged with a number of drug-related offenses in Springfield District Court. (Compl. ¶ 125.) The substances giving rise to these charges were delivered to the Amherst Drug Lab and assigned to Sonja Farak (Farak) for testing. (*Id.* ¶¶ 110-15, 127, 143.) Each test Farak performed in Plaintiff's case purportedly came back positive for the presence of a controlled substance. (*Id.* ¶ 143.) The analysis of these substances took place on three different dates: December 22, 2011, January 6, 2012, and January 9, 2012. (*Id.* ¶ 142.) On the first of these dates, Farak memorialized her use of narcotics at the Amherst Drug Lab by making the following entry on a ServiceNet Diary Card: "tried to resist using @ work but ended

---

the absolute immunity doctrine."); *Marten v. Swain*, 242 F. Supp. 3d 744, 756, 757 (S.D. Ind. 2017) ("[P]roper focus" was not defendant's "prosecutorial role in the civil enforcement action" but "his function in the Martens' criminal cases" where he "acted not as a prosecutor but as an investigator and witness").

up failing." (*Id.* ¶¶ 144-46.)[4] At some point after December 26, 2011, Farak placed the completed Diary Card in the trunk of her automobile. (*Id.* ¶ 147.)

On February 1, 2012, the Hampden County District Attorney's office presented its case against Plaintiff to a Grand Jury. (*Id.* ¶ 160.) During this proceeding, an ADA introduced, as an exhibit, a copy of the drug certificate Farak signed on December 22, 2011, i.e., the same date she "tried to resist using @ work but ended up failing." (*Id.* ¶ 161.)

B.    *The Beginning of the Farak Criminal Investigation*

The charges against Plaintiff were pending on January 19, 2013, when AGO investigators obtained a warrant to search Farak's car and seized approximately 300 pages of paper, including the aforementioned ServiceNet Diary Card. (*Id.* ¶ 201.) Days later, during a more thorough review of these papers, lead investigator Joseph Ballou (Ballou) discovered the ServiceNet Diary Card, along with dozens of other documents related to Farak's treatment for a drug addiction. (*Id.* ¶ 203.) Ballou brought this documentation to the attention of other law enforcement officials including Kaczmarek and John Verner (Verner), the head of the AGO's Criminal Bureau. (*Id.* ¶ 204.) Ballou later attached copies of the ServiceNet Diary Card and other mental health worksheets to an email he sent Kaczmarek with the subject heading, "FARAK Admissions." (*Id.* ¶¶ 220-221.)

Kaczmarek, Ballou and others decided to deny the existence of this highly probative evidence by mischaracterizing Farak's mental health worksheets as "assorted lab paperwork." (*Id.* ¶¶ 205-211.) Kaczmarek and Ballou also agreed not to let the Farak investigation "get more complicated than [they] thought" by disregarding allegations of evidence tampering dating back

---

[4] For reasons that are not at all clear, Kaczmarek has attached a heavily redacted version of this document to her dismissal pleadings. While the ServiceNet Diary Card is central to Plaintiff's claim, the version Kaczmarek has furnished is not authentic, as it does not contain anything Farak wrote besides the dates. As the complaint makes clear, the text Farak supplied memorialized her use of drugs at the lab on the same day she reported testing a sample in Plaintiff's case.

to 2005. (*Id.* ¶¶ 212-219.) In addition, Kaczmarek advocated against a comprehensive review of the Amherst Drug Lab by falsely portraying Farak's place of employment as "a professional lab" in an email to an attorney at the Office of the Inspector General (OIG). (*Id.* ¶¶ 225-231.)

C.    *The Non-Disclosure of FARAK's Mental Health Worksheets to District Attorneys*

On or about March 27, 2013, Verner sent an identical letter to each of the Commonwealth's eleven District Attorneys; it began this way:

> This Office is investigating Sonja Farak, a chemist who conducted analysis of suspected narcotic samples out of the Amherst Drug Laboratory . . . . During our investigation, this Office has produced or otherwise come into possession of information, documents and reports. Pursuant to this Office's obligation to provide potentially exculpatory information to the District Attorneys as well as information necessary to your Offices' determination about how to proceed with cases in which related narcotics evidence was tested at the Amherst Laboratory, please find the below listed materials . . . .

(*Id.* ¶ 232.) None of the mental health worksheets in possession of the AGO were included in the materials provided to the District Attorneys. (*Id.* ¶ 233.)

On the same day Verner sent discovery packets to the District Attorneys, Kaczmarek completed a "Prosecution Memo" and submitted it to Verner and two other supervisors. (*Id.* ¶ 234.) The memo contained multiple references to the mental health worksheets seized from Farak's car and noted they had "not been submitted to the grand jury out of an abundance of caution," even though "[c]ase law" suggested "the paperwork [was] not privileged." (*Id.* ¶ 235.) When Verner reviewed the memo, he knew the mental health worksheets were not a part of the materials he had just distributed to the District Attorneys; he therefore hand-wrote a note to Kaczmarek on the prosecution memo reminding her this evidence had "NOT" been "turned over to DAs offices yet." (*Id.* ¶ 236.)

Verner entrusted Kaczmarek with considerable discretion in how to handle the Farak case. (*Id.* ¶ 237.) Kaczmarek decided the mental health worksheets should not be turned over to the

District Attorneys or any defendants seeking relief based on Farak's misconduct. (*Id.* ¶ 238.) When she disclosed the mental health worksheets to Farak's attorney, Kaczmarek said her office considered the documents to be "privileged" and promised they would not be furnished to any so-called "Farak defendants," like Plaintiff. (*Id.* ¶ 239.)

D.    *Plaintiff's Motion to Dismiss*

On July 15, 2013, Plaintiff filed a motion to dismiss. (*Id.* ¶ 242.) Hampden County Superior Court Judge Mary-Lou Rup issued an order on July 23, 2013, stating that:

> an evidentiary hearing must be conducted on the following issues: (1) if Ms. Farak and/or the Amherst drug lab engaged in egregious misconduct in the handling, storage, and analysis of suspected narcotics during the time period between November 2011 and January 2012, when the Amherst drug lab had custody and control of the alleged substances related to the defendant's case; (2) if such misconduct has substantially prejudiced the defendant or irreparably harmed his right to a fair trial; or (3) if such egregious misconduct was deliberate and intentional, warranting a prophylactic sanction of dismissal.

(*Id.* ¶ 243.)

Judge Rup's order reminded ADA Eduardo Velazquez (Velazquez) of his "obligation to seek [evidence] from government agencies (including the Office of the Attorney General) and to produce exculpatory evidence that may be favorable to [Plaintiff's] case, and not simply turn a blind eye to what is not in its immediate control." (*Id.* ¶ 244.) At this point, neither Plaintiff, Velazquez, nor Judge Rup knew the AGO possessed the mental health worksheets. (*Id.* ¶ 245.) Velazquez sought exculpatory evidence from the AGO and was told all relevant evidence had already been turned over. (*Id.* ¶ 246.)

On August 22, 2013, Plaintiff served Kaczmarek and Ballou with subpoenas to testify at the evidentiary hearing Judge Rup had ordered. (*Id.* ¶ 248.) These subpoenas directed Kaczmarek and Ballou to bring "Copies of any and all inter and intraoffice correspondence pertaining to the scope of evidence tampering and/or deficiencies at the Amherst Drug Laboratory from January 18,

2013 to the present." (*Id.* ¶ 249.) The email Ballou sent to Kaczmarek regarding "FARAK admissions" was among the undisclosed documents they possessed that would have been responsive to the subpoena. (*Id.* ¶ 250.)

Plaintiff's evidentiary hearing was originally scheduled to take place on August 27, 2013. (*Id.* ¶ 261.) It was postponed at the request of the AGO; the parties later agreed that the evidence adduced at a post-conviction proceeding before Superior Court Judge Kinder could be used to adjudicate Plaintiff's pre-trial motion to dismiss. (*Id.* ¶ 262.)

On the morning of September 3, 2013, KACZMAREK sent the following email to Verner and other AAGs:

> I [am] told that the judge wants to come to the bottom of the issues mentioned below making it unlikely he will allow a motion to quash. As long as the judge has set up the scope of the motion & I am confident that Ballou will be pretty unhelpful in what the judge is trying to do- do we just let Ballou go?

(*Id.* ¶ 266.)

During subsequent AGO meetings, Kaczmarek revealed that she and Ballou possessed undisclosed copies of Farak's mental health worksheets. (*Id.* ¶ 273.) Kaczmarek falsely claimed these documents were irrelevant to "Farak defendants" like Plaintiff and should not be produced given the fact that several contained information concerning Farak's health/medical/ psychological treatment. (*Id.* ¶ 274.)

E.    *Responding to the Order for an In Camera Review*

At the outset of the evidentiary hearing on September 9, 2013, Judge Kinder ordered Foster to review Ballou's file and submit copies of any undisclosed documents for an *in camera* review. (*Id.* ¶¶ 287-89.) The next morning, Foster sent an email to Verner, Kaczmarek and other AAGs informing them of Judge Kinder's order. (*Id.* ¶ 296.) Verner responded by posing one question to Kaczmarek and another to Foster. (*Id.* ¶ 298.) "Anne," Verner wrote, "can you get a sense from

Joe what is in his file? Emails etc? Kris, did the judge say his 'file' or did he indicate Joe had to

search his emails etc?" (*Id.* ¶ 299.) Kaczmarek answered:

> Joe has all his reports and all reports generated in the case. All photos and videos taken in the case. His search warrants and returns. Copies of the paperwork seized from her car regarding new[s] articles and her mental health worksheets.

(*Id.* ¶ 300.)

Foster said while it was unclear what Judge Kinder was "looking for . . . [,] Sergeant Ballou

did testify that he thinks everything in his file has already been turned over." (*Id.* ¶ 301.) Later

that morning, Kaczmarek compared Ballou's file to a "trial binder," and told Verner she had "asked

Ballou to come to Boston sometime this week so we/I can look at his file." (*Id.* ¶ 302.) When

Ballou arrived in Boston with his file, Kaczmarek noticed that he never printed out hard copies of

any of the mental health worksheets he scanned and sent to her as attachments to an email. (*Id.* ¶

303.) Kaczmarek decided to embrace an unduly restrictive interpretation of the term "file" and

advised Foster there was no need to produce any additional documents for Judge Kinder's in

camera review. (*Id.* ¶ 304.) On September 16, 2013, Foster wrote Judge Kinder a letter stating:

"After reviewing Sergeant Ballou's file, every document in his possession has already been

disclosed." (*Id.* ¶ 305.)

W. *Plaintiff's Efforts to Inspect the Evidence and Obtain Third Party Records*

On the same day Foster sent this letter, Plaintiff's counsel sent an email to Foster requesting

permission to inspect the evidence seized from FARAK's car. (*Id.* ¶ 309.) Foster forwarded the

email to Kaczmarek. (*Id.* ¶ 310.) In response, Kaczmarek wrote: "No. Why is this relevant to this

case. I really don't like him." (*Id.* ¶ 311.) Foster subsequently sent Plaintiff's counsel an email

conveying the AGO's position that the evidence seized from Farak's car was irrelevant to any case

but Farak's. (*Id.* ¶ 312.)

On October 1, 2013, Plaintiff filed a motion to inspect the physical evidence in the Farak case. (*Id.* ¶ 313.) The following day, Judge Kinder held a hearing on Plaintiff's discovery motions. (*Id.* at 321.) At this hearing, Foster repeated Kaczmarek's claim that the evidence seized from Farak's car was "irrelevant." (*Id.* ¶ 325.) With respect to the AGO's intra-office correspondence, Foster identified Ballou and Kaczmarek as "the people who wrote the most correspondence" and conveyed their claim that there was "nothing in it is outside, really, what has already been disclosed other than work product." (*Id.* ¶ 331.) The hearing concluded with Foster's representation that she had talked to Kaczmarek and Ballou and both assured her their correspondence contained "no smoking gun." (*Id.* ¶ 332.)

K. *Plaintiff's Conviction and Post-Conviction Relief*

Judge Kinder ultimately denied Plaintiff access to evidence in Kaczmarek's possession that memorialized misconduct by Farak on the same day she reported testing a sample in Plaintiff's case. (*Id.* ¶¶ 333-340.) This led to a finding that Farak's misconduct post-dated her handling of the substances in Plaintiff's case and a denial of Plaintiff's motion to dismiss. (*Id.* ¶¶ 341-342.) In December, 2013, Plaintiff was convicted of one count of Distributing a Class A Substance and received a five to seven year state prison sentence. (*Id.* ¶ 376-77.)

In the fall of 2014, an inspection of the evidence seized from Farak's car revealed the presence of the mental health worksheets. (*Id.* ¶ 383.) On May 21, 2015, Plaintiff filed a motion for a new trial. (*Id.* ¶ 386.) His case was once again consolidated with the post-conviction cases of nine other "Farak defendants." (*Id.* ¶ 387.)

Plaintiff and the other post-conviction defendants subsequently sought discovery of prosecutorial misconduct in the possession of the AGO. (*Id.* ¶ 391.) The AGO opposed the

production of such discovery. On April 29, 2016, the AGO filed a pleading that contained this passage:

> The defendants' proposed claim of prosecutorial misconduct based on actions by the Attorney General's Office fails for the very simple fact that the AGO is not the prosecutor of any of these cases. Certainly, the AGO prosecuted Sonja Farak; but this is not Farak's case. Instead, in these cases the AGO was a non-party from which the defendants previously sought expansive post-conviction discovery. In that capacity, the AGO was well supported by case law in presenting arguments opposing the proposed discovery requests, just as any other non-party might do.

(*Id.* ¶ 393.)

On January 10, 2017, Plaintiff's motion for a new trial was allowed with the assent of the Hampden County District Attorney's Office. In a 127-page decision issued on June 26, 2017, Judge Carey dismissed Plaintiff's conviction with prejudice. (*Id.* ¶ 395.) Among other things, Judge Carey found "Kaczmarek's and Foster's deliberate withholding of exculpatory evidence was particularly egregious in the Penate case" and "qualifies as a fraud upon the court." (*Id.* ¶ 396.)

*Pertinent Legal Principles*

"Section 1983, on its face admits of no defense of official immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993). The Supreme Court has "nevertheless ascertained and announced what it deemed to be the appropriate type of immunity from § 1983 liability in a variety of contexts." *Butz v. Economou*, 438 U.S. 478, 503 (1978) (citations omitted). "[A]bsolute immunity contravenes the basic tenet that individuals be held accountable for their wrongful conduct." *Westfall v. Erwin*, 484 U.S. 292, 295 (1988), *superseded by statute on other grounds*, Pub.L. No. 100-694, 102 Stat. 4563 (1988), *codified at* 28 U.S.C. § 2679(d). "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed*, 500 U.S. 478, 486-87 (1991); *see also Cleavinger v.*

*Saxner*, 474 U.S. 193, 202 (1985) (recognizing the "rare and exceptional character of absolute immunity").

Absolute immunity "is reserved for the 'special functions' of certain officials that resemble functions that would have been immune at common law when § 1983 was enacted." *Guzman-Rivera*, 55 F.3d at 29 (citations omitted). A defendant 'seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question.' *Id.* at 30 (quoting *Burns*, 500 U.S. at 486).[5] Unless a defendant can establish a clear-cut "application of the principle," she "simply loses." *Buckley*, 509 U.S. at 281 (Scalia, J., concurring). "[T]he relevant inquiry is the nature and function of the act, not the act itself[,]" *Mireles v. Waco*, 502 U.S. 9, 13 (1991) (Per Curiam) (quotation marks and citation omitted), or 'the identity of the actor who performed it,' *Buckley*, 509 U.S. at 269 (citation omitted).

## Argument

A.    *Kaczmarek Cannot Receive Absolutely Immunity for Conduct in a Prosecution Over Which She Had No Control.*

In *Kulwicki v. Dawson*, 969 F.2d 1454 (3rd Cir. 1992), the defendant was a District Attorney who brought charges against a political rival then "secured the appointment of a special prosecutor, Linda Barr, from a neighboring District Attorney's office." *Id.* at 1458-59. Seven months later, when Barr announced her intention to drop the charges, Dawson "prepared a letter to Barr regarding a confession Kulwicki had allegedly made to Dawson before Kulwicki's arrest . . . ." *Id.* at 1459. This correspondence persuaded Barr to reconsider her decision to abandon the prosecution. *Id.* After Kulwicki was acquitted and brought suit, Dawson raised the defense of absolute immunity. *Id.* at 1457. The Third Circuit rightly concluded that "Dawson was performing

---

[5] "In determining immunity," a court must "accept the allegations of [a] complaint as true." *Kalina v. Fletcher*, 522 U.S. 118, 122 (1997) (citing *Buckley*, 509 U.S. at 261).

a core prosecutorial function in causing [a subordinate] to file criminal charges against Kulwicki[]"
and therefore could not be held liable for this act, regardless of his "personal motives." *Id.* at 1464.

Alerting Barr to Kulwicki's supposed confession was another story. "Unquestionably,"
Judge Roth wrote, "Dawson's submission of false evidence would be absolutely immune . . . *if he
were prosecuting the case himself.*" *Id.* at 1467 (emphasis added).

> However, Dawson was no longer assigned to the case when the memorandum was
> submitted. . . . Dawson had no official control over Kulwicki's prosecution in May
> 1989, and was thus not acting in his prosecutorial role. Clearly, then, the district
> court was correct in concluding that Dawson's submission of the confession fell
> outside his quasi-judicial function as a prosecutor.

*Id.*

Here, Kaczmarek was never assigned to Plaintiff's case and had no official (or unofficial)
control of his prosecution. Like the defendant in *Dawson*, her alleged malfeasance did not occur
when she was acting in her prosecutorial role and thus fell outside her quasi-judicial function as a
prosecutor.

This conclusion is by no means inconsistent with *Reid v. State of New Hampshire*, 56 F.3d
332 (1st Cir. 1995), the First Circuit decision at the heart of Kaczmarek's (and Foster's) defense.
Plaintiff has no quarrel with Kaczmarek's recitation of *Reid*'s facts or the accuracy of the legal
determinations she has chosen to highlight. (*See* Def.'s Mem. of Law in Supp. of Mot. to Dismiss
at 12-13.) Indeed, the only thing missing from her summary of the opinion is Judge Cyr's
recognition that absolute immunity cannot be conferred to prosecutors when they are "not acting
as advocates for the State." *Reid*, 56 F.3d at 337 n.11.

This exception did not apply in *Reid* because the prosecutors who suppressed exculpatory
evidence and defied court orders were the same prosecutors entrusted with "initiating" the
plaintiff's prosecution and "presenting the State's case." *Imbler*, 424 U.S. at 431. The exception

does apply here because Kaczmarek and her colleagues in the AGO were "strangers to [Plaintiff's] prosecutorial process." *Goldstein*, 719 F.3d at 26.

B.   *Kaczmarek Can Be Held Liable for Failing to Disclose Exculpatory Evidence to the Prosecutor with Control Over Plaintiff's Prosecution.*

None of the other cases cited by Kaczmarek stand for the grand, categorical proposition that "the suppression of exculpatory evidence is protected by absolute immunity."[6]   On the contrary, one explicitly notes that unless an act "is considered with reference to context, it is impossible to classify functionally." *Warney*, 587 F.3d at 123.   The context for all successful prosecutorial invocations of absolute immunity is activity undertaken to obtain or defend convictions. *See id.* at 122.[7]   As previously noted, when prosecutors have pursued absolute immunity for misconduct perpetrated in parallel or "derivative" proceedings, their efforts have been unsuccessful. *See supra* note 3.

Here in the First Circuit, while "the responsibility for obtaining and disclosing . . . evidence remains the duty of the prosecutor, . . . law enforcement officers have a correlative duty to turn over to the prosecutor any material evidence that is favorable to a defendant." *Drumgold v.*

---

[6] (Def.'s Mem. of Law in Supp. of Mot. to Dismiss at 13 (citing *Imbler*, 424 U.S. at 430; *Van de Kamp*, 555 U.S. at 342-43; *Yarris v. County of Delaware*, 465 F.3d 129, 137 (3d Cir. 2006); *Peay v. Ajello*, 470 F.3d 65, 67-68 (2d Cir. 2006); *Broam v. Bogan*, 320 F.3d 1023, 1030 (9th Cir. 2003); *Warney v. Monroe County*, 587 F.3d 113, 125 (2d Cir. 2009); *Jones v. Shankland*, 800 F.2d 77, 80 (6th Cir. 1986).)

[7] *See also Imbler*, 424 U.S. at 410 (trial prosecutor "acted within the scope of his duties in initiating and pursuing a criminal prosecution"); *Van de Kamp*, 555 U.S. at 344, 345 (immunizing all "prosecutors in a single office" predicated on an "individual prosecutor's error in the plaintiff's specific criminal trial"); *Yarris*, 465 F.3d at 137 (county prosecutors who convicted plaintiff of capital offense "absolutely immune from claims based on allegations that they 'intentionally concealed' exculpatory evidence *prior* to trial." (emphasis in original) (citation omitted)); *Peay*, 470 F.3d at 68 ("[C]laims against Ajello, which encompass activities involving the initiation and pursuit of prosecution, are foreclosed by absolute prosecutorial immunity[.]"); *Broam*, 320 F.3d at 1032 ("Appellants accuse . . . the prosecutor who presented the evidence against them at trial of violating their federal constitutional rights."); *Jones*, 800 F.2d at 78-80 (awarding absolute immunity to district attorney and his subordinates who presented the state's case against the plaintiff at his criminal trial).

14

*Callahan*, 707 F.3d 28, 38 (1ˢᵗ Cir. 2013) (quotation marks and citations omitted). When Kaczmarek failed to perform this "standard police function," *Brady v. Dill*, 187 F.3d 104, 114 (1999) (citations omitted), she exposed herself to civil liability.

In doing so, she was hardly alone. The complaint alleges that two other AAGs and three MSP troopers assigned to the AGO also knew the mental health worksheets had been mischaracterized as "assorted lab paperwork" and kept from District Attorneys. Granting Kaczmarek and her fellow AAGs absolute immunity for their suppression of this evidence while denying the same protection to the troopers who engaged in the same misconduct would be "incongruous." *Burns*, 500 U.S. at 491. As the Supreme Court has held, "it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Buckley*, 509 U.S. at 273 (quotation marks and citation omitted).

C.    *Kaczmarek Can Be Held Liable for Instructing Others to Suppress Exculpatory Evidence in Defiance of Court Orders.*

As noted above, Kaczmarek not only failed to disclose the ServiceNet Diary Card and other exculpatory mental health worksheets to Plaintiff's prosecutor; she conspired to defy Judge Kinder's order demanding the production of this evidence for an *in camera* inspection.[8] Kaczmarek begins her defense of this misconduct from a familiar, faulty premise.[9] She then accuses Plaintiff of "attempt[ing] to 'plead around' the legal deficiency" of his position "by suggesting that Ms. Kaczmarek served 'only' as a third party witness in the Penate prosecution,

---

[8] Kaczmarek also mischaracterized the nature of her correspondence as "work product"; misrepresented the evidence seized from Farak's trunk as "irrelevant"; and treated the subpoenas she and Ballou received like "an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase." *United States v. Bryan*, 339 U.S. 323, 331 (1951).

[9] (*See* Def.'s Mem. of Law in Supp. Mot. to Dismiss at 16 ("[T]he legal analysis is no different whether Ms. Kaczmarek allegedly failed to turn over exculpatory materials during the course of the Farak prosecution or by allegedly failing to comply with a court order in the Penate prosecution.").)

no different than any other witness called upon to produce documents." (Def.'s Mem. of Law in Supp. of Mot. to Dismiss at 16 (citing Compl. ¶ 436.) According to her, this "conclusory allegation . . . is not entitled to any weight" – particularly since it was "made only once in the 464-paragraph Complaint." (*Id.* at 16 n.5 (citing Compl. ¶ 436.)

This argument mirrors one previously offered by Foster[10] and warrants the same response. The foundation for Paragraph 436 is an AGO pleading Plaintiff quotes in Paragraph 393. In that pleading, the AGO described itself as "a non-party" in Plaintiff's case and the cases of other Farak defendants. (Compl. ¶ 393.) "In that capacity," the AGO claimed it was "well supported by case law in presenting arguments opposing the proposed discovery requests, *just as any other non-party might do*." (*Id.* (emphasis added).)

Kaczmarek does eventually concede her status as a "third party" in Plaintiff's prosecution but clings to the notion that she was no "ordinary" one. (Def.'s Mem. of Law in Supp. of Mot. to Dismiss at 16 (citing Compl. ¶ 436.) The implication here seems to be that whereas ordinary third parties may be held liable for suppressing exculpatory evidence, *extraordinary* ones may not. Suffice it to say, no case or common law tradition supports this contention.

How Kaczmarek came to possess the exculpatory evidence at issue is inconsequential. In *Lampton v. Diaz*, 639 F.3d 223 (5th Cir. 2011), a federal prosecutor assigned to prosecute a Mississippi Supreme Court justice for tax evasion acquired the judge's "tax records . . . during the criminal investigation." *Id.* at 225. When he later provided these records to a commission on judicial performance, the judge sued claiming this disclosure violated various federal statutes. The prosecutor moved to dismiss on the basis of absolute immunity. Like Kaczmarek, he pointed out

---

[10] (*See* Dkt. No. 54, Mem. in Supp. of Foster's Mot. to Dismiss at 7 (characterizing the allegations set forth in paragraph 436 as "conclusory" and therefore devoid of any "well-pleaded fact").

"that he would not have had access to the tax records were it not for his role as a prosecutor[.]" *Id.* at 227. This made no difference to the Fifth Circuit. It held that a "prosecutor does not have *carte blanche* to do as he pleases with the information he can access." *Id.*

Kaczmarek's next contention is that her conduct was "prosecutorial in nature" because she was "compelled to classically exercise her discretion, based on her analysis and experience." (Def.'s Mem. of Law in Supp. Mot. to Dismiss at 17.) Clearly, the plot to deceive Judge Kinder about the contents of her correspondence, Farak's car, and Ballou's file was not carried out by "ministerial" acts.[11] But that does not mean this conduct "lie[s] within the protected area." *Harlow v. Fitzgerald*, 457 U.S. 800, 813 (1982).

In *Filler v. Hancock County*, No. 15-cv-00048-JAW, 2016 WL 335858 (D. Me. Jan. 27, 2016), the plaintiff served a police sergeant with a subpoena *duces tecum* for a civil proceeding related to his divorce. *Id.* at *7. The sergeant subsequently arrived at this civil hearing with the subpoenaed documents but refused to produce them pursuant to an instruction from an ADA who was prosecuting the plaintiff in a pending criminal case. *Id.* Years later when the exculpatory nature of these (and other undisclosed) materials came to light, the ADA claimed there was a "functional equivalence between her failing to turn over discoverable evidence and her advising

---

[11] This is one of a number of straw men Kaczmarek (and Foster) erect for purposes of knocking down. (*See, e.g.* Def.'s Mem. of Law in Supp. Mot. to Dismiss at 15 (refuting purported claim that a "prosecutor's state of mind . . . has . . . bearing on the [absolute immunity] analysis"); Dkt. No. 83, Reply Mem. of Foster in Supp. of Mot. to Dismiss at 1 (characterizing Plaintiff's "basic position" as: "If she's a prosecutor, she's immune. If she's not a prosecutor, she's not immune.").) Just to be clear: allegations concerning Kaczmarek's state of mind are set forth in the complaint not because they are relevant to the absolute immunity analysis but because it is incumbent upon a civil rights plaintiff to show that the government actor was not merely negligent. *See Daniels v. Williams*, 474 U.S. 327, 328, 330-31 (1986). Absolute immunity is also available for "agency officials performing . . . functions analogous to those of a prosecutor," like "initiat[ing] administrative proceedings." (Dkt. No. 74, Pl.'s Opp'n to Foster's Mot. to Dismiss at 15 (citing *Butz v. Economou*, 438 U.S. 478, 515 (1978); *Moniz v. Hall*, 2011 WL 487833 (D. Mass. Feb. 7, 2011)).)

another to do the same." *Id.* at *10. Judge Woodcock disagreed and refused her request for absolute immunity. *Id.* at *23-24.

On appeal, the ADA cited *Reid* for the proposition that prosecutors may not be held personally liable for misleading "the trial court in order to conceal their failure to disclose exculpatory evidence." *Filler*, 859 F.3d at 154 (quoting *Reid*, 56 F.3d at 336). The First Circuit dismissed the appeal. In remanding the case for the development of additional facts, Judge Barron strongly implied that the ADA was not functioning as a prosecutor when she instructed the sergeant to defy a subpoena to produce documents at a civil hearing. *Id.*

Kaczmarek's last non-public policy argument attempts to piggyback upon Foster's immunity claim.[12] Her thinking seems to be that if the preparation of pleadings and court appearances entitle Foster to absolute immunity for her "advocacy on behalf of the state," then Kaczmarek ought to enjoy the same immunity to protect "the proper functioning of the office." (Def.'s Mem. of Law in Supp. Mot. to Dismiss at 18 (quoting *Van de Kamp*, 555 U.S. at 345).)

The first problem with this argument is that "[p]rosecutorial conduct is absolutely immune *only* if it is 'intimately associated with the judicial phase of the criminal process." *Guzman-Rivera*, 55 F.3d at 29 (emphasis in original). "[A] prosecutor's conduct is not intimately associated with the judicial phase of the criminal process merely because it" (or some of it) "takes place in a courtroom." *Loupe v. O'Bannon*, 824 F.3d 534, 540 n.4 (2d Cir. 2016). As the First Circuit recently made clear, "a prosecutor has absolute immunity when functioning as an 'advocate' for the state '*in initiating a prosecution and in presenting the State's case*' . . . because *that conduct* is 'intimately associated with the judicial phase of the criminal process.'" *Filler*, 859 F.3d at 153

---

[12] Kaczmarek "refers to and incorporates the arguments made in Foster's motion to dismiss (and her reply brief) concerning the applicability of prosecutorial immunity." (Dkt. No. 87, Kaczmarek's Mem. of Law in Supp. of Mot. to Dismiss at 18 n.6.) Plaintiff therefore refers to and incorporates the arguments made in opposition to Foster's motion. (*See* Dkt. No. 74, Pl.'s Opp'n to Foster's Mot. to Dismiss.)

(emphasis added) (quoting *Imbler*, 424 U.S. at 430-31). Foster's conduct - representing witnesses and third-party evidence custodians – is nowhere near "the heart of what it means to be 'advocate for the State.'" *Harrington v. Almy*, 977 F.2d 37, 42 n.3 (1ˢᵗ Cir. 1992) (citation omitted).

A second problem stems from the characterization of Foster's personal letter to Judge Kinder as a "motion paper." This factually false and purposefully vague document began with a salutation, ended with a complimentary close, referenced no case number or docket number, and did not contain Foster's Board of Bar Oversees Number. (Compl. ¶¶ 305-306.) The fact that Foster later vouched for the accuracy of her letter in court does not "retroactively transform" engaging in this correspondence into an immunized act. *Buckley*, 509 U.S. at 276.

Finally, one need look no further than the first sentence of the *Van de Kamp* passage Kaczmarek cites to perceive its inapplicability. "*Decisions about indictment or trial prosecution will often involve more than one prosecutor within an office.*" 555 U.S. at 345 (emphasis added). At this point, it should go without saying that no one within the AGO made any decisions about Plaintiff's indictment or trial prosecution.

D.    *No Court Possesses the Power to Extend the Doctrine of Absolute Immunity in the Name of Public Policy.*

Kaczmarek concludes her brief by raising the possibility that others might seek to hold her accountable. In her view, "[e]xposing a prosecutor to civil liability" for failing "to turn exculpatory materials over to each one of the thousands of Farak Defendants" would "necessarily impact how the AG would perform her function (if not compel her to resist participating in any such prosecution at all)." (Kaczmarek's Mem. of Law in Supp. of Mot. to Dismiss at 20.)

In *Tower v. Glover*, 467 U.S. 914 (1984), a criminal defendant whose robbery conviction was affirmed on appeal sued his court-appointed trial and appellate attorneys for their alleged conspiracy with "various state officials." *Id.* at 918. When the case finally made its way to the

Supreme Court, the petitioners argued that exposing public defenders to civil liability could "deter counsel from engaging in activities that require some degree of cooperation with prosecutors — negotiating pleas, expediting trials and appeals, and so on." *Id.* at 922. This, in turn, could negatively impact "the State's attempt to meet its constitutional obligation to furnish criminal defendants with effective counsel" while simultaneously flooding "federal courts . . . with frivolous lawsuits." *Id.*[13] While the Court characterized these concerns as "well founded," it declined the petitioners request for absolute immunity. *Id.*

> We do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy. It is for Congress to determine whether § 1983 litigation has become too burdensome to state or federal institutions and, if so, what remedial action is appropriate.

*Id.* at 922-23.

In short, Kaczmarek's invitation to "make a freewheeling policy choice" is not one this Court can accept. *Malley v. Briggs*, 475 U.S. 335, 342 (1986). "When, as here, the prosecutorial function is not within the advocate's role and there is no historical tradition of immunity on which [to] draw, [the] inquiry is at an end." *Filler*, 859 F.3d at 153 (quoting *Buckley*, 509 U.S. at 268).

## Conclusion

For the reasons set forth above, Anne Kaczmarek's Motion to Dismiss should be denied.

---

[13] "At least the evil of vexatious and frivolous lawsuits is not a concern in this case . . . ." *Filler*, 2016 WL 335858 at *23. While Kaczmarek and Foster may continue to deny any wrongdoing, their misconduct is "undisputed" in ongoing state court proceedings. *See Committee for Public Counsel Services v. Attorney General*, No. SJ-2017-347, at *1 (Jan. 26, 2018) (Gaziano, J.).

Respectfully Submitted,
THE PLAINTIFF,

By   /s/ Luke Ryan
LUKE RYAN, BBO#664999
SASSON, TURNBULL, RYAN & HOOSE
100 Main Street, Third Floor
Northampton, MA 01060
(413) 586-4800
lryan@strhlaw.com

## CERTIFICATE OF SERVICE

    I, LUKE RYAN, hereby state that the foregoing was filed through the ECF system and electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on February 12, 2018. A paper copy of this pleading was also sent via first-class mail to Defendant Sonja Farak at P.O. Box 162, Hatfield, MA 01038.

    /s/ Luke Ryan, Esq.
BBO#664999
Sasson, Turnbull, Ryan & Hoose
100 Main Street, 3rd floor
Northampton, MA 01060
(413) 586-4800
lryan@strhlaw.com