# EXHIBIT 29

1     UNITED STATES DISTRICT COURT
      DISTRICT OF MASSACHUSETTS

2

3 - - - - - - - - - - - - - - - - - - x

4 DAVID JONES,       :

5    Plaintiff,     :  Civil Action No.
             1:13-cv-11196-MGM

6   v.        :

7 LINDA HAN, et al.,    :

8    Defendants.    :

9 - - - - - - - - - - - - - - - - - - x

10

11  BEFORE THE HONORABLE MARK G. MASTROIANNI, DISTRICT JUDGE

12        JURY TRIAL

13

       Wednesday, March 9, 2016
14        2:08 p.m.

15

    John J. Moakley United States Courthouse
16       Courtroom No. 8
       One Courthouse Way
17      Boston, Massachusetts

18

19      Rachel M. Lopez, CRR
      Official Court Reporter
20    One Courthouse Way, Suite 5209
     Boston, Massachusetts  02210
21      raeufp@gmail.com

22

23

24

25

```
1    A P P E A R A N C E S

2    On behalf of the Plaintiff:

3         BY:  MICHAEL L. TUMPOSKY
          HEDGES & TUMPOSKY, LLP
4         15 Broad Street
          Boston, MA 02109
5         617-722-8220
          Email:  tumposky@htlawyers.com
6
          BY:  JESSICA DIANE HEDGES
7         HEDGES & TUMPOSKY, LLP
          Suite 600
8         50 Congress Street
          Boston, MA 02109
9         617-722-8220
          Email:  hedges@htlawyers.com
10

11   On behalf of Defendant Han:

12        BY:  PAUL V. KELLY AND SARAH B. HERLIHY
          JACKSON LEWIS, PC
13        75 Park Plaza
          4th Floor
14        Boston, MA 02116
          617-367-0025
15        Email:  paul.kelly@jacksonlewis.com

16
17   On behalf of Defendant Nassif:

18        BY:  PAUL V. MARINO AND ROBERT N. LAUNIE
          LAUNIE & MARINO, PA
19        1200 East Street
          Westwood, MA 02090
20        781-326-9213
          Email:  PaulMarinoLaw@aol.com

21
22   On behalf of Defendant Salemi:

23        BY:  MICHAEL J. GRACE
          RAIPHER D. PELLEGRINO ASSOCIATES, P.C.
24        4 Longfellow Place, 35th Floor
          Boston, MA 02114
25        617-904-7778
          Email:  mjg@rdpalaw.com
```

# TABLE OF CONTENTS

## TRIAL WITNESSES

On behalf of the Plaintiff:                                    Page

    LINDA HAN

        By Mr. Tumposky                                   6

        By Ms. Herlihy                                   42


On behalf of Defendant Nassif:                                 Page

    JULIANNE NASSIF

        By Mr. Marino                                    76

## MISCELLANEOUS

                                        Page

    Motion for Directed Verdict                      51

    Opening Statement by Mr. Launie                  72

1            **P R O C E E D I N G S**

2                **(In open court.)**

3            THE COURT:  Can I see counsel at sidebar.

02:08:03  4       During the lunch break, was everyone able to

02:08:05  5   follow my instructions not to talk to anyone about the case,

02:08:09  6   or do any deliberations or research, or go on the Internet

02:08:09  7   in any way, shape, or form about the case.

02:08:09  8            THE JURY:  (Negative responses.)

02:08:12  9            THE COURT:  Is there any issues that anyone

02:08:14 10   needs to talk to me about?

02:08:16 11            THE JURY:  (Negative responses.)

02:08:17 12            THE COURT:  You're going to get a complex.

02:10:05 13       (The following discussion held at the bench.)

02:10:05 14            THE COURT:  All right.  How did you guys do

02:10:08 15   on the lunch about this issue of examining the witnesses?

02:10:11 16            MR. TUMPOSKY:  Perhaps I overstated it

02:10:14 17   somewhat, Your Honor.  I think the issue is sort of getting

02:10:17 18   two direct examinations.  In other words, if they -- they

02:10:20 19   can do their direct after I do my direct, if I do an adverse

02:10:27 20   direct.

02:10:27 21            THE COURT:  So you do your adverse direct,

02:10:29 22   they cross.

02:10:30 23            MR. TUMPOSKY:  Right.  But they can't go

02:10:32 24   beyond the scope, I would argue, of what I brought out,

02:10:35 25   unless they're doing their direct.  It wouldn't seem they

4

| | | |
|---|---|---|
| 02:10:39 | 1 | get two cracks at: What's your education, what's your |
| 02:10:41 | 2 | training. |
| 02:10:41 | 3 | THE COURT: Yeah. |
| 02:10:42 | 4 | MR. TUMPOSKY: That would be my position. |
| 02:10:45 | 5 | THE COURT: Come on in. |
| 02:10:47 | 6 | Yeah, I think that's fair. I think you can do |
| 02:10:49 | 7 | your adverse direct, you do a cross. And you reserve your |
| 02:10:53 | 8 | right to call these people again, but not to go over the |
| 02:10:56 | 9 | same thing. |
| 02:10:58 | 10 | MR. KELLY: Right. |
| 02:10:59 | 11 | THE COURT: That sounds fair to me. |
| 02:11:01 | 12 | MR. GRACE: That's what we intended. |
| 02:11:03 | 13 | MR. KELLY: And I think the crosses will be |
| 02:11:05 | 14 | relatively confined and brief, Your Honor. |
| 02:11:07 | 15 | THE COURT: That does sound reasonable. |
| 02:11:09 | 16 | MR. TUMPOSKY: That's fine, Your Honor. |
| 02:11:10 | 17 | THE COURT: All right. Good. |
| 02:11:26 | 18 | (Bench conference concluded.) |
| 02:09:48 | 19 | THE COURT: Okay. Jarrett, you can have |
| 02:09:52 | 20 | these back. |
| 02:10:12 | 21 | THE DEPUTY CLERK: Thank you. |
| 02:10:13 | 22 | THE COURT: Whenever you're ready. |
| 02:10:16 | 23 | MR. TUMPOSKY: The plaintiff calls Linda Han. |
| 02:10:29 | 24 | (The witness was duly sworn.) |
| 02:10:36 | 25 | THE DEPUTY CLERK: Please state you full |

5

02:10:37 1    name, spelling your last.

02:10:40 2              THE WITNESS:  Linda Han, H-a-n.

02:10:40 3                          **LINDA HAN**

02:10:52 4         having been duly sworn, testified as follows:

02:10:52 5         **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

02:10:52 6    BY MR. TUMPOSKY:

02:10:54 7         Q.   Good afternoon, Dr. Han.

02:10:57 8         A.   Good afternoon.

02:10:58 9         Q.   In the time period of 2009, or 2008 to 2012, you

02:11:05 10   were the director of the State Laboratory Institute,

02:11:09 11   correct?

02:11:10 12        A.   2009 to 2010, I was acting director of the State

02:11:15 13   Laboratory.  From 2010 to 2012, I was the actual director

02:11:20 14   of the Bureau of Laboratory Sciences.

02:11:23 15        Q.   And one of your roles as the director of the

02:11:27 16   Bureau of Laboratory Sciences was to oversee the Hinton drug

02:11:31 17   lab, correct?

02:11:34 18        A.   That's correct.

02:11:38 19        Q.   Directly below you was Ms. Nassif, correct?

02:11:44 20        A.   Yes.

02:11:44 21        Q.   And she was in charge of analytical chemistry?

02:11:51 22        A.   Yes.

02:11:51 23        Q.   And one of the labs that she was in charge of was

02:11:55 24   also the Hinton drug lab?

02:12:00 25        A.   Yes.

02:12:00 1     Q.   And so she reported to you.

02:12:00 2     A.   Yes.

02:12:00 3     Q.   And Mr. Salemi reported to Ms. Nassif?

02:12:04 4     A.   That's correct.

02:12:04 5     Q.   Now, as a -- as the head of the State Laboratory

02:12:09 6  Institute, you had certain responsibilities as it related to

02:12:13 7  the drug lab, right?

02:12:15 8     A.   Yes.

02:12:15 9     Q.   It was your job to make sure that all the labs

02:12:21 10  under your purview ran smoothly?

02:12:24 11     A.   Yes.

02:12:25 12     Q.   And that they were run with integrity.

02:12:28 13     A.   Yes.

02:12:29 14     Q.   And that the processes followed in the lab were

02:12:34 15  scientific, right?

02:12:35 16     A.   That's correct.

02:12:36 17     Q.   And it was important that the lab -- the labs

02:12:41 18  under your purview be accurate?

02:12:43 19     A.   That's correct.

02:12:44 20     Q.   And so part of your responsibility, then, is to

02:12:47 21  make sure that the people who are working for you are doing

02:12:50 22  their job?

02:12:51 23     A.   That's correct.

02:12:52 24     Q.   So you have to make sure that Ms. Nassif is

02:12:56 25  performing her role correctly.

02:12:58 1     A.   That's correct.

02:12:59 2     Q.   And you would be responsible for making sure that

02:13:02 3 Mr. Salemi is performing his role correctly?

02:13:06 4     A.   Yes.  We had an organizational structure.

02:13:09 5     Q.   Right.  And so as the director of the lab, you are

02:13:12 6 responsible for making sure that all of the employees of the

02:13:16 7 drug lab are doing what they're supposed to be doing.

02:13:20 8              MR. MARINO:  Objection, Your Honor.  I think

02:13:22 9 it's leading.

02:13:24 10              THE COURT:  Yeah, it is leading.  You called

02:13:28 11 this witness, adverse witness.  I may allow some leading,

02:13:35 12 but let's see where it goes with just your regular direct

02:13:39 13 exam first.

02:13:40 14              MR. TUMPOSKY:  Your Honor, could I be heard

02:13:42 15 on that?

02:13:43 16              THE COURT:  No.

02:13:47 17 BY MR. TUMPOSKY:

02:13:47 18     Q.   Was your role to make sure that all the chemists

02:13:57 19 were doing their job?

02:13:58 20     A.   I had the responsibility for the entire Bureau

02:14:00 21 of Laboratory Sciences, the 120 or so people, and wanted

02:14:03 22 to make sure that at all times they were doing what they

02:14:08 23 were supposed to be doing.

02:14:11 24     Q.   The lab had some policies, right?

02:14:14 25     A.   Yes.

02:14:17 1    Q.   And you're familiar with these?

02:14:19 2    A.   Yes.

02:14:19 3    Q.   And the policies that were in effect in 2009/2010,

02:14:28 4  when were those drafted?

02:14:29 5    A.   They were originally dated 2004.  And my

02:14:36 6  understanding is it was a living document and an ongoing

02:14:40 7  work in progress, to be updated as changes occurred.

02:14:43 8    Q.   Was there ever any formal review and updating of

02:14:47 9  the policies after 2004?

02:14:49 10    A.   I'm not -- I don't know.

02:14:51 11    Q.   And the policies in 2004 were -- made reference to

02:14:59 12  another organization; is that right?

02:15:02 13    A.   Yes.

02:15:03 14    Q.   And they referred specifically to the Scientific

02:15:06 15  Working Group for the analyses of these drugs?

02:15:13 16    A.   Yes.

02:15:13 17    Q.   And the policies of the lab were supposed to

02:15:17 18  adhere to the requirements of the Scientific Working Group,

02:15:21 19  right?

02:15:21 20    A.   They were consistent with the SWG Group.  I

02:15:25 21  don't know if all of the practices were a good fit for

02:15:30 22  what activities were taking place in the laboratory.

02:15:34 23    Q.   Right.  Because, in fact, the SWG, Scientific

02:15:42 24  Working Group policies were supposed to be minimum

02:15:47 25  standards, right?

02:15:47 1      A.   I don't know.

02:15:48 2      Q.   And the lab was supposed to have policies above

02:15:51 3   and beyond what the Scientific Working Group recommended.

02:15:55 4      A.   There's often modifications to account for

02:16:00 5   specific -- the specific setting of each laboratory.

02:16:04 6      Q.   Right.  So it's not enough, you would agree, just

02:16:07 7   to say, "Our policies incorporate SWG drugs," right?

02:16:14 8      A.   I understand that our policies were based on the

02:16:17 9   SWG drug.

02:16:18 10      Q.   And do you believe that there were certain

02:16:21 11   policies that you had that were in direct conflict with SWG

02:16:25 12   drug?

02:16:26 13      A.   I'm -- I don't know.

02:16:27 14      Q.   All right.  Did you have a part in crafting and

02:16:32 15   formulating the policies at the drug lab?

02:16:35 16      A.   I did not.

02:16:36 17      Q.   Whose responsibility was that?

02:16:39 18      A.   That would go to the subject matter experts, the

02:16:44 19   supervisors and the --

02:16:45 20      Q.   And who are you referring to when you say that?

02:16:48 21      A.   If I had a question about drug operations, my

02:16:51 22   first stop would be with Julie Nassif.  Chuck Salemi has

02:16:59 23   also been a valuable resource with respect to his

02:16:59 24   knowledge of the laboratory operations.

02:17:02 25      Q.   Okay.  Because you, yourself, don't have a

02:17:04 1    background in drug testing, right?

02:17:07 2        A.   That's correct.

02:17:07 3        Q.   You don't have a background in forensic chemistry?

02:17:12 4        A.   Not at all.

02:17:15 5        Q.   So Ms. Nassif and Mr. Salemi, they were

02:17:18 6    responsible for making the written policies?

02:17:20 7        A.   Yes.

02:17:20 8        Q.   Are you familiar with the term "accreditation"?

02:17:28 9        A.   Yes.

02:17:28 10       Q.   What does that mean to you?

02:17:30 11       A.   To me, it means you, as an organization, would

02:17:38 12   meet a series of requirements and standards set forth by

02:17:45 13   an agency as a standard for the industry.

02:17:52 14       Q.   And the William A. Hinton drug lab was not

02:17:59 15   accredited; is that correct?

02:18:02 16       A.   That's correct.

02:18:03 17       Q.   And one of the reasons for that was because the

02:18:05 18   policies weren't sufficiently robust?

02:18:09 19       A.   The primary reason for lack of accreditation was

02:18:13 20   resources.  Ms. Nassif was an ardent supporter of

02:18:17 21   accreditation, and I supported her interest in bringing on

02:18:21 22   as many elements of accreditation as we could, given the

02:18:26 23   funding available.

02:18:40 24       Q.   And accreditation would have cost between ten and

02:18:44 25   $25,000 per year, right?

02:18:46  1        A.   I don't believe that was the total cost of

02:18:48  2   accreditation.  In my other -- we had another laboratory

02:18:53  3   in the building that was seeking accreditation in that

02:18:57  4   time frame, and we were only able to even consider it on

02:19:01  5   the basis of our having successfully earned grant funding

02:19:05  6   from a federal source for over a million dollars.

02:19:09  7        Q.   So if you had grant funding, you could then move

02:19:12  8   to accreditation?

02:19:13  9        A.   Yes.  In that instance, of that particular

02:19:16 10   laboratory, we were able to proceed with accreditation.

02:19:19 11        Q.   Right.  But as far as this particular laboratory,

02:19:22 12   the cost for obtaining accreditation would have been between

02:19:26 13   ten and $25,000 per year?

02:19:28 14        A.   No.  I'm not exactly sure how much it costs, but

02:19:32 15   that is a very small amount of money.

02:19:35 16        Q.   And can you tell us what benefits accreditation

02:19:42 17   would provide?

02:19:43 18        A.   You could -- it's an indicator of laboratory

02:19:52 19   quality.  It's a benchmark.  You can say, "We are

02:19:57 20   accredited."  It gives you confidence.  People have

02:19:59 21   enhanced confidence in the result.  It's just like a

02:20:02 22   credential.

02:20:03 23        Q.   What about the other labs in your -- under your

02:20:05 24   purview?  Are they accredited?

02:20:08 25        A.   So we were primarily a diagnostic laboratory,

02:20:13  1    performing diagnostic testing on patient samples for

02:20:18  2    management of patients.  And there's not really -- the

02:20:23  3    standard in the industry is -- is not -- I don't know that

02:20:26  4    it would be called accreditation, but it was certification

02:20:31  5    through the CLIAA, is what it was called, Clinical

02:20:35  6    Laboratory Improvement Amendments Act, but just commonly

02:20:40  7    known as CLIAA regulations.  We complied with those for

02:20:46  8    all testing relating to human patients.

02:20:48  9        Q.   But isn't it true, Doctor, that every other lab

02:20:53 10    for which accreditation was available, actually was

02:20:56 11    accredited, except for the drug lab?

02:20:58 12        A.   We were working on accreditation for the food

02:21:03 13    laboratory, at the time of my departure from the

02:21:06 14    laboratory.

02:21:06 15        Q.   But as far as the other labs, virtually every

02:21:09 16    other lab that had accreditation available to it was, in

02:21:12 17    fact, accredited.

02:21:14 18        A.   I'm not sure if there might have been some

02:21:17 19    outliers, where we didn't -- so all the laboratories

02:21:20 20    performing tests on human patients were -- fell under

02:21:24 21    either the College of American Physicians cap

02:21:29 22    accreditation, and that was accreditation.  The remainder

02:21:32 23    fell under the CLIAA regulations.  And then we had a

02:21:37 24    handful of laboratories that were not specifically related

02:21:39 25    to human testing.  And I'm not sure, for example, the

02:21:42  1    rabies laboratory, whether there isn't some sort of

02:21:45  2    national standard, but we did not have any rabies

02:21:49  3    laboratory accreditation.

02:21:51  4        Q.   And what accreditation provides is a means for

02:21:55  5    continuous quality assurance and improvement, right?

02:22:02  6                MS. HERLIHY:   Objection.   Asked and answered.

02:22:03  7                THE COURT:   No, he can have it.

02:22:05  8    BY MR. TUMPOSKY:

02:22:06  9        Q.   Isn't that what it provides, among other things,

02:22:08 10    it provides a continuous -- a means for continuous quality

02:22:11 11    assurance and improvement, right?

02:22:12 12        A.   It's a nice benchmark to have for your program.

02:22:15 13        Q.   And you get to -- reviewed externally by an

02:22:20 14    independently accredited body, right?

02:22:20 15        A.   Yes, that is an advantage.

02:22:21 16        Q.   And it makes sure that -- the body makes sure

02:22:23 17    you're complying with best practices in the industry?

02:22:28 18        A.   Yes.

02:22:28 19        Q.   And it wasn't until -- you say you began working

02:22:39 20    on accreditation just at the time that you were leaving?

02:22:42 21        A.   For the food laboratory.   That's when the grant

02:22:46 22    funding was offered.

02:22:47 23        Q.   For the food laboratory, excuse me.   But in no

02:22:50 24    time were you actually working towards accreditation for the

02:22:55 25    drug lab.

02:22:55 1    A.   No.  We didn't have the funding for it.

02:22:58 2  Occasionally Julie would say, "Okay.  Here's an element

02:23:01 3  that we could institute in anticipation of some day" --

02:23:05 4  it's always, I think, useful to see what the standards are

02:23:08 5  and to see if there are any steps that we can make in the

02:23:11 6  right direction, given the resources that we had

02:23:13 7  available.

02:23:15 8    Q.   So I want to shift gears a little bit and talk to

02:23:19 9  you about the backlog at the lab.  Now, you mentioned that

02:23:28 10  there were budgetary concerns that prevented you from doing

02:23:32 11  everything that you wanted to do?

02:23:34 12    A.   Yes.

02:23:35 13    Q.   Now, there was, essentially, a waiting list of

02:23:40 14  samples that needed to be tested, right?

02:23:42 15    A.   Yes.

02:23:43 16    Q.   And that waiting list was months?

02:23:47 17    A.   Yes.

02:23:47 18    Q.   And in fact, after the Supreme Court case in 2009,

02:23:53 19  fair to say that that waiting list became even longer?

02:23:55 20    A.   That's my understanding.

02:23:57 21    Q.   All right.  And so this was not something that was

02:24:03 22  considered a good thing for the lab.  Is that fair to say?

02:24:06 23    A.   It is not a good thing.

02:24:08 24    Q.   And why is that?

02:24:09 25    A.   People are waiting on the tail-end for their

02:24:13 1    results.

02:24:14 2        Q.   So I assume, then, that the lab was very

02:24:18 3    interested in ways of reducing this backlog.

02:24:22 4        A.   Yes.

02:24:22 5        Q.   But in 2009, there was some budget cuts.

02:24:31 6        A.   Yes.

02:24:31 7        Q.   In fact, the lab took, it was about 20 percent --

02:24:35 8    the drug lab took about a 20 percent reduction on its annual

02:24:40 9    budget?

02:24:40 10        MS. HERLIHY:  Your Honor, I would just object

02:24:42 11    to the ongoing leading nature of the questions.

02:24:44 12        THE COURT:  Well, that's a good objection.

02:24:47 13    This is a plaintiff's witness we called, but it's an adverse

02:24:52 14    party.  Rule 611 applies in my discretion to allow leading

02:24:56 15    questions of an adverse witness.  My preference would be to

02:25:00 16    conduct a generally direct questioning.  However, that --

02:25:07 17    I'm going to significantly relax that, because this is an

02:25:10 18    adverse witness.

02:25:12 19        So let me just tell you, for the rest of this

02:25:15 20    examination, I would prefer that you ask traditional direct

02:25:20 21    questions, but I'm going to give you the latitude to lead.

02:25:23 22        MR. TUMPOSKY:  Thank you, Your Honor.

02:25:24 23    BY MR. TUMPOSKY:

02:25:25 24        Q.   What was the budget cutback for fiscal year 2009,

02:25:27 25    if you recall?

02:25:28 1    A.   I think it might have been over a million

02:25:31 2  dollars.

02:25:31 3    Q.   A million-dollar reduction?

02:25:34 4    A.   I believe so.  It was the largest reduction I

02:25:39 5  recall having seen.

02:25:41 6    Q.   And this was in 2009?

02:25:43 7    A.   We had to implement the cuts in 2009.

02:25:47 8    Q.   And what month did you have to begin with the

02:25:53 9  money and the cuts?  Would that be July of 2009?

02:25:56 10    A.   I started in my role as acting director of the

02:26:02 11  Bureau of Laboratory Sciences at around July of 2009, so

02:26:10 12  it was -- I recall it being one of my first activities.

02:26:13 13    Q.   Okay.  So summer of 2009, fair to say?

02:26:17 14    A.   Yes.

02:26:18 15    Q.   And again, that was the same season, if you would,

02:26:22 16  where the Supreme Court case came down that changed the

02:26:26 17  rules dramatically, right?

02:26:27 18    A.   As I understand, yes.

02:26:28 19    Q.   And what was your understanding of --

02:26:28 20         THE COURT:  Just so the jury stays on top of

02:26:31 21  that, that's the *Melendez-Diaz* case.

02:26:33 22         MR. TUMPOSKY:  I was going to clarify that.

02:26:36 23  Thank you, Your Honor.

02:26:36 24  BY MR. TUMPOSKY:

02:26:36 25    Q.   And what was your understanding of the effect that

02:26:38 1    the Supreme Court case had on the activities of chemists?

02:26:44 2        A.   Because it required chemists to testify in

02:26:47 3    person at the cases, rather than simply submit a

02:26:50 4    certificate of analysis, it greatly reduced the amount of

02:26:54 5    time that the chemists were available in the lab to work

02:26:58 6    on testing itself.

02:27:01 7        Q.   And between the decision and the budget cuts, what

02:27:02 8    happened to the backlog in the summer of 2009?

02:27:06 9        A.   I don't know specifically.

02:27:09 10       Q.   Do you have any reason to believe that it

02:27:14 11   decreased in that time period?

02:27:15 12       A.   I don't have any reason to believe that it

02:27:17 13   decreased.

02:27:18 14       Q.   Fair to say it probably went up?

02:27:20 15       A.   I would not have been surprised.

02:27:22 16       Q.   Now, what steps did you or Ms. Nassif take to

02:27:28 17   alleviate some of these budgetary concerns?

02:27:31 18       A.   Julie had a number of ideas for how we could be

02:27:37 19   more efficient with the way that samples were allocated to

02:27:41 20   the various chemists.  She had ideas that we also

02:27:47 21   implemented about how to make more efficient use of the

02:27:51 22   court day, if there are multiple calls for testimony in

02:27:57 23   different parts of the state.  There were -- we had some

02:28:03 24   opportunities for overtime pay that helped, also, to

02:28:07 25   manage the backlog.

02:28:08  1        Q.   Where did you get those opportunities?

02:28:10  2        A.   I believe that it was -- some of it came from

02:28:15  3   grants, some of it may have come from unspent funds at the

02:28:21  4   end of the fiscal year.  I'm not really sure.

02:28:23  5        Q.   Are you familiar with the Coverdell grant?

02:28:26  6        A.   Yes.

02:28:27  7        Q.   And what is that?

02:28:29  8        A.   It's a federal grant that was relative -- well,

02:28:35  9   I -- I have heard of it in that I associate it in my mind

02:28:41 10   with funds for overtime testing.

02:28:44 11        Q.   And fair to say shortly after you were hired,

02:28:49 12   there was a push made to obtain some of this funding?

02:28:52 13        A.   It may have also predated my arrival as the

02:28:57 14   bureau director.

02:28:59 15        Q.   So -- but you know that the lab did receive grant

02:29:04 16   funding at some point?

02:29:05 17        A.   Yes.

02:29:05 18        Q.   And that they received it around -- they also

02:29:09 19   received some around the time that you came into the

02:29:14 20   position?

02:29:15 21        A.   I remember seeing it as a line item on our

02:29:17 22   budgets.

02:29:17 23        Q.   And how much was it?

02:29:18 24        A.   I don't remember.

02:29:20 25        Q.   Was it helpful?

02:29:22 1     A.   Any bit was helpful.

02:29:27 2     Q.   And what did it allow you to do?

02:29:27 3     A.   I understand it was associated with the option

02:29:30 4 to have pay, the chemists, additional money for overtime.

02:29:36 5     Q.   What about hiring extra chemists?  Did you

02:29:41 6 understand that it allowed you to do that, as well?

02:29:44 7     A.   I'm not sure.  I'm -- I'm not sure.

02:29:46 8     Q.   And what were the -- were there any requirements

02:29:49 9 for obtaining and maintaining this grant?

02:29:53 10    A.   I'm not sure.  There's usually reporting

02:29:57 11 requirements of some sort with grants.

02:29:58 12    Q.   Are you familiar with the reporting requirements

02:30:01 13 for the Coverdell grant?

02:30:02 14    A.   I've encountered them, yes.

02:30:05 15    Q.   What are they?

02:30:06 16    A.   I -- the context in which I've encountered them,

02:30:11 17 I actually have not read the requirements.  I have not

02:30:15 18 actually completed any reports.  I would -- Julie and her

02:30:21 19 group would do that.  And if there were any issues or

02:30:24 20 questions, I could be consulted.

02:30:27 21    Q.   So your testimony is that you're not personally

02:30:30 22 familiar with the requirements for the grant?

02:30:32 23    A.   No.

02:30:33 24    Q.   So I want to shift gears a little bit and talk to

02:30:44 25 you about when you first became aware of any problems with a

02:30:50  1    chemist by the name of Annie Dookhan.  When did you first

02:31:00  2    become aware?

02:31:02  3        A.   June 2011.

02:31:04  4        Q.   Now, prior to that, had you been alerted to any

02:31:09  5    unusual activity in her -- in her production?

02:31:13  6        A.   None.

02:31:14  7        Q.   Were you aware of the -- her high testing volume

02:31:19  8    prior to June of 2011?

02:31:21  9        A.   I understood her to be a highly productive

02:31:25 10    chemist.

02:31:26 11        Q.   And when did you first reach that understanding?

02:31:28 12        A.   It was sort of general knowledge.  I didn't see

02:31:33 13    any quantitative -- well, actually, I did.  So in -- I had

02:31:43 14    known about it, in general terms, for some time.  I think

02:31:48 15    I learned about it specifically with actual numbers

02:31:53 16    somewhere around 2011.

02:31:54 17        Q.   So you heard about it sometime prior to that, in a

02:32:00 18    general sense?

02:32:00 19        A.   Yes.

02:32:01 20        Q.   And who was it that informed you of this?

02:32:04 21        A.   Most likely Julie and other of the division

02:32:10 22    directors.

02:32:11 23        Q.   And you were -- by that, you're referring to

02:32:14 24    Defendant Salemi?

02:32:15 25        A.   No.  I was referring, actually, to -- for

02:32:18 1    example, the director of the Central Laboratory Services

02:32:22 2    division.

02:32:22 3        Q.   Okay.  But you believe Ms. Nassif might have

02:32:31 4    informed you?

02:32:31 5        A.   Yes.

02:32:31 6        Q.   And you're not sure when, but some time prior to

02:32:33 7    2011?

02:32:33 8        A.   Yes.

02:32:34 9        Q.   Did Ms. Nassif say to you that she received any

02:32:43 10   issues with this high volume?

02:32:47 11       A.   There was a point where I asked for actual

02:32:53 12   numbers associated with the various chemists, and I noted

02:32:57 13   that Ms. Dookhan had high numbers.  I asked Julie if this

02:33:04 14   was strange, and Julie said, "Well, there's all kinds of

02:33:09 15   considerations.  You can't just take those numbers for

02:33:11 16   face value.  You have to consider that a number of those

02:33:13 17   chemists were assigned to other non-bench duties; that

02:33:16 18   some specimens are more complicated than others and

02:33:20 19   involved more components; that some people were taking

02:33:24 20   advantage of the overtime pay to a greater extent than

02:33:27 21   others.  Some people would go home after testifying at a

02:33:31 22   case, and others would come back after testifying and work

02:33:35 23   a few more hours."  So that she said you can't necessarily

02:33:39 24   make any judgments on the face value of the volumes alone.

02:33:42 25       Q.   But it's fair to say, Dr. Han, you were more

02:33:46 1    interested in the other chemists catching up to Ms. Dookhan

02:33:51 2    than you were in slowing her down?

02:33:53 3                    MS. HERLIHY:  Objection.

02:33:54 4                    THE COURT:  Overruled.

02:33:55 5                    THE WITNESS:  I understand -- there's a range

02:33:57 6    of capabilities.  There are -- there's a range of

02:34:01 7    capabilities.  Some people were higher, and some were lower.

02:34:05 8    BY MR. TUMPOSKY:

02:34:05 9        Q.   Fair to say, then, that you were appreciative of

02:34:08 10   her efforts to clear the backlog?

02:34:10 11       A.   I did not see anything negative associated with

02:34:13 12   her high volume of testing.

02:34:16 13       Q.   Did it ever occur to you that that high volume

02:34:21 14   might result in mistakes being made or shortcuts being

02:34:24 15   taken?

02:34:25 16       A.   No.

02:34:25 17       Q.   And how long had Ms. Dookhan been working at the

02:34:34 18   lab when you first noticed her volume?

02:34:38 19       A.   Oh, I -- she started -- I don't remember -- I

02:34:46 20   think she was at the lab starting in 2004, and I wasn't

02:34:50 21   involved in the chemistry group at the time.  So I don't

02:34:54 22   know -- I never even knew who she was until I -- until I

02:34:57 23   had been with the department for several years, so I don't

02:35:03 24   know that I can judge.

02:35:05 25       Q.   But you had chemists who had been doing testing

02:35:08 1    for 30 years, right?

02:35:09 2        A.   As I have learned, recently.

02:35:11 3        Q.   Mr. Lawler had been at the lab for how long?

02:35:15 4        A.   I -- I heard his testimony as he was having --

02:35:18 5    as having been there for over 20 years, 30 possibly.

02:35:21 6        Q.   And so she had a higher volume than people who had

02:35:24 7    been there 15 or 20 years longer than she had.

02:35:28 8        A.   Which is -- Mr. Lawler had a lot of supervisory

02:35:36 9    responsibilities.

02:35:37 10               MR. TUMPOSKY:  Thank you.

02:35:39 11          One moment, Your Honor.

02:35:47 12             (Discussion off the record.)

02:35:49 13   BY MR. TUMPOSKY:

02:35:52 14       Q.   Isn't it true that Mr. Salemi, in fact, believed

02:35:56 15   that this high volume was an issue?

02:36:00 16              MS. HERLIHY:  Objection as to what Mr. Salemi

02:36:02 17   believed.

02:36:03 18              THE COURT:  Sustained.

02:36:05 19          Just rephrase.

02:36:06 20   BY MR. TUMPOSKY:

02:36:07 21       Q.   Isn't it true that Mr. Salemi told you that he was

02:36:10 22   concerned about this high volume?

02:36:12 23       A.   He did not.

02:36:13 24       Q.   Isn't it true that Ms. Nassif told you that Salemi

02:36:19 25   was concerned about this high volume?

02:36:22  1          A.    Can you repeat that?

02:36:25  2          Q.    Isn't it true that Ms. Nassif -- excuse me.

02:36:28  3    Ms. Nassif informed you that Mr. Salemi was concerned about

02:36:31  4    the high volume?

02:36:33  5          A.    I don't recall that.

02:36:34  6          Q.    I want to now turn your attention to June of 2011.

02:37:11  7    Did something happen in the lab at that time?

02:37:14  8          A.    Yes.

02:37:15  9          Q.    And what was that?

02:37:16 10          A.    In the drug lab.  Julie brought to my attention

02:37:21 11    a concern related to Annie Dookhan.

02:37:25 12          Q.    And what was that concern?

02:37:27 13          A.    She conveyed that Annie had conducted testing on

02:37:37 14    a set of samples, without having checked those samples out

02:37:41 15    from the evidence office.

02:37:43 16          Q.    Had she done anything else?

02:37:47 17          A.    Annie had also -- in addition to having

02:37:52 18    conducted testing on samples without checking them out

02:37:55 19    first, she -- when she -- she -- it appeared that she

02:38:02 20    falsified the initials of an evidence officer in the

02:38:07 21    evidence logbook.

02:38:08 22          Q.    To cover up for the fact that she had done

02:38:12 23    something improper?

02:38:13 24          A.    That's what it appeared to be.

02:38:15 25          Q.    Did you consider this to be a problem?

02:38:17 1        A.    I did.

02:38:17 2        Q.    What did you do about it?

02:38:24 3        A.    In discussion with Julie, we immediately took

02:38:30 4   her off of her testing role to eliminate the possibility

02:38:36 5   of her having further issues with chain-of-custody

02:38:41 6   documentation.

02:38:45 7        Q.    And -- but she got another assignment within the

02:38:51 8   lab, right?

02:38:52 9        A.    Yes.

02:38:52 10       Q.    And that assignment was to rewrite the policies

02:38:55 11  from 2004?

02:38:57 12       A.    Yes.

02:38:58 13       Q.    The policies that she had just broken?

02:39:00 14       A.    I'm not sure if those policies were related to

02:39:04 15  evidence, chain of command, and processing of samples.

02:39:10 16       Q.    Is it your testimony that the drug lab doesn't

02:39:12 17  have policies on logging samples in and out of the safe?

02:39:16 18       A.    My testimony is I'm not sure if the procedures

02:39:18 19  that she was updating were of purely technical nature.

02:39:22 20       Q.    You agree that she had just violated, flagrantly,

02:39:28 21  lab policy, right?

02:39:29 22       A.    She violated laboratory policy.

02:39:32 23       Q.    And now she was being tasked with rewriting

02:39:35 24  policies.

02:39:36 25       A.    She was being tasked to rewrite laboratory

02:39:39  1    standard operating procedures.

02:39:41  2         Q.   Which she had just ignored a few moments ago.

02:39:45  3              MR. MARINO:  Objection.  Asked and answered.

02:39:46  4              THE COURT:  No, she can have it.

02:39:50  5              THE WITNESS:  My understanding was that she

02:39:52  6    was revising standard operating procedures for various

02:39:55  7    technical procedures conducted in the laboratory.

02:39:58  8    BY MR. TUMPOSKY:

02:40:01  9         Q.   And you, in fact, wanted to return her to testing

02:40:04  10   at some point?

02:40:05  11        A.   Our plan was to take her off of testing.  We had

02:40:11  12   no end point in mind.  And in fact, over the following

02:40:15  13   nine-month period, there was no call -- nothing that

02:40:18  14   happened that would have made me comfortable with

02:40:21  15   returning her to the bench.

02:40:22  16        Q.   But you, in fact -- isn't it true that you

02:40:27  17   believed that if she apologized and was contrite, that she

02:40:30  18   could go back to testing?

02:40:31  19        A.   I don't believe that.

02:40:32  20        Q.   That was not -- you don't believe that that's --

02:40:35  21   that that was your position?

02:40:36  22        A.   I -- the plan was to take her off testing, let

02:40:43  23   the dust settle down on her personal issues, and see where

02:40:47  24   things landed.

02:41:10  25        Q.   Do you remember speaking to the State Police?

02:41:12 1      A.   I do.

02:41:14 2      Q.   And do you remember speaking to the Department of

02:41:24 3  Public Health about this case?

02:41:27 4      A.   Yes.

02:41:28 5      Q.   And isn't it true that you told the Department of

02:41:45 6  Public Health that you would return Ms. Dookhan to testing

02:41:52 7  if, in fact, she apologized?

02:41:56 8      A.   There was no specific event that would have

02:41:59 9  triggered her return.  We didn't have such explicit detail

02:42:04 10 in our thoughts when we took her off of the bench.

02:42:08 11     Q.   Didn't you tell the Department of Public Health

02:42:12 12 investigator that she was temporarily removed from testing

02:42:15 13 duties?

02:42:15 14     A.   She was -- she was removed for the time being,

02:42:19 15 yes.

02:42:19 16     Q.   With the intention of returning her at a later

02:42:22 17 time.

02:42:23 18     A.   In the event that there was something that would

02:42:29 19 have changed, that would have prompted us to do that.

02:42:32 20          MR. TUMPOSKY:  May I approach, Your Honor,

02:42:35 21 the witness?

02:42:37 22          THE COURT:  Yes.

02:42:42 23          (Discussion off the record.)

02:42:46 24          THE COURT:  Can I see the parties, please?

02:44:41 25     (The following discussion held at the bench.)

THE COURT:  All right.  So this whole line of
questioning has been about what happened after 2011, after
Dookhan was let go.  And now, clearly I had said in my trial
ruling, I'm going to let you get a little bit into that,
because I've already explained to them on the record why I
thought it was important for you to be able to explain a
little bit about what went on in the 2011 range.  But I
think your about at the end of going there.  We got to get
back to 2010 and what -- what this witness knew about 2010.

How much longer are we going to go on what she
knew?

MR. TUMPOSKY:  Well, I think --

THE COURT:  How long are you going to go
on -- do you want to go on about what she knew after the
Dookhan thing blew up in 2011 and she was taken off her
testing duties?

MR. TUMPOSKY:  It was my intention to go
into -- I was going to put this statement in where she
swore -- she signed and swore to the statement -- or, excuse
me, to DPH, that there was a temporary removal and that
Dookhan would be put back on testing duties at some point in
time.  It's my intention to do that.

It's then my intention to explore the fact that
there was no disclosures to law enforcement until February
of 2012 and that the letter disclosing it was, in fact,

02:46:13 1    untrue, which I believe deals with her credibility.

02:46:17 2            THE COURT:  But what is a non-disclosure

02:46:20 3    through 2011/'12 have to do with non-disclosure relative to

02:46:25 4    your client's drug trial?

02:46:28 5            MR. TUMPOSKY:  Again, I think it relates back

02:46:30 6    to the office custom of simply -- and again, the defendants

02:46:35 7    say, essentially, if they had known about problems, they

02:46:37 8    would have disclosed, and this rebuts that.  Because they

02:46:40 9    knew about problems, and they didn't disclose.  So I think

02:46:44 10   it undercuts their defense, and it's relevant to her

02:46:47 11   credibility, particularly to what she's saying, "I had no

02:46:50 12   intention of returning her to testing," and this proves

02:46:53 13   otherwise, and, "As soon as I found out about anything, I

02:46:56 14   disclosed," which is not true in terms of the time frame.

02:46:59 15   And the manner in which she disclosed, quite frankly, was

02:47:03 16   incredible.  It was not believable.  So that relates back to

02:47:06 17   just the believability of her testimony, is all.

02:47:09 18           MS. HERLIHY:  Your Honor, if I may.  With

02:47:10 19   respect to this witness, all he has with respect to this

02:47:18 20   particular witness, prior to June of 2011, she had a general

02:47:24 21   sense that Annie Dookhan was a good worker, a hard worker.

02:47:28 22   There's no evidence that this witness knew anything about

02:47:31 23   even increased numbers prior to 2011, well after the trial.

02:47:36 24           So again, continuing down this road, I agree with

02:47:40 25   Your Honor, it's not --

02:47:41 1                  THE COURT:  You're raising your hand?

02:47:45 2                  MS. HEDGES:  No, no.  I was trying not to

02:47:47 3 fall down.

02:47:53 4                  THE COURT:  I think you've gotten all the

02:47:56 5 mileage here that I'm comfortable with giving you going

02:47:59 6 after this.  I understand you're saying, look, their

02:48:02 7 behavior in 2011 and 2012 and what they failed to do and

02:48:07 8 didn't pay attention to is reflective on what the jury could

02:48:11 9 find they failed to do back in 2010.  I understand that.

02:48:14 10 But I've let you explore that, and just kind of letting you

02:48:18 11 go and go and go on it I don't think is necessarily fair.

02:48:22 12                  MR. TUMPOSKY:  Well, I haven't really

02:48:23 13 explored the response of the defendants, quite frankly,

02:48:27 14 until about five minutes ago.  I was trying to lay the

02:48:32 15 groundwork for that on previous testimony, but this is

02:48:35 16 really our first sort of foray into specifically how they

02:48:38 17 handled things as they came up in 2011.  I don't think we

02:48:41 18 have explored that, actually, at all.

02:48:44 19                  THE COURT:  If you're -- I'm going to let you

02:48:46 20 go one or two questions more, but I'm starting to get

02:48:50 21 sensitive to this issue.

02:48:54 22        And -- and what I'm also sensitive to is defense

02:49:02 23 is getting into a little bit of a tough spot, because you're

02:49:06 24 making a good argument; they're not showing that she knew

02:49:08 25 anything.  But an alternative theory, quite frankly, is what

02:49:11 1  they're showing is that this witness who should have had a

02:49:14 2  lot of information was just kind of blissfully, woefully

02:49:18 3  ignorant about what was going on, and that's a theory, as

02:49:21 4  well, that they could follow-up on.

02:49:24 5              MS. HERLIHY:  You know, I actually don't

02:49:25 6  think that they've shown that.  We have a director of a lab.

02:49:28 7  There are 18 labs in this building.  She's director of all

02:49:31 8  of them.  She's got no chemistry experience, she's not

02:49:36 9  blissfully unaware.  You will hear that she met every week

02:49:40 10  with Julie Nassif and every lab director, that she asked

02:49:43 11  questions when information came to her attention.

02:49:45 12              THE COURT:  I'll have to wait for you to

02:49:47 13  examine her to impress me on that one.

02:49:50 14              MS. HERLIHY:  You are correct.  But, yes,

02:49:52 15  again, I go back to the point that 2011 -- we're now in

02:49:55 16  June 2011.  This is well after any *Brady* disclosure, which

02:49:58 17  is the theory of the case.

02:50:00 18              THE COURT:  I agree with you, to me you put

02:50:04 19  that correctly.

02:50:06 20              MR. TUMPOSKY:  Can I say one more thing?

02:50:08 21              THE COURT:  I am going to give you a couple

02:50:10 22  more questions.

02:50:10 23              MR. TUMPOSKY:  I want to just be clear on a

02:50:13 24  particular topic, because I would like to explore the letter

02:50:15 25  that she actually sent to the DAs, and that was her first

02:50:20 1    disclosure to law enforcement in 2012. And as the IG report

02:50:24 2    found, and I think I can show, essentially it was a

02:50:25 3    fabrication. They said, "Well, we did an investigation, and

02:50:28 4    our investigation revealed that the testing integrity wasn't

02:50:31 5    compromised," when, in fact, there was no investigation of

02:50:34 6    the testing integrity; that the chemist in question had a

02:50:38 7    blemish free personnel record, which, of course, is simply

02:50:42 8    inaccurate. And there was also an incident that was

02:50:46 9    discovered in May, similar to this, and it was not

02:50:51 10   disclosed. So the idea that --

02:50:54 11        THE COURT: But obviously none of this goes

02:50:56 12   to what could have been closed in 2010. This is all conduct

02:51:00 13   and other evidence that is, essentially, if you were

02:51:02 14   reversing the roles here, this is propensity evidence. Look

02:51:06 15   at what she did and didn't do all these years, so it allows

02:51:09 16   you to infer she did or didn't do in 2010; which, perhaps,

02:51:13 17   if you're showing that the method of operation and pattern

02:51:16 18   of conduct could be -- could be admissible.

02:51:19 19        MR. TUMPOSKY: That's --

02:51:20 20        THE COURT: And I'm letting you go there a

02:51:22 21   little. I'm just alerting the parties that you've got to

02:51:25 22   start focusing on 2010.

02:51:29 23        MR. TUMPOSKY: And I understand that, you

02:51:31 24   know, Your Honor has the gatekeeper function. I point out

02:51:34 25   there was no objection from the parties, quite frankly.

02:51:37 1          THE COURT:  There was none.

02:51:38 2          MS. HERLIHY:  Your Honor, we have objected,

02:51:40 3  and you have been letting it in.  We're trying to figure out

02:51:44 4  where the line is as well, Your Honor.

02:51:45 5          THE COURT:  Yeah.  Yeah.  Well, I'm going to

02:51:47 6  keep you guessing.

02:51:48 7          MS. HERLIHY:  We'll keep you guessing.

02:51:50 8          THE COURT:  I really don't mind if you keep

02:51:52 9  objecting.  I don't want you to take any --

02:51:55 10         MR. MARINO:  Why am I getting looked at?

02:51:58 11         THE COURT:  I don't want you to take that to

02:52:02 12  think I'm getting frustrated.  I'm not.

02:52:04 13         MS. HERLIHY:  We have been trying to find out

02:52:06 14  where the line is in this particular issue.

02:52:07 15         THE COURT:  Well, the line keeps moving, it

02:52:10 16  really does, because the evidence keeps changing.  So keep

02:52:13 17  your objecting and keep advocating.  All right.

02:52:28 18              (Bench conference concluded.)

02:52:28 19  BY MR. TUMPOSKY:

02:51:00 20     Q.   Dr. Han, with regards to this incident in June,

02:51:03 21  it's fair to say that you did not report it to law

02:51:06 22  enforcement any time in 2011?  And by "law enforcement," I'm

02:51:13 23  referring to prosecutors, defense lawyers, or police.

02:51:17 24     A.   No, I did not.

02:51:18 25     Q.   In fact, the first time you said anything to law

02:51:24  1    enforcement was February of 2012.

02:51:26  2        A.   2012, yes.

02:51:27  3        Q.   And that was by meaning of a letter?

02:51:35  4        A.   Yes.

02:51:40  5             MR. TUMPOSKY:  May I approach this witness?

02:51:40  6             THE COURT:  Yes.

02:51:51  7    BY MR. TUMPOSKY:

02:51:51  8        Q.   Do you recognize this?

02:51:53  9        A.   Yes.

02:51:58 10        Q.   This is the letter -- the second letter that you

02:52:01 11    sent three weeks after the initial letter, right?

02:52:04 12        A.   I'm not sure.  What was the "initial letter"?

02:52:12 13        Q.   I can show you that.  That's not a problem.

02:52:14 14        A.   Okay.

02:52:43 15             MR. TUMPOSKY:  One moment, Your Honor.

02:53:34 16        I'm not putting my finger on it at the moment,

02:53:37 17    Your Honor.

02:53:34 18    BY MR. TUMPOSKY:

02:53:38 19        Q.   But in any event, do you recall writing this

02:53:39 20    letter at the end of February of 2012?

02:53:40 21        A.   I recall signing this letter.

02:53:42 22        Q.   Okay.  And this was where you detailed the result

02:53:45 23    of sort of the internal inquiry of what happened in June?

02:53:49 24        A.   A number of those details are included, yes.

02:54:02 25        Q.   And one of the details was, according to you, that

02:54:05 1    prior to this incident, the chemist involved had no

02:54:08 2    personnel issues and was well respected for the accuracy of

02:54:09 3    her work and --

02:54:09 4                    MS. HERLIHY:  Your Honor.

02:54:11 5                    MR. TUMPOSKY:  -- her dedication as a

02:54:13 6    laboratory technician?

02:54:13 7                    THE COURT:  Yes.

02:54:13 8                    MS. HERLIHY:  This is not an agreed-upon

02:54:15 9    exhibit.  So he's reading directly from the exhibit.  We'd

02:54:21 10   ask that it be admitted or not, before he reads from it.

02:54:22 11                   THE COURT:  Are you moving to admit that?

02:54:24 12                   MR. TUMPOSKY:  I would, Your Honor, yes.

02:54:25 13                   MS. HERLIHY:  Your Honor, we would object.

02:54:27 14   Again, we're in 2011, in a different county from the case at

02:54:30 15   issue, and discussing no conduct that predates the case at

02:54:33 16   issue.

02:54:34 17                   THE COURT:  All right.  I'm not going to

02:54:35 18   allow the admission of that, the letter right now.  You can

02:54:38 19   ask questions, summarizing in a general way questions.  But

02:54:43 20   you cannot stand there next to the witness box and read the

02:54:47 21   letter.  The witness has just read the letter, so you can

02:54:50 22   ask her questions about it.

02:54:54 23   BY MR. TUMPOSKY:

02:54:54 24        Q.   It's fair to say, Dr. Han, that in that letter you

02:55:01 25   report to the DA -- the Norfolk DA that the chemist involved

02:55:04 1   in the June breach had no personnel issues and was well

02:55:08 2   respected for her work?

02:55:10 3           MS. HERLIHY:  Again, Your Honor, it's quoting

02:55:12 4   from the letter.

02:55:12 5           THE COURT:  I'm going to let it go.  Go

02:55:15 6   ahead.

02:55:15 7           THE WITNESS:  That's in this letter, correct.

02:55:17 8   BY MR. TUMPOSKY:

02:55:18 9      Q.  That wasn't true.

02:55:19 10     A.  I'm sorry.  What was the question?

02:55:20 11     Q.  That statement was incorrect, in other words, that

02:55:23 12   it was factually wrong.

02:55:24 13     A.  I'm sorry, can you back up a question?  I'm not

02:55:27 14   sure -- I think I missed --

02:55:28 15     Q.  Sure.  So you wrote a letter to the DA, indicating

02:55:31 16   that the chemist involved in the June breach was well

02:55:36 17   respected for her accuracy and had no prior issues.  You

02:55:39 18   wrote that to the DA.

02:55:40 19     A.  That is in this letter, yes.

02:55:42 20     Q.  That statement was factually inaccurate.

02:55:47 21     A.  I'm not sure I see where the inaccuracy is.

02:55:51 22     Q.  So it's your position that that's an accurate

02:55:54 23   statement?

02:55:54 24     A.  It is my position that it is accurate, right?

02:56:04 25     Q.  Is that a question or --

02:56:07 1        A.   What was your question?

02:56:07 2    BY MR. TUMPOSKY:

02:51:00 3        Q.   Dr. Han, with regards to this incident in June,

02:51:03 4    it's fair to say that you did not report it to law

02:51:06 5    enforcement any time in 2011?  And by "law enforcement," I'm

02:51:13 6    referring to prosecutors, defense lawyers, or police.

02:51:17 7        A.   No, I did not.

02:51:18 8        Q.   In fact, the first time you said anything to law

02:51:24 9    enforcement was February of 2012.

02:51:26 10       A.   2012, yes.

02:51:27 11       Q.   And that was by meaning of a letter?

02:51:35 12       A.   Yes.

02:51:40 13            MR. TUMPOSKY:  May I approach this witness?

02:51:40 14            THE COURT:  Yes.

02:51:51 15   BY MR. TUMPOSKY:

02:51:51 16       Q.   Do you recognize this?

02:51:53 17       A.   Yes.

02:51:58 18       Q.   This is the letter -- the second letter that you

02:52:01 19   sent three weeks after the initial letter, right?

02:52:04 20       A.   I'm not sure.  What was the "initial letter"?

02:52:12 21       Q.   I can show you that.  That's not a problem.

02:52:14 22       A.   Okay.

02:52:43 23            MR. TUMPOSKY:  One moment, Your Honor.

02:53:34 24            I'm not putting my finger on it at the moment,

02:53:37 25   Your Honor.

BY MR. TUMPOSKY:

02:53:34  1

02:53:38  2      Q.   But in any event, do you recall writing this

02:53:39  3   letter at the end of February of 2012?

02:53:40  4      A.   I recall signing this letter.

02:53:42  5      Q.   Okay.  And this was where you detailed the result

02:53:45  6   of sort of the internal inquiry of what happened in June?

02:53:49  7      A.   A number of those details are included, yes.

02:54:02  8      Q.   And one of the details was, according to you, that

02:54:05  9   prior to this incident, the chemist involved had no

02:54:08 10   personnel issues and was well respected for the accuracy of

02:54:09 11   her work and --

02:54:09 12               MS. HERLIHY:  Your Honor.

02:54:11 13               MR. TUMPOSKY:  -- her dedication as a

02:54:13 14   laboratory technician?

02:54:13 15               THE COURT:  Yes.

02:54:13 16               MS. HERLIHY:  This is not an agreed-upon

02:54:15 17   exhibit.  So he's reading directly from the exhibit.  We'd

02:54:21 18   ask that it be admitted or not, before he reads from it.

02:54:22 19               THE COURT:  Are you moving to admit that?

02:54:24 20               MR. TUMPOSKY:  I would, Your Honor, yes.

02:54:25 21               MS. HERLIHY:  Your Honor, we would object.

02:54:27 22   Again, we're in 2011, in a different county from the case at

02:54:30 23   issue, and discussing no conduct that predates the case at

02:54:33 24   issue.

02:54:34 25               THE COURT:  All right.  I'm not going to

02:54:35 1   allow the admission of that, the letter right now.  You can

02:54:38 2   ask questions, summarizing in a general way questions.  But

02:54:43 3   you cannot stand there next to the witness box and read the

02:54:47 4   letter.  The witness has just read the letter, so you can

02:54:50 5   ask her questions about it.

02:54:54 6   BY MR. TUMPOSKY:

02:54:54 7       Q.   It's fair to say, Dr. Han, that in that letter you

02:55:01 8   report to the DA -- the Norfolk DA that the chemist involved

02:55:04 9   in the June breach had no personnel issues and was well

02:55:08 10  respected for her work?

02:55:10 11              MS. HERLIHY:  Again, Your Honor, it's quoting

02:55:12 12  from the letter.

02:55:12 13              THE COURT:  I'm going to let it go.  Go

02:55:15 14  ahead.

02:55:15 15              THE WITNESS:  That's in this letter, correct.

02:55:17 16  BY MR. TUMPOSKY:

02:55:18 17      Q.   That wasn't true.

02:55:19 18      A.   I'm sorry.  What was the question?

02:55:20 19      Q.   That statement was incorrect, in other words, that

02:55:23 20  it was factually wrong.

02:55:24 21      A.   I'm sorry, can you back up a question?  I'm not

02:55:27 22  sure -- I think I missed --

02:55:28 23      Q.   Sure.  So you wrote a letter to the DA, indicating

02:55:31 24  that the chemist involved in the June breach was well

02:55:36 25  respected for her accuracy and had no prior issues.  You

02:55:39 1    wrote that to the DA.

02:55:40 2        A.   That is in this letter, yes.

02:55:42 3        Q.   That statement was factually inaccurate.

02:55:47 4        A.   I'm not sure I see where the inaccuracy is.

02:55:51 5        Q.   So it's your position that that's an accurate

02:55:54 6    statement?

02:55:54 7        A.   It is my position that it is accurate, right?

02:56:04 8        Q.   Is that a question or --

02:56:07 9        A.   What was your question?

02:56:09 10       Q.   Do you believe that statement to be accurate, that

02:56:11 11   she had no personnel issues and was well respected?

02:56:15 12       A.   I believe that statement to be accurate.

02:56:17 13       Q.   You also informed the DA that -- in this letter,

02:56:28 14   that there's no reason to suspect the integrity of any

02:56:33 15   samples had been affected; is that right?

02:56:36 16       A.   That's correct.

02:56:36 17            MS. HERLIHY:  Again, Your Honor, I would just

02:56:38 18   continue to object the reading in of the letter.

02:56:41 19            THE COURT:  I understand.

02:56:41 20       That's the last question on the letter.

02:56:45 21       Go ahead.

02:56:46 22            THE WITNESS:  That's correct.

02:56:46 23   BY MR. TUMPOSKY:

02:56:47 24       Q.   But the lab had not actually investigated whether

02:56:51 25   the integrity of the samples had been affected by the

02:56:56 1    breach, correct?

02:56:57 2         A.   In review of the incident, they did not

02:57:03 3    believe -- I did not have any reason to believe at the

02:57:06 4    time of the June incident that there was any concern with

02:57:09 5    the quality of the laboratory testing or the accuracy of

02:57:12 6    the results.

02:57:13 7         Q.   But my question was, no one in the lab had

02:57:17 8    actually investigated whether there was any problems with

02:57:21 9    the samples, prior to you making that representation?

02:57:24 10        A.   The Department of Public Health had done their

02:57:27 11   own internal investigation in December through January and

02:57:30 12   had arrived at that same conclusion.

02:57:35 13        Q.   No one actually tested any of your samples at that

02:57:38 14   point?

02:57:38 15        A.   I'm not sure.

02:57:50 16             MR. TUMPOSKY:  Nothing further.

02:57:55 17             MS. HERLIHY:  One moment, Your Honor.

02:58:08 18        Your Honor, as we discussed, we're going to just

02:58:11 19   briefly question Dr. Han now and intend to call her in our

02:58:15 20   case in chief.

02:58:16 21             THE COURT:  Yes.  I understand, now.

02:58:20 22        **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT HAN**

02:58:20 23   BY MS. HERLIHY:

02:58:21 24        Q.   Dr. Han, Mr. Tumposky asked you some questions

02:58:26 25   about accreditation.  Do you recall testifying about those

02:58:26 1    issues?

02:58:26 2        A.    Yes.

02:58:26 3        Q.    And he talked about the cost of accreditation, and

02:58:30 4    you said that when you were the director of the Bureau of

02:58:33 5    Laboratory Sciences, the food lab was going through

02:58:35 6    accreditation, correct?

02:58:37 7        A.    It was just initiating the process when I left.

02:58:40 8        Q.    And do you recall the size of the grant that was

02:58:43 9    necessary to engage in that accreditation process for the

02:58:47 10   food lab?

02:58:48 11       A.    I recall it was a grant that covered three

02:58:53 12   years' worth of activities.  And at least for one of the

02:58:56 13   years, there was more than a million dollars allocated for

02:58:59 14   that activity.

02:59:01 15       Q.    Do you have experience taking labs or other

02:59:04 16   organizations through an accreditation process?

02:59:09 17       A.    No.

02:59:18 18       Q.    Have you worked in a lab as it's gone through an

02:59:21 19   accreditation process?

02:59:23 20       A.    No.

02:59:28 21       Q.    How far did the food lab get in it's accreditation

02:59:35 22   process while you were the director of the Bureau of

02:59:40 23   Laboratory Sciences?

02:59:41 24       A.    I believe we were awarded the grant shortly

02:59:46 25   after my departure, so I was involved in all of the

02:59:52 1    application activities.

02:59:52 2         Q.   And it was expected to be a multiyear process?

02:59:54 3         A.   Multiyear process, involving the hire of

02:59:58 4    additional personnel to support the infrastructure and

03:00:03 5    requirements of accreditation.

03:00:04 6         Q.   And at least a million dollars?

03:00:05 7         A.   Yes.

03:00:06 8         Q.   Mr. Tumposky asked you, with respect to

03:00:15 9    information that you received mid 2011 regarding the volume

03:00:19 10   of the tests that were being done by Ms. Dookhan, he asked

03:00:22 11   you whether you had any reason to believe that there were

03:00:26 12   any mistakes or shortcuts -- that she was making any

03:00:29 13   mistakes or shortcuts to achieve those numbers.  And you

03:00:34 14   testified, no, that you had no basis.

03:00:35 15        Do you recall that testimony?

03:00:35 16        A.   I recall that testimony.

03:00:37 17        Q.   And why do you say that you had no basis to

03:00:40 18   believe that there were no mistakes or shortcuts?

03:00:43 19        A.   I -- so in part because of Julie's explanation

03:00:49 20   that test volume data needs to be interpreted with

03:00:52 21   caution, with consideration of a number of other factors

03:00:55 22   that could impact test volumes, and partly because

03:01:05 23   supervisors in the laboratory area were so confident in

03:01:10 24   the quality of her tests.

03:01:11 25        Q.   Mr. Tumposky asked you about speaking to state

03:01:17 1   police.  Do you recall that?

03:01:17 2       A.   I do.

03:01:17 3       Q.   Did you ever sign a statement for the state

03:01:19 4   police?

03:01:19 5       A.   No.

03:01:20 6       Q.   Were you ever given an opportunity to review notes

03:01:24 7   taken by the State Police?

03:01:25 8       A.   No.

03:01:28 9               MS. HERLIHY:  Nothing further.

03:01:33 10              MR. MARINO:  No questions, Your Honor.

03:01:36 11              MR. GRACE:  No questions.

03:01:40 12              THE COURT:  Any redirect?

03:01:42 13              MR. TUMPOSKY:  Can I have one moment, Your

03:01:44 14  Honor?

03:01:45 15              (Discussion off the record.)

03:02:07 16              MR. TUMPOSKY:  Could we briefly approach

03:02:09 17  sidebar.

03:02:10 18              THE COURT:  All right.

03:02:25 19          (The following discussion held at the bench.)

03:04:08 20              MR. TUMPOSKY:  Your Honor, given the sort of

03:04:11 21  limitations on the form of the question, at this point I

03:04:15 22  think we would elect to rest, quite frankly, and then allow

03:04:19 23  the defendants to begin to present their case.  And we will

03:04:25 24  deal with the other parties here during cross.

03:04:28 25              THE COURT:  Okay.  Well, that's your

03:04:29 1    prerogative.  What do you mean by in light of the limitation

03:04:32 2    of the questions?

03:04:33 3               MR. TUMPOSKY:  Well, I think there was some

03:04:35 4    restrictions on our ability to phrase cross-examination

03:04:39 5    style.  And you're saying you gave us some leeway, but

03:04:41 6    that's the reason.

03:04:42 7               THE COURT:  I don't accept that what the

03:04:48 8    Court did or any ruling was to the extent of changing how

03:04:53 9    you want to put your case on.  I think I've -- I think I've

03:04:56 10   been abundantly fair with what -- what I let you do.  And I

03:05:04 11   don't think it's -- I don't think it would be accurate for

03:05:06 12   you to be creating a situation where you're suggesting the

03:05:09 13   Court has interfered or limited your questioning.

03:05:13 14               You -- Ms. Han's was put on the witness stand, and

03:05:18 15   you asked her as much as what you could get out of her about

03:05:21 16   the 2010 time period.  And I let you ask a good number of

03:05:26 17   questions about 2011 and beyond.  And then even after I

03:05:32 18   brought you to sidebar and told you that I was getting

03:05:35 19   concerned, I let you ask a couple more questions over

03:05:38 20   objection.

03:05:39 21               So I -- I want to make it clear -- perhaps an

03:05:45 22   independent person reviewing the record may have a different

03:05:49 23   opinion, but I want to make it clear that I think the Court

03:05:53 24   has been abundantly fair and been operating in a way that

03:05:59 25   would not act as a restriction to you in calling witnesses.

03:06:06  1    So it's absolutely your choice who you want to put

03:06:09  2    on and what you want to do, but that's a tactical decision,

03:06:15  3    as I view it, not a decision being put upon you by my

03:06:19  4    rulings.

03:06:19  5        MR. TUMPOSKY:  Well, we would rest, Your

03:06:21  6    Honor.

03:06:21  7        THE COURT:  All right.

03:06:27  8        MS. HEDGES:  Could we just have one moment?

03:06:30  9        THE COURT:  Yeah.

03:06:31 10        (Discussion off the record.)

03:07:51 11        MR. TUMPOSKY:  And I apologize, Your Honor, I

03:07:53 12    wasn't intending to be critical.  I understand the Court has

03:07:56 13    been fair.

03:07:57 14        THE COURT:  No, no, no, I wasn't looking for

03:07:59 15    you to apologize.  You know, I'm sensitive only to

03:08:06 16    interfering, as a Court, in your tactical considerations.

03:08:10 17    And you might think I have acted as an interference, but I

03:08:15 18    wanted just to be clear, if this is ever reviewed, kind of

03:08:21 19    how we've operated here.  And I -- I just don't think that

03:08:28 20    the -- that the Court limited you in any significant way.

03:08:32 21    For tactical reasons you chose not to call a witness, then

03:08:36 22    so be it.  But no need to apologize.  All right?

03:08:41 23        MR. TUMPOSKY:  All right.  Well, we will

03:08:43 24    rest.

03:08:43 25        THE COURT:  Okay.  All right.

```
03:08:44  1              MR. KELLY:  Your Honor, since we're here,
03:08:47  2   from a scheduling perspective, obviously there are a couple
03:08:52  3   of things that we would like to do before we call our first
03:08:56  4   witness.  I mean, we would like to address the court outside
03:08:59  5   the presence of the jury on a directed verdict motion.  And
03:09:04  6   obviously we did reserve a little time for a brief opening.
03:09:08  7   We need to just confer.  And it may well be that if we could
03:09:12  8   take 15 minutes to argue a motion to the Court, and then
03:09:15  9   perhaps do a defense opening, I don't know that we're
03:09:20 10   prepared to put a witness on, but we may be able to put a
03:09:23 11   witness on to begin his or her direct starting this
03:09:26 12   afternoon.  I know you want to maximize the time.
03:09:28 13              THE COURT:  All right.  We'll take a lit --
03:09:30 14   so you want a break right now for --
03:09:33 15              MR. KELLY:  Give us 15 minutes just to
03:09:35 16   collect our thoughts.
03:09:36 17              THE COURT:  Just to collect your thoughts.
03:09:36 18   All right.
03:09:38 19         All right.  And do you want to address me on any
03:09:40 20   issue before you start the defense case.
03:09:42 21              MR. KELLY:  Yes, Your Honor.
03:09:43 22              MR. GRACE:  Yes.
03:09:44 23              THE COURT:  So I'll be back out in ten
03:09:46 24   minutes.  All right?
03:09:48 25              MR. KELLY:  Thanks.
```

| | |
|---|---|
| 03:09:50 | 1 |
| 03:09:52 | 2 |
| 03:09:55 | 3 |
| 03:09:58 | 4 |
| 03:10:01 | 5 |
| 03:10:03 | 6 |
| 03:10:05 | 7 |
| 03:10:08 | 8 |
| 03:10:10 | 9 |
| 03:10:19 | 10 |
| 03:10:20 | 11 |
| 03:10:24 | 12 |
| 03:08:46 | 13 |
| 03:08:47 | 14 |
| 03:08:50 | 15 |
| 03:08:52 | 16 |
| 03:08:58 | 17 |
| 03:09:03 | 18 |
| 03:09:05 | 19 |
| 03:09:06 | 20 |
| 03:09:10 | 21 |
| 03:09:16 | 22 |
| 03:09:22 | 23 |
| 03:09:24 | 24 |
| 03:09:27 | 25 |

1    THE COURT:  All right.  And you're going to
2  announce to the --
3         Well, there they go.  They left us.
4         MR. MARINO:  Are we not leaving?
5         MR. TUMPOSKY:  You could be the proxy.
6         THE COURT:  So I'm just going to announce to
7  the jury that the plaintiff plans on resting their case, and
8  this will be a break.  We're going to take a ten-minute
9  break.
10        MR. TUMPOSKY:  Yes.
11        MR. MARINO:  Thank you, Your Honor.
12        (Bench conference concluded.)
13        THE COURT:  All right.  Ma'am, you may step
14  down.
15        All right.  Ladies and gentlemen, at this point,
16  plaintiff's counsel has advised me they will likely be
17  resting their case.  That means their case and their calling
18  witnesses, that portion of the trial will have been
19  completed.
20        There will be a switch now to where the defense
21  can choose to, if they want, to put on certain evidence and
22  begin the defense case.  So it's a significant break in the
23  trial.  So to kind of prepare for that shifting, we're going
24  to take about ten minutes.  It will be an afternoon break
25  for the defense to get their things together and get ready

| | |
|---|---|
| 03:09:30 1 | to start their case. |
| 03:09:31 2 | All right.  During this break, don't discuss the |
| 03:09:33 3 | case, begin deliberations, research the case in any way, or |
| 03:09:37 4 | try to access it through one of your Internet, social media |
| 03:09:42 5 | searches.  All right? |
| 03:09:44 6 | (The jury exits the courtroom.) |
| 03:10:14 7 | MR. TUMPOSKY:  And just very, very quickly. |
| 03:10:16 8 | I understand that we aren't going to call any more |
| 03:10:18 9 | witnesses, but we hope to reserve on whatever the IG report, |
| 03:10:22 10 | whenever that is going to come in, would also be included in |
| 03:10:26 11 | our case. |
| 03:10:26 12 | THE COURT:  Yes.  Absolutely.  You have |
| 03:10:29 13 | reserved on wherever -- whenever we get to deal with it. |
| 03:10:34 14 | But there will be -- at some point, we will deal with the |
| 03:10:37 15 | admissibility, and if admissible at all, what parts.  And |
| 03:10:42 16 | that obviously I would let you -- I'm not even sure if it |
| 03:10:46 17 | would be considered as a reopening of your case or just a |
| 03:10:49 18 | continuation of your case, but yes, if we get to the point |
| 03:10:52 19 | where parts of the IG report are admissible, you will be |
| 03:10:55 20 | allowed to put them in.  It will be considered to be put in |
| 03:10:59 21 | in the plaintiff's case. |
| 03:11:00 22 | MR. TUMPOSKY:  Thank you, Your Honor. |
| 03:11:01 23 | THE COURT:  All right. |
| 03:11:06 24 | THE DEPUTY CLERK:  All rise. |
| 25 | |

03:11:09 1          (Court in recess at 3:11 p.m.

03:34:01 2           and reconvened at 3:34 p.m.)

03:34:01 3          THE COURT:  All right.  Where do we stand?

03:34:03 4          **MOTION FOR DIRECTED VERDICT**

03:34:03 5          MR. KELLY:  Your Honor, if I could briefly

03:34:08 6  address the Court.  At this time -- and I won't make any

03:34:12 7  extended argument, given the time of day and what we're

03:34:15 8  trying to accomplish here in terms of schedule.  But on

03:34:19 9  behalf of all three defendants, I would like to move for a

03:34:22 10 directed verdict at this time, Your Honor.  And if I could

03:34:24 11 just briefly be heard as to the reasons.

03:34:26 12         THE COURT:  All right.  Go ahead.

03:34:28 13         MR. KELLY:  Really, two principal grounds for

03:34:31 14 the motion, Your Honor:  First, that there has not been an

03:34:35 15 adequate showing of causation to establish a claim of

03:34:40 16 supervisory liability under 42 United States Code

03:34:45 17 Section 1983.

03:34:45 18         The law on that point, Your Honor, which is

03:34:49 19 captured in the requested instructions that we've submitted,

03:34:53 20 is that effectively plaintiff has to establish four things:

03:34:57 21 That the behavior of the subordinate to the supervisor

03:35:02 22 caused the constitutional violation, that there was a strong

03:35:06 23 causal connection between the supervisor's conduct and the

03:35:09 24 constitutional deprivation; third, that the supervisor had

03:35:13 25 knowledge of the unconstitutional condition that led to the

03:35:15  1    plaintiff's claim; and finally, that the supervisor was

03:35:17  2    deliberately indifferent, that is, that the supervisor had

03:35:23  3    knowledge of facts from which the supervisor could draw the

03:35:25  4    inference that a substantial risk of serious harm existed.

03:35:30  5         You know, Your Honor, it's our position that the

03:35:32  6    only facts which have been adduced at this point by the

03:35:38  7    plaintiff, relative to the time of trial here, which was

03:35:41  8    September of 2010, and giving the plaintiff the benefit of

03:35:48  9    the doubt, I think fall into three categories:  One, there

03:35:51 10    is the high volume of testing by Ms. Dookhan; two, there was

03:35:56 11    some testimony about her appearance before a microscope.

03:36:01 12         And I think on direct examination, Mr. Piro

03:36:04 13    testified that he never saw her sitting in front of a

03:36:07 14    microscope; however, on cross-examination, it was clarified

03:36:10 15    that Mr. Piro was only in the same laboratory space as

03:36:16 16    Ms. Dookhan for an hour a day and only during a limited time

03:36:20 17    frame.  And so the broad statement that he never saw her in

03:36:23 18    front of a microscope doesn't establish knowledge that she

03:36:28 19    was not engaged in any testing.

03:36:31 20         And the third, I think, point factually has to do

03:36:34 21    with the returns and Mr. Piro recognizing that there were a

03:36:40 22    number of returns from Ms. Dookhan.  But in his testimony,

03:36:50 23    he explained that returns don't actually affect the

03:36:56 24    reliability of the conclusion regarding the actual substance

03:37:02 25    itself.  And he explained that there are a number of reasons

03:37:04 1    why returns are made, and it's ultimately to get it right.

03:37:09 2    And it didn't mean that she simply either wasn't doing the

03:37:13 3    testing or was doing it improperly such that she was getting

03:37:18 4    the wrong result.

03:37:20 5           The point is that I don't believe that the

03:37:23 6    plaintiff has established some of the essential elements to

03:37:26 7    prove supervisory liability under 1983.  Number one, I don't

03:37:31 8    think there is a constitutional violation.  I don't believe

03:37:33 9    there is a *Brady* violation, based upon these facts, at that

03:37:38 10   point in time, at September 2010.

03:37:43 11          The real question is, did the defendants have

03:37:49 12   knowledge of material impeachment evidence regarding

03:37:55 13   Ms. Dookhan, and did they fail to disclose that evidence,

03:38:02 14   such that it violated the constitutional rights of

03:38:08 15   Mr. Jones.  And Your Honor, I don't believe that there has

03:38:10 16   been an adequate showing that there was material impeachment

03:38:14 17   evidence.

03:38:14 18          Typically, when you're talking about that

03:38:17 19   standard, Your Honor, you're talking about either

03:38:20 20   exculpatory evidence, which goes to show that a defendant is

03:38:26 21   not guilty of a crime, or you're talking about the

03:38:31 22   presentation of fabricated evidence that supports a

03:38:35 23   conviction.  It can also be material impeachment evidence,

03:38:39 24   if it's the central witness in the case.  And the

03:38:43 25   impeachment of that witness would undermine the basis of the

03:38:47 1    conviction.  However you look at exculpatory data, material

03:38:52 2    impeachment material, it has not been demonstrated here,

03:38:56 3    Your Honor.  And so therefore, my first argument --

03:38:59 4           And I'll move to the second argument now, Your

03:39:02 5    Honor, is that there has not been an adequate showing of

03:39:05 6    causation to establish supervisory liability in this case,

03:39:07 7    based on the evidence presented.

03:39:10 8           Second basis of the motion, Your Honor, is that

03:39:13 9    each of the three defendants is entitled to qualified

03:39:15 10   immunity, based on the record as it presently stands.  And

03:39:21 11   Your Honor, the law in this area is that there are -- a

03:39:29 12   two-step test that the courts follow to determine whether or

03:39:32 13   not state actors, state officers are entitled to qualified

03:39:35 14   immunity:

03:39:37 15          First, whether the claimant, Mr. Jones here, has

03:39:40 16   alleged a deprivation of a constitutional right.  Clearly he

03:39:43 17   has made such an allegation.  And second, whether that right

03:39:46 18   was clearly established at the time of the alleged action or

03:39:51 19   inaction, such that an objectively reasonable official would

03:39:57 20   have understood that his actions violated that clearly

03:40:00 21   established right.

03:40:01 22          And Your Honor, early on in this case, we moved to

03:40:06 23   dismiss the complaint of Mr. Jones, alleging qualified

03:40:13 24   immunity.  And Judge Saylor, who was the first assigned

03:40:18 25   judge in the matter, denied the motion for qualified

immunity, but he did so based upon the allegations of the
complaint. And he -- he actually entered a ruling, which is
now reported, Your Honor, at 993 F.Supp.2d at page 57.

And what he found in that was that based upon what
had been alleged in the complaint -- and he pointed out a
few things. One, he pointed out the high volume of testing.
Two, he pointed out that there was an allegation that
Ms. Dookhan had forged quality control tests. And third, he
pointed out that there was an allegation that the
supervisors had ignored the fact that she had circulated
different copies of her resume.

Now, at that stage of the proceedings, when the
plaintiff is entitled to all benefit of the doubt, the judge
had to accept those allegations as true. And on that basis,
he denied the motion, finding that, you know, a chemist --
if those facts were true, that a chemist, as an extension of
a prosecutor, as part of a prosecution team, would have some
duty. And so he found that there would be a clearly
established right.

But Your Honor, the facts have not been shown.
Yes, the volume of testing is an issue here, Your Honor.
But pre-September of 2010, there is no evidence of forged
quality controlled tests. And the allegations regarding the
CVs or resumes postdated September of 2010.

I submit that had Judge Saylor been aware at the

03:42:00 1    time that all that existed as of that point in time was the

03:42:03 2    high volume of testing, and particularly if he had the

03:42:05 3    benefit of knowing some of the explanations that we've heard

03:42:08 4    about why testing volumes and numbers vary from time to

03:42:13 5    time, that he may have come down in a different way.

03:42:19 6         But Your Honor, I would suggest that, first of

03:42:22 7    all, is this right clearly established?  I mean, certainly

03:42:27 8    prosecutors and police officers and law enforcement

03:42:29 9    officials have this obligation.  The law is simply evolving

03:42:32 10   here as to whether or not forensic scientists are required

03:42:36 11   under the law.

03:42:39 12        I'm submitting that Judge Saylor found that they

03:42:41 13   were.  And I have great respect for Judge Saylor, and I

03:42:45 14   don't challenge his decision.  But the underpinning of it is

03:42:48 15   a factual finding which frankly has not been made.

03:42:51 16        And based on the factual finding that has been

03:42:53 17   established here, Your Honor, we would submit that as a

03:42:57 18   second basis for our motion for directed verdict, that each

03:42:59 19   of these three defendants is entitled to qualified immunity.

03:43:03 20        THE COURT:  All right.  Before you start,

03:43:06 21   before you respond, I do find that the obligation to turn

03:43:15 22   over exculpatory information does extend to these

03:43:22 23   individuals, which include, at the state police lab,

03:43:28 24   employees and officials as an arm, essentially, of the

03:43:34 25   prosecution, under *Brady* generally.  And so it does extend

03:43:41  1    to them in my view, consistent with Judge Saylor's finding,

03:43:47  2    quite frankly, for many, if not all, of the reasons and

03:43:51  3    rationale Judge Saylor talked about, that you noted.

03:43:56  4         Also, in this case, as to your question of whether

03:44:02  5    or not there really was a constitutional violation, at this

03:44:07  6    time, in the light most favorable to the plaintiff, we are

03:44:11  7    talking about the withholding, perhaps, of

03:44:19  8    impeachment-related evidence, at the one end of what would

03:44:24  9    be useful, to just flat out exculpatory this-test-was-bad

03:44:32 10    information on the other end of the spectrum.

03:44:34 11         But I think impeachment information showing that

03:44:40 12    your job performance is suspect because of a volume of your

03:44:52 13    testing, which in the eyes of supervisors would have called

03:45:00 14    into question how the testing can be done accurately, with

03:45:04 15    any amount of accuracy given that volume, to the extent that

03:45:10 16    it even got to the level of having to go -- supervisors even

03:45:16 17    talking about it, being made aware of the volume, it was a

03:45:21 18    concern, that that would be impeachment material falling

03:45:29 19    under the umbrella of exculpatory evidence for purposes of

03:45:33 20    satisfying a constitutional violation.

03:45:37 21         And that was your first argument.  I'm just kind

03:45:39 22    of addressing your first argument of what I'm finding and

03:45:43 23    not accepting that argument.

03:45:50 24         So I've addressed that, the constitutional

03:45:52 25    violation, and I've addressed your final argument of -- of

03:45:58  1    the obligation to turn over *Brady*-type material does extend

03:46:04  2    to a state police -- or not a state police, a state employee

03:46:08  3    in the drug lab situation, like we have here.  It does

03:46:12  4    extend to them.  So I've addressed those.

03:46:14  5          Now, you -- your qualified immunity argument, I

03:46:26  6    think, is a little bit of a different argument, in the sense

03:46:32  7    that I'm certainly considering what you said.  Do you have a

03:46:39  8    more -- a more specific argument to articulate, relative to

03:46:46  9    each defendant?

03:46:48 10          They are looked at -- in my mind, I'm looking at

03:46:52 11    all three of them differently right now, because, frankly,

03:46:56 12    there was different amounts of evidence relative to each of

03:46:59 13    them.  So now's your opportunity to single out any one that

03:47:04 14    you think stands in a better position at this point than the

03:47:08 15    others.

03:47:10 16          MR. KELLY:  I obviously represent Dr. Linda

03:47:12 17    Han, along with Ms. Herlihy, and I think we have heard far

03:47:19 18    less evidence as to the level of knowledge or involvement of

03:47:23 19    Dr. Linda Han than we have, obviously, of the other two

03:47:27 20    defendants.  I mean, I think with respect to my client --

03:47:31 21    and I'll allow co-counsel to speak on behalf of their own

03:47:36 22    clients -- you know, again, my client was placed into this

03:47:42 23    role, and it -- it will be part of the upcoming evidence if

03:47:49 24    we get there, Your Honor.  You will hear that she accepted

03:47:52 25    this role reluctantly.  She inherited issues --

THE COURT:  I don't want to hear what I'm going to hear about it.

MR. KELLY:  Okay.  Then I won't.  Based upon what has been known, she has clearly testified that, you know, she had only a general understanding of a high productive employee.  Until June of 2011, Dr. Linda Han had no knowledge of any serious problem with this employee at the lab.  And once she became aware of it, she conferred with the other supervisory officials.  They removed this woman from testing.  They took action.

Prior to that time, which, of course, we're talking about the snapshot in time -- we're talking about in trial in September of 2010, all that Dr. Linda Han knew was that there was a productive employee.  And when she spoke with Ms. Nassif about it, as she testified, she was told that there were lots of reasons why you can't just accept the bare numbers on the pages, as she testified.  So I would think with respect to Dr. Linda Han in particular, the qualified immunity doctrine should apply.

THE COURT:  So the analysis would be -- and tell me if you think my analysis is articulated correctly; that in this factual context, what we've heard at this point, viewing it in light most favorable to the plaintiff, considering what Han knew, if it would be reasonable for her to understand that her conduct was violating a

03:49:27 1    constitutional right.

03:49:32 2              MR. KELLY:  I do think that's the right

03:49:34 3    analysis, Your Honor.

03:49:35 4         And have in mind, Dr. Linda Han is not a forensic

03:49:41 5    chemist.  She's not someone who tests drugs --

03:49:44 6              THE COURT:  But I wasn't asking you to

03:49:45 7    supplement the argument.

03:49:47 8              MR. KELLY:  Oh.  I agreed with the analysis.

03:49:47 9    I thought you were calling for more, Your Honor.  I

03:49:50 10   apologize.

03:49:51 11             THE COURT:  I'm just asking you, that's

03:49:52 12   pretty much the framework test here of the meshing of

03:49:55 13   qualified immunity at a Rule 50 stage.

03:50:00 14             MR. KELLY:  Yes, Your Honor.  I'm in

03:50:05 15   agreement.

03:50:06 16             THE COURT:  All right.  I will -- I will

03:50:09 17   allow other counsels -- counsels for the other parties to

03:50:16 18   make a point.

03:50:17 19             MR. MARINO:  Thank you, Your Honor.  Paul

03:50:19 20   Marino, and I represent Ms. Nassif.

03:50:21 21        And taking that same rationale that you just spoke

03:50:25 22   of regarding Dr. Han, what did Ms. Nassif know or reasonably

03:50:29 23   knew, what she knew that she would be violating some

03:50:32 24   constitutional right.

03:50:33 25        And again, I think as the testimony has come in,

as far as what Ms. Nassif was told, what all the other
witnesses have testified, was that there was one concern of
high testing.  It was reported to her, she met with
supervisors.  They did what they said they were going to do.
That's it as of 2010.

And that's -- at the end of 2010, when that
information comes to her, I don't see -- and I've heard no
evidence, and I don't think there's been any evidence
regarding any constitutional violation there or that she
would be violating anyone's constitutional rights by acting
in her role as the supervisor here to simply say, "Here's
what we're going to do.  We're going to address this issue."
And what was reported back to her was exactly that.  "We
don't find" -- from her supervisors that report to her, "We
don't find anything wrong here."

That's her job.  And she then puts it up the chain
of command, so Dr. Han was aware of it, as well, which was
her role.  I don't see how that -- or there can be any
reasonable knowledge there that she's violating a
constitutional right of Mr. Jones by acting in her role as a
supervisor.

THE COURT:  All right.  For Mr. Salemi?

MR. GRACE:  Yes.  Likewise, Your Honor.  As
of September 1, 2010, Your Honor, the only concern was a
vague concern about higher numbers than the other chemists.

| | |
|---|---|
| 03:51:55 | 1 |
| 03:52:00 | 2 |
| 03:52:04 | 3 |
| 03:52:07 | 4 |
| 03:52:10 | 5 |
| 03:52:19 | 6 |
| 03:52:25 | 7 |
| 03:52:28 | 8 |
| 03:52:31 | 9 |
| 03:52:34 | 10 |
| 03:52:38 | 11 |
| 03:52:43 | 12 |
| 03:52:46 | 13 |
| 03:52:50 | 14 |
| 03:52:55 | 15 |
| 03:52:55 | 16 |
| 03:52:57 | 17 |
| 03:52:59 | 18 |
| 03:53:02 | 19 |
| 03:53:07 | 20 |
| 03:53:09 | 21 |
| 03:53:11 | 22 |
| 03:53:14 | 23 |
| 03:53:16 | 24 |
| 03:53:20 | 25 |

1  It was addressed.  And it was certainly not sufficient to

2  lead Mr. Salemi to reasonably believe that he was violating

3  any well-established right of Mr. Jones.

4          THE COURT:  All right.  So clearly I want to

5  hear from the plaintiff, but I'm also kind of factoring in

6  that I need -- we need a resolution of the Inspector General

7  report and what may or may not -- depending on how we

8  resolve this, what may be admissible in the plaintiff's

9  case, to factor into this analysis.

10         So I'll hear you now, your argument, up to this

11  point.  And tomorrow morning is when we're going to have to

12  decide what, if any of the Inspector General's, report comes

13  in.  And then we'll just supplement the arguments on the

14  Rule 50 motion at that point.  All right?

15         MR. TUMPOSKY:  Yes, Your Honor.

16         THE COURT:  Does that sound --

17         MR. TUMPOSKY:  Well, I would suggest, if the

18  Court was inclined to deny all the motions, then the IG

19  issue could come in and be done with, if necessary, if the

20  case ever went up to the First Circuit.

21         THE COURT:  All right.  So the defense has my

22  attention.  How's that?

23         MR. TUMPOSKY:  So I guess I -- I'll talk

24  generally about the evidence that we've heard, and then I'll

25  try and apply it to specific people, as best that I can.

03:53:24  1          THE COURT:  Sure.

03:53:25  2          MR. TUMPOSKY:  You know, the main refrain

03:53:28  3   that -- from the defense has been, "All we ever heard about

03:53:32  4   was high volume."  I would say two things about that:

03:53:35  5   Number one, it's not true; and number two, it wasn't just

03:53:40  6   that her numbers were better than everyone else's.

03:53:44  7          You heard from Mr. Lawler that when he saw her

03:53:47  8   numbers, he was floored.  He actually said, "I don't believe

03:53:50  9   that anyone could possibly be performing this amount of

03:53:56 10   testing."

03:53:57 11          And so I would suggest that a reasonable

03:53:59 12   supervisor, looking at those numbers, would not just say,

03:54:04 13   "Huh.  That's interesting.  She's productive.  You know,

03:54:07 14   maybe other people should skip lunch"; that they, the jury

03:54:11 15   could infer, would be similarly floored, or should have

03:54:14 16   been, that her numbers were so high, compared to all the

03:54:17 17   other chemists, and infer from that, that she simply wasn't

03:54:23 18   performing all the required tests.

03:54:27 19          That alone, I would suggest, is *Brady* material,

03:54:28 20   and that alone would be sufficient to require a state

03:54:32 21   employee -- would put a reasonable state employee on notice.

03:54:36 22   That's something that would be impeachment material.

03:54:38 23          But that's not all we have.

03:54:40 24          THE COURT:  Okay.  So I agree with you with

03:54:43 25   that being on impeachment material, that being potentially

03:54:47 1  exculpatory, that being a potential constitutional

03:54:50 2  violation, if you don't give it over.  So I agree with that.

03:54:53 3          MR. TUMPOSKY:  Okay.  So we know for sure

03:54:55 4  that all three defendants were aware of that high volume.

03:55:00 5  That came in the testimony of Piro and through the testimony

03:55:04 6  of Dr. Han, herself, who said that Ms. Nassif showed her the

03:55:09 7  high volume.

03:55:10 8          Now, Ms. Nassif may have downplayed a significance

03:55:14 9  to Dr. Han, but the law does not require Dr. Han to have a

03:55:18 10 subjective belief that her conduct is going to result in a

03:55:21 11 constitutional violation under the deliberate indifference

03:55:25 12 standard; it's essentially whether a reasonable objective

03:55:28 13 person, confronted with this information, would believe that

03:55:31 14 they had an obligation to take action, and failure to do so,

03:55:35 15 perhaps, would be deliberate indifference.  That's the

03:55:38 16 standard.

03:55:38 17         So the fact alone of the high volume, I would

03:55:42 18 suggest, was sufficient to put all three defendants on

03:55:45 19 notice that they were obligated to turn it over and that the

03:55:48 20 failure to encourage their subordinates to do so would be

03:55:53 21 deliberate indifference.

03:55:54 22         But that's not all we have.

03:55:56 23         Specifically, with respect to Dr. Han, I would

03:55:59 24 suggest that it simply is incredible that the other issues

03:56:07 25 weren't brought to her attention.  In other words, Salemi

Case 1:13-cv-11196-MGM Document 574 Filed 09/10/16 Page 69 of 100

03:56:12  1   had all these concerns that were brought to his attention

03:56:15  2   from Mr. Piro.  And in fact, because of all the concerns,

03:56:19  3   she wasn't under a microscope, she couldn't have been

03:56:24  4   performing all the tests, the high volume, making of

03:56:30  5   mistakes, the unusual high number of returns, so much so

03:56:32  6   that Mr. Salemi assigned Ms. Dookhan, essentially, a

03:56:37  7   babysitter, quite frankly, is how Mr. Prio described it, to

03:56:40  8   keep an eye on her.  So this was obviously something that

03:56:43  9   was a topic of discussion.

03:56:44 10           So when Dr. Han says, "Well, all I knew

03:56:47 11   was she was a good employee" -- and the volume was

03:56:50 12   something, and the other things that were mentioned to

03:56:53 13   Salemi and Nassif were things that were troubling.  So it's

03:56:58 14   simply not credible that when Nassif is discussing Dookhan

03:57:02 15   with Han, that she says, "Oh, no.  No problem."  And I think

03:57:08 16   the jury would be free to disregard that, and, in fact,

03:57:11 17   infer the opposite; that if the discussion was about

03:57:13 18   Dookhan, it was about all of the problems that they were

03:57:15 19   aware of at that time, not just about the high numbers.

03:57:16 20           So I would suggest, Your Honor, that

03:57:18 21   the jury could infer that all of the complaints that

03:57:21 22   occurred prior to Jones's trial, did, in fact, make their

03:57:25 23   way as high as Dr. Han, and that she would be obligated, and

03:57:28 24   a reasonable person in her position should think that she

03:57:32 25   was obligated to, in fact, relay that information over to --

03:57:37 1   to law enforcement, to prosecutors and defense lawyers.

03:57:41 2          I think you also have to look at what

03:57:46 3   happened after the Jones trial, to give us a sense of what

03:57:48 4   the office policy was. And I think if you look specifically

03:57:51 5   at her response to what happened in June, Han's response

03:57:56 6   specifically, you'll see that, in fact, her attitude was one

03:58:00 7   of not disclosing. And I think that tells you what culture

03:58:06 8   was in place prior to the Jones trial.

03:58:08 9          You heard that when it came to her

03:58:10 10   attention, that, in fact, Ms. Dookhan had committed this

03:58:14 11   egregious violation of lab policy, the response of Han and

03:58:19 12   Nassif was, number one, to put Dookhan in charge of

03:58:23 13   rewriting the office policies that she had just violated;

03:58:25 14   and number two, to sit on the information for six months,

03:58:28 15   until -- or eight months, in fact, until February of 2012,

03:58:33 16   when she writes a letter finally to the Norfolk district

03:58:37 17   attorney, outlining essentially that they claim this was an

03:58:42 18   isolated incident from a valued employee. And I think the

03:58:45 19   jury can infer, quite frankly, that letter was simply a

03:58:50 20   falsehood and what that tells us about Dr. Han's credibility

03:58:52 21   in another context.

03:58:54 22          So I think that if you look at what

03:58:57 23   Piro reported to Salemi and Nassif, you look at what Han

03:59:02 24   knew about the volume specifically and what that should have

03:59:05 25   told her, based on the testimony of Lawler, and how no one

03:59:08 1     could possibly be doing all those tests; and then you look

03:59:11 2     at whether we can actually believe that Han, in discussing

03:59:14 3     Dookhan, was simply told she's a available employee who's

03:59:19 4     skipping lunch breaks, and I would suggest that the jury

03:59:21 5     would be free to disbelieve that.  So I would suggest that

03:59:25 6     all of the evidence that we presented relates equally to all

03:59:29 7     three defendants.

03:59:30 8             And I would also point out that there

03:59:32 9     was such a concern about what Ms. Dookhan was doing, about

03:59:35 10     her volume, that before the Jones trial in 2010, they

03:59:38 11     ordered an audit of her paperwork.  Didn't do any retesting,

03:59:42 12     but obviously they thought, maybe there's something up here.

03:59:45 13     Now, the right thing to do would have been to do some

03:59:49 14     retesting on her samples, which they didn't do.  And this

03:59:52 15     was before the Jones trial in 2010.  So adding that to the

03:59:55 16     picture, and sort of the idea that this didn't make its way

03:59:58 17     all the way to the top, I think is not just an accurate

04:00:02 18     state of the evidence.

04:00:02 19             But you add that to the picture, with

04:00:04 20     all the things that Piro reported in 2009, Lawler's reaction

04:00:09 21     to the volume, that, in his belief you couldn't possibly be

04:00:14 22     doing all the tests, you add that to the postevent conduct,

04:00:17 23     which, reflecting the office culture of hiding things

04:00:20 24     instead of turning them over, gives us an insight to what

04:00:24 25     happened before.  You put all of that together, and I think

04:00:26 1    that qualified immunity is not appropriate.

04:00:30 2                    And I would point out that you will be

04:00:32 3    the third judge of this court to look at all these legal

04:00:35 4    issues, and the evidence, quite frankly, brought out at

04:00:39 5    trial is more than was presented in the complaint and in the

04:00:43 6    summary judgment papers.  And both Judge Saylor and Judge

04:00:47 7    Sorokin, on less evidence, I would suggest, denied the very

04:00:50 8    arguments that the defendants are making now, and I would

04:00:52 9    ask the Court to do the same.

04:00:53 10                   THE COURT:  All right.  Thank you.

04:00:55 11                   MR. KELLY:  Your Honor, if I could just --

04:00:57 12   his argument boils down to it's incredible that Dr. Han

04:01:01 13   didn't know, and the jury can disregard what she said.

04:01:04 14   Where is the evidence?  Your Honor, the evidence -- first of

04:01:07 15   all, he's misstated what Dr. Han said about Ms. Dookhan

04:01:11 16   being reassigned.  She wasn't reassigned.  She tried to

04:01:16 17   explain to him, he wasn't listening, that she wasn't

04:01:20 18   rewriting office policy.  She was talking about scientific

04:01:23 19   testing procedures on actual analyses that were done.

04:01:24 20                   Also he quotes from the letter.  The letter is not

04:01:26 21   in evidence.  Where's the evidence?

04:01:27 22                   And third, he talks about Mr. Lawler's comments

04:01:31 23   about his impressions that that number of testing could

04:01:34 24   never be done, it's unfathomable.  He was very clear from

04:01:39 25   the witness stand, because he asked him repeatedly and he

Case 3:13-cv-30116-MGM Document 572 Filed 03/10/16 Page 69 of 109

04:01:40 1    kept saying, when did he fashion that view in his mind:

04:01:44 2    Late winter, early spring 2011.  He said it three or four

04:01:48 3    times under oath.

04:01:50 4           We're talking about a trial which took place in

04:01:52 5    September of 2010.  That one piece of evidence postdated

04:01:55 6    this issue.  And frankly, there is no evidence regarding

04:01:58 7    Dr. Han that would be sufficient to establish liability.

04:02:02 8                  THE COURT:  All right.  Here's what we're

04:02:06 9    going to do.  We are going to -- first thing in the morning,

04:02:13 10   we are going to decide if and what parts of the Office of

04:02:17 11   the Inspector General report are admissible, if anything is

04:02:21 12   admissible, is going to be admitted in the plaintiff's case.

04:02:28 13   At that point, I will consider the plaintiff's case as a

04:02:31 14   whole, complete for purposes of considering a Rule 50

04:02:36 15   motion.  All right?

04:02:40 16                  MR. KELLY:  I understand.

04:02:41 17                  THE COURT:  So until we get to that point,

04:02:44 18   right now you are reserving your rights, and under the rule,

04:02:49 19   under Rule 50, the motion for judgment as a matter of law

04:02:53 20   can be made at any time before the case is submitted to the

04:02:58 21   jury.  So we can move on a little bit, cautiously move on

04:03:03 22   right now until we finish our business with the Inspector

04:03:06 23   General report tomorrow.

04:03:07 24           So I heard your arguments.  Tomorrow morning we'll

04:03:10 25   decide about the Inspector General report, we'll have some

04:03:13 1    more argument, limited, as to how that might affect any

04:03:16 2    Rule 50 motions.

04:03:17 3            Right now we're going to move to opening

04:03:21 4    statements, if that's the choice of counsel for Salemi and

04:03:26 5    Nassif.  All right?

04:03:28 6            Now, after that, do you have a witness?

04:03:34 7                MR. MARINO:  We do, Your Honor.

04:03:36 8                THE COURT:  All right.  All right.  That's

04:03:38 9    how we're going to proceed, then.  All right.

04:03:41 10           So for time, you have basically like nine minutes

04:03:53 11   left apiece for openings.

04:03:57 12               MR. KELLY:  I think we're only going to have

04:03:59 13   one opening, Your Honor.

04:04:00 14               THE COURT:  All right.  All right.  So you're

04:04:03 15   going to use -- you're going to use the entire time

04:04:06 16   remaining.  Who's going to do that?

04:04:09 17               MR. MARINO:  Attorney Launie is going to --

04:04:09 18               MR. LAUNIE:  I am, Your Honor.  I won't use

04:04:11 19   18 minutes.

04:04:11 20               THE COURT:  So you have 18 minutes to use.

04:04:16 21           So in other words, Mr. Grace, you're not going to

04:04:17 22   make an opening?

04:04:19 23               MR. GRACE:  Probably not.  It depends on what

04:04:21 24   I hear.

04:04:22 25               MR. LAUNIE:  Let me know.  I'll do some

04:04:24 1    stand-up.

04:04:24 2              THE COURT:  All right.  So that's what you

04:04:25 3    have.  If you're going to use all of the defense time, you

04:04:28 4    have 18 minutes.  If you want to leave one minute and seven

04:04:32 5    seconds for Mr. Grace, then you can do that.  Okay?  And

04:04:36 6    then we'll proceed to a witness, if we can get one on.

04:04:40 7              All right, Jarrett.  Let's go.

04:04:40 8                    (Discussion off the record.)

04:06:10 9              THE COURT:  This is good.  The next one we

04:06:13 10   all do, we're going to do in Springfield.

04:06:16 11             MS. HEDGES:  Are we going to stay in a fancy

04:06:18 12   hotel?

04:06:18 13             MR. TUMPOSKY:  Are you going to put us up?

04:06:22 14            (The jury enters the courtroom.)

04:06:41 15             THE COURT:  All right.  Ladies and gentlemen,

04:06:43 16   during the break, was everyone able to follow my

04:06:45 17   instructions not to speak about the case, begin

04:06:48 18   deliberations, or to research the case in any way through

04:06:52 19   Internet, computer, social media, Internet access?

04:06:57 20             THE JURY:  (Negative responses.)

04:06:58 21             THE COURT:  And there's nothing that the jury

04:07:01 22   needs to talk to me about?

04:07:03 23             THE JURY:  (Negative responses."

04:07:04 24             THE COURT:  And the plaintiff's intention is

04:07:06 25   to rest their case.  There may be, tomorrow, consideration

04:07:09 1    of some additional evidence in the plaintiff's -- that will

04:07:14 2    be added to the plaintiff's case.  But if that happens, it

04:07:19 3    would likely be not by a witness, it would be documents that

04:07:22 4    are introduced.

04:07:23 5          So at this point, we are right on the verge of

04:07:27 6    starting the defense case.  And if you remember at the start

04:07:30 7    of the case, you heard an opening statement from the

04:07:33 8    plaintiff and by Mr. Kelly, one of the defense attorneys.

04:07:37 9    The other defense attorneys chose to, as they can, to

04:07:41 10   reserve their right to do an opening until right before they

04:07:44 11   start their defense case.  And that's where we're at.  So

04:07:47 12   there will be, I understand it, one opening at this time by

04:07:51 13   the defense.  And we can have that right now.  Thank you.

04:07:59 14                    **OPENING STATEMENT**

04:07:59 15          MR. LAUNIE:  Good afternoon, Your Honor,

04:08:03 16   Mr. Clerk.

04:08:05 17          Ladies and gentlemen of the jury, good afternoon.

04:08:07 18   My name is Robert Launie.  You haven't heard from me yet.

04:08:11 19   I'm the guy who's been sitting right there keeping quite.

04:08:11 20   But it's my turn to talk to you, give you a brief opening.

04:08:14 21          Now, my brother, Mr. Kelly, represents Dr. Linda

04:08:18 22   Han; he came out earlier on Monday, although it probably

04:08:21 23   seems more than two days ago.  He gave an opening on behalf

04:08:24 24   of his client, Dr. Han, but as well as for our client,

04:08:28 25   Ms. Julie Nassif, and Charles Salemi.

Case 3:13-cv-30196-KAR   Document 105-29   Filed 03/10/16   Page 74 of 110

04:08:31  1          Now, an opening statement is not evidence, as Your

04:08:35  2   Honor has told you, it's sort of a roadmap of what's to be

04:08:39  3   expected.  But here, as far as you jurors, you're sort of

04:08:43  4   getting your money's worth, because you've got a civil trial

04:08:46  5   to decide, but you're now going to also hear a reenactment

04:08:51  6   of Mr. Jones's criminal trial.  So you're getting a civil

04:08:54  7   and criminal background.  But the fact is that one of the

04:08:56  8   things that you want to decide is, was Mr. Jones's

04:09:00  9   constitutional rights violated in his trial on August 30th

04:09:06 10   and September 1st of 2010.

04:09:08 11          Now, I have had the opportunity, as you have, to

04:09:13 12   listen to live testimony from clients -- from witnesses who

04:09:18 13   worked at the lab, under all three of the defendants.  Now,

04:09:25 14   one thing you do as jurors that's important in the roadmap

04:09:29 15   to this case is that you leave your prejudices and your

04:09:33 16   biases at the door, but you never leave your good common

04:09:37 17   sense that you were born with.

04:09:38 18          So what we have is three defendants in a case who

04:09:42 19   are at different levels within this close proximity of this

04:09:46 20   lab.  And as any supervisor does, any good person who has

04:09:51 21   delegated responsibilities, they rely on their subordinates.

04:09:57 22   And in this case, I think so far what you've heard and what

04:10:02 23   is clearly going to be established is that these three

04:10:05 24   people relied on each other, made competent decisions, used

04:10:10 25   collective and collaborative bargaining within each other to

04:10:14 1    make good and rational decisions on behalf of the drug lab,

04:10:19 2    to ensure that the testing that was being sent out was

04:10:24 3    accurate.

04:10:25 4            Now, evidence is shown and evidence is going to

04:10:29 5    continue to be shown that the style was nobody was nobody

04:10:33 6    was rushing.  Do your job, do it well, accuracy is

04:10:37 7    important.  All right.  I think we've heard that.  I think

04:10:42 8    that the plaintiff has tried to show that there was some

04:10:46 9    push to get volume up and all this.  I think from the people

04:10:50 10   that worked at that lab, people who will testify, that just

04:10:53 11   simply has not been the case.  That has just simply not been

04:10:57 12   the case, by people who can come to this court, free to say

04:11:00 13   whatever they want now, because the three defendants aren't

04:11:05 14   connected with the lab anymore.  Here's their time.  And to

04:11:09 15   a person, every single one of them told you, we were never

04:11:13 16   asked to rush.  We were always asked to get it right.

04:11:18 17           And that's important, because when you hear the

04:11:22 18   reenactment of Mr. Jones's August 30th and September 1st

04:11:27 19   trial, the jury got it right.  And you're going to hear from

04:11:32 20   the police officers, their observations.  You're going to

04:11:35 21   hear, just as you heard from the stand, Ms. Corbett.  You're

04:11:39 22   going to hear a jury of Mr. Jones's peers have a finding,

04:11:47 23   and that finding was based on the evidence that was

04:11:52 24   presented at that trial.

04:11:54 25           What is also important is that evidence was given

04:11:57 1    to the Commonwealth, passed on to the defense, of what was

04:12:01 2    known by the three defendants in this case on August 30th

04:12:06 3    and September 1st of 2010.  Now, your memory controls as to

04:12:13 4    what dates are important and what dates were testified to,

04:12:19 5    but there are witnesses in this case who will tell you that

04:12:25 6    I may have reported something, maybe in 2008, I could have

04:12:28 7    been three years off, two years off.  I don't know.  But

04:12:32 8    when something was brought to their attention, those three

04:12:36 9    defendants, they acted.  They acted.  They did things which

04:12:41 10   were in the best interest of the lab and to the person

04:12:44 11   before them, their subordinates, the employees of the state,

04:12:50 12   and what they could do at that point in time and whether it

04:12:53 13   was rational.

04:12:54 14        Now, we've -- I've made it through the individual

04:12:59 15   voir dire.  Again, I ask you to use your good common sense

04:13:02 16   as to how you deal with these types of issues and whether

04:13:06 17   they rose to what the plaintiffs need you to believe, that a

04:13:10 18   constitutional violation of that man's rights were violated

04:13:13 19   by what these people did at the lab.  And after all the

04:13:16 20   evidence is in, I suggest that the only verdict that you can

04:13:20 21   come to is that these three defendants acted properly, and

04:13:23 22   that there was no violation.  Thank you.

04:13:25 23             THE COURT:  All right.  Thank you.

04:13:52 24             MR. MARINO:  Your Honor, we call Julie

04:13:55 25   Nassif.

75

04:13:55  1                    THE COURT:  All right.  Let me ask Mr. Grace,

04:13:58  2    any opening?

04:13:59  3                    MR. GRACE:  No, Your Honor.  Thank you.

04:14:00  4                    THE COURT:  All right.  Opening waived?

04:14:02  5                    MR. GRACE:  Yes.

04:14:03  6                    THE COURT:  All right.

04:14:18  7                    (The witness was duly sworn.)

04:14:25  8                    THE DEPUTY CLERK:  Please state your full

04:14:26  9    name, spelling your last.

04:14:29 10                    THE WITNESS:  Julianne Nassif, N-a-s-s-i-f.

04:14:29 11                          **JULIANNE NASSIF**

04:14:41 12        having been duly sworn, testified as follows:

04:14:41 13        **DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT NASSIF**

04:14:41 14    BY MR. MARINO:

04:14:42 15        Q.   Good afternoon, Ms. Nassif.

04:14:45 16        A.   Good afternoon.

04:14:45 17        Q.   Can you tell me a little bit about yourself,

04:14:47 18    meaning your education.

04:14:48 19        A.   Sure.  I have a bachelor's degree in

04:14:50 20    environmental health, and I have a master's degree in

04:14:54 21    environmental science.

04:14:56 22        Q.   Where did you obtain those degrees?

04:14:58 23        A.   My bachelor's degree I got at Quinnipiac

04:15:04 24    University in Hampton, Connecticut; and my master's degree

04:15:07 25    at the University of Massachusetts at the Boston campus.

04:15:11 1      Q.   And are you married now?

04:15:12 2      A.   I am.

04:15:13 3      Q.   Do you have children?

04:15:13 4      A.   I have two.

04:15:14 5      Q.   How old?

04:15:15 6      A.   19 and 23.

04:15:16 7      Q.   Now, I want to talk to you a little bit about your

04:15:20 8   employment history.

04:15:21 9      A.   Okay.

04:15:22 10     Q.   Where did -- at some point you worked for the

04:15:25 11  Department of Public Health, correct?

04:15:26 12     A.   That's true, yes.  The Massachusetts

04:15:29 13  Department --

04:15:30 14     Q.   Of Massachusetts, yes.

04:15:31 15     A.   Yes.

04:15:32 16     Q.   When did you begin working for the Department of

04:15:35 17  Public Health in Massachusetts?

04:15:36 18     A.   In 1984.

04:15:38 19     Q.   Was that shortly after you got out of college?

04:15:40 20     A.   I had one real job prior to that, at a

04:15:45 21  commercial laboratory, as an analytical chemist.

04:15:49 22     Q.   Okay.  And then you found employment with the

04:15:51 23  Department of Public Health, correct?

04:15:53 24     A.   Yes.

04:15:54 25     Q.   All right.  What was your first job there?

04:15:56 1       A.   I was a chemist 1.

04:15:58 2       Q.   With what department?

04:16:00 3       A.   In the environmental laboratories.

04:16:02 4       Q.   And what were your job responsibilities as a

04:16:05 5    chemist 1 in the environmental laboratory?

04:16:08 6       A.   Primarily the analysis of food products for

04:16:11 7    pesticide residue analysis and some other chemical

04:16:21 8    contaminants, but primarily pesticide residue analysis.

04:16:25 9       Q.   And how long did you remain in that position?

04:16:27 10      A.   I was promoted the following year to a

04:16:30 11   chemist 2.

04:16:30 12      Q.   Okay.  Within the same lab?

04:16:34 13      A.   Yes.

04:16:34 14      Q.   How about after that?

04:16:35 15      A.   The following year, I was promoted to a

04:16:38 16   chemist 3.  So that's around 1986.  So I was the

04:16:45 17   chemist 3, and at some point functionally became the

04:16:48 18   supervisor of the organic section of the environmental

04:16:51 19   laboratories.

04:16:52 20      Q.   And when you were in that role, what were your

04:16:54 21   duties and responsibilities?

04:16:56 22      A.   So they were quite varied, as that laboratory

04:17:01 23   tests a variety of sample types, clinical samples, food

04:17:06 24   samples, and environmental media for chemical

04:17:13 25   contaminants.  So I would oversee the activities of the

04:17:17 1  subordinate chemists in terms of, you know, their -- their

04:17:25 2  testing, allocate the work flow, and review data.

04:17:29 3      Q.   And how long did you remain in that position?

04:17:35 4      A.   I was in the title until 1990, but functionally

04:17:40 5  I was acting out of title as the lab supervisor.

04:17:44 6      Q.   And at some point did you change jobs?

04:17:48 7      A.   Yes.  In 2000 -- in 1990, I was -- my position

04:17:58 8  was reallocated.  It was recognized that I was working

04:18:01 9  significantly out of title and was made a manager, a

04:18:10 10 program manager, and that -- my title became director of

04:18:13 11 environmental chemistry.

04:18:17 12     Q.   Where was your office located?

04:18:19 13     A.   At -- mostly on the third floor of the state

04:18:23 14 laboratory institute.

04:18:24 15     Q.   Okay.  And how long did you remain at that job

04:18:28 16 title, with those duties?

04:18:30 17     A.   Until about 2006.

04:18:35 18     Q.   Okay.  So what happened in 2006?

04:18:39 19     A.   The previous few years, our laboratory director

04:18:45 20 had retired, and we had an acting laboratory director in

04:18:49 21 that capacity.  Finding a replacement for the laboratory

04:18:55 22 director took far longer than anyone anticipated, so the

04:19:00 23 acting laboratory director, in an effort to streamline the

04:19:04 24 reporting structure at the lab, created these three major

04:19:10 25 scientific divisions.  So there became an analytical

04:19:16 1    chemical division, molecular diagnostics and virology, and

04:19:22 2    microbiology.  And --

04:19:22 3        Q.   So by streamlining those positions, your job title

04:19:27 4    changed again?

04:19:28 5        A.   Yes.  Then I became the director of analytical

04:19:32 6    chemistry.

04:19:33 7        Q.   As the director of analytical chemistry, what labs

04:19:38 8    fell under your purview?

04:19:40 9        A.   So there was the childhood lead screening

04:19:44 10   laboratory, the environmental chemistry laboratory, the

04:19:48 11   chemical threat response laboratory, the drug laboratory

04:19:51 12   in Boston, and the drug laboratory in Amherst.

04:19:54 13       Q.   So you had five labs that you were overseeing?

04:19:58 14       A.   Yes.

04:19:59 15       Q.   And what year was this?

04:20:01 16       A.   2006.

04:20:02 17       Q.   As the director of analytical chemistry, can you

04:20:08 18   describe for the jurors what your duties and

04:20:10 19   responsibilities were?

04:20:11 20       A.   They were quite varied.  It involved, you know,

04:20:17 21   personnel, budgetary issues, grant writing, overseeing the

04:20:25 22   technical and administrative direction of those

04:20:27 23   laboratories, assisting with any kind of external

04:20:53 24   validation or accreditation.

04:20:53 25       Q.   Now, you said one of the labs was the drug lab in

04:20:53 1    Amherst?

04:20:53 2         A.   Yes.

04:20:53 3         Q.   And were you required to go there, as well?

04:20:53 4         A.   I did go on occasion.  More often than not, Jim

04:20:54 5    Hanchett, the lab supervisor in Amherst, would travel to

04:20:58 6    Boston.

04:20:59 7         Q.   And how long did you hold that job, Ms. Nassif?

04:21:02 8         A.   Until 2012.

04:21:03 9         Q.   Okay.  Now, are you currently employed?

04:21:06 10        A.   I am.

04:21:06 11        Q.   What do you do?

04:21:07 12        A.   I am the analytical chemistry program manager at

04:21:14 13   the New Hampshire Public Health Laboratories.

04:21:17 14        Q.   And how long have you had that job?

04:21:19 15        A.   Since 2013.

04:21:21 16        Q.   Now, going back to your education a little bit,

04:21:26 17   again, what were your degrees in?

04:21:28 18        A.   Environmental health and environmental science.

04:21:32 19        Q.   And did you -- were you trained in chemistry?

04:21:36 20        A.   I absolutely took chemistry as part of my

04:21:40 21   curriculum, yes.

04:21:41 22        Q.   And in your education, were some of the focuses

04:21:43 23   that you -- some of the things that you focused on, were

04:21:47 24   they analytical in nature?

04:21:49 25        A.   Yes.

Q.   Scientific?

A.   Yes.

Q.   Now, when you were at the Department of Public
Health -- and I want to put your time frame down more
to 2006 through 2012, when you were the director of
analytical chemistry.  Okay?

A.   Okay.

Q.   Can you discuss what type of training you were
given back in 2006, when you became the director of
analytical chemistry?

A.   It's really challenging for me to put things --
when you've worked someplace for 28 years, to know which
years you attended which trainings.

Q.   I understand.  Was training available to you
through the Department of Public Health?

A.   There was professional development training
available.  Sometimes training was grant related,
sometimes it was offered through human resources.

Q.   Okay.  Were you ever given any sort of supervisor
training?

A.   Sure.  There were some mandated trainings with
respect to workplace violence, diversity in the workplace,
awareness of sexual harassment.  I did take management
training, but I honestly don't know the dates of when that
occurred.  So I don't know if it happened after the 2006

04:23:18 1    time frame.

04:23:19 2        Q.   Okay.  And were funds available for other chemists

04:23:24 3    within the lab, specifically within the drug lab?

04:23:28 4        A.   Within the drug lab, funds were really limited.

04:23:32 5    Travel and professional development opportunities were

04:23:37 6    really restricted to grant funded or grant -- in some

04:23:42 7    cases really grant-mandated requirements.  So there were

04:23:51 8    very few resources for professional development for the

04:23:55 9    drug laboratory.

04:23:56 10       Q.   Okay.  Was any legal training offered to the

04:24:07 11   chemists or yourself?

04:24:08 12       A.   At one point, we acquired some grant funding,

04:24:12 13   and I was able to bring in a local attorney who did some

04:24:16 14   expert witness testimony with the chemists.

04:24:19 15       Q.   And do you recall when that was?

04:24:21 16       A.   It was post *Melendez-Diaz*.

04:24:24 17       Q.   And was there a reason that you focussed on that

04:24:26 18   issue?

04:24:26 19       A.   Because they were being -- you know, many of the

04:24:29 20   junior staff had never testified in court, and so they

04:24:36 21   were -- they were a little anxious about it.  And so we

04:24:39 22   thought it would be advisable to bring in someone to help

04:24:43 23   them understand the process.

04:24:45 24       Q.   Would it be fair to say that the staff in the drug

04:24:49 25   lab were essentially trained as you were, in analytical

04:24:53 1   chemistry?

04:24:53 2       A.   For the most part, yes.

04:24:55 3       Q.   And no legal sort of training was offered to them

04:24:58 4   within the drug lab, between 2006 and 2012, while you were

04:25:02 5   there?

04:25:03 6       A.   No.

04:25:06 7       Q.   Now, I want to talk to you a little bit about the

04:25:11 8   lab setup.  Okay?

04:25:12 9       A.   Sure.

04:25:13 10      Q.   You can see that diagram next to you there?

04:25:16 11      A.   Uh-huh.

04:25:17 12      Q.   Is that a fair -- and I think that's Exhibit --

04:25:19 13      A.   I think it's 1.

04:25:21 14      Q.   Exhibit 1?  Exhibit 1.  Looking at Exhibit 1,

04:25:26 15  Ms. Nassif, is that a fair and accurate representation of

04:25:28 16  the drug lab in 2011/2012?

04:25:30 17      A.   Yes, it is.

04:25:32 18      Q.   Can you --

04:25:36 19              MR. MARINO:  Your Honor, if she could step

04:25:38 20  down.

04:25:39 21              THE COURT:  Sure.

04:25:40 22  BY MR. MARINO:

04:25:41 23      Q.   If you could just show us on that diagram,

04:25:45 24  Ms. Nassif, where your office was located.

04:25:48 25      A.   Sure.  It was right here, in the lower

04:25:51 1    right-hand corner.

04:25:51 2         Q.   Lower right-hand corner?

04:25:53 3         A.   Uh-huh.

04:25:54 4         Q.   Okay.  Now, there's another office on the side of

04:25:58 5    that?

04:25:58 6         A.   Here?

04:25:59 7         Q.   Yeah.  Who was there?

04:26:00 8         A.   At some points in time, I had an assistant, and

04:26:03 9    some points in time, it was the chemical threat

04:26:06 10   coordinator.  And at some points in time, Ms. Dookhan was

04:26:14 11   in there, as well.

04:26:15 12        Q.   What room was that?

04:26:17 13        A.   This is 305, and my office was 305-A.

04:26:21 14        Q.   Okay.  Now, while you're there --

04:26:25 15        A.   Okay.

04:26:26 16        Q.   -- can you show us where the evidence room is

04:26:28 17   there?

04:26:29 18        A.   It is here.

04:26:33 19        Q.   Now, how did you -- if you came off the elevators,

04:26:38 20   there's a corridor to the left.  Is that how you get into

04:26:42 21   the drug lab?

04:26:42 22        A.   Here?

04:26:43 23        Q.   Yes.

04:26:43 24        A.   Uh-huh.

04:26:44 25        Q.   Could you just walk into the drug lab?

04:26:46 1    A.   No.  So first of all, in the lobby of the

04:26:49 2  building, it was a secure building.  So you would have to

04:26:52 3  provide identification and have a reason to enter the

04:26:56 4  building.  If you traveled up to the third floor, each of

04:27:02 5  the wings had fire doors, and the fire doors were

04:27:05 6  controlled by proximity card readers.  So you needed to

04:27:12 7  have -- these areas were restricted access, so only people

04:27:15 8  who had a need to be in that area could access the area.

04:27:19 9       Police officers who showed proper identification

04:27:24 10 in the lobby were provided with a visitor badge that would

04:27:27 11 give them access to this wing only.

04:27:30 12    Q.   Okay.  And then how would they get down to the

04:27:32 13 evidence room?

04:27:34 14    A.   Turn the corner.

04:27:35 15    Q.   Okay.

04:27:36 16    A.   Yeah.

04:27:37 17    Q.   And then were they ever allowed to enter the

04:27:40 18 evidence room?

04:27:40 19    A.   No.

04:27:40 20    Q.   Now, how did the drugs get into the evidence room?

04:27:43 21    A.   There is a window right here, and when officers

04:27:50 22 came to the window, it would be up, and there would be an

04:27:55 23 evidence officer on the other side of the window, and they

04:27:59 24 would transfer across the window.

04:28:00 25    Q.   Okay.  Now, looking at that diagram, you see that

| | | |
|---|---|---|
| 04:28:04 | 1 | there's a number of rooms that are marked "drug labs." Do |
| 04:28:07 | 2 | you see that? |
| 04:28:08 | 3 | A.   Yes. |
| 04:28:10 | 4 | Q.   Now, if you were to come in that central corridor |
| 04:28:11 | 5 | there, instead of taking a left, you would go right, what |
| 04:28:15 | 6 | would happen there?  What would be there? |
| 04:28:17 | 7 | A.   Here? |
| 04:28:18 | 8 | Q.   Yes. |
| 04:28:19 | 9 | A.   So there was a door here.  This file room is not |
| 04:28:22 | 10 | included, but there's a door here. |
| 04:28:24 | 11 | Q.   Yes. |
| 04:28:26 | 12 | A.   And there's a hand reader there.  And -- a hand |
| 04:28:32 | 13 | reader and a code that you would have to punch in to |
| 04:28:35 | 14 | access this corridor, which led to these other rooms. |
| 04:28:40 | 15 | Q.   Okay.  And if you had gone left past the evidence |
| 04:28:43 | 16 | room? |
| 04:28:43 | 17 | A.   Here? |
| 04:28:44 | 18 | Q.   Yes.  You come down.  Was there access to any of |
| 04:28:47 | 19 | the drug labs from there? |
| 04:28:49 | 20 | A.   On this left side of the corridor? |
| 04:28:51 | 21 | Q.   Yes. |
| 04:28:53 | 22 | A.   Yes.  There is one access door down here, at |
| 04:28:56 | 23 | which it was equipped with a hand reader. |
| 04:28:59 | 24 | Q.   Okay. |
| 04:28:59 | 25 | A.   And a code. |

04:29:00  1      Q.   And a code.

04:29:01  2      A.   Uh-huh.

04:29:02  3      Q.   All right.  Now, on the right-hand side of the

04:29:04  4  hallway --

04:29:05  5      A.   And can I just say, the code was unique to the

04:29:08  6  individual.

04:29:08  7      Q.   Okay.  Thank you.

04:29:09  8      A.   Uh-huh.

04:29:10  9      Q.   On the right-hand side of that diagram, you see

04:29:13 10  two doorways with little black markings?

04:29:16 11      A.   These?

04:29:17 12      Q.   Yeah.  What does that reflect, if you can tell us?

04:29:21 13      A.   Those were the hand readers that were required

04:29:24 14  to access the evidence office and this smaller office

04:29:26 15  here, which is part of the evidence office.

04:29:28 16      Q.   Why were there hand readers there?

04:29:30 17      A.   To restrict access.

04:29:32 18      Q.   And was that for -- the reason why all the hand

04:29:35 19  readers were there?

04:29:36 20      A.   Yes.

04:29:37 21      Q.   And who was the access restricted to, to the

04:29:41 22  evidence room, if you know?

04:29:42 23      A.   For those people who needed to enter.  So the

04:29:46 24  evidence officers and the chemists did have access to

04:29:51 25  those areas.

| | | |
|---|---|---|
| 04:29:52 | 1 | Q. Okay. You can return to the stand. Thank you. |
| 04:30:02 | 2 | A. Okay. |
| 04:30:22 | 3 | Q. Can you see that okay? |
| 04:30:23 | 4 | A. Yeah. |
| 04:30:23 | 5 | Q. Now, Ms. Nassif, I'm going to show you what's been |
| 04:30:31 | 6 | previously marked as Exhibit 15. Okay? |
| 04:30:33 | 7 | A. Okay. |
| 04:30:33 | 8 | Q. And looking at that, Ms. Nassif, is that a fair |
| 04:30:36 | 9 | and accurate representation of the layout -- I'm sorry, the |
| 04:30:41 | 10 | chain of command within the forensic drug lab in 2011/2012? |
| 04:30:45 | 11 | A. Yes. |
| 04:30:46 | 12 | Q. And where do you fall there? Where are you? |
| 04:30:48 | 13 | A. I'm here. |
| 04:30:51 | 14 | Q. All right. And who would you report up to? |
| 04:30:54 | 15 | A. To Linda Han. |
| 04:30:56 | 16 | Q. Okay. And who was below you? |
| 04:30:58 | 17 | A. For the drug laboratory? |
| 04:31:01 | 18 | Q. For the drug lab. |
| 04:31:02 | 19 | A. Chuck Salemi. |
| 04:31:04 | 20 | Q. Now, there's kind of a dotted line going down to |
| 04:31:09 | 21 | the left there. Who is that pointing to? |
| 04:31:10 | 22 | A. Elizabeth O'Brien. |
| 04:31:12 | 23 | Q. And what was her role? |
| 04:31:13 | 24 | A. She was the supervisor of the evidence office. |
| 04:31:15 | 25 | Q. Okay. And does she also report to you? |

| | | |
|---|---|---|
| 04:31:18 | 1 | A.   Yes. |
| 04:31:18 | 2 | Q.   Did she also report to Mr. Salemi, as well? |
| 04:31:22 | 3 | A.   In a functional way, yes. |
| 04:31:25 | 4 | Q.   Now, looking at that chart -- |
| 04:31:30 | 5 | MR. MARINO:  May I approach, Your Honor? |
| 04:31:33 | 6 | THE COURT:  Yes. |
| 04:31:35 | 7 | BY MR. MARINO: |
| 04:31:37 | 8 | Q.   We have our evidence officers listed here, |
| 04:31:40 | 9 | correct? |
| 04:31:40 | 10 | A.   Yes. |
| 04:31:40 | 11 | Q.   And there was four of them? |
| 04:31:42 | 12 | A.   Yes. |
| 04:31:43 | 13 | Q.   And then going into the next room, there's -- |
| 04:31:48 | 14 | A.   So Janice Zanolli was not a full evidence |
| 04:31:53 | 15 | officer.  She was evidence retrieval is what it says |
| 04:31:58 | 16 | there. |
| 04:31:58 | 17 | Q.   Oh.  I'm sorry.  Evidence retrieval.  Okay.  So |
| 04:32:03 | 18 | there was three evidence officers? |
| 04:32:03 | 19 | A.   Yes. |
| 04:32:03 | 20 | Q.   How about Gloria Phillips?  Was she there a lot? |
| 04:32:07 | 21 | A.   She was out on an intermittent family medical |
| 04:32:10 | 22 | leave.  She had a severely ill child.  So you know, she |
| 04:32:15 | 23 | was there at times and then not there for extended periods |
| 04:32:18 | 24 | of time. |
| 04:32:20 | 25 | Q.   So mainly the evidence office is run by two |

04:32:21 1      people?

04:32:22 2          A.   Yes.  Yeah.

04:32:23 3          Q.   Now, it's -- this is broken into the three -- I'm

04:32:28 4      sorry, four separate labs.  Do you see that?

04:32:30 5          A.   Yes.

04:32:30 6          Q.   Now, in this first one here, it says "Chemist 3

04:32:34 7      Vacant"?

04:32:34 8          A.   Uh-huh.

04:32:35 9          Q.   Can you tell me who was in that spot?

04:32:37 10         A.   Elizabeth O'Brien.

04:32:38 11         Q.   And do you recall when she was moved to be a lab

04:32:43 12     supervisor 1 in the evidence office?

04:32:46 13         A.   I don't.  I heard her testimony this morning,

04:32:48 14     but I don't remember exactly when that was.  I think she

04:32:51 15     said 2009, but I'm not positive.

04:32:53 16         Q.   Now, it's listed here as vacant.  How come that

04:32:56 17     position wasn't filled?

04:32:57 18         A.   We weren't allowed to fill vacant positions.

04:33:00 19     There was a hiring freeze, and there was insufficient

04:33:05 20     funding.

04:33:05 21         Q.   So you, as the director of analytical chemistry,

04:33:09 22     weren't able to make that decision to fill that?

04:33:11 23         A.   No.

04:33:12 24         Q.   No?

04:33:12 25         A.   No.

04:33:13  1      Q.   Okay.  Now, if we go to the next room, there's

04:33:15  2  three spots.  We have chemistry 3, which is Mr. Lawler.  Do

04:33:20  3  you see that?

04:33:20  4      A.   Yes.

04:33:21  5      Q.   And this person here, Hevis Leschi?

04:33:30  6      A.   Uh-huh.

04:33:30  7      Q.   There's also a vacant spot there.

04:33:30  8      A.   Uh-huh.

04:33:31  9      Q.   And who was in that on spot?

04:33:33 10      A.   Zhi Tan.

04:33:35 11      Q.   What happened to him?

04:33:37 12      A.   He retired.

04:33:37 13      Q.   And were you able to fill that spot?

04:33:37 14      A.   No.

04:33:37 15      Q.   And you couldn't fill that spot, either?

04:33:39 16      A.   No.

04:33:39 17      Q.   Okay.  And again we go to this next lab, and

04:33:42 18  there's four chemists there, one of them being a vacant

04:33:46 19  chemist 1.  Who was in that spot?

04:33:48 20      A.   I think it was Xu Ying Gao, but I'm not

04:33:53 21  positive.

04:33:53 22      Q.   And Ms. Gao, what --

04:33:54 23      A.   Oh.  Actually, it might be Stacy Desjardins.

04:34:01 24      Q.   Did that person remain with the lab, whoever was

04:34:03 25  there?

| | | |
|---|---|---|
| 04:34:03 | 1 | A.   No. |
| 04:34:04 | 2 | Q.   And I take it you weren't able to fill that spot? |
| 04:34:06 | 3 | A.   Correct. |
| 04:34:06 | 4 | Q.   And then the fourth lab had four people in it, |
| 04:34:09 | 5 | correct? |
| 04:34:09 | 6 | A.   Yes. |
| 04:34:10 | 7 | Q.   Now, was the lab set up so that there would be |
| 04:34:15 | 8 | people who were either chem 1, chem 2, or chem 3? |
| 04:34:19 | 9 | A.   That was the way -- yeah, pretty much was set up |
| 04:34:22 | 10 | that way. |
| 04:34:23 | 11 | Q.   And is that how it was set up when you became the |
| 04:34:26 | 12 | director of analytical chemistry in 2006? |
| 04:34:31 | 13 | A.   Yes. |
| 04:34:31 | 14 | Q.   The chemists that were there -- well, strike that. |
| 04:34:35 | 15 | After 2006, did you hire any chemists yourself? |
| 04:34:40 | 16 | A.   No. |
| 04:34:40 | 17 | Q.   No.  So essentially you inherited this lab as is? |
| 04:34:44 | 18 | A.   Yes. |
| 04:34:45 | 19 | Q.   But with more employees? |
| 04:34:47 | 20 | A.   Oh, yeah. |
| 04:34:57 | 21 | Q.   Originally? |
| 04:34:57 | 22 | A.   Yes. |
| 04:35:00 | 23 | Q.   Annie Dookhan is listed on there in the second |
| 04:35:03 | 24 | column as a chemist 2.  Do you see that? |
| 04:35:05 | 25 | A.   I do. |

04:35:05 1      Q.   And who was her supervisor when you inherited the

04:35:09 2   lab in 2006?

04:35:09 3      A.   Elizabeth O'Brien.

04:35:11 4      Q.   And once Ms. O'Brien became the evidence officer,

04:35:15 5   who was Ms. Dookhan's supervisor at that point?

04:35:18 6      A.   Chuck Salemi?

04:35:21 7      Q.   Now, was Chuck Salemi the supervisor of all the

04:35:25 8   chemists?

04:35:25 9      A.   Yes.

04:35:25 10      Q.   So if they had a problem, they could go to him,

04:35:28 11   right?

04:35:28 12      A.   Yes.

04:35:28 13      Q.   Now, having a chem 3 in the laboratory, what was

04:35:32 14   that chem 3's job, if you can tell us?

04:35:36 15      A.   I -- as I understand it, they were to provide

04:35:42 16   technical assistance and guidance to the more-junior

04:35:48 17   members of the staff and to mentor them.

04:35:52 18      Q.   Okay.  Were they there to watch over what they

04:35:56 19   were doing?

04:35:57 20      A.   No.  They did perform their performance

04:36:02 21   evaluations, however.

04:36:03 22      Q.   Okay.  But were they -- were they supervising

04:36:07 23   these other chemists?  Or were they just sharing lab space

04:36:11 24   with them?

04:36:12 25      A.   I'm -- they were supervising them with -- I'm

04:36:18 1    not sure if Peter actually did the performance evaluations

04:36:22 2    for those individuals or not.

04:36:25 3        Q.   Okay.  Now, I want to talk to you a little bit

04:36:30 4    about Annie Dookhan.  You said she was supervised by

04:36:34 5    Ms. O'Brien, correct?

04:36:36 6        A.   Yes.

04:36:38 7        Q.   All right.  How did Ms. O'Brien speak about

04:36:42 8    Ms. Dookhan to you?

04:36:43 9        A.   Quite favorably.  She felt that she was a

04:36:50 10   very -- very competent, dedicated individual, bit of a

04:36:56 11   workaholic.  She was very friendly, outgoing, well spoken.

04:37:08 12       Q.   Okay.  Did she ever talk about her work as a

04:37:09 13   chemist?

04:37:10 14       A.   Only in the most positive terms.

04:37:14 15       Q.   Now, your role as the director of analytical

04:37:19 16   chemistry, I want to talk a little bit about your

04:37:21 17   administrative duties.  Okay?

04:37:22 18       A.   Sure.

04:37:23 19       Q.   Now, can you describe -- and I know you went

04:37:27 20   through some of this, but your duties in 2010/2011, what

04:37:32 21   would they entail?  What would you do kind of on a daily

04:37:36 22   basis, if you can recall that?

04:37:37 23       A.   Well, it was highly variable, but it would

04:37:41 24   involve any kind of meetings with senior management around

04:37:50 25   budget, information technology, grants, new initiatives

04:37:55 1   that the department was doing, bringing on new tests,

04:38:01 2   providing technical and administrative oversight of the

04:38:04 3   laboratories.  And that's sort of the day-to-day.

04:38:12 4        Q.   Okay.  Now, when you say "laboratories," was the

04:38:16 5   drug lab your only focus?

04:38:18 6        A.   No.  No.

04:38:18 7        Q.   So did you have to do these sorts of things for

04:38:22 8   the other labs that you were supervising, as well?

04:38:25 9        A.   Yes.

04:38:25 10       Q.   And you talked about grants.  What were the

04:38:28 11  reasons for grants?  What would you do for a grant?  How

04:38:31 12  would you get a grant?

04:38:32 13       A.   Well, to get a grant, you -- first of all, you

04:38:35 14  have to look for the grant opportunity, respond to it,

04:38:40 15  prepare a grant proposal, do all the research necessary to

04:38:44 16  have the substance for the grant proposal; prepare a

04:38:50 17  budget, go through the process of review through

04:38:55 18  Department of Public Health, and then submit the grant.

04:39:01 19  If you're awarded it, then there were lots of issues

04:39:05 20  around bringing it on, whether you're bringing on new

04:39:08 21  tests, new initiatives, all the administrative work that

04:39:12 22  is involved with a grant.

04:39:14 23       Q.   Okay.  Now, why would you be looking for grants,

04:39:18 24  if your labs -- if the Hinton lab was run by the state?

04:39:24 25       A.   Well, because there -- if there really wasn't

04:39:26  1   enough funding to -- to accomplish what needed to be done.

04:39:36  2   And sometimes there were special initiatives coming down,

04:39:41  3   perhaps from the Center for Disease Control, or Homeland

04:39:44  4   Security, or others in a very directed way around

04:39:48  5   emergency response, emergency preparedness.  So those

04:39:53  6   would be opportunities to get resources for the

04:40:00  7   laboratory.

04:40:00  8       Q.   Okay.  And was that just the drug lab, or was that

04:40:02  9   for other labs that you supervised?

04:40:05 10       A.   That was for all of the laboratories.

04:40:07 11       Q.   Okay.  Now, because you were run by the state, you

04:40:11 12   were given a budget, correct?

04:40:14 13       A.   We were given a budget for the state -- the

04:40:18 14   Hinton laboratory as a whole had a budget.

04:40:21 15       Q.   Okay.

04:40:21 16       A.   The drug laboratory had a line item on that

04:40:25 17   budget.  The environmental laboratory had a line item.

04:40:29 18   The childhood lead screening laboratory, we did

04:40:34 19   third-party billing for that.  So that was funded entirely

04:40:37 20   by fees that went into a retained revenue account.  And

04:40:41 21   the chemical threat laboratory was funded entirely with

04:40:46 22   federal funds, federal grant funds.

04:40:48 23       Q.   Did you have any say in what was budgeted or put

04:40:52 24   in the line item for any of your labs?

04:40:56 25       A.   We were given a number, and then we tried to

04:41:02 1    make it work.

04:41:03 2        Q.   Okay.  When it came to the drug lab, did you ever

04:41:06 3    have a chance to try and request more funds?

04:41:09 4        A.   Oh, yes.  Yeah.

04:41:10 5        Q.   How often would you do that?

04:41:11 6        A.   So in -- around 2007, put together a plan

04:41:22 7    with -- we sort of put out this vision of where we wanted

04:41:26 8    to be, in terms -- with respect to accreditation and other

04:41:31 9    initiatives.  So at first, the first thing that we wanted

04:41:35 10   to tackle was the physical space of the laboratory.  So I

04:41:40 11   requested that the facility manager meet with me, and we

04:41:44 12   put together a plan for reconfiguring the space, so that

04:41:52 13   it wasn't a lot of little rooms, but rather a larger, open

04:41:58 14   space.

04:41:58 15       Q.   And what would that accomplish?

04:41:59 16       A.   That would provide for greater interaction

04:42:03 17   between the chemists, so that they would be able to

04:42:09 18   collaborate and talk with one another.  It would provide

04:42:13 19   efficiency in the processes.  It would also provide

04:42:18 20   additional oversight in that there would be more people in

04:42:22 21   a given room.

04:42:23 22       Q.   And were you able to get any of the funds

04:42:25 23   available to do that?

04:42:26 24       A.   No.  We were able to -- the estimate was that it

04:42:30 25   would be about a million dollars to reconfigure that

98

04:42:32  1    space.

04:42:33  2         Q.   So it's safe to say that that never happened?

04:42:37  3         A.   It did not happen.  Do you want to hear about

04:42:42  4    the other opportunities?

04:42:44  5         Q.   Absolutely.

04:42:45  6         A.   So we then, you know, looked at some grant

04:42:49  7    funding opportunities, and in researching the grant

04:42:57  8    funding opportunities from the Department of Justice, I

04:42:59  9    had became aware that only one entity per state is

04:43:04 10    actually allowed to be a recipient of Department of

04:43:08 11    Justice funds.  And in Massachusetts, the Department of

04:43:11 12    Public Safety was that designated recipient.

04:43:15 13         Q.   So with them being a recipient, you're unable to

04:43:19 14    get any additional funds from them?

04:43:22 15         A.   We're unable to apply directly to the Department

04:43:26 16    of Justice for funding.

04:43:27 17              So we started working -- there was a group

04:43:30 18    called the Forensic Science Advisory Board, that was

04:43:34 19    chaired by the undersecretary of public safety, and it had

04:43:37 20    representatives from the district attorney's offices,

04:43:42 21    police chiefs, the three laboratories, the public safety,

04:43:47 22    public health, and the Worcester laboratory, and became

04:43:52 23    engaged in that process with them.  It made them aware of

04:43:58 24    our resource needs, the fact that we -- we just didn't

04:44:04 25    have the capacity to test the number of samples that we

04:44:09  1    had.

04:44:13  2            And through the course of those discussions, the

04:44:16  3    undersecretary suggested to the Department of Public

04:44:19  4    Safety that they might be able to make a small award from

04:44:23  5    their Coverdell grant to us, for -- for us to use.  And

04:44:31  6    also the department -- the federal US Attorney's Office

04:44:35  7    approached us about some Byrne grant funding.  We did

04:44:42  8    apply for a Byrne grant of $105,000.  It was not awarded.

04:44:48  9    However, they did give us a small amount of money.  And I

04:44:52 10    can't remember the exact amount, but it was around

04:44:55 11    $10,000, specifically for overtime.  And that was geared

04:44:59 12    towards gang-related cases.

04:45:01 13        Q.   Okay.  And when you say "gang-related," why was it

04:45:05 14    focused on that?

04:45:06 15        A.   That was the nature.

04:45:09 16                MR. TUMPOSKY:  Objection.

04:45:10 17                THE COURT:  What's the objection?

04:45:12 18                MR. TUMPOSKY:  Relevance.

04:45:14 19                THE COURT:  I don't really see the relevance.

04:45:16 20    Just move on.  So the objection is sustained.

04:45:20 21    BY MR. MARINO:

04:45:20 22        Q.   Now, for the drug lab, Ms. Nassif, were there

04:45:29 23    standard operating procedures?

04:45:31 24        A.   There was the training packet that was developed

04:45:37 25    by -- I don't know exactly who developed it, to be honest

04:45:43 1    with you, back in 2004, and then Mr. Salemi's additions to

04:45:47 2    that.  There were also processes for the evidence office.

04:45:55 3    And we were in the process of developing technical

04:45:59 4    protocols for things like -- there was one in process for

04:46:06 5    the analysis of mushrooms, one in process for the

04:46:10 6    operation of a specific analytical instrument.  And those

04:46:15 7    were in place.

04:46:17 8                    MR. MARINO:  Okay.

04:46:17 9                    THE COURT:  Attorney Marino, I'm going to

04:46:19 10   stop you.  It seems like a logical place.  You just seem to

04:46:24 11   start questioning about lab procedures, so it might be a

04:46:27 12   break, if we pick up right there in the morning.

04:46:29 13                   MR. MARINO:  Thank you, Your Honor.

04:46:30 14                   THE COURT:  On lab procedures.  We're going

04:46:32 15   to be stopping in four minutes, anyway, was my plan.

04:46:37 16          All right.  Ladies and gentlemen, we're done for

04:46:40 17   the day.  We will see you at 9 o'clock tomorrow morning.

04:46:44 18   Please do not begin discussing the case, begin deliberating

04:46:46 19   the case.  Do not try to investigate the case in any way or

04:46:49 20   access it through the Internet or social media.  All right.

04:46:53 21   Good night.

04:46:54 22                   THE DEPUTY CLERK:  All rise.

04:46:57 23              (The jury exits the courtroom.)

04:47:28 24                   THE COURT:  All right.  We will start at

04:47:30 25   quarter of 9:00 tomorrow morning with our discussion about

| 04:47:34 | 1 | what you -- what you submit for your highlighted versions of |
| 04:47:39 | 2 | the Inspector General report, or however you intend to |
| 04:47:42 | 3 | approach that issue tomorrow morning.  It will be resolved, |
| 04:47:47 | 4 | that issue, one way or another, admissible or not. |
| 04:47:51 | 5 | Sections, everything will be resolved before the jury comes |
| 04:47:55 | 6 | out tomorrow.  All right? |
| 04:47:58 | 7 | MR. TUMPOSKY:  Your Honor, do you have a plan |
| 04:48:01 | 8 | as far as whether -- we would certainly close tomorrow, if |
| 04:48:04 | 9 | we got there, or would we do it on Friday, start closing on |
| 04:48:08 | 10 | Friday? |
| 04:48:08 | 11 | MR. KELLY:  I don't think we -- Your Honor, |
| 04:48:10 | 12 | to respond to that, we won't get there tomorrow.  I mean, I |
| 04:48:14 | 13 | don't mind telling you, from the scheduling standpoint, from |
| 04:48:17 | 14 | the defense case, at this point, it will be, obviously, the |
| 04:48:21 | 15 | conclusion of Ms. Nassif's testimony, followed by testimony |
| 04:48:25 | 16 | from Mr. Salemi, follow by testimony from Dr. Han. |
| 04:48:29 | 17 | And then we will -- thinking about the comments of |
| 04:48:32 | 18 | the Court earlier, I was going to suggest for your |
| 04:48:37 | 19 | consideration, that we -- with respect to the underlying |
| 04:48:40 | 20 | criminal trial, that we mark the openings and the closings |
| 04:48:45 | 21 | as written exhibits that we can agree to submit to the jury, |
| 04:48:48 | 22 | and if they chose to read them later, they can read them |
| 04:48:52 | 23 | later, but that we offer the testimony -- it's actually of |
| 04:48:56 | 24 | five witnesses.  It's four fairly short testimony from four |
| 04:48:59 | 25 | police officers, and one from Kate Corbett.  Ms. Corbett is |

04:49:03  1    unable to be here herself; however, we have someone who will

04:49:07  2    play her role and read her part.

04:49:09  3          We have two individuals who will read the parts of

04:49:13  4    the prosecutor, the same person throughout, and the same

04:49:16  5    person reading the roles of defense lawyer throughout.  None

04:49:19  6    of the lawyers in this room, so it doesn't confuse the jury.

04:49:22  7    And we have the actual four police officers that testified

04:49:25  8    at the criminal trial coming in.

04:49:27  9          THE COURT:  All right.  Jury instructions for

04:49:29 10    that trial?

04:49:31 11          MR. KELLY:  We have those, as well.  We can

04:49:34 12    mark those, we can do it however you wish, Your Honor.

04:49:36 13          THE COURT:  Do you have an agreement?  It

04:49:38 14    seems to me -- it seems to me that might be important.

04:49:42 15          MS. HEDGES:  Yeah.  They would have to be

04:49:43 16    redacted.  But those weren't in your original --

04:49:46 17          MR. KELLY:  We have redacted out anything

04:49:48 18    relating to the school zone question.

04:49:51 19          THE COURT:  All right.  So I do think that we

04:49:54 20    should introduce as an exhibit, also, the jury instructions,

04:49:56 21    if this jury is going to be analyzing that trial.  And if

04:50:01 22    whether or not something could have been different, they

04:50:02 23    have to know what the rules of that trial are.  So we'll

04:50:05 24    mark for exhibits openings, closings, and jury instructions.

04:50:09 25    Sounds fine to me.  And we will read the evidence that you

04:50:12  1   just told me about.  It was a fairly short trial.

04:50:15  2             MR. KELLY:  It was.  It was done in a day,

04:50:17  3   effectively.  So I think, Your Honor, that we probably could

04:50:20  4   get to the testimony, reading the testimony of -- one of the

04:50:23  5   officers is unavailable on Friday, so we would have to call

04:50:26  6   him.  That's Officer Harry Jean was his name.  And then we

04:50:29  7   would probably call the chemist, the role of Kate Corbett.

04:50:34  8             THE COURT:  All right.

04:50:35  9             MR. KELLY:  And then we would call the other

04:50:36 10   three officers on Friday morning.  And I would expect that

04:50:39 11   we would be done with the testimony -- counsel need to

04:50:43 12   confer on our side, in light of your ruling in the morning

04:50:46 13   relative to the OIG report, as to whether or not we need to

04:50:49 14   call another witness just to explain what the OIG is and

04:50:53 15   what their function is and what their limitations are, and

04:50:56 16   the like.  And that's something that we need to discuss

04:50:58 17   momentarily.

04:50:59 18             THE COURT:  Sounds like, from what you're

04:51:01 19   saying, it's likely, in a fairly comfortable way, to do

04:51:06 20   closings on Friday?

04:51:07 21             MR. KELLY:  I personally don't like doing

04:51:09 22   Friday afternoon closings.  If it were me, Your Honor, I

04:51:13 23   would almost prefer to do a jury instruction conference and

04:51:16 24   close on Monday morning, just because it gives you an

04:51:19 25   opportunity to organize your thoughts, and you get the jury

04:51:22  1    fresh, and it just seems to move better.  But that's your

04:51:25  2    call, Your Honor.

04:51:25  3             THE COURT:  Well, that may not be a bad

04:51:29  4    suggestion.

04:51:29  5             MR. TUMPOSKY:  You know, we may also

04:51:31  6    potentially have a rebuttal witness, the state police who

04:51:35  7    interviewed the various defendants, depending on whether

04:51:38  8    impeachment material is going to be necessary.

04:51:40  9             THE COURT:  Okay.  Well, it certainly seems

04:51:42 10    there's -- even under -- even under a scenario where you

04:51:46 11    call more witnesses, it seems like we are closing Monday at

04:51:49 12    some point.

04:51:51 13             MS. HEDGES:  Correct.

04:51:51 14             THE COURT:  Does that sound fair?

04:51:53 15             MR. TUMPOSKY:  Yeah, that seems fair.

04:51:54 16             THE COURT:  Even if you have to call a couple

04:51:55 17    extra witnesses?

04:51:56 18             MR. KELLY:  I think that sounds right, Your

04:51:58 19    Honor.

04:51:58 20             MS. HEDGES:  Yeah.

04:51:58 21             THE COURT:  So I'm not promising you when.  I

04:52:01 22    might force you to do a Friday, 4 o'clock closing.  Just

04:52:05 23    you, Mr. Kelly.

04:52:07 24             Yeah, no, I understand.  So we'll play it as it

04:52:10 25    goes.

04:52:10 1          MR. KELLY:  And Your Honor, at some point, we

04:52:12 2    would like to perhaps just take ten minutes or five minutes

04:52:16 3    and publish the photographs there to the jury, whether it's

04:52:19 4    just before break or start of the day, and let them flip

04:52:23 5    through the photographs.  They've seen them from a distance,

04:52:26 6    but they haven't actually looked at them.

04:52:28 7          THE COURT:  Yeah.  If you can get a couple

04:52:31 8    more tripods in here or something.  But taking up trial

04:52:34 9    time -- I've done it so many times, and the jurors are

04:52:37 10   handing each other -- if they're handing little, small

04:52:40 11   pictures, it's one thing.  But if they're going to be

04:52:44 12   handing these bigger things to each other -- if you find a

04:52:47 13   way to display them all, I'll take five, ten minutes to look

04:52:52 14   at them.

04:52:54 15         MR. KELLY:  Ms. Herlihy and I have an idea in

04:52:57 16   that regard, and we'll make a suggestion in the morning.

04:52:59 17         THE COURT:  All right.  Do you have the

04:53:00 18   e-mails that you need to work with?

04:53:02 19         MR. TUMPOSKY:  Yes.

04:53:02 20         THE COURT:  To work with the Inspector

04:53:04 21   General?

04:53:05 22         MR. TUMPOSKY:  They were disclosed -- oh.

04:53:07 23   The Inspector General.  I'm sorry.

04:53:08 24         THE COURT:  Yeah.  The e-mail from us.

04:53:10 25         MR. TUMPOSKY:  Do you guys have our --

04:53:13  1                    THE LAW CLERK:  I sent it to the address.

04:53:17  2                    MS. HEDGES:  To our address or their address?

04:53:21  3                    THE LAW CLERK:  Both.

04:53:24  4                    MS. HEDGES:  Okay.  Great.

04:53:24  5                    MS. HERLIHY:  To the extent you don't have

04:53:26  6    it, I'll forward it.

04:53:28  7                    MS. HEDGES:  Okay.  Great.  We did get the

04:53:29  8    e-mails from the Department of Public Health.  There was an

04:53:31  9    issue about the way they -- they were inaccessible.  But I

04:53:34 10    think our associate has helped them figure that out.  So

04:53:38 11    there was a technical problem.  So we got them after 2:00,

04:53:41 12    so hopefully, we'll be able to go through them.

04:53:44 13                    THE COURT:  What are you going to do with

04:53:45 14    that?  Those are documents that you're going to seek to

04:53:48 15    admit.

04:53:48 16                    MR. TUMPOSKY:  Upon review.

04:53:49 17                    THE COURT:  But you need them for

04:53:51 18    cross-examination.

04:53:51 19                    MS. HEDGES:  Cross-examination.

04:53:52 20                    THE COURT:  All right.  Then I'll hold you,

04:53:54 21    I'll let you reserve as to whether or not you might want to

04:53:57 22    introduce those, as well.

04:53:58 23                    MR. TUMPOSKY:  Thank you.

04:53:59 24                    MS. HEDGES:  Thank you.

04:53:59 25                    THE COURT:  You'll be able to tell me that in

04:54:02  1    the morning?

04:54:02  2                    MR. TUMPOSKY:  I would hope so.

04:54:03  3                    MS. HEDGES:  It's going to be a long night.

04:54:05  4                    THE COURT:  Yeah.

04:54:06  5                    MS. HEDGES:  Thanks.

04:54:07  6                    THE COURT:  All right.  We'll see everyone at

04:54:08  7    a quarter to 9:00.

04:54:10  8                    THE DEPUTY CLERK:  All rise.

          9                    (Court in recess at 4:54 p.m.)

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1            **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4         I, Rachel M. Lopez, Certified Realtime Reporter,

5    in and for the United States District Court for the District

6    of Massachusetts, do hereby certify that the foregoing pages

7    are a true and correct transcript of the stenographically

8    reported proceedings held in the above-entitled matter to

9    the best of my skill and ability.

10

11                Dated this 9th day of March, 2016.

12

13

14

15              /s/ RACHEL M. LOPEZ

16

17

18              _____

19              Rachel M. Lopez, CRR
                Official Court Reporter

20

21

22

23

24

25