UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROLANDO PENATE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:17-30119-KAR |
| | ) | |
| ANNE KACZMAREK, KRIS FOSTER, | ) | |
| RANDALL RAVITZ, JOSEPH BALLOU, | ) | |
| ROBERT IRWIN, RANDY THOMAS, | ) | |
| SONJA FARAK, SHARON SALEM, | ) | |
| JAMES HANCHETT, JULIE NASSIF, | ) | |
| LINDA HAN, STEVEN KENT, | ) | |
| JOHN WADLEGGER, GREGG BIGDA, | ) | |
| EDWARD KALISH, and | ) | |
| CITY OF SPRINGFIELD, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER REGARDING MOTIONS TO DISMISS BY
INDIVIDUAL DEFENDANTS STEVEN KENT, JOHN WADLEGGER, GREGG BIGDA,
AND EDWARD KALISH AND THE CITY OF SPRINGFIELD
(Dkt. Nos. 26, 57, & 63)


ROBERTSON, U.S.M.J.

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 by Plaintiff Ronaldo

Penate against fifteen officials at the Department of Public Health, the Massachusetts State

Police, the Attorney General's Office of the Commonwealth, and the Springfield Police

Department, as well as against the City of Springfield.[1]  Most of the defendants have moved to

dismiss.  Because allegations and defenses are particular to certain groups of defendants, the

court has divided the defendants into three categories: the Springfield Police Department (SPD)

---

[1] The suit initially named the estate of Kevin Burnham as one of the defendants.  On December
14, 2017, Plaintiff moved to dismiss the counts brought against Burnham's estate (Dkt. No. 41),
and the court did so on December 15, 2017 (Dkt. No. 42).

police officers (collectively, the SPD Officers) and the City of Springfield; the individuals employed by or affiliated with the Attorney General's office, and the individuals employed by or affiliated with the Department of Public Health and its forensic laboratories, including the laboratories used for analyzing substances suspected of being illegal drugs. The court heard argument on the motions to dismiss over three days. This memorandum addresses the motions to dismiss filed by the SPD Officers and Springfield.

SPD Officers Steven Kent, John Wadlegger, Gregg Bigda, and Edward Kalish move to dismiss Counts VI and VIII directed against them for violation of § 1983 and intentional infliction of emotional distress respectively. Defendant Springfield moves to dismiss Count VII, a § 1983 claim. Defendants all argue that the complaint fails to state a claim upon which relief can be granted, and the SPD Officers assert that qualified immunity insulates them from liability. For the reasons that follow, the court will deny the motions.

## I.    BACKGROUND

In evaluating a motion to dismiss, the court accepts as true all well-pleaded allegations in the complaint and draws all reasonable inferences in favor of Plaintiff. *Diaz-Nieves v. United States*, 858 F.3d 678, 689 (1st Cir. 2017). The facts set down herein are drawn from Plaintiff's Complaint (Dkt. No. 1).[2] The court will first set out a general overview of Plaintiff's allegations before turning to the allegations and claims involving this group of defendants.

## A.    General Overview

---

[2] Plaintiff submitted trial transcripts and excerpts of grand jury testimony in support of his oppositions to the defendants' motions to dismiss. The SPD Officers and the City did not oppose the court's reliance on these sources of information. Nonetheless, because this is a motion to dismiss, the court has relied on the allegations in the very detailed complaint as the source for the facts on which Plaintiff's claims are based.

In late October and early November of 2011, the SPD narcotics unit arranged three controlled buys of a suspected controlled substance from Plaintiff. After each transaction, the undercover officer who made the buy returned to the police station with the evidence to catalog it. The following morning, the narcotics evidence officer, Kevin Burnham, took custody of the packets of alleged drugs. Protocol required that Burnham heat seal packets of suspected narcotics prior to delivering them to the forensic drug laboratory at Amherst (Drug Lab) for analysis. Burnham rarely did so. In Plaintiff's case, he brought the unsealed packets to the Drug Lab and sealed them there.

The Drug Lab operated under the auspices of the Department of Public Health (DPH). Defendant Julie Nassif, Director of DPH's Division of Analytical Chemistry since its inception in 2006 until 2012, had the responsibility of supervising the Drug Lab. Defendant Linda Han, Director of DPH's Bureau of Laboratory Sciences from 2009 until 2012, also supervised the Drug Lab on paper. In practice, however, there was little oversight and few site visits. Defendants Sharon Salem and James Hanchett worked at the Drug Lab. Hanchett, a chemist, became the lab supervisor in 2008. Salem was the evidence officer in charge of assigning samples to chemists for analysis. The Drug Lab was unaccredited, underfunded, and understaffed; there were few, if any, quality assurance safeguards, such as written protocols or audits, or employee performance evaluations. Despite operating with a lean budget, a small staff, and little oversight, the Drug Lab chemists analyzed almost twice as many drug samples as chemists at the DPH drug laboratory in Hinton.

Defendant Sonja Farak worked at the Drug Lab as a chemist, employed first by DPH and then by the Massachusetts State Police. She started working at the Drug Lab in 2004 and remained employed until the lab closed in January 2013. From the beginning of her time at the

Drub Lab, Farak routinely stole and consumed unsecured drugs kept at the Drug Lab as standards for testing the substances submitted by law enforcement. Eventually, Farak moved on from abusing the drug standards to stealing from and ingesting samples submitted for testing, using drugs including methamphetamine, cocaine, and LSD. She consumed these substances during the day, while she was analyzing the samples submitted to the lab for testing.

On November 15, 2011, after the SPD arranged its third undercover purchase from Plaintiff, he was arrested with five other individuals. The arresting officers seized over $2,000 in cash, some packets of suspected heroin and cocaine, and a firearm and ammunition. The arresting officers turned over the money seized at the time of arrest, as well as the packets containing the alleged drugs, to Burnham's custody. Burnham, after stealing some of the cash, cataloged the remaining money and the drugs as evidence. The following day, Burnham drove to the Amherst drug lab with the alleged drugs seized at the time of Plaintiff's arrest and the packets obtained during the two earlier controlled buys. At the Drub Lab, Burnham attempted to heat seal the packets using the lab's heat sealer. Farak, however, had tampered with the heat sealer so that the seal would be ineffective, permitting her access to the drugs. Burnham transferred custody of the drugs to the Drub Lab.

Farak tested the samples in Plaintiff's case over a two week period at the end of December 2011 and into January 2012. In that period, she was also undergoing counseling at ServiceNet for her drug addiction and keeping a diary card as part of her treatment. Despite being in treatment, Farak continued to steal and use drugs to which she had access through her employment. For two of the days during which she tested the samples submitted by Burnham as related to Plaintiff's case, Farak was under the influence of drugs, including crack cocaine and

LSD. She certified that all of the samples related to Plaintiff's arrest had tested positive for the presence of a controlled substance.

On January 11, 2012, Plaintiff was indicted and charged in thirteen counts with possession of illegal substances with intent to distribute, distribution of illegal substances, school zone violations,[3] possession of a firearm without a valid FID card, possession of ammunition without a valid FID card, and possession of a firearm during the commission of a felony. In February 2012, Plaintiff pled not guilty to the charges against him.

In January 2013, Hanchett and Salem discovered that cocaine samples that had been assigned to Farak for testing were not in the evidence room. When the chemists discovered suspicious circumstances at Farak's desk, the Massachusetts State Police (MSP) were brought in to investigate the loss of drug samples. The MSP discovered other case envelopes in Farak's storage locker and, by the afternoon, they had spoken to Farak and impounded her car. After securing a warrant, the MSP investigators, Defendants Joseph Ballou, Robert Irwin, and Randy Thomas, searched Farak's car and seized approximately 300 pages of paper, including so-called "mental health worksheets," comprising ServiceNet diary cards and other documents related to Farak's therapy. The MSP officers turned over the evidence to the Massachusetts Attorney General's Office (AGO). Farak was arrested.

Following Farak's arrest, the AGO began a limited investigation into Farak's activities at the Drug Lab. Defendants Robert Irwin and Joseph Ballou worked with the AGO's Enterprise and Major Crimes Division; defendant Anne Kaczmarek was the assistant attorney general assigned to prosecute Farak's case. On January 22, 2013, Farak was arraigned and charged with tampering with evidence and drug possession. In March 2013, the chief of the AGO's Criminal

---

[3] The Commonwealth dismissed all the school zone charges against Plaintiff before trial.

Bureau sent a letter to each of the Commonwealth's District Attorneys (DAs) explaining the investigation into Farak and providing a list of materials pursuant to the AGO's "obligation to provide potentially exculpatory information to the District Attorneys." This discovery did not include Farak's mental health worksheets or information about such evidence. A prosecution memo sent around this time from Kaczmarek to the chief of the Criminal Bureau listed the mental health worksheets among the paperwork recovered from Farak's car, with the comment that the worksheets were not shown to the grand jury; the chief hand-wrote a note on the memo stating that the worksheets also had not been turned over to the DAs.

During Farak's prosecution, Kaczmarek turned over the mental health worksheets to Farak's attorney. However, Kaczmarek treated the mental health worksheets as privileged and did not provide this material to the "Farak defendants," meaning individuals who were being or had been prosecuted for drug crimes by DAs in cases for which Farak had tested the alleged drugs.

On July 15, 2013, Plaintiff, a "Farak defendant," filed a pretrial motion to dismiss the charges against him based, in part, on Farak's misconduct at the Drug Lab. He sought discovery from the AGO related to Farak's arrest and prosecution. A Superior Court judge set an evidentiary hearing on Plaintiff's motion and, in the order, reminded the DA's office of its obligation to seek and produce exculpatory evidence from relevant government agencies. In anticipation of the hearing, Plaintiff served subpoenas on the AGO and MSP officers involved with Farak's prosecution, including Ballou, the chief MSP investigator in Farak's case.

Subpoenas served on the AGO are handled by its Appeals Division, of whom Defendant Randall Ravitz was chief. Ravitz assigned Defendant Kris Foster, a new assistant attorney

general, the responsibility of responding to Plaintiff's subpoena. Under Ravitz's supervision, Foster moved to quash the subpoenas or, in the alternative, to restrict their scope.

At a September 9, 2013 motion hearing, the Superior Court judge denied the AGO's motion to quash with respect to Ballou's testimony and ordered Foster to review the MSP investigator's file and submit any documents that had not yet been disclosed for *in camera* review. Foster consulted with Kaczmarek regarding the judge's ruling. Kaczmarek knew that Farak's mental health worksheets had not been produced to the DAs or to Plaintiff in response to his subpoena. She also knew that, although Ballou was aware of the mental health worksheets, he did not have copies of the documents in his paper case file. Kaczmarek advised Foster that there were no additional documents in the MSP case file to produce. Foster sent a letter to the state court judge representing that every "document" in the MSP investigator's file had already been disclosed.

Plaintiff's counsel then sent a letter to Foster requesting permission to review all of the evidence seized from Farak's car. Kaczmarek took the position that this evidence was only relevant to the prosecution of Farak; Foster denied the request. On October 1, 2013, Plaintiff filed a motion to inspect the physical evidence in the Farak prosecution on the basis that Plaintiff was seeking proof of any third-party knowledge of Farak's misconduct. Foster opposed this motion as well, arguing that the AGO had already turned over the grand jury exhibits and the documents in the MSP investigator's file and none of it supported the theory that a third party had knowledge of Farak's misconduct prior to her arrest. During argument on Plaintiff's motion, Foster assured the court that there was "no smoking gun." The court ultimately denied Plaintiff's motion to dismiss after concluding – based on the evidence that had been produced by the AGO

and its assurances that there was nothing else relevant – that Farak's misconduct in the Drug Lab commenced after she tested the samples in Plaintiff's case.

On December 9, 2013, Plaintiff's trial began. The trial judge granted the DA's motion *in limine* to preclude Plaintiff from arguing that Farak was engaged in misconduct when she tested the drug samples in Plaintiff's case. All four SPD Officers testified at Plaintiff's trial. Burnham testified as the SPD evidence officer. On December 11, 2013, the trial judge granted Plaintiff's motion for a required finding of not guilty on the three charges related to possession of a firearm or ammunition; on December 13, 2013, the jury returned a not guilty verdict on all remaining charges except one: the jury found Plaintiff guilty of a single count of distribution of a class A substance. On December 16, 2013, Plaintiff received a sentence of five to seven years in state prison.

On January 6, 2014, Farak pled guilty to the criminal charges stemming from some of her misconduct at the Drug Lab. In July 2014, Plaintiff's counsel, in a separate and unrelated case, obtained an order to inspect the "assorted lab paperwork" that had been seized from Farak's car. During counsel's review of those documents, he discovered Farak's mental health worksheets. On November 13, 2014, the AGO sent another mailing to DAs providing copies of documents that had been in its possession but had not previously been turned over, including Farak's mental health worksheets. In May 2015, based on newly discovered evidence, Plaintiff filed a motion for new trial and a motion to dismiss the charges for which he was serving a sentence.

In late December 2015, Burnham was indicted on seven counts of larceny for stealing money from the SPD's evidence room. Plaintiff's motions were consolidated with other Farak defendants' motions for post-conviction relief, and, in December 2016, Superior Court Judge Richard J. Carey convened a six-day evidentiary hearing into the matters. The Commonwealth

eventually withdrew its opposition to Plaintiff's motion for new trial, which was allowed in early 2017. On June 26, 2017, Judge Carey allowed Plaintiff's motion to dismiss the indictment against him with prejudice.

On September 5, 2017, Plaintiff filed this eight count civil action against Defendants for civil rights violations based on allegations of wrongdoing that occurred during the investigation and trial, as well as what Plaintiff alleges was a cover-up by government officials of misconduct.

**B.      Allegations Specific to the SPD Officers and the City**

Defendants Kent, Wadlegger, Kalish, and Bigda were all Springfield police officers employed as nightshift narcotics officers (Compl. ¶¶ 14-18, 356). At the relevant time, it was the practice of the nightshift narcotics officers at the SPD to have two officers count the money whenever they seized cash in excess of $100 (Compl. ¶ 356). Once the officers' counts were in accord, one of the officers would "seal the money in an envelope, record the sum on the envelope and separate evidence tag, then put the envelope and evidence tag through a slot in the door" into Burnham's office (Compl. ¶ 357). On numerous occasions, Burnham had informed the SPD Officers that their counts were off. Each time he did so, he claimed the money submitted was less than the amount the officer(s) had recorded (Compl. ¶¶ 358-59).

The SPD Officers suspected that Burnham regularly stole the cash he was responsible for safekeeping. Each of them had reported their suspicions to superiors at the SPD, including to superior officers "entrusted with the power to make and enforce" SPD policy (Compl. ¶¶ 360-61). The SPD officers never reported "Burnham's thefts" to the Hampden County assistant district attorney prosecuting Plaintiff's case or to anyone else at the Hampden County District Attorney's Office (Compl. ¶ 362). Before Plaintiff's trial, the City "and its policymakers" knew about complaints by the SPD Officers regarding Burnham and his thefts from the evidence room.

The City failed to investigate the allegations made by fellow officers against Burnham or to discipline Burnham and were deliberately indifferent to the rights of individuals such as Plaintiff (Compl. ¶¶ 363-365). The City failed to monitor, supervise, control, and discipline Burnham, contrary to its duty to do so (Compl. ¶¶ 364-65).

Plaintiff further alleges that, in Burnham's capacity as the SPD evidence officer, he would transport suspected controlled substances to the Drug Lab for analysis (Compl. ¶¶ 113-14). Burnham was supposed to heat seal the packets of narcotics prior to submitting them to the Drug Lab in accordance with DPH protocols (Compl. ¶ 128). It was Burnham's practice, however, to bring unsealed drug samples to the Drug Lab and use the Drug Lab heat sealer as he was transferring custody of the narcotics (Compl. ¶ 130). Farak later admitted to partially disabling the heat sealer so she could steal and use substances submitted for analysis (Compl. ¶ 131-32).

Plaintiff's arrest occurred in the fall of 2011. In late October and early November 2011, the narcotics unit of the SPD conducted three undercover buys from Plaintiff of a controlled substance that was purportedly heroin (Compl. ¶¶ 110, 116, 118). Following the first two purchases, the undercover officer returned to the SPD station in the evening, sealed the glassine packets in a manila envelope, and deposited it through a slot into the locked evidence room (Compl. ¶ 112). On November 11, 2011, based on these purchases, Wadlegger applied for and obtained a warrant to search the residence where the undercover buys had taken place (Compl. ¶ 117). After the third undercover sale on November 15, 2011, SPD officers executed the search warrant, arrested Plaintiff and four others, and seized, among other things, certain sums of cash (Compl. ¶¶ 119-24). The police reports documenting the arrest stated that a total of $2,344 in cash was seized from three of the individuals arrested (Compl. ¶¶ 123-24). Wadlegger reported

that Plaintiff had $386 in cash on his person at the time of his arrest (Compl. ¶ 123).  Officers reportedly seized $1,958 in cash from two other suspects arrested at the same time (Compl. ¶ 124).

On November 16, 2011, Burnham transported to the Drug Lab the substances allegedly sold by Plaintiff (Compl. ¶ 127).  Farak was assigned to test the substances (Compl. ¶ 135).  In January 2012, Burnham retrieved the evidence related to Plaintiff's case from the Drug Lab (Compl. ¶ 152).  Although Farak routinely used the drugs she was supposed to be testing and frequently tested drugs while under the influence of narcotics, and was under the influence of drugs when she tested the samples allegedly sold by Plaintiff, Farak nonetheless certified that the envelopes submitted to her by Burnham in Plaintiff's case tested positive for controlled substances (Compl. ¶¶ 142-43, 146, 148-151).  However, the evidence returned to Burnham by Farak did not match what Burnham had dropped off earlier:  the samples were not in heat-sealed bags and did not match the descriptions of the evidence contained on the evidence tags (Compl. ¶¶ 153-58).

At Plaintiff's criminal trial in December 2013, Burnham and each of the SPD Officers testified (Compl. ¶¶ 352, 354).  All were confronted on cross-examination with the discrepancies between Wadlegger's police report, the search warrant return, and the evidence tags for the money and drugs seized at the time of Plaintiff's arrest (Compl. ¶ 355).  The prosecution introduced into evidence sixty bills allegedly seized at the time of Plaintiff's arrest (Compl. ¶ 371).  On December 13, 2013, a jury found Plaintiff guilty of one count of distribution of a Class A substance (Compl. ¶ 376).

After Plaintiff's conviction and sentencing, Burnham's criminal activity came to light. On December 30, 2015, Burnham was indicted for larceny (Compl. ¶ 388).  The investigation

into his wrongdoing revealed that, by the time Burnham testified at Plaintiff's trial, he had stolen over $200,000 in cash submitted to him in his capacity as evidence officer in over 100 separate narcotics investigations (Compl. ¶ 368). Ten of the sixty-six bills introduced into evidence at Plaintiff's trial had not been in circulation at the time of Plaintiff's arrest (Compl. ¶¶ 371-374).

In Count VI of his complaint, brought pursuant to § 1983, Plaintiff alleges that the SPD Officers covered up and lied to Hampden County assistant district attorneys about the substantial evidence of Burnham's criminal activity (Compl. ¶ 447). Plaintiff further alleges that the SPD Officers knew that this information constituted exculpatory evidence in a case like Plaintiff's where the cash was short and Burnham was entrusted with the suspected narcotics (Compl. ¶ 448). Count VIII of the complaint alleges that the conduct of the SPD Officers was extreme and outrageous and caused Plaintiff to suffer severe emotional distress (Compl. ¶¶ 462-64).

In Count VII of the complaint, Plaintiff charges the City with failure to adequately supervise and discipline Burnham in the performance of his duties as an evidence officer with respect to Burnham's thefts of money seized from suspects and his handling of suspected drug samples. Plaintiff alleges that the City had a policy or custom of failing and refusing to investigate allegations of misconduct made against Burnham, and to discipline him, that this failure caused Burnham to believe that he could operate with impunity, and that the City's failure resulted in injury to Plaintiff (Compl. ¶¶ 456-461).

## II. DISCUSSION

The SPD Officers and the City have moved to dismiss on various bases. Plaintiff opposes on all fronts. For both groups, the standard of review is the same. In evaluating a motion to dismiss, the court construes the complaint's well-pleaded facts in the light most favorable to Plaintiff, draws all reasonable inferences in his favor, and ascertains whether the

complaint states a claim for which relief can be granted.  Fed. R. Civ. P. 12(b)(6); *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 7 (1st Cir. 2011).  In § 1983 cases, the court examines if "the facts alleged, viewed in the light most favorable to the complaining party, show that the [defendant's] conduct violated some constitutional right." *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004).  Under the standard laid out by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and distilled by the First Circuit, the court is directed to identify and disregard statements in the complaint that "merely offer 'legal conclusion[s] couched … as fact[]' or '[t]hreadbare recitals of the elements of a cause of action.'" *Ocasio-Hernandez*, 640 F.3d at 12 (alterations in original).  Treating the "[n]on-conclusory factual allegations … as true," the court must determine if these alleged facts state "a plausible, not a merely conceivable, case for relief." *Id*.  While "a complaint need not plead facts sufficient to make out a prima facie case or allege all facts necessary to succeed at trial," *Medina-Valaquez v. Hernandez-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014) (citing *Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 717-18 (1st Cir. 2014)), the elements of a prima facie case "form[] 'part of the background against which a plausibility determination should be made.'" *Id*. (quoting *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013)).  "An analysis of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id*. at 109 (quoting *Grajales v. P.R. Ports Auth*., 682 F.3d 40, 44 (1st Cir. 2012)).  That said, "the court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "[A] court [may not] attempt to forecast a plaintiff's likelihood of success on the merits; 'a well-pleaded complaint may proceed even if … a recovery is very remote and unlikely.'" *Id*. at 12-13 (quoting *Twombly*, 550 U.S. at 556).

**A.      SPD Officers' Motions to Dismiss (Dkt. Nos. 26 & 63)**

**1.   § 1983 Claims**

To succeed in an action for deprivation of his civil rights, Plaintiff must show that the

defendants were acting under color of state law and that their conduct deprived Plaintiff of rights

secured under the U.S. Constitution or federal law.  *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st

Cir. 2008).  The SPD Officers do not challenge the allegation that they were acting under color

of law.  Plaintiff alleges that the SPD Officers violated his rights by failing to disclose

impeachment information about Burnham that could have been used in Plaintiff's 2013 criminal

trial, in contravention of Plaintiff's due process rights under the Fifth Amendment.  *See Brady v.*

*Maryland*, 373 U.S. 83, 87 (1963) (holding that "suppression by the prosecution of evidence

favorable to an accused" is a due process violation).  The SPD Officers argue that Plaintiff's §

1983 claim should be dismissed as to all of them because the facts as alleged fail to make out a

*Brady* claim.[4]  In the alternative, the SPD Officers argue that, even if they committed a *Brady*

violation, they are nonetheless entitled to qualified immunity because this right was not clearly

established at the time of Plaintiff's trial.  Because the decision on whether the defendant officers

are entitled to qualified immunity necessarily encompasses a decision on whether Plaintiff has

adequately alleged a constitutional violation by the SPD Officers, the court turns immediately to

the qualified immunity inquiry.

The judge-made qualified immunity doctrine insulates a defendant official from liability

"when an official's conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known."  *Kisela v. Hughes*, 138 S.Ct. 1148, 1152

---

[4] Kent filed his motion to dismiss (Dkt. No. 26) separately from Wadlegger, Bigda, and Kalish, who filed together (Dkt. No. 63).  Because the arguments raised by the defendant officers are largely the same, the court will address them collectively.

(2018) (holding that qualified immunity protected a police officer in a Fourth Amendment context because the officer's conduct did not violate clearly established law) (quotations omitted). The purpose of the "clearly established" requirement is to provide clear and fair warning to an officer that his or her conduct was unlawful. *Id.* at 1152-53. For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate" at the time the violation is alleged to have occurred. *Id.* (quoting *White v. Pauly*, 137 S.Ct. 548, 551 (2017)); *see also Haley v. City of Boston*, 657 F.3d 39, 47-48 (1st Cir. 2011). On the one hand, there need not be a case "directly on point for a right to be clearly established." *Kisela*, 138 S.Ct. at 1152. On the other hand, "clearly established law" should not be defined "at a high level of generality." *Id.*

The Supreme Court has counseled that the issue of qualified immunity should be resolved "at the earliest possible stage in litigation," because it is an entitlement to "*immunity from suit, rather than a mere defense to liability.*" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (emphasis in original). Thus, the question is appropriately raised by a motion to dismiss. *Haley*, 657 F.3d at 47. The two-step inquiry for the court involves first examining whether the facts as alleged in the complaint make out a constitutional violation and, second, determining if the right at issue was "clearly established" in settled law at the time of the defendant's alleged action. *Id.* at 47.

### (a) Has Plaintiff Adequately Alleged a Constitutional Violation?

#### (i) The Brady Rule

"*Brady* was an 'extension' of a line of cases . . . in which the Supreme Court held that a state actor violates a criminal defendant's due process rights by the knowing use of perjured testimony or the deliberate suppression of evidence leading to the defendant's conviction." *Drumgold v. Callahan*, 707 F.3d 28, 38 (1st Cir. 2013) (citing *Kyles v. Whitley*, 514 U.S. 419,

432 (1995); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Mooney v. Holohan*, 294 U.S. 103 (1935)).

"*Brady* broke new ground in holding that a prosecutor also violates a defendant's due process rights merely by failing to disclose material evidence in his possession that is favorable to the defendant, irrespective of the good or bad faith of the prosecutor." *Id.* The so-called *Brady* rule applies to information that is claimed to be directly exculpatory and to impeachment evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985), as well as to inadmissible evidence that is "so promising a lead to strong exculpatory evidence there could be no justification for withholding it." *Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003). Moreover, the *Brady* duty applies beyond prosecutors to law enforcement officers generally. *Drumgold*, 707 F.3d at 38 (stating that *Brady*'s "affirmative disclosure obligation  also encompasses evidence known only to law enforcement officers and not to prosecutors") (citing *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999); *Kyles*, 514 U.S. at 437-38; *Haley*, 657 F.3d at 49); *cf. Jones v. Han*, 993 F. Supp. 2d 57, 65 (D. Mass. 2014) (holding that the *Brady* rule extends to state drug lab analysts because they "are as much an arm of the government as are police officers"). Thus, *Brady* and its progeny impose a no-fault obligation on police officers to disclose evidence to prosecutors that is favorable to a defendant. *Drumgold*, 707 F.3d at 38.

To make out a successful *Brady* claim, Plaintiff must show that evidence claimed to be withheld is material. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. Impeachment evidence is material "where the evidence is highly impeaching *or* when the witness' testimony is uncorroborated and essential to the

conviction." *Conley v. United States*, 415 F.3d 183, 189 (1st Cir. 2005) (emphasis in original; internal quotations omitted).

### (ii)    Application

Plaintiff asserts that the SPD Officers violated his *Brady* rights when they failed to disclose impeachment information concerning how Burnham handled money that was seized by narcotics officers and turned over to Burnham in his capacity as evidence officer. Plaintiff's complaint states the following allegations and supports the following inferences regarding the money evidence under Burnham's control.[5]

- As night shift narcotics detectives, it was the practice of the SPD Officers to have at least two officers count the cash when there was a seizure of money in excess of $200. When the officers' tallies agreed, the last officer to count the money would seal the money in an envelope, write the amount on the envelope and on a separate evidence tag, and post the envelope and evidence tag through a slot in the locked evidence room door (Compl. ¶ 357).

- When Plaintiff was arrested, the SPD Officers seized $2,344 in cash. Wadlegger reported that Plaintiff had $386 in cash on him at the time of his arrest. According to arrest reports, officers seized a total of $1,958 from two female suspects (Compl. ¶¶ 123-24).

_____

[5] To the extent that Plaintiff's § 1983 claims against the SPD Officers are premised on allegations about Burnham's mishandling of the controlled substances allegedly obtained from Plaintiff, those allegations do not appear to support Plaintiff's claims against the SPD Officers. There are no allegations in the complaint from which it could be inferred that the SPD Officers knew or had reason to know of Burnham's shoddy practices related to the alleged controlled substances he submitted for Drug Lab analysis. While a *Brady* violation in the criminal context may be no fault, "a negligent act or omission cannot provide a basis for liability in a § 1983 action seeking compensation for loss of liberty occasioned by a *Brady* violation." *Porter v. White*, 483 F.3d 1294, 1308 (11th Cir. 2007).

- Before any of the SPD Officers took the stand in Plaintiff's case, each had been told by Burnham on numerous occasions – in cases other than Plaintiff's case – that his money count was off. Each time, the officer was told that there was less cash in the envelope than the amount the officer had recorded (Compl. ¶¶ 358-59).

- Each of the SPD Officers had reported to a supervisor or supervisors that he believed that Burnham was stealing from cash the night narcotics unit had submitted as evidence (Compl. ¶ 361).

- At Plaintiff's trial, the cash that was submitted in evidence did not match the amount of cash that Wadlegger stated in his police report had been seized on the night of Plaintiff's arrest or the amount recorded on the evidence tag that was filled out the night Plaintiff was arrested, nor did the amount of cash recorded in the search warrant return match the amount in the police report, or the amount on the evidence tag (Compl. ¶ 355).

- At least some of the bills submitted as evidence at Plaintiff's trial could not have been seized the night he was arrested because the bills were not placed into circulation until after the date they were allegedly seized (Compl. ¶ 372-74).

- Burnham testified as the SPD evidence officer in Plaintiff's case to the chain of custody as to cash seized when Plaintiff was arrested (Compl. ¶ 367).

Because it is alleged that many of the bills introduced into evidence at Plaintiff's trial were not in circulation when Plaintiff was arrested, it is reasonable to infer that Burnham stole a substantial part of the money that the SPD Officers submitted as evidence in Plaintiff's case, then replaced some of the missing money with cash he obtained from another source. It is also reasonable to infer that the amount of money introduced into evidence during Plaintiff's trial was less than the amount recorded on the evidence tag and in Wadlegger's police report and that,

when the SPD Officers testified at Plaintiff's trial, they knew or had reason to know that Burnham had stolen at least some of the cash seized when Plaintiff was arrested. Further, it is reasonable to infer that Burnham testified falsely at Plaintiff's criminal trial in 2013 regarding the chain of custody for the seized cash and that the SPD Officers knew or should have known that parts of his testimony were false. Not only did the SPD Officers fail to inform the prosecuting assistant district attorney about Burnham's theft prior to trial, they also did nothing to stop Burnham from testifying falsely to a reliable chain of custody during Plaintiff's trial.

The SPD Officers argue that Plaintiff fails to allege facts sufficient to make out a claim for a *Brady* violation for several reasons. One reason can be quickly addressed. The SPD Officers assert that impeachment evidence consisting of nothing more than the officers' suspicions about Burnham's misconduct would not have been admissible. *See Commonwealth v. Dockham*, 542 N.E.2d 591, 599 (Mass. 1989) ("Evidence of specific or particular acts of lying or similar misconduct is not admissible; nor is the opinion of a witness as to the character of the witness being impeached."). The First Circuit has stated that in considering the viability of a *Brady* claim, it is "plain that evidence itself inadmissible *could* be so promising a lead to strong exculpatory evidence that there could be no justification for withholding it." *Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003) (emphasis in original). Accordingly, the claim cannot be dismissed solely on the basis that the evidence the SPD Officers failed to disclose would have been inadmissible. Moreover, the argument is premised on the contention that Plaintiff has merely alleged that the SPD Officers suspected that Burnham was stealing. "[I]t is the party suing, not the party sued, who enjoys the right to frame the claims asserted in the complaint." *Haley*, 657 F.3d at 49. Plaintiff has alleged far more than mere suspicion. Rather, he has alleged

knowledge of a theft in his case, which would have been strong impeachment evidence, and deliberate indifference to false testimony.

Defendant Officers' second argument is an attack on the materiality of the alleged impeachment evidence, a requisite finding for a *Brady* violation to be sustained. They further posit that a finding of non-materiality is mandated by Judge Carey's decision and the principles of collateral estoppel. The court will begin with the issue of collateral estoppel and then address the question of materiality.

On June 26, 2017, Judge Carey issued a comprehensive memorandum of decision on a series of motions to dismiss indictments in cases "emanate[ing] from the scandal at the Amherst drug lab" based on the misconduct by chemist Sonja Farak, one of which was Plaintiff's criminal case. *Commonwealth v. Cotto*, 2017 WL 4124972, at *1 (Mass. Sup. Ct. June 26, 2017) (Indictment No. 2007770). Judge Carey determined that the misconduct of Farak, among other reasons, warranted the "drastic remedy" of dismissal of Plaintiff's indictments with prejudice. *Id.* at **36, 47. Included in his "ultimate" findings of fact was the statement: "Other claims of misconduct by government actors, *including Burnham*, and failings, such as the deficiencies in operating the Amherst lab, have not been shown *by themselves* to merit post-conviction relief for the reasons explained above." *Id.* at *33 (emphasis added). It is this finding that the SPD Officers argue is binding on this court.

This court must give a Massachusetts court judgment the same preclusive effect as would be given that judgement under Massachusetts law. *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). Four prerequisites must exist for issue preclusion to apply here: (1) the prior adjudication reached a final judgment; (2) Plaintiff was a party to the prior adjudication; (3) the issue the SPD Officers seek to preclude is identical to the issue in the prior

adjudication; and (4) the issue sought to be precluded "must have been essential to the earlier judgment." *Kobrin v. Bd. of Registration in Med.*, 832 N.E.2d 628, 634 (Mass. 2005) (quotations omitted). With respect to the first element, the finality of the judgment, "Massachusetts courts also require that appellate review must have been available in the earlier case before issue preclusion will arise." *In re Sonus Networks, Inc. S'holder Derivative Litig.*, 499 F.3d 47, 57 (1st Cir. 2007) (citing *Sena v. Commonwealth*, 629 N.E.2d. 986, 992 (Mass. 1994)).

The SPD Officers assert that Plaintiff is barred from arguing that evidence of Burnham's misconduct as evidence officer can be considered material for purposes of establishing a *Brady* violation because Judge Carey already decided the issue to the contrary. Their argument for collateral estoppel argument fails on the first element: the decision cannot be considered final on the point for which the defendants rely on it. Assuming solely for the sake of argument that Judge Carey ruled that Burnham's thefts of money from the evidence room were not a basis for post-conviction relief,[6] Plaintiff had no way to appeal such a finding. Plaintiff's motion to dismiss was granted on the basis of other government misconduct. Had the Commonwealth

---

[6] In fact, Burnham's transgressions with cash played little, if any, role in Judge Carey's consideration of the motions to dismiss the indictments. Aside from noting in the introduction to his decision that Burnham had been indicted for this misconduct, *Cotto*, 2017 WL 4124972, at *1, Judge Carey only referenced Burnham's role in the various defendants' cases in the context of his handling of the suspected drugs he submitted to the Drug Lab for analysis. While noting that Burnham's mishandling of drugs "facilitated" Farak's scheme, Judge Carey ultimately concluded that the evidence did not support a finding that Burnham himself tampered with the substances he submitted for analysis. *Id.* at **9, 60. Judge Carey's opinion does not refer to Burnham's theft of money from the SPD evidence room in general, or to the theft of money seized in Plaintiff's case. The section of Judge Carey's opinion addressing Plaintiff's motion to dismiss the indictments against him does not mention Burnham at all. Because the Commonwealth did not oppose, Judge Carey did not rule on Plaintiff's motion for a new trial, which was premised in part on Burnham's misconduct. The issue of Burnham's thefts of cash was hardly "essential" to Judge Carey's judgment on Plaintiff's motion to dismiss the indictment returned against him. Accordingly, the SPD Officers' collateral estoppel argument breaks down on both the third and fourth elements of the test as well.

21

appealed the decision, Plaintiff could have defended the judgment on the basis of Burnham's misconduct. *See Boston Edison Co. v. Boston Redevelopment Auth.*, 371 N.E.2d 728, 735 & n.5 (Mass. 1977). However, barring an appeal from the Commonwealth, which was not forthcoming, Plaintiff could not appeal the favorable outcome on the basis of a disagreement with a particular finding. *See Commonwealth v. Graves*, 112 Mass. 282, 283 (1873) ("The defendant is not legally aggrieved by his discharge from custody, and therefore cannot appeal from the order of discharge.").

Leaving aside the question of collateral estoppel, the SPD Officers assert that Plaintiff has not identified withheld evidence that meets the materiality requirement of the *Brady* inquiry because there is no "reasonable probability" that the trial would have come out differently had the impeachment information about Burnham been disclosed to the prosecutor and, through the prosecutor, to defense counsel. *See Conley*, 415 F.3d at 188 ("Impeachment evidence must be material before its suppression justifies a new trial.") (citing *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995)).

"The strength of impeachment evidence and the effect of suppression are evaluated in the context of the entire record to determine materiality. Evidence is immaterial where it is cumulative or merely impeaches a witness on a collateral issue." *United States v. Paladin*, 748 F.3d 438, 444 (1st Cir. 2014) (internal citation omitted). In evaluating the strength of impeachment evidence, a court takes into account whether the evidence was unique or cumulative, as well as whether there was other evidence strongly corroborating the witness's testimony such that the impeachment evidence could be said to have had "little probative value." *Paladin*, 748 F.3d at 444. Ultimately, Plaintiff will be required to show that, had he had access

to the undisclosed evidence, there is a reasonable probability that the outcome of his trial would have been different. *Bagley*, 473 U.S. at 682.

A short answer to the SPD Officers' contention that there is no reasonable probability that the outcome would have been different lies in the Commonwealth's response to Plaintiff's motion for a new trial. The Commonwealth assented to that motion, stating, as to Burnham's misconduct, that "the discovery that currency that was admitted into evidence at [Penate's] trial as circumstantial evidence of distribution had not been in circulation at the time Penate was arrested would have had a profound effect on [Penate's] trial and probably would have been a real factor in the jury's determination" (Dkt. No. 40 at 14). Burnham testified at trial as the SPD narcotics evidence officer to the chain of custody for the money and drugs the Commonwealth chose to introduce into evidence at Plaintiff's trial in support of the distribution charge. Plaintiff brought the discrepancies about the amounts of cash in the police report, the evidence tag, and the warrant return to the jury's attention (Dkt. No. 40 at 10-11). The cash, as the Commonwealth indicated in its assent to Plaintiff's new trial motion, was helpful, albeit perhaps not necessary, circumstantial evidence of Plaintiff's alleged involvement in the distribution, as opposed to mere possession, of heroin. In Farak's absence,[7] Burnham's testimony about the provenance of the drugs was probably essential. At the very least, Burnham was an important Commonwealth witness.

Materiality is in part a question of fact. *See Drumgold*, 707 F.3d at 39 ("We may rule in [the defendant police officer's] favor only if no reasonable person could view the withheld evidence as material.") (citing *Zachar v. Lee*, 363 F.3d 70, 73 (1st Cir. 2004); *Correa v. Hosp.*

---

[7] Plaintiff's counsel represents that jurors were informed that the alleged drug samples were initially submitted to Farak for analysis, but she was under indictment for evidence tampering and therefore unavailable to testify (Dkt. No. 40 at 12).

*San Francisco*, 69 F.3d 1184, 1191 (1st Cir. 1995)). The court cannot say that all reasonable persons would view as immaterial the information that Plaintiff's was one in a long line of cases in which narcotics unit officers had seized more cash than Burnham acknowledged receiving from them, that they had complained internally that he was stealing, and that they had seized more cash at the time of Plaintiff's arrest than the prosecution had introduced into evidence. This evidence is unique, it was relevant to the credibility of an important witness, and there was no other evidence to corroborate Burnham's (false) chain of custody testimony. There is, moreover, a real possibility that timely disclosure of information about Burnham would have led to the discovery that the money the Commonwealth sought to introduce as circumstantial evidence of Plaintiff's distribution of narcotics was not the money seized at the time of his arrest and could not be introduced into evidence, and, further, that the Commonwealth would have been forced to account for this gap in its evidence. The court cannot say, as a matter of law, that the result of Plaintiff's criminal trial would have been the same if the impeachment evidence Plaintiff claims the SPD Officers possessed had been disclosed. *See Drumgold*, 707 F.3d at 41 (evidence that the state's eyewitness received pecuniary benefits from the defendant police officer, which was not disclosed to the plaintiff at the time of his criminal trial, could have undermined the witness's credibility and testimony).

Moreover, the allegations in the complaint also make out a claim for a constitutional violation under the *Mooney* line of cases. That case law established the proscription "against intentionally concealing evidence and permitting false testimony to be given at a defendant's trial." *Haley*, 657 F.3d at 49. Due process rights are contravened when law enforcement officers "deliberately keep the defense in the dark about important evidence" in order "to grease the skids for false testimony and encourage wrongful conviction." *Id.* at 49-50. In this case, the

allegations in the complaint support the inference that the SPD Officers, who all testified at Plaintiff's trial, knew that Burnham's testimony regarding a reliable chain of custody for the cash was false and, yet, said nothing to the prosecutors or to the defense.

Plaintiff's factual allegations, and the reasonable inferences to which they give rise, may not prove out. However, at this early stage, the court cannot dismiss Plaintiff's § 1983 claims against the SPD Officers on the basis that a constitutional violation has not been adequately pled. *See Marrero-Rodriguez v. Municipality of San Juan*, 677 F.3d 497, 502 (1st Cir. 2012) (stating that the court was "reluctant" to dismiss a § 1983 case at the motion to dismiss stage because, although the allegations might not prove to be true, the inferences must be drawn in plaintiff's favor). The SPD Officers' arguments as to the insufficiency of the pleadings on the issue of causation or the necessary state of mind are similarly premature.[8]

**(b) Was the right clearly established?**

The second step of the qualified immunity analysis, after determining if a constitutional right was violated, is whether the state of the law at the time was such that an officer could be said to be on notice that his conduct was unlawful. The inquiry into whether a right has been clearly established itself has two parts. First, the court must examine the state of the law leading up to the point of the alleged infringement. *Drumgold*, 707 F.3d at 42. Second, the court must evaluate – given the particular facts of the case – "whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights." *Id.* The SPD Officers

---

[8] The court acknowledges and leaves for another day the question of whether Plaintiff can succeed in his § 1983 claim for a *Brady* violation without showing that the officers acted deliberately or with reckless disregard to Plaintiff's rights, or whether some "less culpable state of mind might suffice." *Drumgold*, 707 F.3d at 43 n.10; *Nnodimele v. Derienzo*, 13-CV-3461(ARR)(RLM), 2016 WL 3561708, at **4-5 (E.D.N.Y. June 27, 2016) (noting circuit split on the degree of a defendant's culpability required to succeed on a § 1983 claim for a *Brady* violation). Plaintiff has adequately pled knowing or reckless violations of his rights.

assert that the question of whether an officer's *Brady* obligation would extend to disclosing general suspicions of a fellow officer's misconduct is uncertain. Thus, they argue, they prevail on the defense of qualified immunity because the court cannot say that the right to impeachment evidence encompasses speculation about another officer's wrongdoing.

As to the first inquiry, in 1942, the Supreme Court held that a defendant's due process rights were violated by a state actor's "knowing use of perjured testimony or the deliberate suppression of evidence leading to the defendant's conviction." *Id.* at 38 (citing *Mooney*, 294 U.S. at 103; *Pyle*, 317 U.S. at 213). In 1963, the Supreme Court recognized an affirmative obligation on the part of prosecutors to disclose exculpatory evidence to defendants. *Brady*, 373 U.S. at 87; *Drumgold*, 707 F.3d at 43. As of 1985, the law was clear that information encompassed within the *Brady* obligation included evidence that was either exculpatory or impeaching. *Bagley*, 473 U.S. at 676; *Drumgold*, 707 F.3d at 38. In 1995, the Court extended this obligation to evidence known only to law enforcement officers. *Kyles*, 514 U.S. at 437-38; *Haley*, 657 F.3d at 49. Thus, "law enforcement officers have a correlative duty to turn over to the prosecutor any material evidence that is favorable to a defendant." *Drumgold*, 707 F.3d at 38.

Defendant Officers assert that at the time of Plaintiff's trial, the law was not clearly established that they had an obligation to disclose their "suspicions" of Burnham's malfeasance. However, it is not the defendant who defines the claims, but the plaintiff. *Limone*, 372 F.3d at 46 ("Courts must be careful not to permit an artful pleader to convert the doctrine of qualified immunity into a hollow safeguard simply by alleging a violation of an exceedingly nebulous right. Courts must be equally careful, however, not to permit a defendant to hijack the plaintiff's complaint and recharacterize its allegations so as to minimize his or her liability."); *see also*

*Haley*, 657 F.3d at 49.  As is set forth above, Plaintiff's complaint, fairly read, paints a far more damning picture of the SPD Officers' general knowledge about Burnham's thefts and specific knowledge about Burnham's misconduct in Plaintiff's case.  A reasonable inference from Plaintiff's allegations is not that the SPD Officers had a mere suspicion of Burnham's malfeasance, but that they had actual knowledge of it, and knowledge that he had stolen money from the cash submitted as evidence in Plaintiff's case.

When the constitutional violation alleged by Plaintiff is defined as a failure to turn over impeachment evidence regarding a witness whose testimony was important to the criminal case, it is evident that the state of law in 2013, when Plaintiff was tried, put police officers on notice that *Brady* obliged them to tell prosecutors that their witness, Burnham, had stolen money from the evidence room in the past and, in Plaintiff's case in particular.  The law was firmly established at the time of Plaintiff's trial that *Brady* required the government to "disclose impeachment evidence that could have been used to impugn the credibility" of a "key witness." *Conley*, 415 F.3d at 189 (citing *Giglio v. United States*, 405 U.S. 150 (1972)).  Moreover, the state of the law in this circuit, from 2005 onward, was that an officer's *Brady* obligation extended to evidence that could be used to impeach a fellow law enforcement officer.  *Id.* at 191 (concluding that suppression of an FBI memorandum that could have been used to impeach the testimony of a police officer during the trial of a fellow officer for perjury and obstruction of justice constituted a *Brady* violation); *cf. Drumgold*, 707 F.3d at 43 (holding that by 1989 the law was clearly established that "a law enforcement officer may not deliberately suppress material evidence that is favorable to a defendant," and concluding that an officer violated *Brady* by failing to disclose that he provided financial assistance to a key witness).

Finally, it is no answer to Plaintiff's allegations to contend that there was no *Brady* violation because the prosecution disclosed Burnham's misconduct by introducing into evidence bills that were not in circulation at the time of Plaintiff's arrest. Supreme Court "decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695 (2004).[9] At trial, the prosecution elicited testimony from Burnham substantiating the chain of custody for the cash introduced in evidence. Defense counsel had no reason to be suspicious of that testimony. "A rule . . . declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Id.* at 696.

Plaintiff's allegations of reckless or knowing violations of Plaintiffs' due process rights may not be born out on a more complete record. However, at the motion to dismiss stage, the court cannot find that the SPD Officers are entitled to qualified immunity.

### 2. Intentional Infliction of Emotional Distress

Count VIII alleges that the conduct by Defendant Officers was "extreme and outrageous and likely to result in severe emotional distress to Plaintiff" (Compl. ¶ 463). Under Massachusetts law, there are four elements to a claim for intentional infliction of emotional distress: (1) the defendant "intended, knew, or should have known that his conduct would cause emotional distress;" (2) the defendant's conduct was "extreme and outrageous;" (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the plaintiff's emotional distress was severe. *Polay v. McMahon*, 10 N.E.3d 1122, 1128 (Mass. 2014). "The conduct at issue must go 'beyond all possible bounds of decency, and [be] regarded as atrocious, and utterly

---

[9] Procedural aspects of this case have been superseded by the Antiterrorism and Effective Death Penalty Act of 1996.

intolerable in a civilized community.'" *Bazinet v. Thorpe*, 190 F. Supp. 3d 229, 240 (D. Mass. 2016) (quoting *Polay*, 10 N.E.3d at 1128)).  In addition to his conduct being extreme and outrageous, the defendant must have "acted in [a] targeted and malicious manner." *Rua v. Glodis*, 52 F. Supp. 3d 84, 100 (D. Mass. 2014).  For example, a defendant's conduct can be considered "heartless, flagrant, and outrageous" when he or she proceeds to act in the face of actual knowledge that such actions would impact a plaintiff who "is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." *George v. Jordan Marsh Co.*, 268 N.E.2d 915, 921 (Mass. 1971).

Defendant Kent argues that Plaintiff's allegations do not suffice to make out this claim because the complaint is devoid of allegations about specific actions undertaken by Kent targeting Plaintiff. [10]  *Henriquez v. City of Lawrence*, No. 14-cv-14710, 2015 WL 3913449, at *5 (D. Mass. June 25, 2015) (dismissing claim for intentional infliction of emotional distress where the complaint lacked allegations that the defendant engaged in any conduct directed at the plaintiff).  Additionally, Defendant Kent asserts that the allegations themselves do not present conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 82 (Mass. 1987) (quotations omitted).

Accepting the allegations in the complaint as true, and drawing all reasonable inferences in Plaintiff's favor, the court concludes that Plaintiff has adequately alleged a claim for intentional infliction of emotional distress.  This case is similar to *Limone v. United States*, 579

---

[10]  Though Defendants Wadlegger, Bigda, and Kalish ostensibly seek dismissal of Count VIII, unlike Defendant Kent, their memorandum in support of dismissal contains no argument with respect to this count.  Thus, the court's discussion focuses on Defendant Kent's arguments, though they apply with equal force to all the SPD Officers.

F.3d 79, 94 (1st Cir. 2009), in which the Court of Appeals affirmed the district court's finding of liability for intentional infliction of emotional distress where the law enforcement defendants had willingly participated in framing "scapegoat[ed]" civilians and then acted to cover up their malfeasances. The court noted specifically that a finding of extreme and outrageous conduct "may be grounded either on actual knowledge or on a defendant's deliberate disregard of a substantial probability that his actions will produce severe emotional distress." *Id.* at 95; *cf. Bazinet*, 190 F Supp. 3d at 240 (denying motion to dismiss where allegations in complaint charged law enforcement defendants with "fabricating evidence in an effort to obtain criminal charges against an innocent citizen who was in the midst of a suicidal breakdown"). Moreover, under Massachusetts law, "claims for intentional infliction of emotional distress may be founded on a pattern of misconduct." *Limone*, 579 F.3d at 98.

The allegations and reasonable inferences derived therefrom are that the SPD Officers, including Defendant Kent, had actual knowledge that Burnham's testimony at Plaintiff's criminal trial was false. The SPD Officers counted the money seized at the time of Plaintiff's arrest and reached agreement on an amount that Burnham later told the officers – consistent with his past practice – was too high (Compl. ¶¶ 123-24, 355-62); when cross-examined by Plaintiff's attorney, the SPD Officers did not fully account for the difference between the amounts listed in the police reports and on the warrant return and evidence tags (Compl. ¶ 355); Burnham falsely testified about the sums of money seized and the chain of custody (Compl. ¶¶ 367-68, 371-74); and yet at no point did the SPD Officers bring to the attention of the prosecuting district attorneys their knowledge of Burnham's past wrongdoing and likely current malfeasance (Compl. ¶ 362). The SPD Officers' conduct may be considered extreme or outrageous premised on the allegation or the inference that they had actual knowledge or that they acted with

"deliberate disregard of a substantial probability that [their] actions [would] produce severe emotional distress" for Plaintiff. *Limone*, 579 F.3d at 95 (citing *Simon v. Solomon*, 431 N.E.2d 556, 562 (Mass. 1982) (concluding that a defendant could be held liable for intentional infliction of emotional distress where he "violated his duty to [the plaintiff] recklessly, by outrageous omission to act, and thereby caused [her] severe emotional harm").

Accordingly, the SPD Officers' motions to dismiss Count VIII will be denied.

## B.     Defendant City of Springfield's Motion to Dismiss (Dkt. No. 63)

Plaintiff's only claim against the City, in Count VII, is a § 1983 claim premised on the City's alleged policy or custom of failing to supervise and discipline Burnham for his thefts of cash submitted as evidence by narcotics officers and his sloppy handling of narcotics samples submitted to the Drug Lab for analysis (Compl. ¶¶ 456-460).

A city can be liable pursuant to § 1983 when a plaintiff shows that a municipal policy or custom was the driving force behind a constitutional violation committed by one of its employees. *Young v. City of Providence ex. rel. Napolitano*, 404 F.3d 4, 25 (1st Cir. 2005) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). *Monell* liability cannot be based on a theory of *respondeat superior*. "It is only when the governmental employees' 'execution of a government's policy or custom . . . inflicts the injury' and is the 'moving force' behind the constitutional violation that a municipality can be liable." *Id.* at 25 (quoting *Monell*, 436 U.S. at 694) (omissions in original). To successfully make out a *Monell* claim, a plaintiff must show, first, that his "harm was caused by a constitutional violation, and second, that the City [was] responsible for that violation." *Id.* at 26. Furthermore, a plaintiff must show causation and a requisite level of fault. The city's custom or policy must "actually have caused the plaintiff's injury," and the city must have been deliberately indifferent to the plaintiff's

constitutional rights. *Id.* The First Circuit has recognized this standard as "exceptionally stringent." *Crete v. City of Lowell*, 418 F.3d 54, 66 (1st Cir. 2005) (citing *Young*, 404 F.3d at 30).

The City argues that Plaintiff's complaint fails to state a plausible claim either that his injuries stemmed from a constitutional violation or that any such violation was caused by a municipal policy or custom.[11] As to the first argument, the court has already found that the complaint adequately alleges a constitutional violation and that Plaintiff is not barred by collateral estoppel from pursuing this claim.[12] At the motion to dismiss stage, for the reasons set forth above, the first element is satisfied. The remaining questions are deliberate indifference and causation. *See Young*, 404 F.3d at 26; *Cox v. Murphy*, Civil No. 12-11817-FDS, 2016 WL 4009978, at *7 (D. Mass. Feb. 12, 2016) (stating that a plaintiff asserting a *Monell* claim for failure to supervise must show that the municipality had a custom, policy or practice of failing to investigate or discipline its officers; this custom, practice or policy demonstrated deliberate indifference to the rights of citizens; and that the custom, policy or practice was the cause of the alleged constitutional violation).

The City argues that the complaint does not allege a pattern of *Brady* violations such that it should have been on notice that Burnham required investigation or better supervision. The

---

[11] The City also presses the argument that it cannot be liable based the actions of SPD Officers Kent, Wadlegger, Bigda, or Kalish because none of them violated Plaintiff's constitutional rights. The court will pass on this line of argument as it appears from Plaintiff's complaint that the allegations regarding the City's liability under § 1983 rely on the alleged customs and policies of the City that permitted Burnham to mishandle evidence and steal money with impunity (Compl. ¶¶ 455-461).

[12] As is the case with respect to the SPD Officers, the complaint does not allege that the City knew or had reason to know, prior to or at the time of Plaintiff's trial, of Burnham's slipshod practices in handling controlled substances. Under the applicable standard set out in the body of the memorandum and order, the complaint does not make out a claim against the City on this basis.

City further argues that the misconduct Burnham committed in Plaintiff's case, which it defines as stealing from the seized currency and replacing the seized currency with different bills, is so different from the reports of Burnham's misconduct by narcotics unit officers (*i.e.*, stealing cash from the evidence room) that the City cannot be said to have been on notice of the possibility that Burnham's conduct would lead to a constitutional harm. *See Connick v. Thompson*, 563 U.S. 51, 63 (2011) (finding that the plaintiff failed to demonstrate deliberate indifference when there was no proof of a pattern of similar *Brady* violations that would have put the municipality "on notice that specific training was necessary to avoid this constitutional violation").

The City's reading of Plaintiff's allegations is unduly restricted. Plaintiff claims infringement of his due process rights under the Fifth Amendment, of which a *Brady* violation is one type. *See Drumgold*, 707 F.3d at 38. A criminal defendant's due process rights are infringed when officers fail to disclose exculpatory evidence, including impeachment evidence, and they are infringed when officers "intentionally conceal[] evidence and permit[] false testimony to be given at a defendant's trial." *Haley*, 657 F.3d at 49.

Plaintiff alleges that Burnham's thefts of money turned over to him in his capacity as SPD narcotics evidence officer resulted in a violation of Plaintiff's due process rights under the Fifth Amendment.[13] He has alleged a long-standing practice by Burnham of stealing funds seized by narcotics officers (Compl. ¶¶ 113-15, 127-132) that was known to his fellow officers (Compl. ¶¶ 358-360), who reported their suspicions to superior officers in the SPD who had the authority to make and enforce SPD policy (Compl. ¶ 361). He has further alleged that the SPD undertook no investigation and that no disciplinary action followed these reports (Compl. ¶¶

---

[13] Plaintiff's complaint alleges violation of his rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments (Compl. ¶ 453).

358-369).  Over the decades in his role as evidence officer, Burnham managed to steal more than

$200,000 in cash in over a hundred different cases and misappropriated money in many others

(Compl. ¶ 368).  Burnham stole from the cash seized in Plaintiff's case (Compl. ¶¶ 123-24, 355-

362), then testified falsely to the chain of custody when the cash was introduced in evidence at

Plaintiff's trial (Compl. ¶¶ 367-68, 371-74).

For pleading purposes, Plaintiff has adequately alleged that the City had a well-settled

"custom, policy, or practice" of failing to investigate numerous, sometimes heated complaints

about Burnham's thefts from the money being seized by SPD narcotics officers.  *Whitfield v.*

*Melendez-Rivera*, 431 F.3d 1, 13 (1st Cir. 2005) (noting that, while not officially authorized,

some practices may be so well-settled and widespread that a municipality's policymaking

officials can be said to have actual or constructive knowledge of them and yet have done nothing

to end them).  On the question of causation, it must be left to a finder of fact to decide whether,

because of the City's deliberate indifference to complaints about Burnham, he remained the SPD

narcotics evidence officer, able to testify falsely and without challenge, to the chain of custody

for drugs and cash generally and specifically in Plaintiff's case, resulting in a violation of

Plaintiff's due process rights.

The City's reliance on *Connick v. Thompson*, 563 U.S. 51 (2011), is misplaced.  In

*Connick*, the Supreme Court reversed a jury finding of liability against the defendant district

attorney for failure to adequately train the attorneys under his authority on their *Brady*

obligations.  The jury "rejected [the plaintiff's] claim that an unconstitutional policy caused the

*Brady* violations."  *Id.* at 57.  The Court held that the district attorney could not "be held liable

under § 1983 for failure to train based on a single *Brady* violation," *id.* at 54, because the

plaintiff had to show that the defendant was deliberately indifferent to the likelihood of

employees violating his constitutional rights. *Id.* at 71. Therefore, the plaintiff's § 1983 claim premised on failure to train had to include a showing of a "pattern of similar violations." *Id.* Additionally, the earlier incidents used to establish a pattern had to be similar enough to put the defendant "on notice that specific training was necessary to avoid this constitutional violation." *Id.* at 63.

Nowhere in his complaint does Plaintiff allege a failure to train as a basis for his claim against the City. Count VII alleges "a policy or custom of failing to investigate allegations of misconduct" and "failing to discipline" Burnham for his misconduct (Compl. ¶ 458). In support of this claim, Plaintiff has alleged numerous reports made to supervisory SPD officers about Burnham's thefts. As the Supreme Court explained in *Connick*, § 1983 liability premised on a municipality's custom or policy depends on showing either that the policy itself was constitutionally infirm or, as Plaintiff alleges here, that the municipality was deliberately indifferent to the likelihood of constitutional violations resulting from the custom or policy. The touchstone is predictability. *See Connick*, 563 U.S. at 71 ("To prove deliberate indifference, [the plaintiff] needed to show that [the defendant] was on notice that, absent additional specified training, it was 'highly predictable' that the prosecutors in his office would be confounded by those gray areas and make incorrect *Brady* decisions as a result. In fact, [the plaintiff] had to show that it was *so* predictable that failing to train the prosecutors amounted to *conscious disregard* for defendants' *Brady* rights.") (emphasis in original). Here, accepting the allegations in the complaint as true, it cannot be said that no reasonable finder of fact could conclude that the alleged violation of Plaintiff's due process rights was an unpredictable result of the blind eye turned by the City to repeated reports of Burnham's misconduct.

There is much to learn in discovery about reports to the City about Burnham prior to Plaintiff's trial. At this stage, the court must accept allegations in the complaint as true; taken as true, the allegations plausibly state a claim for relief under *Monell*. *See Haley*, 657 F.3d at 52 (reversing a dismissal of § 1983 claims against the city because, though the city "vigorously dispute[d]" the existence of an unconstitutional policy or of deliberate indifference to the need for training, the issue was whether the complaint painted a "plausible picture").

**III.   CONCLUSION**

For the reasons set forth above, the Motions to Dismiss by Defendant Kent (Dkt. No. 26), Defendants Wadlegger, Bigda, and Kalish (Kdt. No. 63), and by the City of Springfield (Dkt. No. 57) are hereby DENIED.

It is so ordered.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED:  September 27, 2018