UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROLANDO PENATE,                               )
                                              )
    Plaintiff,                            )
                                              )
      v.                                )     Civil Action No. 3:17-30119-KAR
                                              )
ANNE KACZMAREK, KRIS FOSTER,                  )
RANDALL RAVITZ, JOSEPH BALLOU,                )
ROBERT IRWIN, RANDY THOMAS,                   )
SONJA FARAK, SHARON SALEM,                    )
JAMES HANCHETT, JULIE NASSIF,                 )
LINDA HAN, STEVEN KENT,                       )
JOHN WADLEGGER, GREGG BIGDA,                  )
EDWARD KALISH, and                            )
CITY OF SPRINGFIELD,                          )
                                              )
    Defendants.                           )

## MEMORANDUM AND ORDER REGARDING MOTIONS TO DISMISS BY INDIVIDUAL DEFENDANTS IRWIN, FOSTER, KACZMAREK, AND RAVITZ
### (Dkt. Nos. 49, 53, 86, & 95)

ROBERTSON, U.S.M.J.

    This is a civil rights action brought pursuant to 42 U.S.C. § 1983 by Plaintiff Ronaldo

Penate against fifteen officials at the Department of Public Health, the Massachusetts State

Police, the Attorney General's Office of the Commonwealth, and the Springfield Police

Department, as well as against the City of Springfield.[1]  Most of the defendants have moved to

dismiss.  Because the allegations and defenses are particular to certain groups of defendants, the

court has divided the defendants into three categories:  individual Springfield police officers and

the City of Springfield; individuals employed by or affiliated with the Massachusetts Attorney

---

[1] The suit initially named the estate of Kevin Burnham as one of the defendants.  On December 14, 2017, Plaintiff moved to dismiss the counts brought against Burnham's estate (Dkt. No. 41), and the court did so on December 15, 2017 (Dkt. No. 42).

General's Office (AGO); and the individuals associated with the Department of Public Health and its forensic laboratories.  The court heard argument on the motions to dismiss over three days.  On September 27, 2018, the court denied the motions to dismiss by the City of Springfield and its police officers (Dkt. No. 140).

This memorandum will address those motions to dismiss filed by the individuals employed by or affiliated with the AGO.  Defendant Massachusetts State Police (MSP) Detective Lieutenant Robert Irwin (Irwin) moves to dismiss Counts III and VIII directed against him for violation of § 1983 and intentional infliction of emotional distress.[2]  Defendants Anne Kaczmarek (Kaczmarek), Kris Foster (Foster), and Randall Ravitz (Ravitz) (collectively, Defendant Attorneys) move to dismiss Counts IV and VIII directed against them for violation of § 1983 and intentional infliction of emotional distress.[3]  Defendants argue that the complaint fails to state a claim upon which relief can be granted.  Additionally, Defendant Attorneys argue that they are entitled to absolute immunity, and Irwin asserts that qualified immunity insulates him from liability.  For the reasons that follow, the court will allow the motions to dismiss with respect to Foster and Ravitz, and deny the others.

## I.   BACKGROUND

In evaluating a motion to dismiss, the court accepts as true all well-pleaded allegations in the complaint and draws all reasonable inferences in favor of Plaintiff.  *Díaz-Nieves v. United States*, 858 F.3d 678, 689 (1st Cir. 2017).  The following recitation of facts is drawn from Plaintiff's complaint (Dkt. No. 1).  The court sketched out a broad overview of Plaintiff's

---

[2] Two other MSP Troopers, Joseph Ballou (Ballou) and Randy Thomas (Thomas), who were also named as defendants, have not moved to dismiss the claims against them.

[3] At the relevant time, the Defendant Attorneys were employed as Assistant Attorneys General for the Commonwealth.

allegations in its earlier memorandum and order regarding the motions to dismiss by Springfield police officers and the City and incorporates that overview herein by reference (Dkt. No. 140 at 2-9). Accordingly, the court moves directly to the allegations relevant to Plaintiff's claims against the AGO defendants.

Springfield police officers arrested Plaintiff on November 15, 2011, after the last of three controlled buys of suspected narcotics (Compl. ¶¶ 118, 121). After each transaction, the glassine packets containing the suspected narcotics were delivered to the Amherst Drug Laboratory (Drug Lab), which was then operated by the Department of Public Health (Compl. ¶¶ 23, 127). Defendant Sonja Farak worked at the Drug Lab as a chemist, along with defendants James Hanchett (Hanchett) and Sharon Salem (Salem). Hanchett became the lab supervisor in 2008. Salem was the evidence officer responsible for work assignments to the Drug Lab chemists (Compl. ¶¶ 66, 141). Hanchett and Salem gave Farak the assignment of testing the suspected narcotics in Plaintiff's case (Compl. ¶ 135). Farak tested the three samples on three separate dates: December 22, 2011; January 6, 2012; and January 9, 2012 (Compl. ¶ 142).

Plaintiff was indicted and charged in thirteen counts with possession of illegal substances with intent to distribute, distribution of illegal substances, school zone violations,[4] possession of a firearm without a valid FID card, possession of ammunition without a valid FID card, and possession of a firearm during the commission of a felony (Compl. ¶ 162). On February 10, 2012, Plaintiff pled not guilty to the charges against him (Compl. ¶ 163).

On January 18, 2013, Salem discovered that cocaine samples assigned to Farak were not in the evidence room and so informed Hanchett (Compl. ¶ 188). When Hanchett and Salem discovered the case envelope for these samples empty on Farak's desk, Hanchett contacted the

---

[4] The Commonwealth dismissed the school zone charges prior to trial.

MSP to investigate (Compl. ¶ 190).  The MSP discovered other case envelopes in Farak's storage locker.  By the afternoon, they had spoken to Farak and impounded her car (Compl. ¶¶ 191, 194-96).  That evening, Ballou and Thomas drafted an application for a warrant to search Farak's car, and a clerk issued the warrant (Compl. ¶¶ 197-98).

Early on September 19, 2013, Ballou and Thomas, with Irwin, searched Farak's car and seized, among other things, over 300 documents found in the car (Compl. ¶¶ 199, 201).  During the search, Irwin spoke with John Verner (Verner), chief of the AGO's Criminal Bureau (Compl. ¶ 200).  Over the next several days, Ballou catalogued the evidence found in Farak's car (Compl. ¶¶ 203, 205-06).  Among the documents recovered from the car were so-called "mental health worksheets."  These were documents related to Farak's treatment with ServiceNet for drug addiction and included diary cards on which she noted her daily drug use (Compl. ¶¶ 144, 146, 201, 203).  On January 22, 2013, Farak was arraigned on charges of tampering with evidence and drug possession (Compl. ¶ 212).

Verner assigned the Farak prosecution to Kaczmarek, an Assistant Attorney General with the AGO's Enterprise and Major Crimes Unit.  Kaczmarek worked with Irwin, Thomas, and Ballou on the Farak case (Compl. ¶ 204).  Plaintiff alleges that together, Kaczmarek, Irwin, Ballou, and Thomas conspired to conceal evidence probative of the extent and timing of Farak's drug abuse, including the mental health worksheets (Compl. ¶ 207).  On January 23, 2013, Ballou prepared an affidavit in support of an application for a warrant to search a tote bag found at Farak's work station (Compl. ¶ 205).  Despite a recommendation from Verner that Ballou list the mental health worksheet as "personal papers" found during the search of Farak's car, Ballou did not describe these documents in the warrant application (Compl. ¶¶ 205-06).  In preparing the return for the warrant that authorized the search of Farak's vehicle, Thomas classified the

ServiceNet mental health worksheets that Farak used as a part of her addiction treatment as "assorted lab paperwork" (Compl. ¶ 210).  Thomas used the same misleading description in his January 24, 2013 police report (Compl. ¶ 211).

On January 24, 2013, Ballou met with a Hampden County Assistant District Attorney (ADA) who reported that Farak might have tampered with oxycodone pills seized in a separate investigation (Compl. ¶¶ 213-14).   Ballou also learned about a sample of cocaine that Farak tested in 2005 that came back to an ADA four grams lighter than when it was sent to the Drug Lab (Compl. ¶¶ 214-15).  In response, Kaczmarek wrote, "Please don't let this get more complicated than we thought.  If she were suffering from a back injury—maybe she took some oxys?" (Compl. ¶ 216).

In February 2013, Ballou sent an email to Kaczmarek to which were attached scanned copies of Farak's mental health worksheets.  He copied Irwin and Verner on the email (Compl. ¶ 220).  The email had the subject heading "Farak Admissions" and stated, "Here are those forms with the admissions of drug use I was talking about. There are also news articles with handwritten comments about other officials being caught with drugs.  All of these were found in her car inside of the lab manila envelopes" (Compl. ¶ 220).  The documents attached to the emails included two "Emotion Regulation Worksheets," a list of the costs and benefits of resisting or engaging in "target behavior," and one ServiceNet diary card (Compl. ¶ 221).  Ballou did not attach a second diary card, which stated, "Shame at work. Going to use phentermine, but when I went to take it, I saw how little (v. little) there is left = ended up not using" (Compl. ¶¶ 223-24).  Kaczmarek never reviewed the originals of the documents or any other evidence seized from Farak's car (Compl. ¶ 222).

On March 27, 2013, Verner sent a letter to each of the Commonwealth's District Attorneys providing, in part, as follows:

> This Office is investigating Sonja Farak, a chemist who conducted analysis of suspected narcotic samples out of the Amherst Drug Laboratory . . . .  During our investigation, this Office has produced or otherwise come into possession of information, documents, and reports.  Pursuant to this Office's obligation to provide potentially exculpatory information to the District Attorneys as well as information necessary to your Offices' determination about how to proceed with cases in which related narcotics evidence was tested at the Amherst Laboratory, please find the below listed materials . . .

(Compl. ¶ 232).

Farak's mental health worksheets were not included in the materials listed in Verner's letter.  That same day, Kaczmarek submitted a Prosecution Memo to her supervisors, including Verner, in which Kaczmarek noted that she had not submitted the mental health worksheets to the grand jury.  Verner wrote back to Kaczmarek on a copy of the memorandum, noting that the mental health worksheets had not yet been turned over to the DAs (Compl. ¶ 236).

Kaczmarek provided copies of the mental health worksheets to Farak's defense attorney (Compl. ¶ 239).  However, Kaczmarek told defense counsel that she regarded the worksheets as privileged and, for this reason, the documents would not be provided to so-called "Farak [D]efendants" (Compl. ¶ 239), meaning individuals prosecuted for crimes by the DAs where Farak had conducted the drug analysis.

On July 15, 2013, Plaintiff, a Farak Defendant, filed a pretrial motion to dismiss the charges against him based in large part on the misconduct of Farak at the Drug Lab (Compl. ¶ 242).  He sought discovery from the AGO concerning Farak's arrest and prosecution (Compl. ¶ 240).  None was forthcoming (Compl. ¶ 241).  Massachusetts Superior Court Judge Mary-Lou Rup scheduled an evidentiary hearing on Plaintiff's motion and, in the order, reminded the DA's

office of its obligation to seek and produce exculpatory evidence from relevant government agencies (Compl. ¶ 244).  When the ADA assigned to Plaintiff's criminal case sought exculpatory evidence from the AGO, the AGO replied that all relevant evidence had been turned over (Compl. ¶ 246).  On August 23, 2013, in anticipation of the hearing, Plaintiff served subpoenas on Kaczmarek and Ballou, seeking all AGO intra and inter office communications regarding deficiencies in the operations of the Drug Lab and evidence-tampering from January 18, 2013 to the present (Compl. ¶ 249).  The mental health worksheets, as well as the email from Ballou to Kaczmarek entitled "Farak Admissions," were responsive to the subpoena (Compl. ¶ 250).

The AGO's Appeals Division handled subpoenas received by its attorneys and MSP officers assigned to work at the AGO.  In 2013, Randall Ravitz was the head of the Appeals Division.  He appointed Kris Foster, who had recently been hired by the AGO, to respond to Plaintiff's subpoenas to Kaczmarek and Ballou (Compl. ¶¶ 251-54).  Ravitz provided Foster with templates for drafting a motion to quash the subpoenas (Compl. ¶¶ 259-60).[5]

On July 25, 2013, Judge Kinder ordered the consolidation of fourteen unrelated cases seeking post-conviction relief for purposes of a September 9, 2013 evidentiary hearing concerning the timing and scope of Farak's misconduct at the Drug Lab (Compl. ¶ 247).  After Foster requested a postponement of the evidentiary hearing in Plaintiff's case, the parties agreed that the evidence adduced in the proceedings before Judge Kinder would be relied on to adjudicate Plaintiff's motion to dismiss (Compl. ¶ 262).  Ballou received a subpoena *duces*

---

[5] These two subpoenas directed their recipients to appear and testify at an evidentiary hearing ordered by Superior Court Judge Mary Lou Rup that was not held because the parties agreed that Plaintiff's pretrial motion to dismiss his indictment would be adjudicated based on evidence adduced at an evidentiary hearing before then-Superior Court Judge C. Jeffrey Kinder (Compl. ¶ 262).

*tecum* ordering "the production of all documents and photographs pertaining to the investigation of Sonja Farak and the Amherst Drug Lab" in advance of the evidentiary hearing before Judge Kinder (Compl. ¶ 263).  Foster was assigned responsibility for responding to this subpoena (Compl. ¶ 265).  In the course of preparing the AGO's response to various subpoenas and motions, Foster never reviewed the files in Kaczmarek's or Ballou's possession (Compl. ¶¶ 256, 258).

Several meetings were held in the AGO, with Foster, Kaczmarek, Ravitz, and Irwin in attendance, to discuss a response to the Ballou subpoena.  Prior to a meeting on September 3, 2013, Kaczmarek sent an email stating that, though she did not think Judge Kinder would allow a motion to quash, she was confident that Ballou would be "pretty unhelpful in what the judge is trying" to get to the bottom of (Compl. ¶ 266).  Ravitz replied that if they could not get the subpoena quashed, they should work to get "its scope limited so as to preclude certain types of questions" (Compl. ¶ 269).  At a meeting the following day, Kaczmarek disclosed the existence of Farak's mental health worksheets (Compl. ¶ 273).  She took the position that the documents were irrelevant to hearings in the Farak Defendant cases (Compl. ¶ 274).

On September 6, 2013, Foster moved to quash the subpoenas or, in the alternative, to restrict their scope (Compl. ¶ 275-76).  The AGO's motion for a proposed protective order included precluding the production of "information concerning the health or medical or psychological treatment of individuals" (Compl. ¶ 276).  On the same day, Plaintiff filed motions to compel the production of documents in third party possession, including the AGO and DPH, at the hearing (Compl. ¶ 278).  Foster prepared oppositions to these motions, which Ravitz reviewed before Foster filed them (Compl. ¶ 314-15).

Plaintiff alleges that, in preparing for the hearing before Judge Kinder, Irwin and Foster instructed Ballou to conceal the existence of the mental health worksheets (Compl. ¶ 286).  On September 9, 2013, Judge Kinder denied the AGO's motion to quash with respect to testimony by Ballou.  He ordered Foster to review Ballou's file and submit for his *in camera* review any documents that had not yet been disclosed (Compl. ¶¶ 287-89).  During Ballou's testimony at the hearing, he was asked about the evidence seized by the MSP from Farak's vehicle.  He represented to the court that crime scene services photographed every piece of evidence at the time of seizure (Compl. ¶ 293).  Ballou, however, knew that the mental health worksheets had not been photographed by crime scene services (Compl. ¶ 294).

After the hearing, Foster consulted with Kaczmarek and Ravitz about Judge Kinder's order to submit documents for *in camera* review (Compl. ¶ 296).  Kaczmarek compared the papers in Ballou's investigative file to her trial binder (Compl. ¶ 302).  She also scheduled a meeting with Ballou to discuss his testimony, his file, and Judge Kinder's order (Compl. ¶¶ 302-03).  Although Kaczmarek knew that the mental health worksheets had not been produced to either the DAs or to Plaintiff in response to his subpoena, Kaczmarek advised Foster that there were no additional documents in Ballou's file to produce (Compl. ¶¶ 303-04).

Foster subsequently sent a letter to Judge Kinder.  The letter stated:

On September 9, 2013, pursuant to a subpoena issued by defense counsel, you ordered the Attorney General's Office to produce all documents in Sergeant Joseph Ballou's possession that the Attorney General's Office believes to be privileged by September 18, 2013, to be reviewed by your Honor in camera.  After reviewing Sergeant Ballou's file, every document in his possession has already been disclosed.  This includes grand jury minutes and exhibits, and police reports.  Therefore, there is nothing for the Attorney General's Office to produce for your review on September 18, 2013.
Please do not hesitate to contact me should your [sic] require anything further.

(Compl. ¶ 305).  The letter closed, "Sincerely," followed by Foster's signature and phone number (Compl. ¶ 305).  Foster did not personally review the file before she sent the letter to Judge Kinder (Compl. ¶ 308).

Plaintiff's counsel also sent an email to Foster requesting permission to review all of the evidence seized from Farak's car (Compl. ¶ 309).[6]  Kaczmarek took the position that the evidence was only relevant to the prosecution of Farak.  Foster denied the request on this basis (Compl. ¶¶ 311-12).  On October 1, 2013, Plaintiff filed a motion to inspect the physical evidence in the Farak prosecution (Compl. ¶¶ 313-14).  Foster opposed this motion as well, arguing, with Ravitz's approval, that the AGO had already turned over the grand jury exhibits and the documents in the MSP investigator's file, and none of it supported the supposition that a third party had knowledge of Farak's misconduct prior to her arrest (Compl. ¶¶ 314-17).[7]

On October 2, 2013, the parties appeared before Judge Kinder for argument on the discovery motions (Compl. ¶ 321).  The judge questioned Foster about the documents Plaintiff was seeking.  He asked whether Foster had reviewed Farak's personnel file or the physical evidence seized during the search of Farak's car or the AGO's intra-office correspondence (Compl. ¶¶ 322, 325, 328).  Foster admitted that she had not personally looked at any of this information.  She represented that her "office" was confident that everything relevant had been

---

[6] When Foster forwarded this email request to Kaczmarek, she replied, "No.  Why is this relevant to this case.  I really don't like him" (Compl. ¶ 311).

[7] Plaintiff alleges that, in addition to blocking Plaintiff's access to the evidence collected during the search of Farak's car, the AGO purposefully stonewalled Plaintiff's inquiries into the administration of the Drug Lab.  For example, Plaintiff's counsel sought access to Farak's personnel file (Compl. ¶¶ 319-20).  Foster responded that Plaintiff was merely speculating that the personnel file "*may* uncover inadequate supervision" (Compl. ¶ 319).  Judge Kinder later denied Plaintiff's motion (Compl. ¶ 323).  When Farak's supervisor, Hanchett, testified that he had completed evaluations of Farak three times a year, Plaintiff's counsel was unable to impeach Hanchett's testimony with the fact that Farak's personnel file contained no evaluations (Compl. ¶¶ 285, 324).

turned over (Compl. ¶¶ 321-31).  She characterized Plaintiff's requests as a "fishing expedition" (Compl. ¶ 330).  She assured the court that there was "no smoking gun" (Compl. ¶ 332).

The court denied most of Plaintiff's motions based largely on the AGO assurances that there was nothing else relevant to produce (Compl. ¶¶ 323, 326).  Judge Kinder did allow Plaintiff's motion with respect to some materials in the AGO's possession (Compl. ¶ 336).  In response to this order, Foster and Ravitz filed a long motion for clarification asserting, among other things, that the court should accept the AGO's representations about work product protections of its materials (Compl. ¶¶ 337-38).  Judge Kinder ultimately held that the AGO did not have to produce any of its internal correspondence (Compl. ¶ 340).  Thereafter, on November 4, 2013, Judge Kinder denied Plaintiff's motion to dismiss the indictment on the grounds that the evidence indicated that Farak's misconduct in the Drug Lab commenced after the testing of the samples Plaintiff allegedly sold (Compl. ¶¶ 341-42).

On November 22, 2013, in advance of Plaintiff's trial, the prosecuting ADA filed a motion *in limine* to preclude Plaintiff from arguing that Farak was engaged in misconduct when she tested the drug samples in Plaintiff's case.  On November 25, 2013, Foster (with Ravitz's approval) filed a motion to quash Plaintiff's subpoenas to Kaczmarek and Ballou, as well as to relieve the AGO of any further obligation to produce health or medical treatment records of individuals or internal AGO emails (Compl. ¶¶ 345-46, 349).  Foster argued again that Plaintiff was on a groundless fishing expedition when he sought evidence to show that Farak's misconduct dated "back much further than the roughly four months before Farak's arrest that the AGO alleges" (Compl. ¶ 347).  On December 4, 2013, the trial judge granted the ADA's and the AGO's motions (Compl. ¶ 351).

Plaintiff's trial began on December 9, 2013 (Compl. ¶ 352).   The jury found Plaintiff guilty of a single count of distribution of a class A substance (Compl. ¶ 376).   On December 16, 2013, Plaintiff was sentenced to five to seven years in state prison (Compl. ¶ 377).

On January 6, 2014, Farak pled guilty to criminal charges stemming from misconduct in the Drug Lab (Compl. ¶ 381).   On July 30, 2014, Plaintiff's counsel, in a separate and unrelated case, obtained a court order to inspect the "assorted lab paperwork" that had been seized from Farak's car eighteen months earlier (Compl. ¶ 382).   When counsel reviewed the documents on October 30, 2014, he discovered Farak's mental health worksheets (Compl. ¶ 383).   On November 1, 2014, he sent a letter to the AGO about the evidence that had not previously been disclosed (Compl. ¶ 384).   On November 13, 2014, Verner finally sent copies of all of the documents that had been seized from Farak's car, including Farak's mental health worksheets, to the Commonwealth's DAs (Compl. ¶ 385).

On May 21, 2015, Plaintiff filed a motion for new trial and a motion to dismiss the indictment (Compl. ¶ 386).   Plaintiff's motions were consolidated with motions for post-conviction relief filed by other Farak Defendants that were assigned to Massachusetts Superior Court Judge Richard Carey for hearing.   In connection with the hearing before Judge Carey, Plaintiff and other Farak Defendants sought evidence of prosecutorial misconduct from the AGO (Compl. ¶ 391).   The AGO opposed this request, stating that:

> The defendants' proposed claim of prosecutorial misconduct based on actions by the Attorney General's Office fails for the very simple fact that the AGO is not the prosecutor of any of these cases.   Certainly, the AGO prosecuted Sonja Farak; but this is not Farak's case.   Instead, in these cases the AGO was a non-party from which the defendants previously sought expansive post-conviction discovery.   In that capacity, the AGO was well supported by case law in presenting arguments opposing the proposed discovery requests, just as any other non-party might do.

(Compl. ¶ 393).

Judge Carey convened a six-day hearing into the Farak Defendants' motions in December 2016 (Compl. ¶ 394).  On June 26, 2017, Judge Carey allowed Plaintiff's motion to dismiss the indictment against him with prejudice (Compl. ¶ 395).  Judge Carey's ruling was based in significant part on his finding that Foster and Kaczmarek had deliberately withheld exculpatory evidence that Plaintiff's counsel had specifically requested.  On June 27, 2017, Plaintiff was released from custody (Compl. ¶ 397).

On September 5, 2017, Plaintiff filed this case against the defendants for civil rights violations based on his allegations of wrongdoing during the investigation of Farak and his trial, as well as what Plaintiff alleges was a cover-up of the misconduct by government officials.

In Count III, brought pursuant to § 1983, Plaintiff alleges that Irwin, Ballou, and Thomas acted in concert with the Defendant Attorneys to cover up and lie about the existence of Farak's mental health worksheets (Compl. ¶ 419).  He asserts that Irwin, Ballou, and Thomas were aware of their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose this information to criminal defendants, including Plaintiff (Compl. ¶¶ 420-21) and that they intentionally, recklessly, or with deliberate indifference to Plaintiff's rights, concealed the *Brady* information and failed to disclose it to Plaintiff prior to his criminal trial, and knowingly caused false or misleading testimony to be presented in state court hearings (Compl. ¶¶ 423-25).

In Count IV, brought pursuant to § 1983, Plaintiff states similar allegations against the Defendant Attorneys, Kaczmarek, Foster, and Ravitz.  In addition to alleging the suppression of *Brady* material, Plaintiff alleges that the Defendant Attorneys acted intentionally, recklessly, and with deliberate indifference to Plaintiff's rights by violating their legal obligations to make truthful statements to the Hampden County Superior Court and the DAs and to not cause

Plaintiff's unconstitutional conviction or the continuance of his incarceration (Compl. ¶¶ 432-33).

Count VIII, directed at all individual Defendants, alleges that their conduct was extreme and outrageous and caused Plaintiff to suffer severe emotional distress (Compl. ¶¶ 462-64).

## II.   DISCUSSION

In evaluating a motion to dismiss, the court construes the complaint's well-pleaded facts in the light most favorable to Plaintiff, draws all reasonable inferences in his favor, and ascertains whether the complaint states a claim for which relief can be granted.  Fed. R. Civ. P. 12(b)(6); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011).  In § 1983 cases, the court examines if "the facts alleged, viewed in the light most favorable to the complaining party, show that the [defendant's] conduct violated some constitutional right." *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004).  Under the standard laid out by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and distilled by the First Circuit, the court is directed to identify and disregard statements in the complaint that "merely offer 'legal conclusion[s] couched … as fact[]' or '[t]hreadbare recitals of the elements of a cause of action.'" *Ocasio-Hernández*, 640 F.3d at 12 (alterations in original).  Treating the "[n]on-conclusory factual allegations … as true," the court must determine if these alleged facts "state a plausible, not a merely conceivable, case for relief." *Id*.  While "a complaint need not plead facts sufficient to make a prima facie case or allege all facts necessary to succeed at trial," *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014) (citing *Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 717-18 (1st Cir. 2014)), the elements of a prima facie case "form[] 'part of the background against which a plausibility determination should be made.'" *Id*. (quoting *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013)).  "An analysis

of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id*. at 109 (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012)).  That said, "the court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "[A] court [may not] attempt to forecast a plaintiff's likelihood of success on the merits; 'a well-pleaded complaint may proceed even if … a recovery is very remote and unlikely.'" *Id*. at 12-13 (quoting *Twombly*, 550 U.S. at 556).

## A.      Defendant Attorneys (Dkt. Nos. 53, 86, & 95)

"Since the principal issue [as to these defendants] is what immunity, if any, may properly be asserted as a defense by each of the[se] defendants, a brief review of the principles governing immunity is essential." *Barrett v. United States*, 798 F.2d 565, 571 (2d Cir. 1986).  "Officials claiming absolute immunity, like the state officials here, bear the burden of proving their actions warrant that protection." *Knowlton v. Shaw*, 704 F.3d 1, 6 (1st Cir. 2013).  An individual injured by a state actor who "acts under color of state law to deprive another of a constitutional right" has a right of action pursuant to 42 U.S.C. § 1983.  *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976).  Though on the face of the statute there are no immunities from suit, the Supreme Court has concluded that the statute did not abrogate "those immunities which historically, and for reasons of public policy, had been accorded to various categories of officials." *Id.* at 418.  Some government officials may, in appropriate circumstances, be entitled to qualified immunity for actions that fall within the scope and discretion of their official responsibilities. *Id.* at 418-19; *Guzman-Rivera v. Rivera-Cruz*, 55 F.3d 26, 29 (1st Cir. 1995).  Other government officials enjoy absolute immunity, which "defeats a suit at the outset, so long as the official's actions were

within the scope of the immunity." *Imbler*, 424 U.S. at 419 n.13. "[A]bsolute immunity[,

however,] is of a 'rare and exceptional character.'" *Barrett*, 798 F.2d at 571 (quoting *Cleavinger

v. Saxner*, 474 U.S. 193, 202 (1985)).

> To determine whether absolute immunity should apply, a court should consider:
> (1) whether a historical or common law basis exists for immunity from suit arising out of
> performance of the function; (2) whether performance of the function poses obvious risks
> of harassing or vexatious litigation against the official; and (3) whether there exist
> alternatives to damage suits against the official as a means of redressing wrongful
> conduct.

*Hootstein v. Collins*, 928 F. Supp. 2d 326, 336-37 (D. Mass. 2013) (citing *Mitchell v. Forsythe*,

472 U.S. 511, 521-23 (1985)).  The principle of absolute immunity can be traced to the Supreme

Court's 1871 opinion in *Bradley v. Fisher,* 80 U.S. 335, 347 (1871).

> [T]he Court analyzed the need for absolute immunity to protect judges from lawsuits
> claiming that their decisions had been tainted by improper motives. The Court began by
> noting that the principle of immunity for acts done by judges in the exercise of their
> judicial functions had been the settled doctrine of the English courts for many centuries,
> and has never been denied, that we are aware of, in the courts of this country.

*Butz v. Economou*, 438 U.S. 478, 508 (1978) (internal quotations omitted).

In 1927, in a summary affirmance, the Supreme Court extended the principle of absolute

immunity recognized in *Bradley* to federal prosecutors.  *Yaselli v. Goff*, 275 U.S. 503 (1927) (per

curiam), *aff'g* 12 F.2d 396 (2d Cir. 1926).  In *Yaselli*, the United States Court of Appeals for the

Second Circuit thoroughly examined, as described by the Supreme Court,

> the common-law precedents extending absolute immunity to parties participating in the
> judicial process: judges, grand jurors, petit jurors, advocates, and witnesses. Grand jurors
> had received absolute immunity "lest they should be biased with the fear of being
> harassed by a vicious suit for acting according to their consciences (the danger of which
> might easily be insinuated where powerful men are warmly engaged in a cause and
> thoroughly prepossessed of the justice of the side which they espouse)."  The court then
> reasoned that "[t]he public prosecutor, in deciding whether a particular prosecution shall
> be instituted or followed up, performs much the same function as a grand jury."

*Butz*, 438 U.S. at 509–10 (internal citations omitted).  On appeal, the Supreme Court affirmed the Court of Appeals holding that the defendant prosecutor was immune from suit for malicious prosecution.  *Id.*  Following those early decisions, courts have found that absolute immunity "applies to a narrow swath of public officials, including 'judges performing judicial acts within their jurisdiction,' 'prosecutors performing acts intimately associated with the judicial phase of the criminal process,' and agency officials with functions similar to judges and/or prosecutors." *Goldstein v. Galvin*, 719 F.3d 16, 24 (1st Cir. 2013) (quoting *Bettencourt v. Bd. of Registration in Med. of Mass.,* 904 F.2d 772, 782 (1st Cir. 1990)) (internal quotation marks omitted).

The Supreme Court has further held that government attorneys who are not formally designated as prosecutors may also be entitled to absolute immunity when their function is intimately associated with the judicial process.  *Butz*, 438 U.S. at 512–13 ("We think that adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages.").  As prosecutors are "absolutely immune for actions, taken as advocates for the State, which are closely associated with the judicial process," so too are "non-prosecutor officials of government agencies 'performing certain functions analogous to those of a prosecutor'" entitled to absolute immunity.  *Knowlton v. Shaw*, 704 F.3d 1, 5 (1st Cir. 2013) (quoting *Imbler,* 424 U.S. at 430–31 & n.33; *Burns v. Reed*, 500 U.S. 478, 479 (1991); *Butz,* 438 U.S. at 515).

The Second Circuit has observed that "[a]s a general principle, a government attorney is entitled to absolute immunity [only] when functioning as an advocate of the state in a way that is intimately associated with the judicial process."  *Mangiafico v. Blumenthal*, 471 F.3d 391, 396 (2d Cir. 2006).  In this regard, the Second Circuit's *Barrett* case is instructive.  In late 1952, one Mr. Blauer voluntarily admitted himself into the New York State Psychiatric Institute (NYSPI)

for treatment for depression.  Unbeknownst to Blauer, NYSPI had entered into an agreement with the United States Army Chemical Corps to test the psychiatric effects of a synthetic mescaline derivative on human subjects.  Without his knowledge or consent, NYSPI personnel injected the chemical into Blauer, resulting in his death.  The cause of Blauer's death, however, was obscured by the death certificate issued by the New York Medical Examiner, which stated that Blauer died suddenly after intravenous injection of the drug "for diagnostic and therapeutic purposes." *Barrett*, 798 F.2d at 567.  Within months of his death, Blauer's estate sued the state of New York for negligence in causing his death.  Defendant David Marcus, an assistant attorney general for the state, defended the suit, which resulted in a settlement with Blauer's estate.  Attorneys for the federal government (defendants in a later federal suit) were also involved in the state's internal settlement deliberations: the state and the federal government reached a consensus on what information would be disclosed as part of the settlement, as well as an agreement that the federal government would provide money to the state of New York to cover the settlement.  *Id.* at 568-69.

Twenty years later, Blauer's family learned of the United States Army's involvement in Blauer's death and its provision of the synthetic mescaline derivative to NYSPI as part of a chemical warfare testing program.  *Id.* at 570.  Plaintiff Elizabeth Barrett, granddaughter of Blauer and successor-administratrix of his estate, brought suit against various state and federal officials.  The district court granted summary judgment as to assistant attorney general Marcus based on absolute immunity, but denied summary judgment on this basis as to the federal attorneys, concluding that they were "not entitled to absolute immunity because they did not act as counsel in any pending or prospective lawsuit."  *Id.* at 570.

The Second Circuit affirmed, determining that the same factors that militate for absolute immunity for government attorneys who initiate lawsuits, whether criminal or civil, apply with equal force to government attorneys who defend against civil suits. *Id.* "The absolute immunity accorded to government prosecutors encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation, including presentation of evidence to a grand jury to initiate a prosecution, activities in deciding not to do so, and conduct of plea bargaining negotiations." *Barrett*, 798 F.2d at 571–72 (citing *Lee v. Willins,* 617 F.2d 320 (2d Cir. 1980); *Dacey v. Dorsey,* 568 F.2d 275, 278 (2d Cir. 1978); *Taylor v. Kavanagh,* 640 F.2d 450 (2d Cir.1981)). The court found "common law and historical support" for the absolute immunity the district court accorded to the assistant attorney general "in the broader principle that 'the immunity which is extended to the judges is in like manner extended to the attorneys in the presentation of a client's case to the court or the jury.'" *Id.* at 572 (quoting *Yaselli*, 12 F.2d at 402). *See also Dinsdale v. Commonwealth*, 675 N.E.2d 374, 378 (Mass. 1997) (finding that absolute immunity shielded assistant attorneys general for activities that "involve[d] them solely in their capacities as advocates for the Commonwealth in civil litigation").

The *Barrett* court held that the federal attorneys, however, were not entitled to absolute immunity. The court rejected the notion that "all federal attorneys acting 'in anticipation of a lawsuit'" should be granted absolute immunity. *Barrett*, 798 F.2d at 573. Regarding the conduct and function of the federal attorneys, the court found that the record showed:

> The federal attorneys did not act as counsel for any of the parties in litigation relating to the death of Blauer. On the contrary, their efforts were devoted mainly to avoiding involvement of the federal government or federal officials in such proceedings by keeping the estate ignorant of the role played by the United States Government. Their conduct was not public and was unknown to those affected by it. Indeed, the open conflict of a court battle, which creates the need for protective immunity to enable the

> government attorney to perform his duty fearlessly, was totally absent.  Finally, acceptance of the view urged by the federal appellants would result in a blanket grant of absolute immunity to government lawyers acting to prevent exposure of the government to liability.  Given the "rare and exceptional character" of absolute immunity, we must reject this proposed wide-ranging immunity.

*Id.* (citing *Forsyth,* 472 U.S. at 521; and *Cleavinger v. Saxner*, 474 U.S. 193, 201 (1985)).

Further, supervisory government attorneys who supervise subordinate attorneys who are entitled to absolute immunity by virtue of their role in the judicial process are also entitled to absolute immunity.  *Van de Kamp v. Goldstein*, 555 U.S. 335, 348–49 (2009).  *Imbler* holds that attorneys who supervise or train prosecutors during the judicial phase of the criminal process are equally entitled to absolute immunity.  *Id.* at 347-48.  This absolute immunity extends as far as a supervisory prosecutor's decision whether to create an information management system:

> [T]he absence of an information system is relevant here if, and only if, a proper system would have included information about the informant [].  Thus, were this claim allowed, a court would have to review the office's legal judgments, not simply about *whether* to have an information system but also about *what kind* of system is appropriate, and whether an appropriate system would have included *Giglio*-related information *about one particular kind of trial informant*.  Such decisions—whether made prior to or during a particular trial—are "intimately associated with the judicial phase of the criminal process."

*Van de Kamp*, 555 U.S. at 348–49 (quoting *Imbler,* 424 U.S. at 430).

This safe harbor of absolute immunity does not attach to an individual by virtue of his or her status, but rather is based "upon the functional nature of the activities" performed by the individual.  *Imbler*, 424 U.S. at 430.  "The Court made clear that absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks."  *Van de Kamp*, 555 U.S. at 342 (citing *Imbler*, 424 U.S. at 431 n.33).  "Absolute immunity . . . is not available to either prosecutors or agency officials whose actions are primarily administrative or investigative in nature and unrelated to their functions as advocates in preparing for the initiation of a prosecution or for judicial

proceedings," *Knowlton*, 704 F.3d at 5, because only conduct undertaken by a government

attorney that is "intimately associated with the judicial phase of the criminal process" is

protected by absolute immunity.  *Imbler*, 424 U.S. at 430; *see Guzman-Rivera*, 55 F.3d at 29

(recognizing a spectrum of prosecutorial conduct where actions may initially not be protected by

absolute immunity but overtime become "increasingly associated with the judicial phase of the

criminal process" such that absolute immunity attaches).  This is "[b]ecause '[a]bsolute

immunity is designed to free the *judicial process* from the harassment and intimidation

associated with litigation.'"  *Filler v. Kellet*, 859 F.3d 148, 153 (1st Cir. 2017) (quoting *Burns*,

500 U.S. at 494) (emphasis in original).  "Deciding where to draw the line between such

immunized prosecutorial advocacy and conduct that is, for example, exclusively investigative or

administrative is not always easy." *Díaz-Colón v. Fuentes-Agostini*, 786 F.3d 144, 150 (1st Cir.

2015).

When absolute immunity applies to insulate a prosecutor or other government attorney's

conduct in a particular case, that immunity applies no matter the degree of culpability or intent.

> [U]nder *Imbler,* it is now [a] well-settled rule that a prosecutor cannot be held
> personally liable for the knowing suppression of exculpatory information.  The
> *Imbler* rule has been applied where prosecutors failed to disclose exculpatory
> evidence specifically requested by the defense and where prosecutors misled the
> trial court in order to conceal their failure to disclose exculpatory evidence.

*Reid v. State of N.H.*, 56 F.3d 332, 336–37 (1st Cir. 1995) (internal citations and quotations

omitted).  If absolute immunity applies, a prosecutor does not forfeit that protection even when

he or she engages in wrongful or deceitful conduct. *See Díaz-Colón*, 786 F.3d at 151 ("The

assertion in this case that the prosecutor not only presented false testimony, but also offered

something of value to induce a trial witness to testify creates no basis for concluding that the

conduct was any less 'intimately associated with the judicial phase of the criminal proceeding.'" (quoting *Imbler*, 242 U.S. at 430)); *see also Reid*, 56 F.3d at 338.

With these principles in mind, the court turns to the parties' arguments.  Plaintiff brings a count under § 1983 for deprivation of his constitutional rights to due process against Foster, Ravitz, and Kaczmarek, as well as a count against them for intentional infliction of emotional distress.  With respect to the civil rights violation, Plaintiff alleges that Foster, Ravitz, and Kaczmarek acted "individually and in concert and conspiracy with each other" to cover up the existence of Farak's mental health worksheets, to conceal this exculpatory material from Plaintiff and the Hampden County ADA prosecuting Plaintiff, and to lie to the Hampden County Superior Court about the existence of exculpatory material (Compl. ¶¶ 429, 433, 434).  Regarding the count for intentional infliction of emotional distress, Plaintiff alleges that the Defendant Attorneys' conduct was extreme and outrageous and caused Plaintiff to suffer severe emotional distress (Compl. ¶ 463).  Whether or not the Attorney Defendants are entitled to absolute immunity from suit on both these counts must be determined based on the functions each defendant was performing.  The actions of Foster and Ravitz will be addressed first, followed by those of Kaczmarek.

### 1.  Foster and Ravitz

The allegations in Plaintiff's complaint as to Foster and Ravitz arise from their actions as Assistant Attorneys General in the Appeals Division of the AGO (Comp. ¶¶ 251-53).  As chief of the Appeals Division, Ravitz assigned to Foster the responsibility for handling the state's response to the August 22, 2013 subpoenas served on Kaczmarek and Ballou by Plaintiff's counsel in the context of Plaintiff's criminal prosecution by the Hampden County DA (Compl. ¶¶ 248, 253).  Foster was tasked with preparing and filing the AGO's legal response to Plaintiff's

subpoenas.  She was subsequently assigned the responsibility for responding to additional

subpoenas and motions to compel from Plaintiff related to Farak and the Amherst Lab directed to

Kaczmarek, Ballou, the AGO, and DPH (Compl. ¶¶ 253, 254, 275).  Plaintiff's complaint states

the following allegations and supports the following inferences about the actions taken by Foster,

with Ravitz's counsel and advice as her supervisor.

- Ravitz assigned Foster the task of responding by filing motions to quash or limit the

  response required from the AGO, DPH, Ballou, and Kaczmarek to subpoenas and

  motions to compel filed by Plaintiff in the post-conviction proceeding before Judge

  Kinder and in his subsequent criminal trial (Compl. ¶¶ 253, 263, 275-76, 314).

- Ravitz and Foster attended a meeting at which Kaczmarek disclosed that she and

  Ballou possessed mental health worksheets that had not been disclosed to the DAs or,

  by inference, to Plaintiff (Compl. ¶ 273).  They were copied on an email from

  Kaczmarek that announced her intention to frustrate Judge Kinder's intention of

  "com[ing] to the bottom" of issues related to Farak's misconduct (Compl. ¶¶ 266,

  271).  It is a fair inference from the allegations in the complaint that Ravitz and Foster

  knowingly cooperated with Kaczmarek's intention of frustrating Judge Kinder's

  investigation into the scope and timing of Farak's misconduct.

- Foster prepared motions to quash and articulated objections to Plaintiff's subpoenas

  and motions to compel without gathering and reviewing potentially responsive

  documents, including Ballou's file and the AGO's internal emails (Compl. ¶¶ 254-

  58).

- Foster, under Ravitz's supervision, filed motions and other pleadings and appeared in

  court to argue in support of the state's position regarding Plaintiff's discovery

requests.  She made misleading and false representations to the court about the
contents of the AGO's files despite never having reviewed the files.  Most notably, in
response to Judge Kinder's order to produce documents responsive to defense
counsel's subpoenas that were in the AGO's possession for *in camera* review, she
falsely informed Judge Kinder that the AGO had already produced all responsive
documents.  Further, she told Judge Kinder that she had spoken to Kaczmarek and
Ballou and falsely represented to him that "there's no smoking gun" in the AGO's
internal email communications (Compl. ¶¶ 303-05, 332-33).

Plaintiff argues that Foster and Ravitz are not entitled to absolute immunity because they
were not functioning as prosecutors in Plaintiff's criminal case (Dkt. No. 103 at 16).  While
Plaintiff is correct that neither Foster nor Ravitz served as a prosecutor in his criminal
prosecution, his argument does not account for the immunity afforded to other government
attorneys whose function is closely connected to the judicial process.

It is "the nature of the function performed, not the identity of the actor who performed it"
that drives the immunity analysis.  *Forrester v. White*, 484 U.S. 219, 229 (1988) (holding that a
state court judge was not immune from suit under § 1983 for gender discrimination based on the
firing of a subordinate because the judge was acting in an administrative capacity in deciding to
discharge an employee).  "As a general principle, a government attorney is entitled to absolute
immunity when functioning as an advocate for the state in a way that is intimately associated
with the judicial process."  *Mangiafico*, 471 F.3d at 396 (citing *Imbler*, 424 U.S. at 430); *see also*
*Barrett*, 798 F.2d 572; *contrast Van de Kamp*, 555 U.S. at 342 (stating that "absolute immunity
may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged
in other tasks, say, investigative or administrative tasks").  The test is whether particular acts are

"intimately associated" with a judicial process and "fit[] within the common-law tradition of absolute immunity." *Guzman-Rivera*, 55 F.3d at 29.   All of Foster's and Ravitz's alleged acts were associated with Foster's filings and appearances in the evidentiary hearing before Judge Kinder and regarding discovery motions for Plaintiff's criminal case.   In these filings and appearances, Foster functioned as an "officer of the court" and the legal representative of the AGO.   *See Mangiafico*, 471 F.3d at 396.   Foster, overseen by Ravitz, was acting as the state's advocate (on behalf of the AGO), exercising discretion as to the state's response to discovery issues in the judicial process, appearing as an advocate, and arguing in court.   Because the shield of absolute immunity for government attorneys "encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation," *Barrett*, 798 F.2d at 571-72, the court concludes that Foster is protected by absolute immunity.[8]

Ravitz's supervisory role over Foster, although it might fairly be viewed as administrative, still falls within the ambit of absolute immunity.   Plaintiff alleges that Ravitz, as head of the Appeals Division of the AGO, assigned Foster the task of responding to Plaintiff's subpoenas and motions (Compl. ¶¶ 252-53) and, among other actions, approved Foster's pleadings before they were filed with the court (Compl. ¶ 315, 346), reviewed and edited other pleadings (Compl. ¶ 338), and attended meetings planning the AGO's response to one of Plaintiff's subpoenas (Compl. ¶ 267).   These allegations are very similar to the hypothetical case

---

[8] Plaintiff's reliance on *Marten v. Swain*, 242 F. Supp. 3d 744 (S.D. Ind. 2017), is misplaced as to Foster and Ravitz.   In *Marten*, the court denied summary judgment to Andrew Swain, a government attorney, noting that the plaintiffs' claims were based on Swain's function as a witness, victim, and investigator.   *Id.* at 756-57.   The court held that Swain "was acting outside the prosecutorial role when he served as a witness and an investigator in [the plaintiffs'] criminal cases."   *Id.* at 757.   That is not the case here as to Foster or, in his supervisory capacity, as to Ravitz.

considered by the Supreme Court in *Van de Kamp*, in which the Court held that a supervisory government attorney is entitled to absolute immunity to the extent a subordinate government attorney enjoys such protection:

> Suppose that Goldstein had brought such a case, seeking damages not only from the trial prosecutor but also from a supervisory prosecutor or from the trial prosecutor's colleagues—all on the ground that they should have found and turned over the impeachment material about [the informant]. *Imbler* makes clear that all these prosecutors would enjoy absolute immunity from such a suit. The prosecutors' behavior, taken individually or separately, would involve "[p]reparation ... for ... trial," and would be "intimately associated with the judicial phase of the criminal process" because it concerned the evidence presented at trial. And all of the considerations that this Court found to militate in favor of absolute immunity in *Imbler* would militate in favor of immunity in such a case.

*Van de Kamp*, 555 U.S. at 345 (internal citations omitted).

Common law supports extending absolute immunity to Foster and Ravitz. *See Barrett*, 798 F.2d at 572 (stating that the "[e]xtension of absolute immunity to defending government litigators finds common law and historical support"). The historical purpose of absolute immunity was to "free the *judicial process* from the harassment and intimidation associated with litigation." *Burns*, 500 U.S. at 494 (emphasis in original). Indeed, for this reason, *all* attorneys are "entitled to absolutely immunity from defamation liability for statements made during the course of judicial proceedings and relevant to them." *Buckley v. Fitzsimmons*, 509 U.S. 259, 276 (1993); *Barrett*, 798 F.2d 572-73. The broader absolute immunity extended to government attorneys, protecting them from civil liability under § 1983, stems from the courts' "'concern that harassment by unfounded litigation would cause a deflection of the [attorney's] energies from his public duties, and . . . would shade his decisions instead of exercising the independence of judgment required by [the] public trust.'" *Filler*, 859 F.3d at 153 (quoting *Burns*, 500 U.S. at 485 (alterations in original)). The conduct alleged here as a basis for subjecting Foster and

Ravitz to liability under § 1983 was conduct necessarily undertaken in connection with a judicial proceeding and in furtherance of their role as advocates for the state.

Plaintiff's allegation – by inference – that Foster and Ravitz intentionally suppressed exculpatory evidence does not alter the court's analysis.  In *Reid*, the First Circuit expressly rejected the notion that a prosecutor's wrongful acts, even if knowing or intentional, foreclosed his entitlement to absolute immunity.  An allegation that "prosecutors repeatedly misled the trial court in order to conceal their alleged misconduct does not defeat absolute immunity." *Reid*, 56 F.3d at 337.  *See also Guzman-Rivera*, 55 F.3d at 31 (failure to dismiss criminal case against innocent defendant, while reprehensible, was shielded by absolute immunity); *Aldridge v. City of Cambridge*, Civil Action No. 12-12273-RGS, 2012 WL 6622495, at *8 (D. Mass. Dec. 18, 2012) (granting absolute immunity to prosecutors alleged to have misled the court to conceal a failure to disclose exculpatory evidence).  Regardless of Foster's or Ravitz's intentions or culpability, absolute immunity applies if, as the court has concluded, they were functioning as advocates and there is historical or common law precedent for absolute immunity.

The conduct in which Foster and Ravitz engaged as the advocates responsible for litigating the state's interest in a judicial process to which the AGO was not technically a party is the type of function that "poses obvious risks of harassing or vexatious litigation against the official." *Hootstein*, 928 F. Supp. 2d at 336-37.  Foster's conduct was both public and known to those affected by it.  *See Barrett*, 798 F.2d at 573.  Her actions were the kind of advocacy on behalf of the government that is protected by absolute immunity so as to permit the attorney to perform her duties "fearlessly" and without concern of retaliation.  *Id.*  Finally, an alternate remedy to redress the alleged misconduct exists through professional disciplinary proceedings.

*Id.* For the foregoing reasons, the court concludes that Foster and Ravitz are entitled to absolute immunity from suit. Their motions to dismiss will be granted in their entirety.

### 2. Kaczmarek

Plaintiff's claims against Kaczmarek stand on a different footing. Plaintiff's complaint states the following allegations and supports the following inferences about the actions taken by Kaczmarek.

- Kaczmarek knew about Farak's mental health worksheets from the outset of the AGO's investigation into Farak (Compl. ¶¶ 204, 220-24). She understood that the mental health worksheets were admissions of drug use by Farak. When the MSP officers entered the worksheets into the evidence inventory, Kaczmarek agreed that the worksheets should be mischaracterized as "assorted lab paperwork" to hide their existence (Compl. ¶¶ 203-10, 220).

- Kaczmarek discouraged Ballou from following up on a lead that might have clarified the length of time during which Farak was abusing drugs (Compl. ¶¶ 215-19).

- Kaczmarek decided that the mental health sheets would not be turned over to the Farak Defendants or to the DAs (Compl. ¶¶ 234-39).

- Kaczmarek took steps to ensure that the Farak Defendants would not learn about the existence of the mental health work sheets. She advised Ballou to be "unhelpful" during Judge Kinder's hearing into the scope and timing of Farak's misconduct. She told Foster and Ravitz that the mental health worksheets were "irrelevant" to the Farak Defendants (Compl. ¶¶ 249, 266-74).

- She advised Foster and Ravitz that Ballou's files did not contain any documents that had not already been disclosed to the DAs when she knew the mental health

worksheets, which were saved electronically and not printed in hard copy, had not been produced (Compl. ¶¶ 295-304).

- A fair inference from the allegations in the complaint is that Kaczmarek deliberately withheld evidence from Plaintiff and other Farak Defendants that she knew was exculpatory in that it was probative of the timing and scope of Farak's misconduct and that she did so knowing that Plaintiff was facing trial and possible incarceration.

Kaczmarek asserts that she is entitled to absolute prosecutorial immunity in this case because she was functioning as a prosecutor when she reviewed and decided not to provide the Farak Defendants with exculpatory material (Dkt. No. 87 at 16). Kaczmarek acknowledges that courts apply a functional approach in determining whether or not a prosecutor is entitled to absolute immunity (*id.* at 13). She argues that she was in possession of documents seized from Farak's car and made decisions about disclosing those documents to Farak and, more pertinently, to Plaintiff and other Farak Defendant, solely because of her function as Farak's prosecutor. All of her actions concerning the documents were, she contends, derivative of her prosecutorial function vis-a-vis Farak. Her decisions required legal knowledge and the related exercise of discretion and, therefore, were not administrative or investigative (*id.* at 14). It follows that she was functioning as a prosecutor and is entitled to absolute immunity for her decision to withhold exculpatory evidence from Plaintiff and other Farak Defendants.

But the Supreme Court and other courts have declined to protect every action by a prosecutor that "could be said to be in some way related to the ultimate decision whether to prosecute." *Burns*, 500 U.S. at 495. "[T]hat a prosecutor engaged in certain activities after a prosecution ha[s] already commenced is not necessarily dispositive of the question whether absolute immunity attaches." *Filler v. Keller*, 859 F.3d 148, 154 (1st Cir. 2017). Thus, in *Burns*,

29

the Supreme Court held that a prosecutor was entitled to absolute immunity for his appearance in

court to apply for a search warrant. *Burns*, 500 U.S. at 490-91.  That same prosecutor, however,

working on the same case, was not entitled to absolute immunity for legal advice he gave to the

investigating police officers about interrogating a witness under hypnosis.  *Id.* at 495.  Similarly,

in *Buckley*,

> the Supreme Court considered whether a prosecutor enjoyed absolute immunity for
> making false statements during a press conference that the prosecutor gave announcing
> the return of an indictment.  *Buckley* held that the prosecutor did not have absolute
> immunity because (1) there was not a common-law immunity for a prosecutor's out-of-
> court statements to the press; and (2) comments to the press are not made in a
> prosecutor's role as advocate for the state.

*Filler*, 859 F.3d at 153 (citing *Buckley*, 509 U.S. at 261 & 277) (internal citations omitted).  As

previously noted, absolute immunity, courts have said, is available only for actions that are

"'intimately associated with the judicial phase of the criminal process.'"  *Id.* (quoting *Imbler*,

424 U.S. at 494).

   Not all of Kaczmarek's actions as alleged in the complaint were "intimately associated"

with the judicial process.  *See Goldstein*, 719 F.3d at 24.  She did not file any pleading or present

argument in the hearing before Judge Kinder, nor did she file any pleadings or present argument

before a judge in relation to any aspect of Plaintiff's criminal trial.  She prepared no pleadings in

response to any of the subpoenas served on behalf of Plaintiff or the other Farak Defendants, nor

did she supervise Foster's preparation of pleadings responsive to those subpoenas or motions.

Rather, as alleged in the complaint, Kaczmarek misrepresented the contents of Ballou's file to

Foster, controlled law enforcement's investigation of Farak by limiting Ballou's inquiries into

Farak's activities, and told Foster to refuse Plaintiff's attorney's request for access to the

evidence from Farak's car, a refusal of a request that was not based on a subpoena or motion.  It

cannot be said that these are acts intimately associated with the judicial phase of the criminal

process.  To the contrary, Kaczmarek's role was like the role of the federal government attorneys in the Second Circuit's *Barrett* case:  Kaczmarek's "efforts were devoted mainly to avoiding involvement . . . by keeping the [plaintiff] ignorant" of certain information.  *Barrett*, 798 F.2d at 573.  Just as the Second Circuit determined absolute immunity was inapplicable to the actions of the federal attorneys in that case, the court cannot find that Kaczmarek is entitled to absolute immunity for all her actions as alleged in the complaint.

Kaczmarek's reliance on *Riley v. Colatuono*, C.A. No. 12-175 MML, 2013 WL 866734 (D.N.H. Feb. 5, 2013) (report and recommendation), is misplaced.  In that case, the court held that an Assistant United States Attorney (AUSA) instituting a civil forfeiture action for firearms was entitled to absolute immunity from a *Bivens* claim.  The claim was based on allegations that the AUSA intentionally instituted the civil forfeiture action without sending notice to the firearms owner, then falsified documents to cover up that notice was never given.  *Id.*, at *1.  The court rested its ruling on the principle that "absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding."  *Id.*, at *6.  The AUSA in *Colatuono* was not alleged to have taken any step that was not related to the initiation of the judicially supervised forfeiture action by which the government sought forfeiture of firearms.  The allegations at issue in *Colatuono* are distinguishable from the allegations Plaintiff makes about Kaczmarek's function and conduct.

Kaczmarek's assertion that "any prosecutor (such as Kaczmarek) charged with prosecuting a drug lab chemist would be subject to lawsuits by thousands of criminal defendants potentially affected by the chemist's actions" is disingenuous (Dkt. No. 87 at 20).  Plaintiff's claims against Kaczmarek are not related to her prosecution of Farak.  His argument does not call into question Kaczmarek's assertion that she would be entitled to absolute immunity for

31

steps she took in her prosecution of Farak.  As set forth above, his claims are based on allegations that she steadfastly stonewalled and caused others to make misrepresentations in response to repeated requests for exculpatory information in the AGO's possession, custody, or control that was relevant to Plaintiff's defense of the charges against him and to the claims for post-conviction relief by other defendants who asserted that their convictions were tainted by Farak's activities.  Kaczmarek has not pointed to any case in which the "strong medicine" of absolute immunity has been applied based on facts such as those alleged by Plaintiff.  *See Barrett*, 798 F.2d at 573.  Accordingly, her motion to dismiss on grounds of absolute immunity is denied.

### B.      Irwin (Dkt. No. 49)

The complaint states two counts against Irwin: one for acting in concert with Ballou and Thomas to violate Plaintiff's constitutional right to due process (Count III) and the other for the intentional infliction of emotional distress (Count VIII).  Irwin contends that the allegations in the complaint are insufficient to sustain a § 1983 claim against him.

Plaintiff's complaint states the following allegations and supports the following inferences about the actions taken by Irwin.

- Irwin, an MSP lieutenant or captain, knew that, among the documents seized on January 19, 2013, when the MSP searched Farak's car, were Farak's mental health worksheets and that these documents reflected admissions about her drug use (Compl. ¶¶ 199-204, 220).

- Irwin conspired with Kaczmarek, Ballou, and Thomas to conceal the existence of the mental health worksheets (Compl. ¶¶ 207).

- Irwin was one of a group associated with the AGO who received Ballou's email discussing the evidence in which Farak admitted to using drugs. He participated in the September 3, 2013 meeting called to discuss the subpoena *duces tecum* received by Ballou and how to impede Judge Kinder's inquiry into the timing and scope of Farak's misconduct (Compl. ¶¶ 266-69).

- Irwin and Foster instructed Ballou "not to divulge the existence of the mental health worksheets" in his testimony before Judge Kinder (Compl. ¶ 286).

Irwin moves to dismiss both counts against him. He argues that the § 1983 claim should be dismissed because the facts alleged show only negligent conduct by Irwin and "the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328 (1986) (emphasis in original). In the alternative, Irwin asserts that he is entitled to qualified immunity on Count III because it was not clearly established in 2013 that Irwin, as an investigating officer, had a *Brady* obligation to turn over evidence directly to Plaintiff. Finally, Irwin argues that Plaintiff has failed to allege facts sufficient to establish that Irwin's conduct was so extreme and outrageous as to support a claim for intentional infliction of emotional distress.

First, as to Plaintiff's § 1983 claim, Irwin is correct that the complaint's allegations must directly allege, or be sufficient to support the inference, that Irwin's conduct was more than negligent. *Id.*; *see also Porter v. White*, 483 F.3d 1294, 1308 (11th Cir. 2007) (holding that "a negligent act or omission cannot provide a basis for liability in a § 1983 action seeking compensation for loss of liberty occasioned by a *Brady* violation"). The court, however, disagrees with Irwin's contention that Plaintiff's allegations fail in this regard. It is Plaintiff, not Irwin, "who enjoys the right to frame the claims asserted in the complaint." *Haley v. City of*

*Boston*, 657 F.3d 39, 49 (1st Cir. 2011).  Irwin, Plaintiff alleges, was part of a deliberate conspiracy to hide evidence from Plaintiff.  *See Daniels*, 474 U.S. at 331.  Plaintiff alleges that Irwin knew about Farak's mental health worksheets and that Judge Kinder was conducting an inquiry into the scope and timing of Farak's misconduct (Compl. ¶¶ 199-204).  At this stage, it is reasonable to infer from the complaint that Irwin was aware of the relevance of the mental health worksheets to that inquiry.  According to Plaintiff, Irwin directly instructed his subordinate, Ballou, not to disclose the existence of the mental health worksheets during Ballou's testimony before Judge Kinder.  Plaintiff has alleged knowing and intentional participation by Irwin in a conspiracy to conceal exculpatory evidence.

The allegations against Irwin and reasonable inferences raised by them may not prove out in discovery.  At the motion to dismiss stage, however, the court accepts as true the allegations in the complaint and must draw all reasonable inferences in Plaintiff's favor.  Accordingly, Plaintiff's § 1983 claim is not subject to dismissal on the basis that the complaint alleges only negligent conduct.  *See Marrero-Rodríguez v. Municipality of San Juan*, 677 F.3d 497, 502 (1st Cir. 2012) (stating that the court was "reluctant" to dismiss a § 1983 case at the motion to dismiss stage because, although the allegations might not prove to be true, the inferences must be drawn in plaintiff's favor).

Second, Irwin argues that Plaintiff's § 1983 claim should be dismissed because Irwin is entitled to qualified immunity.  Irwin argues that the right asserted by Plaintiff is "to be provided with exculpatory evidence *by* Det. Lt. Irwin" (Dkt. No. 50 at 16 (emphasis added)).  A defendant is entitled to the protection of qualified immunity when his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (holding that qualified immunity protected a

police officer in a Fourth Amendment context because the officer's conduct did not violate

clearly established law) (quotations omitted).  The purpose of the "clearly established"

requirement is to provide clear and fair warning to an officer that his or her conduct is unlawful.

*Id.* at 1152-53.  For a right to be clearly established, "existing precedent must have placed the

statutory or constitutional question beyond debate" at the time the violation is alleged to have

occurred.  *Id.* at 1152 (quoting *White v. Pauly*, 137 S.Ct. 548, 551 (2017)); *see also Haley*, 657

F.3d at 47-48.  The two-step inquiry requires, first, examining whether the facts alleged in the

complaint make out a constitutional violation; and, second, determining if the right at issue was

"clearly established" at the time of the defendant's alleged action.  *Haley*, 657 F.3d at 47.

The fatal flaw in Irwin's position is his characterization of the right Plaintiff asserts with

respect to his § 1983 claim.  There is some merit in Irwin's contention that it was not "clearly

established" that Plaintiff's rights under *Brady* extended to a duty on "an officer to inform

defense counsel or the court of exculpatory evidence."  *Kelly v. Curtis*, 21 F.3d 1544, 1552 (11th

Cir. 1994).  "The Constitution places the duty to disclose known exculpatory evidence upon

prosecutors.  It imposes no obligation upon law enforcement officers to second guess prosecutors

about whether evidence known to them is exculpatory."  *Id.* (citing *Brady v. Maryland,* 373 U.S.

83, 86–88 (1963)).  However, that is not how Plaintiff identifies the rights he alleged were

violated.

The court reviewed the *Brady* obligation and related cases in its earlier memorandum and

order involving the Springfield Police Department (SPD) Officers (Dkt. No. 140).  In essence,

Irwin's argument reflects the same flaw that the SPD Officers' argument contained.  "*Brady* was

an 'extension' of a line of cases . . . in which the Supreme Court held that a state actor violates a

criminal defendant's due process rights by the knowing use of perjured testimony or the

deliberate suppression of evidence leading to the defendant's conviction." *Drumgold v. Callahan*, 707 F.3d 28, 38 (1st Cir. 2013) (citing *Kyles v. Whitley*, 514 U.S. 419, 432 (1995).

Here, Plaintiff's allegations plausibly make out a claim for a constitutional violation under the *Mooney* line of cases.[9]   That case law established the proscription "against intentionally concealing evidence and permitting false testimony to be given at a defendant's trial." *Haley*, 657 F.3d at 49.   Due process rights are contravened when law enforcement officers "deliberately keep the defense in the dark about important evidence" in order "to grease the skids for false testimony and encourage wrongful conviction." *Id.* at 49-50.   In this case, at least at this stage, the allegations in the complaint are sufficient to support the inference that Irwin knew about Farak's mental health worksheets, conspired with others to conceal the existence of relevant documents from Plaintiff, the other Farak Defendants, and the state court, and – most importantly – encouraged, then did not disclose, the fact of Ballou's misleading testimony.   It is possible that a more developed factual record might support qualified immunity for Irwin.   At this stage, the court cannot reach that conclusion. *See Marrero-Rodríguez*, 677 F.3d at 503.

Finally, Irwin's arguments for dismissal of the claim of intentional infliction of emotional distress fail for the reasons set forth in the court's decision denying Sergeant Kent's motion to dismiss the claim (Dkt. No. 140 at 28-31).   Irwin argues, as did Kent, that Plaintiff's allegations are not of conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 82 (Mass. 1987) (quotations omitted).

Accepting the allegations in the complaint as true, and drawing all reasonable inferences in Plaintiff's favor, the court concludes that Plaintiff has adequately alleged a claim for

---

[9] The reference is to *Mooney v. Holohan*, 294 U.S. 103 (1935).

intentional infliction of emotional distress.  This case is similar to *Limone v. United States*, 579 F.3d 79, 94 (1st Cir. 2009), in which the Court of Appeals affirmed the district court's finding of liability for intentional infliction of emotional distress where the law enforcement defendants had willingly participated in framing "scapegoat[ed]" civilians and then acted to cover up their misconduct.  The court noted specifically that a finding of extreme and outrageous conduct "may be grounded either on actual knowledge or on a defendant's deliberate disregard of a substantial probability that his actions will produce severe emotional distress." *Id.* at 95; *cf. Bazinet v. Thorpe*, 190 F Supp. 3d 229, 240 (D. Mass. 2016) (denying motion to dismiss where allegations in complaint charged law enforcement defendants with "fabricating evidence in an effort to obtain criminal charges against an innocent citizen who was in the midst of a suicidal breakdown").  Moreover, under Massachusetts law, "claims for intentional infliction of emotional distress may be founded on a pattern of misconduct." *Limone*, 579 F.3d at 98.

The allegations and reasonable inferences derived therefrom are that Irwin knew about Farak's mental health worksheets, understood their relevance to the inquiry being conducted by Judge Kinder as to the timing and scope of Farak's misconduct, as well as the reasons for that inquiry, and participated in a scheme to conceal the existence of the mental health worksheets, thereby deceiving Plaintiff and the state court.  This conduct could be considered extreme and outrageous in view of the liberty interests at stake in the inquiry before Judge Kinder.  Given that Plaintiff faced possible incarceration, intentional conduct by Irwin that contributed to impeding Judge Kinder's ability to conduct a full and fair inquiry could be said to exhibit a "deliberate disregard of a substantial probability that his actions [would] produce severe emotional distress" for Plaintiff. *Limone*, 579 F.3d at 95 (citing *Simon v. Solomon*, 431 N.E.2d 556, 562 (Mass. 1982) (concluding that a defendant could be held liable for intentional infliction of emotional

distress where it "violated its duty to [the plaintiff] recklessly, by outrageous omission to act, and thereby caused [him] severe emotional harm")).

For the reasons set forth above, the court concludes that Plaintiff has adequately pled his § 1983 and intentional infliction of emotional distress claims against Irwin, who is not entitled to qualified immunity at this stage.

## III.   CONCLUSION

For the reasons set forth above, Irwin's and Kaczmarck's motions to dismiss are DENIED (Dkt. Nos. 49 & 86). The motions to dismiss by Foster and Ravitz are hereby GRANTED (Dkt. Nos. 53 & 95).

It is so ordered.

Dated:  December 7, 2018                            /s/ Katherine A. Robertson
                                                    KATHERINE A. ROBERTSON
                                                    U.S. MAGISTRATE JUDGE