UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROLANDO PENATE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:17-30119-KAR |
| | ) | |
| ANNE KACZMAREK, KRIS FOSTER, | ) | |
| RANDALL RAVITZ, JOSEPH BALLOU, | ) | |
| ROBERT IRWIN, RANDY THOMAS, | ) | |
| SONJA FARAK, SHARON SALEM, | ) | |
| JAMES HANCHETT, JULIE NASSIF, | ) | |
| LINDA HAN, STEVEN KENT, | ) | |
| JOHN WADLEGGER, GREGG BIGDA, | ) | |
| EDWARD KALISH, and | ) | |
| CITY OF SPRINGFIELD, | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM AND ORDER REGARDING MOTIONS TO DISMISS BY
DEFENDANTS HAN, HANCHETT, NASSIF, SALEM, AND FARAK</u>
(Dkt. Nos. 93 & 124)

ROBERTSON, U.S.M.J.

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 by Plaintiff Ronaldo

Penate (Plaintiff) against fifteen officials at the Department of Public Health (DPH), the

Massachusetts State Police, the Attorney General's Office of the Commonwealth (AGO), and the

Springfield Police Department (SPD), as well as against the City of Springfield (City).[1] Most of

the defendants have moved to dismiss. Because the allegations and defenses are particular to

certain groups of defendants, the court divided the defendants into three categories: the SPD

police officers and the City; the individuals employed by or affiliated with the AGO; and the

---

[1] The suit initially named the estate of Kevin Burnham as one of the defendants. On December
14, 2017, Plaintiff moved to dismiss the counts brought against Burnham's estate (Dkt. No. 41),
and the court did so on December 15, 2017 (Dkt. No. 42).

individuals associated with DPH and its forensic laboratories.  The court heard argument on the motions to dismiss over three days.  On September 27, 2018, the court denied the motions to dismiss by the City and its police officers (Dkt. No. 140).  On December 7, 2018, the court allowed two and denied two of the motions to dismiss by the AGO defendants (Dkt. No. 143).

This memorandum addresses the last group of motions to dismiss: those filed by the individuals affiliated with DPH and its forensic laboratories.  Defendants Linda Han, Julie Nassif, James Hanchett, and Sharon Salem, all employees or former employees of DPH (hereinafter, the DPH defendants), move to dismiss Counts II and VIII directed against them for violation of § 1983 and intentional infliction of emotional distress, respectively.  Defendant Sonja Farak moves to dismiss Counts I and VIII directed against her for violation of § 1983 and intentional infliction of emotional distress, respectively.[2]  All of these defendants argue that the complaint fails to state a claim upon which relief can be granted.  Additionally, the defendants argue that they are entitled to qualified immunity.  For the reasons that follow, the court will allow the DPH defendants' motion to dismiss as to Han, Nassif, and Salem and deny the motion as to Hanchett, and deny Farak's motion.

## I.  BACKGROUND

In evaluating a motion to dismiss, the court accepts as true all well-pleaded allegations in the complaint and draws all reasonable inferences in favor of Plaintiff.  *Díaz-Nieves v. United States*, 858 F.3d 678, 689 (1st Cir. 2017).  The following recitation of facts is drawn from Plaintiff's Complaint (Dkt. No. 1).  The court sketched out a broad overview of Plaintiff's allegations in its earlier memorandum and order regarding the motions to dismiss by the SPD

---

[2] The court has not treated Farak as a DPH defendant because the liability of the DPH defendants is premised on their alleged roles as supervisors of Farak.  In contrast, Farak's liability is premised on allegations about her own wrongdoing.

Officers and the City (Dkt. No. 140 at 2-9).  Accordingly, the court turns to the allegations against this group of defendants.

## A.     DPH Organization and Management

The Department of Public Health operated a main drug testing facility in Jamaica Plain, called the Hinton Drug Lab (Compl. ¶ 24).  In the 1960s, it opened the Amherst Drug Laboratory (Amherst Lab), a satellite facility in the Morrill Science Building on the University of Massachusetts Amherst campus, with the mission of delivering no cost forensic analysis for local law enforcement agencies (Compl. ¶¶ 23-24, 26).  Both labs were chronically underfunded and understaffed (Compl. ¶ 26).  Budget restrictions often generated back-logs in testing samples and personnel worked hard to reduce the time it took to produce drug certifications (Compl. ¶¶ 32, 33).  The protocols for drug testing were intended to be the same for both the Hinton and Amherst facilities (Compl. ¶ 27).

In 2006, DPH created the Division of Analytical Chemistry.  Defendant Julie Nassif (Nassif) was the first director (Compl. ¶ 39).  Prior to her appointment as director of the Division of Analytical Chemistry, Nassif had been in charge of the Childhood Lead Screening Lab, the Chemical Terrorism Response Lab, and the Environmental Chemistry Lab (Compl. ¶ 40).  She had no academic or work background in forensic chemistry (Compl. ¶ 42).  In her role as Director, Nassif supervised the Hinton and Amherst Labs (Compl. ¶ 41).  She frequently cancelled meetings she scheduled with the drug lab supervisors and rarely went out to the Amherst Lab (Compl. ¶¶ 43, 45).  While the drug lab supervisors regularly evaluated their employees prior to Nassif's appointment as Director, the practice stopped during her tenure (Compl. ¶¶ 46, 48).

Prior to 2007, each laboratory under Nassif's supervision participated in a quality control and quality assurance group called the QC/QA Group (Compl. ¶ 50). The purpose of the group was to ensure that the laboratories complied with their various accrediting bodies' requirements and audit recommendations (Compl. ¶ 51). The DPH drug labs, however, were not accredited and were not subject to routine audits (Compl. ¶ 52). In 2007, budget cuts resulted in the discontinuation of the QC/QA Group, and the responsibility fell to Nassif to oversee quality assurance and control at the drug labs. She did not give priority to this function (Compl. ¶¶ 56-57).

In 2009, defendant Linda Han (Han) became the director of the Bureau of Laboratory Sciences (BLS) (Compl. ¶ 58). Eighteen laboratories, including the Hinton and Amherst Labs, were under the oversight of the BLS (Compl. ¶ 59). Like Nassif, Han rarely visited the Amherst Lab (Compl. ¶ 62). However, both Han and Nassif exercised budgetary control over the Amherst Lab. They questioned requests for essential supplies such as paper, chemicals, gloves, and beakers, denied requests to replace older equipment, and did not authorize continuing education opportunities for the chemists in the lab (Compl. ¶¶ 63- 64).

On May 2, 2011, Nassif sent an email to DPH drug lab employees informing them of her intention to hold monthly meetings to prepare the labs for accreditation (Compl. ¶¶ 97-98). However, Nassif did not follow through with this plan (Compl. ¶ 100). In July 2011, Nassif proposed to her superiors at DPH that the Amherst Lab be closed entirely (Compl. ¶¶ 104-5). The budget passed by the state on October 5, 2011, kept the Amherst Lab open, but with a bare minimum of funds (Compl. ¶ 109).

On July 1, 2012, the MSP took over operations of the Amherst Lab (Compl. ¶ 165).  On August 8, 2012, after the discovery of the misconduct of former chemist Annie Dookhan,[3] the governor of Massachusetts ordered the closure of the Hinton Drug Lab (Compl. ¶ 168).  The investigation into Dookhan's malfeasance revealed neglect and mismanagement by DPH supervisors (Compl. ¶ 169).  On September 11, 2012, Han resigned her position; on September 12, 2012, Nassif was fired (Compl. ¶ 170).

## B.    The Amherst Lab

A 2002 review by a team from the National Forensic Science Technology Center (NFSTC) of the Amherst Lab's policies and procedures revealed a lack of formal quality systems consistent with standards set by accreditation boards and working groups (Compl. ¶¶ 34, 35).  Based on the lab's shortcomings, the NFSTC recommended that the lab develop and implement written protocols for the analysis of substances, peer review or reports, and a proficiency testing program in order to have quality assurance safeguards (Compl. ¶ 36).  The NFSTC regarded these recommended changes as essential to maintaining correct and error-free results (Compl. ¶ 37).  DPH officials did not act on these recommendations (Compl. ¶ 38).

In 2008, defendant James Hanchett (Hanchett), who had worked at the Amherst Lab since 1977, became its supervisor (Compl. ¶¶ 65, 66).  Hanchett and defendant Sharon Salem (Salem), a chemist and the lab's evidence officer, shared responsibility for assigning work in the Amherst Lab (Compl. ¶¶ 135, 141).  As the lab supervisor, Hanchett engaged in very little oversight of his employees: he did not observe or discuss their work, retest samples to check accuracy, or review their notebooks (Compl. ¶¶ 67-70).  In four and one-half years as the

---

[3]  For a summary of Ms. Dookhan's misconduct at the Hinton Lab, see *Jones v. Han*, 993 F. Supp. 2d 57, 61-64 (D. Mass. 2014).

Amherst Lab supervisor, Hanchett never conducted a performance evaluation of Farak (Compl. ¶¶ 283, 285).  Hanchett permitted his employees unfettered access to the entire lab on weekdays and weekends, including to the lab's primary standards (Compl. ¶¶ 72, 73).  As many as fifty standards, including a bottle of methamphetamine oil, were kept in an unlocked refrigerator at the Amherst Lab (Compl. ¶¶ 74, 75).

Shortly after becoming lab supervisor, Hanchett decided to conduct an audit of the lab (Compl. ¶ 85).  Defendant Sonja Farak (Farak), who for several years had been stealing in small increments from an opaque bottle of methamphetamine oil in the unsecured refrigerator, attempted to cover her actions by adding water to the oil in the bottle (Compl. ¶¶ 82-83, 86-7).  The oil and the water did not mix well (Compl. ¶ 88).  On inspection, Hanchett saw that the solution in the methamphetamine oil bottle appeared unusual.  He treated the problem as one of a substance that had degraded (Compl. ¶ 89).  He extracted what methamphetamine oil he could from the larger bottle and placed it in a tiny vial for future use as a standard (Compl. ¶ 90).

In 2011, Hanchett would drive to the parent laboratory to meet with Nassif and give her the Amherst Lab's monthly testing report showing how many samples Amherst had analyzed (Compl. ¶ 101).  In this period, the Hinton drug lab was experiencing a significant backlog in testing samples (Compl. ¶ 102).  To help reduce the backlog, Hanchett would return to the Amherst Lab from these monthly meetings with between 200 and 300 samples for the Amherst chemists to test (*id.*).  As a result, in fiscal year 2011, the Amherst Lab chemists tested, on average, 2052 samples each, as compared to the Hinton drug lab chemists who tested on average 1105 samples each (Compl. ¶¶ 106-07).

In 2012, Hanchett undertook an inventory of lab standards.  He discovered that several were depleted.  Some were missing altogether (Compl. ¶ 171).  This was because Farak had

consumed them (Compl. ¶ 172). Hanchett notified Salem and raised the possibility of wrongdoing (Compl. ¶ 173). Otherwise, Hanchett did not make any report about the missing lab standards, despite having an obligation to do so as a holder of a federal license (Compl. ¶¶ 174, 175). In early 2013, Hanchett found a beaker with liquid and white residue on the edge in a drawer in the lab (Compl. ¶¶ 185, 186). When he confronted Farak with the beaker, she claimed not to know about it (Compl. ¶ 186). Hanchett explained the find by hypothesizing that one of Farak's coworkers had brought a child to the lab, done a science experiment, and mistakenly left the beaker out (Compl. ¶ 187). Actually, Farak had used the beaker to manufacture crack cocaine in the lab for personal consumption (Compl. ¶ 182).

Plaintiff further alleges that Hanchett and Salem had a policy whereby the chemist discovery packets routinely produced in criminal cases would state that the Amherst Lab was not accredited "at this time," but that "[a]ll of our testing procedures performed are the same as in any accredited Drug Analysis Laboratory" (Compl. ¶¶ 177-79). However, a quality assurance audit performed by the MSP found many discrepancies between procedures used by accredited laboratories and those used by the Amherst Lab (Compl. ¶ 176).[4] Among other issues, samples brought to the lab by police officers often arrived in unsealed envelopes which could increase the likelihood of cross-contamination or tampering (Compl. ¶¶ 133-34). Plaintiff alleges that, as evidence officer, Salem knew or should have known how frequently substances arrived at the lab in unsecured condition (id.).

---

[4] Plaintiff alleges that the MSP audit which found the lab shortcomings was conducted on October 10, 2012, and that a November 18, 2012, discovery packet from Farak produced in response to a motion to compel in Plaintiff's case asserted that the lab's testing procedures conformed with those used in an accredited lab (Compl. ¶¶ 176, 177). Plaintiff claims that this evinced a policy by Hanchett and Salem to withhold exculpatory evidence (Compl. ¶ 179).

On the morning of January 18, 2013, Salem discovered that two cocaine samples that had been assigned to Farak for analysis were not in the main evidence room. She promptly informed Hanchett (Compl. ¶ 188). They searched for the samples and found a manila envelope containing their cut-open packaging (Compl. ¶ 189). Hanchett then called the MSP (Compl. ¶ 190).

**C.     Sonja Farak's Misconduct and Its Role in Plaintiff's Trial**

Farak began her employment as a chemist for DPH in 2003 (Compl. ¶ 8). She started consuming drugs at work almost immediately. In 2004, Farak began stealing from the Amherst Lab's methamphetamine oil standard (Compl. ¶ 82). In 2008, after Hanchett discovered the problematic bottle of methamphetamine oil, Farak switched to stealing and using other standards that were kept unsecurely in the Amherst Lab, including standards for amphetamine, cocaine, ecstasy, and LSD (Compl. ¶ 91).

In early 2009, Farak started stealing from samples brought in by police officers for testing (Compl. ¶ 92). *See Comm. for Pub. Counsel Servs. v. Attorney Gen.*, 108 N.E.3d 966, 987 (Mass. 2018). To facilitate this conduct, Farak partially disabled the heat sealer in the Amherst Lab, which allowed her to steal the drugs more easily (Compl. ¶¶ 131, 132). She also began manipulating the testing assignments to gain access to the drugs she favored (Compl. ¶¶ 139, 140). By the end of 2011, Farak was smoking crack cocaine in the Amherst Lab between ten and twelve times a day (Compl. ¶ 138). She stole powder cocaine from samples submitted by police officers, then use the Amherst Lab's equipment to make crack cocaine (Compl. ¶ 180). On one occasion in 2013, Farak left the beaker she had used to make crack cocaine in a drawer where Hanchett later discovered it (Compl. ¶¶ 183-85).

The SPD made its first controlled buy of heroin from Plaintiff on October 21, 2011 (Compl. ¶ 110). On October 25, 2011, SPD Narcotics Evidence Officer Kevin Burnham brought the two glassine packets purchased from Plaintiff to the lab, along with several evidence packets from unrelated investigations (Compl. ¶¶ 114-15). The SPD made two other controlled buys from Plaintiff. Burnham brought the evidence from those purchases to the Amherst Lab on November 16, 2011 (Compl. ¶¶ 125, 127). Burnham did not heat seal the evidence packets prior to bringing them to the lab (Compl. ¶¶ 128-29). Instead, he used the Amherst Lab's heat sealer, which had been partially disabled by Farak, to seal the packages (Compl. ¶¶ 130-33). Hanchett and Salem assigned Farak responsibility for testing the samples in Plaintiff's case (Compl. ¶ 135). Farak reported testing the samples on December 22, 2011; January 6, 2012; and January 9, 2012 (Compl. ¶ 142). She reported that each sample tested positive for the presence of a controlled substance (Compl. ¶ 143).

In late 2011, Farak was being treated at ServiceNet, Inc. for drug addiction (Compl. ¶ 144). Her treatment providers had given her diary cards on which to record whether she was able to resist using illegal substances (Compl. ¶¶ 145-46). On December 22, 2011, the first day she tested evidence from Plaintiff's case, Farak wrote on her diary card, "tried to resist using @ work but ended up failing" (Compl. ¶ 146). On January 9, 2012, another day she tested evidence in Plaintiff's case, Farak spent the morning smoking crack (Compl. ¶ 148). That same day, she also tested a police submission of tablets suspected of containing LSD (Compl. ¶¶ 149-50). After testing and concluding that the samples contained LSD, Farak stole some of the tablets, consumed them, and spent the rest of the work day hallucinating (Compl. ¶¶ 150-51).

Farak issued drug certificates affirming the presence of controlled substances for each of the samples submitted by the SPD as evidence in Plaintiff's case (Compl. ¶ 161). The Hampden

County District Attorney's Office presented the drug certificates to the grand jury, which returned an indictment against Plaintiff, charging him with, among other crimes, possession and distribution of Class A and Class B substances (Compl. ¶¶ 161-62).

On the morning of January 18, 2012, after Hanchett and Salem notified the MSP about their discovery of two open case envelopes on Farak's desk, investigating MSP officers found two more case envelopes for drug samples in a temporary storage locker used by Farak (Compl. ¶¶ 188-91). That day, Farak was at the Hampden County Hall of Justice waiting to testify in a criminal case, having just ingested crack cocaine in the parking garage (Compl. ¶¶ 192-93). The MSP investigators interviewed her about the case envelopes. Farak denied any wrongdoing (Compl. ¶¶ 194-95). At the end of the interview, the MSP impounded Farak's vehicle (Compl. ¶ 196). On January 22, 2013, Farak was arraigned in Belchertown District Court and charged with drug tampering and theft (Compl. ¶ 212). She pled guilty to the charges against her on January 6, 2014 (Compl. ¶ 381).

Plaintiff went to trial on drug charges. The trial started on December 9, 2013 (Compl. ¶¶ 343, 352), almost a year after Farak was arrested and charged (Compl. ¶¶ 212). The Commonwealth had had the evidence in Plaintiff's case retested by a different chemist working at a different laboratory who reported that the samples tested positive for heroin. *Commonwealth v. Cotto*, 2017 WL 4124972, at *46 (Mass. Sup. Ct. June 26, 2017). This chemist testified at trial. Farak's misconduct was a "central tenet" at Plaintiff's trial. *Id.* The jury were told that Farak would not testify at Plaintiff's trial, and that Farak's evidence tampering had occurred as early as July 2012. *Id.* Plaintiff was precluded from arguing at trial that Farak was engaging in misconduct at the Amherst Lab when Plaintiff's evidence was tested there (Compl. ¶ 244). *See id.* On December 13, 2013, the jury found Plaintiff guilty on a single count of distribution of a

Class A substance. He was acquitted on all other charges submitted to the jury (Compl. ¶ 376). He was sentenced to state prison for a term of five to seven years (Compl. ¶ 377). On June 26, 2017, Plaintiff's conviction was dismissed with prejudice based, in part, on Farak's misconduct in the Amherst Lab (Compl. ¶¶ 390, 395). On June 27, 2017, Plaintiff was released from custody, and on September 5, 2017, he filed this suit (Compl. ¶ 397).

In Count I, brought pursuant to § 1983, Plaintiff alleges that Farak acted with deliberate indifference to Plaintiff's constitutional rights by mishandling the evidence in Plaintiff's criminal case, including consuming drugs before or while testing that evidence (Compl. ¶¶ 399, 400). Additionally, Plaintiff contends that Farak violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that she was impaired while handling and testing the evidence in his criminal case (Compl. ¶¶ 401-03), and by failing to disclose the deficient protocols and poor quality of forensic work performed by the Drug Lab during his prosecution (Compl. ¶¶ 404-06).

In Count II, brought pursuant to § 1983, Plaintiff alleges that Han, Nassif, Hanchett, and Salem (the DPH defendants) failed adequately to train, supervise, and discipline the chemists in the Amherst Lab and that this failure constituted gross negligence and deliberate indifference to Plaintiff's constitutional rights (Compl. ¶¶ 410-15). More specifically, Plaintiff alleges that the DPH defendants' failure to properly train, supervise, and discipline Farak enabled her misconduct and that this failure constitutes callous indifference to Plaintiff's civil rights (Compl. ¶¶ 412, 415).

Count VIII, directed at all individual defendants, alleges that their conduct was extreme and outrageous and caused Plaintiff severe emotional distress (Compl. ¶¶ 462-64).

## II.    DISCUSSION

The DPH defendants and Farak have moved to dismiss on the grounds that Plaintiff has failed to adequately allege that their actions deprived Plaintiff of his constitutional rights and based on qualified immunity.

### A.    Standard of Review

In evaluating a motion to dismiss, the court construes the complaint's well-pleaded facts in the light most favorable to Plaintiff, draws all reasonable inferences in his favor, and ascertains whether the complaint states a claim for which relief can be granted.  Fed. R. Civ. P. 12(b)(6); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011).  In § 1983 cases, the court examines whether "the facts alleged, viewed in the light most favorable to the complaining party, show that the [defendant's] conduct violated some constitutional right." *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004).  Under the standard laid out by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and refined by the First Circuit, the court is directed to identify and disregard statements in the complaint that "merely offer 'legal conclusion[s] couched … as fact[]' or '[t]hreadbare recitals of the elements of a cause of action.'"  *Ocasio-Hernández*, 640 F.3d at 12 (alterations in original).  Treating the "[n]on-conclusory factual allegations … as true," the court must determine if these alleged facts state "a plausible, not a merely conceivable, case for relief."  *Id*.   While "a complaint need not plead facts sufficient to make a prima facie case or allege all facts necessary to succeed at trial," *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014) (citing *Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 717-18 (1st Cir. 2014)), the elements of a prima facie case "form[] 'part of the background against which a plausibility determination should be made.'"  *Id*. (quoting *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir.

2013)). "An analysis of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id*. at 109 (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012)). That said, "the court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "[A] court [may not] attempt to forecast a plaintiff's likelihood of success on the merits; 'a well-pleaded complaint may proceed even if … a recovery is very remote and unlikely.'" *Id*. at 12-13 (quoting *Twombly*, 550 U.S. at 556).

**B.      Sufficiency of the Complaint**

Plaintiff charges that Farak deliberately withheld exculpatory information about her mishandling of drug evidence in Plaintiff's criminal case (Count I). As her first ground for dismissal, Farak asserts that Plaintiff's complaint should be dismissed for failure to comply with the dictates of Rule 8(a)(2), which require "a short and plain statement of the claim." This contention lacks merit. While Plaintiff's complaint is lengthy – perhaps longer than most – it is not excessively so, nor is it unnecessarily redundant. *See Kuehl v. F.D.I.C.*, 8 F.3d 905, 908 (1st Cir. 1993). Plaintiff's allegations involve sixteen defendants and four state or local agencies and cover conduct over an approximately six-year period. The complaint presents a chronological and coherent account of what Plaintiff alleges occurred and clearly specifies which claims are directed at which defendants. It cannot be said that any defendant in this action lacks fair notice of the claims and the bases of those claims, against him or her, or that any defendant is prejudiced by the pleading such that he or she cannot prepare a cogent answer and defense. *Belanger v. BNY Mellon Asset Mgmt., LLC*, 307 F.R.D. 55, 57 (D. Mass. 2015).

**C.      Section 1983 Claims Based on Alleged *Brady* Violations**

Moving on to Farak's second argument, which she presses in common with the DPH defendants, she asserts that the § 1983 claims should be dismissed because laboratory personnel had no *Brady* obligation to disclose Farak's criminal misconduct. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that "suppression by the prosecution of evidence favorable to an accused" is a due process violation). "*Brady* was an 'extension' of a line of cases … in which the Supreme Court held that a state actor violates a criminal defendant's due process rights by the knowing use of perjured testimony or the deliberate suppression of evidence leading to the defendant's conviction." *Drumgold v. Callahan*, 707 F.3d 28, 38 (1st Cir. 2013) (citing *Mooney v. Holohan,* 294 U.S. 103 (1935), and *Pyle v. Kansas,* 317 U.S. 213 (1942)). *Brady* only requires disclosure of evidence if it is "both favorable to the accused and 'material either to guilt or to punishment.'" *United States v. Bagley*, 473 U.S. 667, 674 (1985) (citing *Brady*, 373 U.S. at 87). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682. "'Suppressed impeachment evidence is immaterial under *Brady*, however, if the evidence is cumulative or impeaches on a collateral issue.'" *United States v. Avilés-Colón*, 536 F.3d 1, 19 (1st Cir. 2008) (quoting *Conley v. United States*, 415 F.3d 183, 189 (1st Cir. 2005)).

Farak did not raise a qualified immunity argument in her written submissions. Instead, during oral argument, she adopted the arguments of the DPH defendants, all of whom have squarely raised the claim of qualified immunity. Although it is doubtful that this brief reference was sufficient to preserve the issue of qualified immunity as to Farak, it is raised as to the DPH defendants and, in the form in which it is argued, might apply to Farak as well. Accordingly, the

court first examines whether Plaintiff's claims against Farak and the DPH defendants are barred by qualified immunity because, it is argued, the obligation to disclose exculpatory and impeachment evidence does not apply to individuals employed by or associated with the Commonwealth's forensic laboratories.

      1.      **The *Brady* Obligations of State Lab Chemists and Their Supervisors**

Qualified immunity insulates a defendant official from liability "when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (holding that qualified immunity protected a police officer in a Fourth Amendment context because the officer's conduct did not violate clearly established law) (quotations omitted). Generally, in ruling on a qualified immunity claim, the court must first consider whether the facts as alleged make out a cognizable constitutional violation and, second, whether the right at issue was "clearly established" in settled law at the time of the defendant's alleged action. *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011).

Other sessions of this court have rejected the contention that constitutional obligations under *Brady* do not apply to state drug lab chemists and their supervisors. *See Jones v. Han*, 993 F. Supp. 2d 57, 67 (D. Mass. 2014) ("It was well-established that a police officer could be held liable for not disclosing exculpatory information. It would have been obvious that the same principle would extend to state drug-laboratory chemists and supervisors."); *Charles v. City of Boston*, 365 F. Supp. 2d 82, 89 (D. Mass. 2005) (stating that a crime technician had a "duty to disclose *Brady* information to the prosecutor … not to mention [a] duty – unquestionably well-established – to testify truthfully on the stand"); *Johnson v. Han*, No. 14-cv-13274-IT, 2015 WL 4397360, at *4 (D. Mass. July 17, 2015) ("Although the First Circuit has not expressly held that

*Brady* obligations similarly extend to state-employed lab chemists, [defendant] provides no persuasive reason to distinguish between different members of the state investigatory team in this regard."); *Solomon v. Dookhan*, No. 13-cv-10208-GAO, 2014 WL 317202, at *13 (D. Mass. Jan. 27, 2014) ("No reasonable official in [defendant's] position could believe that it was permissible for her (as is alleged) to knowingly abet [a chemist's] misconduct… .").[5]

Courts of Appeals in other circuits have similarly held that forensic chemists employed by the state may be liable under § 1983 for due process violations. *See Brown v. Miller*, 519 F.3d 231, 238 (5th Cir. 2008) (stating that "the deliberate or knowing creation of a misleading and scientifically inaccurate serology report amounts to a violation of a defendant's due process rights" and that the law was clearly established such that, in 1984, a reasonable laboratory technician would have understood this obligation); *Gregory v. City of Louisville*, 444 F.3d 725, 744 (6th Cir. 2006) (affirming the district court's denial of qualified immunity to a forensic examiner alleged to have withheld evidence); *Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004) (stating that a police forensic analyst, as a government official and one who has power to "convince the prosecuting authorities to press charges," can be liable under the Due Process Clause for prevaricating and distorting evidence).

Cases decided by the Massachusetts Supreme Judicial Court ("SJC") further support the proposition that the state's forensic chemists and their supervisors knew or should have known in 2013 that they had an obligation to disclose material exculpatory evidence to a prosecutor. As

---

[5] Farak argues that *Jones v. Han* is not useful precedent as to her potential liability because forensic chemist Annie Dookhan was not named as a defendant in that case. While that assertion is accurate as to the *Jones v. Han* case, Ms. Dookhan was named as a defendant in related cases, *see e.g., Solomon v. Dookhan*, No. 13-cv-10208-IT (D. Mass. filed Feb. 4, 2013); *Johnson v. Han*, No. 14-cv-13274-IT (D. Mass. filed Aug. 8, 2014). Dookhan defaulted in both cases; in the latter case, a default judgment in the amount of $2,097,264.04, plus additional fees and costs, entered against her on June 16, 2017.

early as 1998, the SJC held that a prosecutor's obligations to inquire into exculpatory evidence, including impeachment evidence, extended to "information in the possession of a person who has participated in the investigation or evaluation of the case and has reported to the prosecutor's office concerning the case," including individuals employed in a Commonwealth crime lab. *Commonwealth v. Martin*, 696 N.E.2d 904, 909 (Mass. 1998). In *Martin,* "[t]he SJC concluded that a prosecutor must turn over evidence 'held by the State police crime laboratory and perhaps known only to one of its chemists' to fulfill [his or her] *Brady* obligations." *Jones v. Han*, 993 F. Supp. 2d at 64 (quoting *Martin*, 696 N.E.2d at 904). *See also Commonwealth v. Cotto*, 27 N.E.3d 1213, 1224 (Mass. 2015) ("Farak, like Dookhan, was an agent of the prosecution team, given that, where she was the analyst for a purported drug sample recovered from a defendant, she 'participated in the investigation or evaluation of the case' and 'reported to the prosecutor's office concerning the case.'" (quoting *Commonwealth v. Scott*, 5 N.E.3d 530, 543 (Mass. 2014)).

The court recognizes the improbability that an individual in Farak's position would disclose as impeachment or exculpatory evidence information regarding her own criminal conduct. There is caselaw holding that the prosecutor, and, by extension, other members of the prosecution team, are not responsible under *Brady* for the disclosure of unknown criminal conduct of a member of the prosecution team that is unrelated to a defendant's case. *See Campiti v. Matesanz*, 186 F. Supp. 2d 29, 49 (D. Mass. 2002) (collecting cases and noting, while declining to decide, the question of whether the failure to disclose the unknown criminal conduct of a police officer, who was a witness at the defendant's trial, was a *Brady* violation). In *Commonwealth v. Cotto*, 27 N.E.3d 1213 (Mass. 2015), however, the SJC rejected the Commonwealth's argument that Farak's misconduct was an unlawful scheme by an individual that should not be attributed to the Commonwealth and was therefore not required to be

disclosed as exculpatory evidence. Instead, the SJC held that, although Farak's evidence

tampering was to support her own drug habit, "the effect of her misconduct was to raise serious

questions about the integrity of her work on behalf of the Commonwealth." *Id.* at 1224.

Because Farak's actions tainted the drug analysis process, her "malfeasance [went] right to the

heart of the Commonwealth's ability to convict a defendant in a drug case." *Id.* Her misconduct,

the court held, was not merely an "individual unlawful scheme." Instead, it was "attributable to

the Commonwealth." *Id.* Thus, to the extent Farak's misconduct was material to Plaintiff's

case, he is entitled to seek relief from the members of the prosecution team, including Farak,

who failed to make the requisite disclosures. *Cf. Campiti*, 186 F. Supp. 2d at 50 (assuming

without deciding that the failure to disclose information about a police officer's criminal conduct

was a *Brady* violation and analyzing whether the information would have been material to the

verdict against the defendant).

In summary, the court is persuaded by the cases cited above that laboratory chemists such

as Farak and her supervisors had disclosure obligations under *Brady* and that "the state of the law

at the time of the violation gave the defendant[s] fair warning that [their] particular conduct was

unconstitutional." *Drumgold*, 707 F.3d at 42. "[A]ny exculpatory or impeachment information

concerning [Farak] should have been [timely] turned over to defense counsel in the prosecution

of plaintiff." *Jones*, 993 F. Supp. 2d at 64-65.

### 2.     Evidence of Farak's Misconduct Was Material

The next issue is whether the suppressed evidence was material in Plaintiff's prosecution.

*Bagley*, 473 U.S. at 682.

> Evidence that was withheld during a criminal trial is material only if there is a reasonable
> probability that its disclosure would have altered the trial's outcome. Put another way,
> there must be a reasonable probability that the defendant would not have been convicted
> but for the wrongful withholding of exculpatory evidence. Hence, one cannot establish a

> *Brady* violation without showing to the requisite standard that the withholding of evidence was a necessary condition for the conviction.

*Drumgold*, 707 F.3d at 49 (citing, *inter alia*, *Bagley*, 473 U.S. at 682). "The strength of impeachment evidence and the effect of suppression are evaluated in the context of the entire record to determine materiality. Evidence is immaterial where it is cumulative or merely impeaches a witness on a collateral issue." *United States v. Paladin*, 748 F.3d 438, 444 (1st Cir. 2014) (internal citation omitted). Ultimately, Plaintiff must show that, had he had access to the undisclosed evidence, there is a reasonable probability that the outcome of the proceeding would have been different. *Drumgold*, 707 F.3d at 39. "[A] reasonable probability exists when the withholding of evidence undermines confidence in the outcome of the trial." *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), and *Bagley*, 473 U.S. at 682).

The court has no reservation in concluding that the alleged information about Farak's drug abuse and evidence tampering was material to Plaintiff's conviction. Indeed, Plaintiff reports, state prosecutors chose not to oppose Plaintiff's motion for a new trial on the grounds, in significant part, that newly discovered evidence about the extent of Farak's misconduct, including the admission that she was high on LSD on one of the days she analyzed the substances in Plaintiff's case, would have had a profound effect on the defendant's trial and probably would have been a real factor in the jury's determination. While this concession is not binding on this court, it is persuasive. The defendants' principle argument in support of immateriality is that because the drugs seized from Plaintiff were subsequently analyzed by a different chemist in a different laboratory and tested positive for heroin, there could be no causal connection between information about the extent of Farak's misconduct and Plaintiff's conviction (Dkt. No. 94 at 8-10). The defendants' contention fails to account for the allegations that Farak was, or was close to, incapacitated by drugs when she tested substances seized from

Plaintiff; that she was actively engaged in tampering with substances in the lab at that time; and that the material returned to the SPD as evidence in Plaintiff's case after the substances had been through Farak's hands included packaging, labeled "Moonwalk," that had not been seized from Plaintiff. Taking these allegations in the complaint as true and drawing all reasonable inferences in Plaintiff's favor, a reasonable person could view the withheld evidence as material. There is a reasonable probability that Plaintiff's jurors would not have convicted him based on the risk of deliberate tampering or inadvertent contamination by a drug analyst befuddled by a hallucinogen before the samples were turned over to a different chemist at a different lab. Evidence of Farak's misconduct was not related to a mere "collateral issue," nor would it have been cumulative of other evidence. *See Paladin*, 748 F.3d at 444. The Commonwealth was required to prove that Plaintiff distributed a controlled substance. To the extent the Commonwealth lacked reliable evidence that the substance allegedly purchased from Plaintiff was in the same condition when it was analyzed by the second chemist as it was when it was acquired from Plaintiff, the Commonwealth had no case. In view of Farak's misconduct, a reasonable finder of fact could conclude that the Commonwealth lacked reliable evidence on this point.

Plaintiff further asserts that Farak and the DPH defendants failed in a duty to disclose evidence about operations and supervision at the Amherst Lab as impeachment evidence. On this point, the court is not persuaded. The complaint includes numerous allegations about general deficiencies in the operation of the Amherst Lab, including, for example, that it lacked formal quality control or assurance procedures or safeguards such as peer reviews of reports, proficiency testing, and routine audits (Compl. ¶¶ 35-38, 52). However, the extent to which these conditions were concealed from Plaintiff is not clear from his complaint or opposition. The results of the MSP audit were released months prior to the hearing on Plaintiff's discovery

motions before Judge Kinder. Moreover, even assuming, as Plaintiff argues, that there were various proceedings at which he might have relied on exculpatory evidence to derail his prosecution, he has not identified a proceeding in which evidence about general deficiencies at the Amherst Lab would have been more than collateral impeachment evidence. *See Paladin*, 748 F.3d at 444.

First, Plaintiff points out, the grand jury indicted Plaintiff based in part on drug certifications that Farak prepared. To the extent this evidence was flawed, it was flawed because of Farak's alleged misconduct at the time the substances were analyzed. Moreover, as a matter of law, challenges to an indictment by a grand jury do not raise constitutional issues. *Woodcock v. Amaral*, 511 F.2d 985, 993 (1st Cir. 1974). Second, Plaintiff moved to dismiss the charges against him before his case went to trial. The initial order for an evidentiary hearing in his case was restricted to whether Farak and/or the Drug Lab engaged in "egregious misconduct in the handling, storage and analysis of suspected narcotics during the time period between November 2011 and January 2012" (Compl. ¶ 243). The proceeding in which Plaintiff's motion to dismiss was ultimately denied was convened before Judge Kinder for purposes of determining the timing and scope of Farak's misconduct, the MSP quality assurance audit in October 2012, and how Farak's misconduct and conditions at the Drug Lab might have had an impact on the drug analyses conducted at the laboratory. *Comm. of Pub. Counsel Servs.*, 108 N.E. 3d at 977. The judge heard evidence about general conditions at the Amherst Lab. *Id.* Evidence contradicting Hanchett's testimony that he had evaluated Farak's performance would have been mere collateral impeachment evidence in a proceeding that was focused principally on the timing and scope of Farak's misconduct and was decided on that basis. *See Avilés-Colón*, 536 F.3d at 19. Third, by the time of Plaintiff's trial, the drug analysis on which the prosecution relied had been

performed at a different laboratory unaffected (so far as the record shows) by the kinds of general deficiencies that Plaintiff alleges plagued the Amherst Lab. Thus, at Plaintiff's trial, evidence about conditions at the Amherst Lab and the alleged misrepresentation that testing procedures at the Amherst Lab were consistent with those conducted at accredited laboratories would have been relevant only insofar as those conditions would have supported Plaintiff's arguments about possible evidence tampering and contamination of samples by Farak before those samples were sent to a different laboratory for analysis. *See McCambridge v. Hall*, 303 F.3d 24, 37 (1st Cir. 2002) (noting that "there is no prejudice under *Brady* and so no due process violation unless there is 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different'" (quoting *Bagley*, 473 U.S. at 682)).

Decisions by various Massachusetts courts relating to Farak's misconduct are instructive in this regard. In 2017, Massachusetts Superior Court Judge Richard Carey conducted a six-day evidentiary hearing during which he heard substantial evidence about deficiencies in the operations of the Amherst Lab. He found that drug certificates issued by the chemists in the lab other than Farak were reliable. *Cotto*, 2017 WL 4124972, at *10, *33 ("The original testing by [the other chemists] is not cast into doubt by Farak's subsequent theft and tampering."). In *Committee for Public Counsel Services v. Attorney General*, relying on the evidentiary record compiled before Judge Carey, the SJC declined to dismiss all of the "convictions based on drug samples tested at the Amherst Lab during Farak's tenure." 108 N.E.3d at 986-87. The court concluded that such a remedy was not supported by the evidence of record.[6] In addition to the

---

[6] Farak stated that she switched from stealing from the Amherst Lab's methamphetamine standard in or around early 2009 to tampering with evidence samples around that time. On this basis, the SJC held that the appropriate remedy was to vacate and dismiss the criminal

evidence of Farak's misconduct, the SJC had before it the record compiled by Judge Carey about the general conditions and practices at the Amherst Lab. The SJC did not disturb Judge Carey's finding that conditions at the Amherst Lab, by themselves, did not call into question the validity of testing done at the lab and declined to award relief to petitioners where there was no reason to believe that Farak might have tampered with the drug samples in their cases.

For the foregoing reasons, so much of Farak's motion as seeks dismissal of the § 1983 count is denied. As to the DPH defendants, the court rejects their contentions that they are protected from suit by qualified immunity because the court concludes that it was clearly established in 2013 that a forensic chemist had *Brady* disclosure obligations and the information about Farak's conduct was material to Plaintiff's trial.

## D.    Supervisory Liability as to the DPH Defendants

Count II, asserted against Hanchett, Salem, Nassif, and Han, alleges that they failed to adequately train, supervise, or discipline chemists in the Amherst Lab, thereby making possible Farak's violations of Plaintiff's constitutional rights (Compl. ¶¶ 409-417). The DPH defendants move to dismiss Count II based on failure to adequately allege a supervisory liability claim.

> When a supervisor seeks qualified immunity in a section 1983 action, the "clearly established" prong of the qualified immunity inquiry is satisfied when (1) the subordinate's actions violated a clearly established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context. In other words, for a supervisor to be liable there must be a bifurcated "clearly established" inquiry—one branch probing the underlying violation, and the other probing the supervisor's potential liability.

*Camilo-Robles v. Hoyos*, 151 F.3d 1, 6 (1st Cir. 1998) (internal citations omitted).

---

convictions of "(1) those individuals who were convicted of methamphetamine offenses during Farak's tenure at the Amherst [L]ab; and (2) those individuals whose convictions were based on drugs tested in the Amherst [L]ab on or after January 1, 2009, and through January 18, 2013, the date the lab closed, regardless of who signed the drug certificate of analysis." *Comm. for Pub. Counsel Servs.*, 108 N.E.3d at 972.

The court has set forth above the reasons why Farak's actions violated Plaintiff's clearly established due process rights including his rights under *Brady*. The remaining question is whether the DPH defendants, as Farak's supervisors, may be liable, based on the allegations in the complaint, for the constitutional violations perpetrated by Farak. Supervisory liability "may not be predicated upon a theory of *respondeat superior*." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 562 (1st Cir. 1989); *Feliciano-Hernández*, 663 F.3d at 533 ("The Supreme Court has held that '[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.'" (quoting *Iqbal,* 129 S. Ct. at 1948)); *see also Saldivar v. Racine*, 818 F.3d 14, 18 (1st Cir. 2016). "Proof that the supervisors were negligent is also insufficient." *Ramírez-Lluveras v. Rivera-Merced*, 759 F.3d 10, 19 (1st Cir. 2014). "This does not mean, however, that for section 1983 liability to attach, a supervisor must directly engage in a subordinate's unconstitutional behavior." *Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 515 (1st Cir. 2016) (internal citation omitted). Rather, a supervisory official may be held liable for the behavior of his subordinates "only if '(1) the behavior of [his] subordinates results in a constitutional violation, and (2) the [supervisor]'s action or inaction was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference.'" *Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir. 2008) (quoting *Lipsett v. Univ. of P.R.,* 864 F.2d 881, 902 (1st Cir. 1988)) (alternations in original); *Guadalupe-Báez*, 819 F.3d at 514–15.

"The showing of causation must be a strong one, as that requirement 'contemplates proof that the supervisor's conduct led *inexorably* to the constitutional violation.'" *Ramírez-Lluveras*, 759 F.3d at 19 (quoting *Hegarty v. Somerset Cnty.,* 53 F.3d 1367, 1380 (1st Cir.1995)). "In

other words, the plaintiff must 'affirmatively connect the supervisor's conduct to the subordinate's violative act or omission.' This affirmative connection need not take the form of knowing sanction, but may include tacit approval of, acquiescence in, or purposeful disregard of, rights-violating conduct." *Camilo–Robles,* 151 F.3d at 7 (quoting *Maldonado–Denis v. Castillo– Rodriguez,* 23 F.3d 576, 582 (1st Cir. 1994)) (internal citation omitted). "A plaintiff may prove causation by showing a 'known history of widespread abuse sufficient to alert a supervisor to ongoing violations.' However, proof of that sort must truly show 'widespread' abuse; 'isolated instances of unconstitutional activity ordinarily are insufficient ... to show deliberate indifference.'" *Ramírez-Lluveras*, 759 F.3d at 19 (quoting *Maldonado–Denis,* 23 F.3d at 582). For a supervisor to be considered "deliberately indifferent," he "must have 'actual or constructive knowledge' of a 'grave risk of harm' posed by the subordinate and fail to take 'easily available measures to address the risk.'" *Saldivar*, 818 F.3d at 18 (quoting *Camilo– Robles,* 151 F.3d at 6–7).

## 1. Hanchett

Plaintiff's allegations must "'connect the dots' and demonstrate that [Hanchett's] conduct was affirmatively linked to the harm that eventuated." *Guadalupe-Báez*, 819 F.3d at 516. Moreover, it must be a fair inference from the allegations that Hanchett had at least constructive notice of the constitutional violation. *Id.*; *Saldivar*, 818 F.3d at 18. The complaint alleges that Hanchett failed to take reasonable steps when he discovered the condition of the methamphetamine standard from which Farak had been stealing since 2004 and which she adulterated when she feared discovery. Further, when Hanchett conducted an audit in 2012 and discovered that a number of standards were depleted, he took no follow up steps even though he (rightly) suspected theft by an employee. He did not report the loss of these controlled

substances as he was required to do under his federal license. In 2013, he invented out of whole cloth an implausible explanation to account for his discovery of the beaker in which Farak had been preparing crack cocaine. Practices at the Amherst Lab under Hanchett's supervision made possible Farak's thefts, drug abuse at work, and evidence tampering. Hanchett allowed Amherst Lab employees unfettered access to the facility around the clock, seven days a week. The lab's standards – powerful narcotics – were kept in an unlocked refrigerator. Arguably, Hanchett was a supervisor in name only: Farak is on record as observing that, in contrast to her experience working at the Hinton drug lab, there was virtually no supervision of chemists at the Amherst Lab.

In the court's view, Plaintiff has adequately alleged that Hanchett was deliberately indifferent to suspicious occurrences that should have or did alert him to drug abuse and evidence tampering at the Amherst Lab, resulting in an egregious violation of Plaintiff's constitutional rights, such that, as the complaint alleges, Hanchett's "conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of [Commonwealth defendants, including Plaintiff]." *Gutierrez-Rodriguez*, 882 F.2d at 562. It is undisputed that Hanchett was Farak's direct supervisor at the Amherst Lab. Farak violated Plaintiff's constitutional due process rights by tampering with evidence, testing and certifying the drugs in Plaintiff's criminal prosecution while under the influence of illegal drugs, and failing to disclose the material evidence of her own misconduct. The complaint's allegations support the reasonable inference that Hanchett had constructive notice of Farak's behavior based on the numerous red flags he ignored, such as the severely depleted and missing standards and the beaker with the white residue (which he did not test). *See Jones*, 993 F. Supp. 2d at 62-63. In each instance, Hanchett failed to investigate appropriately and he failed to report losses of

controlled substances to the appropriate authorities. Additionally, Farak's misconduct could be found to be a foreseeable consequence of the policies and procedures Hanchett had in place at the Amherst Lab. *See Camilo-Robles*, 151 F.3d at 6. Where lab standards were kept unsecured, access to the lab was unrestricted and untracked, and there was no oversight or assessment of the chemists' work, there was a "grave risk of harm" that could readily have been addressed with appropriate measures. *See Saldivar*, 818 F.3d at 18.

As to whether a supervisor of a forensic laboratory should have been on notice of potential liability at the relevant time, judges in two other sessions of this court have considered, in connection with Dookhan's conduct at the Hinton lab, whether, at the time Dookhan's misconduct occurred, "a reasonable supervisor would understand that [he] 'would be liable for constitutional violations perpetrated by [his] subordinates in [that] context.'" *Johnson*, 2015 WL 4397360, at *8 (quoting *Camilo-Robles*, 151 F.3d at 6). Those judges held that a supervisor in a forensic laboratory would have reasonably understood his potential liability if he allowed a forensic chemist to persist in conduct that "jeopardized the constitutional rights of criminal defendants subject to the laboratory testing procedures." *Jones*, 993 F. Supp. 2d at 69; *see also Johnson*, 2015 WL 4397360, at *8 ("[N]o reasonable supervisor could fail to grasp that liability would attach for exhibiting deliberate indifference towards the falsification and withholding of evidence by her subordinates. The prohibition of such unconstitutional behavior applies with obvious clarity to the acts of supervisors who condone or deliberately turn a blind eye to these acts."). These opinions are persuasive. While Farak's misconduct differed from Dookhan's, the impact on the fundamental due process rights of criminal defendants was similar. *See Comm. for Pub. Counsel Servs.*, 108 N.E.3d at 988-89 (discussing the state of the evidence about the nature and timing of Farak's evidence tampering and its effect). In either case, given the central roles

the drug labs and their chemists played in criminal prosecutions, a reasonable supervisor would have understood that willfully turning a blind eye to indications of evidence tampering by a lab chemist could be a basis for liability to a defendant whose due process rights were violated. *See Jones*, 993 F. Supp. 2d at 68-69; *Johnson*, 2015 WL 4397360, at \*8.

In sum, the allegations in the complaint paint a picture of a supervisor whose oversight of the Amherst Lab was deliberately indifferent to the rights of Plaintiff as a defendant in a criminal case. The evidence in his criminal trial was stored and tested in a lab where a drug-addicted chemist tampered with, stole, and consumed evidence at will. Hanchett's conduct – or inaction – can be said to have "led inexorably to the constitutional violation." *Guadalupe-Báez*, 819 F.3d at 515 (stating that causation may be proved "by showing inaction in the face of '[incidents] sufficient to alert a supervisor to ongoing violations'"). "Although a fully-developed factual record indeed may not ultimately support the claim, the [c]ourt is obliged at this stage to accept all well-pleaded facts alleged in the [complaint] as true and draw all reasonable inferences in [Plaintiff's] favor." *Solomon*, 2014 WL 317202, at \*15. At this stage, Plaintiff has stated a plausible § 1983 claim against Hanchett.

### 1. Salem

Plaintiff's allegations against Salem, however, fall short for a simple reason. Plaintiff asserts that Salem, like Hanchett, is liable under § 1983 as a supervisor of Farak who was deliberately indifferent to Plaintiff's constitutional rights. When a plaintiff asserts liability for a failure to act or based on deliberate indifference, a plaintiff must plausibly allege that the supervisor "had the power and authority to alleviate" the foreseeable consequences of the alleged misconduct. *Maldonado-Denis*, 23 F.3d at 582; *Camilo-Robles*, 151 F.3d at 7. Plaintiff has not adequately alleged that Farak was subordinate to Salem, or that Salem had power and authority

at the Amherst Lab such that her conduct (or inaction) could be said to have been "tacit approval of, acquiescence in, or purposeful disregard of," Farak's conduct. *Camilo-Robles*, 151 F.3d at 7.

Plaintiff's claim apparently rests on Salem's title and role as evidence officer at the Amherst Lab and the allegation that Salem was responsible for assigning samples for testing to Farak and the other analysts (Compl. ¶¶ 409-417). It may be, as alleged, that Salem was a careless evidence officer (Compl. ¶ 154). However, allegations of negligence are insufficient generally and insufficient more specifically to establish supervisory liability. *See Ramírez-Lluveras*, 759 F.3d at 19. Though supervisors are "defined loosely to encompass a wide range of officials," they must still have some "power and authority." *Camilo-Robles*, 151 F.3d at 6-7. There are no allegations that Salem had responsibilities for training, supervision, or discipline for Amherst Lab employees or that she had quality assurance duties. There is no allegation that Salem accompanied Hanchett when Hanchett attended meetings with Nassif about the operations of the Amherst Lab (Compl. ¶ 101). Plaintiff alleges that when Salem discovered that evidence she had assigned to Farak for analysis was missing, Salem reported the problem to Hanchett rather than addressing it herself (Compl. ¶ 188). The allegation that Salem was responsible for assigning samples for testing to laboratory analysts is insufficient to establish that she had supervisory authority over Farak and the other analysts (Compl. ¶ 141). The complaint simply does not allege that Salem occupied a position of power and authority at the Amherst Lab such that she could be liable as a supervisor for Farak's misconduct. *See Guadalupe-Báez*, 819 F.3d at 518 (affirming dismissal of supervisory claims against defendants where there were no allegations placing them in the relevant chain of command). For this reason, the § 1983 claim against Salem will be dismissed.

3.     **Han and Nassif**

Plaintiff's allegations against Han and Nassif fall short for a different reason. Plaintiff alleges that Nassif assumed a supervisory role over the Amherst Lab when she became the director of the DPH Division of Analytical Chemistry in 2006 (Compl. ¶ 39). In that role, which she held until her employment was involuntarily terminated in 2012, she was neglectful in her oversight of the lab, regularly canceled meetings with supervisors, and rarely traveled to the Amherst Lab (Compl. ¶¶ 11, 43, 97-100, 103-10, 170). She did little to nothing to ensure that the Amherst Lab's quality standards were adequate. She ignored or dismantled mechanisms had been in place to check the lab's conditions and the chemists' work. For example, she failed to conduct performance evaluations of drug lab supervisors and when the quality assurance responsibilities fell to her after the QC/QA Group was discontinued, she did not maintain that oversight (Compl. ¶¶ 43-6, 48, 50-56). Finally, Nassif made decisions that potentially undermined the Amherst Lab's performance. She turned down requests for professional development for the lab chemists and supervisors and requests to replace older lab equipment (Compl. ¶¶ 63-4, 104-5). Han became director of the Bureau of Laboratory Sciences in 2009. Her responsibilities also included oversight of the Amherst Lab, including budgetary control. Like Nassif, Han sometimes denied requests for supplies for the lab and new equipment (Compl. ¶¶ 58-64). Han also rarely visited the Amherst Lab (Compl. ¶ 62).

Plaintiff's allegations against Nassif and Han "rest solely on their positions of authority. That is not a permissible basis for a finding of supervisory liability under section 1983." *Guadalupe-Báez*, 819 F.3d at 518. That these defendants were "high-level officials" with "vast responsibilities" that included oversight over the Amherst Lab is not enough to sustain a supervisory liability claim. *See Feliciano-Hernández*, 663 F.3d at 533. Plaintiff has certainly

alleged that Nassif and Han were neglectful as overseers of the Amherst Lab, but allegations "that the supervisors were negligent [are] … insufficient." *Ramírez-Lluveras*, 795 F.3d at 19.

Plaintiff's reliance on the *Jones* case is inapposite because here Plaintiff has not alleged facts from which it could be inferred that either Nassif or Han were "put on some kind of notice of the alleged violations" committed by Farak. *Lipsett*, 864 F.2d at 902 (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 484 (1986)). The *Jones* case – in which Nassif and Han were also defendants – was premised on the misconduct of Hinton drug lab chemist Dookhan, who ultimately admitted to falsifying positive test results, "dry labbing" (certifying the identity of a substance by looking at it rather than analyzing it), and forging other chemists' signatures to indicate that those chemists had analyzed a particular sample. *Jones*, 993 F. Supp. 2d at 61-62. The plaintiff in *Jones* "allege[d] that Dookhan's supervisors, including [Han and Nassif], knew that she often tested up to five times more samples per month than other chemists; that they were aware of complaints about Dookhan [including concerns about how many samples she was testing]; and that they ignored the fact that Dookhan circulated several different versions of her resume within the office." *Id.* at 65 (footnote omitted). The court concluded that the complaint adequately alleged claims of supervisory liability because it alleged that Han and Nassif had "failed to investigate several 'red flags' concerning [Dookhan's] work." *Id.* at 62-63.

While Plaintiff alleges that chemists at the Amherst Lab also analyzed an excessive volume of samples (Compl. ¶¶ 108), this allegation is unconnected to the allegations about Farak's misconduct. There are no allegations in the complaint that Farak falsified tests or engaged in dry labbing. Farak's misconduct was not linked to atypical productivity, nor were there concerns raised by co-workers about Farak's output, methods, or analyses. Put another way, that a chemist may be falsifying her work is a reasonable inference to draw from

knowledge of an abnormally high volume of testing conducted by that chemist, particularly when coupled with complaints about that chemist. On the other hand, it is not reasonable to infer based on a high volume of testing by an entire lab that one chemist was stealing and tampering with samples to satisfy a drug addiction. Plaintiff has not alleged conduct that would have put Nassif or Han on notice of Farak's constitutional violations. Because Plaintiff has not adequately alleged notice, an essential element of a § 1983 supervisory liability claim, the § 1983 claims against Han and Nassif will be dismissed.

## E.     Intentional Infliction of Emotional Distress

Farak and the DPH defendants move to dismiss Plaintiff's claim for intentional infliction of emotional distress on the grounds that the allegations in the complaint do not concern conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 82 (Mass. 1987) (quotations omitted). A finding of extreme and outrageous conduct "may be grounded either on actual knowledge or on a defendant's deliberate disregard of a substantial probability that his actions will produce severe emotional distress." *Limone*, 579 F.3d at 95; *cf. Bazinet v. Thorpe*, 190 F Supp. 3d 229, 240 (D. Mass. 2016) (denying motion to dismiss where the complaint charged law enforcement defendants with "fabricating evidence in an effort to obtain criminal charges against an innocent citizen who was in the midst of a suicidal breakdown"). A defendant can be held liable for intentional infliction of emotional distress where he "violated [his] duty to [the plaintiff] recklessly, by outrageous omission to act, and thereby caused [] severe emotional harm." *Simon v. Solomon*, 431 N.E.2d 556, 562 (Mass. 1982).

Plaintiff has sufficiently alleged that Farak's tampering with evidence, stealing drugs, and suppressing material evidence of her actions resulted in violations of Plaintiff's Due Process rights and that such actions showed "deliberate disregard of a substantial probability that [her] actions [would] produce severe emotional distress" for Plaintiff. *Limone*, 579 F.3d at 95, 98 (stating that the "SJC has made it abundantly clear that claims for intentional infliction of emotional distress may be founded on a pattern of misconduct"). Plaintiff alleges that because Farak's misconduct was not timely disclosed, he was convicted and served time in state prison. Severe emotional distress resulting from this loss of liberty is a wholly reasonable inference. The same can be said of the allegations against Hanchett. Plaintiff claims that Hanchett disregarded repeated red flags indicating irregular activities in the Amherst Lab, from missing lab standards to suspicious residue on equipment, and that his practices as supervisor at the Amherst Lab created the conditions that permitted Farak's unconstitutional conduct to continue for many years, causing a substantial risk that a defendant in Plaintiff's position might be convicted based on tainted evidence. Hanchett's conduct could also be found to evince a "deliberate disregard of a substantial probability that his actions [would] produce severe emotional distress" for Plaintiff. *Id.* at 95.

On the other hand, the allegations in the complaint are not sufficient as to Nassif, Han, or Salem. Plaintiff alleges substantial deficiencies in the oversight of the Amherst Lab and in Salem's performance as an evidence officer, but he does not connect those allegations to the harm he suffered. It cannot be said, based on the allegations, that Nassif, Han, or Salem "'intended to inflict emotional distress or … knew or should have known that emotional distress was the likely result of [their] conduct.'" *Wilber v. Curtis*, 872 F.3d 15, 24 (1st Cir. 2017) (quoting *Limone*, 579 F.3d at 94).

### III.    CONCLUSION

For the reasons set forth above, the Motion to Dismiss by the DPH defendants (Dkt. No.

93) is hereby ALLOWED as to Salem, Han, and Nassif and DENIED as to Hanchett.  The

Motion to Dismiss by Farak (Dkt. No. 124) is hereby DENIED.

It is so ordered.

Dated: January 24, 2019                              /s/ Katherine A. Robertson
                                                     KATHERINE A. ROBERTSON
                                                     U.S. MAGISTRATE JUDGE