UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROLANDO PENATE,<br><br>Plaintiff,<br><br>v.<br><br>ANNE KACZMAREK, KRIS FOSTER, RANDALL RAVITZ, JOSEPH BALLOU, ROBERT IRWIN, RANDY THOMAS, SONJA FARAK, SHARON SALEM, JAMES HANCHETT, JULIE NASSIF, LINDA HAN, ESTATE OF KEVIN BURNHAM, STEVEN KENT, JOHN WADLEGGER, GREGG BIGDA, EDWARD KALISH, and CITY OF SPRINGFIELD<br><br>Defendants. | CIVIL ACTION<br>NO. 3:17-cv-30119-KAR |

**PLAINTIFF'S CONCISE STATEMENT OF UNDISPUTED FACTS FILED IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT ANNE KACZMAREK**[1]
**(Local Rule 56.1)**

**PLAINTIFF'S ARREST AND INDICTMENT**

1. On November 15, 2011, Springfield narcotics detectives executed a search warrant at 57 Johnson Street. **Ex. 1**, Affidavit of Eduardo Velazquez ¶ 4.

2. Plaintiff Rolando Penate (Plaintff) was among those present at the time of the Johnson Street search. Velazquez Aff. ¶ 6.

[1] Plaintiff has filed a Motion to Collaterally Estop Defendant Anne Kaczmarek From Contesting Factual Findings of Special Hearing Officer. See Dkt. No. 298. This Statement of Undisputed Facts includes some of those findings, which are delineated by italics. If this Court grants the collateral estoppel motion, this Court should consider those findings as beyond dispute and thus ripe for consideration on the issue of summary judgment. If, however, this Court denies that motion, the Court should not consider the italicized facts in deciding summary judgment, but only those established in the record of the instant civil suit.

3. Plaintiff was arrested and charged with *inter alia* three counts of distributing heroin, as well as possessing heroin and cocaine with the intent to distribute. **Ex. 2**, Docket for Commonwealth v. Penate, 1123CR009139.

4. All the substances purchased or seized from 57 Johnson Street were transported to the Amherst Drug Lab and assigned to Sonja Farak (Farak) for analysis. Velazquez Aff. ¶¶ 11-12, **Ex. 3**, Chemist Discovery Packet, Penate 009000-02, 009026-28; 009054.

5. Farak signed drug certificates on December 22, 2011, January 6, 2012, and January 9, 2012, attesting that the substances she analyzed contained heroin or cocaine. **Ex. 4**, Penate Drug Certificates.

6. At the time, the Amherst Drug Lab served as a satellite facility for the main Department of Public Health (DPH) drug lab located at the William A. Hinton State Laboratory Institute in Jamaica Plain (Hinton Drug Lab). Dkt. No. 30, Farak Answer ¶ 144.

7. Starting in late 2004 or early 2005, Farak began stealing and using narcotics at the Amherst Drug Lab. Dkt. No. 30, Farak Answer ¶ 82.

8. During the time Farak was entrusted with samples in Plaintiff's case, she was receiving treatment from clinicians at ServiceNet, Inc. (ServiceNet). Dkt. No. 30, Farak Answer ¶ 144.

9. During the seven-day period from Tuesday, December 20 to Monday, December 26, 2011, Farak completed the following ServiceNet Diary Card.

## ServiceNet Diary Card

Name: ______________________ Week of: __________

| Observe and Describe Emotions: Today I felt (0-5): | 12-26 ---Mon | 12-20 --Tues | 12-21 Wed | 12.22 --Thurs | 12-23 ----Fri | 12-24 --Sat | 12-25 --Sun |
|---|---|---|---|---|---|---|---|
| sadness | 3½ | 2½ | 2½ | 3 | 3 | 2½ | |
| frustration/anger | 4½ / [illegible] | 4 / 3½ | 4 / 2 | 4 / 3 | 3 / 2 | 4 / 4 | |
| anxiety | 2½ | 2 | 2½ | | 3 | 2 | |
| "pleasant" emotion | 1 | 2 | 1½ | | 2½ | 1 | |
| shame | 3 | 2 | 3½ | 4 | 4 | 3 | |
| | | | | | | | |
| | | | | | | | |
| Target Behaviors: Today I felt an urge to (0-5): | | | | | | | |
| Kill myself | 0 | 0 | 0 | | | 2 | |
| Injure myself | 0 | 0 | 1 | | | 3 | |
| Drink or take drugs (2 ciders, 2 shots) | 3 yes / 3½ yes pot | 1 / 1½ | ½ / 3½ | 1 / 4½ yes | 1 / 4 yes | 4 yes 6 / 2½ | 2 yes / 1 (2 glasses wine dinner) |
| Binge, purge or not eat | | | | | | | |
| outburst | 5 yes | 4 yes (I'm told about everything, but I don't remember) | 3½ a little [illegible] | | 2 | 5 yes (about game & Lynda's X-mas pres.) | |
| avoid | 5 yes | 4 yes | 4½ yes | | | 3 | |

Write "Yes" in the box next to the number if you acted on an urge.

What did you do today?

Monday: go home - expect to have relaxing day w/Nikki, but went downhill fast; bed by 6pm

Tuesday: yell @ Nikki (about everything) - get mad about computer/recipe for cheesecake (& broken spatula), so blew it off - went to bed early - hopefully up early tomorrow

Wednesday: leave work ~10:30 to get X-mas stuff done ([illegible]); definitely moments throughout day when I thought I sounded stupid or did something stupid; DBT group: "Throw the shit to the curb"

Thursday: tried to resist using @ work, but ended up failing (I know I should have called, but had thoughts about how I felt last time I called); neighbors B-day; up to midnight wrapping presents.

Friday: go to NY in afternoon. @ work use w/out debating doing it - My thought about its identity issue (i.e. wavering back & forth about who or what I want to use).

Saturday: home from NY - mad about missing part of Pats game (out of 3 reasons, 2 are Nikki's, but main one is not) - had 2 ciders during game when mad, but decided not to drink 3rd

Sunday: (papers) X-mas in RI

(margin notes: want to [illegible] / [illegible] using; Nikki drank on way home from NY)

Nikki drinking on way home from RI

Dkt. No. 30, Farak Answer ¶ 145; **Ex. 5**, Pl.'s Dep. Ex. 187, Email from Ballou (Feb. 14, 2013; 3.31 pm) - attachment 4, pg. 2.

10. On Thursday, December 22, 2011 – the same day she reported testing a sample in Plaintiff's case – Farak memorialized her use of narcotics at the Amherst Drug Lab by making the following Diary Card entry: "tried to resist using @ work but ended up failing." Dkt. No. 30, Farak Answer ¶ 146.

11. At some point after December 26, 2011, Farak placed the completed Diary Card in the trunk of her automobile. Dkt. No. 30, Farak Answer ¶ 147.

12. Plaintiff was indicted on February 1, 2012. Velazquez Aff. ¶ 15; **Ex. 6**, Docket for Commonwealth v. Penate, 1279CR00083, Penate 015306.

13. Eduardo Velazquez, an Assistant District Attorney (ADA) in the Hampden County District Attorney's Office (HCDAO) was assigned the task of prosecuting Plaintiff. Velazquez Aff. ¶ 16.

**DEVELOPING THE DOOKHAN DISCOVERY MODEL**

14. On July 1, 2012, control of Hinton and Amherst Drug Labs transferred from DPH to the Massachusetts State Police (MSP). **Ex. 7**, Robert Irwin Dep. 25:11-15 (Mar. 2, 2020); Dkt. No. 30, Farak Answer ¶ 165.

15. Shortly after the transfer, two Hinton lab employees reported concerns about a former chemist named Annie Dookhan (Dookhan) and the Attorney General's Office (AGO) started an investigation. Irwin Dep. 25:16-20.

16. Detective Lieutenant Robert Irwin (Irwin) was the highest-ranking member of the MSP unit assigned to the AGO. Irwin Dep. 19:14-17.

17. He became the lead investigator in the case. Irwin Dep. 25:21-24.

18. On August 28, 2012, Irwin interviewed Dookhan and she confessed to "dry labbing" and intentionally contaminating samples entrusted to her for analysis. Irwin Dep. 27:14-28:20.

19. Based on this confession and the other evidence of wrongdoing obtained by investigators, the AGO decided to pursue criminal charges against Dookhan. Irwin Dep. 30:7-16.

20. Anne Kaczmarek (Kaczmarek), an Assistant Attorney General (AAG) in Enterprise and Major Crimes (EMC) unit, became the lead prosecutor in the AGO's criminal case against Dookhan. **Ex. 8**, John Verner Dep. 25:7-8 (Mar. 30, 2021).

21. Sergeant Joseph Ballou (Ballou) and Trooper Randy Thomas (Thomas) worked in the Springfield office of the MSP unit assigned to the AGO. **Ex. 9**, Joseph Ballou Dep. 96:6-11 (Mar. 26, 2021).

22. They assisted Irwin in the Dookhan investigation by interviewing past and present employees of Amherst Drug Lab – including Farak. **Ex. 10**, Randy Thomas Dep. 17:17-20:20 (Mar. 2, 2021).

23. Given the nature of Dookhan's work, it quickly became apparent that her criminal activity called into question the integrity of many drug convictions obtained by District Attorney Offices (DAOs) throughout eastern Massachusetts. **Ex. 11**, Anne Kaczmarek Dep. 63:8-18 (Mar. 24, 2021).

24. Criminal Bureau Chief John Verner (Verner) and First Assistant Edward Bedrosian (Bedrosian) realized that evidence inculpating Dookhan would be exculpatory in the cases prosecuted by District Attorneys that relied upon testing purportedly performed by Dookhan. Verner Dep. 46:14-47:8.

25. Leaders in the AGO decided to disseminate this potentially exculpatory evidence to the District Attorneys. Verner Dep. 47:16-48:4.

26. During a meeting with district attorneys at the Executive Office of Public Safety and Security (EOPSS), Deputy Attorney General Shelia Caulkins (Caulkins) conveyed the sentiment that it was the AGO's obligation to do so. **Ex. 12**, Pl.'s Dep. Ex. 127, Kaczmarek BBO Testimony 140:3-141:3 (Nov. 6, 2020).

**THE OUTSET OF THE FARAK INVESTIGATION**

27. On Friday morning, January 18, 2013, the evidence officer at the Amherst Drug Lab advised Supervisor James Hanchett (Hanchett) that two cocaine samples assigned to Farak were not in the main evidence room where they were supposed to be. Dkt. No. 30, Farak Answer ¶ 188.

28. Hanchett eventually called the MSP. Dkt. No. 30, Farak Answer ¶ 190.

29. Detectives in the MSP unit assigned to the Northwestern District Attorney's office (NWDAO) commenced an investigation. **Ex. 13**, Verner BBO Testimony Excerpt 94:1-20 (Oct. 15, 2020).

30. During an interview at the Hampden County Hall of Justice, Farak denied any wrongdoing and investigators asked for permission to search her vehicle. Dkt. No. 30, Farak Answer ¶ 195; **Ex. 14**, Farak Interview (Jan. 18, 2013), Penate 006567.

31. Farak knew her vehicle contained the aforementioned ServiceNet Diary Card, as well as other documents that memorialized her use of narcotics at the Amherst Drug Lab. **Ex. 15**, Sonja Farak Dep. 61:2-6 (Mar. 29, 2021).

32. When Farak refused to consent to a search of the car, investigators impounded the vehicle and towed it back to the MSP barracks in Northampton. Dkt. No. 30, Farak Answer ¶ 196.

33. Irwin was directed to drive out to Western Massachusetts and bring some state police detectives assigned to the AGO to either assist or take over the investigation from the NWDAO. Irwin Dep. 90:2-15.

34. At approximately 7:00 pm, Irwin relayed this directive to Ballou. **Ex. 16**, Pl.'s Dep. Ex. 235, Carey Hr'g Excerpt 137:23-138:19 (Dec. 13, 2016) (testimony of Ballou).

35. Ballou then contacted Thomas and told him to report to the MSP's detective unit assigned to the NWDAO. Thomas Dep. 25:1-26:6 (Mar. 2, 2020).

36. By the time Ballou reached the NWDAO that evening, detectives assigned to that office had already conducted audio-recorded interviews of the four employees at the Amherst Drug Lab and secured Farak's vehicle pending the issuance of a search warrant. Ballou Dep. 206:10-23; **Ex. 17**, Pl.'s Dep. Ex. 236, Ballou BBO Testimony 132:4-133:9 (Oct. 29, 2020); **Ex. 18**, Pl.'s Dep. Ex. 13, Ballou Report ¶ 2 (Feb. 6, 2013).

**THE SEARCH OF FARAK'S VEHICLE**

37. At approximately 2:30 a.m., Irwin, Ballou, and Thomas met Clerk Brian St. Onge at the Amherst Police Department, and he issued a search warrant for Farak's vehicle. Thomas Dep. 28:14-29:15; Pl.'s Dep. Ex. 13, Ballou Report ¶ 12 (Feb. 6, 2013); **Ex. 19**, Pl.'s Dep. Ex. 35, Car Warrant Materials, Penate 006992.

38. Irwin, Ballou, and Thomas then proceeded to the garage underneath the Northampton barracks where Farak's car had been towed. Thomas Dep. 32:9-14; **Ex. 20**, Carey Hr'g Excerpt 9 (Dec. 12, 2016) (testimony of Thomas).

39. Trooper Christopher Dolan (Dolan) from Crime Scene Services was summoned to the garage to take photographs while the three detectives executed the warrant. Thomas Dep. 32:15-21; **Ex. 21**, Pl.'s Dep. Ex. 14, Thomas Police Report ¶ 1 (Jan. 24, 2013).

40. Their search began at 3:23 am and ended at 4:56 am. Dkt. No. 21, Thomas Answer ¶ 199; Dkt. No. 185, Irwin Answer ¶ 199; Thomas Dep. 40:9-19.

41. During the search of the trunk, Irwin found the manila envelope pictured here ("the Bogo envelope"):




**Ex. 22**, Pl.'s Dep. Ex. 40, Photo, Farak Discovery Page 3384; Irwin Dep: 100:16-101:23.

42. Inside the "Bogo" envelope was a lot of paperwork, including the aforementioned ServiceNet Diary Card and this Emotion Regulation Worksheet:

000506

EMOTION REGULATION Worksheet

OBSERVE AND DESCRIBE EMOTIONS

DIRECTIONS: Write as much as you can about each as soon after "event" as possible. Write on back for more room.

Vulnerability Factors: What made me more vulnerable? last night w/ Molly Shawn (& Becky) ~~not~~ taking today off.

Emotion Name(s): (Pre-) Shame Intensity: (0-10) 7

Prompting Event: For my emotion (what, who where, when?) got "good" sample @ work & having urges to use (+ knowing that I will be the only one here after lunch)

Interpretations: What are my Thoughts, Judgments, Beliefs, Assumptions, Appraisals of the situation? I'm a bad person for having urges " " " " not wanting to try to stop them. It doesn't matter – I won't get caught. Know I'll feel worse when/if I use. I know I should call Anna, but I don't want to. I can lie on my homework

Face and Body Changes: What am I feeling in my face and body? hungry (??) head is ~~go~~ running 100m/h little tightness across shoulder

Body Language: What is my facial expression, body posture and gestures? can't sit still – hands to my head temples clenched jaw

Action Urge: What do I feel like doing or saying? → give in and go w/ urge. hurry up + prepare fast (my mind says to get it out of way, but I don't think that will be the end of it)

What I Did or Said:

After Effects: What is my state of mind, other emotions, actions or thoughts?

Function of Emotions: Communicate?, Organize?, Give Information?

(19).

Penate 013913

Irwin Dep. 101:7-103:7; **Ex. 23**, Pl.'s Dep. Ex. 42, Bogo Envelope, pg. 30.

43. Other documents in the car included: a second undated ServiceNet Diary Card, **Ex. 24**, Pl.'s Dep. Ex. 129; a "Homework" assignment dated "11-16-11," **Ex. 25**, Pl.'s Dep. Ex. 130; a scrap piece of paper containing name, address, and telephone number of a therapist named Anna Kogan, **Ex. 26**, Pl.'s Dep. Ex. 131; numerous pre-2012 emails, **Ex. 27**, Pl.'s Dep. Ex. 132; two pre-2012 letters, **Ex. 28**, Pl.'s Dep. Ex. 133; numerous pre-2012 news articles, **Ex. 29**, Pl.'s Dep. Ex. 134; two pre-2012 receipts, **Ex. 30**, Pl.'s Dep. Ex. 135; 2011 travel authorization forms, **Ex. 31**, Pl.'s Dep. Ex. 136; pre-2012 lab paperwork, **Ex. 32**, Pl.'s Dep. Ex. 137; and a schedule of games for Week 13 of the NFL's 2011 season, **Ex. 33**, Pl.'s Dep. Ex. 244.

44. The second undated ServiceNet Diary Card contained the following notation: "Shame at work. Going to use phentermine, but when I went to take it, I saw how little (v. little) there is left = ended up not using." Pl.'s Dep. Ex. 129.

45. Phentermine was among the standards Farak stole and used at the Amherst Drug Lab. Farak Dep. 36:13-38:22.

**IMPACT ON PLAINTIFF'S PROSECUTION**

46. Farak was arrested at approximately 10:30 pm on January 19, 2013. Irwin Dep. 49:22-24.

47. During a press conference the next morning, Attorney General Martha Coakley proclaimed, "These allegations [against Farak] do not implicate any system-wide practices that would implicate the reliability of drug certificates or would in any way, as we have seen in the allegations against Annie Dookhan, implicate the fairness of trials against defendants." Verner Dep. 65:14-67:13.

48. The case against Plaintiff was pending at this time, as were a number of cases against other defendants where Farak had signed drug certificates. Velazquez Aff. ¶ 20.

49. In some cases, the HCDAO prosecutors chose not to move forward based on concerns Farak was engaging in misconduct at the laboratory at the same time substances in these cases were in her possession. Velazquez Aff. ¶ 21.

50. Velazquez was an experienced trial attorney and had discretion in terms of how to deal with the fallout of from Farak's misconduct. **Ex. 34**, Eduardo Velazquez Dep. 47:20-48:1 (Feb. 25, 2021).

51. By this point, the prosecution of Plaintiff had become something of a "shitshow." Velazquez Dep. 142:19-24.

52. The undercover officer had misidentified a co-defendant, and discrepancies in police accounts of cash seized raised additional questions about the quality of the investigation. Velazquez Aff. ¶¶ 5, 8, 10, 15-18.

53. However, because Velazquez had no reason to believe Farak was engaging in misconduct at the laboratory in December 2011 or January 2012, he exercised his discretion to proceed with the prosecution. Velazquez Aff. ¶ 22.

**FARAK'S ARRAIGNMENT AND POSITIVE DRUG SCREEN**

54. Farak was arraigned in the Eastern Hampshire District Court on Tuesday, January 22, 2013. Dkt. No. 30, Farak Answer ¶ 212.

55. By this point, Kaczmarek had been assigned the task of prosecuting Farak. Dkt. No. 187, Kaczmarek Answer ¶ 204; Kaczmarek Dep. 24:21-25:2; Verner Dep. 61:1-6.

56. *"Kaczmarek . . . understood early on that, as had been the case in Dookhan, defendants with pending cases, and those who had been convicted on the basis of Farak's drug analysis ("Farak defendants"), would be entitled to receive from the District Attorneys'*

*Offices (DAOs), potentially exculpatory evidence obtained by the MSP and the AGO in the investigation and prosecution of Farak."* **Ex. 35**, Hearing Report ⁋ 30 (July 9, 2021).

57. *"Kaczmarek understood that this obligation extended to information held by a police officer within her control."* Hearing Report ⁋ 30 (July 9, 2021).

58. *"It was understood from the outset that all evidence that was inculpatory towards Farak was potentially exculpatory to Farak defendants."* Hearing Report ⁋ 31 (July 9, 2021).

59. With the assignment to prosecute Farak came the responsibility to provide all potentially exculpatory information to the DAOs that prosecuted Farak defendants. Verner Dep. 72:17-73:5, 70:22-71-20; *see also* **Ex. 36**, Carey Hr'g Excerpt 129:20-23 (Dec. 15, 2016) (testimony of Verner).

60. *In other words, "it was . . . part of Kaczmarek's job to identify and send Farak-related discovery to the DAOs for the benefit of the Farak defendants."* Hearing Report ⁋ 116 (July 9, 2021); *see also infra* ¶¶ 307-309 (citing statements by Kaczmarek that "Most of the discovery obtained in the Dookhan and Farak cases needed to be released to the District Attorney's offices statewide . . . **I was the point person** in determining whether the information had been disseminated and gathering further information if needed." (emphasis added)).

61. Farak's release conditions included weekly urine screens. **Ex. 37**, Email from Kaczmarek (Jan. 22, 2013; 3:07 pm).

62. During her first such screen on January 23, 2013, Farak tested positive for cocaine and admitted using that substance on the day before her arrest. **Ex. 38**, BBO Ex. 227, Email from Kaczmarek (Jan. 24, 2013; 10:56 pm).

63. *"[T]he urine test results were compelling and irrefutable evidence that Farak had recently used cocaine" and therefore constituted "potentially exculpatory information as to the Farak defendants."* Hearing Report ¶ 58 (July 9, 2021).

64. Upon receiving this information, Kaczmarek had a subordinate prepare an internal memorandum on the admissibility of such evidence. **Ex. 39**, Email from Elizabeth Rosen (Jan. 31, 2013; 3:24 pm), AGOFRK000923; **Ex. 40**, Attachment to Email from Rosen (Jan. 31, 2013; 3:24 pm), AGOFRK000924-929.

65. Kaczmarek did not furnish the information of Farak's positive drug test to the DAOs. **Ex. 41**, Pl.'s Dep. Ex. 215, Kaczmarek BBO Testimony 63:18-64:14 (Nov. 24, 2020).

66. While Kaczmarek claimed she never looked at this (or any other) evidence through the lens of the Farak defendants, Pl.'s Dep. Ex. 215, Kaczmarek BBO Testimony 64:16-66:18 (Nov. 24, 2020), *it was later determined that "Kaczmarek knowingly failed to disclose . . . Farak's urinalysis,"* Hearing Report ¶ 187 (July 9, 2021).

**"ASSORTED LAB PAPERWORK"**

67. When Thomas returned the car search warrant to the clerk's office, he provided "an inventory of the property taken pursuant to this search warrant." Pl.'s Dep. Ex. 35, Car Warrant Materials, Penate 006987-88.

68. This inventory listed twenty separate items, seven of which referenced "assorted lab paperwork," "assorted lab paper work," or "lab paperwork." Pl.'s Dep. Ex. 35, Car Warrant Materials, Penate 006987-88.

69. Item 6 was: "Envelope 'A11-03020 -> A1103022, 2-29-12 SFD V. Dimitry Bogo' containing *lab paperwork*." Pl.'s Dep. Ex. 35, Car Warrant Materials, Penate 006987 (emphasis added).

70. Thomas subsequently submitted a police report memorializing the execution of the search warrant. Pl.'s Dep. Ex. 14, Thomas Police Report (Jan. 24, 2013).

71. This report listed the same twenty items and described them the same way as the search warrant return. Pl.'s Dep. Ex. 14, Thomas Police Report (Jan. 24, 2013).

**"PLEASE DON'T LET THIS GET MORE COMPLICATED THAN WE THOUGHT."**

72. On January 23, 2013, Ballou sent an email to Kaczmarek, Irwin, and Verner about a message Ballou received from Karen Southerland (Southerland), an ADA in the HCDAO, regarding a case where Farak appeared to tamper with oxycodone pills. **Ex. 42**, Pl.'s Dep. Ex. 64, Email from Ballou (Jan. 23, 2013; 10:23 am).

73. When Ballou met with Southerland, she told him ADA Diane Dillon (Dillon) had a Farak cocaine case that was "light" by four grams. **Ex. 43**, Pl.'s Dep. Ex. 146, Email from Ballou (Jan. 23, 2013; 4:41 pm).

74. In an email to Kaczmarek and Irwin, Ballou expressed skepticism concerning these allegations due, in part, to the fact that these cases went "back a lot further than the cases we are looking at." Pl.'s Dep. Ex. 146, Email from Ballou (Jan. 23, 2013; 4:41 pm).

75. On January 24, 2013, after speaking to Dillon, Ballou sent an email informing Kaczmarek that Farak had performed the analysis in Dillon's case back in 2005. Pl.'s Dep. Ex. 146, Email from Ballou (Jan. 24, 2013; 9:16 am).

76. *"Kaczmarek, an experienced prosecutor, . . . realize[d] that this evidence was potentially exculpatory for Farak defendants, both to widen Farak's range of drug abuse and to lengthen substantially the tampering time period."* Hearing Report ¶ 55 (July 9, 2021).

77. Yet in response, Kaczmarek wrote: "Please don't let this get more complicated than we thought. If she were suffering from back injury- maybe she took some oxys?" Pl.'s Dep. Ex. 146, Email from Kaczmarek (Jan. 24, 2013; 9:46 am).

78. When she wrote this, Kaczmarek possessed no information suggesting Farak actually had a back injury. Kaczmarek Dep. 85:14-86:8.

79. In December 2016, Kaczmarek characterized this email as a "plea to God" to spare her team from "an avalanche of work [about] to hit us." Kaczmarek Dep. 87:7-14.

80. In March 2021, Kaczmarek claimed that when she wrote the words, "Please don't let this get more complicated than we thought," she did not care if the case became more complicated. Kaczmarek Dep. 86:23-89:11.

81. Kaczmarek also testified in March 2021 that, notwithstanding her prior testimony regarding a potential "avalanche of work," she was not concerned about the prospect of having more work to do. Kaczmarek Dep. 86:23-89:11.

82. While Kaczmarek may have sent this email to Ballou, she took the position that her comments were not directed to him. Kaczmarek Dep. 89:12-22.

83. *It was later determined that "Kaczmarek knowingly failed to disclose . . . the information concerning . . . the 2005 light cocaine case."* Hearing Report ⁋ 188 (July 9, 2021).

84. *"[T]his [w]as an example of Kaczmarek's disregard for the rights of defendants possibly impacted by Farak's misconduct."* Hearing Report ⁋ 56 (July 9, 2021).

**THE DISCOVERY OF THE MENTAL HEALTH WORKSHEETS**

85. On or about the morning of February 14, 2013, Ballou took a closer look at the "assorted lab paperwork" seized from Farak's vehicle. Pl.'s Dep. Ex. 236, Ballou BBO Testimony 185:10-19 (Oct. 29, 2020).

86. At some point, he came across what became known as the "mental health worksheets." Ballou Dep. 20:11-15.

87. Years later, when a judge characterized this as the "Eureka" moment in the investigation, Ballou adopted the characterization. Ballou Dep. 20:16-21:23.

88. Ballou was "excited" to find this evidence and initially regarded the discovery as a "huge development." Ballou Dep. 20:11-23:6.

89. Prior to discovering this evidence, investigators possessed "circumstantial evidence that suggested [Farak] had broken the law," but they "didn't have any admissions that she was stealing and using drugs at work." Pl.'s Dep. Ex. 235, Carey Hr'g Excerpt 177:23-178:5 (Dec. 13, 2016) (testimony of Ballou).

90. Ballou assumed Farak's admissions concerned misconduct she perpetrated in December 2012. Ballou Dep. 43:4-16.

91. According to Ballou, if "Kaczmarek had told [him] she liked . . . the ServiceNet Diaries as a lead and wanted [him] to pursue it, [he] would have started looking at [the other paperwork] a lot more closely . . . and at some point . . . would have realized" the ServiceNet Diary Card with December dates actually memorialized 2011 activity. Ballou Dep. 56:2-13.

92. As it turned out, Kaczmarek never asked him to do that. Ballou Dep. 56:14-16.

**BALLOU'S VALENTINE'S DAY EMAIL**

93. When Ballou "started finding things in the physical evidence," he called Kaczmarek; after hearing his "teaser" report of Farak's admissions, Kaczmarek asked him to scan and send the materials to her. Ballou Dep. Ballou Dep. 70:5-9.

94. Ballou utilized his scanner to create four PDF documents and gave the files names describing their contents. Pl.'s Dep. Ex. 236, Ballou BBO Testimony 189:5-14 (Oct. 29, 2020).

95. "Articles and Notes" consisted of copies of three news articles. **Ex. 44**, Pl.'s Dep. Ex. 192, Email from Ballou (Feb. 14, 2013; 3:31 pm) – attachment 1.

96. This first article was entitled, "Capeless on Steroid Probe." It was printed on September 20, 2011, and concerned the removal of Pittsfield Police Officer David Kirchner from the Berkshire County Drug Task Force. Pl.'s Dep. Ex. 192, Email from Ballou (Feb. 14, 2013; 3:31 pm) – attachment 1, pg. 1.

97. Handwriting on the document stated: "And Kirchner seemed like such a good guy. I do feel bad for his 5 y.o. daughter. (Thank god I'm not a law enforcement officer) P.S. Most of the cases he's been a part of have been dismissed for exactly this reason." Pl.'s Dep. Ex. 192, Email from Ballou (Feb. 14, 2013; 3:31 pm) – attachment 1, pg. 1.

98. The second article pertained to a Pittsfield pharmacist sentenced to three years in prison for stealing OxyContin pills, and the third was about the indictment of a San Francisco drug lab analyst. Pl.'s Dep. Ex. 192, Email from Ballou (Feb. 14, 2013; 3:31 pm) – attachment 1, pp. 2-3.

99. "Emotion Regulation Homework" consisted of: (i) the Emotion Regulation Worksheet describing Farak's shame at having lied to her supervisor about submitting a DEA application and the fact that she has "12 urge-ful samples to analyze out of next 13"; (ii) a handwritten "Pros" and "Cons" list for "resisting" and "TB"; and (iii) a handwritten account of various events, actions, and emotions. **Ex. 45**, Pl.'s Dep. Ex. 189, Email from Ballou (Feb. 14, 2013; 3:31 pm) – attachment 2.

100. Positive Morphine Test was, as the name suggests, a positive morphine screen conducted by Quest Diagnostics for an unknown third party. **Ex. 46**, Pl.'s Dep. Ex. 191, Email from Ballou (Feb. 14, 2013; 3:31 pm) – attachment 3.

101. "Emotion Regulation Worksheet" consisted of: (i) a second Emotion Regulation Worksheet prompted by Farak's receipt of a "'good' sample @ work" and her realization that she should "call Anna" but her actual urge was to "hurry up + prepare/use"; (ii) the ServiceNet Diary Card memorializing December 22, 2011 use "@ work"; and (iii) a handwritten skills worksheet. Pl.'s Dep. Ex. 187, Email from Ballou (Feb. 14, 2013; 3.31 pm - attachment 4.

102. Ballou appended these four attachments to an email to Kaczmarek and cc'ed Verner and Irwin; the subject heading was "FARAK admissions" and the text read:

> Anne,
>
> Here are those forms with the admissions of drug use I was talking about. There are also news articles with handwritten comments about other officials being caught with drugs. All of these were found in her car inside of the lab manila envelopes.
>
> Joe

**Ex. 47**, Pl.'s Dep. Ex. 186, Email from Ballou (Feb. 14, 2013; 3:31 pm); Ballou Dep. 27:22-28:4.

103. Kaczmarek understood that Ballou "was sending [her] a selection of things that he found of interest." **Ex. 48**, Pl.'s Dep. Ex. 128, Kaczmarek BBO Testimony 203:4-14 (Nov. 23, 2020).

104. *The "exculpatory nature" of the mental health worksheets "was patent and obvious, especially to a prosecutor with [Kaczmarek's] years of experience."* Hearing Report ¶ 110 (July 9, 2021).

105. "When [she] first received the worksheets [Kaczmarek] believed them to be homework or journal entries that Farak kept as part of mental health therapy created at the direction of Farak's therapist." **Ex. 49**, Pl.'s Dep. Ex. 166, Kaczmarek Personal Narrative 9 (Oct. 24, 2017).

106. During her deposition, Kaczmarek conceded that these items she received from Ballou were "objectively exculpatory to Mr. Penate." Kaczmarek Dep. 258:2-7.

107. At some point after receiving Ballou's email, Kaczmarek said that she would have to get out and look at the evidence. Pl.'s Dep. Ex. 236, Ballou BBO Testimony 195:13-19.

108. However, Kaczmarek never reviewed the originals of these documents or any of the other evidence Irwin, Ballou, and Thomas seized from Farak's car. Dkt. No. 187, Kaczmarek Answer ¶ 222.

**THE FIRST FARAK DISCLOSURE LETTER TO THE DISTRICT ATTORNEYS**

109. During an interview in 2018, Kaczmarek was asked whether she reviewed Farak discovery letters sent to the district attorneys. **Ex. 50**, Pl.'s Dep. Ex. 150, Kaczmarek Bar Counsel Interview 57 (Aug. 2, 2018).

110. Kaczmarek said no one asked her to do this and if there was "something that [Verner] wrote that he was sending out to the D.A.'s offices, [she] wouldn't have changed anything to it." Pl.'s Dep. Ex. 150, Kaczmarek Bar Counsel Interview 57 (Aug. 2, 2018).

111. *In truth, "Kaczmarek helped to edit the first Farak discovery letter."* Hearing Report ¶ 91.

112. On March 25, 2013, Kaczmarek and Verner received the draft of a cover letter to district attorneys from Verner's administrative assistant. **Ex. 51**, Pl.'s Dep. Ex. 280, Email from

Megan O'Brien (Mar. 25, 2013; 12:41 pm); **Ex. 52**, Pl.'s Dep. Ex. 281, Attachment to Email from O'Brien (Mar. 25, 2013; 12:41 pm).

113. Among other things, it stated: "Pursuant to this Office's continuing obligation to provide potentially exculpatory information to the District Attorneys as well as information necessary to your Offices' determination about how to proceed with cases in which related narcotics evidence was tested at the Amherst laboratory, please find the below listed materials:" Pl.'s Dep. Ex. 281, Draft of Letter from Verner to Capeless.

114. Kaczmarek provided the following feedback:

> As this is the first letter- do we call it "continuing obligation"? I know this is along the lines of Dookhan….
>
> Otherwise it contains every report that I have.

**Ex. 53**, Pl.'s Ex. 282, Email from Kaczmarek (Mar. 25, 2013; 12:46 pm).

115. The final draft of the letter, sent to District Attorneys on or about March 27, 2013, stated:

> This Office is investigating Sonja Farak, a chemist who conducted analysis of suspected narcotic samples out of the Amherst Drug Laboratory . . . . During our investigation, this Office has produced or otherwise come into possession of information, documents and reports. *Pursuant to this Office's obligation to provide potentially exculpatory information to the District Attorneys* as well as information necessary to your Offices' determination about how to proceed with cases in which related narcotics evidence was tested at the Amherst Laboratory, please find the below listed materials . . .

**Ex. 54**, Pl.'s Dep. Ex. 283, Letter from Verner (Mar. 27, 2013) (emphasis added).

116. *"Kaczmarek pulled these documents together, and Verner signed the letter."* Hearing Report ⁋ 92 (July 9, 2021); see also *infra* ¶¶ 307-309 ("[Kaczmarek] was the point person in . . . gathering further information if needed.")

117. *"Verner's letter did not reference the mental health worksheets, information concerning the 2012 Oxycodone case, the 2005 light cocaine case, or Farak's January 23, 2013*

*urinalysis."* Hearing Report ⁋ 93 (July 9, 2021); see also Pl.'s Dep. Ex. 283, Letter from Verner (Mar. 27, 2013).

118. *"Kaczmarek recognized the exculpatory nature of these materials and . . . knowingly failed to produce them to the DAOs."* Hearing Report ⁋ 78 (July 9, 2021).

**THE PROSECUTION MEMO**

119. Back in 2013, if a line AAG like Kaczmarek wanted to obtain an indictment, she would have to submit a "prosecution memo" or "pros memo" to her superiors. Verner Dep. 107:17-108:6, 121:1-3.

120. Verner expected a line AAG to set forth the "facts of the case, charges requested, summary of evidence," and flag any issues like potentially "viable motions to suppress" or "dismiss." Verner Dep. 107:22-108:1.

121. It was Verner's practice, upon receiving pros memos, to "issue spot" and "make comments" on the document before sending approved memos upstairs to Bedrosian or Calkins on "the 20th floor." Verner Dep. 108:7-15.

122. Verner made these comments "[t]o flag something for the line AAG" and saw the exercise as "an opportunity to give . . . input or thoughts on a case" without necessarily "sitting down with the line AAG." Verner Dep. 118:7-11, 119:21-23.

123. Each and every time a prosecution memo received final approval, the document containing "handwritten notes" would be returned to Verner's administrative assistant who would provide one copy of the document to Verner and another to the line AAG. Verner Dep. 117:15-118:2.

124. Verner "[a]bsolutely, 100 percent" expected each line AAG to read his notes. (Verner 118:12-20.

125. On March 25, 2013, Kaczmarek submitted a prosecution memo to Mazzone. **Ex. 55**, Email from Kaczmarek (Mar. 25, 2013; 3:40 pm).

126. The next day, she received handwritten edits from Mazzone and incorporated them in a new draft of the memo she provided to Verner. **Ex. 56**, Email from Emily Barrett (Mar. 26, 2013; 10:34 am); **Ex. 57**, Attachment to Email from Emily Barrett (Mar. 26, 2013; 10:34 am); **Ex. 58**, Email from Kaczmarek (Mar. 26, 2013; 11:43 pm); **Ex. 59**, Attachment to Email from Kaczmarek (Mar. 26, 2013; 11:43 pm).

127. The final draft of Kaczmarek's prosecution memo stated that among the "[i]tems of note recovered from [Farak's] vehicle" were "mental health worksheets describing how Farak feels when she uses illegal substances and the temptation of working with 'urge-ful samples.'" **Ex. 60**, Pl.'s Dep. Ex. 188, Prosecution Memo 5.

128. In a footnote, Kaczmarek wrote: "These worksheets were not submitted to the grand jury out of an abundance of caution in order to protect possibly privileged information. Case law suggests, however, that the paperwork is not privileged." Pl.'s Dep. Ex. 188, Prosecution Memo 5 n.7.

129. Verner approved the prosecution memo then passed it along to Deputy AG Shelia Calkins (Calkins) for her review. Pl.'s Dep. Ex. 188, Prosecution Memo 1.

130. Both Verner and Calkins made a number of handwritten comments on the document. (*See generally* Pl.'s Dep. Ex. 188, Prosecution Memo; Verner Dep. 109:18-110:22.

131. For example, on the first and ninth pages of the document, Verner wrote notes to Kaczmarek suggesting she seek two counts of Possession of a Class B substance instead of one, given the fact that investigators found cocaine both in her car and at her workstation. Pl.'s Dep. Ex. 188, Prosecution Memo at 1, 9; Verner Dep. 121:12-125:4.

132. With respect to the mental health worksheets, Verner wrote: "this paperwork NOT turned over to DAs offices yet." Pl.'s Dep. Ex. 188, Prosecution Memo, at 5; Verner Dep. 125:24-126:11.

133. When asked why he wrote this note, Verner testified: "So, to me, when I say 'Paperwork not turned over to the DA's offices yet,' . . . that's flagging it that it has not been turned over. And the word 'yet,' you know, I meant to say these need to be turned over, right? So they're not turned over yet." Verner Dep. 126:23-127:5.

134. When he wrote the note, Verner knew that the mental health worksheets were not among the documents Kaczmarek had compiled for the first formal distribution of Farak materials to the District Attorneys. Verner Dep. 127:6-13.

135. Verner considered these documents to be exculpatory for Farak defendants and therefore expected they would be turned over to the district attorneys. Verner Dep. 116:9-117:11.

136. At one point, Kaczmarek falsely claimed that approved "memos were not necessarily passed down the chain of command." Pl.'s Dep. Ex. 166, Kaczmarek Personal Narrative 9 (Oct. 24, 2017).

137. She later conceded that these memos were returned to line prosecutors but claimed it was not her practice to review the written feedback provided by supervisors. Pl.'s Dep. Ex. 127, Kaczmarek BBO Testimony 182:1-184:10 (Nov. 6, 2020).

138. *It was ultimately determined that Kaczmarek "saw [Verner's] comments" on the prosecution memo stating the mental health worksheets seized from Farak's car had not been turned over to the DAOs yet "and knew she should act on them."* Hearing Report ¶ 87.

**THE DISCLOSURE OF "POTENTIALLY EXCULPATORY EVIDENCE" TO THE DISTRICT ATTORNEYS**

139. Ballou testified at the Farak grand jury for the first time on February 28, 2013. **Ex. 61**, Pl.'s Dep. Ex. 240, Farak Grand Jury Minutes (Feb. 28, 2013).

140. Before he was sworn in, Kaczmarek informed Ballou that the mental health worksheets would not be introduced at the proceeding. Pl.'s Dep. Ex. 235, Carey Hr'g Excerpt 194:7-21 (Dec. 13, 2016) (testimony of Ballou).

141. When asked to "tell the Grand Jurors some of the things that were recovered from Ms. Farak's vehicle," Ballou was careful to avoid divulging the existence of the forms with admissions. Pl.'s Dep. Ex. 240, Farak Grand Jury Minutes 13:18-14:10 (Feb. 28, 2013); Ballou Dep. 38:21-24.

142. In addition to "newspaper articles," Ballou testified that the car contained "writings." Pl.'s Dep. Ex. 240, Farak Grand Jury Minutes 14:7-9 (Feb. 28, 2013)

143. *On April 1, 2013, "based on Verner's note" in the prosecution memo about "the number of possession counts" to seek, Kaczmarek obtained indictments for not one but "two counts of unlawful possession of Class B controlled substance [cocaine]," as well as "four counts of tampering with evidence . . . and four counts of theft of a controlled substance."* Hearing Report ⁋⁋ 87, 88; **Ex. 62**, Pl.'s Dep. Ex. 93, Farak Indictments.

144. By this point, Frank Flannery (Flannery) had become a First Assistant in the HCDAO and was responsible for handling post-conviction motions filed by <u>Farak</u> defendants**. Ex. 63**, Frank Flannery Dep. 11:14-15:22 (Mar. 16, 2021).

145. Based on the representations in the first <u>Farak</u> discovery letter dated March 27, 2013, Flannery surmised that the AGO would eventually distribute copies of the Farak Grand Jury minutes to the HCDAO. Flannery Dep. 29:7-13.

146. On May 31, 2013, Flannery sent an email to Kaczmarek requesting an "ETA" on the minutes. **Ex. 64**, Email from Flannery (May 31, 2013; 9:41 am).

147. By this point, he and his colleagues in the HCDAO were feeling pressure from defense attorneys and judges to produce potentially exculpatory evidence to Farak Defendants. Flannery Dep. 29:21-30:8.

148. On June 3, 2013, Kaczmarek said that Farak's attorney, Elaine Pourinski (Pourinski) had requested a couple days to think about whether she wanted to oppose Kaczmarek's motion to disseminate the minutes. **Ex. 65**, Email from Kaczmarek (June 3, 2013; 12:35 pm).

149. In anticipation of Kaczmarek's motion to disseminate the minutes, Pourinski filed a motion on June 19, 2013, to redact any testimony relative to the physical or mental health of Farak's wife – the first witness to testify at the Grand Jury. **Ex. 66**, Def.'s Mot. to Redact Witness' Grand Jury Testimony Prior to Dissemination to the District Attorneys & Motion to Impound, Commonwealth v. Farak, 1380CR00061.

150. On June 21, 2013, Kaczmarek sent an email to Flannery and Bucci stating:

> I am headed west on Monday to argue the dissemination of GJ materials. Farak wants me to redact the minutes of Farak's wife. I am arguing that *my responsibility is to turn over all the minutes unredacted* and the accepting prosecutors can decide what is relevant to meet their discovery requests.

**Ex. 67**, Pl.'s Dep. Ex. 96, Email from Kaczmarek (June 21, 2013; 12:38 pm) (emphasis added).

151. On or about June 24, 2013, Kaczmarek signed her name to a motion to disclose the Farak grand jury minutes and exhibits to the District Attorneys as well as the U.S. Attorney for the District of Massachusetts. **Ex. 68**, Pl.'s Dep. Ex. 174, Commonwealth's Mot. for

Order to Disseminate Grand Jury Materials to Certain Parties, Commonwealth v. Farak, 1380CR00061.

152. During her depositions, Kaczmarek testified that she agreed with the following statements contained in this pleading:

- The Commonwealth states that the issues presented in the criminal case of Sonja Farak potentially affect the criminal cases of numerous individuals within the Commonwealth.
- The Commonwealth believes that the grand jury minutes may contain potentially exculpatory evidence.
- It is the duty of the Attorney General's Office to release such potentially exculpatory evidence to the government entities charged with prosecuting of the affected individuals.

Kaczmarek Dep. 131:9-132:13; see also Verner Dep. 90:4-91:12.

153. In support of the motion, Kaczmarek cited Mass. R. Crim. P. 14 for the proposition that: "(t)he prosecution shall disclose to the defense, and permit the defense to discover, inspect and copy, each of the following items and information at or prior to the pretrial conference, provided it is relevant to the case and is in the possession...of persons who have participated in investigating or evaluating the case and either regularly report to the prosecutor's office or have done so in the case:…(a)ny facts of an exculpatory nature." Pl.'s Dep. Ex. 174, Commonwealth's Mot. For Order To Disseminate Grand Jury Materials to Certain Parties, pp. 1-2.

154. Kaczmarek ultimately agreed that the "specific mental health" of Farak's wife "was not relevant to the 'Farak defendants,'" and therefore "agreed to redact those portions of her testimony before disclosure." Pl.'s Dep. Ex. 166, Kaczmarek Narrative 11 (Oct. 24, 2017).

155. The Honorable Bertha Josephson allowed Kaczmarek's motion to disseminate with this caveat. Pl.'s Dep. Ex. 174, Commonwealth's Mot. For Order To Disseminate Grand Jury Materials to Certain Parties, pg. 1.

156. On or about June 26, 2013, Kaczmarek signed her name to the following letter, which was sent to each of the Commonwealth's District Attorneys:

> As you know, this Office is investigating defendant, Sonja Farak, a chemist who analyzed drugs out of the Amherst drug lab. During the investigation process, this Office has come into possession of information, documents and reports. Pursuant to this Office's continuing obligation to provide potentially exculpatory information to the District Attorneys as well as information necessary to your Offices' determination about how to proceed with cases in which related narcotics evidence was tested at the Amherst laboratory, please find the below listed materials:

**Ex. 69**, Pl.'s Dep. Ex. 284, Letter from Kaczmarek (June 26, 2013); Kaczmarek Dep. 126:3-18.

### THE SECOND DISCLOSURE OF FARAK GRAND JURY MINUTES

157. On the morning of July 9, 2013, Kaczmarek sent an email to Suffolk ADA DeMore; the subject heading was: "opposition for motion to vacate guilty plea." **Ex. 70**, Pl.'s Dep. Ex. 212, Email from Kaczmarek (July 9, 2013; 9:29 am).

158. "I figured you guys had a couple of these oppositions lying around," Kaczmarek wrote. "Could I get a sample?" *Id.*

159. DeMore obliged by attaching a draft of a pleading filed in the Suffolk County case of Commonwealth v. Hemingway, Dkt. No. 1014CR002842. Pl.'s Dep. Ex. 212, Email from DeMore (July 9, 2013; 9:54 am); **Ex. 71**, Attachment 1 to Email from DeMore (July 9, 2013; 9:54 am).

160. "On a somewhat related note," DeMore asked Kaczmarek if she had any objection to his filing a motion "to permit [Suffolk] to disseminate the [Farak grand jury] materials." Pl.'s Dep. Ex. 212, Email from DeMore (July 9, 2013; 9:54 am).

161. The draft of the motion DeMore attached for Kaczmarek's review contained this passage:

> As it was the duty of the Office of the Attorney General to release these materials in question to the District Attorneys and United States Attorney for the District of Massachusetts, it is now the responsibility of these prosecutorial agencies to further disseminate the materials to the individuals possibly affected. See Mass. R. Crim. P. Rule 14 ("(t)he prosecution shall disclose to the defense, and permit the defense to discover, inspect and copy each of the following items and information at or prior to the pretrial conference, provided it is relevant to the case and is in the possession . . . of persons who have participated in investigating or evaluating the case and either regularly report to the prosecutor's office or have done so on the case…(a)ny facts of an exculpatory nature."); 18 U.S.C. §3500 (the Jencks Act); Fed. R. Crim. P. 16; Fed. R. Crim. P. 26.2; *Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963).

**Ex. 72**, Attachment 2 to Email from DeMore (July 9, 2013; 9:54 am).

162. Kaczmarek did not object to the motion or request any changes in the text of the pleading; instead, she assisted DeMore in getting the motion filed. **Ex. 73**, Email from Kaczmarek (July 9, 2013; 10:14 am).

163. Two days later, DeMore filed the motion, which was allowed by the Honorable Richard J. Carey. **Ex. 74,** Commonwealth's Motion for Order to Disseminate Grand Jury Materials to Certain Parties, Commonwealth v. Farak, 1380CR00061.

164. On or about July 12, 2013, Kaczmarek drafted another letter to the District Attorneys. It contained this now-familiar passage:

> As you know, this Office is investigating defendant, Sonja Farak, a chemist who analyzed drugs out of the Amherst drug lab. During the investigation process, this Office has come into possession of information, documents and reports. Pursuant to this Office's continuing obligation to provide potentially exculpatory information to the District Attorneys as

> well as information necessary to your Offices' determination about how to proceed with cases in which related narcotics evidence was tested at the Amherst laboratory, please find the below listed materials:

**Ex. 75**, Pl.'s Dep. Ex. 172, Letter from Kaczmarek (July 12, 2013); see also Pl.'s Dep. Ex. 127, Kaczmarek BBO Testimony 196:7-22 (Nov. 6, 2020) (acknowledging she signed and sent copies of unsigned letter).)

165. *"This was the last discovery letter Kaczmarek sent to the DAOs."* Hearing Report ¶ 105 (July 9, 2021).

166. At no point did Kaczmarek seek a court order permitting the disclosure of the mental health worksheets. Carey Hr'g Excerpt 166:13-167:4 (Dec. 16, 2016) (testimony of Kaczmarek).

167. When asked in 2016 whether it was her "intention" that they "eventually . . . be turned over," she answered:

> I was really nervous about those records at the time. And now, because of -- I see now that I totally misjudged the dates, and I see where that was a mistake on my part. If I had realized that, like, what it really meant, I would have -- I would have turned it over. What I would have done is I would've gotten an order, like I did for the Grand Jury minutes, and have the judge relieve me of any sort of -- any issues that could have come up with privilege and released it. I made a mistake.

**Ex. 76**, Carey Hr'g Excerpt 112:23-113:9 (Dec. 16, 2016) (testimony of Kaczmarek).

168. When asked in 2019, why she did not disclose the existence of the mental health records to "Flannery or anybody," Kaczmarek answered: "It was neglect." **Ex. 77**, Kaczmarek Bar Counsel Interview 39:4-6 (May 10, 2019).

169. *It was eventually determined "Kaczmarek recognized the exculpatory nature of these materials and . . . knowingly failed to produce them to the DAOs."* Hearing Report ⁋ 78.

170. On July 15, 2013, Plaintiff filed a motion to dismiss the drug charges against him based on Farak's egregious misconduct and the government's noncompliance with its obligation to turn over exculpatory evidence. Docket for Commonwealth v. Penate, 1279CR00083, Penate 015308.

171. Hampden County Superior Court Judge Mary-Lou Rup issued an order on July 23, 2013, stating that:

> an evidentiary hearing must be conducted on the following issues: (i) if Ms. Farak and/or the Amherst drug lab engaged in egregious misconduct in the handling, storage, and analysis of suspected narcotics during the time period between November 2011 and January 2012, when the Amherst drug lab had custody and control of the alleged substances related to the defendant's case; (2) if such misconduct has substantially prejudiced the defendant or irreparably harmed his right to a fair trial; or (3) if such egregious misconduct was deliberate and intentional, warranting a prophylactic sanction of dismissal.

**Ex. 78**, Mem. on Def.'s Mot. to Dismiss & Motion in Limine to Preclude Evidence of Expert Visual Identification of Purported Narcotics, Commonwealth v. Penate, 1279CR00083, Penate 008524.

172. Judge Rup's order reminded the HCDAO of its "obligation to seek [evidence] from government agencies (including the Office of the Attorney General) and to produce exculpatory evidence that may be favorable to [Plaintiff's] case, and not simply turn a blind eye to what is not in its immediate control." *Id.*

**"ANY DISCOVERY YOU NEED"**

173. Starting on or about July 22, 2013, the Honorable C. Jeffrey Kinder issued a series of orders consolidating unrelated post-conviction cases for an evidentiary hearing to determine "the timing and scope of Sonja Farak's alleged misconduct." **Ex. 79**, Pl.s' Dep. Ex. 103, Kinder Orders; Flannery Dep. 46:4-47:3.

174. On August 16, 2013, with the assistance of support staff, Flannery uploaded all of the discovery provided by the AGO onto a "Box" site that was subsequently made available to counsel representing Farak defendants in the upcoming hearing scheduled by Judge Kinder. **Ex. 80**, Pl.'s Dep. Ex. 116, Box Screenshots; Flannery Dep. 56:2-19.

175. That same day, Flannery informed Kaczmarek this hearing had been scheduled "for 9/9 . . . to define the scope, to the extent possible, of Farak's misconduct." **Ex. 81**, Pl.'s Dep. Ex. 104, Email from Flannery (Aug. 16, 2013; 10:09 am).

176. Flannery predicted the hearing would "include the testimony of some of the investigators and chemists involved in [Kaczmarek's] investigation." Pl.'s Dep. Ex. 104, Email from Flannery (Aug. 16, 2013; 10:09 am).

177. Sensitive to the complications this could present, Flannery made a commitment to keep Kaczmarek "in the loop." Pl.'s Dep. Ex. 104, Email from Flannery (Aug. 16, 2013; 10:09 am).

178. In that same email, Flannery stated: "I've had numerous requests for the photos that were taken during the search of Farak's vehicle. I spoke to Sgt. Ballou who tells me he can provide those photos to me directly but I want to make sure I have your permission first." Pl.'s Dep. Ex. 104, Email from Flannery (Aug. 16, 2013; 10:09 am).

179. These photos were referenced in Thomas' police report and had not previously been provided to the HCDAO. Flannery Dep. 59:24-60:12.

180. On August 21, 2013, Ballou sent the following email to Kaczmarek (with a cc to Irwin):

> Hampden County ADA Frank Flannery advised me that he needs me to testify in a hearing in front of Judge Kinder on September 9th regarding the FARAQ case. He said that Judge Kinder has consolidated a number of motions from defense attorney's regarding drugs tested by FARAQ.

> In preparation for this motion, ADA Flannery found he doesn't have our photos from the SW of Faraq's car. Is it alright with you if I give him a disc with the photos? I'm guessing he'll be asking for other things as we move along.

**Ex. 82**, Email from Ballou (Aug. 21, 2013; 4:38 pm).

181. The next morning, Kaczmarek responded to Flannery's August 16 email by telling him Ballou would give him "any discovery you need." **Ex. 83**, Pl.'s Dep. Ex. 115, Email from Kaczmarek (Aug. 22, 2013; 6:40 am).

182. *Flannery "reasonably expected that by the time of the hearing, the AGO would have provided him with all of its Farak-related evidence."* Hearing Report ¶ 360 (July 9, 2021).

183. By this point, Flannery had no doubt that Kaczmarek and her office had the obligation repeatedly referenced in her correspondence. Flannery Dep. 42:6-43:1.

184. During her communications with him, Kaczmarek: (i) never expressed an unwillingness to provide discovery in her possession; (ii) demonstrated an understanding that Flannery and his colleagues in the HCDAO had obligations to disclose exculpatory evidence under *Brady v. Maryland*; and (iii) appeared committed to providing Flannery with everything he and his fellow ADAs needed to satisfy their *Brady* obligations. Flannery Dep. 30:9-11, 31:17-24.

185. In fact, with respect to his discovery obligations to Farak defendants, Flannery considered the AGO a member of his prosecution team. **Ex. 84**, Pl.'s Dep. Ex. 94, Flannery BBO Testimony 93:8-13 (Sept. 25, 2020); see also *id. at* 173:22-175:5.

186. *For her part, "Kaczmarek knew what Flannery's role was, and knew that Flannery was relying on her to provide him with these materials."* Hearing Report ¶ 155 (July 9, 2021).

187. *However, "[a]side from agreeing to release the photos, . . . Kaczmarek took no steps to ensure that, prior to September 9, Flannery would be given all of the potentially exculpatory Farak material."* Hearing Report ¶ 157 (July 9, 2021).

**ASSISTING BOSSE**

188. On August 23, 2013, Kaczmarek received a phone call from John Bosse (Bosse), a prosecutor in the Berkshire County District Attorney's Office (BCDAO). **Ex. 85**, Pl.'s Dep. Ex. 228, Bosse BBO Testimony 227:6-228:4 (Sept. 30, 2020); Kaczmarek Dep. 218:3-12.

189. Bosse had been tasked with handling his office's response to Rule 30 motions filed by Farak Defendants. Pl.'s Dep. Ex. 228, Bosse BBO Testimony 221:15-19.

190. On or about July 18, 2013 and August 8, 2013, Attorney Karen Morth (Morth) had sent Bosse discovery letters on behalf of a post-conviction Farak defendant. Pl.'s Dep. Ex. 228, Bosse BBO Testimony 221:20-222:19; **Ex. 86**, BBO Ex. 194, Letter from Morth (July 18, 2013); **Ex. 87**, BBO Ex. 193, Letter from Morth (Aug. 8, 2013).

191. Among other things, the August 8 discovery letter stated:

> Regarding Sergeant Ballou's testimony about the "writings" and "lab test paperwork" found in Ms. Farak's car at page 14 of the 2/28/13 Grand Jury Minutes, **would you be so kind as to provide me with copies of any additional documents found in Ms. Farak's car dated 2010 or earlier, and/or that are exculpatory in Mr. Manson's case because they indicate Ms. Farak may have been tampering with evidence prior to 2013?**

Letter from Morth, pg. 1 (Aug. 8, 2013) (emphasis added).

192. During the phone call, Kaczmarek concluded that Bosse "didn't know how to respond to a Motion to Vacate a Guilty Plea. So [she] offered to ask around the DA's Office to see if [she] could get a sample one for him." **Ex. 88**, Pl.'s Dep. Ex. 203, Kaczmarek BBO Testimony 142:4-19 (Nov. 13, 2020).

193. At 11:04 am, Kaczmarek forwarded to Bosse the opposition to the Rule 30 motion she received from DeMore. Kaczmarek Dep. 252:21-254:3.

194. Kaczmarek testified that she took this action "to assist" Bosse by giving him "a model" he could use in opposing requests for post-conviction relief. Pl.'s Dep. Ex. 128, Kaczmarek BBO Testimony 226:23-227:4 (Nov. 23, 2020).

195. *At the end of the phone call, Kaczmarek "agreed to discuss the discovery requests [Berkshire ADA John] Bossé had received" when he came to Boston for an argument at the Appeals Court on September 4, 2013.* Hearing Report ⁋ 184 (July 9, 2021).

196. At 11:53 am, Bosse sent Kaczmarek an email stating, in pertinent part:

> Thanks for speaking with me today. **I faxed over the two letters with the discovery requests.**
>
> Also, attached, please find three memorandums that I have drafted in Farak cases. **I look forward to meeting you on September 4** in Boston around 11:30 a.m. **to discuss the discovery requests**.

**Ex. 89**, Pl.'s Dep. Ex. 213, Email from Bosse (Aug. 23, 2013; 11:53 am) (emphasis added).

197. *"[W]hen Bossé arrived, Kaczmarek had the two discovery request letters he had earlier sent her, and looked at them in his presence."* Hearing Report ⁋ 185 (July 9, 2021).

198. *Kaczmarek "told Bossé that all relevant discovery had been produced when she knew this was not true."* Hearing Report ⁋ 361 (July 9, 2021).

199. On September 30, 2013, Bossé sent Kaczmarek a draft of the letter he proposed to send to Morth, summarizing the conversation he had had with Kaczmarek about discovery. **Ex. 90**, Pl.'s Dep. Ex. 229, Email from Bosse (Sept. 30, 2013; 8:48 am).

200. The draft of the letter stated, in pertinent part:

> On September 4, 2013, Assistant Attorney General Anne Kaczmarek informed me that all relevant discovery from the Farak prosecution has been provided to the Berkshire District Attorney's Office. Thus, the Commonwealth would object to the additional discovery inquiries on grounds that the Attorney General's Office has released all relevant discovery in the Farak prosecution.

**Ex. 91**, Pl.'s Dep. Ex. 230, Attachment to Email from Bosse (Sept. 30, 2013; 8:48 am).

201. Kaczmarek did not respond. Pl.'s Dep. Ex. 203, Kaczmarek BBO Testimony 142:4-19 (Nov. 13, 2020).

202. On or about October 2, 2013, Bosse sent the letter to Morth. **Ex. 92**, BBO Ex. 198, Letter from Bosse (Oct. 2, 2013).

203. *"Kaczmarek's statement to Bossé that all relevant discovery had been provided was materially false and intentionally misleading. Kaczmarek knowingly failed to disclose the mental health worksheets, . . . the 2005 light cocaine case, and Farak's urinalysis."* Hearing Report ⁋ 186 (July 9, 2021).

### SUBPOENAS TO KACZMAREK AND BALLOU AND THE FIRST REQUEST TO INSPECT THE EVIDENCE

204. The evidentiary hearing on Plaintiff's motion to dismiss was initially scheduled for August 27, 2013. **Ex. 93**, Pl.'s Dep. Ex. 202, Penate Subpoena for Kaczmarek.

205. Prior to that date, Plaintiff served Ballou and Kaczmarek with subpoenas to testify at the hearing. **Ex. 94**, Pl.'s Dep. Ex. 201, Email from Ballou (Aug. 23, 2013; 3:35 pm); Pl.'s Dep. Ex. 202, Penate Subpoena for Kaczmarek.

206. Kris Foster (Foster), a new line AAG in the Appeals Unit, received the assignment to respond to the Penate subpoenas. **Ex. 95**, Foster BBO Testimony 31:21-32:2 (Oct. 27, 2020).

207. Kaczmarek's subpoena for the Penate case directed her to bring "Copies of any and all inter and intraoffice correspondence pertaining to the scope of evidence tampering and/or deficiencies at the Amherst Drug Laboratory from January 18, 2013 to the present." Pl.'s Ex. 202, Penate Subpoena for Kaczmarek.

208. *The ServiceNet Diary Card Ballou sent on February 14, 2013 was among the undisclosed documents Kaczmarek possessed that would have been responsive to this request.* Hearing Report ¶ 281 (July 9, 2021).

209. On August 29, 2013, Plaintiff's counsel sent an email to Foster and Flannery asking for assistance in "making arrangements" to "inspect the 60 items seized during the course of the Farak investigation." **Ex. 96**, Pl.'s Dep. Ex. 217, Email from Ryan (Aug. 29, 2013; 8:29 pm).

210. The next morning, Foster forwarded the correspondence to Kaczmarek and asked if she had "any thoughts." Pl.'s Dep. Ex. 217, Email from Foster (Aug. 30, 2013; 9:34 am).

211. Kaczmarek knew the 60 seized items included the originals of the mental health worksheets. Kaczmarek Dep. 186:15-19.

212. Kaczmarek stated "several times" that she did not want [Plaintiff's counsel] to be able to view the physical evidence. Kaczmarek Dep. 186:21-187:2.

213. Foster subsequently responded to Plaintiff's counsel that because the Farak investigation was ongoing, she could permit an inspection. **Ex. 97**, Email from Foster (Aug. 30, 2013).

214. On the afternoon of Friday, August 30, 2013, Ballou sent an email to Kaczmarek (with a cc to Irwin) stating that he had just received a subpoena to testify at the hearing on September 9th "ADA Flannery [had] warned [him] about." **Ex. 98**, Pl.'s Dep. Ex. 22, Email from Ballou (Aug. 30, 2013; 2:19 pm).

215. The subpoena Ballou attached to his email commanded him to bring "a copy of all documents and photographs pertaining to the investigation of Sonja J. Farak and the Amherst drug laboratory." **Ex. 99**, Pl.'s Dep. Ex. 23, Attachment to Email from Ballou (Aug. 30, 2019; 2:19 pm).

216. The following Tuesday morning, Kaczmarek forwarded Ballou's email to Randy Ravitz (Ravitz) and Susanne Reardon (Reardon), the Chief and Deputy Chief of the AGO's Appeals Unit. **Ex. 100**, Pl.'s Dep. Ex. 218, Email from Kaczmarek (Sept. 3, 2013; 8:42 am).

217. Kaczmarek opined that "Sgt. Ballou will not be very helpful" in Judge Kinder's quest "to determine the scope of Farak's malfeasance." Pl.'s Dep. Ex. 218, Email from Kaczmarek (Sept. 3, 2013; 8:41 am).

218. Later that morning, when Verner raised the possibility of moving to quash Ballou's subpoena, Kaczmarek responded:

> I told that the judge wants to come to the bottom of the issues mentioned below making it unlikely he will allow a motion to quash. As long as the judge has set up the scope of the motion & I am confident that Ballou will be pretty unhelpful in what the judge is trying to do- do we just let Ballou go?

Pl.'s Dep. Ex. 218, Email from Kaczmarek (Sept. 3, 2013; 9:03 am).

219. Flannery was not cc'ed on Foster's August 30 email denying the request of Plaintiff's counsel to inspect the evidence. See *supra* ¶ 213.

220. Flannery had no objection to this request and passed it along to Kaczmarek. Pl.'s Dep. Ex. 94, Flannery BBO Testimony 71:10-72:16.

221. Before receiving Kaczmarek's response, Flannery asked Ballou to make arrangements for a team of defense counsel to view the evidence. **Ex. 101**, Pl.'s Dep. Ex. 249, Email from Ballou (Sept. 3, 2013; 5:20 pm).

222. When Ballou told Kaczmarek about Flannery's request to arrange an inspection of the evidence, she responded by stating: "No. This is still an open criminal case. I do not want defense attorneys going through evidence on a fishing expedition." Pl.'s Dep. Ex. 249, Email from Kaczmarek (Sept. 3, 2013; 5:38 pm).

223. *"Kaczmarek, in her role as Farak's lead prosecutor, clearly saw herself as in charge of and in control of all of the Farak evidence, including evidence in the custody and control of the MSP. Furthermore, Kaczmarek knew that others saw her as the gatekeeper with regard to access to Farak evidence."* Hearing Report ¶ 179 (July 9, 2021).

224. On the morning of September 4, 2013, Kaczmarek spoke to Flannery and told him she was unwilling to provide access to the physical evidence to counsel for Farak defendants. Flannery Dep. 63:23-64:9.

225. Kaczmarek did not invite Flannery to inspect the evidence himself or offer to make copies of the assorted lab paperwork listed in the search warrant return. Flannery Dep. 68:20-69:3.

226. At Verner's request, a "Farak Subpoena mtg." took place in his office at 10:30 am on September 6, 2013. **Ex. 102**, BBO Ex. 54, Email from Verner (Sept. 5, 2013; 12:17 pm); **Ex. 103**, BBO Ex. 56, Farak Subpoena mtg. (Sept. 6, 2013; 10:30 am – 11:00 am).

227. By this point, Verner believed that Kaczmarek had already given the DAs copies of "the mental health worksheets that Joseph Ballou sent . . . on February 14th." Verner Dep. 131:20-132:12.

228. Foster attended the meeting and recalled that the "mantra" was, "This isn't Annie Dookhan. They're trying to make this Annie Dookhan." **Ex. 104**, Foster Bar Counsel Interview 59:1-5 (July 2, 2018).

229. Kaczmarek made light of the notion that Farak's computer might contain relevant evidence. "Why would we search her computer?" she asked. "There's not going to be anything there. This isn't Annie Dookhan." Foster Bar Counsel Interview 76:8-13 (July 2, 2018).

**THE KINDER HEARING**

230. At the outset of the hearing on September 9, 2013, Judge Kinder denied Foster's motion to quash the Ballou subpoena insofar as it related to Ballou's testimony. **Ex. 105**, Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 15:1-13 (Sept. 9, 2013).

231. With respect to her request for a protective order, Foster confessed to Judge Kinder that she had not reviewed any documents in Ballou's possession and asserted that Ballou had not brought his file to the hearing. Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 15:14-19:23 (Sept. 9, 2013).

232. Rather than delay the hearing, Judge Kinder admonished Foster, then instructed her to review Ballou's file and submit copies of any undisclosed documents for an *in camera* review. Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 15:1-13 (Sept. 9, 2013).

233. During questioning by Plaintiff's counsel, Ballou testified: "I believe everything pertaining to the Farak investigation has been turned over. I am not aware of anything else." Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 150:11-151:7 (Sept. 9, 2013).

234. At the end of the hearing, Plaintiff's counsel referenced Flannery's unsuccessful effort to arrange for an inspection of the physical evidence and made an oral motion for "access to

the evidence that was seized from Ms. Farak's car." Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 245:14-246:6 (Sept. 9, 2013).

235. Judge Kinder instructed the parties to "try to work through some agreement about viewing, physically, the evidence, if that can be done." Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 246:7-20 (Sept. 9, 2013).

**"HER MENTAL HEALTH WORKSHEETS"**

236. The next morning, Foster sent an email to Verner, Kaczmarek and others informing them of Judge Kinder's order with respect to the *in camera* review. **Ex. 106**, Pl.'s Dep. Ex. 287, Email from Foster (Sept. 10, 2013; 9:43 am).

237. Verner responded by posing one question to Kaczmarek and another to Foster. Pl.'s Dep. Ex. 287, Email from Verner (Sept. 10, 2013; 9:46 am).

238. "Anne," Verner wrote, "can you get a sense from Joe what is in his file? Emails etc? Kris, did the judge say his 'file' or did he indicate Joe had to search his emails etc?" Pl.'s Dep. Ex. 287, Email from Verner (Sept. 10, 2013; 9:46 am).

239. Foster and Kaczmarek responded within seconds of each other, creating two branches of the email thread. Foster BBO Testimony 102:2-103:24 (Oct. 27, 2020)

240. Foster wrote that while it was unclear what Judge Kinder was "looking for . . . [,] Sergeant Ballou did testify that he thinks everything in his file has already been turned over." Pl.'s Dep. Ex. 287, Email from Foster (Sept. 10, 2013; 9:50 am).

241. Seconds later, Kaczmarek stated:

> Joe has all his reports and all reports generated in the case. All photos and videos taken in the case. His search warrants and returns. Copies of the paperwork seized from her car regarding new[s] articles and her *mental health worksheets*.

**Ex. 107**, Pl.'s Dep. Ex. 204, Email from Kaczmarek (Sept. 10, 2013; 9:51 am) (emphasis added).

242. *Participants in the email thread subsequently had a "short meeting" at which "Kaczmarek told Foster and the other attendees that everything had been turned over."* Hearing Report ⁋ 237 (July 9, 2021).

243. *"Kaczmarek made no effort to clearly explain what she knew, i.e., that the materials in Ballou's trial file were but a small subset of the larger universe of evidence in Springfield, and that neither she nor anyone in the AGO had reviewed the evidence in Springfield."* Hearing Report ⁋ 238 (July 9, 2021).

244. In a letter to Judge Kinder dated September 16, 2013, Foster stated that "every document in [Ballou's] his possession has already been disclosed. . . . Therefore, there is nothing for the Attorney General's Office to produce for your review . . . ." **Ex. 108**, BBO Ex. 117, Letter from Foster (Sept. 16, 2013).

**"WHY IS THAT EVIDENCE RELEVANT TO HIS CASE?"**

245. On that same date, Plaintiff's counsel sent Foster an email asking this question: "Has your office determined what it's position will be with respect to viewing the seized evidence?" **Ex. 109**, Pl.'s Dep. Ex. 158, Email from Ryan (Sept. 16, 2013; 4:45 pm).

246. This was the third email in six days seeking permission to inspect the physical evidence. Pl.'s Dep. Ex. 158, Email from Ryan (Sept. 10, 2013; 6:12 pm); Pl.'s Dep. Ex. 158, Email from Ryan (Sept. 12, 2013; 11:49 am).

247. Foster immediately forwarded the September 16 email to Kaczmarek for her "[t]houghts." Pl.'s Dep. Ex. 158, Email from Foster (Sept. 16, 2013; 4:45 pm).

248. "No," Kaczmarek wrote responded. "Why is this relevant to this case. I really don't like him." Pl.'s Dep. Ex. 158, Email from Foster (Sept. 16, 2013; 6:49 pm).

249. Foster sent Plaintiff's counsel an email conveying the AGO's position that "viewing the seized evidence [was] irrelevant to any case other than Farak's." **Ex. 110**, Rice Dep. Ex. 28, Email from Foster (Sept. 17, 2013; 9:28 am).

**PLAINTIFF'S MOTION TO COMPEL**

250. On September 17, 2013, Plaintiff served the MSP with a motion to compel that had previously been provided to Velazquez and Foster on September 6, 2013. **Ex. 111**, BBO Ex. 142, Fax to MSP (Sept. 17, 2013), AGOFRK002657-2680; **Ex. 112**, Email from Ryan (Sept. 6, 2013; 10:44 am).

251. The motion sought an order directing the AGO, MSP, DPH and/or the EOPSS to provide eleven categories of documentation including: "Copies of any and all inter- and/ or intra-office correspondence from January 18, 2013 to the present pertaining to the scope of evidence tampering and/or deficiencies at the Amherst Drug Laboratory." BBO Ex. 142, Fax to MSP (Sept. 17, 2013), AGOFRK002659.

252. On September 27, 2013, MSP General Counsel Sean Farrell (Farrell) sent Kaczmarek a copy of Plaintiff's motion and asked her "whether any of the items being sought in this motion have already been turned over." **Ex. 113**, Pl.'s Dep. Ex. 222, Email from Farrell (Sept. 27, 2013; 10:11 am).

253. Kaczmarek sent the following response:

> Hi Sean-We also received this gem. We have turned over #1 and #2.
>
> We did not do most of this stuff in our investigation- such as getting Farak's emails, phones info, personnel records. Everything other than 1 and 2 is a NO from us.

> Do not give this attorney an inch, he is very rude and aggressive. He has also misrepresented us in court so make sure all your correspondence is in writing.

**Ex. 114,** Pl.'s Dep. Ex. 224, Email from Kaczmarek (Sept. 27, 2013; 1:30 pm).

254. *This email to Farrell "falsely implied that the AGO had no information responsive to the Penate requests in its files."* Hearing Report ¶ 290 (July 9, 2021).

255. *"Kaczmarek failed to disclose that she, Verner, Ballou and others had exchanged correspondence pertaining to the scope of Farak's evidence tampering."* Hearing Report ¶ 290 (July 9, 2021).

256. *"Kaczmarek also failed to disclose that she and Ballou had the mental health worksheets."* Hearing Report ¶ 290 (July 9, 2021).

257. *In sum, "Kaczmarek's statement to Farrell was materially misleading."* Hearing Report ¶ 290 (July 9, 2021).

258. *"Not only did Kaczmarek fail to disclose information; . . . she intentionally misrepresented the evidence she had, and worked to actively shut down inquiry and deflect zealous work by Farak defendants' counsel who were doing their jobs by requesting evidence of Farak's misconduct."* Hearing Report ¶ 291 (July 9, 2021).

259. *"Her flippant responses extended to evidence she had not even reviewed."* Hearing Report ¶ 291 (July 9, 2021).

**FIRST PUBLIC RECORDS REQUEST FOR ASSORTED LAB PAPERWORK**

260. On or about June 18, 2013, Morth made a public records request to the AGO and MSP "for copies or photographs of all documents," including but "not limited to . . . the 'Assorted lab paperwork' identified as items 4, 5, 8 and 14 in the search warrant

execution 13-034-4804-1003 of Ms. Farak's car." **Ex. 115,** Letter from Morth, pp. 1, 2 (June 18, 2013), AGOFRK003729, 003730.

261. When it was brought to her attention, Kaczmarek said "[t]he Farak case is on-going" and the AGO claimed the materials Morth requested were exempt from disclosure. **Ex. 116**, Pl.'s Dep. Ex. 196, Email Thread (June 24-25, 2013).

262. On September 30, 2013, AAG Lorraine Tarrow (Tarrow) sought Kaczmarek's input on Morth's appeal to the Supervisor of **Ex. 117**, BBO Ex. 305, Email from Tarrow (Sept. 30, 2013; 12:10 pm); **Ex. 118**, BBO Ex. 196, Morth Public Records Appeal.

263. In response, Kaczmarek stated: "The items that this attorney is seeking is all evidence in my on-going criminal case. I am not opening up my evidence for a fishing expedition. These discovery issues are currently being litigated in court with Judge Kinder in Hamden County. *The attorney cannot even state why these documents are relevant to her defense. The AGO is opposing turning over all of our evidence to other similarly placed defendants.*" BBO Ex. 305, Email from Kaczmarek (Sept. 30, 2013; 1:59 pm) (emphasis added).

**THE AGO' S MOTION FOR CLARIFICATION**

264. After Foster conveyed Kaczmarek's views on the irrelevance of the physical evidence to Plaintiff's case, he filed a motion to inspect. **Ex. 119**, Defendant's Motion to Inspect, Commonwealth v. Penate, 1279CR00083, Penate 015934.

265. On October 2, 2013, Plaintiff's counsel, Velazquez, Foster, and Farrell appeared before Judge Kinder for a non-evidentiary hearing on Plaintiff's discovery motions, including the motion to inspect. **Ex. 120**, BBO Ex. 143, Kinder Non-Evidentiary Hr'g (Oct. 2, 2013).

266. Judge Kinder ultimately denied the motion to inspect physical evidence, writing: "DENIED. I am not persuaded that Rule 17(a)(2) permits a third-party to inspect evidence held in a pending criminal case. Particularly under the circumstances of this case where the physical evidence has been described in detail for the defendant and photographs of that evidence have been provided." **Ex. 121**, Carey Hr'g Ex. 217, Ruling on Defendant's Motion to Inspect, Commonwealth v. Penate, 1279CR00083, Penate 013831.

267. *"The wording of Judge Kinder's October 2, 2013 Order demonstrates the degree to which he had been misled. The 'physical evidence' had not been 'described in detail,' nor had it all been photographed. Kaczmarek knew, even if Foster did not, that important documentary evidence existed and had not been produced."* Hearing Report ¶ 308 (July 9, 2021).

268. Judge Kinder allowed Plaintiff's motion to compel insofar as it sought "production of . . . any correspondence related directly to drug use or evidence of tampering by Sonja Farak." **Ex. 122,** Order on Defendant's Motion to Compel, Commonwealth v. Penate, 1279CR00083, Penate 008526.

269. On October 9, 2013, Kaczmarek sent an email to ADAs in the four western counties expressing grave concerns about Judge Kinder's order to turn over "inter- and intra communications." **Ex. 123**, BBO Ex. 244, Email from Kaczmarek (Oct. 9, 2013; 3:39 pm).

270. Following a conference call with ADAs on October 16, 2013, Kaczmarek sent an email giving two of them "a heads-up" about a motion for clarification her office intended to file. **Ex. 124**, BBO Ex. 79, Email from Kaczmarek (Oct. 21, 2013; 3:37 pm).

271. Kaczmarek noted that "in addition to work product and investigative privilege, we also argue that Rule 17 wasn't properly invoked since your offices were not given notice. As soon as I have a final copy of our motion, I will forward it to you." BBO Ex. 79, Email from Kaczmarek (Oct. 21, 2013; 3:37 pm).

272. On the morning of October 22, 2013, Kaczmarek sent an email to Foster with the heading, "can I get a copy of the final Penate memo" and conveyed her plan to "send[] it to the Western DAs." **Ex. 125**, BBO Ex. 84, Email from Kaczmarek (Oct. 22, 2013; 9:42 am).

273. *"After Kaczmarek reviewed the draft Motion for Clarification, she failed to ensure that all potentially exculpatory information known to her had been turned over to the district attorneys."* Hearing Report ¶ 315 (July 9, 2021).

274. Kaczmarek forwarded the final version of the motion to the DAOs shortly after receiving it. **Ex. 126**, BBO Ex. 85, Email from Kaczmarek (Oct. 22, 2013; 12:04 pm).

275. Section IV sought clarification that Kinder's order did "not extend to and/or from Certain District Attorney's offices where they did not receive notice or an opportunity to be heard." **Ex. 127**, AGO Motion for Clarification 26, Commonwealth v. Penate, 1279CR00083.

276. According to the pleading, the "failure to make service was particularly inappropriate with respect to the Hampden District Attorney's Office." AGO Motion for Clarification 27, Commonwealth v. Penate, 1279CR00083.

277. As previously noted, a copy of Plaintiff's motion was served on Velazquez via email on September 6, 2013, and Velazquez appeared at a hearing on October 2, 2013, where Judge Kinder heard argument on the motion. *See supra* ¶¶ 250, 265.

278. Judge Kinder responded to the request for clarification on October 23, 2013. **Ex. 128**, BBO Ex. 134, Order Clarifying Partial Allowance of Defendant's Rule 17 Motion for Production of Documents, Commonwealth v. Penate, 1279CR00083 (Oct. 23, 2013), AGOFRK002805.

279. "It was my intention," he wrote, "to order the production of any correspondence that shows knowledge by any state employee of Farak's drug use or evidence tampering before the criminal investigation of Farak was initiated on January 18, 2013." Order Clarifying Partial Allowance of Defendant's Rule 17 Motion for Production of Documents, pg. 2, Commonwealth v. Penate, 1279CR00083 (Oct. 23, 2013), AGOFRK002806.

**THE DENIAL OF PLAINTIFF'S MOTION TO DISMISS**

280. On November 4, 2013, Judge Kinder denied Plaintiff's motion to dismiss. **Ex. 129**, Pl.'s Dep. Ex. 51, Mem. of Decision & Order on Def.'s Mot. to Dismiss Counts 1-10 and 13, Commonwealth v. Penate, 1279CR00083.

281. Judge Kinder ultimately concluded that while there was "powerful evidence that Farak was stealing cocaine and replacing it with other substances," there was "insufficient evidence before [him] that . . . that she was engaged in misconduct in November 2011, and January of 2012, when the samples in this case were tested." Pl.'s Dep. Ex. 51, Mem. of Decision & Order on Def.'s Mot. to Dismiss Counts 1-10 and 13, pg. 11, Commonwealth v. Penate, 1279CR00083.

282. To reach this conclusion, Judge Kinder relied on what he believed was "*all* of the physical evidence seized in connection with the criminal investigation of Farak." Pl.'s

Dep. Ex. 51, Mem. of Decision & Order on Def.'s Mot. to Dismiss Counts 1-10 and 13, pg. 11, Commonwealth v. Penate, 1279CR00083 (emphasis added)

**PLAINTIFF'S TRIAL**

283. On November 13, 2013, Plaintiff served Kaczmarek and Ballou with trial subpoenas. See **Ex. 130**, AGO's Mem. of Law in Support of Mot. to Quash Kaczmarek Subpoena, Commonwealth v. Penate, 1279CR00083 (Nov. 25, 2013), Penate 015670; **Ex. 131**, AGO's Mem. of Law in Support of Mot. to Quash Ballou Subpoena, Commonwealth v. Penate, 1279CR00083 (Nov. 25, 2013), Penate 015659.

284. Foster filed motions to quash. The memorandum of law submitted in support of the Kaczmarek motion stated:

> The testimony the defendant apparently seeks from AAG Anne Kaczmarek either could be obtained from other sources or is irrelevant. The drugs in the defendant's case were seized in October and November of 2011. It appears that the defendant is going to argue that Farak may have tampered with the drugs in his case, by attempting to elicit from AAG Kaczmarek that the allegations against Farak date back much further than the roughly four months before Farak's arrest that the AGO alleges. This is merely a fishing expedition. There is nothing to indicate that the allegations against Farak date back to the time she tested the drugs in the defendant's case. Therefore, her testimony would be irrelevant and unhelpful to the Court.

AGO's Mem. of Law in Support of Mot. to Quash Kaczmarek Subpoena, Commonwealth v. Penate, 1279CR00083 (Nov. 25, 2013), Penate 015675.

285. Judge Page allowed the motions to quash. **Ex. 132**, Email from Foster (Dec. 5, 2013; 9:28 am).

286. Prior to Plaintiff's trial, Velazquez filed a motion to keep him from introducing any Farak-related evidence. Velazquez Aff. ¶ 27.

287. Judge Tina Page allowed this motion. Velazquez Aff. ¶ 27.

288. Jury selection in Plaintiff's case began on December 9, 2013. Velazquez Aff. ¶ 29.

289. When Velazquez rested, Judge Page allowed Plaintiff's motion for required findings of not guilty with respect to Counts 11-13, charging firearm and ammunition-related offenses. Docket for Commonwealth v. Penate, 1279CR00083, Penate 015311; **Ex. 133**, Penate Trial 136:5-137:18 (Dec. 11, 2013).

290. Five drug charges went to the jury on the morning of Thursday, December 12, 2013. **Ex. 134**, Penate Trial Transcript 72:24 (Dec. 12, 2013).

291. When court reconvened at 4:01 pm, Judge Page read the following note from the foreperson into the record: "We cannot come to a conclusion and come up with a verdict." Penate Trial Transcript 72:25-73:3 (Dec. 12, 2013).

292. Judge Page instructed the jurors to resume their deliberations. Penate Trial Transcript 77:9-19 (Dec. 12, 2013).

293. At 5:30, she discharged them for the day. Penate Trial Transcript 81:3-25 (Dec. 12, 2013).

294. Deliberations began the following day at 9:15 am. **Ex. 135**, Penate Trial Transcript 3:1-25 (Dec. 13, 2013).

295. Jurors subsequently requested to be instructed on reasonable doubt and elements of possession with the intent to distribute. Penate Trial Transcript 4:3-11 (Dec. 13, 2013).

296. After being reinstructed, the jury resumed deliberations at 10:37 am. Penate Trial Transcript 10:22 (Dec. 13, 2013).

297. At 12:13 pm, Judge Page brought the parties back into the courtroom and stated it was her inclination to read jurors the Tuey-Rodriguez instruction. Penate Trial Transcript 11:20-21 (Dec. 13, 2013).

298. Plaintiff's counsel took the position such an instruction would be premature, and the judge elected not to give it. Penate Trial Transcript 12:19-13:3 (Dec. 13, 2013).

299. After the lunch recess, jurors sent the judge another note asking about a particular evidentiary ruling. Penate Trial Transcript 13:4-20 (Dec. 13, 2013).

300. After receiving instructions on this issue, the jury once again resumed its deliberations; finally, at approximately 2:30 pm, the jury finalized its verdicts. Penate Trial Transcript 16:9-10 (Dec. 13, 2013).

301. The jury acquitted Plaintiff of all but one charge of distributing a Class A substance. Penate Trial Transcript 17:1-19:25 (Dec. 13, 2013); Velazquez Aff. ¶ 32; Docket for Commonwealth v. Penate, 1279CR00083, Penate 015299-15321.)

302. On December 16, 2013, Judge Page sentenced Plaintiff to not less than five years and not more than seven years in state prison. Velazquez Aff. ¶ 32; Docket for Commonwealth v. Penate, 1279CR00083, Penate 015299-15321.

303. Ballou forwarded his colleagues at the AGO a link to a news article about the outcome of the trial with the message: "He got 5-7 years." **Ex. 136**, Pl.'s Dep. Ex. 262, Email from Ballou (Dec. 16, 2013: 6:31 pm).

304. This prompted replies of "Nice" and "Sweet" from Mazzone and Verner. Pl.'s Dep. Ex. 262, Email from Mazzone (Dec. 16, 2013; 8:03 pm); Pl.'s Dep. Ex. 262, Email from Verner (Dec. 16, 2013; 10:26 pm).

**THE PROSECUTION TEAM**

305. Plaintiff filed a Notice of Appeal on December 20, 2013. Paper No. 126, Docket for 1279CR00083, Penate 015312.

306. Farak pled guilty to the charges against on January 6, 2014. Farak Answer ¶ 381

307. In a self-evaluation dated February 28, 2014, Kaczmarek stated that "[t]he Dookhan and Farak investigations required close collaboration with other members of the investigative team, updates to interested parties within the AGO, and regular communications with affected agencies outside of the AGO." **Ex. 137**, Pl.'s Dep. Ex. 178, Kaczmarek Self-Evaluation pg. 1 (Feb. 28, 2014).

308. According to Kaczmarek, "Most of the discovery obtained in the Dookhan and Farak cases needed to be released to the District Attorney's offices statewide." Pl.'s Dep. Ex. 178, Kaczmarek Self-Evaluation pg. 2 (Feb. 28, 2014).

309. Kaczmarek portrayed herself as "the point person in determining whether the information had been disseminated and gathering further information if needed." Pl.'s Dep. Ex. 178, Kaczmarek Self-Evaluation pg. 2 (Feb. 28, 2014).

310. Paul Cassell is a former federal prosecutor, former federal judge, and current professor of law at the University of Utah School of Law. **Ex. 138**, Paul Cassell Curriculum Vitae.

311. Professor Cassell has reviewed dozens of Farak-related emails exchanged with ADAs throughout the Commonwealth, letters Kaczmarek and Verner wrote to District Attorneys, and pleadings Kaczmarek and ADAs filed concerning the AGO's obligation, duty, and/or responsibility to disclose potentially exculpatory information to DAs. **Ex. 139**, Cassell Report (Apr. 30, 2021); see also **Ex. 140**, Ryan Affidavit (Aug. 20, 2021).

312. In his expert opinion, "there was extensive interaction and cooperation between prosecutors and state police investigators assigned to the AGO and the prosecutors in the District Attorneys' Offices who were prosecuting drug cases, including the criminal case for which Mr. Penate was convicted." Cassell Report at 21-22; see also *id.* at 22 ("[T]he

level of interaction between the AGO and the District Attorneys' Office is clearly far more than one would see in an ordinary criminal case.").

313. Professor Cassell also opined that references by Kaczmarek and others to the AGO's "obligation," "duty," and/or "responsibility" to turn over potentially exculpatory evidence concerned the federal constitutional obligation set forth in *Brady* and its progeny. Cassell Report at 24-25.

**POST-FARAK PLEA REQUESTS FOR ACCESS TO PHYSICAL EVIDENCE**

314. During an interview in 2018, Kaczmarek claimed that shortly after Farak pled guilty, the AGO received a public records request for access to the physical evidence. Kaczmarek Bar Counsel Interview 46 (Aug. 2, 2018).

315. Kaczmarek specifically recalled that AAG Patrick Devlin (Devlin) was the person who received the request and her response was: "All right, Pat. . . . [P]ack all the evidence up and send it to the A.G.'s office . . . and we'll let them go through it." Kaczmarek Bar Counsel Interview 46 (Aug. 2, 2018).

316. The public records request to which she referred did not come to Kaczmarek's attention until May 27, 2014. **Ex. 141**, Email from Tarrow (May 27, 2014; 5:01 pm); **Ex. 142**, Attachment to Email from Tarrow (May 27, 2013; 5:01 pm).

317. The next morning, Hanne Rush (Rush), an AAG in the General Counsel's Office, sent a copy of the request to Caulkins, Bedrosian, and Verner (with cc's to Kaczmarek, Devlin, and others) along with a message stating:

> FYI. We received the attached PRR yesterday from NY attorney Karen Morth for documents related to chemist Sonja Farak's "potential irregular handling of drug evidence in 2010 and earlier."
>
> Ms. Morth represents Stephen Manson, a defendant in Berkshire Superior Court. She made a similar request in 2013 and in response we asserted the

> (f) exemption (investigatory materials) because the case was still open. Ms. Morth now states that because Ms. Farak has been sentenced, she presumes this Office would consider that the exemption no longer applies.
>
> Anne Kaczmarek and Patrick Devlin are working on determining what, if anything, is subject to disclosure. Some, if not all, of the responsive records may be exempt under CORI, but we'll keep you in the loop.

**Ex. 143**, Email from Rush (May 28, 2014; 11:33 am).

318. Previously on March 7, 2014, Foster advised Kaczmarek that Plaintiff's counsel was "now arguing that because Farak's case is over, he should get access . . . to the evidence locker where the evidence against Farak is stored." **Ex. 144**, Email from Foster (Mar. 7, 2014; 1:00 pm), AGOFRK002948.

319. "I figure we're opposing these requests," Foster wrote, "but I wanted to let you know and see if you had any thoughts." Email from Foster (Mar. 7, 2014; 1:00 pm), AGOFRK002948.

320. There is no record of any response by Kaczmarek. Ryan Aff. ¶¶ 13-14.

321. On June 16, 2014, EMC paralegal Lindsay Bonda (Bonda) sent an email to Ballou (with a cc to Kaczmarek) asking him to bring the "actual evidence" in the Farak case to Boston. **Ex. 145**, Email from Bonda (June 16, 2014; 9:31 am).

322. Later that day, Bonda sent an email to Kaczmarek informing her that three "Farak boxes" would be arriving at 10 am on June 17, 2013. **Ex. 146**, Email from Bonda (June 16, 2014; 2:53 pm).

323. On June 23, 2014, Plaintiff's counsel sent the following email to Foster:

> Hi Kris,
>
> Hope this finds you well. I am writing today because I represent a Hampshire County client charged with narcotics offenses and the substances at issue were deposited at the Amherst lab in December, 2012, never assigned to anybody, then brought to a state police lab where they

> were tested. I am moving to dismiss the drug charges and would like to take a look at the evidence seized during the Farak investigation.
>
> I know that the last time I sought to do this, your office objected on the ground that the charges against Ms. Farak were pending and you did not want to introduce the possibility of a chain of custody defense by giving defense counsel access to it.
>
> Now that Ms. Farak has pled guilty and been sentenced, would it be possible for me to view the evidence seized from, among other places, her car?
>
> Sincerely,
>
> Luke

**Ex. 147**, Email from Ryan (June 23, 2014; 10:06 am).

324. Later that day, Foster forwarded the email to Kaczmarek and asked her for "[a]ny thoughts on Luke Ryan's request to see the evidence in Farak's case." **Ex. 148**, Email from Foster (June 23, 2014; 3:05 pm).

325. Once again, there is no record of any response by Kaczmarek. Ryan Aff. ¶¶ 15-16.

326. On June 24, 2014, Devlin sent an email to Kaczmarek (with a cc to Bonda) asking if she was around for "30 minutes tomorrow afternoon to go through the boxes." **Ex. 149**, Email from Devlin (June 24, 2014; 12:50 pm).

327. There is no record of any response by Kaczmarek. Ryan Aff. ¶¶ 17-18.

328. *It was later determined that she did not go through the boxes.* Hearing Report ¶ 325 (July 9, 2021); see also *supra* ¶ 108.

329. Devlin ultimately responded to Morth that items seized from Farak's car were exempt from statutory definition of public records. **Ex. 150**, Email from Rush (July 10, 2014; 3:35 pm); **Ex. 151**, Attachment 1 to Email from Rush (July 10, 2014).

330. This prompted Attorney Morth to bring another appeal to the Supervisor of Records. **Ex. 152**, Letter from Morth (Oct. 7, 2014), AGOFRK007546

**NEWLY DISCOVERED EVIDENCE**

331. On July 21, 2014, Plaintiff's counsel filed a motion to inspect on behalf of Wayne Burston, a Hampshire County Superior Court defendant. **Ex. 153**, Burston Motion to Inspect (July 21, 2014), AGOFRK000716

332. This pleading acknowledged previous efforts to obtain access to this evidence and attached a copy of Judge Kinder's ruling denying Plaintiff's motion to inspect. Burston Motion to Inspect (July 21, 2014), AGOFRK000717.

333. It also stated: "Now that Ms. Farak's prosecution had concluded with convictions for evidence tampering, there is no compelling reason why defendants like Mr. Burston should be forced to accept representations concerning the nature of critical evidence from an agency that consistently turned a blind eye toward anything suggesting that the target of its prosecution committed other crime with which she was not charged." Burston Motion to Inspect (July 21, 2014), AGOFRK000717-718

334. When she received a copy of this pleading from the First Assistant District Attorney for the NWDAO, Kaczmarek said she was "going to forward this to our appeals people. Mostly because today is my last day at the office. I have taken a new position at the trial court." **Ex. 154**, BBO Ex. 298, Email from Kaczmarek (July 21, 2014: 11:29 am).

335. Kaczmarek subsequently forwarded the email to her superiors with this message: "I think we may want to address this issue. Please note that all of the Farak evidence is currently housed here in Ashburton due to a public record request. Devlin knows where the boxes are." **Ex. 155**, Pl.'s Dep. Ex. 288, Email from Kaczmarek (July 21, 2013; 11:31 am).

336. Verner ultimately took the position that Plaintiff's counsel should be granted access to the evidence. Verner Dep. 141:14-21.

337. Following Kaczmarek's departure from the AGO, Foster and Devlin forwarded to Plaintiff's counsel an Assented-to Motion to Inspect that the parties filed on July 31, 2014. **Ex. 156**, Email from Foster (July 30, 2014; 10:20 pm); **Ex. 157**, Pl.'s Dep. Ex. 77, Assented-to Motion to Inspect Physical Evidence, Commonwealth v. Burston, 1380CR00113.

338. On October 30, 2014, Plaintiff's counsel and an investigator inspected the Farak physical evidence in an AGO conference room at One Ashburton Place. **Ex. 158**, Devlin Dep.47:13-48:9 (Mar. 16, 2021).

339. On Saturday, November 1, 2014, Plaintiff's counsel sent the AGO an email with an 11-page letter attached detailing the significance of the previously undisclosed evidence. **Ex. 159**, Pl.'s Dep. Ex. 78, Letter from Ryan (Nov. 1, 2014).

340. On or about November 13, 2014, the AGO disclosed to the district attorneys all 289 pages of documentary evidence recovered from Farak's vehicle. **Ex. 160**, Letter from Verner (Nov. 13, 2014).

341. This included the ServiceNet Diary Card that indicated Farak used drugs at work on December 22, 2011 – the same date she signed a drug certificate in Plaintiff's case. Velazquez Aff. ¶¶ 34-35.

**THE AFTERMATH**

342. In May 2015, Plaintiff filed a motion for a new trial based on this newly discovered evidence. Velazquez Aff. ¶ 36; Docket for 1279CR00083, Penate 015299-15321.

343. In January 2017, Hampden County Superior Court Judge Richard J. Carey allowed Plaintiff's motion for a new trial with the assent of the HCDAO. Velazquez Aff. ¶ 41.

344. In a 127-page decision issued on June 26, 2017, Judge Carey dismissed the case against Plaintiff with prejudice. Dkt. No. 187, Kaczmarek Answer ¶ 395.

345. The HCDAO subsequently vacated every conviction dependent upon a Farak drug certificate and dismissed each such case with prejudice. Velazquez Aff. ¶ 44 (citing *Committee for Public Counsel Services v. Attorney General*, 480 Mass. 700, 704 (2018)).

346. On February 28, 2018, the SJC appointed retired Appeals Court Judge Judd J. Carhart as a Special Master to assist in the dismissal of convictions tainted by Farak's misconduct. **Ex. 161**, Report of the Special Master ¶ 1, <u>Committee for Public Counsel Services v. Attorney General</u>, No: SJ-2017-347 (Sept. 23, 2019).

347. On September 23, 2019, the Special Master filed a report documenting the dismissal of 24,295 drug charges in 16,449 criminal cases. Report of the Special Master ¶ 11, Committee for Public Counsel Services v. Attorney General, No: SJ-2017-347 (Sept. 23, 2019).

348. According to Velazquez, had the AGO produced, during the pretrial phase of Plaintiff's criminal case, the ServiceNet Diary Card documenting drug use by Farak at the Amherst Drug in December 2011, this would have led to the realization that Farak used illicit drugs at the laboratory while entrusted with the samples in Plaintiff's case and that would have resulted in the HCDAO dismissing the drug charges against Plaintiff. (Velazquez Aff. ¶ 49.

349. In other words, the disclosure of the true extent of Farak's misconduct would have led Velazquez and his office to dismiss or file a *nolle prosequi* of all drug charges against Plaintiff in Indictment No. 1279CR00083. Velazquez Aff. ¶ 50.

**THE PLAINTIFF**

By: /s/ Luke Ryan
His Attorney
LUKE RYAN, BBO#664999
SASSON, TURNBULL, RYAN & HOOSE
100 Main Street, 3rd floor
Northampton, MA 01060
(413) 586-4800
lryan@strhlaw.com

By /s/ Paul Rudof
His Attorney
PAUL RUDOF, BBO# 643765
ELKINS, AUER, RUDOF & SCHIFF
31 Trumbull Rd, Suite B
Northampton, MA 01060
(413) 341-2131
paulrudof@elkinslawllc.com

## CERTIFICATE OF SERVICE

I, LUKE RYAN, hereby state that the foregoing was filed through the ECF system and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 20, 2021. A paper copy of the foregoing was sent to Sonja Farak by first-class mail to P.O. Box 192, Easthampton, MA 01027.

/s/ Luke Ryan, Esq.

BBO#664999
Sasson, Turnbull, Ryan & Hoose
100 Main Street, 3rd floor
Northampton, MA 01060
(413) 586-4800
lryan@strhlaw.com

Dated: 8/20/21