UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROLANDO PENATE,<br><br>Plaintiff,<br><br>v.<br><br>ANNE KACZMAREK, KRIS FOSTER, RANDALL RAVITZ, JOSEPH BALLOU, ROBERT IRWIN, RANDY THOMAS, SONJA FARAK, SHARON SALEM, JAMES HANCHETT, JULIE NASSIF, LINDA HAN, ESTATE OF KEVIN BURNHAM, STEVEN KENT, JOHN WADLEGGER, GREGG BIGDA, EDWARD KALISH, and CITY OF SPRINGFIELD<br><br>Defendants. | CIVIL ACTION<br>NO. 3:17-cv-30119-KAR |

**PLAINTIFF'S CONCISE STATEMENT OF UNDISPUTED FACTS FILED IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS JOSEPH BALLOU, ROBERT IRWIN, AND RANDY THOMAS**
**(Local Rule 56.1)**

**PLAINTIFF'S ARREST AND INDICTMENT**

1. On November 15, 2011, Springfield narcotics detectives executed a search warrant at 57 Johnson Street. **Ex. 1**, Affidavit of Eduardo Velazquez ¶ 4.

2. Plaintiff Rolando Penate (Plaintiff) was among those present at the time of the Johnson Street search. Velazquez Aff. ¶ 6.

3. Plaintiff was arrested and charged with *inter alia* three counts of distributing heroin and possessing heroin and cocaine with the intent to distribute. **Ex. 2**, Docket for Commonwealth v. Penate, 1123CR009139.

4. All the substances purchased or seized from 57 Johnson Street were transported to the Amherst Drug Lab and assigned to Sonja Farak (Farak) for analysis. Velazquez Aff. ¶¶ 11-12, **Ex. 3**, Chemist Discovery Packet, Penate 009000-02, 009026-28; 009054.

5. Farak signed drug certificates on December 22, 2011, January 6, 2012, and January 9, 2012, attesting that the substances she analyzed contained heroin or cocaine. **Ex. 4**, Penate Drug Certificates.

6. At the time, the Amherst Drug Lab served as a satellite facility for the main Department of Public Health (DPH) drug lab located at the William A. Hinton State Laboratory Institute in Jamaica Plain (Hinton Drug Lab). Dkt. No. 30, Farak Answer ¶ 144.

7. Starting in late 2004 or early 2005, Farak began stealing and using narcotics at the Amherst Drug Lab. Dkt. No. 30, Farak Answer ¶ 82.

8. During the time Farak was entrusted with samples in Plaintiff's case, she was receiving treatment from clinicians at ServiceNet, Inc. (ServiceNet). Dkt. No. 30, Farak Answer ¶ 144.

9. During the seven-day period from Tuesday, December 20 to Monday, December 26, 2011, Farak completed the following ServiceNet Diary Card.

## ServiceNet Diary Card

Name: ______________________ Week of: __________

| Observe and Describe Emotions: Today I felt (0-5): | 12-26 ---Mon | 12-20 --Tues | 12-21 Wed | 12.22 --Thurs | 12-23 ----Fri | 12-24 --Sat | 12-25 --Sun |
|---|---|---|---|---|---|---|---|
| sadness | 3½ | 2½ | 2½ | 3 | 3 | 2½ | |
| frustration / anger | 4½ / 2½ | 4 / 3½ | 4 / 2 | 4 / 3 | 3 / 2 | 4 / 4 | |
| anxiety | 2½ | 2 | 2½ | | 3 | 2 | |
| "pleasant" emotion | 1 | 2 | 1½ | | 2½ | 1 | |
| shame | 3 | 2 | 3½ | 4 | 4 | 3 | |
| | | | | | | | |
| | | | | | | | |
| Target Behaviors: Today I felt an urge to (0-5): | | | | | | | |
| Kill myself | 0 | 0 | 0 | | | 2 | |
| Injure myself | 0 | 0 | 1 | | | 3 | |
| Drink or take drugs (2 ciders 2 shots) | 3 yes / 3½ yes pot | 1 / 1½ | ½ / 3½ | 1 / 4 yes | 1 / 4 yes | 4 yes (2) / 2½ | 2 / 1 yes (2 glass wine dinner) |
| Binge, purge or not eat | | | | | | | |
| outburst | 5 yes | 4 yes (I'm told about everything, but I don't remember) | 3½ a little [illegible] | | 2 | 5 yes (about game & Lynda's X-mas pres.) | |
| avoid | 5 yes | 4 yes | 4½ yes | | | 3 | |

Write "Yes" in the box next to the number if you acted on an urge.

What did you do today?

Monday: go home - expect to have relaxing day w/ Nikki, but went downhill fast; bed by 6pm

Tuesday: yell @ Nikki (about everything) - get mad about computer / recipe for cheesecake (+ broken spatula), so blow it off [until 9pm]; bed early - hopefully up early tomorrow

Wednesday: leave work ~10:30 to get X-mas stuff done [crossed out]; definitely moments throughout day when I thought I sounded stupid or did something stupid; DBT group: "Throw the shit to the curb"

Thursday: tried to resist using @ work, but ended up failing (I know I should have called, but had thoughts about how I felt last time I called); neighbors B-day; up to midnight wrapping presents.

Friday: go to NY in afternoon. @ work use w/out debating doing it - My thought about its identity issue (i.e. wavering back & forth about whether I want to use).

Saturday: home from NY - mad about missing part of Pats game (out of 3 reasons, 2 are Nikki's, but main one is not) - had 2 ciders during game when mad, but decided not to drink 3rd

Sunday: ______ X-mas in RI

[Margin notes:] want to [illegible] as [illegible] [illegible] using; Nikki drank on way home from NY; Nikki drinking on way home from RI

Dkt. No. 30, Farak Answer ¶ 145; **Ex. 5**, Pl.'s Dep. Ex. 187, Email from Ballou (Feb. 14, 2013; 3.31 pm) - attachment 4, pg. 2.

10. On Thursday, December 22, 2011 – the same day she reported testing a sample in Plaintiff's case – Farak memorialized her use of narcotics at the Amherst Drug Lab by making the following Diary Card entry: "tried to resist using @ work but ended up failing." Dkt. No. 30, Farak Answer ¶ 146.

11. At some point after December 26, 2011, Farak placed the completed Diary Card in the trunk of her automobile. Dkt. No. 30, Farak Answer ¶ 147.

12. Plaintiff was indicted on February 1, 2012. Velazquez Aff. ¶ 15; **Ex. 6**, Docket for Commonwealth v. Penate, 1279CR00083, Penate 015306.

13. Eduardo Velazquez, an Assistant District Attorney (ADA) in the Hampden County District Attorney's Office (HCDAO), was assigned the task of prosecuting Plaintiff. Velazquez Aff. ¶ 16.

## DEVELOPING THE DOOKHAN DISCOVERY MODEL

14. On July 1, 2012, control of Hinton and Amherst Drug Labs transferred from DPH to the Massachusetts State Police (MSP). **Ex. 7**, Robert Irwin Dep. 25:11-15 (Mar. 2, 2020); Dkt. No. 30, Farak Answer ¶ 165.

15. Shortly after the transfer, two Hinton lab employees reported concerns about a former chemist named Annie Dookhan (Dookhan), and the Attorney General's Office (AGO) started an investigation. Irwin Dep. 25:16-20.

16. Detective Lieutenant Robert Irwin (Irwin) was the highest-ranking member of the MSP unit assigned to the AGO. Irwin Dep. 19:14-17.

17. He became the lead investigator in the Dookhan case. Irwin Dep. 25:21-24.

18. On August 28, 2012, Irwin interviewed Dookhan, and she confessed to "dry labbing" and intentionally contaminating samples entrusted to her for analysis. Irwin Dep. 27:14-28:20.

19. Based on this confession and the other evidence of wrongdoing obtained by investigators, the AGO decided to pursue criminal charges against Dookhan. Irwin Dep. 30:7-16.

20. Anne Kaczmarek (Kaczmarek), an Assistant Attorney General (AAG) in the Enterprise and Major Crimes (EMC) unit, became the lead prosecutor in the AGO's criminal case against Dookhan. **Ex. 8**, John Verner Dep. 25:7-8 (Mar. 30, 2021).

21. Sergeant Joseph Ballou (Ballou) and Trooper Randy Thomas (Thomas) worked in the Springfield office of the MSP unit assigned to the AGO. **Ex. 9**, Joseph Ballou Dep. 96:6-11 (Mar. 26, 2021).

22. They assisted Irwin in the Dookhan investigation by interviewing past and present employees of Amherst Drug Lab – including Farak. **Ex. 10**, Randy Thomas Dep. 17:17-20:20 (Mar. 2, 2021).

23. Given the nature of Dookhan's work, it quickly became apparent that her criminal activity called into question the integrity of many drug convictions obtained by District Attorneys throughout eastern Massachusetts. **Ex. 11**, Anne Kaczmarek Dep. 63:8-18 (Mar. 24, 2021).

24. Criminal Bureau Chief John Verner (Verner) and First Assistant Edward Bedrosian (Bedrosian) realized that evidence inculpating Dookhan would be exculpatory in the cases prosecuted by District Attorneys that relied upon testing purportedly performed by Dookhan. Verner Dep. 46:14-47:8.

25. Leaders in the AGO decided to disseminate this potentially exculpatory evidence to the District Attorneys. Verner Dep. 47:16-48:4.

26. During a meeting with district attorneys at the Executive Office of Public Safety and Security (EOPSS), Deputy Attorney General Shelia Caulkins (Caulkins) conveyed the sentiment that it was the AGO's obligation to do so. **Ex. 12**, Pl.'s Dep. Ex. 127, Kaczmarek BBO Testimony 140:3-141:3 (Nov. 6, 2020).

**THE OUTSET OF THE FARAK INVESTIGATION**

27. On Friday morning, January 18, 2013, Sharon Salem (Salem), the evidence officer at the Amherst Drug Lab, advised Supervisor James Hanchett (Hanchett) that two cocaine samples assigned to Farak were not in the main evidence room where they were supposed to be. Dkt. No. 30, Farak Answer ¶ 188.

28. Hanchett eventually called the MSP. Dkt. No. 30, Farak Answer ¶ 190.

29. Detectives in the MSP unit assigned to the Northwestern District Attorney's office (NWDAO) commenced an investigation. **Ex. 13**, Verner BBO Testimony Excerpt 94:1-20 (Oct. 15, 2020).

30. During an interview at the Hampden County Hall of Justice, Farak denied any wrongdoing and investigators asked for permission to search her vehicle. Dkt. No. 30, Farak Answer ¶ 195; **Ex. 14**, Farak Interview (Jan. 18, 2013), Penate 006567.

31. Farak knew her vehicle contained the aforementioned ServiceNet Diary Card, as well as other documents that memorialized her use of narcotics at the Amherst Drug Lab. **Ex. 15**, Sonja Farak Dep. 59:12-17 (Mar. 29, 2021).

32. When Farak refused to consent to a search of the car, investigators impounded the vehicle and towed it back to the MSP barracks in Northampton. Dkt. No. 30, Farak Answer ¶ 196.

33. Irwin was directed to drive out to Western Massachusetts and bring some state police detectives assigned to the AGO to either assist or take over the investigation from the NWDAO. Irwin Dep. 90:2-15.

34. At approximately 7:00 pm, Irwin relayed this directive to Ballou. **Ex. 16**, Pl.'s Dep. Ex. 235, Carey Hr'g Excerpt 137:23-138:19 (Dec. 13, 2016) (testimony of Ballou).

35. Ballou then contacted Thomas and told him to report to the MSP's detective unit assigned to the NWDAO. Thomas Dep. 25:1-26:6 (Mar. 2, 2020).

36. By the time Ballou reached the NWDAO that evening, detectives assigned to that office had already conducted audio-recorded interviews of the four employees at the Amherst Drug Lab and secured Farak's vehicle pending the issuance of a search warrant. Ballou Dep. 206:10-23; **Ex. 17**, Pl.'s Dep. Ex. 236, Ballou BBO Testimony 132:4-133:9 (Oct. 29, 2020); **Ex. 18**, Pl.'s Dep. Ex. 13, Ballou Report ¶ 2 (Feb. 6, 2013).

### THE SEARCH OF FARAK'S VEHICLE

37. Thomas was assigned the task of drafting a search warrant application for Farak's car; he relied on information provided by AGO and NWDAO investigators. Thomas Dep. 27:10-20.

38. At approximately 2:30 a.m., Irwin, Ballou, and Thomas met Clerk Brian St. Onge at the Amherst Police Department, and he issued a search warrant for Farak's vehicle. Thomas Dep. 28:14-29:15; Pl.'s Dep. Ex. 13, Ballou Report ¶ 12 (Feb. 6, 2013); **Ex. 19**, Pl.'s Dep. Ex. 35, Car Warrant Materials, Penate 006992.

39. Irwin, Ballou, and Thomas then proceeded to the garage underneath the Northampton barracks where Farak's car had been towed. Thomas Dep. 32:9-14; **Ex. 20**, Carey Hr'g Excerpt 9 (Dec. 12, 2016) (testimony of Thomas).

40. Trooper Christopher Dolan (Dolan) from Crime Scene Services was summoned to the garage to take photographs while the three detectives executed the warrant. Thomas Dep. 32:15-21; **Ex. 21**, Pl.'s Dep. Ex. 14, Thomas Police Report ¶ 1 (Jan. 24, 2013).

41. Their search began at 3:23 am and ended at 4:56 am. Dkt. No. 21, Thomas Answer ¶ 199; Dkt. No. 185, Irwin Answer ¶ 199; Thomas Dep. 40:9-19.

42. The warrant authorized the seizure of five specific items, including narcotics and records or paperwork associated with controlled substances. Thomas Dep. 30:24-32:4; Pl.'s Dep. Ex. 35, Car Warrant Materials, Penate 006985.

43. Before seizing any document, Irwin, Ballou, and Thomas did a preliminary review of the papers in order to make sure their seizure would comply with the terms of the warrant. Ballou Dep. 19:24-20:10; Irwin Dep. 94:14-17.

44. If an item in the car met the criteria of the warrant, it would be placed in an evidence bag, and an evidence tag would be placed on the bag. Irwin Dep. 94:18-22.

45. Inside the vehicle, investigators discovered a clear plastic bag containing drug paraphernalia, white powder that appeared to be cocaine, and a brownish tar substance consistent with heroin. Ballou Dep. 25:4-14.

46. During the search of the trunk, Irwin found the manila envelope pictured here ("the Bogo envelope"):




**Ex. 22**, Pl.'s Dep. Ex. 40, Photo, Farak Discovery Page 3384; Irwin Dep: 100:16-101:23.

47. Inside the Bogo envelope was a lot of paperwork, including the aforementioned ServiceNet Diary Card and this Emotion Regulation Worksheet:

000506

EMOTION REGULATION Worksheet

OBSERVE AND DESCRIBE EMOTIONS

DIRECTIONS: Write as much as you can about each as soon after "event" as possible. Write on back for more room.

Vulnerability Factors: What made me more vulnerable?
last night w/ Molly
Shawn (+ Becky) ~~not~~ taking today off.

Emotion Name(s): (Pre-) Shame    Intensity: (0-10) 7

Prompting Event: For my emotion (what, who where, when?)
got "good" sample @ work + having urges to use
(+ knowing that I will be the only one here after lunch)

Interpretations: What are my Thoughts, Judgments, Beliefs, Assumptions, Appraisals of the situation?
I'm a bad person for having urges
" " " " " not wanting to try to stop them
It doesn't matter – I won't get caught
Know I'll feel worse when/if I use
I know I should call Anna, but I don't want to.
I can lie on my homework

Face and Body Changes: What am I feeling in my face and body?
hungry (??)
head is running 100m/h
little tightness across shoulder

Body Language: What is my facial expression, body posture and gestures?
can't sit still – hands to my head temples
clenched jar

Action Urge: What do I feel like doing or saying? hurry up + prepare fase (my mind says to get it out of way, but I don't think that will be the end of it)
→ give in and go w/ urge

What I Did or Said:

After Effects: What is my state of mind, other emotions, actions or thoughts?

Function of Emotions: Communicate?, Organize?, Give Information?

(19)

Penate 013913

Irwin Dep. 101:7-103:7; **Ex. 23**, Pl.'s Dep. Ex. 42, Bogo Envelope, pg. 30.

48. The Bogo envelope was placed in an MSP evidence bag and received this evidence tag:

13-034-4804-1003:006

Office of the Attorney General

Related Case #: AMHERST,FARAK,LAB,SONIA,SONJA,SONJA FARAK
Packaging : One plastic evidence bag containing 1 Envelope
Desc/Loc : (1) Envelope "A11-03020 -> A11-03022, 2-29-12, SFD, V. Dimitry Bogo"

Serial#/Ref :
Col Date : 01/19/2013 03:23
Col Location: Sunkist Box In Hatchback Of Vehicle Of Sonja Farak
Col Officer : Robert Irwin
Container :
Victim(s) :
Suspects(s) : FARAK,SONJA J DOB:1/13/1978
Defendant(s):
Seized from :

Case Officer: Joseph Ballou
Offense Date: 01/18/2013
Offense Code: (35A) Drug / Narcotic Violation

Collection Purpose:
EVIDENCE

Submitting Signature Date/Time

Irwin Dep. 101:7-15; Pl.'s Dep. Ex. 42, Bogo Envelope, pg. 1.

49. Other documents in the car included: a second undated ServiceNet Diary Card **Ex. 24**, Pl.'s Dep. Ex. 129; a "Homework" assignment dated "11-16-11," **Ex. 25**, Pl.'s Dep. Ex. 130; a scrap piece of paper containing the name, address, and telephone number of a therapist named Anna Kogan, **Ex. 26**, Pl.'s Dep. Ex. 131; numerous pre-2012 emails, **Ex. 27**, Pl.'s Dep. Ex. 132; two pre-2012 letters, **Ex. 28**, Pl.'s Dep. Ex. 133; numerous pre-2012 news articles, **Ex. 29**, Pl.'s Dep. Ex. 134; two pre-2012 receipts, **Ex. 30**, Pl.'s Dep. Ex. 135; 2011 travel authorization forms, **Ex. 31**, Pl.'s Dep. Ex. 136; pre-2012 lab paperwork, **Ex. 32**, Pl.'s Dep. Ex. 137; and a schedule of games for Week 13 of the NFL's 2011 season, **Ex. 33**, Pl.'s Dep. Ex. 244.

50. The second undated ServiceNet Diary Card contained the following notation: "Shame at work. Going to use phentermine, but when I went to take it, I saw how little (v. little) there is left = ended up not using." Pl.'s Dep. Ex. 129.

51. Phentermine was among the standards Farak stole and used at the Amherst Drug Lab. Farak Dep. 36:13-38:22.

**IMPACT ON PLAINTIFF'S PROSECUTION**

52. Farak was arrested at approximately 10:30 pm on January 19, 2013. Irwin Dep. 49:22-24; Pl.'s Dep. Ex. 13, Ballou Report ¶ 16 (Feb. 6, 2013).

53. During a press conference the next morning, Attorney General Martha Coakley proclaimed, "These allegations [against Farak] do not implicate any system-wide practices that would implicate the reliability of drug certificates or would in any way, as we have seen in the allegations against Annie Dookhan, implicate the fairness of trials against defendants." Verner Dep. 65:14-67:13.

54. The case against Plaintiff was pending at this time, as were a number of cases against other defendants where Farak had signed drug certificates. Velazquez Aff. ¶ 20.

55. In some cases, HCDAO prosecutors chose not to move forward based on concerns Farak was engaging in misconduct at the laboratory at the same time substances in these cases were in her possession. Velazquez Aff. ¶ 21.

56. Velazquez was an experienced trial attorney and had discretion in terms of how to deal with the fallout from Farak's misconduct. **Ex. 34**, Eduardo Velazquez Dep. 47:20-48:1 (Feb. 25, 2021).

57. By this point, the prosecution of Plaintiff had become something of a "shitshow" in Velazquez's view. Velazquez Dep. 142:19-24.

58. Specifically, the undercover officer in Plaintiff's prosecution had misidentified a co-defendant, and discrepancies in police accounts of cash seized raised additional questions about the quality of the investigation. Velazquez Aff. ¶¶ 5, 8, 10, 15-18.

59. However, because Velazquez had no reason to believe Farak was engaging in misconduct at the laboratory in December 2011 or January 2012, he exercised his discretion to proceed with Plaintiff's prosecution. Velazquez Aff. ¶ 22.

**"ASSORTED LAB PAPERWORK"**

60. Farak was arraigned in the Eastern Hampshire District Court on Tuesday, January 22, 2013. Dkt. No. 30, Farak Answer ¶ 212.

61. By this point, Kaczmarek had been assigned the task of prosecuting Farak. Dkt. No. 187, Kaczmarek Answer ¶ 204; Kaczmarek Dep. 24:21-25:2; Verner Dep. 61:1-6.

62. On January 23, 2013, Thomas returned the car search warrant to the clerk's office. Pl.'s Dep. Ex. 35, Car Warrant Materials, Penate 006987-88.

63. Thomas provided the court with "an inventory of the property taken pursuant to this search warrant." Pl.'s Dep. Ex. 35, Car Warrant Materials, Penate 006987.

64. This inventory listed twenty separate items, seven of which referenced "assorted lab paperwork," "assorted lab paper work," or "lab paperwork." Pl.'s Dep. Ex. 35, Car Warrant Materials, Penate 006987-88.

65. Item 6 was: "Envelope 'A11-03020 -> A1103022, 2-29-12 SFD V. Dimitry Bogo' containing *lab paperwork*." Pl.'s Dep. Ex. 35, Car Warrant Materials, Penate 006987 (emphasis added).

66. Thomas swore "that this inventory [was] a true and detailed account of all the property taken by [him] on this search warrant." Pl.'s Dep. Ex. 35, Car Warrant Materials, Penate 006988.

67. As noted above, the Bogo envelope not only contained "lab paperwork" but papers memorializing Farak's use of narcotics at the Amherst Drug Lab. *See supra* ¶¶ 9-11, 46-48.

68. During his deposition in 2021, Thomas testified that if he "had these pages in front of [him] before filing [his] return," he would not "have referred to them as 'assorted lab paperwork.'" Thomas Dep. 55:5-19.

69. Thomas subsequently submitted a police report memorializing the execution of the search warrant. Pl.'s Dep. Ex. 14, Thomas Police Report (Jan. 24, 2013).

70. This report listed the same twenty items and described them the same way as the search warrant return. Pl.'s Dep. Ex. 14, Thomas Police Report (Jan. 24, 2013).

**THE DISCOVERY OF THE MENTAL HEALTH WORKSHEETS**

71. On or about the morning of February 14, 2013, Ballou took a closer look at the "assorted lab paperwork" seized from Farak's vehicle. Pl.'s Dep. Ex. 236, Ballou BBO Testimony 185:10-19 (Oct. 29, 2020).

72. At some point, he came across what became known as the "mental health worksheets." Ballou Dep. 20:11-15.

73. Years later, when a judge characterized this as the "Eureka" moment in the investigation, Ballou adopted the characterization. Ballou Dep. 20:16-21:23.

74. Ballou was "excited" to find this evidence and initially regarded the discovery as a "huge development." Ballou Dep. 20:11-23:6.

75. Prior to this discovery, investigators possessed "circumstantial evidence that suggested [Farak] had broken the law," but they "didn't have any admissions that she was stealing and using drugs at work." Pl.'s Dep. Ex. 235, Carey Hr'g Excerpt 177:23-178:5 (Dec. 13, 2016) (testimony of Ballou).

76. Thomas recalled Ballou appearing "surprised" and saying he needed to bring the existence of these "psychological" records to Kaczmarek's attention. Thomas Dep. 46:12-17, 47:12-17.

77. At some point either then or in the future, Thomas learned from Ballou that this paperwork contained admissions by Farak of using drugs at work. Thomas Dep. 48:1-3.

78. Upon receiving this information, Thomas did not amend or supplement the search warrant return he filed; nor did he amend or supplement the police report he submitted which mischaracterized the mental health worksheets as "assorted lab paperwork." Irwin Dep. 109:19-110:1.

79. According to Ballou, he assumed Farak's admissions concerned drug use in December 2012. Ballou Dep. 43:4-16.

80. One Emotion Regulation Worksheet contained a notation that Farak "lied" to Hanchett about submitting an application to attend a DEA training.

EXHIBIT
189
KACZMAREK 3/24/21 Penate c.g.

EMOTION REGULATION Worksheet
OBSERVE AND DESCRIBE EMOTIONS

*DIRECTIONS: Write as much as you can about each as soon after "event" as possible. Write on back for more room.*

Vulnerability Factors: What made me more vulnerable? – tired this morning (though enough sleep)
urges to use beforehand

Emotion Name(s): Shame    Intensity: (0-10) 6½

Prompting Event: For my emotion (what, who where, when?)
told Jim earlier in week I put DEA application in, but I didn't (figured I would later/soon). Today found out I need his signature on it – he knows (will know I lied)

Interpretations: What are my Thoughts, Judgments, Beliefs, Assumptions, Appraisals of the situation?
- He will know I lied – judge me
- wondering if I can ~~see~~ have boss over him sign it
- have to wait until at least tomorrow to tell/face him = build up anxiety

Face and Body Changes: What am I feeling in my face and body?
restlessness in hands/arms
– slight headache – head going in circles how to "fix" situation

Body Language: What is my facial expression, body posture and gestures?
clenched jaw
slouched a bit
passing around a little

Action Urge: What do I feel like doing or saying?
Asking Becky who she had sign it
Use (have 12 urge-fill samples to analyze out of next 13)
- make up lie

What I Did or Said:
call Anna – commit to not using
asked Becky – she thinks Jim signed her stuff

After Effects: What is my state of mind, other emotions, actions or thoughts?

Function of Emotions: Communicate?, Organize?, Give Information?
Motivate/tell me to get my act in gear (both here and in life) = take charge, don't procrastinate

(14)

**Ex. 35**, Pl.'s Dep. Ex. 189, Email from Ballou (Feb.14, 2013; 3.31 pm) - attachment 2, pg. 1; Ballou Dep. 56:17-22.

81. During his deposition, Ballou admitted taking no steps to date the document. Ballou Dep. 57:17-58:3.

82. Other paperwork in Ballou's possession strongly suggested that Farak's lie about submitting the DEA application happened in 2011. Ballou Dep. 58:12-62:8.

83. Ballou's review of the physical evidence also revealed the presence of newspaper articles pertaining to illicit drug activity on the part of chemists and/or government officials. Ballou Dep. 51:5-10.

84. This "very circumstantial" evidence regarding Farak's state of mind was "very much a concern" for Ballou; the articles suggested Farak might have been engaging in misconduct at the lab in 2011, when the articles were printed. Pl.'s Dep. Ex. 236, Ballou BBO Testimony 219:14-222:9 (Oct. 29, 2020).

85. As previously noted, these were hardly the only papers in Farak's car that were printed or created prior to 2012. *See supra* ¶ 49.

86. However, Ballou regarded the articles as an "outlier" because he failed to take note of pre-2012 dates on any of these other documents. Ballou Dep. 53:18-55:16.

87. In fact, Ballou could not confirm he did anything more than "leaf[] through" any of these documents. Ballou Dep. 19:8-20, 70:1-71:2.

**BALLOU'S VALENTINE'S DAY EMAIL**

88. When Ballou "started finding things in the physical evidence," he "stopped [his] search" to call Kaczmarek. Ballou Dep. 70:5-6, 70:16-20.

89. After hearing his "teaser" report of Farak's admissions, Kaczmarek asked Ballou to scan and send the materials to her. Ballou Dep. 70:8-9.

90. Ballou utilized his scanner to create four PDF documents and gave the files names describing their contents. Pl.'s Dep. Ex. 236, Ballou BBO Testimony 189:5-14 (Oct. 29, 2020).

91. "Articles and Notes" consisted of copies of three news articles. **Ex. 36**, Pl.'s Dep. Ex. 192, Email from Ballou (Feb. 14, 2013; 3:31 pm) – attachment 1.

92. This first article was entitled, "Capeless on Steroid Probe." It was printed on September 20, 2011 and concerned the removal of Pittsfield Police Officer David Kirchner from the Berkshire County Drug Task Force. Pl.'s Dep. Ex. 192, Email from Ballou (Feb. 14, 2013; 3:31 pm) – attachment 1, pg. 1.

93. Handwriting on the document stated: "And Kirchner seemed like such a good guy. I do feel bad for his 5 y.o. daughter. (Thank god I'm not a law enforcement officer) P.S. Most of the cases he's been a part of have been dismissed for exactly this reason." Pl.'s Dep. Ex. 192, Email from Ballou (Feb. 14, 2013; 3:31 pm) – attachment 1, pg. 1.

94. The second article pertained to a Pittsfield pharmacist sentenced to three years in prison for stealing OxyContin pills, and the third was about the indictment of a San Francisco drug lab analyst. Pl.'s Dep. Ex. 192, Email from Ballou (Feb. 14, 2013; 3:31 pm) – attachment 1, pp. 2-3.

95. "Emotion Regulation Homework" consisted of: (i) the Emotion Regulation Worksheet describing Farak's shame at having lied to her supervisor about submitting a DEA application and the fact that she has "12 urge-ful samples to analyze out of next 13"; (ii) a handwritten "Pros" and "Cons" list for "resisting" and "TB"; and (iii) a handwritten account of various events, actions, and emotions. Pl.'s Dep. Ex. 189, Email from Ballou (Feb. 14, 2013; 3:31 pm) – attachment 2.

96. Positive Morphine Test was, as the name suggests, a positive morphine screen conducted by Quest Diagnostics for an unknown third party. **Ex. 37**, Pl.'s Dep. Ex. 191, Email from Ballou (Feb. 14, 2013; 3:31 pm) – attachment 3.

97. "Emotion Regulation Worksheet" consisted of: (i) a second Emotion Regulation Worksheet prompted by Farak's receipt of a "'good' sample @ work" and her realization that she should "call Anna" but her actual urge was to "hurry up + prepare/use"; (ii) the ServiceNet Diary Card memorializing December 22, 2011 use "@ work"; and (iii) a handwritten skills worksheet. Pl.'s Dep. Ex. 187, Email from Ballou (Feb. 14, 2013; 3.31 pm - attachment 4.

98. Ballou appended these four attachments to an email to Kaczmarek and cc'ed Verner and Irwin; the subject heading was "FARAK admissions" and the text read:

> Anne,
>
> Here are those forms with the admissions of drug use I was talking about. There are also news articles with handwritten comments about other officials being caught with drugs. All of these were found in her car inside of the lab manila envelopes.
>
> Joe

**Ex. 38**, Pl.'s Dep. Ex. 186, Email from Ballou (Feb. 14, 2013; 3:31 pm); Ballou Dep. 27:22-28:4.

99. Ballou knew these "forms with . . . admissions" constituted exculpatory evidence in the cases of defendants, like Plaintiff, who were charged with distributing or possessing controlled substances that were purportedly analyzed by Farak. Dkt. No. 35, Ballou Answer ¶ 420; *see also* Kaczmarek Dep. 258:2-7 (characterizing the materials she received on February 14 as "objectively exculpatory to Mr. Penate").

**BALLOU'S FAILURE TO DISCLOSE EXCULPATORY EVIDENCE TO KACZMAREK**

100. Irwin read Ballou's Valentine's Day email and reviewed the attachments on the day they were sent. Irwin Dep. 88:9-12.

101. Irwin believed these pieces of paper constituted important evidence in the case against Farak. **Ex. 39**, Carey Hr'g Excerpt 96:1-12 (Dec. 12, 2016) (testimony of Irwin).

102. Irwin did not disclose these documents or their existence to any district attorney's office; nor did he direct Ballou or any other subordinate to make sure a disclosure. Irwin Dep. 132:17-133:15.

103. When asked what training he provided to his subordinates on their duty to disclose exculpatory evidence, Irwin answered:

> we are required to turn over everything we seize, all notes, all reports, all evidence, to the Attorney General's Office so they can make that determination of, you know, what, as you say, is exculpatory, inculpatory, what stays, what goes, what's turned over, what's not. That's all the way up to – that's all up to the Attorney General's Office. The state police just provide the evidence.

Irwin Dep. 84:3-22.

104. Ballou agreed that it was his "custom" to "collect the evidence, . . . turn it over to the prosecutor, and the prosecutor [did] whatever the prosecutor is supposed to do with the discovery." Pl.'s Dep. Ex. 235, Carey Hr'g Excerpt 211:5-9 (Dec. 13, 2016) (testimony of Ballou).

105. However, after sending the Valentine's Day email, Ballou did not end up turning over any more of the physical evidence to Kaczmarek. As he explained in 2016, Ballou only passed along what he perceived to be the "most important" documents – "[t]he ones that" he thought "AAG Kaczmarek need[ed] to see." **Ex. 40**, Carey Hr'g Excerpt 18:25-19:9 (Dec. 14, 2016) (testimony of Ballou).

106. According to Ballou, if "Kaczmarek had told [him] she liked . . . the ServiceNet Diaries as a lead and wanted [him] to pursue it, [he] would have started looking at [the other paperwork] a lot more closely . . . and at some point . . . would have realized" the ServiceNet Diary Card with December dates actually memorialized 2011 activity. Ballou Dep. 56:2-13.

107. As it turned out, Kaczmarek never asked him to do that. Ballou 56:14-16.

108. When asked during his deposition whether he "review[ed] every single piece of paper" seized from Farak's vehicle, Ballou conceded there was "stuff that [he] never really scrutinized." Ballou Dep. 19:8-20.

109. In fact, Ballou could not say for sure whether he resumed his review of the documents after pausing to tell Kaczmarek what he found. Ballou Dep. 70:21-71:7.

110. It is undisputed that Kaczmarek never reviewed the evidence Irwin, Ballou, and Thomas seized from Farak's car. Dkt. No. 187, Kaczmarek Answer ¶ 222.

111. Ballou, as the custodian of the physical evidence, knew he was the only member of law enforcement to undertake any sort of review. Carey Hr'g Excerpt 42:23-45:12 (Dec. 14, 2016) (testimony of Ballou).

**KACZMAREK'S FAILURE TO DISCLOSE "POTENTIALLY EXCULPATORY EVIDENCE" TO THE DISTRICT ATTORNEYS**

112. Thomas received a copy of Ballou's "FARAK Admissions" email (without the attachments) on February 15, 2013 and responded to Kaczmarek's request for assistance at the grand jury. **Ex. 41**, Email from Thomas (Feb. 15, 2013; 2.36 pm).

113. Ballou testified at the Farak grand jury for the first time on February 28, 2013. **Ex. 42**, Pl.'s Dep. Ex. 240, Farak Grand Jury Minutes (Feb. 28, 2013).

114. Before he was sworn in, Kaczmarek informed Ballou that the mental health worksheets would not be introduced at the proceeding. Pl.'s Dep. Ex. 235, Carey Hr'g Excerpt 194:7-21 (Dec. 13, 2016) (testimony of Ballou).

115. When asked to "tell the Grand Jurors some of the things that were recovered from Ms. Farak's vehicle," Ballou was careful to avoid divulging the existence of the forms with admissions. Pl.'s Dep. Ex. 240, Farak Grand Jury Minutes 15:18-16:10 (Feb. 28, 2013); Ballou Dep. 38:21-24.

116. As the AGO presented its case against Farak to the grand jury, Frank Flannery became a First Assistant District Attorney (ADA) in the office of Hampden County District Attorney Mark Mastroianni. **Ex. 43**, Frank Flannery Dep. 11:14-17 (Mar. 16, 2021).

117. He soon became responsible for handling post-conviction motions filed by Farak Defendants. Flannery Dep. 15:18-22.

118. On or about March 27, 2013, Verner sent a letter to all eleven elected District Attorneys that stated:

> This Office is investigating Sonja Farak, a chemist who conducted analysis of suspected narcotic samples out of the Amherst Drug Laboratory . . . . During our investigation, this Office has produced or otherwise come into possession of information, documents and reports. *Pursuant to this Office's obligation to provide potentially exculpatory information to the District Attorneys* as well as information necessary to your Offices' determination about how to proceed with cases in which related narcotics evidence was tested at the Amherst Laboratory, please find the below listed materials . . .

**Ex. 44**, Pl.'s Dep. Ex. 283, Letter from Verner (Mar. 27, 2013) (emphasis added).

119. The mental health worksheets were not among the materials included in this disclosure. *Id.*

120. Ballou knew Kaczmarek put together these discovery packets, as he delivered one such packet to the Hampshire County District Attorney's office. Pl.'s Dep. Ex. 236, Ballou BBO Testimony 194:1-15 (Oct. 29, 2020).

121. Based on the representations in Verner's letter, Flannery surmised that the AGO would eventually distribute copies of the Farak Grand Jury minutes to the HCDAO. Flannery Dep. 29:7-13.

122. Farak was indicted on April 1, 2013. **Ex. 45**, Pl.'s Dep. Ex. 93, Farak Indictments.

123. On or about June 24, 2013, Kaczmarek signed her name to a motion to disclose the Farak grand jury minutes and exhibits to the District Attorneys as well as the U.S. Attorney for the District of Massachusetts. **Ex. 46**, Pl.'s Dep. Ex. 174, Commonwealth's Mot. for Order to Disseminate Grand Jury Materials to Certain Parties, Commonwealth v. Farak, 1380CR00061; Kaczmarek Dep. 130:2-18.

124. This pleading used much of the same language as the pleading Kaczmarek previously filed to obtain court approval to disseminate the Dookhan Grand Jury minutes. **Ex. 47**, Commonwealth's Mot. for Order to Disseminate Grand Jury Materials to Certain Parties, Commonwealth v. Dookhan, Suffolk Indictment No. 12-11155.

125. Among other things, the motion filed in the Farak case stated:

- [T]he issues presented in the criminal case of Sonja Farak potentially affect the criminal cases of numerous individuals within the Commonwealth.

- The Commonwealth believes that the grand jury minutes may contain potentially exculpatory evidence.

- It is the duty of the Attorney General's Office to release such potentially exculpatory evidence to the government entities charged with prosecuting of the affected individuals.

Pl.'s Dep. Ex. 174, Commonwealth's Mot. for Order to Disseminate Grand Jury Materials to Certain Parties, Commonwealth v. Farak, 1380CR00061.

126. Like her Dookhan motion to disseminate, the motion Kaczmarek filed in the Farak case also cited Mass. R. Crim. P. 14 for the proposition that: "(t)he prosecution shall disclose to the defense, and permit the defense to discover, inspect and copy, each of the following items and information at or prior to the pretrial conference, provided it is relevant to the case and is in the possession...of persons who have participated in investigating or evaluating the case and either regularly report to the prosecutor's office or have done so in the case:…(a)ny facts of an exculpatory nature." Pl.'s Dep. Ex. 174, Commonwealth's Mot. For Order To Disseminate Grand Jury Materials to Certain Parties, pp. 1-2; *see also* Commonwealth's Mot. for Order to Disseminate Grand Jury Materials to Certain Parties, pp. 1-2, Commonwealth v. Dookhan, Suffolk Indictment No. 12-11155.

127. Kaczmarek ultimately agreed that the "specific mental health" of Farak's wife "was not relevant to the 'Farak defendants,'" and therefore "agreed to redact those portions of her testimony before disclosure." **Ex. 48**, Kaczmarek Narrative 11 (Oct. 24, 2017).

128. The Honorable Bertha Josephson allowed Kaczmarek's motion to disseminate with this caveat. Pl.'s Dep. Ex. 174, Commonwealth's Mot. For Order To Disseminate Grand Jury Materials to Certain Parties, pg. 1.

129. Kaczmarek did not seek a court order permitting the disclosure of the mental health worksheets. **Ex. 49**, Carey Hr'g Excerpt 166:13-167:4 (Dec. 16, 2016) (testimony of Kaczmarek).

130. On or about June 26, 2013, Kaczmarek signed her name to the following letter, which was sent to each of the Commonwealth's District Attorneys:

> As you know, this Office is investigating defendant, Sonja Farak, a chemist who analyzed drugs out of the Amherst drug lab. During the investigation process, this Office has come into possession of information, documents and reports. Pursuant to this Office's continuing obligation to provide potentially exculpatory information to the District Attorneys as well as information necessary to your Offices' determination about how to proceed with cases in which related narcotics evidence was tested at the Amherst laboratory, please find the below listed materials:

**Ex. 50**, Pl.'s Dep. Ex. 284, Letter from Kaczmarek (June 26, 2013); Kaczmarek Dep. 126:3-18.

**PLAINTIFF'S MOTION TO DISMISS**

131. On July 15, 2013, Plaintiff filed a motion to dismiss the drug charges against him based on Farak's egregious misconduct and the government's noncompliance with its obligation to turn over exculpatory evidence. Docket for Commonwealth v. Penate, 1279CR00083, Penate 015308.

132. Hampden County Superior Court Judge Mary-Lou Rup issued an order on July 23, 2013, stating that:

> an evidentiary hearing must be conducted on the following issues: (i) if Ms. Farak and/or the Amherst drug lab engaged in egregious misconduct in the handling, storage, and analysis of suspected narcotics during the time period between November 2011 and January 2012, when the Amherst drug lab had custody and control of the alleged substances related to the defendant's case; (2) if such misconduct has substantially prejudiced the defendant or irreparably harmed his right to a fair trial; or (3) if such egregious misconduct was deliberate and intentional, warranting a prophylactic sanction of dismissal.

**Ex. 51**, Mem. on Def.'s Mot. to Dismiss & Motion in Limine to Preclude Evidence of Expert Visual Identification of Purported Narcotics, Commonwealth v. Penate, 1279CR00083, Penate 008524.

133. Judge Rup's order reminded the HCDAO of its "obligation to seek [evidence] from government agencies (including the Office of the Attorney General) and to produce exculpatory evidence that may be favorable to [Plaintiff's] case, and not simply turn a blind eye to what is not in its immediate control." *Id.*

134. Irwin and Thomas later admitted that they knew they had duties, under the United States Constitution, to disclose *Brady* material to Hampden County ADAs in general and the Hampden County ADA prosecuting Plaintiff in particular. Dkt. No. 21, Thomas Answer ¶ 421; Dkt. No. 185, Irwin Answer ¶ 421.

**THE CAR PHOTOS**

135. Starting on or about July 22, 2013, Judge Kinder issued a series of orders consolidating unrelated post-conviction cases for an evidentiary hearing to determine "the timing and scope of Sonja Farak's alleged misconduct." **Ex. 52**, Pl.s' Dep. Ex. 103, Kinder Orders; Flannery Dep. 46:4-47:3.

136. On August 16, 2013, with the assistance of support staff, Flannery uploaded all of the discovery provided by the AGO onto a "Box" site that was subsequently made available to counsel representing Farak defendants in the upcoming hearing scheduled by Judge Kinder. **Ex. 53**, Pl.'s Dep. Ex. 116, Box Screenshots; Flannery Dep. 56:2-19.

137. That same day, Flannery informed Kaczmarek this hearing had been scheduled "for 9/9 . . . to define the scope, to the extent possible, of Farak's misconduct." **Ex. 54**, Pl.'s Dep. Ex. 104, Email from Flannery (Aug. 16, 2013; 10:09 am).

138. Flannery predicted the hearing would "include the testimony of some of the investigators and chemists involved in [Kaczmarek's] investigation." Pl.'s Dep. Ex. 104, Email from Flannery (Aug. 16, 2013; 10:09 am).

139. Sensitive to the complications this could present, Flannery made a commitment to keep Kaczmarek "in the loop." Pl.'s Dep. Ex. 104, Email from Flannery (Aug. 16, 2013; 10:09 am).

140. In that same email, Flannery stated: "I've had numerous requests for the photos that were taken during the search of Farak's vehicle. I spoke to Sgt. Ballou who tells me he can provide those photos to me directly but I want to make sure I have your permission first." Pl.'s Dep. Ex. 104, Email from Flannery (Aug. 16, 2013; 10:09 am).

141. These photos taken by Dolan were referenced in Thomas' police report and had not previously been provided to the HCDAO. Flannery Dep. 59:24-60:12.

142. On August 21, 2013, Ballou sent the following email to Kaczmarek (with a cc to Irwin):

> Hampden County ADA Frank Flannery advised me that he needs me to testify in a hearing in front of Judge Kinder on September 9th regarding the FARAQ case. He said that Judge Kinder has consolidated a number of motions from defense attorney's regarding drugs tested by FARAQ.
>
> In preparation for this motion, ADA Flannery found he doesn't have our photos from the SW of Faraq's car. Is it alright with you if I give him a disc with the photos? I'm guessing he'll be asking for other things as we move along.

**Ex. 55**, Email from Ballou (Aug. 21, 2013; 4:38 pm).

143. The next morning, Kaczmarek responded to Flannery's August 16 email by telling him Ballou would give him "any discovery" he "need[ed]." **Ex. 56**, Pl.'s Dep. Ex. 115, Email from Kaczmarek (Aug. 22, 2013; 6:40 am).

144. By this point, Flannery had no doubt that Kaczmarek and the MSP investigators assigned to her office had the obligation repeatedly referenced in her correspondence. Flannery Dep. 42:6-43:1.

145. In fact, with respect to his discovery obligations to Farak defendants, Flannery considered the AGO a member of his prosecution team. **Ex. 57**, Pl.'s Dep. Ex. 94, Flannery BBO Testimony 93:8-13 (Sept. 25, 2020); *see also id. at* 173:22-175:5.

146. Ballou eventually gave Flannery a disc containing 71 photographs taken during the search of Farak's car. Flannery Dep. Pl.'s Dep. Ex. 116, Box Screenshots.

147. Neither Ballou nor anyone else at the AGO provided the HCDAO with a copy of the report Dolan submitted back on January 24, 2013. **Ex. 58**, Pl.'s Dep. Ex. 37, Dolan Report (Jan. 24, 2013); *see* Pl.'s Dep. Ex. 283, Letter from Verner to Conley (Mar. 27, 2013) (referencing four reports by Ballou, one by Thomas, and Trooper Geraldine Bresnahan).

148. This document contained metadata for the photographs and suggested several (including DSC_4984 and DSC_4985) were deleted.




Pl.'s Dep. Ex. 37, Dolan Report pg. 2 (Jan. 24, 2013).

149. During his deposition, Irwin testified that he did not know whether Dolan deleted any of the photographs he took during the search of the vehicle and professed to be unfamiliar with the concept of "metadata." Irwin Dep. 97:1-100:7.

**BALLOU SUBPOENAS**

150. The evidentiary hearing on Plaintiff's motion to dismiss was initially scheduled for August 27, 2013. **Ex. 59**, Pl.'s Dep. Ex. 202, Penate Subpoena for Kaczmarek.

151. Prior to that date, Plaintiff served Ballou and Kaczmarek with subpoenas to testify at the hearing. **Ex. 60**, Pl.'s Dep. Ex. 201, Email from Ballou (Aug. 23, 2013; 3:35 pm); Pl.'s Dep. Ex. 202, Penate Subpoena for Kaczmarek.

152. Kris Foster (Foster), a new line AAG in the Appeals Unit, received the assignment to respond to the Penate subpoenas. **Ex. 61**, Foster BBO Testimony 31:21-32:2 (Oct. 27, 2020).

153. On August 26, 2013, she informed Plaintiff's counsel that Kaczmarek was unable to attend court the next day and Plaintiff's counsel agreed to report Kaczmarek's unavailability and request a new date. **Ex. 62**, Email from Foster (Aug. 26, 2013; 12:05 pm).

154. On the afternoon of Friday, August 30, 2013, Ballou sent an email to Kaczmarek (with a cc to Irwin) stating that he had just received a subpoena to testify at the hearing on September 9th that "ADA Flannery [had] warned [him] about." **Ex. 63**, Pl.'s Dep. Ex. 22, Email from Ballou (Aug. 30, 2013; 2:19 pm).

155. The subpoena Ballou attached to his email commanded him to bring "a copy of all documents and photographs pertaining to the investigation of Sonja J. Farak and the Amherst drug laboratory." **Ex. 64**, Pl.'s Dep. Ex. 23, Attachment to Email from Ballou (Aug. 30, 2019; 2:19 pm).

156. The mental health worksheets were documents pertaining to the investigation of Sonja J. Farak. Ballou Dep. 116:22-118:18.

157. Ballou spoke "pretty often" with Flannery during the pendency of the Farak prosecution and regarded him as a straight shooter. Ballou Dep. 112:7-15.

158. Prior to the September 9 hearing, Flannery asked Ballou to make arrangements for a team of defense counsel to view the evidence. **Ex. 65**, Pl.'s Dep. Ex. 31, Email from Ballou (Sept. 3, 2013; 5:20 pm).

159. When Ballou told Kaczmarek about Flannery's request, she responded by stating: "No. This is still an open criminal case. I do not want defense attorneys going through evidence on a fishing expedition." Pl.'s Dep. Ex. 31, Email from Kaczmarek (Sept. 3, 2013; 5:38 pm).

160. Irwin and Ballou separately voiced their support for this decision. Pl.'s Dep. Ex. 31, Email from Irwin (Sept. 3, 2013; 7:43 pm); **Ex. 66**, Pl.'s Dep. Ex. 249, Email from Ballou (Sept. 3, 2013; 5:48 pm).

161. During his conversations with Flannery in preparation for the September 9 hearing, Ballou did not disclose the seizure of mental health worksheets from Farak's automobile. Flannery Dep. 87:14-22, 92:5-14; Ballou Dep. 138:8-11, 138:19-139:8.

**DAY ONE OF THE KINDER HEARING**

162. Foster filed a motion to quash Ballou's testimony; in the alternative, she sought a protective order relieving him of the obligation to produce certain documentary evidence. **Ex. 67**, Motion & Mem. to Quash Ballou Subpoena (Sept. 6, 2013), Penate 015361-015373.

163. At the outset of the hearing on September 9, 2013, Judge Kinder denied Foster's motion to quash the Ballou subpoena insofar as it related to Ballou's testimony. **Ex. 68**, Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 15:1-13 (Sept. 9, 2013).

164. With respect to her request for a protective order, Foster confessed to Judge Kinder that she had not reviewed any documents in Ballou's possession and asserted that Ballou had not brought his file to the hearing. Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 15:14-19:23 (Sept. 9, 2013).

165. Rather than delay the hearing, Judge Kinder admonished Foster, then instructed her to review Ballou's file and submit copies of any undisclosed documents for an *in camera* review. Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 19:2-18 (Sept. 9, 2013).

166. When Ballou took the stand, binders were placed before him "which contained all the discovery that was sent to the DA's office." Ballou Dep. 176:8-10.

167. Ballou had the thought: "I hope the things I sent to Anne were among the discovery." Ballou Dep. 176:10-21.

168. Ballou was concerned that not all the discovery he provided Kaczmarek had reached the binders. Ballou Dep. 191:8-12.

169. Three attorneys examined Ballou during a total of five rounds of questioning. Ballou Dep. 195:4-196:7.

170. Not a single question was posed to Ballou about forms whose significance literally leapt off the page. Ballou Dep. 196:8-12.

171. Ballou had his attention directed to fifteen exhibits. Ballou Dep. 196:13-18.

172. No attorney drew Ballou's attention to what he agreed was the "Eureka" evidence in the case. Ballou Dep. 196:19-23.

173. At one point, Ballou testified that Major James Connolly (Connolly) was overseeing re-testing of samples tied to lab numbers for the packaging found in Farak's car. Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 119:3-4, 142:14-22 (Sept. 9, 2013).

174. This led to the following exchange with Plaintiff's counsel:

> Q. Now, Attorney Olanoff asked you some questions about other cases where suspected evidence tampering is sort of in the air. Do you recall those questions?
>
> A. Yes.
>
> Q. And I believe you said that there was an investigation going on at the lab?
>
> A. Yes.
>
> Q. Who's conducting that investigation?
>
> A. It was Major Connolly and -- Major James Connolly and a captain -- I can't remember his name off hand.
>
> Q. Are these members of the investigative team that's prosecuting Sonja Farak?
>
> A. No.
>
> Q. And so there is an independent investigation that's being conducted by these individuals that you just named?
>
> A. Correct.

Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 148:13-149:3 (Sept. 9, 2013).

175. When Ballou gave this testimony, Connolly had been retired for nearly three months. **Ex. 69**, Email from Connolly (June 14, 2013; 2:03 pm) ("As you know today is my last day.").

176. At the conclusion of Ballou's first round of questioning by Plaintiff's attorney, the following exchange occurred:

> Q. Now, you're aware that in the course of this proceeding that you've been called here today, there's been some disclosures that your office has made to defense counsel; is that correct?
>
> A. Yes.

> Q. Have you had any role to play in deciding what documentation is provided to the defendants in this case?
>
> A. No, I've -- everything in my case file has been turned over.
>
> Q. And to your knowledge, has everything in Ms. Kaczmarek's case file been turned over?
>
> THE COURT: You're asking this witness whether something in Ms. Kaczmarek's case file has been turned over?
>
> MR. RYAN: I'm just trying to find out what we have and don't have. And if he knows that she's maintaining a file that reflects the investigation that he just referenced by Major Connolly.
>
> THE COURT: If, for some reason you know the answer to that question, you may answer it.
>
> THE WITNESS: I believe everything pertaining to the Farak investigation has been turned over. I am not aware of anything else.

Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 150:11-151:7 (Sept. 9, 2013).

177. Foster was present in the courtroom for this testimony and when asked about it in 2020, provided this perspective:

> Q. Now, Sergeant Ballou testified that he had turned over his entire file, right?
>
> A. His file and the whole Farak file had been turned over.
>
> Q. Did you believe him?
>
> A. I did.
>
> Q. Why?
>
> A. He was a state trooper testifying under oath. He was -- if not the lead investigator or trooper on the case, he was one of them that had obviously significant knowledge of the matter, and I knew he worked with Anne which is why both him and Anne were the ones getting subpoenaed. So I figured he had the knowledge that what he had had been produced.

Foster BBO Testimony 92:2-18 (Oct. 27, 2020).

178. The contents of Farak's trunk came up at the end of Ballou's testimony. Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 173:24-174:2 (Sept. 9, 2013).

179. After agreeing that "reports regarding what was in the car" only provided a "summary" of what was seized, Ballou was asked to acknowledge that he did not write "paragraph after paragraph about what assorted lab paperwork was found." Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 174:23-175:2 (Sept. 9, 2013).

180. Instead of answering the question, Ballou claimed Crime Scene Services "took pretty detailed photos." Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 175:3-4 (Sept. 9, 2013).

181. In response to a later question inquiring whether he "'photograph[ed] every piece of evidence that was seized from the automobile," Ballou implied that this is exactly what Crime Scene Services did: "As I said, I didn't photograph anything. But yeah, crime scene services photographed the evidence as we seized it, yes." Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 176:1-5 (Sept. 9, 2013).

182. None of the photographs taken by Crime Scene Services depicted any of the mental health worksheets Ballou attached to the email he sent on February 14, 2013. Ballou Dep. 195:2-3.

183. At the end of the hearing, Plaintiff's counsel referenced Flannery's unsuccessful effort to arrange for an inspection of the physical evidence and made an oral motion for "access to the evidence that was seized from Ms. Farak's car." Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 245:14-246:6 (Sept. 9, 2013).

184. Judge Kinder instructed the parties to "try to work through some agreement about viewing, physically, the evidence, if that can be done." Pl.'s Dep. Ex. 245, Kinder Evidentiary Hr'g 246:7-20 (Sept. 9, 2013).

**PLAINTIFF'S MOTION TO COMPEL**

185. On September 17, 2013, Plaintiff served the MSP with a motion to compel the production of various documents including:

> 7. Copies of any and all inter- and/ or intra-office correspondence from January 18, 2013 to the present pertaining to the scope of evidence tampering and/or deficiencies at the Amherst Drug Laboratory; and
>
> 10. [A]ny and all evidence suggesting that a third party may have been aware of Farak's evidence tampering at the Amherst Drug Laboratory prior to Farak's arrest in January, 2013;

**Ex. 70**, Pl.'s Dep. Ex. 223, Def.'s Motion to Compel Production of Documentary Evidence, pp. 2, 3 Commonwealth v. Penate, 1279CR00083, AGOFRK002657-2661.

186. On September 27, 2013, MSP Deputy Chief Legal Counsel Sean Farrell (Farrell) sent Kaczmarek a copy of Plaintiff's motion and asked her "whether any of the items being sought in this motion have already been turned over." **Ex. 71**, Pl.'s Dep. Ex. 224, Email from Farrell (Sept. 27, 2013; 10:11 am).

187. In response, Kaczmarek stated that the AGO "also received this gem," called Plaintiff's counsel "very rude and aggressive," and advised Farrell not to give him "an inch." Pl.'s Dep. Ex. 224, Email from Kaczmarek (Sept. 27, 2013; 1:30 pm).

188. Three days later, Farrell sent Ballou an email stating that he had been "advised" by Kaczmarek that she possessed "no records responsive" to most of Plaintiff's requests, including the ones requesting correspondence pertaining to the scope of evidence tampering and "any and all evidence suggesting that a third party may have been aware of Farak's evidence tampering at the Amherst Drug Laboratory prior to Farak's arrest in January, 2013." **Ex. 72**, Pl.'s Dep. Ex. 261, Email from Farrell (Sept. 30, 2013; 12:03 pm).

189. Ballou wrote back to Farrell (with a cc to Kaczmarek) that his "entire investigative file ha[d] been turned over" and he had "found no indication that Ms. Farak had an accomplice or that a third party was aware of her tampering." Pl.'s Dep. Ex. 261, Email from Ballou (Sept. 30, 2013; 4:28 pm).

190. Ballou's entire investigative file had not been turned over; among the items he possessed that had not been disclosed to Plaintiff were ServiceNet Diary Cards suggesting ServiceNet clinicians may have been aware of Farak evidence tampering prior to her arrest. Pl.'s Dep. Ex. 235, Carey Hr'g Excerpt 204:24-205:2 (Dec. 13, 2016) (testimony of Ballou).

**HEARING ON PLAINTIFF'S DISCOVERY MOTIONS**

191. On October 2, 2013, Plaintiff's counsel, Velazquez, Foster, and Farrell appeared before Judge Kinder for a non-evidentiary hearing on Plaintiff's discovery motions, including a motion to inspect the physical evidence. **Ex. 73**, Kinder Non-Evidentiary Hr'g 1:11-18 (Oct. 2, 2013).

192. At the outset of this hearing, the parties reported an agreement that, for the purposes of Plaintiff's pre-trial motion to dismiss, the Court could rely upon the evidence introduced at the hearing for post-conviction Farak defendants that began on September 9, 2013. *Id.* at 6:11-7:23.

193. After taking all matters under advisement, Judge Kinder denied Plaintiff's motion to inspect, due, in part, to Ballou's representations concerning the comprehensiveness of the photographs taken of the car evidence. **Ex. 74**, Order Denying Motion to Inspect Physical Evidence, Commonwealth v. Penate, 1279CR00083, Penate 013831.

**THE DENIAL OF PLAINTIFF'S MOTION TO DISMISS**

194. On November 4, 2013, Judge Kinder denied Plaintiff's motion to dismiss. **Ex. 75**, Pl.'s Dep. Ex. 51, Mem. of Decision & Order on Def.'s Mot. to Dismiss Counts 1-10 and 13, Commonwealth v. Penate, 1279CR00083, Penate 008542.

195. In his findings of fact, Judge Kinder cited the seizure of the so-called "assorted lab paperwork" and the "copies of newspaper articles" introduced at the grand jury. Pl.'s Dep. Ex. 51, Mem. of Decision & Order on Def.'s Mot. to Dismiss Counts 1-10 and 13, pg. 7, Commonwealth v. Penate, 1279CR00083, Penate 008542

196. Judge Kinder ultimately concluded that while there was "powerful evidence that Farak was stealing cocaine and replacing it with other substances," there was "insufficient evidence before [him] that . . . that she was engaged in misconduct in November 2011, and January of 2012, when the samples in this case were tested." Pl.'s Dep. Ex. 51, Mem. of Decision & Order on Def.'s Mot. to Dismiss Counts 1-10 and 13, pg. 11, Commonwealth v. Penate, 1279CR00083, Penate 008542.

197. To reach this conclusion, Judge Kinder relied on what he believed was "*all* of the physical evidence seized in connection with the criminal investigation of Farak." Pl.'s Dep. Ex. 51, Mem. of Decision & Order on Def.'s Mot. to Dismiss Counts 1-10 and 13, pg. 11, Commonwealth v. Penate, 1279CR00083, Penate 008542 (emphasis added)

**PLAINTIFF'S TRIAL**

198. On November 13, 2013, Plaintiff served Kaczmarek and Ballou with trial subpoenas. **Ex. 76,** AGO's Mem. of Law in Support of Mot. to Quash Kaczmarek Subpoena, Commonwealth v. Penate, 1279CR00083, Penate 015670; **Ex. 77**, AGO's Mem. of Law in Support of Mot. to Quash Ballou Subpoena, Commonwealth v. Penate, 1279CR00083, Penate 015659.

199. Foster successfully moved to quash these subpoenas. **Ex. 78**, Ex. 262, Email from Foster (Dec. 5, 2013; 9:28 am).

200. Prior to trial, Velazquez filed a motion to keep Plaintiff from introducing any Farak-related evidence. Velazquez Aff. ¶ 27.

201. The Honorable Tina Page allowed this motion. Velazquez Aff. ¶ 27.

202. Jury selection in Plaintiff's case began on December 9, 2013. Velazquez Aff. ¶ 29.

203. When Velazquez rested, Judge Page allowed Plaintiff's motion for required findings of not guilty with respect to Counts 11-13, charging firearm and ammunition-related offenses. Docket for Commonwealth v. Penate, 1279CR00083, Penate 015311.

204. Five drug charges went to the jury on the morning of Thursday, December 12, 2013. **Ex. 79**, Penate Trial 72:24 (Dec. 12, 2013), Penate 003265.

205. When court reconvened at 4:01 pm, Judge Page read the following note from the foreperson into the record: "We cannot come to a conclusion and come up with a verdict." Penate Trial 72:25-73:3 (Dec. 12, 2013), Penate 003265-3266.

206. Judge Page instructed the jurors to resume their deliberations. *Id.* at 77:9-19.

207. At 5:30, she discharged them for the day. *Id.* at 81:3-25.

208. Deliberations began the following day at 9:15 am. **Ex. 80**, Penate Trial 3:1-25 (Dec. 13, 2013), Penate 003278.

209. Jurors subsequently requested to be instructed on reasonable doubt and elements of possession with the intent to distribute. *Id.* at 4:3-11.

210. After being reinstructed, the jury resumed deliberations at 10:37 am. *Id.* at 10:22.

211. At 12:13 pm, Judge Page brought the parties back into the courtroom and stated it was her inclination to read jurors the Tuey-Rodriguez instruction. *Id.* at 11:20-21.

212. Plaintiff's counsel took the position such an instruction would be premature, and the judge elected not to give it. *Id.* at 12:19-13:3.

213. After the lunch recess, jurors sent the judge another note asking about a particular evidentiary ruling. *Id.* at 13:4-20.

214. After receiving instructions on this issue, the jury once again resumed its deliberations.

215. Finally, at approximately 2:30 pm, the jury finalized its verdicts. *Id.* at 16:9-10.

216. The jury acquitted Plaintiff of all but one charge of distributing a Class A substance. *Id.* at 17:1-19:25; Velazquez Aff. ¶ 32; Docket for 1279CR00083, Penate 015299-15321.

217. On December 16, 2013, Judge Page sentenced Plaintiff to not less than five years and not more than seven years in state prison. Velazquez Aff. ¶ 32; Docket for 1279CR00083, Penate 015299-15321.

218. Ballou forwarded his colleagues at the AGO a link to a news article about the outcome of the trial with the message: "He got 5-7 years." **Ex. 81**, Pl.'s Dep. Ex. 262, Email from Ballou (Dec. 16, 2013: 6:31 pm).

219. This prompted replies of "Nice" and "Sweet" from Mazzone and Verner. Pl.'s Dep. Ex. 262, Email from Mazzone (Dec. 16, 2013; 8:03 pm); Pl.'s Dep. Ex. 262, Email from Verner (Dec. 16, 2013; 10:26 pm).

**THE PROSECUTION TEAM**

220. Farak pled guilty to the charges against her on January 6, 2014. Dkt. No. 30, Farak Answer ¶ 381.

221. In a self-evaluation dated February 28, 2014, Kaczmarek stated that "[t]he Dookhan and Farak investigations required close collaboration with other members of the investigative team, updates to interested parties within the AGO, and regular communications with

affected agencies outside of the AGO." **Ex. 82**, Pl.'s Dep. Ex. 178, Kaczmarek Self-Evaluation (Feb. 28, 2014).

222. According to Kaczmarek, "Most of the discovery obtained in the Dookhan and Farak cases needed to be released to the District Attorney's offices statewide." *Id.*

223. Kaczmarek portrayed herself as "the point person in determining whether the information had been disseminated and gathering further information if needed." *Id.*

224. Paul Cassell is a former federal prosecutor, former federal judge, and current professor of law at the University of Utah School of Law. **Ex. 83**, Paul Cassell Curriculum Vitae.

225. Professor Cassell has reviewed dozens of Farak-related emails exchanged with ADAs throughout the Commonwealth, letters Kaczmarek and Verner wrote to District Attorneys, and pleadings Kaczmarek and ADAs filed concerning the AGO's obligation, duty, and/or responsibility to disclose potentially exculpatory information to DAs. **Ex. 84**, Cassell Report (Apr. 30, 2021); *see also* **Ex. 85**, Ryan Affidavit (Aug. 20, 2021).

226. In his expert opinion, "there was extensive interaction and cooperation between prosecutors and state police investigators assigned to the AGO and the prosecutors in the District Attorneys' Offices who were prosecuting drug cases, including the criminal case for which Mr. Penate was convicted." Cassell Report at 21-22; *see also id.* at 22 ("[T]he level of interaction between the AGO and the District Attorneys' Office is clearly far more than one would see in an ordinary criminal case.").

227. Professor Cassell also opined that references by Kaczmarek and others to the AGO's "obligation," "duty," and/or "responsibility" to turn over potentially exculpatory evidence concerned the federal constitutional obligation set forth in *Brady* and its progeny. *Id.* at 24-25.

### Newly Discovered Evidence

228. Kaczmarek left the AGO for a position with the Trial Court on July 21, 2014. Kaczmarek Dep. 215:9-14.

229. On July 31, the AGO assented to a motion to inspect the physical evidence in the Farak case filed by Plaintiff's counsel on behalf of another defendant. **Ex. 86**, Pl.'s Dep. Ex. 77, Assented-to Motion to Inspect Physical Evidence, Commonwealth v. Burston, 1380CR00113.

230. On October 30, 2014, Plaintiff's attorney and an investigator inspected the Farak physical evidence in an AGO conference room at One Ashburton Place. **Ex. 87**, Patrick Devlin Dep. 47:9-48:1 (Mar. 10, 2021).

231. On Saturday, November 1, 2014, Plaintiff's attorney sent the AGO an email with an 11-page letter attached detailing the significance of the previously undisclosed evidence. **Ex. 88**, Letter from Ryan (Nov. 1, 2014).

232. On or about November 13, 2014, the AGO disclosed to the district attorneys all 289 pages of documentary evidence recovered from Farak's vehicle. **Ex. 89**, Letter from Verner (Nov. 13, 2014).

233. This included the ServiceNet Diary Card that indicated Farak used drugs at work on December 22, 2011 – the same date she signed a drug certificate in Plaintiff's case. Velazquez Aff. ¶¶ 34-35.

### The Aftermath

234. In May 2015, Plaintiff filed a motion for a new trial based on this newly discovered evidence. Velazquez Aff. ¶ 36; Docket for 1279CR00083, Penate 015299-15321.

235. In January 2017, Hampden County Superior Court Judge Richard J. Carey allowed Plaintiff's motion for a new trial with the assent of the HCDAO. Velazquez Aff. ¶ 41.

236. In a 127-page decision issued on June 26, 2017, Judge Carey dismissed the case against Plaintiff with prejudice. Dkt. No. 187, Kaczmarek Answer ¶ 395.

237. The HCDAO subsequently vacated every conviction dependent upon a Farak drug certificate and dismissed each such case with prejudice. Velazquez Aff. ¶ 44 (citing *Committee for Public Counsel Services v. Att'y Gen.*, 480 Mass. 700, 704 (2018)).

238. According to Velazquez, had the AGO produced, during the pretrial phase of Plaintiff's criminal case, the ServiceNet Diary Card documenting drug use by Farak at the Amherst Drug in December 2011, this would have led to the realization that Farak used illicit drugs at the laboratory while entrusted with the samples in Plaintiff's case and that would have resulted in the HCDAO's dismissing the drug charges against Plaintiff. (Velazquez Aff. ¶ 49.

239. In other words, the disclosure of the true extent of Farak's misconduct would have led Velazquez and his office to dismiss or file a *nolle prosequi* of all drug charges against Plaintiff in Indictment No. 1279CR00083. Velazquez Aff. ¶ 50.

**THE PLAINTIFF**

By: /s/ Luke Ryan
His Attorney
LUKE RYAN, BBO#664999
SASSON, TURNBULL, RYAN & HOOSE
100 Main Street, 3rd floor
Northampton, MA 01060
(413) 586-4800
lryan@strhlaw.com

By /s/ Paul Rudof
His Attorney
PAUL RUDOF, BBO# 643765
ELKINS, AUER, RUDOF & SCHIFF
31 Trumbull Rd, Suite B
Northampton, MA 01060
(413) 341-2131
paulrudof@elkinslawllc.com

**CERTIFICATE OF SERVICE**

I, LUKE RYAN, hereby state that the foregoing was filed through the ECF system and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 20, 2021. A paper copy of the foregoing was sent to Sonja Farak by first-class mail to P.O. Box 192, Easthampton, MA 01027.

/s/ Luke Ryan, Esq.
BBO#664999
Sasson, Turnbull, Ryan & Hoose
100 Main Street, 3rd floor
Northampton, MA 01060
(413) 586-4800
lryan@strhlaw.com

Dated: 8/20/21