UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROLANDO PENATE,<br><br>Plaintiff,<br><br>v.<br><br>ANNE KACZMAREK, JOSEPH BALLOU, ROBERT IRWIN, RANDY THOMAS and SONJA FARAK,<br><br>Defendants. | ) | Civil Action No. 3:17-30119-KAR |

MEMORANDUM AND ORDER REGARDING DEFEDANT JOSEPH BALLOU'S MOTION TO DISQUALIFY MAGISTRATE JUDGE
(Dkt. No. 275)

ROBERTSON, U.S.M.J.

## I. Introduction

This is a civil rights action filed on September 5, 2017, pursuant to 42 U.S.C. § 1983 by plaintiff Rolando Penate (Dkt. No. 1, Compl.). Penate named the Estate of Kevin Burnham, officials and employees of the Massachusetts Department of Public Health, the Massachusetts State Police, the Attorney General's Office of the Commonwealth, and the Springfield Police Department, and the City of Springfield as defendants. The list of defendants has shortened over the life of the case. Plaintiff's claims against Springfield, officers of the Springfield Police Department, the Estate of Kevin Burnham, officials and all but one of the employees of the Department of Public Health, and two employees of the Attorney General's Office have been dismissed, either by action of Penate, agreements between parties, or pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. The remaining defendants are Anne Kaczmarek, Joseph Ballou, Robert Irwin, Randy Thomas, and Sonja Farak.

Now before the court is a motion by defendant Joseph Ballou for my recusal pursuant to 28 U.S.C. § 455(a), (b)(1), and (3) arising from my previous role as an assistant district attorney in the appellate division of the Hampden County District Attorney's Office ("HCDAO"). The court gave Ballou the opportunity to be heard on his motion at the April 5, 2021, case management conference (Dkt. No. 282). For the reasons set forth below, Ballou's motion is denied.

II. Relevant Background

Springfield police officers arrested Penate on November 15, 2011, for the sale of illegal controlled substances and on firearms charges (Compl. ¶¶ 111-121, 162). On February 10, 2012, Penate pled not guilty (Compl. ¶ 163). In December 2013, Penate was convicted on a single count of distributing a Class A substance (Compl. ¶ 376).

On January 18, 2013, an employee at the Amherst drug laboratory ("Drug Lab") discovered that cocaine samples assigned for analysis to Farak, then working as a chemist for the Massachusetts Department of Public Health ("DPH"), were not in the evidence room (Compl. ¶¶ 8, 188). The Drug Lab supervisor called the Massachusetts State Police ("MSP") to investigate (Compl. ¶ 190). By the afternoon, MSP officers had interviewed Farak and impounded her car (Compl. ¶¶ 194-96). The next day, executing a search warrant obtained from a state court judge, Ballou, an MSP sergeant assigned to the Massachusetts Attorney General's Office ("AGO"), and others searched Farak's car and seized, among other things, over 300 pages of documents (Compl. ¶¶ 5, 199, 201). On January 22, 2013, Farak was arraigned on charges of tampering with evidence and drug possession (Compl. ¶ 212). On January 6, 2014, Farak pled guilty to criminal charges stemming from misconduct in the Drug Lab (Compl. ¶ 381). Farak was prosecuted by attorneys employed by the AGO (Compl. ¶ 204).

In summary, Penate alleges that Ballou acted in concert with Kaczmarek and others to cover up and lie about the existence of relevant documents, including mental health worksheets filled out by Farak that evidenced her illicit use of drugs while at work and documented her treatment for substance use disorder, that Ballou and others discovered during the search of Farak's car (Compl. ¶¶ 2, 419). Penate asserts that the mental health worksheets were exculpatory information, that Ballou was aware of his obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), to make relevant disclosures to Penate (Compl. ¶¶ 420-21), and that he intentionally, recklessly, or with deliberate indifference to Penate's rights, concealed *Brady* information and failed to disclose it prior to Penate's criminal trial, and knowingly caused false or misleading testimony to be presented in state court hearings (Compl. ¶¶ 423-24).

On July 15, 2013, Penate filed a pretrial motion to dismiss the charges against him based mainly on Farak's alleged misconduct (Compl. ¶ 242). On July 25, 2013, Honorable C. Jeffrey Kinder of the Massachusetts Superior Court ordered the consolidation of fourteen unrelated criminal cases, including cases filed by Erick Cotto, Jr., and Bryant Ware, seeking post-conviction relief based on Farak's misconduct. The consolidation was for purposes of a September 9, 2013, evidentiary hearing addressing the timing and scope of Farak's misconduct at the Drug Lab (Compl. ¶ 247). The parties agreed that the evidence in the hearing before Judge Kinder would be relied on to adjudicate Penate's motion to dismiss the indictment (Compl. ¶ 262). On November 4, 2013, Judge Kinder denied Penate's motion to dismiss on the grounds that the evidence adduced at the September 9, 2013, hearing showed that Farak's misconduct postdated the drug testing in Penate's case (Compl. ¶¶ 341-42). I did not represent the

Commonwealth in opposing the motions for post-conviction relief or in connection with the September 9, 2013, evidentiary hearing.[1]

Cotto filed a motion to withdraw his guilty plea and for a new trial based on Farak's indictment. *See Commonwealth v. Cotto*, 27 N.E.3d 1213, 1216 (Mass. 2015). Ware also filed a motion for a new trial based on Farak's misconduct, followed by a motion to conduct postconviction discovery and for funds to do so. *See Commonwealth v. Ware*, 27 N.E.3d 1204, 1208-09 (Mass. 2015). On October 30, 2013, based on the evidence adduced at the September 9, 2013, evidentiary hearing, Judge Kinder denied Cotto's motion, concluding that "although there was 'powerful evidence' that Farak had engaged in egregious misconduct by stealing cocaine and replacing it with other substances," Cotto had "failed to establish that Farak's misconduct antedated his guilty pleas." *Cotto*, 27 N.E.3d at 1219. On March 12, 2014, Judge Kinder denied Ware's discovery motion for similar reasons. *Ware*, 27 N.E.3d at 1212. The Supreme Judicial Court granted applications for direct appellate review in the *Cotto* and *Ware* cases and consolidated them for argument. I represented the Commonwealth in the *Ware* and *Cotto* appeals in my capacity as an assistant district attorney in the appellate division of the Hampden County District Attorney's Office ("HCDAO"). The SJC heard argument on the cases on December 4, 2014. On or around January 6, 2015, I was sworn in as a Magistrate Judge of the United States District Court for the District of Massachusetts.

On April 8, 2015, The SJC issued its *Cotto* and *Ware* decisions. In *Ware*, the Court affirmed the denial of the defendant's motion for postconviction relief and for funds for the

[1] Then-assistant district attorney Frank Flannery was placed in charge of responding to motions for post-conviction relief based on Farak's misconduct. *See Commonwealth v. Cotto*, Indictment No. 2007770, 2017 WL 4124972, at *15 (Mass. Sup. Ct. June 26, 2017) ("*Cotto 2017*"). On or around October 1, 2018, Mr. Flannery was inducted as a judge of the Superior Court Department of the Massachusetts Trial Court.

discovery he proposed. *Ware*, 27 N.E.3d at 1213. The Court remanded the case for further proceedings because:

> the precise timing and scope of Farak's wrongdoing are unclear. When personnel at the Amherst drug lab notified the State police in January, 2013, that Farak may have compromised the evidence in two drug cases, the Commonwealth had a duty to conduct a thorough investigation to determine the nature and extent of her misconduct, and its effect both on pending cases and on cases in which defendants already had been convicted of crimes involving controlled substances that Farak had analyzed.

*Id.* at 1211-12. The Court suggested that "the State police detective unit of the Attorney General's office might be best suited to lead an investigation." *Id.* at 1212 n.14.

The Court also reversed the trial judge's ruling in *Cotto*, stating that, given what it knew, it had "no basis for concluding in the [*Cotto*] case that Farak's misconduct [wa]s a 'lapse of systemic magnitude in the criminal justice system,'" *Cotto*, 27 N.E.3d at 1225 (quoting *Commonwealth v. Scott*, 5 N.E.3d 530, 544 (Mass. 2014)), and that the defendant had not shown that Farak's misconduct antedated the testing of the drug samples in his case. *Id.* at 1226. The court held, however, that Cotto was entitled to have the Commonwealth conduct a thorough investigation to determine the nature and extent of Farak's misconduct. *Id.*

In response to the SJC's *Cotto* decision, the Attorney General directed Assistant Attorney General Thomas Caldwell "to investigate the timing and scope of Farak's misconduct and the deficiencies in the operation of the Amherst [drug] lab." *Cotto 2017*, 2017 WL 4124972, at *32. Farak and other drug lab employees testified before two grand juries convened by Caldwell, who filed his report on April 1, 2016. *Id.*

Throughout Penate's defense of the November 2011 charges, Luke Ryan, Penate's defense attorney – also his attorney in this case – was diligent in seeking access to the documents seized from Farak's car when she was arrested. *See id.* at *21, 47. He was unsuccessful in

obtaining such access before Penate's criminal trial and was subsequently limited by the presiding trial judge in defending Penate based on Farak's misconduct. *Id.* at *46-47. In July 2014, representing Wayne Burston, another so-called Drug Lab defendant, Ryan successfully moved for access to the evidence seized from Farak's car. *See id.* at *31. On October 30, 2014, Ryan inspected the evidence seized from Farak's car and discovered documents not previously turned over to defense counsel, including the mental health worksheets that suggested that Farak had been treated for substance use disorder in 2011. *Id.* Ryan immediately notified the AGO about his discovery and its significance. *Id.* On November 13, 2014, the AGO notified Massachusetts district attorneys "that, pursuant to a court order allowing a motion to inspect physical evidence, the AGO was sending them 289 pages of documentary evidence not previously turned over." *Id.*

With the expanded record generated by Caldwell's investigation and the documents turned over to the district attorneys in November 2014, Penate and other defendants filed new motions for post-conviction relief based on: "(1) Farak's drug tampering and theft; (2) the AGO's failure to disclose exculpatory evidence, particularly seven pages of Farak's mental health worksheets; [and] (3) the AGO's failure to conduct an adequate investigation in 2013 on the nature and scope of Farak's misconduct … ."[2] *Id.* at *1. The motions were consolidated and assigned to Honorable Richard J. Carey of the Superior Court Department of the Massachusetts Trial Court, who conducted a six-day evidentiary hearing in December 2016 "on the scope of

[2] The motions also relied on allegations of misconduct by former Springfield police officer Kevin Burnham. Plaintiff's claims in this case against the City of Springfield and various Springfield police officers were based on Burnham's alleged misconduct. Those claims have been resolved and dismissed (Dkt. No. 267).

governmental misconduct," followed by further hearings on the defendants' individual motions for new trials or to dismiss the indictments against them. *Id.* at *2.

The Commonwealth did not oppose Penate's motion for a new trial. *Id.* at *47. Judge Carey granted Penate's motion to dismiss his conviction because:

> Kaczmarek's and Foster's deliberate withholding of exculpatory evidence was particularly egregious in the Penate case. In 2013 and much of 2014, Ryan employed every appropriate and available legal mechanism to challenge what he aptly sensed was the AGO's stonewalling. His requests and motions for discovery in the drug lab cases earned him the ire of Kaczmarek. Ultimately, Ryan's efforts proved crucial for the disclosure of the mental health work sheets. Kaczmarek's and Foster's misconduct was so egregious in the Penate case that it creates presumptive prejudice and qualifies as a fraud upon the court. Dismissal is appropriate in this case to deter further misconduct of this unprecedented scope and nature.
>
> Furthermore, Penate was irremediably prejudiced by the failure to disclose the exculpatory evidence of Farak's misconduct, including her severe impairment from LSD on January 9, 2012, the day she analyzed the substances in [Penate's] case. Kaczmarek's and Foster's withholding of it deprived Penate of a key, meritorious defense. That constitutional deprivation resulted in Penate serving a longer prison sentence than he would have otherwise. The egregious misconduct by Kaczmarek and Foster, therefore, caused Penate irremediable harm which supplies a third and independent ground for allowing Penate's motion to dismiss the indictments with prejudice.

*Id.* at *47 (citations omitted).

III. Analysis

A. Timing

A motion under § 455 must be timely filed. *See United States v. O'Brien*, 18 F. Supp. 3d 25, 33 (D. Mass. 2014) (citing *In re United States*, 666 F.2d 690, 694 (1st Cir. 1981)). "[I]n general, a party must raise the recusal issue 'at the earliest moment after [acquiring] knowledge of the [relevant] facts.'" *In re United States*, 441 F.3d 44, 65 (1st Cir. 2006) (quoting *In re Abijoe Realty Corp.*, 943 F.2d 121, 126 (1st Cir. 1991) (alterations in original) (internal quotation marks and emphasis omitted)). In addition to avoiding the disruption and delay almost

certain to arise from an untimely recusal motion, *see O'Brien*, 18 F. Supp. 3d at 37-38, the timeliness requirement responds to concerns about a possible strategic motion by a litigant dissatisfied with, or concerned about, prior rulings by the presiding judge. *See id.* at 30-32 (citing *In re United States*, 441 F.3d at 65; *In re Abijoe Realty Corp.*, 943 F. 2d at 126).

Ballou acknowledges that a recusal motion must be timely and argues that his is because his counsel recently learned of my role in the *Cotto* and *Ware* cases. Penate's opposition to Ballou's motion presses the timeliness issue (Dkt. No. 277 at 7-11). He argues that if Ballou's initial and subsequent counsel did not know of my role as appellate counsel in the *Cotto* and *Ware* cases, they should have, since Penate's attorney identified that role in his discussions with defense counsel about possible consent (Dkt. No. 277-1, ¶¶ 33-37, my role was a matter of public record, and the SJC's *Cotto* and *Ware* decisions (in which I am identified as the attorney for the Commonwealth) were cited in Judge Carey's *Cotto 2017* decision, which was the only document Ballou identified to Penate in his Fed. R. 26(a) required initial disclosures (Dkt. No. 277 at 7-9).

While Penate's arguments are well taken, I will not deny the motion on gounds of untimeliness. When the case was assigned, I considered and determined that § 455 did not require my recusal. In the ordinary course, I would have discussed my role in *Cotto* and *Ware* with all counsel at the outset of the case in connection with the consent inquiry. That did not occur, however, because nine defendants responded to the complaint with motions to dismiss and some rulings on motions to dismiss were appealed on an interlocutory basis (Dkt. Nos. 26, 49, 53, 57, 63, 93, 95, 124, 145, 163). A hearing for purposes of setting a pretrial schedule with all counsel for the remaining defendants present was not held until April 30, 2019, approximately a year and a half after the case was filed and some fourteen months after the parties had filed the

consent form (Dkt. No. 92). Neither the parties nor the court raised the question of consent at this hearing. While the timing of Ballou's recusal motion immediately before the court addresses Ballou's summary judgment motion raises concerns, in the circumstances, I consider it appropriate to address the merits of Ballou's motion.

B. Merits

Defendant Joseph Ballou moves for my disqualification based on 28 U.S.C. § 455(a), (b)(1) and (3). The motion is not brought based on an allegation of actual partiality (Dkt. No. 275 at 5). Section 455 provides, in pertinent part, as follows:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify [her]self in any proceeding in which [her] impartiality might reasonably be questioned.
>
> (b) [S]he shall also disqualify herself in the following circumstances:
>
> > (1) Where [s]he has … personal knowledge of disputed evidentiary facts concerning the proceeding; or
> >
> > (2) …
> >
> > (3) Where[s]he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy.

I address the rekevant statutory provisions in reverse order.

1. Section (b)(3)

For purposes of § 455(b)(3), "[a] 'proceeding' is defined to include 'pretrial, trial, appellate review, or other stages of litigation.'" *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 471 F.3d 1355, 1357 (D.C. Cir. 2006) (Kavanaugh, J.). "In the statute, Congress chose to draw the recusal line for prior government employment at participation in the proceeding or expression of an opinion concerning the merits of the particular case in

controversy. It bears emphasis, moreover, that Congress chose the 'personal-participation' rule for recusal based on prior *government* employment while simultaneously enacting a different and far broader 'associational' rule for recusal based on prior *law firm* employment." *Id.* at 1357-58.

Ballou does not clearly identify a particular case on which he bases his recusal motion. I have not participated in the present case in any capacity other than as a judicial officer (it was not filed until after I was appointed), and I have not expressed any opinions concerning its merits other than in written opinions, during hearings, and in appropriate confidential discussions within the court. To the extent Ballou relies on my role before I was appointed as a U.S. Magistrate Judge, I did not represent the Commonwealth in its prosecution of Penate at any stage, either in any pretrial proceedings, at trial, on appeal, or in any post-conviction proceeding (Dkt. No. 277-2). I was unaware of, and never expressed any opinion about, the Commonwealth's prosecution of Penate.

I also did not represent the Commonwealth in its case against Farak, who was prosecuted in Hampshire County by lawyers employed by the AGO, nor did I express an opinion concerning the merits of the Commonwealth's prosecution of Farak. Neither *Cotto* nor *Ware* could reasonably be viewed as the "particular case" now in controversy. *See id.*

I conclude that 28 U.S.C. § 455(b)(3) does not require my recusal.

2. <u>Section (b)(1)</u>

"Under 28 U.S.C. § 455(b)(1), a judge must recuse [her]self when [s]he 'has … personal knowledge of disputed evidentiary facts concerning the proceeding.'" *United States v. Nixon*, 267 F. Supp. 3d 140, 152 (D.D.C. 2017) (quoting 8 U.S.C. § 455(b)(1)). Ballou does not identify any specific disputed facts of concern. Thus, it is not clear, what, if any, disputes there are between Penate and Ballou about evidentiary facts. *See id.* (stating that, when factual

evidentiary disputes had not yet materialized, the defendants' argument that the judge should recuse himself because of personal knowledge of disputed evidentiary facts was "too speculative at this point to support the Court's recusal").

Plaintiff's allegations about Ballou's role, as related in the Complaint, may be summarized as follows. After Drug Lab employees notified the MSP that drug samples assigned to Farak for analysis were missing, (Compl. ¶¶ 188-90), MSP officers impounded Farak's car (Compl. ¶ 196). Ballou and a colleague searched the vehicle, seizing approximately 300 pages of documents, some of which were documents related to Farak's treatment for substance use disorder, including a document recording Farak's use of narcotics while at work on December 22, 2011 (Compl. ¶¶ 199, 201-03). Penate does not dispute that Ballou reported his discoveries in the Farak investigation to the AGO, including the discovery of the mental health worksheets (Compl. ¶¶ 204, 213-221). Rather, he alleges that Ballou knowingly participated in the AGO's decision to withhold information about Farak's thefts and use of drugs during her Drug Lab employment (Compl. ¶¶ 207, 223, 291-94), and, at Kaczmarek's request, did not pursue investigative leads that might have shed light on the timing and extent of Farak's thefts and use of drugs (Compl. ¶¶ 213-16, 219).

It is possible that there are disputed evidentiary facts about the content of Ballou's communications with one or more of the AGO lawyers or his MSP colleagues about the Farak investigation and disclosure of documents to defense counsel, the district attorneys, and Judge Kinder. I was not the trial attorney in Penate's case, nor did I participate in pretrial or posttrial proceedings. I also was not the attorney representing the HCDAO in the September 2013 evidentiary hearing before Judge Kinder, and I did not participate in discussions or hearings about access to evidence at that hearing. I did not gain any personal knowledge about internal

AGO communications and the AGO's decisions about disclosures of evidence in my role as an appellate attorney arguing the *Cotto* and *Ware* cases, neither of which raised any issue about the AGO's disclosures of evidence. At the relevant time, members of the HCDAO appellate unit did not work in physical proximity to HCDAO trial attorneys and had limited informal communications with those colleagues. There was little to no opportunity for informal "water cooler" conversations about cases that HCDAO line attorneys were trying or motions they were arguing.

So far as appears from the record and to the best of my understanding, information about the AGO communications, decisions, and actions that are the basis of Penate's claims against Ballou did not come to light until after April 2015, when the SJC issued its decisions in the *Cotto* and *Ware* cases, and further investigative efforts led to the extended evidentiary hearing that Judge Carey conducted in December 2016, close to two years after I left the HCDAO.

In connection with ruling on Ballou's recusal motion, I re-read briefs in the *Cotto* and *Ware* cases. Ballou's testimony at the 2013 evidentiary hearing before Judge Kinder was at issue in the appeal of the *Cotto* case only insofar as Judge Kinder accepted Ballou's testimony that certain evidence (alleged discrepancies in Farak's analysis of pills seized by a Springfield police officer) on which the defendant sought to rely was not probative on the timing of Farak's evidence tampering.

On or around November 30, 2014, Ryan and attorney Glynis McVeety filed amicus briefs in the *Cotto* case. Ryan, who filed an amicus brief on behalf of Rafael Rodriguez, argued that documents he had discovered in October 2014, when he was finally allowed to review the evidence seized from Farak's vehicle, undermined Judge Kinder's decision about the timing of Farak's misconduct, that the AGO's failure to disclose the documents earlier had interfered with

efforts to reconstruct the timing of Farak's misconduct, and that any renewed effort to reconstruct the scope and timing of Farak's misconduct would be futile. The SJC acknowledged receipt of the amicus briefs, noting that the briefs were filed on behalf of two other Amherst drug lab cases whose motions to withdraw their guilty pleas had been denied and whose appeals of those decisions, pending in the Massachusetts Appeals Court, had been stayed pending the Court's decision in the *Cotto* case. *Cotto*, 27 N.E.3d at 1216 n.4. The *Cotto* court did not otherwise refer to or rely on the contents of the amicus briefs.

Ballou has not pointed to anything in the record from which it could be inferred that I have personal knowledge predating my assignment to this case of any potentially disputed evidentiary facts related to Ballou's responsibility for participating in decisions by the AGO that allegedly deprived Penate of access to exculpatory information in advance of his 2013 trial. Recusal is therefore not required under 28 U.S.C. § 455(b)(1).

3. <u>Section 455(a)</u>.

Section 455(a) of Title 28 provides that a magistrate judge shall disqualify him or herself "in any proceeding in which his [or her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "The focus of that provision 'is not [the judge's] actual state of mind at a particular time, but the existence of facts that would prompt a reasonable question in the mind of a well-informed person about the judge's capacity for impartiality.'" *O'Brien*, 18 F. Supp. 3d at 32 (quoting *In re Bulger*, 710 F.3d 42, 46 (1st Cir. 2013)). "[T]he test is not that of a casual observer, but rather a reasonable and objective observer who is 'fully informed of all the relevant facts.'" *Id.* (quoting *In re United States*, 158 F.3d 26, 31 (1st Cir. 1998)). "'[T]he presumption is that a judge will put personal beliefs aside and rule according to the laws as enacted, as required by his or her oath.'" *United States v. Sampson*, 148 F. Supp. 3d 75, 87 (D. Mass. 2015)

(quoting *In re Aguinda*, 241 F.3d 194, 204 (2d Cir. 2001)). "While doubts ordinarily should be resolved in favor of recusal, … the challenged judge enjoys a margin of discretion." *In re United States*, 158 F.3d at 30 (citing *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995); *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993)). Cases consistently acknowledge the need to balance the "public confidence in the integrity of the judicial process," *United States v. Salemme*, 164 F. Supp. 2d 86, 94 (D. Mass. 1998), against the risk that a party will invoke recusal for strategic reasons, which also risks undermining confidence in judicial integrity. *See Sampson*, 148 F. Supp. 3d at 87-88 (citing *In re Cargill, Inc.*, 66 F.3d 1256, 1262 (1st Cir. 1995)). Accordingly, "[s]ection 455(a) does not impose 'the standard of "Caesar's wife," the standard of mere suspicion.'" *O'Brien*, 18 F. Supp. 3d at 32 (quoting *In re Allied-Signal*, 891 F.2d 967, 970 (1st Cir. 1989)).

Rather,

> [t]he recusal standard must be more demanding because the disqualification decision must reflect *not only* the need to secure public confidence through proceedings that appear impartial, *but also* the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking.

*Bulger*, 710 F.3d at 47 (quoting *Allied-Signal*, 891 F.2d at 970) (internal quotations omitted).

The test is objective, based on the facts viewed as a whole. "[I]t is not based on the subjective state of mind of the judge, or that of the party seeking recusal." *O'Brien*, 18. F. Supp. 3d at 32 (citing *United States v. Voccola*, 99 F.3d 37, 42 (1st Cir. 1996)). "Generally, '[a] trial judge must hear cases unless some reasonable factual basis to doubt his [or her] impartiality or fairness of the tribunal is shown by some kind of probative evidence.'" *Salemme*, 164 F. Supp. 2d at 94 (quoting *Blizard v. Frechette*, 601 F.2d 1217, 1221 (1st Cir. 1979)). A decision to disqualify should not be based on speculation or suspicion. *Id.* In the final analysis, "'[t]he trial

judge has a duty not to recuse himself or herself if there is no objective basis for recusal.'" *Fideicomiso de la Tierra Del Caño Martin Peña v. Fortuño*, 631 F. Supp. 2d 134, 136 (D.P.R. 2009) (quoting *In re United States*, 441 F.3d at 67) (citations omitted).

Ballou argues that recusal is required because I was employed by the HCDAO during the period of time when Penate alleges that Ballou violated Penate's civil rights, and I represented the Commonwealth in two appeals that arose out of Farak's misconduct in which the appellants were seeking exculpatory material that Penate alleges should have been turned over to the HCDAO (Dkt. No. 275 at 4). He contends that the "overlap of the Farak scandal" with my tenure at the HCDAO and "[my] direct representation of the Commonwealth in the *Ware* and *Cotto* cases taken together establish 'facts [that] provide what an objective knowledgeable member of the public would find to be a reasonable basis for doubting the judge's partiality'" (Dkt. No. 275 at 4) (quoting *Voccola*, 99 F.3d at 41).

In analyzing Ballou's contentions, the *In re Bulger* case, in which the First Circuit held that the Honorable Richard G. Stearns could not preside over James Bulger's trial, is particularly instructive. *In re Bulger*, 710 F.3d at 49. In the 1970s and 1980s, organized crime in Boston was investigated by the F.B.I. and prosecuted either by the U.S. Attorney's Office or by a strike force which operated independently from the U.S. Attorney's Office. There was, however, communication between the strike force and the U.S. Attorney's Office. The indictment described Bulger as a leader of a Boston criminal organization from 1972 to 1999 and charged him with a number of federal offenses in this capacity. *Id.* at 43-44. In defense, Bulger asserted that he was granted immunity from prosecution by Jeremiah O'Sullivan in exchange for informing about others' criminal activities. O'Sullivan was, at the time, a member of the strike force, but was at other times an Assistant United States Attorney and Acting United States

Attorney. Bulger argued that "[t]he immunity agreement must have been known and honored by the Government's prosecutorial apparatus in Boston … throughout the better part of the period covered by the indictment," *id.* at 46, because he was not prosecuted. The First Circuit observed that official reports and cases predating Bulger's indictment had "disclosed disquieting links between the Government and the criminal element during the years in question …." *Id.* at 47. Judge Stearns held a variety of managerial and supervisory appointments in the U.S. Attorney's Office during much of the time that was covered by Bulger's indictment. *Id.* at 44. He denied Bulger's motion for his recusal because, at the relevant time, the U.S. Attorney's Office was separate from the strike force and he had no personal knowledge of anything material to the charges against Bulger. *Id.* at 44.

The First Circuit affirmed its belief in Judge Stearns' sincerity, but nonetheless concluded that, in the circumstances, a reasonable person might question his ability to preserve impartiality in the prosecution, particularly with respect to Bulger's immunity claim, which was a hotly contested factual dispute. *Id.* at 49. The First Circuit focused on the following facts in reaching this conclusion. The Court held that a reasonable person could think that someone who held the high positions in the U.S. Attorney's Office that Judge Stearns held at the relevant time "would only be human in reacting to [the immunity] claim in either a defensive or an adversarial way" in view of the institutional relationship between O'Sullivan and the U.S. Attorney's Office. *Id.* at 46. In reaching its conclusion, the First Circuit pointed to publicly available information suggesting that "responsibility for favoritism to [Bulger] was … extended to [O'Sullivan] who was subsequently placed in charge of the United States Attorney's Office." The First Circuit concluded that "[o]n these facts, concerns about impartiality arise from the very structure of the prosecutorial forces, which included some communication between the Strike Force and the

United States Attorney's Office." *Id.* at 48. Information that had been publicly disclosed tended to indicate "that the Government and [Bulger] were not at arm's length during all of the period in question, and that any evidence about the terms on which they dealt with each other could reflect on the United States Attorney's Office as it was constituted in those days." *Id.*

This case is distinguishable from *In re Bulger* in aspects that count. First, in relevant part, Penate's complaint charges violations of his rights by Ballou (and others) employed by, or assigned to work with, the AGO at the relevant time. I was employed by the HCDAO, not the AGO. In connection with Penate's prosecution, Penate alleges in his complaint in this case, on information and belief, that "ADA Eduardo Valazquez …, the Hampden County prosecutor assigned to Plaintiff's case, sought exculpatory evidence from the AGO and was told all relevant evidence had already been turned over" (Compl. ¶ 246). Judge Carey found that, on September 3, 2013, in advance of the evidentiary hearing before Judge Kinder, then-assistant district attorney Flannery, who was employed by the HCDAO, "wanted Ballou to schedule a day that week for Ryan to review the Farak evidence before the September 9th hearing. … Flannery had agreed to arrange for Ryan to view the evidence seized from Farak's vehicle." *Cotto 2017*, 2017 WL 4124972, at *28. Judge Carey found that Kaczmarek – an AGO employee – refused to permit this inspection to go forward. *Id.* So far as the court is aware, Penate has never alleged that any employee of the HCDAO sought to deny him access to exculpatory material. Nothing has been brought to the court's attention to suggest that further proceedings in Penate's case will result in inquiry into wrongdoing by the HCDAO, which is the government agency by which I was employed. *Contrast In re Bulger*, 710 F.3d at 48-49. Indeed, in 2018, on appeal of aspects of Judge Carey's rulings, the Massachusetts Supreme Judicial Court observed that it "discern[ed] no fault … in any actions by the district attorneys and their offices. The district attorneys

properly turned over the evidence they received to defendants whose convictions were called into question by Farak's misconduct, and engaged in time-consuming work promptly to identify and notify individuals whose cases were affected by Farak's misconduct." *Comm. for Pub. Counsel Servs. v. Attorney Gen.*, 108 N.E.3d 966, 986 n.11 (Mass. 2018). A reasonable, fully informed person would not question my ability to be impartial with respect to allegations of wrongdoing within the AGO, a government agency by which I have never been employed.

Second, even if there was any evidence or indication that actions by any HCDAO employee might be implicated by Penate's claims in this case, which there is not, I was an assistant district attorney with no supervisory role at the HCDAO. I did not have anything approaching the "level of institutional responsibility" for decisions made by the HCDAO that Judge Stearns had at the U.S. Attorney's Office. *See In re Bulger*, 710 F.3d at 44, 49. Again, a reasonable, informed person would not believe that my position at the HCDAO, which did not include any responsibility for acting as a liaison with the AGO or making policy decisions related to Farak's alleged misconduct, about which comparatively little was known in 2014, would affect my ability to judge the claims remaining in this case impartially. *See In re Scholl*, 166 F.3d 964, 977 (9th Cir. 1999) (affirming the trial judge's decision not to recuse herself where she was Chief Criminal Assistant to the United States attorney but did not supervise the division of the United States Attorney's Office that investigated the defendant).

"Congress could not foresee every conceivable recusal scenario that might occur. Therefore, rare and extraordinary circumstances arising out of prior government employment – but not covered or envisioned by § 455(b)(3) – conceivably could occur and support recusal under § 455(a)." *Baker & Hostetler*, 471 F.3d at 1358. This is not such a case. I was assigned to work on discrete appeals and that work did not include any pretrial, trial, or appellate

proceedings in Penate's case. Neither the *Cotto* nor the *Ware* appeal presented – directly or tangentially – the issue of whether Ballou participated in a scheme with AGO employees to knowingly withhold exculpatory evidence about Farak's misconduct from Penate, thereby violating Penate's *Brady* rights. In the *Ware* case, which raised the issue of discovery in connection with Ware's motion for a new trial, Ware sought inspection and retesting of drug evidence maintained by the Springfield police department related to drug cases brought between 2004 and 2013, not inspection of the evidence seized from Farak's vehicle. *Ware*, 27 N.E.3d at 1209. In the *Cotto* case, the defendant appealed the denial of access to testimony from Farak's spouse about Farak's substance use disorder. *See Cotto*, 27 N.E.3d at 1229-32. Neither case raised the issue of Ryan's efforts to obtain evidence from the AGO.

While Ballou is right that the alleged misconduct on which Penate bases his claims took place at the AGO while I was employed at the HCDAO (Dkt. No. 275 at 4), that misconduct did not come to light until a group of Drug Lab defendants, including Cotto and Ware, moved for new trials and/or to dismiss the indictments that had resulted in their prior convictions based on newly available evidence about the timing and scope of Farak's drug use and the AGO's failure to disclose the exculpatory evidence that shed light on the timing and scope of Farak's misconduct. *See Cotto 2017*, 2017 WL 4124972, at *2, 36. These are facts that were not implicated in my prior work as a government lawyer and about which I did not become aware until this case was assigned to me in my present judicial capacity. "It is well established that generally '[k]knowledge of disputed facts requires disqualification only if the knowledge has an extrajudicial source.'" *Salemme*, 164 F. Supp. 2d at 99 (quoting *United States v. Widgery*, 778 F.2d 325, 328 (7th Cir. 1985)) (collecting additional cases).

I conclude that an objective and reasonable person, fully informed of the relevant facts, would not entertain a significant doubt about my ability to impartially adjudicate Penate's claims against Ballou.

4. Conclusion

For the foregoing reasons, Defendant Joseph Ballou's Motion to Disqualify Magistrate Judge (Dkt. No. 275) is DENIED.

It is so ordered.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED: September 22, 2021