UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROLANDO PENATE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:17-30119-KAR |
| | ) | |
| | ) | |
| ANNE KACZMAREK, JOSEPH | ) | |
| BALLOU, ROBERT IRWIN, RANDY | ) | |
| THOMAS, and SONJA FARAK, | ) | |
| Defendants. | ) | |

<u>MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AGAINST DEFENDANTS JOSEPH BALLOU, ROBERT IRWIN, AND
RANDY THOMAS; DEFENDANT JOSEPH BALLOU'S MOTION FOR SUMMARY
JUDGMENT AND REQUEST FOR ORAL ARGUMENT; DEFENDANT RANDY THOMAS'
MOTION FOR SUMMARY JUDGMENT; and DEFENDANT ROBERT IRWIN'S MOTION
FOR SUMMARY JUDGMENT</u>
(Dkt Nos. 310, 317, 320, and 322)

ROBERTSON, U.S.M.J.

Rolando Penate ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against

Joseph Ballou ("Ballou"), Randy Thomas ("Thomas"), and Robert Irwin ("Irwin") (collectively,

"Defendants") and others after having spent over five years in Massachusetts state prison based

on his criminal conviction for drug distribution, a conviction which was ultimately dismissed

with prejudice as a result of evidence that Sonja Farak, a drug laboratory chemist, was stealing

and using lab samples to feed a drug addiction at the time she was testing and certifying the

samples in Plaintiff's case.[1]  Penate alleges that Ballou, Thomas, and Irwin, who were members

---

[1] The other remaining defendants are Farak and Anne Kaczmarek, a former Massachusetts
Assistant Attorney General.  The motions for summary judgment relating to these defendants are
addressed separately.

of the Massachusetts State Police involved in the investigation of Farak, violated his constitutional rights by suppressing evidence of the extent of Farak's misconduct.  Presently before the court is Plaintiff's motion for summary judgment against Ballou and partial summary judgment against Irwin and Thomas on Count III of his complaint alleging a violation of 42 U.S.C. § 1983 (Dkt. No. 310), as well as Ballou's, Irwin's, and Thomas's cross-motions for summary judgment against Plaintiff on Count III of his complaint (Dkt. Nos. 317, 320, and 322).[2]  The parties have consented to this court's jurisdiction.  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73 (Dkt. No. 92).  For the following reasons, Plaintiff's motion (Dkt. No. 310) is DENIED and Ballou's (Dkt. No. 317), Irwin's, (Dkt. No. 322), and Thomas's (Dkt. No. 320) motions are GRANTED.

## I.     STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue is 'genuine' when a rational factfinder could resolve it either direction."  *Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 5 (1st Cir.), *rev. denied*, 885 F.3d 52 (1st Cir. 2018) (citing *Borges ex rel. S.M.B.W. v. Serrano–Isern*, 605 F.3d 1, 4 (1st Cir. 2010)).  "A fact is 'material' when its (non)existence could change a case's outcome."  *Id*. (citing *Borges*, 605 F.3d at 5).

A party seeking summary judgment is responsible for identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden either by "offering

---

[2] Defendants also moved for summary judgment on Count VIII of Plaintiff's complaint for intentional infliction of emotional distress, but Plaintiff has decided not to proceed with that claim.  Accordingly, it is dismissed.

evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325). If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute." *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The record is viewed in favor of the nonmoving party, and reasonable inferences are drawn in the nonmoving party's favor. *See Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (citing *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)).

"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se*." *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996) (citing *Wiley v. Am. Greetings Corp.*, 762 F.2d 139, 141 (1st Cir. 1985)). "Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Id.* (citing *Wiley*, 762 F.2d at 141). "Where, as here, a district court rules simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism." *Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010) (citing *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir. 1996) ("Barring special circumstances, the nisi prius court must consider each motion separately, drawing inferences against each movant in turn.")).

## II.    FACTUAL BACKGROUND[3]

On Friday morning, January 18, 2013, Sharon Salem ("Salem"), the evidence officer at the Amherst Drug Lab ("the Lab"), advised Supervisor James Hanchett ("Hanchett") that two cocaine samples assigned to chemist Sonja Farak ("Farak") were not in the main evidence room where they were supposed to be (Pl. SOF 27; Def. Resp. 27; Def. SOF 31; Pl. Resp. 31). Salem and Hanchett undertook a search of the Lab and discovered suspected drugs and adulterants at Farak's workstation (Def. SOF 31; Pl. Resp. 31). In response, Hanchett contacted the Massachusetts State Police ("MSP"), and detectives in the MSP unit assigned to the Northwestern District Attorney's office ("NWDAO") commenced an investigation (Pl. SOF 28-29; Def. Resp. 28-29; Def. SOF 31; Pl. Resp. 31). Investigators quickly spoke to Farak, who denied any wrongdoing and refused to consent to a search of her car (Pl. SOF 30,32; Def. Resp. 30, 32; Def. SOF 33; Pl. Resp. 33). Undeterred, the investigators impounded the vehicle and towed it to the MSP barracks in Northampton pending issuance of a search warrant (Pl. SOF 32, 36; Def. Resp. 32, 36; Def. SOF 34; Pl. Resp. 34).

---

[3] The facts are taken from Plaintiff's Response to Defendants Joseph F. Ballou and Randy Thomas' Joint Concise Statement of Undisputed Material Facts (Dkt. No. 336), which includes Defendants' statement of facts ("Def. SOF") and Plaintiff's responses thereto ("Pl. Resp."), as well as Defendants Joseph Ballou and Randy Thomas's Reply to the Statement of Material Facts Filed in Opposition to Motions for Summary Judgment Filed by Defendant Joseph Ballou, Randy Thomas, and Robert Irwin (Dkt. No. 359), which includes Plaintiff's statement of facts ("Pl. SOF") and Defendants' responses thereto ("Def. Resp."); as well as from the materials cited therein. The court notes that Irwin did not file his own Local Rule 56.1 statement but has instead adopted the statement jointly submitted by Ballou and Thomas (Dkt. No. 323 at 3). Nor did he file a response to Plaintiff's statement of facts, instead adopting the responses jointly submitted by Ballou and Thomas (Dkt. No. 342 at 2). The court declines Plaintiff's invitation to deem Plaintiff's statement of facts admitted based on Defendants' purported failure to comply with the strictures of L.R. 56.1, which requires a party opposing a motion for summary judgment to "include a concise statement of the material facts of record as to which it is contended there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation." Defendant's reply sufficiently complies with the rule to be considered.

Irwin, who was the highest-ranking member of the MSP unit assigned to the Attorney General's Office ("AGO") and worked in Boston, was directed to drive to Northampton and bring some state police detectives assigned to the AGO to either assist in or take over the investigation from the NWDAO (Pl. SOF 16, 33; Def. Resp. 16, 33; Def. SOF 14, 16-17; Pl. Resp. 14, 16-17).[4]  Irwin relayed this directive to Ballou, who was a sergeant working in the Springfield office of the MSP unit assigned to the AGO and reported to Irwin (Pl. SOF 21, 34; Def. Resp. 21, 34; Def. SOF 16, 18, 35 ; Pl. Resp. 16, 18, 35).  Ballou then contacted Thomas, a trooper working in the same office under his supervision and told him to report to the MSP's detective unit assigned to the NWDAO (Pl. SOF 21, 35; Def. Resp. 21, 35; Def. SOF 15-16, 19, 36; Pl. Resp. 15-16, 19, 36).

After arriving at the NWDAO, Ballou and Thomas began reviewing reports and interviewing troopers about the investigation of Farak (Def. SOF 38; Pl. Resp. 38).  Ballou and Thomas, with the participation of Irwin, produced an affidavit to use in support of the application for a warrant to search Farak's car (Pl. SOF 37; Def. Resp. 37; Def. SOF 38; Pl. Resp. 38).  The AGO reviewed and approved the affidavit, and Thomas signed it in its final form (Pl. SOF 37; Def. Resp. 37; Def. SOF 38; Pl. Resp. 38).  At approximately 2:30 a.m., a search warrant issued for the vehicle authorizing the seizure of white powdery substances that could be used as adulterants/diluents; records of purchases of lighters, substances that could be used as adulterants/diluents, plastic bags, and pipes/smoking implements; cocaine and other controlled

---

[4] Defendants object to Plaintiff's SOF 33 as not being supported by the citation (Def. Resp. 33). The court disagrees, and the objection is overruled.  Defendants further object that the statement is not a material fact.  Rule 56 does not contemplate objections on the basis of materiality, but rather only if "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Evid. 56(c)(2).  Arguments about materiality go to the merits of whether a party is entitled to summary judgment, not to admissibility.  Accordingly, each of Defendants' many objections on materiality grounds is overruled.

substances; records of ownership or access/possession/control of the vehicle; and records or

paperwork associated with controlled substances (Pl. SOF 38, 42, 42A; Def. Resp. 38, 42, 42A;

Def. SOF 38; Pl. Resp. 38; Dkt. 337-19 at 2).[5]

Between 3:23 a.m. and 4:56 a.m., Irwin, Ballou, and Thomas executed the warrant, while

Trooper Christopher Dolan ("Dolan") from Crime Scene Services took photographs (Pl. SOF 39-

41; Def. Resp. 39-41; Def. SOF 39-40; Pl. Resp. 39-40).  Thomas was assigned to be the

evidence officer for the search (Def. SOF 42; Pl. Resp. 42).  As the officers were conducting the

search, they attempted to ascertain whether the items being taken out of the car met the criteria of

the warrant (Pl. SOF 43; Def. Resp. 43).[6]  If an item in the car met the criteria of the warrant, it

was placed in an evidence bag, and an evidence tag was placed on the bag (Pl. SOF 44, Def.

Resp. 44).  Among the items the investigators seized were a clear plastic bag containing drug

paraphernalia, white powder that appeared to be cocaine, a brownish tar substance consistent

with heroin, and a manila envelope containing paperwork (Pl. SOF 45-47; Def. Resp. 45-47).

Included among that paperwork was a "ServiceNet Diary Card" that Farak completed during the

seven-day period from Tuesday, December 20 to Monday, December 26, 2011 (Pl. SOF 9, 47;

Def. Resp. 9, 47).[7]  Farak's entry for December 22 states: "tried to resist using @ work but

---

[5] Defendants object to Plaintiff's SOF 42 and 42A on grounds that "the document speaks for itself," and to 42A for the additional reasons that it is argumentative and inadmissible opinion. None of the objections have any substance, and they are overruled.

[6] Defendants object to Plaintiff's SOF 43 as not being supported by the citation, but Irwin's testimony plainly supports the fact that he, Ballou, and Thomas were trying to ensure that items being seized met the criteria of the warrant.  The objection is overruled.

[7] Defendants object to Plaintiff's SOF 9 containing the ServiceNet Diary Card on hearsay grounds (Def. Resp. 9).  The court finds that the document could be presented in a form that would be admissible in evidence under Rule 803 as a statement made for medical diagnosis or treatment and overrules the objection.  It appears the document "[wa]s made for – and [was] reasonably pertinent to – medical diagnosis or treatment," insofar as Farak was receiving treatment from clinicians at ServiceNet, Inc. at the time (Pl. SOF 8).  *See* Fed. R. Evid. 803(4). The court also overrules Defendants' objection that the citations offered in support of the

ended up failing" (Pl. SOF 10; Def. Resp. 10).[8]  Also in the envelope was an "Emotion

Regulation Worksheet" bearing handwritten notations including: under the heading "Prompting

Event," "got 'good' sample @ work + having urges to use (+ knowing that I will be the only one

here after lunch;" under the heading "Interpretations," "It doesn't matter – I won't get caught,"

and "Know I'll feel worse when/if I use," and under the heading "Action/Urge," "hurry up +

prepare/use" (Pl. SOF 47; Def. Resp. 47).  Other documents in the car included: a second

undated "ServiceNet Diary Card" with the notation "Shame at work. Going to use phentermine,

but when I went to take it, I saw how little (v. little) there is left = ended up not using;" a

"Homework" assignment dated "11-16-11;" a scrap of paper containing the name, address, and

telephone number of a therapist named Anna Kogan; numerous pre-2012 emails; two pre-2012

letters; numerous pre-2012 news articles; two pre-2012 receipts; 2011 travel authorization forms,

pre-2012 lab paperwork, a schedule of games for Week 13 of the NFL's 2011 season; four blank

worksheet pages bearing the title, "The Four Responses," and asking for reflections of a personal

nature; handwritten notes reflecting on how "to ride out an urge, which can be a hellish

process…;" two charts labeled DBT-S States of Mind," contrasting the characteristics of an

"Addict Mind" and a "Clean" or "Clear Mind;" two pages discussing "The Path to Clear Mind;"

one blank "Emotion Regulation Worksheet;" three blank "ServiceNet Diary Cards;" four blank

"Skills" worksheets aimed at fostering personal growth; one blank "Distress Tolerance Work

Sheet;" ten pages providing instructions on "How to Check the Facts" leading to emotions; and

ten blank "DBT Behavioral Chain Analysis" worksheets (Pl. SOF 49, 49A, 50; Def. Resp. 49,

---

statement do not support the fact asserted.  Because the document is not excluded by the rule
against hearsay pursuant to Fed. R. Evid. 803, it may be offered for the truth of matters asserted
therein.

[8] Defendant's objections to Plaintiff's SOF 10 relating to the ServiceNet Diary Card are
overruled for the same reasons as stated in the previous footnote.

49A, 50).[9]  The investigators seized a total of 289 pages of documentary evidence from Farak's vehicle (Pl. SOF 232; Def. Resp. 232).  Irwin later testified that the investigators seized the mental health documents during the search of Farak's car because they were important evidence in the case against Farak (Pl. SOF 61H; Def. Resp. 61H).  Immediately upon completion of the search of Farak's vehicle, Ballou and Thomas brought the items seized to the evidence locker at the AGO's Springfield office, which is a locked room with limited access (Def. SOF 45; Pl. Resp. 45).

Following the search of Farak's automobile, Ballou applied for a criminal complaint to issue against her charging her with two counts of tampering with evidence and two counts of unlawful possession of narcotics (Def. SOF 49; Pl. Resp. 49).  After the AGO signed off on the submission of the affidavit in support of the criminal complaint, a clerk-magistrate approved it and issued an arrest warrant for Farak (Def. SOF 50; Pl. Resp. 50).  Ballou and Thomas arrested Farak on January 19, 2013, and she was arraigned in the Eastern Hampshire District Court on Tuesday, January 22, 2013 (Pl. SOF 52, 60; Def. Resp. 52, 60; Def. SOF 21, 50-51; Pl. Resp. 21, 50-51).  Assistant Attorney General Anne Kaczmarek ("Kaczmarek") in the Enterprise and Major Crimes Unit within the Criminal Bureau was assigned the task of prosecuting Farak, and Ballou became the case officer (Pl. SOF 20, 61, 70H; Def. Resp. 20, 61, 70H; Def. SOF 10-11; Pl. Resp. 10-11).  Ballou testified that as case officer, he was "in charge of holding on to the evidence," and "keeping track of it" (Pl. SOF 70I).[10]  According to Irwin, it was "the

---

[9] Defendants object to Plaintiff's SOF 50 regarding the second "ServiceNet Diary Card" on hearsay grounds.  The objection is overruled pursuant to Fed. R. Evid. 803(4) following the rationale set out in footnote 7.

[10] Defendants object to Plaintiff's SOF 70I, stating "Objection.  See ECF No. 318 at ¶¶ 45, 59-61, 80-85, 99-101)" (Def. Resp. 70I).  However, none of the paragraphs cited by Defendants, nor the exhibits cited in the paragraphs, controvert the assertion in paragraph 70I, which is directly quoted from Ballou's testimony.  Therefore, the objection is overruled.

responsibility of the case officer to go through [the papers seized from Farak's car] and detect anything and everything of evidentiary value and turn it into a report" (Pl. SOF 70J).[11]

In the evening of January 22, 2013, Ballou sent an email to Kaczmarek, copying Criminal Bureau Chief John Verner ("Verner") and Thomas, with a draft of an affidavit he prepared in support of an application for a warrant to search a duffel bag found at Farak's workstation (Pl. SOF 24, 61A; Def. Resp. 24, 61A; Def. SOF 52; Pl. Resp. 52).  Ballou indicated that if any changes could be made in the morning, Thomas might be able to take the completed warrant application to court, along with the return for the search of Farak's car (Pl. SOF 61B; Def. Resp. 61; Dkt. 337-92).  Verner responded the following morning, saying that he would add to one of the paragraphs "all that was found, including the papers.  The fact that all this stuff was found in her car leads [sic] credence to our proposition that stuff will be found in the bag (most is in there, but we found personal papers) …"  (Pl. SOF 61C-61E; Dkt. 337-92).

Later that morning, Thomas returned the car search warrant to the clerk's office and provided the court with "an inventory of the property taken pursuant to th[e] warrant" (Pl. SOF 62-63; Def. Resp. 62-63; Def. SOF 47; Pl. Resp. 47).  The inventory listed twenty separate items, seven of which referenced "assorted lab paperwork," "assorted lab paper work," or "lab paperwork;" these were the same descriptive terms that were given to the items when they were seized (Pl. SOF 64; Def. Resp. 64; Def. SOF 47; Pl. Resp. 47).  The envelope containing the ServiceNet Diary Card for December 20 to December 26, 2011, in particular, was identified as containing "lab paperwork" (Pl. SOF 65; Def. Resp. 65).  Irwin later indicated that the mental health documents were not referenced in the search warrant return because it was unclear

---

[11] Defendants' objection to Plaintiff's SOF 70J suffers from the same shortcoming as their objection to 70I.  It is overruled.

whether they were protected under HIPAA (Pl. SOF 61G; Def. Resp. 61G).[12]  Thomas swore

that the inventory was "a true and detailed account of all the property taken by [him] on th[e]

search warrant" (Pl. SOF 66; Def. Resp. 66).  Thereafter, Thomas submitted a police report

memorializing the execution of the search warrant, which listed the same twenty items and

described them the same way as in the search warrant return (Pl. SOF 69-70; Def. Resp. 69-70).

On the same day that Thomas returned the car search warrant, Ballou sent an email to

Kaczmarek, copying Verner and Irwin, indicating that he had received a call from Karen

Southerland ("Southerland"), an Assistant District Attorney ("ADA") in the Hampden County

District Attorney's Office ("HCDAO"), regarding a Farak drug case she had in which the

Springfield Police told her that one of the drug samples appeared to have been tampered with

(Dkt. 337-94).  Later that day, Ballou sent another email to Kaczmarek, copying Irwin, in which

he stated that he had spoken with Southerland; the Springfield police report indicated that 51

Oxycodone pills were seized on March 16, 2012, but that after Farak conducted an analysis,

which showed that no controlled substances were found, there were 61 pills and they looked

different from the ones the officer had seized (Dkt. 337-95).  Southerland also told Ballou about

another cocaine case that was "light" by 4 grams (Def. SOF 83; Pl. Resp. 83; Dkt. 337-95).

Ballou ended his email by stating, "I'm a little skeptical because neither of these cases seem to fit

the scheme that we think Farak was perpetrating.  In our cases, she was certifying the drugs

correctly, then stealing/replacing the drugs.  They also go back a lot further than the cases we are

looking at.  Still, it warrants investigation of course" (Dkt. No. 337-95).  The following day,

January 24, 2013, Ballou followed up with another email to Kaczmarek, stating that he had

spoken with ADA Diane Dillon about the "light" cocaine case and that Farak had performed the

---

[12] HIPAA is the acronym for the Health Insurance Portability and Accountability Act of 1996.

analysis back in 2005 (Pl. SOF 70E; Def. Resp. 70E; Dkt. No. 337-95).  In response, Kaczmarek

wrote, "Please don't let this get more complicated than we thought.  If she were suffering from a

back injury – maybe she took some oxys?" (Pl. SOF 70F; Dkt. No. 337-95).

The search warrant for the duffel bag was obtained and executed on January 25, 2013

(Def. SOF 53; Pl. Resp. 53).  The search authorized by the warrant resulted in the recovery of

soy candle wax shavings, a box of baking soda, a canister of baking powder, white clay, Dove

soap, and numerous opened heat-sealed packages (Def. SOF 53; Pl. Resp. 53).  Ballou placed the

items seized from the duffel bag in the same evidence locker at the AGO's Springfield office as

the items that had been seized from Farak's car, as well as items previously seized by MSP

members assigned to the NWDAO (Def. SOF 54; Pl. Resp. 54).

On February 6, 2013, Ballou submitted a nine-page police report to Irwin regarding the

Farak investigation (Pl. SOF 70K; Def. Resp. 70K).  A single paragraph of the report relates to

the search of Farak's vehicle (Dkt. No. 337-18).  The paragraph makes no mention of personal

papers being seized from the car (Dkt. No. 337-18).  It directs the reader to Thomas's search

warrant execution report and Dolan's photographs and report for additional detail (Dkt. No. 337-

18).

At some point after Farak's arrest, Irwin and Kaczmarek received a folder containing

access report records for the Drug Evidence Storage Room at the Lab, which had been requested

by MSP Forensic Services Supervisor Bruce Cranstoun (Pl. SOF 70O, 70S; Def. Resp. 70O,

70S).  Neither Irwin nor Kaczmarek ever looked at the records or shared them with Ballou (Pl.

SOF 70T; Def. Resp. 70T).  The reports showed that Farak had entered the Drug Evidence

Storage Room on four consecutive Sundays in July 2012 (Pl. SOF 70U; Def. SOF 70U).  On the

first of those Sundays, Farak assigned herself a batch of samples submitted by the Westfield

Police Department, which, when subsequently re-tested by another chemist, revealed evidence of tampering by Farak (Pl. SOF 70V-70W; Def. Resp. 70V-70W).

On the morning of February 14, 2013, Ballou took a closer look at the evidence seized during the investigation of Farak, including the paperwork seized from Farak's vehicle (Pl. SOF 71; Def. Resp. 71; Def. SOF 55; Pl. Resp. 55). Ballou's table examination of the evidence involved Ballou signing out the evidence from the AGO's secured evidence locker and spreading it out on the conference room table in the AGO's office (Def. SOF 57; Pl. Resp. 57). At some point, he came across mental health documents that contained admissions by Farak of using drugs at work (Pl. SOF 72, 77; Def. Resp. 72, 77; Def. SOF 57; Pl. Resp. 57). According to Ballou, he assumed Farak's admissions concerned drug use in December 2012 (Pl. SOF 78; Def. Resp. 78).[13] Ballou shared this information with Thomas, who neither amended nor supplemented the search warrant return he filed, nor the police report he submitted (Pl. SOF 77-78; Def. Resp. 77-78).

When Ballou started finding things in the physical evidence, he stopped his review to call Kaczmarek, who asked him to scan and send the materials to her (Pl. SOF 88-89; Def. Resp. 88-89; Def. SOF 57; Pl. Resp. 57). Ballou told Kaczmarek that the mental health documents could be privileged, or HIPAA related (Pl. SOF 112D; Def. Resp. 112D). Ballou complied with Kaczmarek's request, sending her an email, copying Verner and Irwin, with the subject "FARAK admissions," which stated:

> Anne,
>
> Here are those forms with the admissions of drug use I was talking about.  There are also news articles with handwritten comments

---

[13] The ServiceNet Diary Card included the dates "12-26 – Mon," "12-20 – Tues," "12-21 – Wed," "12-22 – Thurs," "12-23 – Fri," "12-24 – Sat," and "12-25 – Sun," but the document does not include an indication of the year in which the entries were made.

about other officials being caught with drugs.  All of these were
found in her car inside of the lab manila envelopes.

Joe

(Pl. SOF 98; Def. Resp. 98; Def. SOF 24, 58; Pl. Resp. 24, 58).  Ballou appended four

attachments to the email, as follows:

1. "Articles and Notes," which consisted of copies of three news articles, including
   (a) an article entitled "Capeless on Steroid Probe," which was printed on
   September 20, 2011, and concerned the removal of Pittsfield Police Officer David
   Kirchner from the Berkshire County Drug Task Force, and included a handwritten
   note stating "And Kirchner seemed like such a good guy.  I do feel bad for his 5
   y.o. daughter.  (Thank god I'm not a law enforcement officer)  P.S. Most of the
   cases he's been a part of have been dismissed for exactly this reason."; (b) an
   article about a Pittsfield pharmacist sentenced to three years in prison for stealing
   OxyContin pills; and (c) an article about the indictment of a San Francisco drug
   lab analyst;

2. "Emotion Regulation Homework" consisting of (a) an "Emotion Regulation
   Worksheet" bearing the handwritten notation under the heading "Action Urge,"
   "Use (have 12 urge-ful samples to analyze out of the next 13);" (b) a handwritten
   "Pros" and "Cons" list for "resisting" and "TB"; and (c) a handwritten account of
   various events, actions, and emotions;

3. "Positive Morphine Test," which consisted of a positive morphine screen
   conducted by Quest Diagnostics for an unknown third party; and

4. "Emotion Regulation Worksheet," consisting of (a) the "Emotion Regulation
   Worksheet" with the handwritten notation regarding a "'good' sample @ work"
   and the urge to "hurry up + prepare/use"; (b) the "ServiceNet Diary Card"
   memorializing Farak's "using @ work" on December 22, 2011; and (c) a
   handwritten skills worksheet

(Pl. SOF 90-98; Def. Resp. 90-98; Def. SOF 58; Pl. Resp. 58).[14]  After speaking with Ballou

about the documents and reviewing those that Ballou forwarded to her, Kaczmarek understood

that what Ballou had sent was just a sampling of the documents that had been seized during the

---

[14] Defendants object to Plaintiff's SOF 92-97 as hearsay.  The objections are overruled as the
documents are not offered for the truth of the matters asserted therein.  *See* Fed. R. Evid.
801(c)(2).

search of Farak's car (Def. SOF 59; Pl. Resp. 59).  Irwin read Ballou's email and reviewed the

attachments that same day (Pl. SOF 100; Def. Resp. 100).  Thomas also received a copy of

Ballou's email but without the attachments (Pl. SOF 112; Def. Resp. 112).

 After scanning and emailing the documents to Kaczmarek, Ballou returned them to the

locked evidence room in the AGO's Springfield office (Def. SOF 61; Pl. Resp. 61).  He could

not say whether he resumed his review of the remaining documents after pausing to tell

Kaczmarek what he had found (Pl. SOF 109; Def. Resp. 109).  Kaczmarek never asked Ballou to

look into the documents further (Pl. SOF 107; Def. Resp. 107).  Irwin did not disclose the mental

health documents or their existence to any district attorney's office, nor did he direct Ballou or

any other subordinate to make such a disclosure (Pl. SOF 102; Def. Resp. 102).  According to

Irwin, when asked what training he provided to subordinates on their duty to disclose

exculpatory evidence, he stated:

> [W]e are required to turn everything we seize, all notes, all reports,
> all evidence, to the Attorney General's Office so they can make
> that determination of, you know, what, as you say, is exculpatory,
> inculpatory, what stays, what goes, what's turned over what's not.
> That's all the way up to – that's all up to the Attorney General's
> Office.  The state police just provide the evidence.

(Pl. SOF 103).  Ballou agreed that it was his "custom" to "collect the evidence, … turn it over to

the prosecutor, and the prosecutor does whatever the prosecutor is supposed to do with the

discovery" (Pl. SOF 104; Def. Resp. 104).[15]

---

[15] Defendants object to Plaintiff's SOF 104, as "[a]rgumentative" and "[m]ischaracterization"
and by citing ECF No. 318 at ¶¶ 45, 59-61, 99-101 (Def. Resp. 104).  The statement is neither
argumentative nor a mischaracterization as it is taken directly from Ballou's testimony.
Moreover, none of the paragraphs cited by Defendants, nor the exhibits cited in the paragraphs,
controvert the assertion in paragraph 104.  Therefore, the objection is overruled.

After Farak was arrested and arraigned in the District Court, the AGO took action to remove the case to Superior Court by having a grand jury indict Farak (Def. SOF 63; Pl. Resp. 63). Kaczmarek called Ballou to testify before the grand jury on February 28, 2013, March 11, 2013, and April 1, 2013 (Def. SOF 65; Pl. Resp. 65). Kaczmarek told Ballou that the documents he had named "Emotion Regulation Homework" and "Emotion Regulation Worksheet" in his February 14, 2013, email to her would not be introduced to the grand jury because they were not needed to establish probable cause and due to the AGO's concern that they might be privileged; Ballou was not involved in this decision (Pl. SOF 113-115; Def. Resp. 113-115; Def. SOF 65-66; Pl. Resp. 65-66). Ballou was not asked about the documents, nor did he offer any testimony about them before the grand jury (Def. SOF 69; Pl. Resp. 69). Ultimately, Farak was indicted by the grand jury on April 1, 2013, on four counts of tampering with evidence, two counts of possession of a Class B substance, and four counts of theft of a controlled substance from a dispensary (Def. SOF 70-71; Pl. Resp. 70-71). Thereafter, the Commonwealth dropped the four charges that were pending against Farak in the Eastern Hampshire District Court and proceeded against her in the Hampshire Superior Court (Def. SOF 72; Pl. Resp. 72).

On or about March 27, 2013, Verner sent a letter to all eleven elected Massachusetts District Attorneys that stated:

> This Office is investigating Sonja Farak, a chemist who conducted analysis of suspected narcotic samples out of the Amherst Drug Laboratory. … During our investigation, this Office has produced or otherwise come into possession of information, documents and reports. Pursuant to this Office's obligation to provide potentially exculpatory information to the District Attorneys as well as information necessary to your Offices' determination about how to proceed with cases in which related narcotics evidence was tested at the Amherst Laboratory, please find the below listed materials: ….

(Pl. SOF 118; Def. Resp. 118; Def. SOF 107; Pl. Resp. 107).  The mental health documents were not included in this disclosure (Pl. SOF 119; Def. Resp. 119; Def. SOF 107; Pl. Resp. 107).  All of Ballou's reports were included (Def. SOF 104; Pl. Resp. 104).  Ballou hand delivered the sealed envelopes containing the disclosures to the NWDAO and the HCDAO that same day (Def. SOF 111; Pl. Resp. 111).

Farak was arraigned in the Hampshire Superior Court on April 22, 2013 (Def. SOF 73; Pl. Resp. 73).  On that day, Kaczmarek provided Farak's defense counsel, Elaine Pourinski ("Pourinski"), with a discovery packet that included the documents that Ballou had attached to his February 14, 2013, email (Def. SOF 73; Pl. Resp. 73).  Kaczmarek also directed Ballou to provide Pourinski with access to all the items that had been collected in the investigation of Farak (Def. SOF 74; Pl. Resp. 74).  Accordingly, on May 14, 2013, Farak and her defense counsel spent about three hours reviewing the evidence that had been gathered by the Commonwealth in the case against her, which Ballou had set out in a conference room in the AGO's Springfield office (Def. SOF 75, 77; Pl. Resp. 75, 77).  Kaczmarek was present in the Springfield office that day and met with both Ballou and Pourinski, but she did not review the evidence that had been gathered in the Farak investigation at that time (Def. SOF 76, 78; Pl. Resp. 76, 78).  In Ballou's experience, the prosecutors he worked with at the AGO, including Kaczmarek, would thoroughly review all the items seized during an investigation closer to the time of trial (Def. SOF 78; Pl. Resp. 78).

On June 24, 2013, Kaczmarek signed her name to a motion to disclose the Farak grand jury minutes and exhibits to the Commonwealth's District Attorneys as well as the U.S. Attorney for the District of Massachusetts, which stated:

(1) "[T]he issues presented in the criminal case of Sonja
Farak potentially affect the criminal cases of numerous
individuals within the Commonwealth;"

(2) "The Commonwealth believes that the grand jury
minutes may contain potentially exculpatory evidence;"
and

(3) "It is the duty of the Attorney General's Office to
release such potentially exculpatory evidence to the
government entities charged with prosecuting of the
affected individuals"

(Pl. SOF 125; Def. Resp. 125).  The motion to disseminate was allowed (Pl. SOF 128; Def. Resp.

128).  Kaczmarek did not seek a court order permitting the disclosure of the mental health

documents, which had not been admitted to the grand jury (Pl. SOF 129; Def. Resp. 129).

On June 26, 2013, Kaczmarek sent a letter to each of the Commonwealth's District

Attorneys that was very similar to the one previously sent by Verner (Pl. SOF 130; Def. Resp.

130; Def. SOF 109; Pl. Resp. 109).  Kaczmarek's letter stated:

> As you know, this Office is investigating defendant, Sonja Farak, a
> chemist who analyzed drugs out of the Amherst drug lab.  During
> the investigation process, this Office has come into possession of
> information, documents and reports.  Pursuant to this Office's
> continuing obligation to provide potentially exculpatory
> information to the District Attorneys as well as information
> necessary to your Offices' determination about how to proceed
> with cases in which related narcotics evidence was tested at the
> Amherst laboratory, please find the below listed materials …

(Pl. SOF 130; Def. Resp. 130).  Again, the mental health documents were not included in the

disclosure.

At the time of Farak's arrest, a criminal case was pending against Plaintiff, who was

charged, *inter alia*, with three counts of distributing heroin as a second offender and possessing

heroin and cocaine with intent to distribute as a second offender (Pl. SOF 3, 54; Def. Resp. 3, 54;

Def. SOF 3; Pl. Resp. 3).[16]  Farak signed drug certificates in Plaintiff's case on December 22,

2011 – the same day she had "tried to resist using @ work but ended up failing," January 6,

2012, and January 9, 2012, attesting that the substances she analyzed in connection with his case

contained heroin or cocaine (Pl. SOF 5, 10; Def. Resp. 5).  Neither Ballou nor Thomas had any

role in the investigation, arrest, or prosecution of Plaintiff for these charges (Def. SOF 90; Pl.

Resp. 90).[17]  Eduardo Velazquez, an Assistant District Attorney in the HCDAO, was assigned to

prosecute Plaintiff (Pl. SOF 13; Def. Resp. 13; Dkt. 337-1 at ¶¶ 3, 16; Def. SOF 26, 91; Pl. Resp.

26, 91).[18]  Velazquez had the discretion not to move forward with Plaintiff's prosecution in light

of Farak's misconduct, but he decided to proceed because he had no reason to believe that Farak

was engaging in misconduct at the Lab at the time she signed the drug certificates in Plaintiff's

case (Pl. SOF 56, 59; Def. Resp. 56, 59).[19]

On July 15, 2013, Plaintiff's defense counsel filed a motion to dismiss the drug charges

against him based on Farak's egregious misconduct and the government's noncompliance with

---

[16] Defendants object to Plaintiff's SOF 54 to the extent if relies on the affidavit of Eduardo Velazquez (Dkt. No. 337-1), which they argue is "inadmissible hearsay as it is not based on firsthand knowledge, and it was submitted on information and belief," and is "inadmissible opinion."  Defendants' claim that Velazquez, who was assigned to prosecute Plaintiff, would not have firsthand knowledge that Plaintiff's case was pending at the time of Farak's arrest is contradicted by abundant record evidence.  The notion that such knowledge is opinion evidence makes no sense.  The objection is overruled.

[17] Plaintiff purports to dispute Defendants' SOF 90, but the evidence he cites to support his dispute does not establish that Ballou or Thomas played any role in the investigation, arrest, or prosecution of Plaintiff.  Therefore, the fact is deemed admitted.

[18] Defendants object to Plaintiff's SOF 13 on the same grounds as they objected to Plaintiff's SOF 54; i.e., that the Velazquez affidavit is inadmissible hearsay and opinion.  The objections are overruled for the same reasons.  Defendants object for the additional reason that the citation does not support the fact asserted, but it plainly does, and the objection is overruled.

[19] Defendants object to Plaintiff's SOF 56 and 59 on the same grounds as they objected to Plaintiff's SOF 13 and 54; i.e., that the Velazquez affidavit is inadmissible hearsay and opinion. The objections to SOF 59 are overruled for the reasons set forth in footnote 16, and the objections to SOF 56 are overruled because the statement cites to and is supported by Velazquez's testimony at his deposition.

its obligation to turn over exculpatory evidence (Pl. SOF 131, Def. Resp. 131; Def. SOF 94; Pl.

Resp. 94).  Superior Court Judge Mary-Lou Rup issued an order on July 23, 2013, stating that:

> an evidentiary hearing must be conducted on the following issues:
> (i) if Ms. Farak and/or the Amherst drug lab engaged in egregious
> misconduct in the handling, storage, and analysis of suspected
> narcotics during the time period between November 2011 and
> January 2012, when the Amherst drug lab had custody and control
> of the alleged substances related to the defendant's case; (2) if such
> misconduct has substantially prejudiced the defendant or
> irreparably harmed his right to a fair trial; or (3) if such egregious
> misconduct was deliberate and intentional, warranting a
> prophylactic sanction of dismissal

(Pl. SOF 132; Def. Resp. 132).  As part of her order, Judge Rup reminded Velazquez and the

HCDAO of their "obligation to seek [evidence] from government agencies (including the Office

of the Attorney General) and to produce exculpatory evidence that may be favorable to

[Plaintiff's] case, and not simply turn a blind eye to what is not in its immediate control" (Def.

SOF 96; Pl. Resp. 96).  Velazquez made no effort to comply with Judge Rup's order (Def. SOF

97; Pl. Resp. 97).  Velazquez contacted neither Ballou nor the AGO to determine if they had any

evidence from the Farak investigation that might be exculpatory to Plaintiff (Def. SOF 98; Pl.

Resp. 98).

The evidentiary hearing on Plaintiff's motion to dismiss was initially scheduled for

August 27, 2013, and Plaintiff served Ballou and Kaczmarek with subpoenas to testify at the

hearing (Pl. SOF 150-151; Def. Resp. 150-151).  The subpoena to Ballou requested various

items, including "documentation reflecting access to the evidence safe at the Amherst

Laboratory" (Pl. SOF 151B; Def. Resp. 151B).  Ballou forwarded a copy of the subpoena to

Irwin and Verner, copying Kaczmarek, and stated that he did not have possession of any of the

items requested, including the access documents for the evidence safe (Pl. SOF 151A; Def. Resp.

151A).  Neither Kaczmarek nor Irwin informed Ballou that they had received the access records (Pl. SOF 151D; Def. Resp. 151D).[20]

Beginning July 22, 2013, Superior Court Judge C. Jeffrey Kinder issued a series of orders consolidating unrelated post-conviction cases for an evidentiary hearing to determine "the timing and scope of Sonja Farak's alleged misconduct" (Pl. SOF 135; Def. Resp. 135).  On August 16, 2013, First Assistant District Attorney Frank Flannery ("Flannery"), who represented the Commonwealth at the hearing and was responsible for handling post-conviction motions filed by Farak defendants (i.e., criminal defendants seeking relief based on Farak's misconduct), informed Kaczmarek that the evidentiary hearing had been scheduled for September 9, 2013, "to define the scope, to the extent possible, of Farak's misconduct" (Pl. SOF 116, 137; Def. Resp. 116, 137).  Flannery advised Kaczmarek that the hearing would likely "include the testimony of some of the investigators and chemists involved in [her] investigation" (Pl. SOF 138; Def. Resp. 138).  He also indicated, "I've had numerous requests for the photos that were taken during the search of Farak's vehicle.  I spoke to Sgt. Ballou who tells me he can provide those photos to me directly but I want to make sure I have your permission first" Pl. SOF 140, Def. Resp. 140).  Five days later, Ballou sent an email to Kaczmarek, copying Irwin, indicating that Flannery had advised Ballou that he would need him to testify at the September 9, 2013, hearing, and asking Kaczmarek if he could provide the photos from the search of Farak's car because Flannery did not have them (Pl. SOF 142, Def. Resp. 142).  The following morning, August 22, 2013, Kaczmarek responded to Flannery's August 16, 2013, email, telling him that Ballou would give him any discovery he needed (Pl. SOF 143; Def. Resp. 143).  Subsequently, Ballou gave

---

[20] Defendants object to Plaintiff's SOF 151A, 151B, and 151D on the ground that the citation does not support the fact asserted.  The court disagrees, and the objections are overruled.

Flannery a disc containing 71 photographs taken during the search of Farak's car, which were referenced in Thomas's police report but had not previously been provided to the HCDAO (Pl. SOF 141, 146; Def. Resp. 141, 146; Pl. Resp. 97).  Neither Ballou nor anyone else at the AGO provided the HCDAO with a copy of Dolan's January 24, 2013, report (Pl. SOF 147; Def. Resp. 147).  Before the hearing, Flannery asked Ballou to make arrangements for a team of defense counsel to view the Farak evidence (Pl. SOF 158, Def. Resp. 158; Def. SOF 126; Pl. Resp. 126).  Kaczmarek refused, stating that she did not want defense attorneys going through the evidence in an open criminal case (Pl. SOF 159; Def. Resp. 159; Def. SOF 126; Pl. Resp. 126).  While Ballou spoke "pretty often" with Flannery during the pendency of the Farak prosecution, at no time did Ballou disclose to Flannery the existence of the mental health documents seized from Farak's car (Pl. SOF 157, 161; Def. Resp. 157, 161).

On Friday, August 30, 2013, Ballou received a subpoena to testify at the evidentiary hearing on September 9, 2013 (Pl. SOF 154; Def. Resp. 154; Def. SOF 114; Pl. Resp. 114).  He sent an email to Kaczmarek, copying Irwin, notifying her that he had been subpoenaed and attaching a copy of the subpoena, which commanded him to bring "a copy of all documents and photographs pertaining to the investigation of Sonja J. Farak and the Amherst drug laboratory" (Pl. SOF 154, 155; Def. Resp. 154, 155; Def. SOF 116; Pl. Resp. 116).  On September 6, 2013, Assistant Attorney General Kris Foster ("Foster") filed a motion to quash the subpoena to Ballou, or, in the alternative, requesting relief from the obligation to produce certain types of information, including "information concerning the health or medical or psychological treatment of individuals" (Pl. SOF 152, 156A, 156B; Def. Resp. 152, 156A, 156B; Def. SOF 25; Pl. Resp. 25).  Before filing the motion, meetings were held at which Foster and other participants discussed potential privileges that might be asserted (Pl. SOF 156C; Def. Resp. 156C).  Irwin

attended one of these meetings, at which the discussion centered around limiting the scope of Ballou's subpoena because the AGO believed the Farak documents containing admissions of drug use constituted privileged medical treatment information (Pl. SOF 156D-156E; Def. Resp. 156D-156E).  Ballou and Irwin spoke by phone on the morning of September 4, 2013 (Pl. SOF 160A; Def. Resp. 160A).  Ballou recalled learning that there was uncertainty as to "what the hearing was going to be about" and "at one point," Irwin said, "something about HIPAA" (Pl. SOF 160A; Def. Resp. 160A).

At the outset of the hearing on September 9, 2013, Judge Kinder denied Foster's motion to quash the Ballou subpoena insofar as it related to Ballou's testimony (Pl. SOF 163; Def. Resp. 163).  With respect to the request for a protective order, Kinder instructed Foster to review Ballou's file and submit copies of any undisclosed documents for an *in camera* inspection (Pl. SOF 165; Def. Resp. 165; Def. SOF 128; Pl. Resp. 128).  Ballou appeared at the hearing with his "case file," which consisted of paper copies of all police reports, witness statements, an inventory of evidence, and copies of any search warrants and returns (Pl. Resp. 121; Def. SOF 124; Pl. Resp. 124).  Ballou did not bring his "investigator's file," which included emails and other electronically stored information related to the case (Pl. Resp. 121).  During Ballou's testimony, he was asked about 15 exhibits, none of which were the mental health documents, and he was not asked any questions about the mental health documents (Pl. SOF 170-171; Def. Resp. 170-171).  Ballou was concerned that not all the discovery he had provided Kaczmarek had been sent to the HCDAO (Pl. SOF 168; Def. Resp. 168).  Nevertheless, in response to questioning, Ballou indicated that everything in his case file had been turned over and that he believed that everything pertaining to the Farak investigation had been turned over as well; he testified that he was not aware of anything else (Pl. SOF 176; Def. Resp. 176; Def. SOF 122; Pl. Resp. 122).

When the contents of Farak's car came up at the end of Ballou's testimony, Ballou agreed that the reports regarding what was in the car only provided a summary of what was seized, but when he was asked whether "every piece of evidence that was seized from the automobile" was photographed, he replied, "crime scene services photographed the evidence as we seized it, yes" (Pl. SOF 178-181; Def. SOF 178-181).  In fact, none of the photographs depicted any of the mental health documents Ballou attached to the email he sent on February 14, 2013 (Pl. SOF 182; Def. Resp. 182).  At the end of the hearing, Plaintiff's counsel made an oral motion for access to the evidence that was seized from Farak's car (Pl. SOF 183; Def. Resp. 183).  Judge Kinder instructed the parties to try to work out an agreement (Pl. SOF 184; Def. Resp. 184; Def. SOF 124; Pl. Resp. 124).

Following the hearing, Ballou told Foster that he had his file, and "they already have what's here" (Pl. SOF 184A; Def. Resp. 184A).  Foster sent an email to Verner and Kaczmarek informing them of Judge Kinder's order for an *in camera* review of any undisclosed documents. When Verner asked Kaczmarek what was in Ballou's file, she responded that it included all reports generated in the case, all photos and videos in the case, the search warrants and returns, and copies of all the paperwork seized from Farak's car regarding news articles and Farak's mental health worksheets (Pl. SOF 184G; Def. Resp. 184G).  Following a meeting with Verner and Foster, Kaczmarek sent Ballou an email asking him to come to Boston with his file, and Ballou subsequently told Kaczmarek and Foster of his plans to be in Boston on September 12, 2013, with the Farak file (Pl. SOF 184J-184K; Def. Resp. 184J-184K).  According to Foster, she attended a short meeting on September 16, 2013, at which she was told everything in Ballou's possession had already been turned over and that she should inform Judge Kinder of this fact; Foster believed Kaczmarek was at that meeting (Pl. SOF 184O; Def. Resp. 184O).  Thereafter,

Foster sent Judge Kinder a letter representing that Ballou's file had been reviewed, that every document in his possession had already been disclosed, and, therefore, there was nothing for the AGO to produce for *in camera* review (Pl. SOF 184P; Def. Resp. 184P; Def. SOF 130; Pl. Resp. 130).

On September 17, 2013, the day after Foster wrote her letter to Judge Kinder, Plaintiff's defense counsel served the MSP with a motion to compel production of various documents, including:

> …
>
> 7. Copies of any and all inter- and/ or intra-office correspondence from January 18, 2013 to the present pertaining to the scope of evidence tampering and/or deficiencies at the Amherst Drug Laboratory; and
>
> …
>
> 10. [A]ny and all evidence suggesting that a third party may have been aware of Farak's evidence tampering at the Amherst Drug Laboratory prior to Farak's arrest in January, 2013

(Pl. SOF 185; Def. Resp. 185). Upon inquiry, Kaczmarek told MSP Deputy Chief Legal Counsel Sean Farrell ("Farrell") that she possessed no records responsive to most of Plaintiff's requests (Pl. SOF 186, 188; Def. Resp. 186, 188). Farrell relayed this information on to Ballou, who told Farrell that his "entire investigative file ha[d] been turned over," and he had "found no indication that Ms. Farak had an accomplice or that a third party was aware of her tampering" (Pl. SOF 188-189; Def. Resp. 188-189).

Following a non-evidentiary hearing, Judge Kinder denied Plaintiff's motion to inspect the physical evidence, stating that he was "not persuaded that [Mass. R. Crim. Pro.] 17(a)(2) permits a third-party to inspect evidence held in a pending criminal case. Particularly under the circumstances of this case where the physical evidence has been described in detail for the

defendant and photographs of that evidence have been provided" (Pl. SOF 193; Def. Resp. 193; Dkt. 337-74).  Later, on November 4, 2013, Judge Kinder denied Plaintiff's motion to dismiss, stating that while there was "powerful evidence that Farak was stealing cocaine and replacing it with other substances," there was "insufficient evidence before [him] … that she was engaged in misconduct in November 2011, and January of 2012, when the samples in this case were tested" (Pl. SOF 194, 196; Def. Resp. 194, 196).

Plaintiff's trial took place between December 9, and December 13, 2013 (Pl. SOF 202-216; Def. Resp. 202-216).  Prior to trial, Plaintiff served Kaczmarek and Ballou with trial subpoenas, but those subpoenas were quashed (Pl. SOF 198-199; Def. Resp. 198-199).  Plaintiff was precluded from introducing any Farak-related evidence (Pl. SOF 200-201; Def. Resp. 200-201).  Plaintiff was ultimately convicted of one count of distributing a class A substance; he was acquitted of four other drug charges, and the court allowed Plaintiff's motion for required findings of not guilty with respect to firearm and ammunition related charges (Pl. SOF 203, 216; Def. Resp. 203, 216; Def. SOF 5; Pl. Resp. 5).[21]  Superior Court Judge Tina Page sentenced Plaintiff to not less than five years and not more than seven years in state prison (Pl. SOF 217; Def. Resp. 217; Def. SOF 6; Pl. Resp. 6).

Farak pled guilty to the criminal charges against her on January 6, 2014 (Pl. SOF 220; Def. Resp. 220; Def. SOF 22; Pl. Resp. 22).  Dkt. No. 304 at ¶¶ 149-150).  On July 31, 2014, after Kaczmarek left the AGO, the AGO assented to a motion to inspect the physical evidence in the Farak case filed by Plaintiff's defense counsel on behalf of another defendant (Pl. SOF 228-229; Def. Resp. 228-229).  The inspection took place on October 30, 2014, and Plaintiff's

---

[21] Defendants object to Plaintiff's SOF 216 on the same grounds as they objected to Plaintiff's SOF 13 and 54; i.e., that the Velazquez affidavit is inadmissible hearsay and opinion.  The objection is overruled for the reasons previously stated.

counsel saw the mental health documents for the first time (Def. SOF 142-143; Pl. Resp. 142-143).  After the inspection, Plaintiff's attorney sent an 11-page letter to the AGO detailing the significance of the previously undisclosed evidence (Pl. SOF 230-231; Def. Resp. 230-231).  Thereafter, on November 13, 2014, the AGO disclosed to the district attorneys all 289 pages of documentary evidence seized from Defendant's vehicle, including the ServiceNet Diary Card indicating that Defendant had used drugs at work on December 22, 2011 (Pl. SOF 232-233; Def. Resp. 232-233).

In May 2015, Plaintiff filed a motion for a new trial based on this newly discovery evidence, which was allowed with the assent of the HCDAO (Pl. SOF 234-235; Def. Resp. 234-235; Def. SOF 144; Pl. Resp. 144).  On June 26, 2017, Superior Court Judge Richard J. Carey issued a 127-page decision dismissing Plaintiff's conviction with prejudice (Pl. SOF 236; Def. Resp. 236).  Plaintiff was released from prison on June 27, 2017 (Def. SOF 8; Pl. Resp. 8).  According to Velazquez, had he known prior to Plaintiff's trial that Defendant was using illicit drugs at the Lab while she was in custody of and analyzing the samples in Plaintiff's case, he would have dismissed the charges against Plaintiff prior to trial (Pl. SOF 238-239; Def. Resp. 238-239).

### III.   DISCUSSION

#### A.  Violation of a Federally Secured Right

Section 1983 provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory."  42 U.S.C. § 1983.  The threshold question in a § 1983 suit is whether there has been a violation of a federally secured right." *Drumgold v. Callahan*, 707 F.3d 28, 49 n.13 (1st Cir. 2013) (citing *Baker v.*

*McCollan*, 443 U.S. 137, 140 (1979)).  In addition to deprivation of a right, a plaintiff also must

establish "a causal connection between the actor and the deprivation, and state action."  *Sanchez*

*v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009) (citing 42 U.S.C. § 1983).  Moreover, in

a § 1983 case, "each Government official … is only liable for his or her own misconduct."

*Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  "To be liable, a 'defendant must have personally

participated in, encouraged, condoned, or acquiesced in rights-violating conduct.'"  *Echavarria*

*v. Roach*, No. 16-cv-11118-ADB, 2021 WL 4480771, at *13 (D. Mass. Sept. 30, 2021) (quoting

*Remus-Milán v. Irizarry-Pagán*, 81 F. Supp. 3d 174, 178 (D.P.R. 2015)).

     Beginning with the threshold question, Plaintiff alleges that his constitutional due process

rights were violated by Defendants' suppression of material exculpatory evidence during his

criminal trial that established that Farak was stealing, using, and tampering with narcotics at the

Lab during the time period in which she was testing and certifying the samples in Plaintiff's

case, which he asserts was in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), *Mooney v.*

*Holohan*, 294 U.S. 103 (1935), and their progeny.  The Supreme Court in *Brady* held that "the

suppression by the prosecution of evidence favorable to an accused upon request violates due

process where the evidence is material either to guilt or to punishment, irrespective of the good

faith or bad faith of the prosecution."  *Id*., 373 U.S. at 87.  "Evidence is favorable to a defendant

if it is either exculpatory or impeaching in nature."  *Drumgold*, 707 F.3d at 38-39.  Evidence is

"material" when there is a reasonable probability that, had the prosecution disclosed the

evidence, the trial proceedings would have ended differently.  *United States v. Bagley*, 473 U.S.

667, 682 (1985).  The rule announced in *Brady* was an extension of the earlier holding in

*Mooney*, that "a conviction obtained through the use of false evidence, known to be such by

representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360

U.S. 264, 269 (1935) (describing *Mooney*, 294 U.S. at 112-13).

More than twenty years after *Brady*, in *Kyles v. Whitley*, 514 U.S. 419 (1995), the

Supreme Court held that the disclosure obligation imposed by *Brady* extends to evidence known

only to law enforcement officers. *Id*. at 437-38. The "responsibility for obtaining and disclosing

such evidence remains the duty of the prosecutor, and not the police officer," however. *Haley v.

City of Boston*, 657 F.3d 39, 49 (1st Cir. 2011). Nevertheless, the First Circuit has recognized

that "law enforcement officers have a correlative duty to turn over to the prosecutor any material

evidence that is favorable to a defendant." *Drumgold*, 707 F.3d at 38 (citing *Moldowan v. City

of Warren*, 578 F.3d 351, 381 (6th Cir. 2009); *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th

Cir. 1996)).

A plaintiff asserting a *Brady* violation must prove that: 1) the evidence is favorable to the

accused because it is exculpatory or impeaching, 2) the evidence was suppressed, either willfully

or inadvertently, and 3) prejudice ensued, meaning that "there is a reasonable probability; that

the result of the trial would have been different if the suppressed documents had been disclosed

to the defense." *Strickler v. Greene,* 527 U.S. 263, 281–82, 289 (1999). In addition, "while a

prosecutor's duty to disclose is absolute, to recover damages from other law enforcement

officials for a *Brady* violation, a § 1983 plaintiff must prove the requisite *mens rea*." *Stewart v.

Wagner*, 836 F.3d 978, 982 (8th Cir. 2016). *See also Cok v. Cosentino*, 876 F.2d 1, 4 (1st Cir.

1989) (citing *Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Davidson v. Cannon*, 474 U.S. 344,

348 (1986) ("The Supreme Court has made plain that due process, whether procedural or

substantive, is not implicated by mere negligence of persons acting under color of state law.")).

As Plaintiff acknowledges, there is a question at the outset as to whether Defendants had an affirmative disclosure obligation requiring them to turn over the allegedly exculpatory evidence seized from Farak's car directly to the HCDAO or Velazquez, or whether it was constitutionally sufficient that they turned it over to Kaczmarek.  While it is undisputed that Defendants did not turn over the mental health documents to the HCDAO or Velazquez, it is also undisputed (with the exception of a subset of the documents which will be addressed below) that they were turned over to Kaczmarek.  Pursuant to controlling First Circuit precedent, "a police officer sometimes may be liable if he fails to apprise the prosecutor or a judicial officer of known exculpatory information."  *Brady v. Dill*, 187 F.3d 104, 114 (1st Cir. 1999) (citing *Hart v. O'Brien*, 127 F.3d 424, 446-47 (5th Cir. 1997), *cert. denied*, 525 U.S. 1103 (1999); *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992); *Jones v. City of Chicago*, 856 F.2d 985, 992-94 (7th Cir. 1988); *but see Taylor v. Waters*, 81 F.3d 429, 435-37 (4th Cir. 1996)).  The court went on to explain that "[i]n these cases, the constitutional wrong results from the officer's failure to deliver material information to competent authorities."  *Id.  See also Whitlock v. Brueggemann*, 682 F.3d 567, 576 (7th Cir. 2012) (citing *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007) ("[P]olice must disclose exculpatory evidence to a 'competent authority.'")).  In the normal course, the prosecutor in the criminal case in question is the authority competent to act on the information.  This is so because when the prosecutor is in possession of material exculpatory evidence, "there is a reasonable probability that it will be disclosed to and received by the defense."  *Drumgold v. Callahan*, 806 F. Supp. 2d 405, 408 (D. Mass. 2011), *overruled on another ground*, 707 F.3d 28 (1st Cir. 2013).  Thus, "police officers generally discharge their *Brady* obligations by turning over [exculpatory] evidence to the prosecutor[ ], who in turn ha[s] a

duty to disclose the evidence to the defense." *Goudy v. Cummings*, 922 F.3d 834, 837 (7th Cir. 2019).

The question presented by Plaintiff's claim then is whether the HCDAO or Velazquez were the only competent authorities vis-à-vis the prosecution of Plaintiff, or whether Kaczmarek was also a competent authority. For Plaintiff's claim that Defendants were derelict in the discharge of their *Brady* obligations to succeed, this court would have to find that Kaczmarek was not a competent authority in relation to Plaintiff's prosecution. The court cannot make such a finding on the record before the court viewed in the light most favorable to Plaintiff. Not only was Kaczmarek competent to make disclosures to the HCDAO of information potentially exculpatory to Farak defendants such as Plaintiff, but she explicitly assumed the obligation to do so on behalf of the AGO. On June 24, 2013, Kaczmarek signed her name to a motion to disclose the Farak grand jury minutes and exhibits to the Commonwealth's District Attorneys, stating that "[i]t is the duty of the Attorney General's Office to release such potentially exculpatory evidence to the government entities charged with prosecuting of the affected individuals." Two days later, in her June 26, 2013, letter to each of the Commonwealth's District Attorneys, she acknowledged that she was sending the included materials "[p]ursuant to [the AGO's] continuing obligation to provide potentially exculpatory information to the District Attorneys." By providing Kaczmarek with the allegedly exculpatory evidence, there was a "reasonable probability that it [would] be disclosed to and received by the defense." *Drumgold*, 806 F. Supp. 2d at 408. Consequently, because Kaczmarek was a "competent authority," Defendants met any affirmative disclosure obligation by turning the mental health documents over to her.[22] This

---

[22] There is an important caveat to the requirement that a police officer disclose exculpatory evidence to a competent authority, namely that "a prosecutor who is conspiring with the officer to frame a criminal defendant is not competent to receive the evidence." *Heidelberg v. Manias*,

conclusion comports with the differing roles police and prosecutors play regarding *Brady* material.  While police are required only to turn over material exculpatory evidence to prosecutors, "prosecutors, who possess the requisite legal acumen, [are] charged with the task of determining which evidence constitutes *Brady* material that must be disclosed to the defense.  A rule requiring the police to make separate, often difficult, and perhaps conflicting, disclosure decisions would create unnecessary confusion."  *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992).  Thus, Defendants were entitled to rely on Kaczmarek to make the decisions about what evidence needed to be disclosed to the Farak defendants and what information could be lawfully withheld on privilege grounds or otherwise, and Defendants would not have been required or expected to second guess those decisions.

Plaintiff makes a subsidiary argument with respect to Ballou and a subset of the documents that were not attached to his February 14, 2013, email to Kaczmarek.  Specifically, Plaintiff argues that because Ballou never conducted a full review of the documents that had been seized from Farak's vehicle, he failed to ascertain the exculpatory nature of certain additional documents that were not attached to his February 14, 2013, email, and never disclosed them to anyone, including Kaczmarek.  The court finds that the undisputed material facts do not support such a finding.  Immediately after the search of Farak's vehicle, Ballou and Thomas placed all the materials seized in the search in the AGO's evidence locker in the AGO's Springfield office.  It is undisputed that Ballou understood that Kaczmarek would review the evidence in the locker in connection with the prosecution of Farak and that Kaczmarek

---

503 F. Supp. 3d 758, 783 (C.D. Ill. 2020) (quoting *Whitlock*, 682 F.3d at 576).  Here, however, there are no allegations, nor is there any evidence, that any of the Defendants were conspiring with Kaczmarek to frame Plaintiff or even to withhold the alleged exculpatory evidence from Plaintiff.

understood that the email that Ballou sent to her on February 14, 2013, was just a sampling of the documents seized from Farak's car.  "[T]he court fails to see how [Ballou] can be held liable for suppressing evidence" on these facts.  *Allen v. Small*, CV 16-00396-BRO (GJSx), 2017 WL 11635252, at *15 (C.D. Cal. Jan. 26, 2017).  "Where, as here, Defendants have provided the prosecutor with all the relevant evidence, the Court finds that Defendant cannot be held liable for suppression of evidence based on the prosecutor's failure to examine all of the provided evidence …." *Id*.

This case is unlike *Tennison v. County of San Francisco*, 570 F.3d 1078 (9th Cir. 2009), in which the Ninth Circuit affirmed the district court's denial of the defendant police officers' summary judgment motion on the plaintiffs' § 1983 claim, finding that the officers had a duty to disclose to plaintiffs' prosecutor exculpatory recorded statements by witnesses to the murder for which plaintiffs were convicted.  *Id*. at 1093-94.  The *Tennison* court found that the exculpatory information should not have been "buried in a [police] file, but should have been made known to the prosecutor." *Id*. at 1090.  Here, unlike in *Tennison*, Ballou brought the existence of the mental health documents to Kaczmarek's attention by telling her about them and, upon request, sending them to her as attachments to an email.  The fact that Ballou did not attach every alleged exculpatory piece of paper is inconsequential; Kaczmarek knew that Ballou was only sending a sampling of the documents that had been seized from the search of Farak's car.  Ballou did not suppress the other alleged exculpatory documents by not attaching them to his email or by not looking at them himself.  Indeed, Ballou expected that Kaczmarek would review all of the documents herself in due course.

Plaintiff does not address the issue of whether Kaczmarek was a competent authority to whom Defendants could turn over the exculpatory information.  Instead, to support imposition of

a duty to disclose exculpatory information directly to the HCDAO or Velazquez on Irwin and

Thomas, Plaintiff seizes on their admissions in their answers to the complaint that they "knew

they had duties, under the United States Constitution, to disclose *Brady* material to the Hampden

County ADAs in general and the Hampden Count ADA prosecuting Plaintiff in particular" (Dkt.

No. 1 at ¶421; Dkt. No. 21 at ¶ 421; Dkt. No. 185 at ¶ 421).  Plaintiff is correct that "[o]rdinarily,

a pleading admitting a fact alleged in an antecedent pleading is treated as a binding judicial

admission, removing the fact from contention for the duration of the litigation."  *Harrington v.*

*City of Nashua*, 610 F.3d 24, 31 (1st Cir. 2010) (citing *Crest Hill Land Dev., LLC v. City of*

*Joliet*, 396 F.3d 801, 805 (7th Cir. 2005)).  However, the First Circuit has noted that "there are

limits to what a party can admit."  *Id.* (citing *Whitfield v. Mun'y of Fajardo*, 564 F.3d 40, 44 (1st

Cir. 2009)).  In particular, "a court is not obliged to accept a proposition of law simply because

one party elects not to contest it."  *Id.* (citing *Comm'l Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508

F.3d 327, 336 (6th Cir. 2007)).  The court finds the instant admission to fall within this exception

and will not conclude that Irwin and Thomas owed a duty to disclose *Brady* material directly to

the HCDAO based upon it.  In so finding, the court rejects Plaintiff's suggestion that "[t]he true

significance of the 'admitted allegation' lies in the 'factual component,' specifically, that

Thomas and Irwin *knew* they had such duties" (Dkt. No. 354 at 13).  In evaluating judicial

admissions, the First Circuit has stressed the importance of parsing the admission in question.

*Harrington*, 610 F.3d at 31.  Here, there are two components to the admitted allegation: 1) the

legal proposition that Irwin and Thomas had constitutional duties to disclose *Brady* material to

the HCDAO in general and Plaintiff's prosecutor in particular, and 2) the factual proposition that

they were aware of this duty.  These admissions do not address the steps Irwin and Thomas

believed necessary to satisfy this duty.  In other words, the admissions are not incompatible with

33

a reasonable belief by Irwin and Thomas that, by disclosing exculpatory evidence to the AGO, which Irwin and Thomas knew was passing evidence to the HCDAO, they were satisfying their duty to disclose exculpatory material to the HCDAO and, through the HCDAO, to Plaintiff's prosecutor.  There is nothing in the record before the court to suggest that either Irwin or Thomas believed that he had a constitutional obligation to assemble and deliver Farak-related evidence directly into Velazquez's hands.

To support imposition of such a constitutional duty on Ballou, and Irwin and Thomas if they are not held to their admissions, Plaintiff relies on two rationales.  First, Plaintiff cites *Unites States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002), for the premise that a state actor's constitutional obligation under *Brady* and its progeny arises if that actor is part of the "prosecution team."  Plaintiff then cites to *United States v. Mannarino*, 850 F. Supp. 57 (D. Mass. 1994), to argue for a "'case-by-case analysis of the extent of interaction and cooperation between two governments,'" in determining whether Defendants were part of Plaintiff's prosecution team.  *Id*. at 65 (quoting *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979)).  Second, Plaintiff argues that *Mastracchio v. Vose*, 274 F.3d 590, 600 (1st Cir. 2001), and *Limone v. United States*, 497 F. Supp. 2d 143, 154 (D. Mass. 2007), *aff'd*, 579 F.3d 79 (1st Cir. 2009), "make[ ] clear that government officials become members of the prosecution teams, for purposes of *Brady*, when they acquire probative evidence undermining the veracity and/or reliability of a key witness in another agency's prosecution" (Dkt. No. 312 at 10).

Addressing Plaintiff's first rationale, even assuming arguendo that Defendants were part of Plaintiff's prosecution team as Plaintiff posits, *Mannarino* does not support the conclusion that Defendants could meet their *Brady* obligations only by disclosing the allegedly exculpatory information directly to Plaintiff's prosecutor or prosecuting authority.  In *Mannarino*, three

criminal defendants who had been convicted of a narcotics conspiracy sought relief based on the government's claimed Jencks Act violation when a state police officer, who was responsible for debriefing and supervising the federal government's principal witness, destroyed a narrative criminal history that the witness had prepared. *Id*., 850 F. Supp. at 59. As part of the court's determination of whether the destroyed document was Jencks Act material, the court had to determine if the statement was in the possession of the United States. *Id*. at 62. The court answered that question in the affirmative, reasoning that where the DEA had used the state police officer to debrief the witness and oversee the witness's overall cooperation, the officer was "functionally part of the United States Attorney's prosecutorial team," such that "his possession of [the] narrative history must be imputed to the government." *Id*. at 61, 64. The court found support for its analysis in the Fifth Circuit decision in *Antone*, in which that court stated that "[i]mposing a rigid distinction between federal and state agencies which have cooperated intimately from the outset of an investigation would artificially contort the determination of what is mandated by due process," and instead adopted a "case-by-case analysis of the extent of interaction and cooperation between the two governments." *Id*. at 570. In *Mannarino*, there was no evidence that the state police officer had disclosed the existence of the narrative criminal history to anyone; instead, it only came out on cross-examination of the witness. *Id*. at 60. Here, Defendants disclosed the potentially exculpatory evidence to Kaczmarek, who, as discussed, was a competent authority who had explicitly assumed the duty to disclose information gathered in the investigation of Farak that might be exculpatory to Farak defendants such as Plaintiff. While *Mannarino* might support imputing knowledge of the documents seized from Farak's car to Velazquez, it does not support a finding that Defendants violated their duties under *Brady* to turn over those documents to a competent authority.

Further, in pressing his argument that Defendants were part of Plaintiff's prosecution team pursuant to the case-by-case analysis suggested by *Mannarino*, Plaintiff lumps all three defendants together instead of individually analyzing their degree of interaction and cooperation with the HCDAO. Yet in the undisputed facts that Plaintiff marshals in his favor, Ballou is the only Defendant who directly interacted with the HCDAO. Ballou had frequent contact with Flannery about the Farak investigation, its potential impact on cases like that of Plaintiff, and disclosure of evidence obtained in the investigation. Ballou directly provided Flannery with a disc of photographs taken during the search of Farak's car. Ballou was a witness at a hearing on Plaintiff's motion to dismiss premised on Farak's misconduct and engaged in conversations with Flannery in preparation for his testimony. According to Plaintiff, these facts "demonstrate that Ballou and the other MSP investigators involved in the Farak investigation had a [sic] sufficiently intimate interactions and cooperation with the HCDAO such that they were part of the 'prosecution team' vis-à-vis Plaintiff's drug charges" (Dkt. No. 312 at 10). The court fails to see how the absence of evidence of any interactions or cooperation between "the other MSP investigators involved in the Farak investigation," namely Irwin and Thomas, and the HCDAO could be sufficiently "intimate" to render them part of Plaintiff's prosecution team.

Even with respect to Ballou, *Mannarino* does not compel the finding that Ballou was on Plaintiff's prosecution team. While the Maine police officer who was found to have been part of the federal government's prosecution team in *Mannarino* was not formally assigned to the DEA, he was nevertheless acting at the direction of the DEA and the prosecutorial team in debriefing the cooperating witness. *Id*., 850 F. Supp. at 60 ("Special Agent Cunniff stated that he requested Seitz conduct follow-up debriefings;" and "[T]he April, 1992 debriefing was done at the specific request of the United States prosecutorial team."). In contrast, in the instant case, Ballou

provided the disc of photographs to Flannery at the direction of Kaczmarek, and his interactions with Flannery in preparing for and testifying at the hearing on Plaintiff's motion to dismiss were in response to subpoenas from Plaintiff and another Farak defendant. In other words, the undisputed material facts do not establish that Ballou was acting at the direction of the prosecuting authority of Plaintiff the way the Maine police officer was in *Mannarino*. *Id*. at 65 ("[The Maine police officer's] federally-assigned duties made him part of the prosecution team."). In any event, the court need not make a finding as to whether Ballou was on Plaintiff's prosecution team given its earlier conclusion that Ballou provided the alleged exculpatory documents to a competent authority.

As for Plaintiff's second rationale, neither *Mastracchio* nor *Limone* establish that Defendants owed a *Brady* duty to Plaintiff which could only be met by turning over the alleged exculpatory evidence directly to the HCDAO or Velazquez. In *Mastracchio*, the petitioner, a state prisoner, appealed the denial of a writ of habeas corpus, asserting that the state supreme court had erred by, *inter alia*, refusing to impute knowledge to the prosecutor in the Rhode Island Attorney General's Department of certain cash payments and liberties given to an incarcerated prosecution witness known to the Providence police officers on the witness protection team. *Id*., 274 F.3d 593, 598. The First Circuit, "[m]indful of the intense involvement of the attorney general's department in [the witness's] protective custody," concluded that the Providence police officers who comprised the witness protection team "should be treated as an integral part of the prosecution team for the purpose of determining whether a failure to disclose occurred." *Id*. at 599-600 (citing *United States v. Wilson*, 237 F.3d 827, 832 (7th Cir.), *cert. denied*, 122 S. Ct. 97 (2001)). From that premise, the First Circuit readily concluded that the state supreme court had committed error based on "clear" Supreme Court precedent that, "[w]hen any member of the

prosecution team has information in his possession that is favorable to the defense, that information is imputable to the prosecutor." *Id*. at 600 (citing *Kyles*, 514 U.S. at 437 (explaining that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police")).  Thus, "the prosecutor [in the office of the Rhode Island Attorney General] had a duty to learn of all the inducements and rewards that the state had tendered" to the witness that were known to the Providence police officers on the witness protection team, and "the state supreme court's refusal to impute the police officers' knowledge to the prosecutor r[an] contrary to established Supreme Court case law." *Id*. at 601.  There was no discussion in *Mastracchio* of whether the Providence police officers bore any duty to the petitioner to disclose their knowledge directly to the petitioner's prosecutor because that issue was not before the court.

*Limone* did not involve *Brady* claims.  Instead, the plaintiffs in *Limone* – two exonerated former state prisoners and the estates of their two co-defendants who died in prison – brought claims against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et. seq.*, for malicious prosecution, civil conspiracy, intentional infliction of emotional distress, and negligent selection, supervision and retention.  *Id*., 497 F. Supp. 2d at 151, 154.  The plaintiffs alleged, and proved in a bench trial, that two FBI agents "handling" a witness in the state murder prosecution of the plaintiffs, as well as their superiors, knew that the witness would perjure himself in testifying against the plaintiffs and yet, they encouraged him to testify, failed to tell the truth about what they knew about the murder and the witness's perjury to the prosecuting agency, and went so far as to assure the prosecutor that the witness's story "checked out."  *Id*. at 152.  The court explicitly rejected the United States' attempt to reduce the plaintiffs' malicious prosecution claim to a failure to disclose exculpatory evidence in violation of *Brady*, since the

FTCA does not hold the government liable for constitutional torts. *Id*. at 221. Instead, the allegations of suppression of exculpatory information were part of a "broader scheme to put [the witness] forward … no matter the cost, even if it meant framing the plaintiffs." *Id*. at 222. Because the plaintiffs proved their allegations, the *Limone* court found the United States liable under the FTCA on the plaintiff's claims that the FBI agents committed the state tort of malicious prosecution. *Id*. at 202. Thus, Plaintiff is incorrect when he claims that *Limone* found liable FBI agents who failed to disclose to the state prosecutor information casting doubt on the veracity of the witness (Dkt. No. 312 at 10-11). Instead, the United States was held liable for its agents' active participation "in a plot to secure and sustain the unjust convictions against innocent men," which plot "include[d] suballegations that occasionally involve[d] *Brady* violations." *Limone*, 497 F. Supp. 2d at 222.

In summary, the court finds that the undisputed material facts viewed in the light most favorable to Plaintiff fail to establish that Defendants participated in conduct that breached a constitutional duty they owed to Plaintiff pursuant to *Brady* and its progeny. To the contrary, Defendants met the affirmative disclosure obligation they had by turning over the allegedly material exculpatory evidence seized from Farak's car to Kaczmarek. Consequently, Defendants are entitled to summary judgment in their favor.

B. <u>Absolute Immunity</u>

Ballou argues that he is absolutely immune from Plaintiff's § 1983 claim to the extent that it is based on his testimony before the Farak grand jury or in the hearing on the motion to dismiss the criminal charges against Plaintiff (and others) before Judge Kinder. "Police officers enjoy absolute immunity from claims for damages under section 1983 when testifying in criminal proceedings." *Tierney v. Town of Framingham*, 292 F. Supp. 3d 534, 543 (D. Mass.

2018) (citing *Briscoe v. LaHue*, 460 U.S. 325, 341-42 (1983)).  Plaintiff does not contest this principle, and, therefore, to the extent that Plaintiff seeks to impose liability on Ballou for his testimony, Ballou is entitled to summary judgment in his favor on this ground as well.

    C.  <u>Qualified Immunity</u>

Defendants also claim that they are entitled to qualified immunity against Plaintiff's claim.  Because the facts in the record do not present a genuine dispute as to whether Plaintiff's constitutional rights were violated, this court need not address Defendants' qualified immunity argument.  *Ruiz-Casillas v. Camacho-Morales*, 415 F.3d 127, 134 (1st Cir. 2005) ("The failure of appellant's constitutional claims obviates our need to address the qualified immunity defense: we have found no constitutional violation.").  However, in an abundance of caution, the court will address it.

"Qualified immunity is a doctrine that shelters government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *McKenney v. Mangino*, 873 F.3d 75, 80 (1st Cir. 2017) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231(2009).  Qualified immunity "protects all but 'the plainly incompetent [and] those who knowingly violate the law.'"  *Pagán v. Calderón*, 448 F.3d 16, 31 (1st 2006) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  When a defendant invokes qualified immunity, the burden is on the plaintiff to show that the defense is inapplicable.  *Escalera-Salgado v. United States*, 911 F.3d 38, 41 (1st Cir. 2018) (quoting *Rivera-Corraliza v. Puig-Morales*, 794 F.3d 208, 215 (1st Cir. 2015)).

The qualified immunity analysis breaks down into two parts.  *McKenney*, 873 F.3d at 81. "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "The 'clearly established' inquiry itself has two elements."  *Castagna v. Jean*, 955 F.3d 211, 219 (1st Cir.), *cert. denied*, 141 S. Ct. 896 (2020).  The first focuses on the clarity of the law.  *Id.*  While "a case directly on point" is unnecessary, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Malley*, 475 U.S. at 341).  The rule must be settled, meaning that it is "dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'"  *Wesby*, 138 S. Ct. at 589–90 (quoting *al-Kidd*, 563 U.S. at 741–42).  "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."  *Wesby*, 138 S. Ct. at 590 (citing *Reichle*, 566 U.S. at 666).  The second element of the "clearly established" inquiry "focuses on the objective legal reasonableness of an official's acts."  *Castagna*, 955 F.3d at 220 (quoting *Eves v. LePage*, 927 F.3d 575, 583 (1st Cir. 2019) (en banc)).  This requires a focus "'on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights.'"  *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019) (quoting *Drumgold*, 707 F.3d at 42).  The components of the qualified immunity test can be addressed in any order.  *Justiniano v. Walker*, 986 F.3d 11, 27 (1st Cir. 2021) (citing *Pearson*, 555 U.S. at 236).

The First Circuit has observed that "deciding qualified immunity at the summary-judgment stage can be tricky." *Id.* (citing *Morelli v. Webster*, 552 F.3d 12, 18-19 (1st Cir. 2009)). Specifically, "'[t]he doctrinal intersection of qualified immunity principles and summary judgment principles is not well mapped," and "[p]lotting that intersection can present thorny analytic problems – problems that are magnified because of the desire to resolve claims of qualified immunity at the earliest practicable stage of litigation." *Id.* (quoting *Morelli*, 552 F.3d at 18. The court has described the decision as a "tug-of-war … between who gets the benefit of the doubt: summary judgment 'requires absolute deference to the nonmovant's factual assertions,' while qualified immunity 'demands deference to the reasonable, if mistaken, actions of the movant.'" *Id.* (quoting *Morelli*, 552 F.3d at 18-19).

This court has already determined that Defendants did not violate Plaintiff's Fourteenth Amendment *Brady* rights by turning over the allegedly material exculpatory documents seized during the search of Farak's car to Kaczmarek rather than directly to the HCDAO or Velazquez. However, if that determination were deemed to be in error, Defendants would nevertheless be entitled to qualified immunity if, viewing the evidence in the light most favorable to Plaintiff, reasonable officers in Defendants' positions would not have understood that they were violating Plaintiff's constitutional rights. "Here, then, [Plaintiff] ha[s] the burden to identify 'controlling authority or a robust consensus of persuasive authority such that any reasonable official in the [Defendants'] position[s] would have known that the challenged conduct [wa]s illegal in the particular circumstances that [they] faced.'" *Escalera-Salgado*, 911 F.3d at 41 (quoting *Rivera-Corraliza*, 794 F.3d at 214-15).

As Plaintiff points out, by the time of Plaintiff's criminal trial in December 2013, there was controlling precedent in the First Circuit that "law enforcement officers have a … duty to

turn over to the prosecutor any material evidence that is favorable to a defendant." *Drumgold*, 707 F.3d at 38 (decided January 31, 2013). *See also Brady*, 187 F.3d at 114 (stating that "a police officer sometimes may be liable if he fails to apprise the prosecutor … of known exculpatory information"). However, that does not end the inquiry. The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11 (2021) (citing *al-Kidd*, 563 U.S. at 742). "[D]oing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Wesby*, 138 S. Ct. at 590 (citing *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)). Thus, the court must determine whether the "rule's contours [were] so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 138 S. Ct. at 590 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 138 S. Ct. at 590 (quoting *Anderson*, 483 U.S. at 641).

Plaintiff cites three First Circuit cases in opposition to Defendants' claims of qualified immunity. First, Plaintiff cites *Conley v. United States*, 415 F.3d 183 (1st Cir. 2005), in which the First Circuit held that a *Brady* violation had occurred when the government failed to disclose to the defendant that a key witness had expressed uncertainty about his recollection of the events to which he had testified, going so far as to ask that he be hypnotized to better remember what had happened. *Id*. at 185-86, 191. The defendant, a police officer, had been convicted of perjury and obstruction of justice charges in connection with his involvement in and subsequent cover up of the accidental beating of an undercover officer. *Id*. at 187. The key witness in the defendant's prosecution was a fellow police officer who had been involved in the pursuit that led to the

beating.  This officer had made the statements calling into question the reliability of his memory during an FBI interview related to the investigation into whether any of the officers involved in the beating had used excessive force, rather than in the subsequent investigation into whether the defendant had committed perjury and obstruction of justice in the excessive force investigation. *Id*. at 185-86.  The government failed to turn over the FBI memorandum memorializing the details of the interview to the defendant in his criminal trial for perjury and obstruction of justice. *Id*. at 186.  *Conley* is of little value to Plaintiff because the government conceded that it had improperly suppressed the FBI memorandum.  *Id*. at 190.  Accordingly, the decision turned not on whether the FBI agent who conducted the interview in the excessive force investigation had an affirmative disclosure obligation to turn the statement over to the perjury and obstruction prosecutor, but rather whether the memorandum was material.  Indeed, because the government conceded the point, key facts cannot be gleaned from the opinion, such as whether the prosecutor in the perjury and obstruction investigation had the statement or whether the FBI agent who conducted the interview in the excessive force investigation was involved in the perjury and obstruction investigation as well.  Thus, no rule flows inexorably from the *Conley* decision that Defendants in this case had an affirmative disclosure obligation requiring them to produce the mental health documents directly to the HCDAO or Velazquez.

Second, Plaintiff cites *Drumgold* for the proposition that a police officer cannot turn over potentially exculpatory evidence to just any prosecutor.  The fact that the defendant in *Drumgold* had turned over the potentially exculpatory evidence to a prosecutor in another murder case who worked down the hall from the prosecutor in the plaintiff's murder case was insufficient to shield the defendant from § 1983 liability.  Instead, the majority found that the defendant's provision of the potentially exculpatory evidence to the other prosecutor was simply evidence the factfinder

could weigh in determining the defendant's state of mind in not turning over the evidence to the plaintiff's prosecutor. *Id*. at 45. The key difference in *Drumgold* was that the police officer defendant was assigned to both murder cases. *Id*. at 34. Thus, *Drumgold* stands for the proposition that a police officer assigned to a criminal investigation of a particular defendant cannot satisfy his *Brady* disclosure obligation to that criminal defendant by turning over material exculpatory evidence to a different prosecutor handling a different case to which the officer also is assigned. Critically, here, Defendants were not assigned to the Penate case, and *Drumgold* would not have put them on notice that they were constitutionally required to turn over material exculpatory information directly to the HCDAO or Velazquez in the prosecution of Penate, a defendant in whose investigation they had no involvement.

Finally, Plaintiff cites *Burke v. Town of Walpole*, 405 F.3d 66 (1st Cir. 2005), to negate any claim that having a minimal role in an investigation somehow undercuts a police officer's duty of full disclosure of exculpatory information. In *Burke*, a murder arrestee brought a § 1983 action against a state police trooper and others after having spent forty-one days in custody following his arrest. *Id*. at 74. The plaintiff alleged that the trooper violated his Fourth Amendment rights when, knowing that DNA analysis had conclusively excluded the plaintiff as the source of the saliva found in a bite mark on the victim, he intentionally or recklessly withheld this information from the officer who was preparing the warrant for the plaintiff's arrest. *Id*. at 84. The court found that the plaintiff had proffered evidence sufficient to support a finding that he was arrested without probable cause in violation of his Fourth Amendment rights and thus the ability of the defendant to avail himself of qualified immunity turned on the clearly established prong of the analysis. *Id*. at 84-85. The defendant argued that he had no clearly established constitutional duty to disclose exculpatory evidence to anyone because he was neither an affiant

for the arrest warrant nor an arresting officer. *Id*. at 85. The court rejected this argument, finding that the summary judgment record established that the defendant was "centrally involved in the collection of evidence to be used to secure an arrest warrant." *Id*. at 86. From there, the court concluded that, "[a]t the time of [the plaintiff's] arrest, his constitutional right to be free from arrest pursuant to a warrant that would not have issued if material exculpatory evidence had been provided to the magistrate was clearly established, as was [the defendant's] concomitant duty of full disclosure of exculpatory information to follow officers seeking warrants based on probable cause." *Id*. The key weakness in Plaintiff's reliance on *Burke* is that it involved a Fourth Amendment claim concerning the right to be free from unreasonable seizures rather than a Fourteenth Amendment *Brady* claim. It's difficult to see how Plaintiff's Fourteenth Amendment *Brady* right to have defendants turn over the alleged material exculpatory evidence directly to the HCDAO or Velazquez could have been clearly established in a Fourth Amendment case. Importantly, in *Burke*, the defendant did not disclose the existence of the exculpatory DNA evidence to the affiant for the search warrant before the issuance of the warrant. Here Defendants did disclose the alleged material exculpatory evidence to a prosecutor who had expressly avowed her obligation to disclose such evidence to prosecutors of Farak defendants such as Plaintiff.

Plaintiff also relies on two cases of persuasive authority. In *McMillian*, which the *Drumgold* court cited in support of its recognition that law enforcement officers have a duty to turn over to the prosecutor any material evidence that is favorable to a defendant, the plaintiff brought a § 1983 action against law enforcement officials after his murder conviction and death sentence were set aside on appeal, alleging that they had "suppressed and withheld exculpatory and impeachment evidence in violation of his due process rights under the Fourteenth

Amendment." *Id*., 88 F.3d at 1560. The Eleventh Circuit rejected the defendants' argument that they did not violate *Brady* because the exculpatory and impeachment evidence was acquired during a different murder investigation where the defendants were charged with investigating both murders contemporaneously and the same defendants had been charged in both murders. *Id*. at 1568. Under those circumstances, "[r]egardless of which murder was being investigated at the precise moment the evidence was acquired, [the defendants] had an obligation under *Brady* to give evidence that was favorable to [the plaintiff] in the Morrison murder to the Morrison prosecutor." *Id*. *McMillian* is easily distinguishable from the instant case where Defendants were not charged with investigating Plaintiff and Defendants turned the exculpatory material over to the prosecutor in the case they were investigating, who, in turn, had pledged to turn over any material exculpatory evidence to the agency prosecuting Plaintiff.

Plaintiff next invokes *United States v. Howell*, 231 F.3d 615 (9th Cir. 2000), to suggest that Thomas should have been on notice that he needed to correct the "glaring mistake" in his police report. *Id*. at 623. In *Howell*, the defendant was convicted of possessing cocaine with the intent to distribute, and he appealed his conviction and sentence on several grounds, including the court's refusal to grant a mistrial after the government failed to inform defense counsel of material mistakes in police reports in violation of *Brady*. *Id*. at 618, 624. The material errors consisted of representations in two police reports that sums of money were recovered from a co-defendant when, in fact, they were recovered from the defendant. *Id*. at 623. The prosecutor learned of the errors before trial but did not disclose the mistakes to the defense. *Id*. at 623. The court rejected the government's argument that it was under no obligation to reveal the errors because the defendant already knew the sums of money had been recovered from him and because the correct information was inculpatory. *Id*. at 625. Instead, applying Fed. R. Crim. P.

16(c) regarding a party's continuing duty to disclose, the court held that "[w]hen a prosecutor discovers material mistakes in police reports already turned over to the defense, the prosecutor must take appropriate steps promptly to notify the defense of the mistakes." *Id*. at 626.  The court did not find a *Brady* violation, however, based on its conclusion that the defendant had not demonstrated sufficient prejudice to warrant a mistrial. *Id*.   There is no discussion in *Howell* of any duty on the police officers to correct their reports.  To the contrary, *Howell* held that the burden was on the prosecutor, who was aware of the errors, to notify the defense of those errors. While the police would have had a correlative duty to advise the prosecutor of the mistakes, there is no discussion of this duty in the decision and, again, there would be nothing novel about finding that a police officer has a duty to disclose material exculpatory evidence to the prosecutor in the case on which she or he is working.

Finally, Plaintiff cites *Taylor v. Riojas*, 141 S. Ct. 52 (2020), to suggest that the facts of this case are "particularly egregious" such that "any reasonable officer should have realized that [his actions] offended the Constitution." *Id*. at 54.  In *Taylor*, the Court held that the defendant prison officials were not entitled to qualified immunity at summary judgment where the facts viewed in the light most favorable to the plaintiff established that the defendants housed plaintiff in abhorrent conditions for six days, first in a cell covered nearly floor to ceiling in feces, and second in a frigidly cold cell, which was equipped with only a clogged drain on the floor to dispose of bodily waste. *Id*. at 53.  The facts of this case simply do not rise to the level where their unconstitutionality would be obvious to any reasonable officer.

"[W]hen an officer disregards police procedure, it bolsters the plaintiff's argument … that 'a reasonable officer in [the officer's] circumstances would have believed that his conduct violated the Constitution." *Irish v. Fowler*, 979 F.3d 65, 77 (1st Cir. 2020).  Here, the converse

is true.  Defendants acted in compliance with police procedure in turning over the evidence to Kaczmarek.  According to Irwin, he instructed his subordinates that all seized evidence must be turned over to the AGO for the AGO to make the determination of what had to be turned over to the defense.  Ballou echoed this instruction, stating that it was his custom to collect the evidence and turn it over to the prosecutor for the prosecutor to do whatever was necessary with it.  Thus, Defendants followed the precise procedure they believed was required of them, a procedure that is consistent with caselaw, bolstering their argument that they reasonably believed their conduct was not in violation of Plaintiff's constitutional rights.

In summary, in light of the case law available at the time of Plaintiff's criminal trial, there was no "controlling consensus" that, under the circumstances viewed in the light most favorable to Plaintiff, Defendants violated Plaintiff's *Brady* rights by turning over the allegedly material exculpatory documents to Kaczmarek and not to the HCDAO or Velazquez.  A reasonable law enforcement officer could have concluded that it was constitutionally permissible to turn over the evidence to Kaczmarek and to rely on her to turn over any evidence required by *Brady* to be turned over to Plaintiff's prosecutor, a duty she explicitly assumed.  Stated another way, the record viewed in the light most favorable to Plaintiff does not support a finding that a reasonable officer would have clearly understood Defendants' conduct to be an unreasonable violation of Plaintiff's rights.  For these reasons, even if Defendants' conduct did violate Plaintiff's Fourteenth Amendment rights, they would not be liable to him for damages in a § 1983 action.

## IV.     CONCLUSION

For the above-stated reasons, Plaintiff's motion (Dkt. No. 310) is DENIED and Ballou's (Dkt. No. 317), Irwin's, (Dkt. No. 322), and Thomas's (Dkt. No. 320) motions are GRANTED.

It is so ordered.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED:  June 17, 2022