UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROLANDO PENATE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:17-30119-KAR |
| | ) | |
| | ) | |
| ANNE KACZMAREK, JOSEPH | ) | |
| BALLOU, ROBERT IRWIN, RANDY | ) | |
| THOMAS, and SONJA FARAK, | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO COLLATERALLY ESTOP
DEFENDANT ANNE KACZMAREK FROM CONTESTING FACTUAL FINDINGS OF
SPECIAL HEARING OFFICER, PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AGAINST DEFNDANT ANNE KACZMAREK, and ANNE KACZMAREK'S
MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR A HEARING
(Dkt. Nos. 298, 307, and 313)

ROBERTSON, U.S.M.J.

Rolando Penate ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against Anne

Kaczmarek ("Defendant") and others after having spent over five years in Massachusetts state

prison based on his criminal conviction for drug distribution, a conviction which was ultimately

dismissed with prejudice as a result of evidence that Sonja Farak, a drug laboratory chemist, was

stealing and using lab samples to feed a drug addiction at the time she was testing and certifying

the samples in Plaintiff's case.[1]  Plaintiff alleges that Defendant violated his constitutional rights

by suppressing evidence of the extent of Farak's misconduct.  Presently before the court is

Plaintiff's motion to collaterally estop Defendant from contesting the factual findings of a

_____

[1] The other remaining defendants are Farak and three members of the Massachusetts State
Police, Joseph Ballou, Robert Irwin, and Randy Thomas.  The motions for summary judgment
relating to these defendants are addressed separately.

Special Hearing Officer of the Board of Bar Overseers in a "Hearing Report" issued on July 9, 2021, in connection with attorney disciplinary proceedings against Defendant (Dkt. No. 298), Plaintiff's motion for partial summary judgment against Defendant on Count III of his complaint alleging a violation of 42 U.S.C. § 1983 (Dkt. No. 307), and Defendant's cross-motion for summary judgment against Plaintiff on Count III of his complaint (Dkt. No. 313).[2]  The parties have consented to this court's jurisdiction.  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73 (Dkt. No. 92).  For the following reasons, Plaintiff's motion for collateral estoppel (Dkt. No. 298) is DENIED, Plaintiff's motion for summary judgment (Dkt. No. 307) is GRANTED in part and DENIED in part, and Defendant's motion for summary judgment (Dkt. No. 313) is DENIED.

## I.      PLAINTIFF'S MOTION FOR COLLATERAL ESTOPPEL

### A.  Legal Standard

Pursuant to federal common law rules of preclusion, "when a state agency 'acting in a judicial capacity … resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422 (1966), federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts."  *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 789 (1986) (reaching its holding relative to the plaintiff's claim under 42 U.S.C. § 1983).  The Supreme Judicial Court of Massachusetts has "held that the 'judicial doctrine of issue preclusion, also known as collateral estoppel, provides that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, … the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."'"  *Brunson v.*

---

[2] Defendant also moved for summary judgment on Count VIII of Plaintiff's complaint for intentional infliction of emotional distress, but Plaintiff has decided not to proceed with that claim.  Accordingly, it is dismissed.

*Wall*, 541 N.E.2d 338, 340 (Mass. 1989) (quoting *Martin v. Ring*, 514 N.E.2d 663, 664 (Mass. 1987)).  Thus, "[o]rdinarily to preclude relitigation of an issue there must exist "identity of cause of action and issues, the same parties, and judgment on the merits by a court of competent jurisdiction.'" *Id.* (quoting *Almeida v. Travelers Ins. Co.*, 418 N.E.2d 602, 605 (Mass. 1981)). Mutuality of parties is not always required, however.  *Id.*  The offensive use of collateral estoppel, which occurs when a plaintiff seeks to prevent a defendant from litigating issues that the defendant has previously litigated unsuccessfully in an action against another party, "'does not require mutuality of parties, so long as there is an identity of issues, a finding adverse to the party against whom it is being asserted, and a judgment by a court or tribunal of competent jurisdiction.'" *Bellermann v. Fitchburg Gas & Elec. Light Co.*, 18 N.E.3d 1050, 1065 (Mass. 2014) (quoting *Evans v. Lorillard Tobacco Co.*, 990 N.E.2d 997, 1039 (Mass. 2013)). "Additionally, 'the determination of the issue for which preclusion is sought must have been essential to the underlying judgment.'" *Id.* (quoting *Matter of Brauer*, 890 N.E.2d 847, 857 (Mass. 2008)).  *See also DeGiacomo v. City of Quincy*, 63 N.E.3d 365, 369 (Mass. 2016) (quoting *Kobrin v. Bd. of Registration in Med.*, 832 N.E.2d 628, 634 (Mass. 2005)) ("A party is precluded from relitigating an issue where '(1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication,' was essential to the earlier judgment, and was actually litigated in the prior action.").  "Offensive issue preclusion may apply to the findings of an administrative agency 'so long as the tribunal rendering judgment ha[d] the legal authority to adjudicate the dispute.'" *Bellerman*, 18 N.E.3d at 1065 (quoting *Alba v. Raytheon Co.*, 809 N.E.2d 516, 521 (Mass. 2004)).  "The burden of demonstrating that an issue is precluded 'is

always on the person raising the bar.'"  *Mullins v. Corcoran*, 172 N.E.3d 759, 767 (Mass. 2021)

(quoting *Fireside Motors, Inc. v. Nissan Motor Corp. in U.S.A.*, 479 N.E.2d 1386, 1390 (Mass.

1985)).  "A judge has wide discretion in deciding whether the doctrine should apply in a

particular case."  *Bellermann*, 18 N.E.3d at 1065 (citing *Matter of Brauer*, 890 N.E.2d at 857).

If a plaintiff establishes the initial requirements of preclusion, "the 'central inquiry'

becomes whether the defendant had a 'full and fair opportunity to litigate the issue in the first

action.'"  *Bellermann*, 18 N.E.3d at 1065 (quoting *Pierce* v. *Morrison Mahoney LLP*, 897 N.E.2d

562, 572 (Mass. 2008)).  "Ultimately, '[f]airness is the "decisive consideration" in determining

whether to apply offensive issue preclusion.'"  *Pierce*, 897 N.E.2d at 572 (quoting *Matter

of Goldstone*, 839 N.E.2d 825, 832 (Mass. 2005)).  The fairness determination involves asking

whether: "'(1) the party in whose favor the estoppel would operate could have joined the original

action, (2) the party against whom it would operate had an adequate incentive to defend the

original action vigorously, (3) "the judgment relied upon as a basis for the estoppel is itself

inconsistent with one or more previous judgments in favor of the defendant," and (4) "the second

action affords the defendant procedural opportunities unavailable in the first action that could

readily cause a different result."'"  *Bellermann*, 18 N.E.3d at 1066 (quoting *Matter of Brauer*,

890 N.E.2d at 859).  "The party facing preclusion bears the burden of proof on the question of

fairness."  *Id.* at 1066–67 (citing *Bailey v. Metro. Prop. & Liab. Ins. Co.*, 505 N.E.2d 908, 911

(Mass. App. Ct. 1987)).  A trial court judge has "'wide discretion in determining whether'

applying offensive collateral estoppel 'would be fair to the defendant.'"  *Pierce*, 897 N.E.2d at

731 (quoting *Bar Counsel* v. *Bd. of Bar Overseers*, 647 N.E.2d 1182, 1185 (Mass. 1995)).

"Reasonable doubts are resolved against an asserted preclusion."  *Schneider v. Colegio de

*Abogados de Puerto Rico*, 546 F. Supp. 1251, 1271 (D.P.R.) *aff'd in part, reversed in part on*

*other grounds sub nom In Re Justices of Supreme Court of Puerto Rico*, 695 F.2d 17 (1st Cir. 1982). *See also Milton Bradley Co. v. Diamantis*, Civ. A. No. 85-0099-F, 1986 WL 11268, at *4 (D. Mass. Oct. 9, 1986) (citing *Bouchard, Inc. v. United States*, 583 F. Supp. 477, 482 (D. Mass. 1984)).

> B.  Background

On June 28, 2019, Bar Counsel filed a Petition for Discipline against Defendant and two other former Assistant Attorneys General alleging numerous acts of misconduct related to the Attorney General's prosecution of Farak and referencing violations of a number of Rules of Professional Responsibility, including: Rule 1.1, Competence; Rule 1.2(a), Scope of Representation; Rule 1.3, Diligence; Rule 3.3(a), Candor Toward the Tribunal; Rule 3.4, Fairness to Opposing Party and Counsel; Rule 3.8, Special Responsibilities of a Prosecutor; Rule 4.1, Truthfulness in Statements to Others; Rule 5.1, Responsibilities of Partners, Managers, and Supervisory Lawyers; Rule 5.3, Responsibilities Regarding Nonlawyer Assistants; and Rule 8.4, Misconduct (Dkt. No. 299-21 at 1).  The Board of Bar Overseers appointed a Special Hearing Officer ("SHO"), who held a disciplinary hearing by videoconference over twenty-three days during the Fall of 2020 (Dkt. No. 299-21 at 4).  During the hearing, the SHO admitted 305 exhibits and heard testimony from fifteen witnesses (Dkt. No. 299-21 at 4).  Thereafter, on July 9, 2021, the SHO issued a 92-page Hearing Report containing his findings of fact and conclusions of law (Dkt. 299-21).  Defendant waived any objections to the SHO's findings by not filing a brief on appeal setting forth her objections.

Pursuant to the Rules of the Board of Bar Overseers, the Board must now review the case, at which time it may adopt the findings of the SHO or revise any findings which it determines to be erroneous, "paying due respect for the role of the … special hearing officer as

the sole judge of credibility of the testimony presented at the hearing." SJC Rule 4:01, § 8(5)(a). If the Board determines that formal proceedings should be concluded by suspension or disbarment, or if it determines formal proceedings should be concluded by dismissal, admonition, or public reprimand and a demand is made, it must file an Information with the Clerk of the Supreme Judicial Court, together with the entire record of its proceedings. SJC Rule 4:01, § 8(6). At that point, a single justice of the Supreme Judicial Court conducts a "substantial evidence" review of the subsidiary findings of fact found by the Board. SJC Rule 4:01, § 8(6). A party aggrieved by a final order or judgment of the single justice may appeal to the full court for further review. SJC Rule 2:23.

      C.  <u>Discussion</u>

      Plaintiff seeks an order collaterally estopping Defendant from contesting certain enumerated factual findings by the SHO. Preliminarily, the court addresses Defendant's argument that Plaintiff's motion for collateral estoppel is premature and is more akin to a motion in limine preventing Defendant from offering certain testimony at trial. According to Defendant, Plaintiff's motion, rather than a straightforward legitimate litigation tactic, is "a blatant attempt to smear Ms. Kaczmarek and to prejudice the Court against her through the weaponization of the SHO's report" (Dkt. No. 326 at 2). The court rejects Defendant's characterization. There is nothing improper about Plaintiff requesting that preclusive effect be given to the factual findings of the SHO in conjunction with his motion for summary judgment. "A party may move for summary judgment on the ground that ... the earlier litigation actually determined an issue crucial to both actions so that an application of collateral estoppel entitles the movant to a judgment as a matter of law in the second action." *Robinson v. Globe Newspaper Co.*, 26 F. Supp. 2d 195, 199 (D. Me. 1998) (quoting 10A Charles A. Wright & Arthur R. Miller, *Federal*

*Practice and Procedure,* § 2735 (1983)).  "Indeed, a Rule 56 motion often is the most appropriate vehicle for determining the validity of a defense of former adjudication."  10A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 2735 (2022).  Thus, the court will address the substance of Plaintiff's motion.

The parties' dispute over the applicability of issue preclusion to the factual findings of the SHO predominantly centers on the question of finality and, therefore, the court addresses it first.  "Finality, for the purposes of issue preclusion, does not require a final judgment in the strict sense."  *Jarosz v. Palmer*, 766 N.E.2d 482, 489 (Mass. 2002) (citing *Tausevich v. Bd. of Appeals of Stoughton*, 521 N.E.2d 385, 387 (Mass. 1988)).  The determination of "finality" depends upon a consideration of whether "the parties were fully heard, the judge's decision is supported by a reasoned opinion, and the earlier opinion was subject to review or was in fact reviewed."  *Tausevich*, 521 N.E.2d at 387 (citing Restatement (Second) of Judgments § 13 cmt. g 1982); *see also Mullins*, 172 N.E.3d at 768 (quoting *Jarosz*, 766 N.E.2d at 489).  "'"Finality" in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.'"  *Tausevich*, 521 N.E.2d at 387 (quoting *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961), *cert. denied*, 368 U.S. 986 (1962)).

Plaintiff argues that the factual findings set forth in the SHO's 92-page "reasoned opinion" are "sufficiently firm" to be accorded preclusive effect and that no "really good reason" exists to allow them to be relitigated.  *Tausevich*, 521 N.E.2d at 387.  Defendant contends that the SHO's report cannot be considered a final judgment because the Board has not yet reviewed it and issued its own judgment, meaning it is not yet appealable, and cites *In re Strangie*, 192 F.3d 192, 195 (1st Cir. 1999), for the proposition that a judgment is not considered final when it

is not yet subject to appeal.[3]  Plaintiff counters that the fact that the findings of the SHO are not

yet appealable is inconsequential and directs the court's attention to *Greenleaf v. Garlock, Inc.*,

174 F.3d 352 (3rd Cir. 1999), in which the Third Circuit stated that "decisions not yet final for

purposes of appealability may nevertheless be sufficiently final to have issue preclusive effect."[4]

*Id*. at 360.

        As set forth above, this court must follow the issue preclusion rules of Massachusetts in

determining whether to apply preclusive effect to the findings of the SHO.  The SJC has held that

where there has been no appealable judgment or interlocutory order, "special circumstances" are

necessary to justify the imposition of issue preclusion.  *Tausevich*, 521 N.E.2d at 387 (declining

to give issue preclusive effect to determinations made on a partial summary judgment in an

earlier action between the parties where it was never expressed in an appealable order or

judgment).  *See also In re Strangie*, 192 F.3d at 195 (citing *Sena v. Commonwealth*, 629 N.E.2d

986, 992 (Mass. 1994); *Tausevich*, 521 N.E.2d at 387 ("Under Massachusetts law, collateral

estoppel normally is not triggered by a nonappealable judgment.")).  This requirement appears to

be in line with the Restatement (Second) of Judgments, which provides that "[t]he requirement

---

[3] Defendant also argues that even after the Board completes its review, appellate avenues remain.
However, as noted by Plaintiff, the SJC has adopted the "Federal rule, followed by the majority
of the States, … that a trial court judgment is final and has preclusive effect regardless of the fact
that it is on appeal." *O'Brien v. Hanover Ins. Co.*, 692 N.E.2d 39, 44 (Mass. 1998).  *See also
Kupperstein v. Baker*, No. 20-11868-FDS, 2021 WL 3079887, at *8 (D. Mass. July 21, 2021)
(recognizing the SJC's adoption of the majority rule).  Thus, it would make no difference to the
finality analysis if the Board's decision were on appeal.
[4] Plaintiff also cites to *Chase Manhattan Mortg. Corp. v. Moore*, 446 F.3d 725, 728 (7th Cir.
2006), for its observation that this "is the general rule, not anything special to the Third Circuit."
However, the Seventh Circuit cites to a Second Circuit case in which the court was considering
what a district court in the Third Circuit would do, not stating the rule in the Second Circuit.  *See
Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436, 443 (2d Cir. 2005) (citing *Burlington
Northern R.R. Co. v. Hyundai Merchant Marine Co., Ltd.*, 63 F.3d 1227, 1233 n.8 (3d Cir.
1995)) (noting that "the Third Circuit does not require that the … district court have issued an
appealable order.").  Thus, *Chase Manhattan Mortg. Corp.* adds nothing to the discussion.

of finality of judgment is interpreted strictly … when bar or merger is at stake," and "*[u]sually*

there is no occasion to interpret finality less strictly when the question is one of issue preclusion

…." Restatement (Second) of Judgments § 13 cmt. g 1982) (emphasis added).[5]  However, strict

interpretation of finality for purposes of applying issue preclusion "can involve hardship

[including] needless duplication of effort and expense in the second action to decide the same

issue …." *Id*.  Thus, in the normal course finality should be interpreted strictly, but "special

circumstances" may arise where a more lenient application of the finality requirement is in order.

Because the decision of the SHO is not an appealable judgment, the burden is on Plaintiff

to establish "special circumstances" justifying the imposition of issue preclusion.  He has not

made any effort to do so, nor is it likely that he could.  Not only is the decision of the SHO not

appealable, but also the SHO does not even have the power of final disposition; only the Board

does.  Thus, the court exercises its discretion to decline Plaintiff's application of collateral

estoppel to the factual findings of the SHO.

Moreover, even if the court were to find that Plaintiff established finality (as well as the

other elements necessary for preclusion), the court would nevertheless decline to apply

preclusive effect to the SHO's findings on the basis of fairness.  Defendant's claim of unfairness

is predicated on the fact that she is entitled to a jury trial on Plaintiff's § 1983 claim, while she

had no entitlement to a jury relative to the Board's proceeding, which was decided by the single

SHO.  Although the Supreme Court in *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322 (1979),

found that the lack of a jury trial in the initial action did not bar offensive issue preclusion under

federal common law and was "basically neutral," *id*. at 332 n.19, trial judges in Massachusetts

have broad discretion over the fairness determination.  The court here finds deprivation of a jury

---

[5] Merger and bar are the traditional phrases for claim preclusion.  *Negrón-Fuentes v. UPS Supply Chain Solutions*, 532 F.3d 1, 5 n.2 (1st Cir. 2008).

trial particularly weighty where the key elements in dispute and as to which the Plaintiff seeks to have preclusive effect applied relate to elusive concepts of motive and intent.  Nor is this court alone in giving weight to the deprivation of a jury trial.  *See In re Light Cigarette Mktg. Sales Practices Litig.*, 691 F. Supp. 2d 239, 251 (D.N.H. 2010) ("This Court follows the lead of other courts that have given weight to the deprivation of a jury trial."); *Grisham v. Philip Morris, Inc.*, 670 F. Supp. 2d 1014, 1036 (C.D. Cal. 2009) (noting that "a District Court may consider the deprivation of a jury trial when exercising its discretion to reject issue preclusion in a particular case," and declining to apply issue preclusion in part because "the Court [wa]s wary of depriving Defendants of their Seventh Amendment interest in having a jury decide the factual basis for Plaintiff's claim"); *Whelan v. Abell*, 953 F.2d 663, 669 (D.C. Cir. 1992) ("Were this a bench trial, we might have greater reason to question the district court's refusal to accord preclusive effect to findings made in the [earlier litigation]."); *Bhatti v. Whooters*, No. CA 01-2151, 2002 WL 1963211, at *1 (Mass. Super. Aug. 19, 2002) ("While the right to a jury trial is not absolute, it is held 'sacred' by the inhabitants of Massachusetts.").

The court rejects Plaintiff's suggestion that allowing Defendant to contest the SHO's factual findings "runs the very real risk of injecting 'the aura of the gaming table' into this proceeding" (Dkt. No. 366 at 9 (quoting *Parklane Hosiery*, 439 U.S. at 328).  Because Plaintiff is seeking to apply offensive issue preclusion against Defendant, there is no danger of a plaintiff cycling through unrelated defendants until he can prove his case, which was the concern identified by the *Parklane* Court.  Id.  Thus, the court exercises its discretion to decline to apply preclusive effect to the enumerated findings of the SHO.

## II.       THE CROSS MOTIONS FOR SUMMARY JUDGMENT

A. <u>Legal Standard</u>

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue is 'genuine' when a rational factfinder could resolve it either direction."  *Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 5 (1st Cir.), *rev. denied*, 885 F.3d 52 (1st Cir. 2018) (citing *Borges ex rel. S.M.B.W. v. Serrano–Isern*, 605 F.3d 1, 4 (1st Cir. 2010)).  "A fact is 'material' when its (non)existence could change a case's outcome.  *Id*. (citing *Borges*, 605 F.3d at 5).

A party seeking summary judgment is responsible for identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'"  *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325).  If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute."  *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The record is viewed in favor of the nonmoving party, and reasonable inferences are drawn in the nonmoving party's favor.  *See Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (citing *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)).

"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se*."  *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996) (citing *Wiley v. Am. Greetings Corp.*, 762 F.2d 139, 141 (1st Cir.

1985)).  "Cross motions simply require [the court] to determine whether either of the parties

deserves judgment as a matter of law on facts that are not disputed."  *Id*. (citing *Wiley*, 762 F.2d

at 141).  "Where, as here, a district court rules simultaneously on cross-motions for summary

judgment, it must view each motion, separately, through this prism."  *Estate of Hevia v. Portrio*

*Corp.*, 602 F.3d 34, 40 (1st Cir. 2010) (citing *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir. 1996)

("Barring special circumstances, the nisi prius court must consider each motion separately,

drawing inferences against each movant in turn.")).

     B.  <u>Factual Background</u>[6]

On Friday morning, January 18, 2013, Sharon Salem, the evidence officer at the Amherst

Drug Lab ("the Lab"), advised Supervisor James Hanchett ("Hanchett") that two cocaine

samples assigned to chemist Sonja Farak ("Farak") were not in the main evidence room where

they were supposed to be (Pl. SOF 27; Def. Resp. 27; Def. SOF 1-2; Pl. Resp. 1-2).  Hanchett

contacted the Massachusetts State Police ("MSP"), and detectives in the MSP unit assigned to

the Northwestern District Attorney's office ("NWDAO") commenced an investigation (Pl. SOF

28-29; Def. Resp. 28-29; Def. SOF 4; Pl. Resp. 4).  Investigators quickly spoke to Farak, who

denied any wrongdoing and refused to consent to a search of her car (Pl. SOF 30, 32; Def. Resp.

30, 32).  Undeterred, the investigators impounded the vehicle and towed it to the MSP barracks

in Northampton pending issuance of a search warrant (Pl. SOF 32, 36; Def. Resp. 32, 36).

Robert Irwin ("Irwin"), who was the highest-ranking member of the MSP unit assigned to

the Attorney General's Office ("AGO") and worked in Boston, was directed to drive to

_____

[6] The facts are taken from Plaintiff's Response to Defendant Anne Kaczmarek's Statement of
Undisputed Material Facts (Dkt. No. 333), which includes Defendant's statement of facts ("Def.
SOF") and Plaintiff's responses thereto ("Pl. Resp."), as well as Anne Kaczmarek's Responses to
Rolando Penate's Statement of Additional Material Facts (Dkt. No. 358), which includes
Plaintiff's statement of facts ("Pl. SOF") and Defendants' responses thereto ("Def. Resp."); as
well as from the materials cited therein.

Northampton and bring some state police detectives assigned to the AGO to either assist in or take over the investigation from the NWDAO (Pl. SOF 16, 33; Def. Resp. 16, 33; Def. SOF 4; Pl. Resp. 4).  Irwin relayed this directive to Joseph Ballou ("Ballou), who was a sergeant working in the Springfield office of the MSP unit assigned to the AGO and reported to Irwin (Pl. SOF 21, 34; Def. Resp. 21, 34; Def. SOF 6; Pl. Resp. 6).  Ballou then contacted Randy Thomas ("Thomas"), a trooper working in the same office under his supervision and told him to report to the MSP's detective unit assigned to the NWDAO (Pl. SOF 21, 35; Def. Resp. 21, 35).

At approximately 2:30 a.m., a search warrant issued for Farak's vehicle (Pl. SOF 37; Def. Resp. 37).  Between 3:23 a.m. and 4:56 a.m., Irwin, Ballou, and Thomas executed the warrant, while Trooper Christopher Dolan from Crime Scene Services took photographs (Pl. SOF 38-40; Def. Resp. 38-40; Def. SOF 5, 7; Pl. Resp. 5, 7).  Among the items the investigators seized was a manila envelope containing paperwork (Pl. SOF 41-42; Def. Resp. 41-42).  Included among that paperwork was a "ServiceNet Diary Card" that Farak completed during the seven-day period from December 20 to December 26, 2011 (Pl. SOF 9, 42; Def. Resp. 9, 42).  The Diary Card itself includes notations that it was completed daily between "12-20 – Tues" and "12-26 – Mon" but does not indicate in what year (Def. SOF 9).  Farak's entry for December 22 states: "tried to resist using @ work but ended up failing" (Pl. SOF 10; Def. Resp. 10).  Also in the envelope was an "Emotion Regulation Worksheet" bearing handwritten notations including: under the heading "Prompting Event," "got 'good' sample @ work + having urges to use (+ knowing that I will be the only one here after lunch;" under the heading "Interpretations," "It doesn't matter – I won't get caught," and "Know I'll feel worse when/if I use," and under the heading "Action/Urge," "hurry up + prepare/use" (Pl. SOF 42; Def. Resp. 42).  Other documents in the car included: a second undated "ServiceNet Diary Card" with the notation "Shame at work. Going to use

phentermine, but when I went to take it, I saw how little (v. little) there is left = ended up not using;" a "Homework" assignment dated "11-16-11;" a scrap of paper containing the name, address, and telephone number of a therapist named Anna Kogan; numerous pre-2012 emails; two pre-2012 letters; numerous pre-2012 news articles; two pre-2012 receipts; 2011 travel authorization forms; pre-2012 lab paperwork; and a schedule of games for Week 13 of the NFL's 2011 season (Pl. SOF 43-44; Def. Resp. 43-44).

When Thomas returned the car search warrant to the clerk's office, he provided the court with "an inventory of the property taken pursuant to th[e] warrant" (Pl. SOF 67; Def. Resp. 67). The inventory listed twenty separate items, seven of which referenced "assorted lab paperwork," "assorted lab paper work," or "lab paperwork" (Pl. SOF 68; Def. Resp. 68). The envelope containing the ServiceNet Diary Card for December 20 to December 26, 2011, in particular, was identified as containing "lab paperwork" (Pl. SOF 69; Def. Resp. 69). Thereafter, Thomas submitted a police report memorializing the execution of the search warrant (Pl. SOF 70; Def. Resp. 70).

Ballou and Thomas arrested Farak on January 19, 2013, and she was arraigned in the Eastern Hampshire District Court on Tuesday, January 22, 2013 (Pl. SOF 46, 54; Def. Resp. 46, 54; Def. SOF 3; Pl. Resp. 3). By this time, Defendant, who was an Assistant Attorney General ("AAG") in the Enterprise and Major Crimes Unit within the AGO's Criminal Bureau, had been assigned the task of prosecuting Farak (Pl. SOF 20, 55; Def. Resp. 20, 55; Def. SOF 10, 12; Pl. Resp. 10, 12). Farak's release conditions included weekly urine screens, and, during her first such screen, Farak tested positive for cocaine and admitted using that substance on the day before her arrest (Pl. SOF 61-62; Def. Resp. 61-62).

At the time Defendant became the lead prosecutor in the AGO's criminal case against Farak, Defendant was already the lead prosecutor against another lab chemist, Annie Dookhan ("Dookhan"), who had confessed to "dry labbing" and intentionally contaminating samples entrusted to her for analysis in the Hinton Drug Lab (Pl. SOF 15, 18, 20; Def. Resp. 15, 18, 20). Because of the nature of Dookhan's work, Defendant knew that "her misconduct would affect any drug cases that she had touched" (Dkt. 334-11 at 63). AGO Criminal Bureau Chief John Verner ("Verner") and First Assistant Edward Bedrosian also realized the potential ramifications of Dookhan's misconduct on any drug prosecution in which she had signed the drug certificate (Dkt. 334-8 at 46-47). As a result of these concerns, a decision was made to turn over all documents and information that came to the AGO in the Dookhan investigation to the District Attorney's offices ("DAOs") (Dkt. 334-8 at 47-48). As Dookhan's lead prosecutor, Defendant became "responsible for the collection of this material to turn over to the [DAOs]" because she "knew what the documents were, understood the case intimately, [and] would be able to gather that information to get out" (Pl. SOF 26A-26B).[7] Similarly, with Defendant's assignment to prosecute Farak came the responsibility to provide all potentially exculpatory information gathered in the Farak investigation to the DAOs prosecuting Farak Defendants (Pl. SOF 59).[8]

---

[7] Defendant objects to Plaintiff's SOF 26A and 26B stating "Kaczmarek did not have the obligation to produce evidence to Farak Defendants and therefore was not given this assignment: the AGO which intended to turn over all evidence gathered in the drug lab investigations … decided to make these productions itself" (Def. Resp. 26A, 26B). This objection is overruled. First, these statements of fact refer to Defendant's responsibility vis-à-vis the Dookhan defendants not the Farak defendants. Second, the AGO as an entity can act only through its agents. Plaintiff has submitted evidence in the form of Verner's testimony that it was Defendant's responsibility to collect the material and turn it over to the DAOs prosecuting the Dookhan defendants. Defendant has not offered any conflicting evidence that it was the responsibility of anyone else within the AGO's office.

[8] Defendant lodges essentially the same objection to Plaintiff's SOF 59 as she does to Plaintiff's SOF 26A and 26B. Again, the objection is overruled. In this instance, the statement of fact does refer to Plaintiff's responsibility vis-à-vis the Farak defendants. However, whether in the

"[D]isclos[ing] investigative materials to the district attorneys" was "a policy decision," and because "Kaczmarek was the most knowledgeable person with respect to the documents in the case …[,] she was the point person for carrying out that policy" (Pl. SOF 59A).[9]

On January 23, 2013, Ballou had a series of email communications with Defendant about information he was receiving from Karen Southerland ("Southerland"), an Assistant District Attorney ("ADA") in the Hampden County District Attorney's Office ("HCDAO").  In the first email, on which Verner and Irwin were copied, Ballou indicated that he had received a call from Southerland regarding a Farak drug case she had in which the Springfield Police told her that one of the drug samples appeared to have been tampered with (Dkt. 334-42; Def. SOF 11; Pl. Resp. 11).  In a subsequent email, copied to Irwin, Ballou indicated that he had spoken with Southerland, who told him that the Springfield police report indicated that 51 Oxycodone pills were seized on March 16, 2012, but that after Farak conducted an analysis, which showed that no controlled substances were found, there were 61 pills and they looked different than the ones the officer seized (Dkt. No. 334-43).  In a later email, again copied to Irwin, Ballou wrote that he had met with Southerland and that she had told him about another cocaine case that was "light" by 4 grams (Dkt. No. 334-43).  The following day, Ballou reported by email to Defendant that he had spoken with ADA Diane Dillon ("Dillon") about the "light" cocaine case; Dillon reported that the Farak had tested the sample in 2005 and that Dillon thought the difference in weight could be accounted for because of the weight of the packaging, the drying of the product, and any inaccuracy in the police scale (Dkt. No. 334-43).  In response, Defendant wrote, "Please

_____

Dookhan investigation or the Farak investigation, the AGO can only act through its agents, and Defendant has not offered any evidence to rebut Plaintiff's evidence that it was Defendant's responsibility within the AGO to disseminate the information gathered in the two investigations to the DAOs.

[9] Defendant lodges her now familiar objection to Plaintiff' SOF 59A as well.  It is overruled for the same reason.

don't let this get more complicated than we thought.  If she were suffering from a back injury –

maybe she took some oxys?" (Dkt. No. 334-43).

On or near the morning of February 14, 2013, Ballou undertook a more complete review

of the evidence seized from Farak's car (Pl. SOF 85; Def. Resp. 85).  At some point during his

review, Ballou came across what became known as the "mental health worksheets," documents

in which Farak admitted that she was stealing and using drugs at work (Pl. SOF 86, 89; Def.

Resp. 86, 89; Def. SOF 8; Pl. Resp. 8).  Ballou was "excited" to find these admissions and

viewed them as a "huge development" because, before then, all the investigators had was

circumstantial evidence of Farak's guilt (Pl. SOF 88-89; Def. Resp. 88-89).  Ballou assumed

Farak's admissions concerned misconduct she perpetrated in December 2012 (Pl. SOF 90; Def.

Resp. 90).  When Ballou started finding things in the physical evidence, he stopped his review to

call Defendant, who asked him to scan and send the materials to her (Pl. SOF 93; Def. Resp. 93).

In the afternoon on February 14, 2013, Ballou sent Defendant the requested email, copying

Verner and Irwin, with the subject "FARAK admissions," which stated:

> Anne,
>
> Here are those forms with the admissions of drug use I was talking
> about.  There are also news articles with handwritten comments
> about other officials being caught with drugs.  All of these were
> found in her car inside of the lab manila envelopes.
>
> Joe

(Pl. SOF 102; Def. Resp. 102).  Ballou appended four attachments to the email, as follows:

1. "Articles and Notes," which consisted of copies of three news articles, including
   (a) an article entitled "Capeless on Steroid Probe," which was printed on
   September 20, 2011, and concerned the removal of Pittsfield Police Officer David
   Kirchner from the Berkshire County Drug Task Force, and included a handwritten
   note stating "And Kirchner seemed like such a good guy.  I do feel bad for his 5
   y.o. daughter.  (Thank god I'm not a law enforcement <u>officer</u>)  P.S. Most of the
   cases he's been a part of have been dismissed for exactly this reason."; (b) an

article about a Pittsfield pharmacist sentenced to three years in prison for stealing OxyContin pills; and (c) an article about the indictment of a San Francisco drug lab analyst;

2.  "Emotion Regulation Homework" consisting of (a) an "Emotion Regulation Worksheet" bearing the handwritten notation under the heading "Action Urge," "Use (have 12 urge-ful samples to analyze out of the next 13);" (b) a handwritten "Pros" and "Cons" list for "resisting" and "TB"; and (c) a handwritten account of various events, actions, and emotions;

3.  "Positive Morphine Test," which consisted of a positive morphine screen conducted by Quest Diagnostics for an unknown third party; and

4.  "Emotion Regulation Worksheet," consisting of (a) the "Emotion Regulation Worksheet" with the handwritten notation regarding a "'good' sample @ work" and the urge to "hurry up + prepare/use"; (b) the "ServiceNet Diary Card" memorializing Farak's "using @ work" on December 22; and (c) a handwritten skills worksheet

(Pl. SOF 95-102; Def. Resp. 95-102; Def. SOF 13-14; Pl. Resp. 13-14).  After speaking with Ballou about the documents and reviewing those that Ballou forwarded to her, Defendant understood that Ballou "was sending [her] a selection of things he found of interest" (Pl. SOF 103; Def. Resp. 103).  At some point after receiving Ballou's email, Defendant stated that she would have to get out to Springfield to review the evidence, but, in fact, she never reviewed the originals of the documents appended to Ballou's email or any of the other evidence Irwin, Ballou, and Thomas seized from Farak's car (Pl. SOF 107-108; Def. Resp. 107-108).  Nor did she ask Ballou to pursue the mental health worksheets as a lead (Pl. SOF 92; Def. Resp. 92).  Years later, during her deposition, Defendant conceded that the items she received from Ballou were "objectively exculpatory to Mr. Penate" (Pl. SOF 106; Def. Resp. 106).

On February 26, 2013, Defendant emailed Audrey Mark ("Mark"), an attorney with the Office of the Inspector General ("OIG"), who was the lead investigator in an independent review of the Hinton Drug Lab, forwarding a news article raising the possibility of a similar investigation into the Amherst Lab (Pl. SOF 84E-84G; Def. Resp. 84E-84G).  In the email,

Defendant said to Mark, "when they ask you to [do] this audit – say no. (actually its very different than [the Hinton Lab]. A professional lab" (Pl. SOF 84H; Def. Resp. 84H).  Defendant had previously characterized the results of an audit of the Amherst Lab showing how little quality control they had as "a little embarrassing" (Pl. SOF 84C; Def. Resp. 84C).  Defendant would later testify that she did not mean to suggest nobody at OIG should investigate the Amherst Lab but just that Mark herself should not as she was "in the midst of the JP Hinton Lab investigation" and "in the middle of, like, a ton of work;" she also explained that her statement was a joke (Pl. SOF 84I; Def. Resp. 84I).

Defendant called Ballou to testify before the grand jury regarding Farak for the first time on February 28, 2013 (Pl. SOF 139; Def. Resp. 139).  Before he was sworn in, Defendant told Ballou that the mental health worksheets would not be introduced at the proceeding (Pl. SOF 140; Def. Resp. 140; Def. SOF 16; Pl. Resp. 16).  When asked to tell the Grand Jurors some of the things that were recovered from Farak's vehicle, Ballou mentioned "newspaper articles" and "writings" and not the mental health worksheets (Pl. SOF 142; Def. Resp. 142).  As Defendant indicated, she did not use the mental health worksheets before the grand jury (Def. SOF 16; Pl. Resp. 16).

On March 25, 2013, Defendant and Verner received an email from Meghan O'Brien, an administrative assistant, attaching a Microsoft Word document consisting of a letter to District Attorney David F. Capeless, stating "[p]ursuant to this Office's continuing obligation to provide potentially exculpatory information to the District Attorneys as well as information necessary to your Offices' determination about how to proceed with cases in which related narcotics evidence was tested at the Amherst laboratory, please find the below listed materials: …"  (Dkt. 334-51- Dkt. 334-52).  Defendant provided the following feedback to the letter:

> As this is the first letter – do we call it "continuing obligation"? I know this is along the lines of Dookhan ….
>
> Otherwise it contains every report I have.

(Pl. SOF 114; Def. Resp. 114).  The final draft of the letter, which Verner sent to all eleven elected District Attorneys on March 27, 2013, stated:

> This Office is investigating Sonja Farak, a chemist who conducted analysis of suspected narcotic samples out of the Amherst Drug Laboratory. … During our investigation, this Office has produced or otherwise come into possession of information, documents and reports.  Pursuant to this Office's obligation to provide potentially exculpatory information to the District Attorneys as well as information necessary to your Offices' determination about how to proceed with cases in which related narcotics evidence was tested at the Amherst Laboratory, please find the below listed materials: ….

(Pl. SOF 115; Def. Resp. 115; Def. SOF 18; Pl. Resp. 18).  Verner's letter did not reference the mental health worksheets, information concerning the 2012 Oxycodone case, the 2005 light cocaine case, or Farak's January 23, 2013, urinalysis (Pl. SOF 117; Def. Resp. 117).

At the time of Farak's prosecution in 2013, if a line AAG like Defendant wanted to obtain an indictment, she would have to submit a "prosecution memo" to her superiors (Pl. SOF 119; Def. Resp. 119).  The final draft of Defendant's prosecution memo regarding Farak, which was approved at the end of March 2013, stated that among the "[i]tems of note recovered from Farak's vehicle" were "mental health worksheets describing how Farak feels when she uses illegal substances and the temptation of working with 'urge-ful samples'" (Pl. SOF 127; Def. Resp. 127; Dkt. 334-60).  In a footnote, Defendant wrote: "These worksheets were not submitted to the grand jury out of an abundance of caution in order to protect possibly privileged information.  Case law suggests, however, that the paperwork is not privileged" (Pl. SOF 128; Def. Resp. 128).  Verner approved the prosecution memo and made a handwritten note on it with

respect to the mental health worksheets that "this paperwork NOT turned over to the DAs offices yet" (Pl. SOF 129, 132; Def. Resp. 129, 132).  When asked why he wrote this note, Verner testified, "to me, when I say 'Paperwork not turned over to the DA's offices yet,' … that's flagging that it has not been turned over.  And the word 'yet,' you know, I mean to say these need to be turned over, right?  So they're not turned over yet" (Pl. SOF 133; Def. Resp. 133). Verner considered the mental health worksheets to be exculpatory for Farak defendants and therefore expected that they would be turned over to the district attorneys (Pl. SOF 135: Def. Resp. 135).  Defendant denies ever seeing Verner's note (Def. Resp. 138).

Farak was arraigned in the Hampshire Superior Court on April 22, 2013, and Defendant provided Farak's defense counsel, Elaine Pourinski ("Pourinski"), with a discovery packet that included the documents that Ballou had attached to his February 14, 2013, email (Def. SOF 143C; Def. Resp. 143C; Def. SOF 15; Pl. Resp. 15).  According to Pourinski, Defendant told her that her office considered the mental health sheets to be privileged and promised that they would not be furnished to any so-called Farak defendants (Pl. SOF 143E).  Defendant denies having made this statement to Pourinski (Def. SOF 143E).

On June 24, 2013, Defendant signed her name to a motion filed in <u>Commonwealth v. Farak</u> to disclose the grand jury minutes and exhibits to the District Attorneys as well as the U.S. Attorney for the District of Massachusetts (Pl. SOF 151; Def. Resp. 151).  The motion stated that:

> (1) "[T]he issues presented in the criminal case of Sonja Farak potentially affect the criminal cases of numerous individuals within the Commonwealth;"
>
> (2) "The Commonwealth believes that the grand jury minutes may contain potentially exculpatory evidence;" and

> (3) "It is the duty of the Attorney General's Office to
> release such potentially exculpatory evidence to the
> government entities charged with prosecuting of the
> affected individuals"

(Pl. SOF 152; Def. Resp. 152).  The motion to disseminate was allowed with the caveat that

testimony regarding the mental health of Farak's wife would be redacted before disclosure, and

the AGO, through Defendant, produced the grand jury minutes and exhibits (Pl. SOF 154-155;

Def. Resp. 154-155; Def. SOF 20; Pl. Resp. 20).

On June 26, 2013, Defendant sent a letter to each of the Commonwealth's District

Attorneys that was very similar to the one previously sent by Verner (Pl. SOF 130; Def. Resp.

130; Def. SOF 109; Pl. Resp. 109; Def. SOF 19; Def. Resp. 19).  Defendant's letter stated:

> As you know, this Office is investigating defendant, Sonja Farak, a
> chemist who analyzed drugs out of the Amherst drug lab.  During
> the investigation process, this Office has come into possession of
> information, documents and reports.  Pursuant to this Office's
> continuing obligation to provide potentially exculpatory
> information to the District Attorneys as well as information
> necessary to your Offices' determination about how to proceed
> with cases in which related narcotics evidence was tested at the
> Amherst laboratory, please find the below listed materials …

(Pl. SOF 156; Def. Resp. 156).

On the morning of July 9, 2013, Defendant sent an email to Suffolk ADA Vincent

DeMore ("DeMore") seeking a sample "opposition for motion to vacate guilty plea" (Pl. SOF

157-158; Def. Resp. 157-158).  DeMore replied with a sample document and asked Defendant

whether she had any objection to his filing a motion to permit the dissemination of the Farak

grand jury materials (Pl. SOF 160; Def. SOF 160).  Attached to his email was a draft motion

stating:

> As it was the duty of the Office of the Attorney General to release
> these materials in question to the District Attorneys and United
> States Attorney for the District of Massachusetts, it is now the

> responsibility of these prosecutorial agencies to further disseminate the materials to the individuals possibly affected.  See Mass. R. Crim. Pro. 14 ("(t)he prosecution shall disclose to the defense, and permit the defense to discover, inspect and copy each of the following items and information at or prior to the pretrial conference, provided it is relevant to the case and is in the possession … of persons who have participated in investigating or evaluation the case and either regularly report to the prosecutor's office or have done so on the case … (a)ny facts of an exculpatory nature."); 18 U.S.C. § 3500 (the Jencks Act); Fed. R. Crim. P. 16; Fed. R. Crim. Pro. 26.2; *Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963).

(Pl. SOF 161; Def. Resp. 161).  Two days later, DeMore filed the motion, which was allowed (Pl. SOF 163; Def. Resp. 163).

On or about July 12, 2013, Defendant drafted another letter to the District Attorneys containing the same passage as the earlier letters (Pl. SOF 164; Def. Resp. 164; Def. SOF 19; Pl. Resp. 19).  At no point did Defendant seek a court order permitting disclosure of the mental health worksheets, and they were never turned over (Pl. SOF 166; Def. Resp. 166; Def. SOF 21; Pl. Resp. 21).  When asked in 2016 whether it was her "intention" that they "eventually … be turned over," she answered:

> I was really nervous about those records at the time.  And now, because of – I see now that I totally misjudged the dates, and a I see where that was a mistake on my part.  If I had realized that, like, what it really meant, I would have – I would have turned it over.  What I would have done is I would've gotten an order, like I did for the Grand Jury minutes, and have the judge relieve me of any sort of – any issues that could have come up with the privilege and released it.  I made a mistake.

(Pl. SOF 167; Def. Resp. 167).  When asked in 2019 why she did not disclose the existence of the mental health worksheets, Defendant answered: "It was neglect" (Pl. SOF 168; Def. Resp. 168).

At the time of Farak's arrest, a criminal case was pending against Plaintiff, who was charged, *inter alia*, with three counts of distributing heroin and possessing heroin and cocaine with intent to distribute (Pl. SOF 3, 48; Def. Resp. 3, 48).  Farak signed drug certificates in Plaintiff's case on December 22, 2011 – the same day she had "tried to resist using @ work but ended up failing," January 6, 2012, and January 9, 2012, attesting that the substances she analyzed in connection with his case contained heroin or cocaine (Pl. SOF 5, 10; Def. Resp. 5, 10; Def. SOF 52; Pl. Resp. 52).[10]  HCDAO ADA Eduardo Velazquez ("Velazquez") was assigned to prosecute Plaintiff (Pl. SOF 13; Def. Resp. 13; Def. SOF 50-51; Pl. Resp. 50-51). Velazquez had the discretion not to move forward with Plaintiff's prosecution in light of Farak's misconduct, but he decided to proceed because he had no reason to believe that Farak was engaging in misconduct at the Lab at the time she signed the drug certificates in Plaintiff's case (Pl. SOF 50, 53; Def. Resp. 50, 53).

On July 15, 2013, Plaintiff's defense counsel filed a motion to dismiss the drug charges against him based on Farak's egregious misconduct and the government's noncompliance with its obligation to turn over exculpatory evidence (Pl. SOF 170, Def. Resp. 170).  Superior Court Judge Mary-Lou Rup issued an order on July 23, 2013, stating that:

> an evidentiary hearing must be conducted on the following issues:
> (i) if Ms. Farak and/or the Amherst drug lab engaged in egregious
> misconduct in the handling, storage, and analysis of suspected
> narcotics during the time period between November 2011 and
> January 2012, when the Amherst drug lab had custody and control
> of the alleged substances related to the defendant's case; (2) if such
> misconduct has substantially prejudiced the defendant or
> irreparably harmed his right to a fair trial; or (3) if such egregious
> misconduct was deliberate and intentional, warranting a
> prophylactic sanction of dismissal

---

[10] Defendant objects to Plaintiff's SOF 5 as "incomplete," but Defendant does not cite to any affidavits, depositions, or other documentation to support the objection.  Therefore, it is overruled.

(Pl. SOF 171; Def. Resp. 171).  As part of her order, Judge Rup reminded Velazquez and the HCDAO of their "obligation to seek [evidence] from government agencies (including the Office of the Attorney General) and to produce exculpatory evidence that may be favorable to [Plaintiff's] case, and not simply turn a blind eye to what is not in its immediate control" (Pl. SOF 172; Def. Resp. 172).

Beginning July 22, 2013, Judge C. Jeffrey Kinder issued a series of orders consolidating unrelated post-conviction cases for an evidentiary hearing to determine "the timing and scope of Sonja Farak's alleged misconduct" (Pl. SOF 173; Def. Resp. 173).  On August 16, 2013, Frank Flannery ("Flannery"), the First Assistant in the HCDAO responsible for handing post-conviction motions, informed Defendant that the evidentiary hearing had been scheduled for September 9, 2013, "to define the scope, to the extent possible, of Farak's misconduct" (Pl. SOF 144, 175; Def. Resp. 144, 175).  In the same email, Flannery advised Defendant that the hearing would likely "include the testimony of some of the investigators and chemists involved in your investigation" (Dkt. No. 334-81).  He also indicated, "I've had numerous requests for the photos that were taken during the search of Farak's vehicle.  I spoke to Sgt. Ballou who tells me he can provide those photos to me directly but I want to make sure I have your permission first" (Pl. SOF 178; Def. Resp. 178).  Defendant responded to Flannery's email telling him Ballou would give him "any discovery you need" (Pl. SOF 181; Def. Resp. 181).

Plaintiff served Defendant and Ballou with subpoenas to testify at the hearing on his motion to dismiss, which was initially scheduled for August 27, 2013 (Pl. SOF 204-205; Def. Resp. 204-205; Def. SOF 22; Pl. Resp. 22).  Kris Foster ("Foster"), an AAG in the Appeals Unit, received the assignment to respond to the subpoena (Pl. SOF 206; Def. Resp. 206).  Defendant's subpoena directed her to bring "Copies of any and all inter and intraoffice correspondence

pertaining to the scope of evidence tampering and/or deficiencies at the Amherst Drug

Laboratory from January 18, 2013, to the present" (Pl. SOF 207; Def. Resp. 207; Def. SOF 23;

Pl. Resp. 23).  The ServiceNet Diary Card Ballou sent on February 14, 2013, was among the

undisclosed documents Defendant possessed that would have been responsive to this request, but

neither it nor the other mental health worksheets were produced (Pl. SOF 208; Def. Resp. 208;

Def. SOF 26; Pl. Resp. 26).

On August 23, 2013, Defendant received a phone call from John Bosse ("Bosse"), a

prosecutor in the Berkshire County District Attorney's Office who had been tasked with

handling his office's response to Rule 30 motions filed by Farak defendants (Pl. SOF 188-189;

Def. Resp. 188-189).  Bosse had received discovery letters from Attorney Karen Morth

("Morth") sent on behalf of a post-conviction Farak defendant, one of which stated:

> Regarding Sergeant Ballou's testimony about the "writings" and
> "lab test paperwork" found in Ms. Farak's car … , would you be so
> kind as to provide me with copies of any additional documents
> found in Ms. Farak's car dated 2010 or earlier, and/or that are
> exculpatory in Mr. Manson's case because they indicate Ms. Farak
> may have been tampering with evidence prior to 2013?

(Pl. SOF 191; Def. Resp. 191).  Defendant forwarded to Bosse the sample opposition to the

motion to vacate a guilty plea that she had received from DeMore (Dkt. 334-11 at 263-254).

Bosse later emailed Defendant, indicating that he had faxed over two letters with the discovery

requests, that he was attaching three memoranda he drafted in Farak cases, and that he looked

forward to meeting with her on September 4 to discuss the discovery requests (Pl. SOF 196; Def.

Resp. 196).  Bosse again emailed Defendant on September 30, 2013, attaching a letter he drafted

in response to the Farak discovery request (Dkt. 334-90).  The draft letter stated:

> With regard to your two letters dated July 18, 2013 and August 8,
> 2013, addressing additional discovery in the Attorney General's
> prosecution of Sonja Farak, I offer the following.  On September 4,

> 2013, Assistant Attorney General Anne Kaczmarek informed me
> that all relevant discovery from the Farak prosecution has been
> provided to the Berkshire DA Office.  Thus, the Commonwealth
> would object to the additional discovery inquiries on grounds that
> the Attorney General's Office has released all relevant discovery in
> the Farak prosecution.

(Pl. SOF 200; Def. Resp. 200).  Two days later, Bosse sent the letter to Morth (Dkt. 334-92).

On August 30, 2013, Foster forwarded Defendant an email she and Flannery had received

from Plaintiff's counsel asking for assistance in "making arrangements" to "inspect the 60 items

seized during the course of the Farak investigation," and asking if Defendant had "any thoughts"

(Pl. SOF 209-210; Def. Resp. 209-210).  Defendant stated "several times" that she did not want

Plaintiff's counsel to be able to view the physical evidence (Pl. SOF 212; Def. Resp. 212).

Foster subsequently responded to Plaintiff's counsel advising him that because the Farak

investigation was ongoing, she could not permit an inspection (Dkt. 334-97).  Flannery, for his

part, had no objection to the request and also passed it along to Defendant (Pl. SOF 220; Def.

Resp. 220).  Before receiving a response from Defendant, Flannery asked Ballou to make

arrangements for a team of defense counsel to view the evidence (Pl. SOF 221; Def. Resp. 221).

When Ballou told Defendant about Flannery's request, she responded by stating: "No.  This is

still an open criminal case.  I do not want defense attorneys going through evidence on a fishing

expedition" (Pl. SOF 222; Def. Resp. 222).  Defendant declined Flannery's request (Dkt. No.

334-63 at 64).  Defendant did not invite Flannery to inspect the evidence himself or offer to

make copies of the assorted lab paperwork listed in the search warrant return (Pl. SOF 225; Def.

Resp. 225).

At Verner's request, a "Farak Subpoena mtg." took place in his office at 10:30 am on

September 6, 2013 (Pl. SOF 226; Def. Resp. 226).  Verner testified that by this point, he believed

Defendant had already given the District Attorneys copies of the mental health worksheets Ballou appended to his February 14, 2013, email (Pl. SOF 227; Def. Resp. 227).

On Friday, August 30, 2013, Ballou received a subpoena to testify at the evidentiary hearing on September 9, 2013 (Pl. SOF 214; Def. Resp. 214). Ballou sent an email to Defendant, copying Irwin, and attaching a copy of the subpoena, which commanded him to bring "a copy of all documents and photographs pertaining to the investigation of Sonja J. Farak and the Amherst drug laboratory" (Pl. SOF 214-215; Def. Resp. 214-215).

At the outset of the hearing on September 9, 2013, Judge Kinder denied a motion to quash the Ballou subpoena insofar as it related to Ballou's testimony (Pl. SOF 230; Def. Resp. 230). With respect to a request for a protective order, Kinder instructed Foster to review Ballou's file and submit copies of any undisclosed documents for an *in camera* inspection (Dkt. No. 334-105 at 62). In response to questioning, Ballou indicated that he believed everything pertaining to the Farak investigation had been turned over and that he was not aware of anything else (Pl. SOF 233; Def. Resp. 233). At the end of the hearing, Plaintiff's counsel made an oral motion for access to the evidence that was seized from Farak's car (Pl. SOF 234; Def. Resp. 234). Judge Kinder instructed the parties to try to work out an agreement (Pl. SOF 235; Def. Resp. 235).

Following the hearing, Foster sent an email to Verner and Defendant informing them of Judge Kinder's order for an *in camera* review of any undisclosed documents (Pl. SOF 236; Def. Resp. 236). When Verner asked Defendant what was in Ballou's file, she responded that it included all reports generated in the case, all photos and videos in the case, the search warrants and returns, and copies of all the paperwork seized from Farak's car regarding news articles and Farak's mental health worksheets (Pl. SOF 238, 240; Def. Resp. 238, 240). Verner also asked

Foster whether Judge Kinder had asked what was in Ballou's "file" or whether he indicated Ballou had to search through his "emails, etc." (Pl. SOF 238; Def. Resp. 238). Foster replied that while it was unclear what Judge Kinder was "looking for …[,] Sergeant Ballou did testify that he thinks everything in his file has already been turned over" (Pl. SOF 240; Def. Resp. 240). Defendant subsequently sent Ballou an email asking him to come to Boston with his file, and, on September 11, 2013, Ballou emailed Defendant and Foster regarding his plans to be in Boston the following day with the Farak file (Pl. SOF 243A-243B; Def. Resp. 243A-243B). However, neither Ballou nor Defendant recalled a meeting to review his file on September 12, 2013 (Pl. SOF 243E; Def. Resp. 243E).

On September 16, 2013, Foster was summoned to Verner's office (Pl. SOF 243G; Def. Resp. 243G). Testifying in 2020, Foster said that she believed Defendant was there (Dkt. 334-95 at 105). According to Foster, the meeting attendees "agreed that everything had been turned over," and she was subsequently given the task of communicating this message in a letter to Judge Kinder (Dkt. 334-95 at 105-106). Defendant, however, denies ever telling Foster that everything had been turned over (Dkt. 334-11 at 214). That same day, Foster sent Judge Kinder a letter stating that "every document in [Ballou's] possession has already been disclosed …. Therefore, there is nothing for the Attorney General's Office to produce for your review …" (Pl. SOF 244; Def. Resp. 244).

Also on September 16, 2013, Plaintiff's counsel sent Foster an email seeking the AGO's position with respect to his viewing the seized evidence (Pl. SOF 245; Def. Resp. 245). Foster forwarded the email to Defendant for her thoughts, and Defendant responded, "Why is this relevant to his case. I really don't like him" (Pl. SOF 247-248; Def. Resp. 247-248). Foster subsequently responded to Plaintiff's counsel, stating that the AGO's position was that "viewing

the seized evidence [was] irrelevant to any case other than Farak's" (Pl. SOF 249; Def. Resp. 249).  In 2016, Defendant admitted that the evidence Plaintiff wished to see was relevant to his case and conceded that she had made a mistake in saying it was irrelevant (Pl. SOF 249A-249B; Def. Resp. 249A-249B).

On September 17, 2013, Plaintiff served the MSP with a motion to compel that had previously been provided to Velazquez and Foster (Pl. SOF 250; Def. Resp. 250).  Among other things, the motion sought an order directing the AGO to provide eleven categories of documentation, including "Copies of any and all inter- and/or intra-office correspondence from January 18, 2013, to the present pertaining to the scope of evidence tampering and/or deficiencies at the Amherst Drug Laboratory" (Pl. SOF 251; Def. Resp. 251).  In response to an email from MSP General Counsel Sean Farrell about whether any of the items being sought in the motion had already been turned over, Defendant stated that the AGO had already produced everything in the first two categories, and that everything else, including the inter- and intra-office correspondence, was a "NO" (Pl. SOF 253; Def. Resp. 253).

On or about June 18, 2013, Morth made a public records request to the AGO and MSP "for copies or photographs of all documents," including but "not limited to … the 'Assorted lab paperwork' identified as items 4, 5, 8 and 14 in the search warrant execution … of Ms. Farak's car" (Pl. SOF 260; Def. Resp. 260).  Defendant noted that the Farak case was "on-going," and the AGO claimed the materials Morth requested were exempt from disclosure (Dkt. 334-116).  In response to a September 30, 2013, email from AAG Lorraine Tarrow seeking Defendant's input on Morth's appeal to the Supervisor of Records,  Defendant indicated that the items sought in the public records request were evidence in the ongoing Farak prosecution; that she was not going to open her evidence up for a "fishing expedition;" that the discovery issues were being litigated in

court before Judge Kinder; that the attorney "could not even state why these documents are relevant to her defense;" and that the AGO was opposing turning over the evidence to similarly situated criminal defendants (Pl. SOF 262-263; Def. Resp. 262-263).

After Foster conveyed Defendant's views on the irrelevance of the physical evidence to Plaintiff's case, Plaintiff filed a motion to inspect (Pl. SOF 264; Def. Resp. 264).  Judge Kinder held a non-evidentiary hearing on Plaintiff's discovery motions, including the motion to inspect, on October 2, 2013 (Pl. SOF 265; Def. Resp. 265).  Foster appeared at the hearing and opposed the motion to inspect, arguing that Plaintiff was after "irrelevant evidence" (Dkt. 334-120 at 14-15).  Regarding the production of correspondence inside the AGO and with the DA's offices, Foster argued that "almost all of that is going to be work-product preparation" (Dkt. 334-120 at 27).  Judge Kinder ultimately denied the motion to inspect, stating "I am not persuaded that Rule 17(a)(2) permits a third-party to inspect evidence held in a pending criminal case.  Particularly under the circumstances of this case where the physical evidence has been described in detail for the defendant and photographs of that evidence have been provided" (Pl. SOF 266; Def. Resp. 266).  Judge Kinder allowed Plaintiff's motion to compel "production of … any correspondence directly related to drug use or evidence of tampering by Sonja Farak" (Pl. SOF 268; Def. Resp. 268).

On October 9, 2013, Defendant sent an email to the ADAs in the four western counties seeking to set up a conference call in light of Judge Kinder's order, stating, "[o]ne of our biggest concerns is the order to turn over inter- and intra-office communications regarding Farak and the drug tampering between the DAs, AGO, and other agencies" (Dkt. 334-123).  Following the sought-after conference call, Defendant sent another email indicating that the AGO would be filing a motion for clarification raising the work product and investigative privileges and arguing

that Rule 17 was not properly invoked because notice was not given to certain District Attorney's offices (Pl. SOF 270-271; Def. Resp. 270-271).  The AGO indeed made this argument in the motion for clarification, stating in particular that "failure to make service was particularly inappropriate with respect to the Hampden District Attorney's Office," despite the fact that a copy of Plaintiff's motion had been served on Velazquez by email on September 6, 2013, and Velazquez had appeared at the hearing where Judge Kinder heard argument on the motion (Pl. SOF 274-277; Def. SOF 274-277).  Ultimately, Judge Kinder responded to the request for clarification as follows: "It was my intention to order the production of any correspondence that shows knowledge by any state employee of Farak's drug use or evidence tampering before the criminal investigation of Farak was initiated on January 18, 2013" (Pl. SOF 278-279; Def. Resp. 278-279).

On November 4, 2013, Judge Kinder denied Plaintiff's motion to dismiss, stating that while there was "powerful evidence that Farak was stealing cocaine and replacing it with other substances," there was "insufficient evidence before [him] … that she was engaged in misconduct in November 2011, and January of 2012, when the samples in this case were tested" (Pl. SOF 280-281; Def. Resp. 280-281).  To reach this conclusion, Judge Kinder expressly relied on facts outlined in his Order as well as what he (reasonably but incorrectly) believed to be "all of the physical evidence seized in connection with the criminal investigation of Farak" (Pl. SOF 282; Def. Resp. 282).

Plaintiff's trial took place between December 9, and December 13, 2013 (Pl. SOF 288-301; Def. Resp. 288-301; Def. SOF 61; Pl. Resp. 61).  Prior to trial, Plaintiff served Defendant and Ballou with trial subpoenas, but those subpoenas were quashed (Pl. SOF 283, 285; Def.

Resp. 283, 285).  In Foster's memorandum of law submitted in support of the Defendant motion,

she stated:

> The testimony the defendant apparently seeks from AAG Anne
> Kaczmarek either could be obtained from other sources or is
> irrelevant.  The drugs in the defendant's case were seized in
> October and November 2011.  It appears that the defendant is
> going to argue that Farak may have tampered with the drugs in his
> case, by attempting to elicit from AAG Kaczmarek that the
> allegations against Farak date back much further than the roughly
> four month's before Farak's arrest that the AGO alleges.  This is
> merely a fishing expedition.  There is nothing to indicate that the
> allegations against Farak date back to the time she tested the drugs
> in the defendant's case.  Therefore, her testimony would be
> irrelevant and unhelpful to the Court.

(Pl. SOF 284; Def. Resp. 284).  Plaintiff was precluded from introducing any Farak-related

evidence during his trial (Pl. SOF 286-287; Def. Resp. 286-287).  The parties entered into a

stipulation, which was read to the jury two times, as follows:

> Items alleged to be controlled substances in this case were seized
> by the Springfield Police and originally sent to a laboratory in
> Amherst for testing.  These items were sent in October and
> November 2011 and tested between December of 2011 and
> January of 2012 by Sonja Farak, a chemist for the Department of
> Public Health.  In January of 2013, Ms. Farak was arrested and
> charged with evidence tampering involving alleged heroin and
> cocaine.  As a result of her pending indictment, Ms. Farak is
> unavailable to testify in this case, and no testimony can or will be
> offered concerning the results of any testing she may have
> performed.  The Court has found that tampering by Ms. Farak
> occurred as early as July of 2012.

(Def. SOF 62-63; Pl. Resp. 62-63).  After Farak's malfeasance came to light, Velazquez

submitted the samples the Commonwealth alleged had been purchased or seized from Plaintiff's

residence to William Hebard of the Worcester Drugs of Abuse Laboratory at UMass Medical

Center for analysis (Def. SOF 53-54; Pl. Resp. 53-54).  Hebard tested the samples on August 8,

2013, and he testified at Plaintiff's trial that the substances contained the presence of heroin or

cocaine (Def. SOF 55-56, 65; Pl. Resp. 55-56, 65).  While the court granted Plaintiff's ex parte

motion for additional fees and costs to hire a drug analyst and obtain an affidavit from that

analyst, Plaintiff never sought an order that would have allowed him to have the evidence in his

case tested, and he never provided an affidavit from a drug analyst regarding the evidence (Def.

SOF 57-60; Pl. Resp. 57-60).  Plaintiff was ultimately convicted of one count of distributing a

class A substance; he was acquitted of four other drug charges, and the court allowed Plaintiff's

motion for required findings of not guilty with respect to firearm and ammunition related charges

(Pl. SOF 289, 301; Def. Resp. 289, 301).  Hampden County Superior Court Judge Tina Page

sentenced Plaintiff to not less than five years and not more than seven years in state prison (Pl.

SOF 302; Def. Resp. 302; Def. SOF 67; Pl. Resp. 67).  Plaintiff filed a Notice of Appeal on

December 20, 2013 (Pl. SOF 305; Def. Resp. 305).  Farak pled guilty to the criminal charges

against her on January 6, 2014 (Pl. SOF 306; Def. Resp. 306; Def. SOF 27; Pl. Resp. 27).

    In a self-evaluation dated February 28, 2014, Defendant stated that "[t]he Dookhan and

Farak investigations required close collaboration with other members of the investigative team,

updates to interested parties within the AGO, and regular communications with affected agencies

outside the AGO" (Pl. SOF 307; Def. Resp. 307).  Further, "[m]ost of the discovery obtained in

the … Farak case[] needed to be released to the District Attorney's offices statewide" (Pl. SOF

308; Def. Resp. 308).  Defendant portrayed herself as "the point person in determining whether

the information had been disseminated and gathering further information if needed" (Pl. SOF

309; Def. Resp. 309).

    On July 31, 2014, after Defendant left her position in the AGO, the AGO assented to a

motion to inspect the physical evidence in the Farak case filed by Plaintiff's counsel on behalf of

another defendant (Pl. SOF 331, 337; Def. Resp. 331, 337).  The inspection took place on

October 30, 2014 (Pl. SOF 338; Def. Resp. 338).  Immediately after the inspection, Plaintiff's

attorney sent an 11-page letter to the AGO detailing the significance of the previously

undisclosed evidence (Pl. SOF 339; Def. Resp. 339).  Thereafter, on November 13, 2014, the

AGO disclosed to the district attorneys all 289 pages of documentary evidence seized from

Defendant's vehicle, including the ServiceNet Diary Card indicating that Defendant had used

drugs at work on December 22, 2011 (Pl. SOF 340-341; Def. Resp. 340-341).

     In May 2015, Plaintiff filed a motion for a new trial based on this newly discovery

evidence, which was allowed with the assent of the HCDAO (Pl. SOF 342-343; Def. Resp. 342-

343).  On June 26, 2017, Superior Court Judge Richard J. Carey issued a 127-page decision

dismissing Plaintiff's conviction with prejudice (Pl. SOF 344; Def. Resp. 344).  Plaintiff was

released from prison on June 27, 2017 (Def. SOF 8; Pl. Resp. 8).  According to Velazquez, had

he known prior to Plaintiff's trial that Defendant was using illicit drugs at the Lab while she was

in custody of and analyzing the samples in Plaintiff's case, he would have dismissed the charges

against Plaintiff (Dkt. 334-1 at 6).

     C.  <u>Discussion</u>

         1.  <u>*Brady* Violation</u>

     Section 1983 provides a cause of action for the "deprivation of any rights, privileges, or

immunities secured by the Constitution and laws" by any person acting "under color of any

statute, ordinance, regulation, custom, or usage, of any State or Territory."  42 U.S.C. § 1983.

The threshold question in a § 1983 suit is whether there has been a violation of a federally

secured right."  *Drumgold v. Callahan*, 707 F.3d 28, 49 n.13 (1st Cir. 2013) (citing *Baker v.*

*McCollan*, 443 U.S. 137, 140 (1979)).  In addition to deprivation of a right, a plaintiff also must

establish "a causal connection between the actor and the deprivation, and state action."[11]
*Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009) (citing 42 U.S.C. § 1983).
Moreover, in a § 1983 case, "each Government official … is only liable for his or her own
misconduct."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  "To be liable, a 'defendant must have
personally participated in, encouraged, condoned, or acquiesced in rights-violating conduct.'"
*Echavarria v. Roach*, No. 16-cv-11118-ADB, 2021 WL 4480771, at *13 (D. Mass. Sept. 30,
2021) (quoting *Remus-Milán v. Irizarry-Pagán*, 81 F. Supp. 3d 174, 178 (D.P.R. 2015).

Beginning with the threshold question, Plaintiff alleges that his constitutional due process
rights were violated by Defendant's suppression of material exculpatory evidence during his
criminal trial that established that Farak was stealing, using, and tampering with narcotics at the
Lab during the time period in which she was testing and certifying the samples in Plaintiff's
case, which he asserts was in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), *Mooney v.
Holohan*, 294 U.S. 103 (1935), and their progeny.  The Supreme Court in *Brady* held that "the
suppression by the prosecution of evidence favorable to an accused upon request violates due
process where the evidence is material either to guilt or to punishment, irrespective of the good
faith or bad faith of the prosecution."  *Id*., 373 U.S. at 87.  "Evidence is favorable to a defendant
if it is either exculpatory or impeaching in nature."  *Drumgold*, 707 F.3d at 38-39.  Evidence is
"material" when there is a reasonable probability that, had the prosecution disclosed the
evidence, the trial proceedings would have resulted differently.  *United States v. Bagley*, 473
U.S. 667, 682 (1985).  The rule announced in *Brady* was an extension of the earlier holding in
*Mooney*, that "a conviction obtained through the use of false evidence, known to be such by

---

[11] Defendant does not dispute that she was acting under color of state law.

representatives of the State, must fall under the Fourteenth Amendment."  *Napue v. Illinois*, 360

U.S. 264, 269 (1935) (describing *Mooney*, 294 U.S. at 112-13).

More than twenty years after *Brady*, in *Kyles v. Whitley*, 514 U.S. 419 (1995), the

Supreme Court held that the disclosure obligation imposed by *Brady* extends to evidence known

only to law enforcement officers.  *Id*. at 437-38.  Thus, "[u]nder *Brady,* the prosecutor has a duty

to make available to the defense exculpatory evidence, including evidence useful for

impeachment, possessed by the prosecution team or its agents."  *López v. Massachusetts*, 480

F.3d 591, 594 (1st Cir. 2007) (citing *Giglio v. United States,* 405 U.S. 150, 153-54 (1972);

*Brady,* 373 U.S. at 87).  The "responsibility for obtaining and disclosing such evidence remains

the duty of the prosecutor, and not the police officer," however.  *Haley v. City of Boston*, 657

F.3d 39, 49 (1st Cir. 2011).  Nevertheless, the First Circuit has recognized that "law enforcement

officers have a correlative duty to turn over to the prosecutor any material evidence that is

favorable to a defendant."  *Drumgold*, 707 F.3d at 38 (citing *Moldowan v. City of Warren*, 578

F.3d 351, 381 (6th Cir. 2009); *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996)).

A plaintiff asserting a *Brady* violation must prove that: 1) the evidence is favorable to the

accused because it is exculpatory or impeaching, 2) the evidence was suppressed, either willfully

or inadvertently, and 3) prejudice ensued, meaning that "there is a reasonable probability; that

the result of the trial would have been different if the suppressed documents had been disclosed

to the defense."  *Strickler v. Greene,* 527 U.S. 263, 281–82, 289 (1999).  In addition, "while a

prosecutor's duty to disclose is absolute, to recover damages from other law enforcement

officials for a *Brady* violation, a § 1983 plaintiff must prove the requisite *mens rea*."  *Stewart v.*

*Wagner*, 836 F.3d 978, 982 (8th Cir. 2016).  *See also Cok v. Cosentino*, 876 F.2d 1, 4 (1st Cir.

1989) (citing *Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Davidson v. Cannon*, 474 U.S. 344,

348 (1986) ("The Supreme Court has made plain that due process, whether procedural or substantive, is not implicated by mere negligence of persons acting under color of state law.")).

(a)  Affirmative Disclosure Obligation

As the parties recognize, there is a question at the outset as to whether Defendant had an affirmative disclosure obligation requiring her to turn over the allegedly exculpatory evidence seized from Farak's car to the HCDAO or Velazquez.  The question arises because Velazquez, not Defendant was Plaintiff's prosecutor.  As such, it was Velazquez and not Defendant who was responsible for obtaining and disclosing exculpatory evidence to the defense.  *Haley*, 657 F.3d at 49.  Nevertheless, Plaintiff argues that "[a] state actor's constitutional obligation under *Brady* and its progeny arises if that actor is part of the 'prosecution team,'" Dkt. 309 at 10 (citing *United States v. Bender*, 304 F.3d 161, 164 (1st Cir. 2002)), and, according to Plaintiff, Defendant was part of Plaintiff's prosecution team.  Plaintiff relies on *United States v. Mannarino*, 850 F. Supp. 57 (D. Mass. 1994), for the proposition that determining prosecution team membership requires a "case-by-case analysis of the extent of interaction and cooperation between two governments," *id*. at 65, or in this case, two law enforcement agencies of the same government.  Plaintiff argues that applying that case-by-case approach to the undisputed facts of this case "leads inexorably to the conclusion that Defendant owed a *Brady* duty to Plaintiff" (Dkt. 309 at 11).  Plaintiff highlights the following facts as establishing that Defendant was part of Plaintiff's prosecution team for purposes of *Brady* and its progeny: that the AGO sent several disclosures of Farak investigation materials to the DAOs under cover letters, including two Defendant herself signed, emphasizing its "obligation to provide potentially exculpatory information to the District Attorneys;" Defendant labeled herself the "point person" responsible for ensuring the dissemination of Farak investigation materials to the DAOs; Defendant filed a

motion in court acknowledging the AGO's "duty … to release such potentially exculpatory evidence to the government entities charged with prosecuting of the affected individuals;" Defendant engaged in "regular communications" with prosecutors in the HCDAO and other DAOs about the Farak investigation, its potential impact on cases like that of Plaintiff, and disclosure of evidence obtained in the investigation; Defendant assisted DAOs, including the HCDAO, in responding to Farak-related discovery requests that they received; Defendant assisted a DAO in opposing a motion to vacate a guilty plea premised on Farak's misconduct; and it was Defendant's permission Flannery and AAG Foster sought when Plaintiff's counsel and other attorneys for Farak defendants wanted to view the physical evidence seized in the Farak investigation (Dkt. No. 309 at 11-12).  Finally, relying on *Mastracchio v. Vose*, 274 F.3d 590 (1st Cir. 2001), and *Limone v. United States*, 497 F. Supp. 2d 143, 154 (D. Mass. 2007), *aff'd in part and rev'd in part*, 579 F.3d 79 (1st Cir. 2009), Plaintiff claims that "government officials become members of prosecution teams, for purposes of *Brady*, when they acquire probative evidence undermining the veracity and/or reliability of a key witness in another agency's prosecution" (Dkt. No. 309 at 12).

Defendant has several rebuttals.  First, Defendant argues that Plaintiff's position is not advanced in good faith because it contravenes Plaintiff's representations at the motion to dismiss phase that Defendant was not Plaintiff's prosecutor, nor was she involved in prosecuting Plaintiff, and, as such, she was not entitled to absolute prosecutorial immunity.  Secondarily, Defendant relies on *Commonwealth v. Torres*, 98 N.E.3d 155, 164 (Mass. 2018), to argue that "the law is clear that a government actor does not have an obligation to produce exculpatory evidence where the individual was not directly involved in the prosecution of a criminal defendant" (Dkt. No. 343 at 15).  Third, according to Defendant, none of the facts which Plaintiff

cites establish that Defendant was part of Plaintiff's prosecution team.  Finally, Defendant argues

that the cases on which Plaintiff relies are distinguishable because they involve law enforcement

officers gathering evidence in conjunction with the criminal defendant's prosecutor on the same

case.

As an initial matter, the court rejects Defendant's argument that Plaintiff should be

precluded from advancing his prosecution team theory because it is inconsistent with the position

he took at the motion to dismiss stage that Defendant was not his prosecutor.  The "prosecution

team" is made up of more than just a prosecutor, *see, e.g., United States v. Antone*, 603 F.2d 566,

569 (5th Cir. 1979) (noting that the "'prosecution team … includes both investigative and

prosecutorial personnel'"), and Plaintiff is not claiming that Defendant was his prosecutor but

rather that she was a member of the prosecution team in her a role as a custodian of relevant

evidence.  A person can be part of the prosecution team without being the prosecutor.  Indeed,

this is precisely the argument Plaintiff made at the hearing on the motion to dismiss (Dkt. 299-14

at 63-65) and continues to make in moving for summary judgment.  Thus, Plaintiff's present

argument does not conflict with his earlier argument, but rather is entirely consistent with it, and

there is nothing improper about it.

Turning to the merits of the prosecution team argument, the court is persuaded that a

case-by-case analysis as adopted in *Mannarino* is the appropriate approach.  In *Mannarino*, three

criminal defendants who had been convicted of a narcotics conspiracy sought relief based on the

government's claimed Jencks Act violation when a state police officer, who was responsible for

debriefing and supervising the federal government's principal witness, destroyed a narrative

criminal history that the witness had prepared.  *Id*., 850 F. Supp. at 59.  As part of the court's

determination of whether the destroyed document was Jencks Act material, the court had to

determine if the statement was in the possession of the United States. *Id*. at 62. The court answered that question in the affirmative, reasoning that where the DEA had used the state police officer to debrief the witness and oversee the witness's overall cooperation, the officer was "functionally part of the United States Attorney's prosecutorial team," such that "his possession of [the] narrative history must be imputed to the government." *Id*. at 61, 64. The court found support for its analysis in the Fifth Circuit decision in *Antone*, in which that court stated that "[i]mposing a rigid distinction between federal and state agencies which have cooperated intimately from the outset of an investigation would artificially contort the determination of what is mandated by due process," and instead adopted the case-by-case approach. *Id*., 603 F.2d at 570. This court finds *Mannarino* persuasive and agrees that a case-by-case analysis of the extent of interaction and cooperation between two agencies is apt. A bright-line rule that *Brady* never requires an investigator from one agency working on one case to disclose exculpatory information to a prosecutor in another agency working on another case would create an artificial constraint that could give rise to a serious constitutional violation.

Applying a case-by-case analysis to the undisputed facts of this case leads to the conclusion that Defendant was part of Plaintiff's prosecution team with respect to the obligation to ensure Plaintiff's access to exculpatory material. The most salient and decisive facts are that Defendant personally sent two sets of materials gathered in her investigation of Farak to the DAOs under cover letters emphasizing the "obligation to provide potentially exculpatory information to the District Attorneys," and filed a motion in court to release the grand jury minutes and exhibits to the DAOs stating, "[i]t is the duty of the Attorney General's Office to release such potentially exculpatory evidence to the government entities charged with prosecuting of the affected individuals." Defendant tries to blunt the impact of these facts by

arguing that the AGO assumed the duty, not Defendant herself.  The problem with this argument, as set forth above, is that the AGO is an entity and can only act through its agents, and Plaintiff has submitted unrebutted evidence, in the form of Verner's testimony, that it was Defendant who had the responsibility within the AGO to see that the Farak investigation materials were disseminated to the DAOs.  The evidence before the court is that Defendant was charged with meeting the AGO's obligation to transmit the potentially exculpatory materials to the DAOs, and there is no evidence showing that anyone else within the AGO's office bore the obligation. Additional undisputed facts shore up this conclusion.  Defendant labeled herself "the point person" responsible for ensuring the dissemination of Farak investigation materials to the DAOs, including the HCDAO.  Defendant acknowledged having frequent communications with the DAOs.  Defendant advised Flannery that Ballou would give him "any discovery [he] need[ed]." Defendant was aware that ADAs were relying on the AGO to turn over potentially exculpatory evidence.  And, Defendant was the gatekeeper.  In that role, it was Defendant who repeatedly refused access to attorneys representing Farak defendants, including, in particular, the attorney representing Plaintiff, when they asked to review the evidence seized from Farak's car.  But for these repeated refusals, Plaintiff's counsel would have seen the records showing Farak's December 2011 drug use before Plaintiff's trial.

The Supreme Judicial Court's decision in *Torres* does not negate the conclusion that Plaintiff had a role in Plaintiff's prosecution team.  In *Torres*, the defendant sought to reverse his conviction for stalking based on the trial court's denial of his motion for access to records in a victim compensation file held by the Attorney General.  *Id*., 98 N.E.3d at 159.  Specifically, the defendant argued that the records in the Attorney General's file were mandatory discovery under Mass. R. Crim. P. 14 as "facts of an exculpatory nature within the possession, custody, or control

of the prosecutor." *Id*. at 162 (quoting *Commonwealth v. Wanis*, 690 N.E.2d 407, 411 (Mass. 1998)). The court rejected the defendant's contention, holding instead that the records were not in the possession, custody, or control of the prosecutor where there was "no indication … that the Attorney General participated in the investigation or prosecution of the defendant," or that the district attorney had access to the Attorney General's files. *Id*. at 163. The court also rejected the defendant's subsidiary argument that the Attorney General is the "overarching prosecutorial authority" for the Commonwealth and, therefore, a party to the case, noting that, "we have previously declined to hold that possession of documents by one government agency is sufficient to require mandatory discovery, absent control by the prosecutor or contribution by that agency to the prosecutor's investigation." *Id*. at 164 (citing *Commonwealth v. Daye*, 587 N.E.2d 194, 203 (Mass. 1992); *Commonwealth v. Campbell*, 393 N.E.2d 820, 833 (Mass. 1979)).

Here, unlike in *Torres*, the AGO contributed to Plaintiff's prosecution. In each of the formal disclosures of information, documents, and reports sent to the DAOs, the AGO included a cover letter, two of which were signed by Defendant, acknowledging that its provision of potentially exculpatory information was "necessary to [the] determination about how to proceed with cases in which related narcotics evidence was tested at the Amherst Laboratory." In addition, Defendant filed a motion to disclose the grand jury minutes to the DAOs, in which she explicitly relied upon Mass. R. Crim. P. 14, the very same provision the SJC found inapplicable in *Torres*. *Id*. at 163. Defendant argues that she could not have been contributing to the HCDAO's investigation because she did not seek or disclose evidence that was inculpatory as to the Farak defendants. All of the evidence she turned over, she contends, was exculpatory. As a matter of fact, this contention is misleading. Defendant's failure to disclose evidence tending to show the extent and timing of Farak's misconduct left ongoing or intact numerous prosecutions

and convictions that were eventually vacated after the timing of Farak's misconduct was shown, based on the evidence that Defendant withheld or further investigation prompted by that evidence. Even if Defendant's contention about her limited role is accurate, Defendant does not cite any authority for such an anemic understanding of the scope of an investigation, nor, as Plaintiff notes, does it square with the requirements of due process as elucidated in *Brady* and its progeny.

The First Circuit decision in *Mastracchio* bolsters the conclusion that Defendant was part of Plaintiff's prosecution team. In *Mastracchio*, the petitioner, a state prisoner, appealed the denial of a writ of habeas corpus, asserting that the state supreme court had erred by, *inter alia*, refusing to impute knowledge to the prosecutor in the Rhode Island Attorney General's Department of certain cash payments and liberties given to an incarcerated prosecution witness known to the Providence police officers on the witness protection team. *Id.*, 274 F.3d at 593, 598. The First Circuit, "[m]indful of the intense involvement of the attorney general's department in [the witness's] protective custody," concluded that the Providence police officers who comprised the witness protection team "should be treated as an integral part of the prosecution team for the purpose of determining whether a failure to disclose occurred." *Id.* at 599-600 (citing *United States v. Wilson*, 237 F.3d 827, 832 (7th Cir.), *cert. denied*, 122 S. Ct. 97 (2001)). From that premise, the First Circuit readily concluded that the state supreme court had committed error based on "clear" Supreme Court precedent that, "[w]hen any member of the prosecution team has information in his possession that is favorable to the defense, that information is imputable to the prosecutor." *Id.* at 600 (citing *Kyles*, 514 U.S. at 437 (explaining that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police")). The court does not agree

with Plaintiff that *Mastracchio* renders any government official a member of the prosecution team for purposes of *Brady* when he or she acquires probative evidence undermining the veracity and/or reliability of a key witness in another agency's prosecution (Dkt. No. 309 at 12).  Surely, where the official has no knowledge of or involvement in the other agency's prosecution, he or she would not be liable for damages under § 1983 for failing to turn over exculpatory evidence to the prosecutor.  That was not the situation in *Mastracchio*, however.  Instead, the attorney general's office was "intense[ly] involved" in the witness's protective custody.  Here, too, Defendant was involved in Plaintiff's prosecution; as noted by the First Circuit in its decision affirming this court's denial of Defendant's motion to dismiss, Defendant functioned as a "custodian of evidence" vis-à-vis Plaintiff's prosecution.[12]  *Penate v. Kaczmarek*, 928 F.3d 128, 139 (1st Cir. 2019).  Thus, *Masstracchio* would support imputing the exculpatory information in the possession of Defendant to Velazquez, and *Drumgold*, in turn, establishes Defendant's "correlative duty" to turn over to Velazquez any material evidence that was favorable to Plaintiff.  *Id.*, 707 F.3d at 38.

Limone *is of less value to Plaintiff, as it did not involve* Brady *claims.  Instead, the plaintiffs in* Limone *– two exonerated former state prisoners and the estates of their two co-defendants who died in prison – brought claims against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671, et. seq., for malicious prosecution, civil conspiracy, intentional infliction of emotional distress, and negligent selection, supervision and retention.* Id.*, 497 F. Supp. 2d at 151, 154.  The plaintiffs alleged, and proved during a bench trial, that two FBI agents "handling" a witness in the state murder prosecution of the plaintiffs, as well as their superiors, knew that the witness would perjure himself in testifying against the plaintiffs and yet, they*

---

[12] While that determination was based on the allegations of Plaintiff's complaint, those allegations are borne out by the summary judgment record.

encouraged him to testify, failed to tell the truth about what they knew about the murder and the witness's perjury to the prosecuting agency, and went so far as to assure the prosecutor that the witness's story "checked out." *Id*. at 152.  The court explicitly rejected the United States' attempt to reduce the plaintiffs' malicious prosecution claim to a failure to disclose exculpatory evidence in violation of *Brady*, since the FTCA does not hold the government liable for constitutional torts. *Id*. at 221.  Instead, the allegations of suppression of exculpatory information were part of a "broader scheme to put [the witness] forward … no matter the cost, even if it meant framing the plaintiffs." *Id*. at 222.  Because the plaintiffs proved their allegations, the *Limone* court found the United States liable under the FTCA on the plaintiff's claims that the FBI agents committed the state tort of malicious prosecution. *Id*. at 202.  Thus, Plaintiff is incorrect when he claims that *Limone* found liable FBI agents who failed to disclose to the state prosecutor information casting doubt on the veracity of the witness (Dkt. No. 309 at 13).  Instead, the United States was held liable for its agents' active participation "in a plot to secure and sustain the unjust convictions against innocent men," which plot "include[d] suballegations that occasionally involve[d] *Brady* violations." *Limone*, 497 F. Supp, 2d at 222.  That said, Plaintiff does not need *Limone* to prevail on this issue.

In summary, the court finds that the undisputed material facts viewed in the light most favorable to Defendant establish as a matter of law that Defendant was part of Plaintiff's prosecution team and had an affirmative disclosure obligation to turn over material exculpatory evidence to the HCDAO or Velazquez.

(b) Favorable Evidence

Plaintiff posits that the mental health worksheets Ballou attached to his Valentine's Day email clearly constituted "favorable evidence."  Defendant does not dispute this.  The court

agrees that the mental health worksheets were favorable as a matter of law. "Evidence is

favorable to a defendant if it is either exculpatory or impeaching in nature." *Drumgold*, 707 F.3d

at 38 (citing *Bagley*, 473 U.S. at 676). The mental health worksheets were certainly exculpatory

to Plaintiff, as Defendant conceded during her deposition. The mental health worksheets

constituted admissions by the state lab chemist assigned to analyze the samples seized in

Plaintiff's case that she was stealing and using lab samples to feed a drug addiction at the time

she was testing and certifying the samples in Plaintiff's case, including, in one instance, on the

very day that she certified a sample. No reasonably jury could conclude that this evidence is not

favorable. *Nnodimele v. Derienzo*, No. 13-CV-3461 (ARR) (RLM), 2016 WL 3561708, at *8

(E.D.N.Y. June 27, 2016) (finding undisclosed evidence favorable as a matter of law).

       (c)  Suppression of Favorable Evidence

       The undisputed facts of record establish that Defendant never turned over the mental

health worksheets to either the HCDAO or Velazquez. Defendant does not contest this.

Therefore, the court finds that Plaintiff has shown suppression as a matter of law.

       (d)  Materiality

       Evidence is "material" when there is a reasonable probability that, had the prosecution

disclosed the evidence, the trial proceedings would have resulted differently. *Bagley*, 473 U.S. at

682. "A 'reasonable probability' of a different result is … shown when the government's

evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles,* 514 U.S. at

434 (quoting *Bagley*, 437 U.S. at 678). Plaintiff claims that the materiality of the mental health

worksheets is impossible to dispute because the belated discovery of the documents not only led

to Plaintiff's post-conviction relief, but also to the dismissal of drug charges for thousands of

other Farak defendants. *Comm. for Pub. Counsel Servs. v. Att'y Gen.*, 108 N.E.3d 966, 971-72

(Mass. 2018).  Defendant does not specifically contest materiality; instead, purportedly relying on *Drumgold*, she analyzes it under the § 1983 causation element.  However, while acknowledging the "logical appeal to bypassing the materiality inquiry," the *Drumgold* court instructed that "materiality and causation are in fact discrete inquiries and should be considered separately." *Id.*, 707 F.3d at 49 n.13.  This is so because materiality is a component of the threshold question in a § 1983 suit as to whether there has been a violation of a federally secured right. *Id.* (citing *Baker*, 443 U.S. at 140).  If no violation is established, the court does not reach the question of causation. *Id.*

Turning then to the issue of materiality, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles,* 514 U.S. at 434.  Favorable evidence is material if it "'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Cone v. Bell,* 556 U.S. 449, 470 (2009) (quoting *Kyles*, 514 U.S. at 435).  Ultimately, the question is whether in the absence of the suppressed evidence, Plaintiff received "a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434.

The court finds that Plaintiff has established the materiality of the ServiceNet Diary Card as a matter of law.  While Plaintiff's jury was informed that Farak had tested the items alleged to be heroin and cocaine in Plaintiff's case, and that she had been arrested and charged with evidence tampering involving alleged heroin and cocaine, as far as the jury was aware, her tampering occurred only as early as July of 2012, six months after she tested the substances in Plaintiff's case.  Had the jury known that Farak admitted that she was tampering with evidence and using drugs at the very time she was testing the samples in Plaintiff's case, there is a

48

reasonable probability that the trial proceedings would have ended differently.  Even if the

samples were retested, a reasonable juror, hearing evidence of Farak's drug use at work at the

relevant time, could find that the samples' integrity had been compromised and that any

subsequent testing was unreliable.  At the risk of collapsing the materiality and causation

inquiries, it is worth noting in connection with materiality (as is discussed below in more detail

in connection with causation) that Velazquez, Plaintiff's prosecutor, affirmed and then testified

at his deposition that had he known that Farak was tampering with evidence in December 2011,

he would have dismissed the drug charges in Plaintiff's case.  No reasonable person could

conclude that Plaintiff received a fair trial in the absence of evidence of Farak's admissions.

(e)  *Mens Rea*

To recover damages for a *Brady* violation, a § 1983 plaintiff must prove the

requisite *mens rea*.  The First Circuit has not identified what state of mind suffices to establish

liability of a law enforcement officer under § 1983.  *Drumgold*, 707 F.3d at 43 n.10.  While

deliberate suppression of evidence is adequate, "[n]on-disclosure with a less culpable state of

mind might [also] suffice."  *Id*. (citing *Haley*, 657 F.3d at 47).[13]  For example, in the Ninth

Circuit, "[a] § 1983 plaintiff must show that police officers acted with deliberate indifference to

---

[13] Plaintiff argues that "*Drumgold* did make clear that 'intentionally or recklessly' withholding exculpatory evidence is 'clearly unlawful' and a proper basis for a Section 1983 claim" (Dkt. No. 308 at 16 (quoting *Drumgold*, 707 F.3d at 45).  However, this is not the holding of *Drumgold*. The *Drumgold* court explicitly declined to decide whether a reckless failure to disclose exculpatory evidence would suffice for purposes of a *Brady*-based Section 1983 claim, calling this a "difficult question."  *Drumgold*, 707 F.3d at 43 n.10.  Instead, what the *Drumgold* court identified as "firmly settled" was that a law enforcement officer could not deliberately suppress material evidence that was favorable to a defendant.  *Id*. at 43.  The court held that Drumgold had raised this claim, which arose under *Mooney v. Holohan*, 294 U.S. 103 (1935), and *Pyle v. Kansas*, 317 U.S. 213 (1942), "in which the Supreme Court held that a state actor violates a criminal defendant's due process rights by the knowing use of perjured testimony or the deliberate suppression of evidence leading to the defendant's conviction."  *Id*. at 38 (citing *Brady*, 373 U.S. at 86).

or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009). By contrast, in the Eighth Circuit, "[t]he recovery of § 1983 damages requires proof that a law enforcement officer … intended to deprive the defendant of a fair trial." *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004). *See also Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000) (Wilkinson, J., concurring) (stating that § 1983 liability requires that a police officer have "intentionally withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial").

As a general matter, "[c]ases in this circuit suggest that government officials may be held liable for a deprivation of life, liberty, or property without due process if their conduct reflects a reckless or callous indifference to an individual's rights." *Germany v. Vance*, 868 F.2d 9, 17-18 (1st Cir. 1989) (citing *Maldonado Santiago v. Velazquez Garcia*, 821 F.2d 822, 831 (1st Cir. 1987); *Clark v. Taylor*, 710 F.2d 4, 9 (1st Cir. 1983)). *See also id*. at 12 n.2 ("We use the phrase 'merely negligent' only for the purpose of distinguishing negligent conduct, which cannot constitute a violation of the due process clause, from 'intentional' or 'reckless' conduct, which can constitute such a violation."). In addition, the First Circuit's recent decision in *Irish v. Fowler*, 979 F.3d 65 (1st Cir. 2020), suggests that it would find recklessness sufficient to support the imposition of § 1983 liability in this context. In the *Irish* case, the First Circuit affirmed the viability of the plaintiff's § 1983 claim based on the theory of a state-created danger that resulted in the loss of life and liberty in violation of the plaintiff's substantive due process rights. *Id.* at 67. The court did not require the plaintiff to prove that the defendant law enforcement officers, who were investigating a suspect for kidnapping and rape, intended to cause the "attacks, murders, and rapes" allegedly triggered by their conduct. *Id.* at 67-68. Rather, the First Circuit

held the defendants' acts must shock the conscience, and, as to *mens rea*, where a state actor had

time to make unhurried judgments and rational decisions, a plaintiff could prevail by showing

that a state actor was deliberately indifferent to a substantial risk of harm.  *Id.* at 74.  "To show

deliberate indifference, the plaintiff 'must, at a bare minimum, demonstrate that [the defendant]

actually knew of a substantial risk of serious harm … and disregarded that risk.'"  *Id.* (quoting

*Coyne v. Cronin*, 386 F.3d 280, 288 (1st Cir. 2004)).  In view of the foregoing precedent, this

court believes that the First Circuit would hold that, when, as in this case, a defendant has the

opportunity to exercise rational and unhurried judgment, reckless or callous indifference is

sufficient to establish liability for a failure to comply with the *Brady* directive to turn over

material exculpatory evidence.

     "An official displays … reckless or callous indifference when it would be manifest to any

reasonable official that his conduct was very likely to violate an individual's constitutional

rights."  *Id*. at 18.  In *Germany*, the First Circuit acknowledged that the distinction between

"'negligence,' 'reckless or callous indifference,' and 'intentional' conduct can be elusive."  *Id.*

18 n.10.  For purposes of defining these states of mind, the court stated that reckless or callous

indifference should be viewed "not as a heightened degree of negligence (akin to 'gross

negligence'), but rather as a lesser form of intent."  *Id.*

> An intentional violation of a person's constitutional rights occurs if
> the official desires to cause such a violation or believes that his
> conduct is certain to result in such a violation.  A reckless or
> callously indifferent violation occurs, in contrast, if the official
> believes (or reasonably should believe) that his conduct is *very
> likely* (but not certain) to result in such a [constitutional due
> process] violation.

*Id.* (citing *Restatement (Second) of Torts* § 500, cmt. f (1977); *Cook v. Avien, Inc.*, 573 F.2d

685, 692 (1st Cir. 1978)).  "[A] decision [to withhold information] is recklessly indifferent only

if the information is of such obvious import that withholding it would appear very likely to lead to a miscarriage of justice." *Id*. at 19.

Because Defendant contests that she acted intentionally, and this court has declined to apply preclusive effect to the findings of the SHO, Plaintiff cannot prevail on summary judgment on the theory that Defendant acted intentionally to deprive him of a fair trial. This leaves the question of whether the undisputed material facts viewed in the light most favorable to Defendant establish that Defendant acted with reckless disregard for Plaintiff's rights in failing to turn over the ServiceNet Diary Card to the HCDAO and Velazquez. Plaintiff argues that the import of the mental health worksheets "could hardly have been more obvious" (Dkt. No. 309 at 17). This is so, according to Plaintiff, because, before the discovery of the mental health worksheets, there was only circumstantial evidence of Farak's guilt. The mental health worksheets, however, amounted to admissions by Farak that she was stealing and using drugs at work. Thus, the obvious exculpatory import of these documents for the Farak defendants, combined with the fact that it was Defendant who was assigned the job of ensuring that potentially exculpatory evidence was provided to the HCDAO, establish the recklessness of Defendant's conduct as matter of law. Defendant counters that there is evidence demonstrating that her non-disclosure of the mental health worksheets was, at worst, negligent. This evidence consists of Defendant's testimony that she "'did not look at the evidence through the lens of the Farak defendants,' as her focus was on prosecuting Ms. Farak," and that she "did not recognize that the mental health worksheet related to the time-period at issue where the documents did not reflect a year at all" (Dkt No. 343 at 22).

The court finds that the summary judgment record raises a genuine issue of material fact as to Defendant's *mens rea* in failing to turn over the ServiceNet Diary Card. Certainly, a

reasonable jury could find that Defendant's actions were reckless.  The undisputed facts establish

that it was Defendant's responsibility within the AGO to disseminate the information,

documents, and reports gathered in the Farak investigation to the HCDAO and the other DAOs.

Defendant personally acknowledged in both correspondence and pleadings that the AGO had an

obligation to provide this information that was potentially exculpatory to the criminal defendants

being prosecuted by the DAOs.  She knew that several attorneys for Farak defendants, including

Plaintiff's counsel, had sought access to the evidence from Farak's car, explaining that they

believed the evidence could be relevant on the critical question of the timing of Farak's

misconduct.  Defendant, who was responsible for prosecuting Farak, would have understood the

evidentiary significance of the admissions by Farak that she was stealing and using drugs at work

and the importance of the *Brady* duty to disclose such material exculpatory evidence to the

criminal defendants being prosecuted by the DAOs.  Thus, the record would support a finding

that it would have been manifest to any reasonable official in Defendant's position that her

conduct was very likely to violate Plaintiff's constitutional rights.

Nevertheless, there is evidence in the record from which that same reasonable jury could

find that Defendant's actions were negligent, rather than reckless. In addition to the facts

highlighted by Defendant regarding the "lens" through which she looked at the evidence and her

failure to recognize that Defendant made the entries on the ServiceNet Diary Card in December

2011, Defendant offered testimony that she made a "mistake" when she said that the evidence

seized from Farak's car was not relevant to Plaintiff's criminal prosecution, and that, in 2019,

she characterized her failure to disclose the existence of the mental health work sheets as

"neglect."  These facts do not compel a finding of neglect.  Even if Defendant's testimony on

these points is credited, a reasonable jury could conclude that Defendant's failure to look at the

evidence through the "lens" of the Farak defendants was itself reckless, particularly in light of the ongoing effort by the court to determine "the timing and scope of Sonja Farak's alleged misconduct," and the efforts of counsel for Farak defendants, including Plaintiff's counsel, to obtain the evidence seized from Farak's car.  Moreover, a reasonable jury could conclude that Defendant's failure to determine the year in which the ServiceNet Diary card was completed was reckless given the large volume of documents recovered from Farak's car that predated 2012, combined with the ease with which it could have been determined that the ServiceNet Dairy Card was completed in 2011 and not 2012.  However, this court takes into consideration the principle, most often applied in employment cases but applicable beyond that context, that "intent … is a matter generally deemed ill-suited to summary judgment – as the First Circuit has cautioned, 'courts must be exceptionally cautious in granting *brevis* disposition in such cases.'" *Chu v. Legion of Christ, Inc.*, 2. F. Supp. 3d 160, 176 (D.R.I. 2014) (quoting *In re Varrasso*, 37 F.3d 760, 764 (1st Cir. 1994)).  While Defendant's testimony does not compel a finding of negligence, it does permit one, and, therefore, the issue of Defendant's *mens rea* must be left to a jury.

## 2.   Causation

To recover damages under § 1983 for a *Brady* violation, Plaintiff "must demonstrate by a preponderance of the evidence a causal link between the *Brady* violation and his conviction. *Drumgold*, 707 F.3d at 48 (citing *Johnson v. Mahoney*, 424 F.3d 83, 89 (1st Cir. 2005)).   "[T]he factual causation inquiry essentially replicates the materiality inquiry with a heightened burden of proof."  *Id*. at 49.  For purposes of establishing the *Brady* violation, the § 1983 plaintiff must have "shown a reasonable probability that he would not have been convicted but for the withholding of evidence."  *Id*.  To establish causation, "the plaintiff must then make the same

showing by a preponderance of the evidence." *Id.* "Once a *Brady* violation has been shown, the causation inquiry in a § 1983 damages suit is only a 'but for' inquiry pursuant to the preponderance of the evidence standard." *Id.* at 50.

While Plaintiff acknowledges that it is usually up to the jury to determine the effect the undisclosed evidence would have had on the ability to convict, he nevertheless argues that his case falls outside the norm because he has submitted uncontroverted evidence, in the form of an affidavit from Velazquez, establishing that Velazquez and the HCDAO would have dismissed or filed a *nolle prosequi* of all of the drug charges against Plaintiff if Defendant had produced the ServiceNet Diary Card during the pretrial phase of Plaintiff's case. Defendant, on the other hand, maintains that Velazquez backed away from the averments in his affidavit during his deposition, thereby creating an issue of material fact that cannot be resolved on summary judgment. Accordingly, the court must examine the Velazquez affidavit and deposition testimony in some detail.

In the affidavit, Velazquez averred the following:

> 49. With respect to the aforementioned ServiceNet Diary Card, the AGO's production of this evidence during the pre-trial phase of Mr. Penate's case would have led to the realization that Ms. Farak used illicit drugs at the laboratory while entrusted with the samples in Mr. Penate's case and that would have resulted in our office's dismissal of the drug charges against Mr. Penate.

> 50. In other words, the disclosure of … the true extent of Farak's misconduct would have led me and my office to dismiss or file a nolle prosequi of all drug charges against Mr. Penate in [the] Indictment ….

(Dkt. 334-1 at 6). Defendant's counsel questioned Velazquez about the averments in his affidavit during his subsequent deposition. Specifically, Defendant's counsel asked Velazquez about the edits he had made to three paragraphs from the original draft to the final signed

version, which included paragraph 49 (Dkt. No. 334-34 at 23-24).  Counsel had Velazquez read

the original version of paragraph 49, which was identical to the final version, with the exception

of the addition of the word "drug" before the word "charges" in the final version (Dkt. No. 334-

34 at 29).  After Velazquez read the original paragraph 49, the following exchange occurred:

> Q: And what was your problem with that paragraph?
>
> A: I'm not sure.  It would have resulted in the dismissal.  And I
> may have felt that was our only option at some point.  But then I
> changed my mind, because I thought that we could always retest
> those drugs, but …  I don't recall what I wrote instead of that.

(Dkt. No. 334-34 at 29-30).  After Velazquez indicated that there was "not a lot of difference"

between the original version of paragraph 49 and the final version, Defendant's counsel pointed

out that the sole difference was the addition of the word "drug" before the word "charges" (Dkt.

334-34 at 31).  Velazquez, replied:

> Yeah, I recall having – you know, thinking about how the drug
> charges kept becoming more and more problematic.  But I also
> recall having some thoughts about proceeding on the gun charges
> against Mr. Penate based on his prior involvement with the law.
> ….  So if there was ever a time that I would have dismissed the
> drug charges, I would have continued to prosecute Mr. Penate for
> the gun and ammunition charges ….

(Dkt. 334-34 at 32).

Defendant seizes on Velazquez's statement "[b]ut then I changed my mind," in an

attempt to create a triable issue.  Defendant urges the court to read this testimony as an indication

that Velazquez changed his mind about his statement in his affidavit that the AGO's production

of the ServiceNet Diary Card would have resulted in the dismissal of the drug charges against

Plaintiff.  Defendant's reading cannot be squared with the full record.  When read in context, it is

clear that what Velazquez was testifying to was that, following Farak's arrest, he considered

dismissing the charges against Plaintiff, but he changed his mind and decided to have the

substances retested and proceeded with the prosecution.  Regarding the production of the ServiceNet Diary Card, Velazquez affirmed in his deposition testimony that its production "would have resulted in the dismissal" of the drug charges and elaborated that he nevertheless would have proceeded on the gun and ammunition charges.

Thus, the question becomes whether Velazquez's uncontradicted affidavit establishes but-for causation for purposes of Plaintiff's § 1983 claim.  The court finds that it does. Velazquez is unequivocal that Plaintiff would not have been prosecuted on drug charges had Defendant turned over the undisclosed ServiceNet Diary Card showing that Farak had been tampering with evidence and using illegal controlled substances in December 2011, including on the very day that she certified controlled substances in Plaintiff's case.  Plaintiff's only conviction was on one of the drug charges.  Accordingly, Plaintiff has established as a matter of law that Defendant's failure to turn over the ServiceNet Diary Card was the but-for cause of Plaintiff's conviction.

### 3.  Qualified Immunity

Defendant claims that she is entitled to qualified immunity against Plaintiff's claim. "Qualified immunity is a doctrine that shelters government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *McKenney v. Mangino*, 873 F.3d 75, 80 (1st Cir. 2017) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231(2009).  Qualified immunity "protects all but 'the plainly incompetent [and] those who knowingly violate the law.'"  *Pagán v.*

57

*Calderón*, 448 F.3d 16, 31 (1st 2006) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  When

a defendant invokes qualified immunity, the burden is on the plaintiff to show that the defense is

inapplicable.  *Escalera-Salgado v. United States*, 911 F.3d 38, 41 (1st Cir. 2018) (quoting

*Rivera-Corraliza v. Puig-Morales*, 794 F.3d 208, 215 (1st Cir. 2015)).

  The qualified immunity analysis breaks down into two parts.  *McKenney*, 873 F.3d at 81.

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal

statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly

established at the time.'"  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)

(quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  "The 'clearly established' inquiry itself

has two elements."  *Castagna v. Jean*, 955 F.3d 211, 219 (1st Cir.), *cert. denied*, 141 S. Ct. 896

(2020).  The first focuses on the clarity of the law.  *Id.*  While "a case directly on point" is

unnecessary, "existing precedent must have placed the statutory or constitutional question

beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Anderson v. Creighton*,

483 U.S. 635, 640 (1987); *Malley*, 475 U.S. at 341).  The rule must be settled, meaning that it is

"dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'"

*Wesby*, 138 S. Ct. at 589–90 (quoting *al-Kidd*, 563 U.S. at 741–42).  "The precedent must be

clear enough that every reasonable official would interpret it to establish the particular rule the

plaintiff seeks to apply."  *Wesby*, 138 S. Ct. at 590 (citing *Reichle*, 566 U.S. at 666.  The second

element of the "clearly established" inquiry "focuses on the objective legal reasonableness of an

official's acts."  *Castagna*, 955 F.3d at 220 (quoting *Eves v. LePage*, 927 F.3d 575, 583 (1st Cir.

2019) (en banc)).  This requires a focus "on the facts of the particular case and whether a

reasonable defendant would have understood that his conduct violated the plaintiff's

constitutional rights."  *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019) (quoting *Drumgold*,

707 F.3d at 42).  The components of the qualified immunity test can be addressed in any order. *Justiniano v. Walker*, 986 F.3d 11, 27 (1st Cir. 2021) (citing *Pearson*, 555 U.S. at 236).  "The plaintiff bears the burden of demonstrating that the law was clearly established at the time of the alleged violation, and it is a heavy burden indeed."  *Lachance v. Town of Charlton*, 990 F.3d 14, 20 (1st Cir. 2021) (quoting *Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015)).

The First Circuit has observed that "deciding qualified immunity at the summary-judgment stage can be tricky."  *Id*. (citing *Morelli v. Webster*, 552 F.3d 12, 18-19 (1st Cir. 2009)).  Specifically, ""[t]he doctrinal intersection of qualified immunity principles and summary judgment principles is not well mapped," and "[p]lotting that intersection can present thorny analytic problems – problems that are magnified because of the desire to resolve claims of qualified immunity at the earliest practicable stage of litigation."  *Id*. (quoting *Morelli*, 552 F.3d at 18).  The court has described the decision as a "tug-of war … between who gets the benefit of the doubt: summary judgment 'requires absolute deference to the nonmovant's factual assertions,' while qualified immunity 'demands deference to the reasonable, if mistaken, actions of the movant.'"  *Id*. (quoting *Morelli*, 552 F.3d at 18-19).

This court has already determined that Defendant violated Plaintiff's Fourteenth Amendment *Brady* rights by failing to turn over the ServiceNet Diary Card to Velazquez or the HCDAO.  Nevertheless, Defendant would be entitled to qualified immunity on the second prong of the analysis if, viewing the evidence in the light most favorable to Plaintiff, a reasonable official in Defendant's position would not have understood that she was violating Plaintiff's constitutional rights.  "Here, then, [Plaintiff] ha[s] the burden to identify 'controlling authority or a robust consensus of persuasive authority such that any reasonable official in the defendant's position would have known that the challenged conduct [wa]s illegal in the particular

circumstances that … she faced.'" *Escalera-Salgado*, 911 F.3d at 41 (quoting *Rivera-Corraliza*, 794 F.3d at 214-15). "A 'robust consensus' does not require the express agreement of every circuit. Rather, sister circuit law is sufficient to clearly establish a proposition of law when it would provide notice to every reasonable officer that his conduct was unlawful." *Irish*, 979 F.3d at (citing *Wilson v. Layne*, 526 U.S. 603, 616-18 (1999); *Wesby*, 138 S. Ct. at 589-90).

Defendant argues that no controlling First Circuit or Supreme Court case establishes that an assistant attorney general prosecuting one criminal defendant has a constitutional obligation to produce *Brady* material to a different defendant in a separate criminal matter whom she is not involved in prosecuting (Dkt. No. 314 at 13). According to Defendant, this alone entitles her to qualified immunity. Furthermore, Defendant posits that there is not a single case in any other jurisdiction that establishes such an obligation. Even Plaintiff's own expert is unable to identify a controlling case in the First Circuit or a consensus of persuasive authority such that Defendant would have been on notice that her actions were illegal.

Plaintiff responds that he does not need to identify controlling precedent with materially similar facts to render a right clearly established. It is enough that it was clearly established prior to December 2013 that law enforcement officers acting in an investigative capacity had a clearly established duty not to conceal exculpatory evidence. Moreover, a reasonable officer, similarly situated to Defendant, would have understood that her conduct violated Plaintiff's clearly established right to receive exculpatory evidence. Finally, the testimony of Plaintiff's expert is irrelevant for purposes of the court's qualified immunity analysis, which is a question of law for the court, not an issue for an expert.

Plaintiff is correct that, as set forth above, "there need not be 'a case directly on point' to satisfy the second step of the qualified immunity paradigm." *McKenney*, 873 F.3d at 82–83

(citing *al-Kidd*, 563 U.S. at 741).  *See also Irish*, 979 F.3d at 76 (citing *Hope v. Pelzer*, 536 U.S.

730, 741 (2002) ("The Supreme Court has established that cases involving materially similar

facts are not necessary to a finding that the law was clearly established")).  Instead, the Supreme

Court has "ma[de] clear that officials can still be on notice that their conduct violates established

law even in novel circumstances."  *Hope*, 536 U.S. at 741.  "Although earlier cases involving

'fundamentally similar' facts can provide especially strong support for a conclusion that the law

is clearly established, they are not necessary to such a finding."  *Id*.  "In some cases, 'a general

constitutional rule already identified in the decisional law may apply with obvious clarity to the

specific conduct in question.'"  *McKenney*, 873 F.3d at 83 (quoting *United States v. Lanier*, 520

U.S. 259, 271 (1997)).  The First Circuit has explained that "[w]hat counts is whether precedents

existing at the time of the incident 'establish the applicable legal rule with sufficient clarity and

specificity to put the official on notice that his contemplated course of conduct will violate that

rule.'"  *McKenney*, 873 F.3d at 83 (quoting *Alfano v. Lynch*, 847 F.3d 71, 76 (1st Cir. 2017)).

Accordingly, Defendant is incorrect when she argues that she is entitled to qualified immunity if

Plaintiff is unable to identify a controlling case that mirrors the facts of this case.  It is sufficient

for Plaintiff to identify controlling authority or a robust consensus of persuasive authority that,

while not necessarily involving fundamentally similar or materially similar facts, nevertheless

gave Defendant fair warning that her treatment of Plaintiff was unconstitutional.  *Hope*, 536 U.S.

at 741.

        Taking a step back, the First Circuit has observed that "the manner in which a right is

defined can make or break a qualified immunity defense."  *Limone v. Condon*, 372 F.3d 39, 46

(1st Cir. 2004).  That dichotomy can be observed in the way the parties define the right at issue

here.  Where Defendant defines the right as the right of a criminal defendant to have an assistant

attorney general who is not involved in prosecuting him produce *Brady* material when that assistant attorney general is prosecuting a different criminal defendant in a separate matter, Plaintiff defines it as the right of a criminal defendant to have law enforcement officers acting in an investigative capacity not conceal exculpatory information.

In determining whether a right is clearly established, "judges must 'not … define clearly established law at a high level of generality.  The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.'"  *Belsito Commc'ns, Inc. v. Decker*, 845 F.3d 13, 23 (1st Cir. 2016) (quoting *al–Kidd*, 563 U.S. at 742).  Rather, the qualified immunity analysis requires a "more particularized" inquiry.  *Id*. (citing *Anderson*, 483 U.S. at 640).  "[T]he relevant legal rights and obligations must be particularized enough that a reasonable official can be expected to extrapolate from them and conclude that a certain course of action will violate the law."  *Savard v. Rhode Island*, 338 F.3d 23, 28 (1st Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)).  That said, "'just as a court can generalize too much, it can generalize too little.  If it defeats the qualified immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas).'"  *Belsito Commc'ns*, 845 F.3d at 23 n.9 (quoting *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 508-09 (6th Cir. 2012)).

The First Circuit's decision affirming this court's denial of Defendant's motion to dismiss is a useful starting point for properly defining the right at issue.  In that decision, the First Circuit noted that Defendant primarily functioned as a "custodian of evidence" vis-à-vis the prosecution

of Plaintiff. *Penate*, 928 F.3d at 139. The First Circuit noted that Defendant was serving "the same non-adversarial function as police officers … and other clerical state employees." *Id.* at 140. In this court's view, the focus of the qualified immunity analysis for purposes of determining whether Plaintiff had a clearly established *Brady* right to have Defendant turn over the ServiceNet Diary Card should be on Defendant's role as a custodian of evidence with respect to his prosecution, not as a prosecutor with respect to Farak's prosecution. Thus, the question is not whether a prosecutor prosecuting one criminal case owes a *Brady* duty to turn over material exculpatory evidence to a different defendant who she is not involved in prosecuting, as Defendant would have it. Rather, it is whether a prosecutor functioning as a custodian of evidence in a criminal case owes a *Brady* duty to turn over material exculpatory evidence to that defendant's prosecutor.

Plaintiff points to *Drumgold*, which was decided two weeks before Defendant received the mental health worksheets and ten months before Plaintiff's trial, as "warn[ing] 'law enforcement officers' not to disregard their 'duty to turn over to the prosecutor any material evidence that is favorable to a defendant'" (Dkt. No. 335 at 15 (quoting *Drumgold*, 707 F.3d at 38). According to Plaintiff, because Defendant did not heed this warning, she is not entitled to immunity for her actions. This court agrees with Plaintiff. *Drumgold* established that that "law enforcement officers have a … duty to turn over to the prosecutor any material evidence that is favorable to a defendant." *Id.*, 707 F.3d at 38 (citing *Moldowan*, 578 F.3d at 381; *McMillian*, 88 F.3d at 1567). Thus, the law was clearly established insofar as every reasonable official would interpret *Drumgold* as establishing the rule that law enforcement officers owe a *Brady* duty to criminal defendants to turn over material exculpatory evidence to the defendants' prosecutors. Because Defendant was functioning in the role of a knowledgeable custodian of evidence, one of

the roles that are performed by law enforcement officers, rather than as a prosecutor vis-à-vis Plaintiff's prosecution, she cannot avoid the impact of this rule.

This leaves the only the second element of the "clearly established" inquiry where the court focuses "on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights." *Penate*, 944 F.3d at 366 (quoting *Drumgold*, 707 F.3d at 42). As Plaintiff points out, the hypothetical officer is "reasonably well-trained," *Estate of Bennett v. Wainwright*, 548 F.3d 155, 168 (1st Cir. 2008) (citations omitted), "competent," *Jordan v. Town of Waldoboro*, 943 F.3d 532, 549 (1st Cir. 2019) (citation omitted), and "acts in *good faith*," *Rainsberger v. Benner*, 913 F.3d 640, 652-53 (7th Cir. 2019), *cited with approval by Irish*, 979 F.3d at 76. The undisputed facts compel the answer that such an individual would have understood the illegality of her actions. In particular, Defendant professed in correspondence that the Attorney General's Office had a "continuing obligation to provide potentially exculpatory information to the District Attorneys," and in a court filing that it was the "duty of the Attorney General's Office to release … potentially exculpatory evidence to the government entities charged with prosecuting of … affected individuals." And it was Defendant who was tasked at the Attorney General's Office with seeing that this "continuing obligation" or "duty" was met by disseminating the information, documents, and reports to the prosecuting agencies, including the HCDAO. No reasonable individual could have failed to appreciate the unlawfulness of her actions in these circumstances.[14]

---

[14] Indeed, Ballou, the MSP case officer for the Farak investigation, understood the import of Farak's admissions of drug use at work and believed that the documents containing these admissions should have been turned over to the HCDAO in connection with the hearing before Judge Kinder.

In summary, in light of the case law available at the time of Plaintiff's criminal trial, there was controlling authority that, under the circumstances viewed in the light most favorable to Plaintiff, Defendant violated Plaintiff's *Brady* rights by failing to turn over material exculpatory documents to the HCDAO or Velazquez.  A reasonable law enforcement officer could have concluded that it was constitutionally permissible to turn over the alleged favorable evidence to Defendant and to rely on her to turn over any evidence required by *Brady* to Plaintiff's prosecutor, a duty she explicitly assumed.  Stated another way, the record viewed in the light most favorable to Plaintiff supports a finding that a reasonable custodian of exculpatory evidence would have clearly understood her conduct to be an unreasonable violation of Plaintiff's rights. For these reasons, Defendant is not entitled to qualified immunity from Plaintiff's § 1983 claim.

The principles established in *Brady* and its progeny exist to "avoid[] … an unfair trial to the accused."  *Brady*, 373 U.S. at 87.  This case illustrates how important it is for government actors to observe those rights.  Plaintiff's attorney took every conceivable step on his client's behalf to obtain access to material exculpatory evidence.  All Defendant had to do to honor the Plaintiff's *Brady* rights was to turn over copies of documents that were obviously exculpatory as to the Farak defendants or accede to one of the repeated requests from counsel, including Plaintiff's counsel, that they be permitted to inspect the evidence seized from Farak's car.  As the gatekeeper to this evidence, she failed to turn over documents and she adamantly opposed the requests for access.  Because she did so, Plaintiff served more than five years in a state prison. At the least, Plaintiff is entitled to have a factfinder hear this case.

## III.    CONCLUSION

For the above-stated reasons, Plaintiff's motion for collateral estoppel (Dkt. No. 298) is DENIED, Plaintiff's motion for summary judgment (Dkt. No. 307) is GRANTED in part and

DENIED in part, and Defendant's motion for summary judgment (Dkt. No. 313) is DENIED.

The Clerk's Office is directed to schedule a status conference, to be conducted remotely or in

person according to the attorneys' preference, at a date and time mutually convenient for the

court and the parties.

     It is so ordered.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED:  June 17, 2022